Pages 1 - 225

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Before The Honorable Lauren Fleischer Louis, Magistrate Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )        NO. 22-CR-20104-JEM
                               )
ARCANGEL PRETEL ORTIZ, WALTER  )
VEINTEMILLA, AND FEDERICK      )
JOSEPH BERGMANN, JR.,          )
                               )
            Defendants.        )
_____)


                        Miami, Florida
                        Friday, February 17, 2023

            __TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING__
                         __OF PROCEEDINGS__

            Digital Audio Recording 10:53 a.m. - 1:12 p.m. and
             1:32 p.m. - 4:28 p.m. = 5 hours and 15 minutes


__APPEARANCES:__

For Plaintiff:
                        JUAN ANTONIO GONZALEZ
                        UNITED STATES ATTORNEY
                        99 Northeast Fourth Street
                        Miami, Florida 33132
                  BY:   **MONICA K. CASTRO, ESQ.**
                        **ANDREA GOLDBARG, ESQ.**
                        **ASSISTANT UNITED STATES ATTORNEYS**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff:
                     U.S. DEPARTMENT OF JUSTICE
 3                   National Security Division
                     950 Pennsylvania Avenue, Northwest
 4                   Washington, DC 20530
               BY:   EMMA ELLENRIEDER, ESQ.
 5                   FRANK RUSSO, ESQ.
                     ASSISTANT UNITED STATES ATTORNEYS
 6
     For Defendant Arcangel Pretel Ortiz:
 7                   FEDERAL PUBLIC DEFENDER'S OFFICE
                     150 West Flagler Street, Suite 1700
 8                   Miami, Florida 33130
               BY:   MICHAEL CARUSO, ESQ.
 9                   JULIE HOLT, ESQ.
                     ASSISTANT FEDERAL PUBLIC DEFENDERS
10
     For Defendant Walter Veintemilla:
11                   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
                     7108 Fairway Drive, Suite 130
12                   Palm Beach Gardens, Florida 33418
               BY:   TAMA BETH KUDMAN, ESQ.
13                   ATTORNEY AT LAW

14   For Defendant Federick Joseph Bergmann, Jr.:
                     BELL ROSQUETE REYES, PLLC
15                   999 Ponce de Leon Boulevard, Suite 1120
                     Coral Gables, Florida 33134
16             BY:   HENRY PHILIP BELL, ESQ.
                     ATTORNEY AT LAW

17

18

19

20

21

22

23

24

25
```

# **I N D E X**

Friday, February 17, 2023 - Volume 1

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **FERLAZZO, MICHAEL** | | |
| (SWORN) | 29 | 1 |
| Cross-Examination by Mr. Bell | 30 | 1 |
| Cross-Examination by Ms. Kudman | 53 | 1 |
| Cross-Examination by Ms. Holt | 85 | 1 |
| Redirect Examination by Ms. Castro | 96 | 1 |
| Recross-Examination by Ms. Kudman | 116 | 1 |
| | | |
| **CARSTEN, JUSTIN** | | |
| (SWORN) | 122 | 1 |
| Direct Examination by Ms. Goldbarg | 122 | 1 |
| Cross-Examination by Ms. Kudman | 125 | 1 |

# **E X H I B I T S**

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1 | 101 | | 1 |
| 2 | 103 | | 1 |
| 3 | 104 | | 1 |

| | |
|---|---|
| 1 | **Friday - February 17, 2023**                    **10:53 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---o0o---** |
| 4 | **THE CLERK:** Calling United States versus |
| 5 | Walter Veintemilla, Case Number 22-20104-Criminal-Judge |
| 6 | Martinez. |
| 7 | **THE COURT:** Mr. Bell, should we also call your client |
| 8 | at the same time? |
| 9 | **MS. KUDMAN:** Good morning, Your Honor. |
| 10 | **MR. RUSSO:** Good morning, Your Honor. |
| 11 | **THE COURT:** Good morning. |
| 12 | Mr. Bell, do you want us to call -- are you going to do |
| 13 | the hearing together? |
| 14 | **MR. BELL:** If that's what the Court is doing, that's |
| 15 | what I'll do. |
| 16 | **THE COURT:** No, no, no. What's your preference, sir? |
| 17 | **MR. BELL:** I'd like a hearing just for my client. He |
| 18 | isn't charged with the same offenses. |
| 19 | **THE COURT:** Okay. No problem. |
| 20 | **MS. KUDMAN:** Your Honor, I have several documents that |
| 21 | are just being organized right now. |
| 22 | **THE COURT:** Could I get you to make your appearance on |
| 23 | the record? |
| 24 | **MS. KUDMAN:** Yes. |
| 25 | Tama Beth Kudman on behalf of Mr. Veintemilla. |

1          **THE COURT:**  Thank you.

2     Just because I know you doesn't mean that the record does.

3          **MS. KUDMAN:**  Yes, I understand.  Thank you.

4          **THE COURT:**  Okay.  All right.

5          **MS. KUDMAN:**  So if we can pass to Mr. Bell while we

6     finish that --

7          **THE COURT:**  Oh.

8          **MS. KUDMAN:**  -- organization of those last couple of

9     documents, I would appreciate it.

10         **THE COURT:**  Of course.  The deputy --

11         **MS. KUDMAN:**  Thank you, Your Honor.

12         **MR. BELL:**  Thank you, Your Honor.

13         **THE COURT:**  -- marshals love this kind of exercise in

14    the morning.

15    Thank you, sirs.

16         **THE CLERK:**  Calling United States versus

17    Federick Joseph Bergmann, Jr., Case Number

18    22-20104-Criminal-Judge Martinez.

19    Counsel --

20         **MS. CASTRO:**  Monica --

21         **THE CLERK:**  -- please announce your appearances for

22    the record.

23         **MS. CASTRO:**  Monica Castro, Andrea Goldbarg,

24    Emma Ellenrieder, and Frank Russo for the United States.

25    Good morning, Your Honor.

1          **MS. GOLDBARG:**  Good morning, Your Honor.

2          **THE COURT:**  Good morning.

3          **MR. BELL:**  Hello again, Judge.  How are you?

4          **THE COURT:**  Mr. Bell.

5      Well.  Thank you for asking.  How are you, Mr. Bell?

6          **MR. BELL:**  I am well.  Thank you, Judge.

7      Henry Bell --

8          **THE COURT:**  Okay.

9          **MR. BELL:**  -- on behalf of the defendant Mr. Bergmann,

10     who is, of course, standing to my right.

11         **THE COURT:**  Okay.  Good morning, Mr. Bergmann.

12     I've got you on this morning for both arraignment and

13     pretrial detention.

14     Mr. Bell, are we ready for the arraignment?

15         **MR. BELL:**  Yes, Judge.

16         **THE COURT:**  All right.  Ready when you are.

17         **MR. BELL:**  Judge, we acknowledge receiving a copy of

18     the indictment.  We waive its formal reading in open court, ask

19     that the Court enter a plea of not guilty as to all the counts

20     in that indictment lodged against Mr. Bergmann.  We ask the

21     Court issue a standing discovery order, demand a trial by jury

22     and plea of not guilty.

23         **THE COURT:**  The Court will accept that not-guilty

24     plea, and we've entered the standing discovery order.

25     Mr. Bergmann, this case has been indicted before

1  Judge Martinez, and I'll refer you to him after all

2  proceedings -- I'm sorry -- for all proceedings after today's

3  detention hearing.

4      And -- okay.  With that, Mr. Bell, are you ready?

5          **MR. BELL:**  I am, Judge.

6          **THE COURT:**  Okay.

7          **MR. BELL:**  Thank you.

8          **MS. CASTRO:**  Thank you, Your Honor.

9      I'll begin the factual proffer, as I noted, by adopting

10  the facts that are present in the complaint with respect to

11  Mr. Bergmann, as well as the complaint with respect to

12  Mr. Ortiz, Mr. Veintemilla, and Mr. Intriago.

13      Turning to an overview of -- of some of the salient facts,

14  Your Honor, on July 7th of 2021, the President of Haiti --

15          **THE COURT:**  Will you slow down for me?

16          **MS. CASTRO:**  I apologize, Your Honor.

17      On July 7th of 2021, the President of Haiti,

18  Jovenel Moïse, was assassinated at his home in Port-au-Prince,

19  Haiti.  That morning, armed assailants wearing ballistic vests

20  entered the President's home, and he was shot 12 times and died

21  as a result.  His wife, the First Lady, survived but also

22  suffered multiple gunshot wounds.

23      The investigation into the events of July 7th revealed

24  that President Moïse's assassination was, in fact, the

25  culmination of months of planning, spearheaded by

1   Arcangel Pretel Ortiz and Antonio Intriago, as principals of

2   related South Florida companies, collectively referred to as

3   CTU, and funded by Worldwide Capital Lending Group through its

4   principal, Mr. Walter Veintemilla.

5        Ortiz, Intriago, and Veintemilla were each motivated by

6   the expectation of financial opportunities in Haiti should they

7   succeed in ousting President Moïse and replacing him with their

8   intended successor, who they expected could award them

9   lucrative contracts should that successor come into power.

10       Initially, that intended successor was Christian Sanon, a

11  Haitian political hopeful who opposed President Moïse's

12  administration and a close associate of Federick Bergmann, Jr.

13       Mr. Bergmann contributed financially to the conspiracy and

14  helped illegally export the very ballistic vests that the

15  assassins wore during their raid in the President's home that

16  resulted in his murder.  The evidence shows that when

17  Mr. Bergmann shipped these vests, he well knew they would be

18  used in furtherance of a conspiracy to remove Mr. Moïse from

19  the Presidency.

20       Now, the events leading to the President's assassination

21  date back to at least February of 2021.  In approximately

22  February 2021, Ortiz and Intriago, as principals of CTU, agreed

23  to support Sanon in his efforts to become President of Haiti.

24       As for Worldwide and its principal, Veintemilla, by the

25  end of April 2021, Veintemilla had agreed to finance CTU's

1  support of Sanon and extended a 175,000-dollar line of credit

2  to CTU.

3      Witness interviews, flight records, and seized electronic

4  evidence confirmed that CTU and Worldwide hosted meetings

5  amongst coconspirators in April and May of 2021 here in

6  South Florida.

7          THE COURT:  So wait, Ms. Castro.  A corporation can't

8  act but through its principals.  What do you mean when you say

9  "CTU and Worldwide"?

10          MS. CASTRO:  When I refer --

11          THE COURT:  Are -- do you mean the individuals, or do

12  you mean their place of business?

13          MS. CASTRO:  When I refer to CTU and Worldwide, I am

14  referring to their principals, Your Honor.  That would be

15  Antonio Intriago and Arcangel Ortiz with respect to CTU and

16  Mr. Veintemilla with respect to Worldwide.  And I will do my

17  best to be clear about that as I move forward in the proffer,

18  Your Honor.

19      Turning back to these meetings that were occurring in

20  South Florida, the evidence shows that they were attended by

21  Ortiz, Intriago, Veintemilla, and Mr. Bergmann, along with

22  Sanon and other coconspirators.

23      At these meetings, the conspirators talked about how they

24  could forcibly remove President Moïse and install Sanon as

25  President.  They also discussed how to acquire weapons and

1  military equipment to facilitate their plan to remove

2  President Moïse and replace him with Sanon.

3       **THE COURT:**  Can I ask you to pause again?

4       **MS. CASTRO:**  Yes.

5       **THE COURT:**  Two things that are quite generalized.

6  When you say "they" and "the meetings," with respect to this

7  defendant, are you in a position to tell me what meetings he

8  attended?

9       **MS. CASTRO:**  Your Honor, we are able to say that he

10  was in attendance in these meetings.  And we know, from witness

11  statements, what the subject of these meetings were.  I'm not

12  in a position to provide specific dates of the meetings he was

13  present at.

14       **THE COURT:**  Somewhere between February and July?

15       **MS. CASTRO:**  I know he -- I apologize.  I should

16  correct myself.  Between April and May 2021 as to the meetings

17  that Mr. Bergmann attended.

18       **THE COURT:**  Go ahead.

19       **MS. CASTRO:**  Now, as to how to remove President Moïse,

20  the conspirators' plan vacillated from fomenting a public

21  uprising that would force the President out of power, to

22  physically removing him from power by kidnapping him and, of

23  course, ultimately to an assassination.

24       From early on, the principals of CTU, Mr. Ortiz and

25  Mr. Intriago, retained and, with financial support from

1    Veintemilla, transported at least 20 ex-soldiers from the

2    Colombian military to Haiti to assist in their plot to remove

3    President Moïse from power.

4         As the conspiracy progressed, Ortiz, Intriago,

5    Veintemilla, and Mr. Bergmann exchanged a number of written and

6    audio communications in furtherance of their operational

7    planning.  These communications show, by way of example -- and

8    I'll note many are enumerated in the complaint.

9         But they show, by example -- for example, Mr. Ortiz

10   directing members of the conspiracy in Haiti, including

11   Mr. James Solages and Herman Rivera, both of whom were at the

12   President's home at the night of the assassination.

13        April messages also show the conspirators discussing the

14   weaponry and ammunition they would need to carry out their

15   operation in Haiti, including, as laid out in a document

16   titled, quote, "Fighter for the Liberation of Haiti," a request

17   for machine guns, hand grenades, more than 20,000 rounds of

18   ammunition, and rocket-propelled grenades.

19        Discussions about conducting surveillance at the

20   President's home were also present in these communications,

21   with Mr. Ortiz specifically directing Mr. Solages to conduct

22   the surveillance with his own eyes and, in similar

23   communications or close-in-time communications with

24   Mr. Solages, Mr. Ortiz referring to deleting compromising

25   messages and mentioning to Mr. Solages that there was a risk of

```
 1   potential criminal exposure for their planning.

 2       The communications also show Mr. Ortiz distributing a

 3   whiteboard that featured an assault plan on the

 4   Presidential Palace to conspirators within the group, including

 5   Mr. Rivera and Mr. Veintemilla.

 6       The whiteboard described the use of, quote, "snipers" and

 7   referenced a, quote, "militia team" that comprised ten

 8   warriors, neutralizers -- I'm sorry -- ten warriors, dash,

 9   neutralizers and shows the location of, quote, "palace

10   security."

11           THE COURT:  Pause again, Ms. Castro.

12           MS. CASTRO:  Yes, Your Honor.

13           THE COURT:  You're in a position to proffer that

14   Mr. Bergmann received --

15           THE INTERPRETER:  Okay.

16           THE COURT:  -- that whiteboard?

17           MS. CASTRO:  Your Honor, not with respect to this

18   whiteboard.  I will --

19           THE COURT:  Okay.

20           MS. CASTRO:  Oh.

21           THE INTERPRETER:  Yeah.  So --

22           MS. CASTRO:  Your Honor, one quick note.  I'm advised

23   that the interpreter was not translating for Mr. Ortiz during

24   the proffer, which we were intending to use as a singular

25   proffer.
```

```
 1              THE COURT:  Take it from the top when the time comes.

 2              MS. CASTRO:  Understood, Your Honor.

 3              THE COURT:  I appreciate letting you know that for the

 4    record.

 5              MS. CASTRO:  Yeah.

 6              THE COURT:  Okay.

 7              MS. CASTRO:  Understood, Your Honor.  We'll take it

 8    from the top at that point.

 9         To answer Your Honor's -- would we be translating from

10    this point forward so that we can know?  Okay.

11              THE INTERPRETER:  Are you going to start from the

12    beginning?

13              THE COURT:  No, not right now.  Not right now.  We're

14    going to keep going with this hearing.

15              THE INTERPRETER:  Okay.  All right.

16              THE COURT:  Okay.

17              MS. CASTRO:  Your Honor, I apologize.  I believe

18    Your Honor had asked about the whiteboard.

19              THE COURT:  I did, but I think you've already answered

20    me that you're not in a position to proffer that Mr. Bergmann

21    received the whiteboard.

22              MS. CASTRO:  I don't have evidence that Mr. Bergmann

23    received that whiteboard, Your Honor.

24              THE COURT:  Okay.

25              MS. CASTRO:  Okay.  The electronic evidence shows that
```

```
 1   Ortiz played a managerial role amongst the coconspirators.  And
 2   the messages show Ortiz, for example, directing Mr. Solages to
 3   coordinate with, quote, "Tony," which was believed to be
 4   Mr. Intriago, who also himself received a message from a
 5   codefendant, from Codefendant Solages, confirming that Solages
 6   and others were meeting to conduct hitting plans.
 7         And so this is a message -- oh.  I'm being asked to slow
 8   down for the interpreter.
 9                         (Laughter.)
10         MS. CASTRO:  I apologize for the interpreter.
11         Referring back to the hitting plans, this was a message
12   that was sent to Tony Intriago, where Mr. Solages, who is a
13   codefendant in this case -- he's been charged with the very
14   same conduct that Mr. Ortiz, Mr. Veintemilla, and Mr. Intriago
15   were charged with -- sent to Mr. Intriago while he was on the
16   ground in Haiti.
17         And he sends it alongside an image of himself meeting with
18   other known coconspirators in Haiti, and he stated to
19   Mr. Intriago, "Conducting the hitting plans now."
20         Speaking to Mr. Intriago's playing a managerial role akin
21   to that of Mr. Ortiz, Mr. Intriago did respond to that message,
22   asking, "Is there any other information we need to know?" and
23   "Great."
24         Other communications show Veintemilla, Intriago, and
25   Bergmann discussing obtaining weapons and ammunition for
```

conspirators in Haiti.  This was seen in a June 3rd
communication -- this is at least a full month before the
President's assassination -- where Mr. Veintemilla confirmed to
Mr. Bergmann that he had provided $15,000 for, quote, "screws
and nails."

Now, as outlined in the complaint, these were coded terms
that the conspirators used to mask their discussion about
obtaining weapons and ammunition for their efforts in Haiti.

By June of 2021, the messages amongst the coconspirators
confirmed an impatience with the delay in executing Moïse's
removal, particularly as funds continued to be expended.  These
included messages in early June, where Veintemilla messaged
Ortiz about, quote, "giving the order."  And Ortiz messaged
coconspirators, expressing his concern -- concern that the
group was in, quote, "red numbers" and needed to go forward.

These messages were followed by an audio message where
Veintemilla insisted to Solages that, quote, "The plan has to
be simultaneous.  It cannot be just 'hit the rat,'" a known
term that these individuals used to refer to Mr. Moïse during
their planning.

Going back to the message, Veintemilla stated, "It cannot
be just 'hit the rat.'  That's not how that's going to work
because then we're going to look horrible."

Solages responded, "Understood" and "Roger that" -- "Roger
that."

1    Around the same time, Veintemilla messaged both Solages

2   and Mr. Bergmann, cautioning that the group had, quote, "lost

3   the element of surprise," that they were risking people, quote,

4   "informing the rat" and that the party had to go forward.

5    The references to the party appear throughout the messages

6   exchanged amongst the coconspirators, and it's been identified

7   by law enforcement as the term that they were using for their

8   operation against President Moïse.

9    The same day as this communication regarding the party

10   going forward, Bergmann messaged Sanon, confirming shipment of

11   CTU-branded armored vest -- vests to Haiti for use by the

12   Colombian nationals that had been retained for the group's work

13   in Haiti.

14    Records from the shipment show that Bergmann's signature

15   and -- I'm sorry -- show Bergmann's signature and affirmation

16   that the contents of the shipping labels were true, but they

17   were not, as Bergmann labeled the vests "Medical X-ray Vests"

18   and lied about their value.

19    Communications related to the shipment show that Bergmann

20   and Intriago discussed how best to lie about the contents of

21   the shipment, with Intriago suggesting that they could

22   potentially call the vests -- again, these ballistic vests --

23   paintball protection vests and Mr. Bergmann responding, "I

24   don't think they'll have a problem having my research company

25   ship X-ray protective vests."

1      The same day the vests were shipped, Mr. Bergmann also

2  texted Sanon, directing him, quote, "Please explain to

3  Individual 1 we have to use these type of vests so health care

4  providers can be protected from harmful effects of X-rays,"

5  question mark.

6      Son -- Sanon responded, "Okay.  I will let him know."

7      Additional communications show more efforts to secure

8  equipment after the ballistic vests were shipped by

9  Mr. Bergmann.  The same day the vests were shipped, Solages

10  texted Intriago asking for 150 to 200 zip-tied handcuffs.

11  Intriago replied with a photograph of zip-tied handcuffs

12  presumably and said, "No ankle."

13           **THE COURT:**  "No angle"?

14           **MS. CASTRO:**  I'm sorry.  "No ankle."

15           **THE COURT:**  Thank you.

16           **MS. CASTRO:**  Days later -- we're now at about

17  June 15th, 2021 -- Rivera sent Ortiz a text message stating, in

18  substance, that the Colombian national -- nationals needed a

19  battering ram to breach doors as well as black caps, cash,

20  balaclavas, gun holsters, and other materials.

21      And just to add additional context with respect to

22  Mr. Rivera, this is another named codefendant in this case.

23  And he's charged with the same conduct as Mr. Ortiz,

24  Mr. Veintemilla, and Mr. Intriago, which is the conspiracy to

25  kill and kidnap, providing material support to the same, and

1  conspiring to provide material support to the same.

2        **THE COURT:**  Can I interrupt you to ask another

3  question?

4        **MS. CASTRO:**  Yes.

5        **THE COURT:**  I'm just trying to understand the

6  chronology with respect to the vest shipment.

7        **MS. CASTRO:**  Yes.

8        **THE COURT:**  The vests were shipped in May; is that

9  right?

10        **MS. CASTRO:**  The vests were shipped in June.  The

11  specific shipment we were discussing was on June 10th of 2021.

12        **THE COURT:**  Okay.  So Paragraph 13 -- 14 of the

13  complaint --

14        **MS. CASTRO:**  Oh.  If I may clarify, is it --

15        **THE COURT:**  Well, it just -- the -- the text you just

16  proffered, Mr. Bergmann's half, which says to Sanon that they

17  were medical X-ray vests, and his response, "I got it.  Thank

18  you."

19     And I'm trying to contextualize, from the timing of the

20  shipment, whether that means, like, "I understand" or "I

21  received the shipment."

22        **MS. CASTRO:**  Your Honor, we've interpreted that

23  message to mean "I understand," as in Mr. Sanon is now aware of

24  what terminology will be used to mislabel these vests as they

25  get shipped.

1      **THE COURT:**  So the evidence doesn't show that the

2 vests were already there?

3      **MS. CASTRO:**  These vests were not there at that stage.

4 They were shipped the next day after that vest --

5      **THE COURT:**  Thank you.

6      **MS. CASTRO:**  -- after that message.

7      **THE COURT:**  Okay.  All right.  Keep going.

8      **MS. CASTRO:**  I had begun to give Your Honor some

9 additional context with respect to Mr. Rivera.  His name may

10 appear throughout.

11     The investigation has shown that Mr. Rivera was one of

12 these Colombian nationals that was retained by CTU.  He arrived

13 in Haiti and was essentially tasked with being one of the

14 leaders of the other Colombian men there on the ground, and he

15 reported to Ortiz, as shown in electronic communications.

16     I just wanted to add that context because I just mentioned

17 a message where he asked Mr. Ortiz for a battering ram and

18 other equipment.

19     **THE COURT:**  Okay.

20     **MS. CASTRO:**  Also, in around -- in or around mid-June

21 of 2021, the conspirators discuss that Sanon lacked the

22 necessary qualifications to serve as President of Haiti.

23     So around this time, Ortiz, Intriago, and Veintemilla

24 began to support a second individual, that's identified in the

25 complaint as Individual 2, as the intended successor for

1   President Moïse.  But for them, the motivation of financial

2   gain did remain constant.

3        Through their companies CTU and Worldwide, Ortiz,

4   Intriago, and Veintemilla contracted with Individual 2, as they

5   had with Sanon, to serve their financial interests once

6   Individual 2 was installed as President.  They did so by

7   entering into these purported consultation agreements with

8   Individual 2, in which Individual 2 promised them future

9   business contracts.

10       Continued discussions around operational planning are

11   reflected in June 20th, 2021, messages that show Solages told

12   Ortiz that they, being the conspirators, need ten DEA Velcro

13   patches, front and back, and 26 masks, full face cover, to

14   arrive no later than June 22nd, to which Ortiz responded,

15   quote, "Costume party," an apparent acknowledgment that these

16   patches would be used by individuals that, in fact, were not

17   DEA.

18       In this regard, it's notable that Haitian law enforcement

19   also recovered DEA patches from the kind -- crime scene after

20   President Moïse's assassination.  And, of course, Mr. Solages,

21   one of the individuals who reported directly to Mr. Ortiz, has

22   been identified by witnesses as shouting, "DEA" as he breached

23   the President's home on the night of the assassination.

24       As the operation or, as the conspirators called it, the

25   party neared, the conspirators also took steps to immunize

1    their actions in Haiti.  On June 28th of 2021, Solages flew

2    from Haiti to the Southern District of Florida to deliver a

3    purported Haitian immunity agreement to Ortiz, Intriago, and

4    Veintemilla.

5        Messages show Ortiz circulating the agreement to members

6    of the conspiracy.  The document was dated and ostensibly

7    executed June 22nd of 2021, weeks before the President's

8    assassination and months into the conspirators' operational

9    planning in Haiti.

10           **THE COURT:**  So the evidence doesn't show that Bergmann

11   received a copy of the --

12           **MS. CASTRO:**  That's correct, Your Honor.  I don't have

13   any evidence showing that Mr. Bergmann received a copy of this

14   immunity agreement.

15           **THE COURT:**  Okay.

16           **MS. CASTRO:**  This document claimed that

17   President Moïse, quote, "illegally and unconstitutionally

18   extended his Presidential mandate" and purported to request

19   CTU's, as an agency, urgent help and assistance.  It promised,

20   quote, "immunity, protection, and security to their actions in

21   our favor," "our favor" being the signatories of the purported

22   immunity agreement.

23       According to messages sent amongst the coconspirators

24   regarding this agreement, the conspirators believed that this

25   document would protect them from prosecution in Haiti once

1  Individual 2 was sworn in as President.

2       By July 6th, 2021, over 20 individuals from Colombia had

3  traveled to Haiti to participate in the operation to remove

4  President Moïse by either kidnapping or killing him.  Their

5  travel was arranged for and funded by Mr. Veintemilla.

6       On or about July 6th of 2021, Ortiz and Intriago, in a

7  series of text messages, in substance, asked Veintemilla to pay

8  these Colombian nationals.

9       Veintemilla responded, in substance, that these things

10 took too long -- that things took too long, and there were no

11 money or investors until Individual 2 was sworn into the

12 office.  He essentially told Mr. Ortiz that the operation had

13 failed.

14      Mr. Ortiz responded, in substance, by stating he did not

15 have permission to fail.  And he reassured Mr. Veintemilla

16 that, by the end of the following day, Mr. Veintemilla would

17 see things better, that things were just getting started.  Of

18 course, President Moïse was assassinated the very next day.

19      On July 6th, 2021, on the eve of the assassination,

20 conspirators met prior to the assassination at a nearby

21 residence.

22           **THE COURT:**  Who?  Who are "conspirators"?

23           **MS. CASTRO:**  These would be the conspirators that were

24 in Haiti.  These would be Solages, Rivera, Mr. John, who is

25 also an indicted conspirator, not the con- -- not the

1  defendants that are here today.

2          **THE COURT:**  Okay.

3          **MS. CASTRO:**  The defendants that are here today were

4  not in Haiti on the day of the assassination.

5      Firearms and equipment were distributed, and Solages

6  announced to the room that their mission was to kill the

7  President.

8      According to witnesses, on July 7th, 2021, conspirators

9  drove a convoy to President Moïse's residence.  Again, these

10 are just the individuals in Haiti.  Once the group arrived

11 outside the residence, Solages falsely announced to those

12 inside that they were engaged in a, quote, "DE operation" --

13 "DEA operation" in an attempt to ensure compliance by the

14 President's security and other civilians.

15     A subset of Colombian conspirators entered the President's

16 residence and assassinated him, leaving him with 12 gunshot

17 wounds and his wife seriously injured.

18     Hours after the assassination, still on July 7th of 2021,

19 Bergmann texted an individual, quote, "It happened," and,

20 quote, "Battle right now."

21     This text was sent to the same person who, in messages

22 that dated back to June 2nd of 2021, asked Bergmann, quote,

23 "What time is the next coup meeting?"  Bergmann did not respond

24 to the reference about a coup with any shock or surprise, just

25 as he did not respond to the news of a, quote, "battle" at the

1   President's home with any shock or surprise.

2       After the assassination, Bergmann texted Sanon a news

3   article stating that President Moïse had been murdered.  He

4   asked Sanon if Sanon was okay.  When Sanon confirmed, Bergmann

5   asked about, quote, "the guys," presumably the Colombian

6   nationals who had assassinated the President, stating, "I have

7   been so worried."

8       Sanon texted that there was a diplomatic vehicle that

9   crossed over to reach them, again, "them" being understood --

10  understood to be the Colombian nationals in Haiti, apparently

11  indicating an attempt to helping extract these individuals.

12      Bergmann did not miss a beat, however, on seeking to

13  continue the coup efforts, stating, "It's time for people to

14  hit the streets."

15      And the evidence in this case has shown that part of the

16  planning here was that the conspirators would be able to foment

17  a public uprising that would offer some cover to what happened

18  with respect to the President's removal, kidnapping, or

19  assassination.  And that is the context within which we read

20  the reference to "Time for people to hit the streets."

21      When Sanon replied, saying that the leaders are working on

22  that, Bergmann confirmed, "We are all on standby once you know

23  what is going on."

24      A search history the day following the assassination

25  showed that Mr. Bergmann began Googling the Florida statute

```
 1   related to the Baker Act.  And I raise that because, as I

 2   proffered during Mr. Bergmann's initial appearance,

 3   Mr. Bergmann also began to talk about the Baker Act when he was

 4   taken into custody just earlier this week, specifically

 5   directing his wife, in the presence of agents, after he had

 6   learned that there was a warrant for his arrest, that she

 7   needed to immediately Baker Act him.

 8        Additional communications after the assassination show

 9   Mr. Bergmann talking about trying to get funding presumably,

10   again, to the people in Haiti, the Colombian nationals.  He

11   made reference to the, quote, "14 security people" and provided

12   a budget of about $75,000 per month to the individual he was

13   texting.  He said, "I wish I could continue to fund this, but I

14   just can't."

15        With respect to recent events in Haiti, he said, "We are

16   on the eight-yard line, close to the goal line to save these

17   poor souls.  I hope you guys can help."

18             THE COURT:  Who is he messaging this to?

19             MS. CASTRO:  Your Honor, I don't want to name this

20   individual because they're not part of the charging instrument.

21             THE COURT:  It's not somebody I've already heard?

22             MS. CASTRO:  No, Your Honor.  It's a third party.

23             THE COURT:  It's -- okay.

24             MS. CASTRO:  And so --

25             THE COURT:  Okay.  If it's not one of the -- then do
```

1    it again.  What are the messages?

2         MS. CASTRO:  Yes, Your Honor.

3         The point -- the point the Government was seeking to make

4    here was that he was seeking funding, as we understand it, for

5    the individuals that were still trapped in Haiti that have been

6    part of the conspiracy.

7         THE COURT:  And the date on those communications?

8         MS. CASTRO:  These are after the assassination on the

9    evening of July 7th, 2021.

10        THE COURT:  Same day.  Okay.

11        MS. CASTRO:  The assassination happened in the very

12   early morning hours of July 7th, 2021.

13        THE COURT:  Go ahead.

14        MS. CASTRO:  Ortiz, Veintemilla, Mr. Bergmann, and

15   Mr. -- Mr. Intriago were all interviewed after the

16   assassination.  Ortiz, for his part, denied any involvement in

17   the arrest or ever seeing the immunity -- immunity agreement.

18        THE COURT:  When were these interviews?

19        MS. CASTRO:  I don't have the -- I -- if I can have

20   one moment to --

21        THE COURT:  I'll tell you that it's going to be a

22   question in my mind that two and a half years -- two -- a year

23   and a half later, where are you going with -- you know, they've

24   been at large, and what's the evidence between here and there?

25        So were these interviews immediately after?  Recently?

1          MS. CASTRO:  Your Honor --

2          THE COURT:  When -- when would the risk of flight have

3     been triggered here?

4          MS. CASTRO:  Your Honor, these -- these interviews

5     were immediately after, but the defendants candidly provided

6     false exculpatories and lied about their involvement in the

7     assassination.

8          So the expectation was that these individuals had a false

9     sense of security that perhaps their lies had been believed by

10    law enforcement.

11         THE COURT:  I know that you want one for all, but will

12    you proffer with respect to Mr. Bergmann?

13         MS. CASTRO:  Yes, Your Honor, of course.

14         With respect to Mr. Bergmann, the salient point as to his

15    statement, which I believe happened a couple of months -- there

16    was some time lag in talking to him, Your Honor, I believe,

17    because he had been committed.

18         We do see, from the pretrial report, that Mr. Bergmann

19    committed himself, or was committed, in July of 2021.  So I

20    know that there was some initial difficulty speaking to

21    Mr. Bergmann.

22         The most salient point that I would raise for

23    Mr. Bergmann's statement was that he lied to law enforcement

24    and stated that it was, in fact, the shipping company who had

25    told him to lie about the armored vests that he shipped to

1    Haiti.

2         He -- and that is demonstrably false, based on the

3    communications we already referenced, where Mr. Bergmann is

4    seen, in discussions with Mr. Intriago, debating whether they

5    should mislabel these as paintball or mislabel these as medical

6    X-ray vests.

7         We've also spoken to a witness from that shipping company,

8    who denied that claim.

9              **THE COURT:**  Denied which claim?

10             **MS. CASTRO:**  This claim that it was the shipping

11   company who told Mr. Bergmann to put false information on the

12   shipping form.

13             **THE COURT:**  Okay.

14             **MS. CASTRO:**  I did get confirmation that

15   Mr. Bergmann's first interview was July 12th of 2021.

16             **THE COURT:**  July what?

17             **MS. CASTRO:**  July 12th of 2021.

18        Oh.  And I'm being advised he was committed immediately

19   after that interview.  So I apologize.  I need to correct

20   myself on that one.

21             **THE COURT:**  I appreciate it because I was struggling

22   to figure out how that timing worked.

23             **MS. CASTRO:**  Yes.  I apologize, Your Honor.

24        Your Honor, I think that concludes the factual proffer.

25   There are certainly specific references to additional messages

1  that I tried to avoid overburdening the factual proffer with

2  today, but we're happy to refer to the complaint.

3      Of course, it's open for cross-examination as to our

4  witness.  And if there's anything we can provide clarity on for

5  the Court, we will certainly do so.

6          **THE COURT:**  Okay.  Well, thank you, Ms. Castro.

7          **MS. CASTRO:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  Mr. Bell, your pleasure?

9          **MR. BELL:**  I'd like to cross-examine the agent,

10  please.

11          **THE COURT:**  Have him come forward.

12          **MS. CASTRO:**  Yes, Your Honor.

13      The Government tenders Special Agent Michael Ferlazzo from

14  the Federal Bureau of Investigation for questioning.

15          **COURT SECURITY OFFICER:**  Remain standing to be sworn

16  in.

17          **THE CLERK:**  Please raise your right hand.

18                  **MICHAEL FERLAZZO**,

19  called as a witness for the Government, having been duly sworn,

20  testified as follows:

21          **THE WITNESS:**  I do.

22          **THE CLERK:**  Thank you.  Please be seated.

23      Speak into the microphone.  State your name.  Can you

24  spell your last name for the record and tell us where you're

25  employed?

FERLAZZO - CROSS / BELL

```
 1              THE WITNESS:  Mike Ferlazzo with the FBI,

 2    F-e-r-l-a-z-z-o.

 3                       CROSS-EXAMINATION

 4    BY MR. BELL:

 5    Q.   Good morning, Agent Ferlazzo.  How are you?

 6    A.   I'm well.  How are you?

 7    Q.   Did you hear the proffer provided by Ms. Castro?

 8    A.   I did.

 9    Q.   Do you adopt that as your testimony?

10    A.   I do, just one slight addition.  The email that

11    Mr. Bergmann sent to the unnamed individual was also sent to

12    Mr. Sanon.

13    Q.   And when was that email sent?

14              THE COURT:  I'm sorry?  Wait.  I can't hear you.  It

15    was also sent --

16              THE WITNESS:  To Christian Sanon, Your Honor.

17              THE COURT:  Thank you.

18              THE WITNESS:  And that was sent the evening of

19    July 7th.

20    BY MR. BELL:

21    Q.   So I take it you're familiar with the criminal complaint

22    filed in -- in Mr. Bergmann's case?

23    A.   And also -- one more answer to your other question.  It's

24    just the time frame for Mr. Sanon to become President was

25    stated as February.  It was a little up in the air at that
```

**FERLAZZO - CROSS / BELL**

 1   time.  We might hold a different position.  I'd be more

 2   comfortable with March.

 3          **THE COURT:**  Before you ask your next question,

 4   whoever's cell phone is sitting next to the microphone, you're

 5   all I hear.  Can you please turn it off.

 6       Go ahead, Mr. Bell.

 7          **MR. BELL:**  It's not mine, Judge.

 8          **THE COURT:**  I -- yeah.  I don't think you're close

 9   enough to the microphone, but --

10   **BY MR. BELL:**

11   **Q.**   I take it, Agent, you're familiar with the criminal

12   complaint lodged against Mr. Bergmann, even though you're not

13   the affiant in that?

14   **A.**   I am.

15   **Q.**   So you're familiar with all the facts set forth in there?

16   **A.**   I do, and I accept them.

17   **Q.**   And, obviously, you're familiar with the indictment;

18   right?

19   **A.**   I am.

20   **Q.**   And you're familiar with the charges brought against

21   Mr. Bergmann?

22   **A.**   I am.

23   **Q.**   And you're familiar with how they're different from the

24   charges brought against the other defendants?

25   **A.**   That's correct.

**FERLAZZO - CROSS / BELL**

1  **Q.**   All right.  So were you involved in Mr. Bergmann's arrest

2  this week?

3  **A.**   I was not.  I was down here.

4  **Q.**   So you weren't there?

5  **A.**   I was not in Tampa.

6  **Q.**   Okay.  Have you spoken to agents who were there?

7  **A.**   I have.

8  **Q.**   What time did they arrive there?

9  **A.**   I think it was just before 6:00 a.m.

10 **Q.**   Okay.  They knocked on the door?

11 **A.**   They did.

12 **Q.**   He answered the door?

13 **A.**   I think his wife initially answered, and then he came to

14 the door.

15 **Q.**   Okay.  And did he threaten the agents in any way?

16 **A.**   He did not.

17 **Q.**   Right.

18     He didn't -- he wasn't verbally abusive to them, was he?

19 **A.**   No.

20 **Q.**   He did not do anything in order to put them at risk in any

21 way, did he?

22 **A.**   He did not.

23 **Q.**   He submitted to their authority?

24 **A.**   He did.

25 **Q.**   And he was arrested?

FERLAZZO - CROSS / BELL

1   **A.**   He was.

2   **Q.**   Okay.  Did he act in any way, when he was arrested, to

3   suggest that he might flee or leave the jurisdiction?

4   **A.**   He was very confused and immediately said he took an

5   antianxiety pill, and he was a little confused as well.  He was

6   holding a blind-opener in his hand, and he didn't put it down

7   immediately, but the agents were able to take it out of his

8   hand.

9         **THE COURT:**  A what?

10         **THE WITNESS:**  It was, like, a wooden dowel,

11   Your Honor.

12   **BY MR. BELL:**

13   **Q.**   So that -- that -- it wasn't a curtain rod; right?

14   **A.**   It was to open the curtains.

15   **Q.**   Isn't it to open the lock on the door?

16   **A.**   Yeah.  I'm unclear.  I know it was a wooden dowel.

17   **Q.**   You weren't there, and you don't know what the lock looks

18   like; right?

19   **A.**   I do not.

20   **Q.**   Right.

21         Do you -- did you talk to anybody about whether there was

22   a lock on a door that needed a rod to pull it down, and that's

23   what he was holding?

24   **A.**   Like I said, I knew that he was holding a dowel.  That was

25   it.

FERLAZZO - CROSS / BELL

1   **Q.**   Did anybody report that he actually threatened somebody
2   with this --
3   **A.**   No.  No.
4   **Q.**   -- this rod?
5        Okay.  And he was confused?
6   **A.**   He was.
7   **Q.**   Okay.
8            **THE COURT:**  Agent, I'm really having trouble.  Can you
9   speak into your microphone?
10           **THE WITNESS:**  I can, Your Honor.
11           **THE COURT:**  Thank you.
12  BY MR. BELL:
13  **Q.**   Are you telling the Court that being confused suggests he
14  might be a risk of flight?
15  **A.**   I think his --
16  **Q.**   That doesn't show he's a risk of flight; right?
17  **A.**   Personally, I think that it shows that he is having a lot
18  of mental issues, which makes me nervous about his ability to
19  appear.
20  **Q.**   Do you think someone having the FBI show up at his house
21  at 6:00 a.m. to arrest him might make him a little stressed?
22  **A.**   It sure could.
23  **Q.**   Okay.  Most people in that situation are stressed; right?
24  Right?
25  **A.**   Yes.  Not all would immediately take an anxiety pill.

**FERLAZZO - CROSS / BELL**

1   Q.   Okay.  And do you know whether he had been prescribed

2   medications for anxiety and similar --

3   A.   He has.

4   Q.   -- disorders?  He is; right?

5   A.   Correct.

6   Q.   So he's under the care of a doctor, and you're aware of

7   that?

8   A.   I am.

9   Q.   And when we're talking about "doctor," we're talking about

10  one who treats his mental health; right?

11  A.   That's correct.

12  Q.   Okay.  And were you present when he was interviewed back

13  in -- in 2021?

14  A.   I was not.

15  Q.   But you have obviously spoken to people or agents who

16  were -- who were present; right?

17  A.   I read the report.

18  Q.   You read the report.

19       And where was he interviewed?

20  A.   In Tampa.

21  Q.   Is it correct that the agents walked into his house --

22  into his garage while he was parked in his car?

23  A.   I assumed he was at his residence, yes.

24  Q.   All right.  Did they have a warrant?

25  A.   No.

FERLAZZO - CROSS / BELL

1    **Q.**   Did they seize his phone?

2    **A.**   I'm actually unsure about that.

3    **Q.**   Did they ask him for his phone, and did he give them his

4    phone?

5    **A.**   He may have consented to a phone search at that point.

6    **Q.**   And he was interviewed?

7    **A.**   He was.

8    **Q.**   And so, during the proffer, the Government argued that he

9    lied during the interview.  About what exactly?

10   **A.**   The lie was the fact that we know, from text messages,

11   that it was his idea to mislabel.  And what he told the agents

12   that day was that the shipping company told him to do that.

13   **Q.**   Right.

14        So he diminished his true involvement as it related to

15   shipping the vests; right?

16   **A.**   That's correct.

17   **Q.**   Let me ask you something about those vests.

18        Who -- who was the actual -- who owned the vests, and who

19   was transporting them to Haiti?

20   **A.**   They were owned by CTU.

21   **Q.**   Right.

22        And Mr. Bergmann's involvement was limited to facilitating

23   the shipment of the vests; right?

24   **A.**   That's correct, and paying for it.

25   **Q.**   And paying -- he paid for the vests, or he paid for the

**FERLAZZO - CROSS / BELL**

1   shipment?

2   **A.**   He paid for the shipment.

3   **Q.**   Okay.  How much did he pay for the shipment?

4   **A.**   Unclear.  I don't remember the exact number.

5   **Q.**   Did you hear the part of the proffer, and are you familiar

6   with the part of the affidavit in the complaint, that talks

7   about him spending money in furtherance of this -- of this

8   matter of --

9   **A.**   That's correct.

10  **Q.**   How much money did he spend?

11  **A.**   There was a shipment of the vests, and then there was also

12  money to support the Colombians.

13  **Q.**   Okay.  So let's talk about the shipment of the vests.

14       How much money did he contribute to that?

15  **A.**   I don't know the number off the top of my head.

16  **Q.**   More than a hundred dollars?

17  **A.**   Yes.

18  **Q.**   More than 500?  Probably less than 500; right?

19  **A.**   Maybe so.

20  **Q.**   Okay.  And what else did he spend money on?

21  **A.**   He spent money to house the Colombians in Haiti.

22  **Q.**   And how much was that?

23  **A.**   I think it was around $5,000.

24  **Q.**   He had spent $5,000 of his money to house the Colombians?

25  Is that your testimony?

**FERLAZZO - CROSS / BELL**

1  A.   There was a credit card statement.  If -- if I can look at

2  it, I'd know that I'd -- I'd be able to know the number, but I

3  know that he spent money on the -- the hotel in -- in Haiti.

4  Q.   Was he asked about that back in July of 2021?

5  A.   No.

6  Q.   And was he asked about this conspiracy that the Government

7  proffered, during -- during the -- during their presentation,

8  back in July of 2021?

9  A.   I think it was clear of why they were there as far as it

10  was the matter surrounding the assassination.

11  Q.   What did he say about whether he knew that there was a

12  plan where the goal was actually to assassinate Mr. Moïse?

13  What did he say about that?

14  A.   I don't think he was asked that specific question.

15  Q.   He wasn't asked about that?

16      Was he asked other questions that might engage in a

17  conversation about that?

18  A.   I read the report, and I can only see what he -- what he

19  stated.

20  Q.   Okay.  Because you weren't there, and you really don't

21  know what he stated.  You're reading a report about what he

22  supposedly stated?

23  A.   That's correct.  I read a report.

24  Q.   Right.

25      So did he have any involvement in shipping ammo to Haiti?

**FERLAZZO - CROSS / BELL**

1  **A.**   He was in direct knowledge that ammo was being shipped,

2  and he was -- coded language was used with him, what was called

3  "screws."

4  **Q.**   Uh-huh.

5       When was that?

6  **A.**   I don't know the date of the text off the top of my head.

7  **Q.**   Was it before the plan changed to make Individual Number 2

8  the President and assassinate Mr. Moïse?

9  **A.**   Well, he was still being told about it, and there was --

10  the theme of assassination runs through both the first and

11  second candidate.

12  **Q.**   And was he ever asked about that, like, "Hey, did you know

13  that there was a plan to assassinate somebody?"  What did he

14  say?

15  **A.**   Is your question -- is your question specific to who asked

16  him?

17  **Q.**   Yeah.  Did anybody ask him?

18  **A.**   I don't think the HSI agent specifically asked him that

19  that day.

20  **Q.**   Well, let me ask you something.  There were, like, two

21  different plans here that -- one followed the other; right?

22  **A.**   That's correct.

23  **Q.**   One was for Mr. Sanon to become President?

24  **A.**   By means of force.

25  **Q.**   Right.

1      And the second one was to make Individual 2 the President?

2  **A.**   That's correct.

3  **Q.**   And am I correct that it was during Phase 2, if we'll call

4  it that, that it evolved into actually shooting and killing the

5  President?

6  **A.**   Like I said, the theme for -- for violence was -- was

7  discussed throughout, or we have witnesses saying that killing

8  was an option throughout both the first and second plan.

9  **Q.**   Are there any text messages or audio messages, in which

10  Mr. Bergmann is a party, where they're talking about killing

11  Mr. Moïse, and he's a party to that communication?

12  **A.**   Not specific to that.

13  **Q.**   Okay.  Now, returning to ammo, did he actually participate

14  in sending ammo to Haiti the way he helped with the vests?

15  **A.**   No.

16  **Q.**   How about grenades?

17  **A.**   No.

18  **Q.**   How about baklavas [sic] or -- if I heard that correctly?

19  **A.**   No.

20  **Q.**   Battering rams?

21  **A.**   No.

22  **Q.**   Handguns?

23  **A.**   No.

24  **Q.**   Other types of guns or weapons?

25  **A.**   No.

1   Q.   The vests that -- that we're talking about here, that are

2   the subject of the complaint and the indictment as it relates

3   to Mr. Bergmann -- do you know what they're worth or how much

4   was paid for them?

5   A.   I think their value is approximately around a thousand

6   dollars each.

7   Q.   Each.

8        So we're talking about $20,000 in vests, then?

9   A.   Approximately.

10  Q.   Who was the buyer of the vests?

11  A.   They were acquired by CTU.

12  Q.   Okay.  And Mr. Bergmann is not a principal in CTU;

13  correct?

14  A.   That's correct.

15  Q.   Now, I'd like to draw your attention to the portion of the

16  proffer where the Government was talking about the text

17  messages of July 7th by Mr. Bergmann with Mr. Sanon.

18  A.   Okay.

19  Q.   Were there any -- do you have any evidence that

20  Mr. Bergmann was texting anybody else at that time, like

21  Mr. Intriago, for example?

22  A.   No.  No, not that I know of.

23  Q.   Okay.  So the only one he was texting was Mr. Sanon and

24  this unidentified person?

25  A.   The other was an email.

FERLAZZO - CROSS / BELL

1   **Q.**   It was an e-mail?

2   **A.**   Yes.

3   **Q.**   So it's one email?

4   **A.**   That's one email that we were referring to, yes.

5   **Q.**   And the date of that was approximately when?

6   **A.**   That's the same day of the assassination, July 7th.

7   **Q.**   On July 7th.

8        And what did he say again in the email?

9   **A.**   He was soliciting financial support from the individual,

10  saying that they were close to accomplishing their goal.

11  **Q.**   Okay.  And so we have that email.  We have the text of

12  July 7th with Mr. Sanon.  Are there any other text messages

13  between him and any of these other conspirators on July 7th?

14  **A.**   I'd have to really look through his -- his phone before I

15  can say without --

16  **Q.**   In looking through the evidence of his phone, are you

17  aware of any other text messages or communications where he

18  expressed surprise to learning that the President of Haiti at

19  the time had been killed?

20  **A.**   Initially?  Not that I'm aware of.

21  **Q.**   Okay.  Now, obviously, when he was interviewed on

22  July 2021, he knew he was being investigated; right?

23  **A.**   It's a valid assumption.

24  **Q.**   I mean, you said it was obvious; right?  That's your word,

25  not mine.

**FERLAZZO - CROSS / BELL**

1    A.   What was obvious?  Oh.  Why they were there?

2    Q.   Why they were there.  Why they were there.

3    A.   That's correct.

4    Q.   All right.  So now between that interview and when he's

5    arrested, do you have any evidence that he -- knowing that he

6    was being investigated and that he might be charged, that he

7    took any steps to leave the jurisdiction or plan to leave the

8    jurisdiction?

9    A.   No.

10   Q.   And, again, he was arrested at his house; right?

11   A.   That's correct.

12   Q.   And you're out -- again, you're familiar with the charges

13   and the evidence; right?

14   A.   I am.

15   Q.   He's been charged strictly with three offenses relating to

16   the unlawful exportation of those vests; right?

17   A.   That's correct.

18   Q.   He's not charged with having conspired to kill Mr. Moïse

19   and the other offenses, Counts 1 through 3, in the indictment;

20   right?

21   A.   That's correct.

22   Q.   So there's no probable cause that he committed those

23   offenses; right?

24   A.   Committed those offenses?  No.

25   Q.   Okay.

1            MS. CASTRO:  Objection, Your Honor.

2            THE COURT:  Overruled.

3   BY MR. BELL:

4   Q.   You got it.

5        And now in the several reports that the Government sent me

6   last night authored by you, I noticed that there was one

7   relating to surveilling three of the conspirators.

8   A.   That's correct.

9   Q.   And you wrote in the report that you were surveilling them

10  in anticipation of arresting them, if I understood the report

11  correctly; is that right?

12  A.   That's correct.  We resumed surveillance on all the

13  subjects when we felt that they had a -- an indication.  After

14  we had picked up other coconspirators, we knew that they would

15  be alerted.

16  Q.   Did you surveil Mr. Bergmann?

17  A.   The FBI did not, but HSI did.

18  Q.   HSI did.

19       And when did they start their surveillance?

20  A.   The same time frame.

21  Q.   And did they find anything in his movements or what he was

22  doing that suggested that he might flee the jurisdiction?

23  A.   Not that I'm aware of.

24  Q.   Okay.  So you agree he's not a risk of flight; right?

25            MS. CASTRO:  Objection, Your Honor.

FERLAZZO - CROSS / BELL

1                    THE COURT:  Overruled.

2                    THE WITNESS:  I do not.

3      BY MR. BELL:

4      Q.   What evidence can you point to that shows he's a risk of

5      flight, specifically that he -- what steps did he did -- take

6      in this case -- in this case that suggests he might flee?

7                    MS. CASTRO:  Your Honor, I would just object to the

8      extent he's asking for legal argument from the witness.

9                    THE COURT:  Overruled.

10                   THE WITNESS:  Well, you asked me what I thought, and

11     I -- I said that earlier.

12     BY MR. BELL:

13     Q.   Well, tell me what evidence you have that shows that he

14     might take steps to flee or that he took steps to flee, knowing

15     he was being investigated.

16     A.   I've already stated -- we discussed where he exhibited

17     signs of having a nervous breakdown.  And when you asked what I

18     thought, that's -- I think that he is capable.

19                   MR. BELL:  Okay.  Just a minute, Judge, and I may be

20     done.

21                   THE COURT:  Okay.

22     BY MR. BELL:

23     Q.   Am I right in understanding -- and maybe I'm wrong --

24     based on the proffer and your testimony, that the plan, if you

25     will, to dispense with Sanon and use Individual 2 took place

**FERLAZZO - CROSS / BELL**

1    after the vests had already been sent to Haiti?

2    **A.**    That's correct, in or around the same time frame.

3    **Q.**    Returning to that part of the proffer where -- and I think

4    the judge may have even asked a couple of questions about

5    meetings that were taking place in April or May.  Do you

6    remember that part of the proffer?

7    **A.**    I do.

8    **Q.**    Do you know how many meetings we're talking about?

9    **A.**    So the proffer was talking about meetings that occurred

10   from April to May.  So it was two months of meetings and the

11   different witnesses.  We're talking in the -- 10 to 20

12   different meetings during that time frame.

13   **Q.**    And do you know -- do you have any evidence as to how many

14   of these meetings specifically Mr. Bergmann attended?

15   **A.**    I don't know the specific number.

16   **Q.**    Okay.  Do you know where the meetings took place?

17   **A.**    I do, here in South Florida.

18   **Q.**    In Miami?

19   **A.**    Correct.  Yeah, at -- at CTU.

20   **Q.**    Okay.  So, arguably, CTU is in the greater Miami area --

21   **A.**    Right.

22   **Q.**    -- even if not in the city; right?

23   **A.**    Correct.  It's Doral.

24   **Q.**    It's in Doral.

25        Do you have any evidence that Mr. Bergmann has ever been

FERLAZZO - CROSS / BELL

1   to CTU at Doral?

2   **A.**   Outside of those meetings?

3   **Q.**   Yeah.

4   **A.**   No, not that I'm aware of.

5   **Q.**   Do you have any evidence, other than the witness

6   statements, that show or corroborate that he was at those

7   meetings at CTU?

8   **A.**   Not that I'm aware of.

9   **Q.**   So the only way we might infer or understand, if you will,

10  that he was at those meetings is because somebody else said he

11  was there?

12  **A.**   That's correct.

13  **Q.**   Okay.  And who was that?

14          **MS. CASTRO:**  Objection, Your Honor.

15          **THE COURT:**  Basis?

16          **MS. CASTRO:**  It's seeking witness names.

17          **THE COURT:**  Right.

18          **MS. CASTRO:**  I don't believe we're referring to any

19  charged individuals here, and even if we were, I don't think

20  it's appropriate for defense counsel to --

21          **THE COURT:**  "Do you know or not know?"  Sorry.  I'm

22  trying to understand your objection.

23          **MS. CASTRO:**  I believe that defense counsel's question

24  was an attempt to solicit -- solicit the name of a witness that

25  provided information to the Government, and I don't think

1  that's appropriate at this proceeding.

2      THE COURT:  Okay.  Ms. Castro, let me try again.

3      The question was "What is the person's name who gave you

4  that information?"  So it's not a -- it's not an ambiguous

5  question.

6      So I'm trying to understand your objection.

7      MS. CASTRO:  I object to defense counsel seeking to

8  elicit witness names in the course of these proceedings.

9      THE COURT:  Let me -- let me try.

10     Are you proffering or telling me that this is someone

11 who's not previously been identified at this hearing?

12     MS. CASTRO:  Not as a witness, Your Honor.  I am

13 proffering that --

14     THE COURT:  I mean, is it your position that if that

15 came from one of the coconspirators or someone who's

16 cooperating, that wouldn't be admissible and relevant?

17     MS. CASTRO:  It is my position that he may be able to

18 ask if that person has an incentive to lie.  I think that's a

19 fair question.

20     But to ask specifically the name that would potentially

21 reveal the cooperation of a witness at this stage of the

22 proceedings, I think, is inappropriate.

23     THE COURT:  Mr. Bell?

24     MR. BELL:  I think it's relevant.  All this is coming

25 out sooner or later.  They've been proffering everyone's name

```
1    here.

2              THE COURT:  Yeah.  I don't --

3              MR. BELL:  I haven't asked for the identity of the one

4    person that they've chosen not to name, but apparently this is

5    someone we've been talking about all morning.

6              THE COURT:  I don't understand your objection,

7    Ms. Castro.

8              MS. CASTRO:  Your Honor, I don't think it's

9    appropriate for defense counsel to seek to out the potential

10   cooperation of a witness.  And to be clear, the question was

11   with respect to who said that Mr. Bergmann was at the meeting.

12       Is that fair?  I just want to make sure I -- I remembered

13   it correctly.

14             MR. BELL:  Yeah, the name of the person.

15       By the way, I would add to my argument, respectfully,

16   Judge, the Government, in its proffer, argued about the witness

17   statements given by the defendants; right?  Like --

18             THE COURT:  Yeah.

19             MR. BELL:  -- they were interrogated.  They answered

20   questions.

21             MS. CASTRO:  Well, Your Honor, to be clear, I

22   proffered about statements that they may have said about

23   themselves.  I did not proffer any statement that was offered

24   in cooperation against anybody else.

25       I've identified, yes, that we have witness statements in
```

**FERLAZZO - CROSS / BELL**

1   this case, but I don't think that defense counsel should be

2   eliciting cooperating -- or trying to elicit the name of a

3   cooperating witness.  And I know that the -- the agent answered

4   that this was multiple witnesses.

5       And I don't think that defense, for his purposes of cross,

6   needs to know the name of that individual.  He can certainly

7   ask about what incentive that individual may have to provide

8   dishonest information against Mr. Bergmann, but I think that

9   can be done in a way that protects the witness's identity.

10      **THE COURT:**  I -- you know, as -- I hear your objection

11  is that you just keep characterizing it as inappropriate, but

12  I -- I'm not understanding the evidentiary basis for your

13  objection.

14      **MS. CASTRO:**  It's -- it's -- this would be *Jencks*

15  material as to a -- as to a witness.  This isn't information

16  the defense is entitled to at this stage.

17      **THE COURT:**  Overruled.

18      **THE WITNESS:**  So I think there are multiple sources of

19  that, to include, if I would be able to look at reports -- that

20  I think Mr. Veintemilla and Mr. Ortiz might have listed who

21  have been at these meetings -- in their meetings in July, as

22  well as John.

23  **BY MR. BELL:**

24  **Q.**  Okay.  And do you have dates of the meetings?

25  **A.**  Not committed to memory.

**FERLAZZO - CROSS / BELL**

1   Q.   Okay.  Did they give dates for the meetings?

2   A.   There were some, yes.

3   Q.   Did they provide anything, other than their own

4   statements, to cooperate -- that corroborated that the

5   meetings, in fact, took place and that Mr. Bergmann was there?

6   A.   There were pictures of some but not the one that

7   Mr. Bergmann attended.

8   Q.   Okay.

9   A.   It's --

10  Q.   So Mr. Bergmann attended one meeting?

11  A.   Attended, in plural, meaning --

12  Q.   Okay.

13  A.   -- they're not the one that he attended.  They're the ones

14  that he attended.

15  Q.   And am I understanding or inferring correctly that you're

16  not sure how many meetings he attended?

17  A.   I'm not, not off the top of my head.

18  Q.   Okay.  So could -- it could have been many meetings?  It

19  could have been just a few meetings?

20  A.   That's correct.

21          MR. BELL:  Okay.  I don't have any further questions

22  for the witness at this time.

23          Thank you, Agent.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Okay.  Let me make sure that I understand

```
 1   procedurally how we're proceeding because, Ms. Kudman, you're
 2   traveling off the same proffer that we've just had -- is that
 3   right? -- for your client?
 4       Okay.  Do you --
 5           MS. KUDMAN:  (Inaudible) if the Government has
 6   anything to add.
 7           THE COURT:  Ms. Castro, is there anything that you're
 8   going to additionally elicit with respect to Ms. Kudman's
 9   client?
10           MS. CASTRO:  I do have -- no.  With respect to the
11   factual proffer, no.  I have redirect.  I can save my redirect
12   for the end and the name of --
13           THE COURT:  I was going to complete cross and then
14   have you --
15           MS. CASTRO:  Yes.
16           THE COURT:  Okay.  So this -- and this is the same
17   agent you would call for Ms. Kudman's client?
18           MS. CASTRO:  Yes, Your Honor.
19           THE COURT:  Okay.  Then I'm going to additionally call
20   Case Number 22-CR-20104, United States versus
21   Walter Veintemilla.
22       And, Ms. Kudman, if you'd like to cross the agent.
23           MR. BELL:  Judge, we'll step aside.
24           THE COURT:  Yes, if you don't mind, Mr. Bell.
25           MR. BELL:  Thank you, Judge.
```

FERLAZZO - CROSS / KUDMAN

1              THE COURT:  And then we'll -- so we'll complete the

2    evidence.

3         Okay.  Ms. Kudman, you were in a position to hear the

4    whole proffer and the beginning of Mr. Bell's -- or the --

5    Mr. Bell's cross?

6              MS. KUDMAN:  Yes, Your Honor, I was.

7              THE COURT:  Okay.  Are you ready to cross the agent?

8              MS. KUDMAN:  I am.

9              THE COURT:  Okay.

10                        <u>**CROSS-EXAMINATION**</u>

11   BY MS. KUDMAN:

12   **Q.**   Good morning, Agent.

13   **A.**   Good morning.

14   **Q.**   Agent, were you present when Mr. Veintemilla was arrested?

15   **A.**   I was not.

16   **Q.**   Okay.  Have you spoken to the agents who did arrest him?

17   **A.**   No.

18   **Q.**   Are any of the agents that did arrest him present in the

19   courtroom here this morning?

20   **A.**   No.

21              THE COURT:  I don't know what you want to elicit, and

22   so I don't know what to do.  If there are circumstances that

23   you want to inquire about, then we may just have to continue

24   the hearing so that they can bring the agent who's -- who's

25   knowledgeable.

FERLAZZO - CROSS / KUDMAN

1           MS. KUDMAN:  I will certainly want to do that,

2    Your Honor --

3           THE COURT:  Okay.

4           MS. KUDMAN:  -- but I can continue with this witness

5    with respect to things that he can address.

6           THE COURT:  Okay.

7           MS. KUDMAN:  But, certainly, I'll want to get that on

8    the record as well.

9           THE COURT:  Well, there's a whole team of you-all.  So

10   you might want to get on the horn and see whether or not that

11   agent can get here.

12          MS. CASTRO:  Your Honor, if I may, I also, of course,

13   don't know what defense counsel seeks to elicit.  I'm certainly

14   happy to stipulate.  We didn't identify any issues with respect

15   to Mr. Veintemilla's cooperation during the course of his

16   arrest.

17       I don't know if that answers the problem -- the issue.

18          MS. KUDMAN:  No.  There are some additional factors

19   that I'd like to tease out, Your Honor.

20          MS. CASTRO:  Okay.

21          MS. KUDMAN:  So I do certainly want to have one of the

22   agents here.

23          THE COURT:  Okay.

24          MS. CASTRO:  Thank you.

25          THE COURT:  All right.

FERLAZZO - CROSS / KUDMAN

1   BY MS. KUDMAN:

2   Q.   Okay.  Now, you just stated that the assassination was in

3   July of 2021, and Mr. Veintemilla has been at liberty since

4   then; correct?

5   A.   That's correct.

6   Q.   And you are aware that Mr. Veintemilla has been

7   represented by counsel since immediately following this

8   assassination; correct?

9   A.   Yes.

10  Q.   And you are aware that counsel has been in regular

11  communication with the Government with respect to its

12  investigation in this case; correct?

13  A.   I am.

14  Q.   Are you also aware that Mr. Veintemilla has repeatedly

15  offered to self-surrender should the Government decide to

16  charge him with anything in this case?

17  A.   I didn't get the specifics of the conversations between

18  you and the Government -- the Government attorneys.

19  Q.   But are you aware that those offers were made on multiple

20  occasions?

21  A.   Not that specifically, just that you guys were in contact.

22  Q.   Okay.  Now, you are aware that there was a search warrant

23  executed at Mr. Veintemilla's home in 2021?

24  A.   That's correct.

25  Q.   Soon after the assassination; correct?

**FERLAZZO - CROSS / KUDMAN**

1    **A.**   That's correct.

2    **Q.**   Okay.  And you are aware that Mr. Veintemilla was

3    compliant when the agents showed up at his house?

4    **A.**   I am.

5    **Q.**   Okay.  And you're also aware that his travel documents

6    were seized during the course of that execution of that search

7    warrant; correct?

8    **A.**   Yes.

9    **Q.**   Are you aware of Mr. Veintemilla ever trying to leave the

10   country during the course of your investigation?

11   **A.**   No.

12   **Q.**   Are you aware of Mr. Veintemilla taking any steps to rid

13   himself of any assets during the course of your investigation?

14   **A.**   No.

15   **Q.**   Mr. Veintemilla has remained in his same home during the

16   course of your investigation; correct?

17   **A.**   That's correct.

18   **Q.**   And you are aware that he resides there with his current

19   wife?

20   **A.**   Yes.

21   **Q.**   And with his children; correct?

22   **A.**   Yes.

23   **Q.**   You are also aware that Mr. Veintemilla has a severely

24   handicapped child who suffers from cerebral palsy; correct?

25   **A.**   I am.

**FERLAZZO - CROSS / KUDMAN**

1  Q.   Okay.  And you're aware of that because, throughout the

2  course of the investigation, counsel has communicated that and

3  said Mr. Veintemilla would appreciate the ability to

4  voluntarily surrender himself because he's very concerned with

5  the emotional effects that this might have on his child;

6  correct?

7  A.   I know about the child from surveillance.  I don't know

8  what you just spoke about, that specific conversation.

9  Q.   Okay.  You are aware that Mr. Veintemilla is the primary

10 caretaker for this child; correct?

11 A.   I am.

12 Q.   Are you also aware that she is un- -- incapable of

13 walking?

14 A.   I know that she's wheelchair-bound, yes.

15 Q.   Yes.

16      And you are also aware that she's noncommunicative?

17 She's -- she's nonverbal?

18 A.   Yes.

19 Q.   Okay.  Are you also aware that Mr. Veintemilla's

20 children -- their mother actually is deceased; correct?

21 A.   I am aware of that.

22 Q.   Okay.  And that his current wife is his second wife?

23 A.   That's correct.

24 Q.   Okay.  And that they have a stable relationship and have

25 been together for --

FERLAZZO - CROSS / KUDMAN

1          MS. KUDMAN:  11 years?

2          DEFENDANT VEINTEMILLA:  Yes.

3    BY MS. KUDMAN:

4    Q.   11 years?

5    A.   I didn't know.

6    Q.   Okay.  But you haven't seen any signs that there's discord

7    in their marriage or that there's anything unstable in the

8    family unit?

9    A.   I'm not aware of anything, no.

10   Q.   Okay.  You're also not aware of Mr. Veintemilla making any

11   effort to get additional travel documents?

12   A.   No.

13   Q.   Okay.  Are you also aware that Mr. Veintemilla has

14   absolutely no criminal history?

15   A.   I didn't think that was totally accurate, but maybe I'm

16   confusing him with a different subject when I thought that

17   there was some instance here.

18   Q.   Have you read the presentence report?

19   A.   No.

20         MS. KUDMAN:  Okay.  Your Honor, I'll -- I'll ask the

21   Court to take note of his presentence report.  There's no

22   criminal history here.

23         THE COURT:  I know.

24   BY MS. KUDMAN:

25   Q.   Okay.  You're certainly not aware of Mr. Veintemilla

**FERLAZZO - CROSS / KUDMAN**

1   having any violence in his past --

2   **A.**   No.  No.

3   **Q.**   -- within the community?

4   **A.**   No.

5   **Q.**   Okay.  And you're aware that Mr. Veintemilla's company,

6   Worldwide Capital, is essentially a mortgage broker?

7   **A.**   I understand it as a finance company.

8   **Q.**   A finance company?

9   **A.**   Yes.

10  **Q.**   And that he's been involved in finance for many years;

11  correct?

12  **A.**   That's correct.

13  **Q.**   And that, as part of his work, he financed community

14  projects in South America; correct?

15  **A.**   Yes.

16  **Q.**   Okay.  And among those works would be water projects and

17  electric projects in third-world countries; correct?

18  **A.**   As far as I know, yes.

19  **Q.**   Okay.  And he's been doing that for many years?

20  **A.**   Yes.

21  **Q.**   Okay.  And particularly in underserved communities?

22  **A.**   Yes.

23  **Q.**   Okay.  And he's never participated in a coup in any of

24  those countries; correct?

25  **A.**   Not that I'm aware of.

**FERLAZZO - CROSS / KUDMAN**

1  Q.   Okay.  And part of those projects is that they are funded

2  by long-term bonds and loans and also self-funded within the

3  communities; correct?

4  A.   Yes.

5  Q.   And that's generally how these kinds of projects work?

6  A.   As far as I know, yes.

7  Q.   Okay.  And are you also aware that Mr. Veintemilla has

8  extensively participated in community projects voluntarily?

9  A.   I'm not.

10  Q.   Okay.  Now, you did draft the affidavit in support of his

11  criminal complaint?  And when I say "his," I mean

12  Mr. Veintemilla's.

13  A.   That's correct.

14  Q.   Okay.  Now, you've talked somewhat about the fact that

15  this was, in essence, an evolving situation with respect to the

16  plans in Haiti; correct?

17  A.   That's correct.

18  Q.   Okay.  So, originally, Mr. Sanon had wanted to go to Haiti

19  and agitate for a sort of public uprising against the regime of

20  Moïse so that there could be regime change; correct?

21  A.   He was the President, yes, not --

22  Q.   I'm sorry, but --

23  A.   Yes.

24  Q.   -- I'll call it a regime.

25  A.   Okay.

FERLAZZO - CROSS / KUDMAN

1   Q.   Okay.  And you're aware that there are strong beliefs, in

2   law enforcement, that President Moïse is a drug dealer?

3   A.   What law enforcement?

4          MS. CASTRO:  I would object to speculation.

5          THE COURT:  Relevance?

6   BY MS. KUDMAN:

7   Q.   Okay.  Well, you're aware, certainly, that there's a

8   belief that this is a violent Presidency; correct?

9          MS. CASTRO:  Objection to that characterization as

10  well as to relevance.

11         MS. KUDMAN:  Your Honor, I think this is very relevant

12  because -- I can explain.  I mean --

13         THE COURT:  Agent's knowledge?

14         MS. KUDMAN:  You know what?  I'll --

15         THE COURT:  Argue --

16         MS. KUDMAN:  I'll connect it.

17         THE COURT:  Okay.

18         MS. KUDMAN:  I'll connect it.

19         THE COURT:  All right.  Withdrawn.

20  BY MS. KUDMAN:

21  Q.   You're aware that when there were first discussions with

22  Mr. Veintemilla about providing a line of credit to CTU, it was

23  to provide security for Mr. Sanon when he went to Haiti; is

24  that correct?

25  A.   Initially, a -- security as a Presidential hopeful.

FERLAZZO - CROSS / KUDMAN

1   **Q.**   Right.

2       And that the plan was that he was going to go there and

3   present himself in Haiti as a potential President; correct?

4   **A.**   That's correct.

5   **Q.**   And you're aware that there was a concern that there might

6   be an attempt by President Moïse to intervene with -- with

7   anybody who might present themselves as an alternative to his

8   Presidency; correct?

9   **A.**   Yes.

10  **Q.**   Okay.  And that there was a concern that people who had

11  agitated against President Moïse had been arrested?

12  **A.**   That's correct.

13  **Q.**   And that there had been violence against individuals who

14  had presented themselves as either opposition to Moïse or as

15  potential substitutes for President Moïse?

16  **A.**   I don't know about violence.  I'm aware of arrests.

17  **Q.**   There was some concern that anybody who might present

18  themselves as an alternative to President Moïse might be placed

19  in harm's way or might be arrested?

20  **A.**   Yes.  These conspirators spoke of that.

21  **Q.**   Okay.

22          **THE COURT:**  I beg your pardon.  I couldn't hear you.

23          **THE WITNESS:**  These conspirators spoke of that fear.

24          **THE COURT:**  Thank you.

25  ///

**FERLAZZO - CROSS / KUDMAN**

1    BY MS. KUDMAN:

2    **Q.**   And these conspirators also spoke about violence against

3    the citizens of Haiti who were opposed to President Moïse?

4             **MS. CASTRO:**   I would object as to foundation.

5    BY MS. KUDMAN:

6    **Q.**   Was there a discussion among the conspirators about that,

7    Agent?

8    **A.**   About violence towards -- towards whom?

9    **Q.**   That there had been violence by President Moïse and his

10   police against people who were opposed to his Presidency.

11   **A.**   Like I said, I remember arrests.  I don't -- I don't know

12   if they spoke specifically about people being killed.

13   **Q.**   Okay.  Are you aware that there have been news reports out

14   of Haiti of violence against individuals who are opposed to

15   President Moïse?

16   **A.**   Like I said, I remember the arrests in February.  I don't

17   remember the reports of people being murdered for it.

18   **Q.**   Okay.  Are you aware of the fact that there is quite a bit

19   of violence in Haiti --

20   **A.**   There is.

21   **Q.**   -- based on news reports?

22   **A.**   There is.

23   **Q.**   Okay.  And when Mr. Veintemilla met with presidential

24   hopeful Sanon, there was a concern that there might be violence

25   against him when he arrived in Haiti?

**FERLAZZO - CROSS / KUDMAN**

1   **A.**   That's correct.

2   **Q.**   And that's why he needed a security detail?

3          **MS. CASTRO:**  I would say that calls for speculation.

4   **BY MS. KUDMAN:**

5   **Q.**   Is that what they were saying?  Is that what the

6   conspirators spoke about, that he needed security?

7   **A.**   Correct.

8   **Q.**   Okay.  And in terms of providing security, is it not usual

9   for people who are involved in private security to wear

10  protective vests?

11  **A.**   They do.

12  **Q.**   Okay.  Is it not unusual for people involved in security

13  to have guns?

14  **A.**   They do.

15  **Q.**   And so when the members of CTU first met with

16  Mr. Veintemilla and Mr. Sanon, the request was for a line of

17  credit so that they could put together the resources necessary

18  to be able to fund Mr. Sanon's trip to Haiti and have security;

19  correct?

20  **A.**   And discussions started early on about removing the rat.

21  **Q.**   Okay.  Well, I didn't ask you about that yet.

22         I'm asking, at the very beginning, there were discussions

23  about President Sanon needing security when he went to Haiti;

24  correct?

25  **A.**   Correct.

FERLAZZO - CROSS / KUDMAN

1  Q.   Okay.  And, in fact, in April, April 30th of 2021, there

2  was a loan agreement that was executed between CTU and

3  Mr. Veintemilla's company, Worldwide Capital Lending; correct?

4  A.   Correct.

5  Q.   Okay.  And this was actually a line of credit; correct?

6  It was not a lump sum loan; correct?

7  A.   Correct.

8  Q.   And CTU was authorized to draw down against that line of

9  credit, as needed; correct?

10 A.   That's correct.

11 Q.   That's the difference between a loan and a line of

12 credit --

13 A.   Correct.

14 Q.   -- correct?

15      And Mr. Sanon himself was directly authorized to draw down

16 on that line of credit as well as part of that line of credit

17 agreement; correct?

18 A.   That's correct.

19 Q.   And, again, that was executed on April 30th at the very

20 beginning, when they were talking about presidential hopeful

21 Sanon going to Haiti; correct?

22 A.   Correct.

23 Q.   Okay.  Now, you've identified Mr. Ortiz and Mr. Intriago

24 as princ- -- principals of CTU; correct?

25 A.   Yes.

**FERLAZZO - CROSS / KUDMAN**

1   **Q.**   And you're aware that Mr. Ortiz was a Government asset;

2   correct?

3   **A.**   He was an FBI source.

4   **Q.**   Right.

5       And he told everybody that he was working with the FBI;

6   correct?

7   **A.**   I don't know who he told.

8   **Q.**   But you're aware that he told a lot of people that he was

9   working with the FBI?

10  **A.**   That he had a relationship with the FBI, yes.

11  **Q.**   You're aware that he told Mr. Veintemilla that as well;

12  correct?

13  **A.**   That he had a relationship, yes.

14  **Q.**   And you don't know exactly what he told Mr. Veintemilla

15  about that relationship, but you do know that he made

16  Mr. Veintemilla aware of that; correct?

17  **A.**   Yes.

18  **Q.**   Okay.  Now, you authored this affidavit in support of the

19  criminal complaint.  And I would turn your attention to

20  Paragraph 12, where you state, "At the April meetings, CTU

21  represented that it was associated with the United States

22  Department of Justice and/or the FBI and took steps to falsely

23  suggest that the United States Government sanctioned its

24  operation plan of Sanon going over to Haiti"; correct?

25  **A.**   I'd have to look at the paragraph exactly.  I don't think

 1   that's what it -- what it says.

 2   **Q.**   Please take a --

 3   **A.**   "Sanon going" -- I don't -- what does it say?

 4   **Q.**   Well, it says that it sanctioned its operational plan;

 5   correct?

 6           **MS. CASTRO:**   Your Honor, if he could just refresh his

 7   recollection --

 8           **MS. KUDMAN:**   Absolutely.

 9           **MS. CASTRO:**   -- of the exact paragraph so we can be

10   precise.

11           **THE WITNESS:**   Sure.

12       "Sanctioned its operational plan," not "him going."

13   **BY MS. KUDMAN:**

14   **Q.**   And that's at the April 30th meeting; correct?

15   **A.**   You just took it away from me, but yes.  I trust you, if

16   that's what it says.

17                           (Laughter.)

18   **BY MS. KUDMAN:**

19   **Q.**   At the April meeting?

20   **A.**   Yes, April meetings.

21   **Q.**   So certainly, in April, they're representing that the

22   Government's aware of this plan?

23   **A.**   Correct.

24   **Q.**   Now, you also reference an April 6th meeting that did take

25   place with the FBI and Ortiz; correct?

FERLAZZO - CROSS / KUDMAN

```
 1   A.    That's correct.

 2   Q.    And Mr. Veintemilla was not there; correct?

 3   A.    Not that I'm aware of.

 4   Q.    Okay.  Well, take a look again at your affidavit.

 5   A.    Who did I list?

 6   Q.    It would be important to list who's there; correct?

 7   A.    For April 7th?

 8   Q.    April 6th.

 9   A.    Correct.  Yeah.

10   Q.    In the meeting with the FBI?

11   A.    Correct.

12         THE COURT:  Ms. Kudman --

13   BY MS. KUDMAN:

14   Q.    The defendant (Inaudible)?

15         THE COURT:  Ms. Kudman, we don't pick you up when

16   you're not on the microphone.

17         MS. KUDMAN:  Oh.  I'm sorry.

18         THE COURT:  Ask the day of the meeting again.  It was

19   April --

20         MS. KUDMAN:  April 6th.

21         THE COURT:  April 6th.

22         MS. KUDMAN:  And, again, Your Honor, for the record,

23   this is a meeting between Ortiz and the FBI.

24         THE COURT:  Okay.

25         THE WITNESS:  We didn't list the full participants of
```

1    that meeting.  So I'd actually have to look at maybe

2    potentially a baseline re- -- report of who specifically was

3    there for that one.

4    **BY MS. KUDMAN:**

5    **Q.**   Okay.  But, certainly, it would be important for you to

6    list if Mr. Veintemilla was there; correct?

7    **A.**   Potentially, but we didn't list anybody.  So I just -- I

8    just don't know.  I can't say one way or the other.

9    **Q.**   Okay.  Well, certainly, we can agree, according to your

10   affidavit, Ortiz was there; correct?

11   **A.**   Correct.

12   **Q.**   And you don't list Mr. Veintemilla?

13   **A.**   Correct.

14   **Q.**   Okay.  Now, you do note a meeting on April 7th that

15   Mr. Veintemilla attended with Intriago, Solages, Sanon, and

16   John --

17   **A.**   Correct.

18   **Q.**   -- correct?

19        Okay.  And the FBI was not there?

20   **A.**   Correct.

21   **Q.**   And you don't list what's discussed at the April 7th

22   meeting; correct?

23   **A.**   Correct.

24   **Q.**   Okay.  But Sanon is there?

25   **A.**   Correct.

**FERLAZZO - CROSS / KUDMAN**

1  **Q.**  So certainly, at that stage, the understanding is that

2  this is a security detail for Sanon; correct?

3  **A.**  For security, but they're talking about their -- the plan

4  for him to become President as well.

5  **Q.**  Right.

6     So we're still talking about Plan 1, which is Sanon to

7  become President?

8  **A.**  Correct.

9  **Q.**  And later on, there's a Plan 2 for another individual to

10  become President; correct?

11  **A.**  Correct.

12  **Q.**  Okay.  Now -- you know what?  To make it easier, why don't

13  I supply you with a copy of your affidavit.

14  **A.**  Thank you.

15  **Q.**  Sorry.  I'm a little blind.

16       **THE COURT:**  I believe we have a copy, if it's easier.

17       **MS. KUDMAN:**  That would be great.

18       **THE COURT:**  Sorry.  I didn't register it quick enough.

19       **MS. KUDMAN:**  I appreciate it.

20       **THE CLERK:**  There, Your Honor.

21  BY MS. KUDMAN:

22  **Q.**  Now, you heard the Government's proffer that

23  Mr. Veintemilla supplied -- or there was discussion of

24  supplying Kalashnikov rifles, hand grenades, gas masks, full

25  bulletproof vests; correct?

1  **A.**   That's correct.

2  **Q.**   And other items.

3       If you turn to Paragraph 14 of your affidavit, you write

4  that on April 20th, Ortiz told Solages that the current

5  President of Haiti is a thief.  And then on or about

6  April 21st, 2021, Solages again sent Ortiz a message with a

7  list of military equipment needed for the operation.

8       You can agree with me that that text message was not sent

9  to Mr. Veintemilla; correct?

10 **A.**   That's correct.

11 **Q.**   Okay.  Now, if you turn to Paragraph 15, on or about

12 April 27th, again, Ortiz sent a text message to Rivera with a

13 photo of the whiteboard, with a drawing of the assault plan for

14 the palace; correct?

15 **A.**   That's correct.

16 **Q.**   Okay.  Now, you describe the whiteboard as appearing to

17 describe the use of snipers and a militia team of ten

18 warriors/neutralizers; correct?

19 **A.**   Correct.

20 **Q.**   Okay.  So what the whiteboard showed was individuals in

21 places up above; correct?

22 **A.**   Correct.

23 **Q.**   And the idea would be you use snipers for security

24 purposes; correct?  To be looking down on a crowd; correct?

25 **A.**   No.  It was unclear.  It's like a -- it's a picture of the

 1  palace above, but then aside from that, they're not placed.

 2  And it's just -- it has the kind of people for the operation

 3  that will be needed, not necessarily placed at the pal- -- at

 4  the palace.

 5  **Q.**   Okay.  And it doesn't call them snipers; correct?  It's

 6  just "people around"?

 7  **A.**   No.  It said "snipers."

 8  **Q.**   Said "snipers."

 9       And so it showed people around; correct?

10  **A.**   No.  It has an arrow.  It's -- it's at the corner of it,

11  almost kind of what their team would be in opposition to the

12  palace.

13  **Q.**   Okay.  Do you have a copy of that whiteboard here?

14  **A.**   I do not.

15  **Q.**   Okay.

16  **A.**   We do --

17       **MS. CASTRO:**  Your Honor, I can provide a photo of it,

18  if it's helpful.

19       **THE COURT:**  Sounds like it would be.

20       **MS. KUDMAN:**  Okay.

21       **MS. CASTRO:**  And -- oh, not yet?

22  **BY MS. KUDMAN:**

23  **Q.**   Regardless, we can agree that Mr. Veintemilla is not sent

24  that photo on April 27th; correct?

25  **A.**   Did he -- did he send it?

FERLAZZO - CROSS / KUDMAN

1   **Q.**   He is not sent that photo; correct?  On April 27th, Ortiz

2   sends that picture to Rivera; correct?

3   **A.**   Sends, yes.  Yes.

4         **THE COURT:**  Ms. Kudman, it looks like Ms. Castro has a

5   picture there for you, if you want.

6         **MS. KUDMAN:**  It's not relevant, Your Honor.

7         **THE COURT:**  Oh.  Sorry.

8         **MS. KUDMAN:**  It wasn't sent to Mr. Veintemilla.  So

9   that's okay.

10        **THE COURT:**  Okay.  All right.

11  **BY MS. KUDMAN:**

12  **Q.**   If we turn to Paragraph 16 --

13  **A.**   Okay.

14  **Q.**   -- on May 22nd, Ortiz sends Solages the following text

15  message:  "If things do not go well in the next few days,

16  things could come against us."

17        So, again, this is not to Mr. Veintemilla; correct?

18  **A.**   That's correct.

19  **Q.**   Okay.  And, again, Paragraph 17.  On June 2nd, Solages

20  texted Intriago a photograph of himself and other conspirators

21  sitting around a table with the message "Conducting the hitting

22  plans right now."  And, again, Mr. Veintemilla is not mentioned

23  in this paragraph; correct?

24  **A.**   That's correct.

25  **Q.**   Now, Mr. Bergmann is not charged with providing material

**FERLAZZO - CROSS / KUDMAN**

1  support or with the kid- -- kidnapping or attempted murder --

2  well, actually, assassination of the President; correct?

3  **A.**   Mr. Bergmann, correct.

4  **Q.**   Okay.  And in Paragraph 18, you reference that Veintemilla

5  messaged Bergmann that he just wired 15,000 to James for

6  screws.  Same day, Intriago texted Solages, et cetera.

7       But the point is there's a communication between

8  Mr. Bergmann and Mr. Veintemilla about screws, yet you don't --

9  you haven't charged him with understanding that this was going

10  to be a coup attempt; correct?

11 **A.**   That's correct.

12 **Q.**   And so somebody could have understood that there were

13 going to be screws, which you've interpreted to mean bullets,

14 without having the understanding that they were for an

15 assassination; correct?

16 **A.**   Not in combination with statements that he makes later.

17 **Q.**   Okay.  Well, let's look at what you allege here.  Let's

18 turn to Paragraph --

19 **A.**   Paragraph 21.

20 **Q.**   Hold on one second.

21      Now, in Paragraph 21, you allege that Veintemilla told

22 Solages, "The plan has to be simultaneously.  It cannot be just

23 'hit the rat.'"  And you've interpreted that to mean "hit" as,

24 like, a hit on a person, to kill them; correct?

25 **A.**   Yes, or arrest operation.

 1   Q.   Or an arrest operation.

 2        Couldn't it also be "This is the time to hit him," meaning

 3   have the people agitate -- "they have to be agitating, and we

 4   have to move for him to be" -- "to step down from office"?

 5   A.   No, because that's the other thing that he's saying.

 6   Q.   But there are a lot of --

 7   A.   He's saying the other thing is the "Hit the streets," and

 8   he's saying it can't just be that.  So --

 9   Q.   Right.

10   A.   -- it's two separate events.

11   Q.   But in other words, they're trying to put pressure on the

12   President, and the only way that that can happen is if they hit

13   him with all of that popular support and force him to step

14   down; correct?

15   A.   That is not the way I interpret that at all.

16   Q.   That's the way you interpret it; correct?

17   A.   Correct.

18   Q.   But there are other people, and you don't know what's in

19   their mind when they're seeing these things?

20        MS. CASTRO:  I would just say it calls for

21   speculation.

22        MS. KUDMAN:  Well, so does the paragraph.

23        THE COURT:  Understood.

24        You can argue it, Ms. Kudman, a bit after you finish

25   examining.

1          **MS. KUDMAN:**  Okay.  Thank you, Your Honor.

2   **BY MS. KUDMAN:**

3   **Q.**   Now, if you turn to Paragraph 22, you're talking about as

4   late as June 9th; correct?

5   **A.**   Yes.

6   **Q.**   And at that point, Mr. Veintemilla is still talking about

7   Mr. P, which you've said you understood to mean Sanon --

8   **A.**   That's correct.

9   **Q.**   -- correct?

10          So as late as June, Mr. Veintemilla is still talking about

11   his understanding that the hope is that Mr. Sanon will be able

12   to step up as President in Haiti; correct?

13   **A.**   That's correct, in that -- on that date.

14   **Q.**   Okay.  And you understand that, all throughout these

15   discussions, there was the term "party," which, I can gather

16   from your testimony, was the popular uprising that everybody

17   had been trying to agitate; correct?  That was the term for

18   that?

19          **MS. CASTRO:**  I would object that that misstates the

20   Government's proffer and, as such, the agent's testimony.

21   **BY MS. KUDMAN:**

22   **Q.**   Well, let me ask you this, Agent.

23          **THE COURT:**  Hold up.  Hold up.

24          Overruled.

25          If you understand the question, you can answer it.

FERLAZZO - CROSS / KUDMAN

1    If you're withdrawing the question and asking a different

2  one --

3         MS. KUDMAN:  I can ask it clearer, Your Honor.

4         THE COURT:  Okay.

5  BY MS. KUDMAN:

6  Q.    Agent, throughout these text messages for these several

7  months, there are references to "the party"; correct?

8  A.    Correct.

9  Q.    Okay.  And this was an evolving plan, according to your

10 theory of the case; correct?

11 A.    That's correct.

12 Q.    Okay.  So originally, the term "party" meant, according to

13 your testimony, the popular uprising that they had hoped to

14 bring about; correct?

15 A.    I don't have any indication that they were using the term

16 "party" back then.  What we said was the -- the plan, so to

17 speak, was to foment kind of public uprise.  But in this

18 instance that you're referring to, "the party" is referring to

19 an operation.

20 Q.    Well, there are multiple plans apparently; correct?

21 A.    Correct.

22 Q.    So first there's a plan to put Sanon in place, and then

23 there's a plan to put Person 2 in place; correct?

24 A.    That's correct.

25 Q.    Okay.  And these things are evolving, and different people

 1  had different understandings at different times; correct?

 2          MS. CASTRO:  It calls for speculation, Your Honor.

 3          THE COURT:  Yeah.

 4     Ms. Kudman --

 5  BY MS. KUDMAN:

 6  Q.   If you know.

 7  A.   What exactly are you asking?

 8          THE COURT:  Yeah.

 9     Ms. Kudman, can I ask you two -- two things?  Not revisit

10  questions you've already asked and they've already answered --

11          MS. KUDMAN:  Yep.

12          THE COURT:  -- and then to save argument for me?

13          MS. KUDMAN:  Absolutely, Your Honor.

14          THE COURT:  Thank you.

15  BY MS. KUDMAN:

16  Q.   Now, Agent, if you'll turn to Paragraph 32, you allege

17  that, on July 6th, over 20 individuals from Colombia had

18  traveled to Haiti to participate in the operation; correct?

19  A.   That's correct.

20  Q.   And you allege that the travel was arranged for and funded

21  by Mr. Veintemilla; correct?

22  A.   That's correct.

23  Q.   Isn't it true that that travel was arranged for over a

24  month before?

25  A.   That's correct.

**FERLAZZO - CROSS / KUDMAN**

1   **Q.**   Okay.  And, certainly, it was paid for well over a month

2   before that as well?

3   **A.**   That's correct.

4   **Q.**   Okay.  And you've seen the various fund draw requests that

5   were filled out in favor of C- -- CTU and Mr. Sanon?

6   **A.**   I have.

7   **Q.**   Okay.  And you've seen that the vast majority of fund

8   requests occurred in May; correct?

9   **A.**   Yes.

10  **Q.**   And, in fact, that travel was paid for to the travel

11  agency directly; correct?

12  **A.**   That's correct.

13  **Q.**   And that was paid for in -- on May 19th of 2021; correct?

14  **A.**   I don't have it in front of me for this specific date, but

15  I trust you.

16  **Q.**   Okay.  And I'll show you because I don't want to trick

17  you.

18  **A.**   Is it in the complaint?  Did I say that?

19  **Q.**   No.

20  **A.**   No?

21  **Q.**   And, in fact, it was $15,000; correct?

22  **A.**   Yes.

23          **THE COURT:**  Can I -- excuse me.

24      Ms. Kudman, did you show the Government what you're

25  showing the witness to refresh his recollection?

 1              MS. KUDMAN:  Take a look.

 2              MS. CASTRO:  Understood.  Thank you.

 3         What's the date?

 4              MS. KUDMAN:  May 19th.

 5              MS. CASTRO:  Okay.  Thank you.

 6    BY MS. KUDMAN:

 7    Q.    Here you go.

 8    A.    Yes, May 19th for 15,477.

 9    Q.    And if you turn to Paragraph 34, you write, "According to

10    witness interviews, on or about July 6th, 2021, several

11    conspirators, including Solages, Vincent, Rivera, John, Jaar,

12    and Palacios, met prior to the assassination.  And at that

13    meeting, Solages falsely announced to the group that it was a

14    CIA operation"?

15    A.    That's correct.

16    Q.    Okay.  So throughout this whole thing, people are making

17    representations that this is a government-backed operation;

18    correct?

19    A.    Correct.

20    Q.    And, again, Mr. Veintemilla wasn't at that particular

21    meeting; correct?

22    A.    He was not.  It was in Haiti.

23    Q.    It was in Haiti.

24         And, in fact, Mr. Veintemilla never went to Haiti;

25    correct?

 1    A.    That's correct.

 2    Q.    And in July -- in fact, on July 6th, there were additional

 3    text messages asking Mr. Veintemilla to continue funding the

 4    operation; correct?

 5    A.    Yes.

 6    Q.    And Mr. Veintemilla declined to do so; correct?

 7    A.    Yes.

 8    Q.    And as far as you know, he never sent any more money;

 9    correct?

10    A.    Not -- not that I know.

11          MS. KUDMAN:   One moment, Your Honor.   I think I'm

12    done.

13    BY MS. KUDMAN:

14    Q.    Agent, you heard the Government's proffer whereby it was

15    stated that Mr. Veintemilla provided false statements to the

16    Government.   Do you know when he was interviewed?

17    A.    In July of 2021.

18    Q.    Right after the assassination; correct?

19    A.    That's correct.

20    Q.    And he voluntarily spoke with agents?

21    A.    He did.

22    Q.    Mr. Veintemilla also gave agents his telephone

23    voluntarily?

24    A.    That's correct.

25    Q.    Okay.   And for the past year and a half, you're aware that

**FERLAZZO - CROSS / KUDMAN**

 1  counsel has been working with the Government in terms of

 2  providing documents; correct?

 3  **A.**   What documents are you referring to?

 4  **Q.**   Pursuant to subpoena.

 5  **A.**   Yes.

 6  **Q.**   Okay.  And you're aware that Mr. Veintemilla has

 7  repeatedly stated that he is here, and he's not going anywhere?

 8  **A.**   Yes.

 9  **Q.**   Now, do you know what statements it is that you believe to

10  be false by Mr. Veintemilla?

11  **A.**   I think we allege it in the proffer.  I can't remember

12  what specifically we stated.

13  **Q.**   There was nothing specific stated.  I'm asking you.  What

14  do you believe Mr. Veintemilla told the Government that was not

15  true?

16  **A.**   Oh.  I do feel like it was a minimization of his

17  involvement.

18  **Q.**   So what specifically do you believe he minimized?

19  **A.**   The fact that he was aware that it was an arrest operation

20  and that -- to think that it was not going to be violent at

21  all.  I don't -- I don't think that is the -- the truth to

22  what -- in his own words from his text messages, that he's not

23  surprised by.

24  **Q.**   So it's your -- it's his state of mind that you don't

25  believe he was truthful about?

1   **A.**   His -- his overall in -- characterization of it, of the --

2   of his involvement.

3          **MS. KUDMAN:**  Okay.  I have nothing further.

4          **THE COURT:**  Okay.  All right.  So tell me where we are

5   procedurally.

6          **MS. KUDMAN:**  Your Honor, I would like to speak to one

7   of the arresting agents.

8          **THE COURT:**  Okay.

9          **MS. CASTRO:**  I am -- I'm told he'll be here in 25

10  minutes.

11         **THE COURT:**  Okay.  All right.  Well, that's -- that's

12  helpful for planning purposes, but let me -- let me do this.

13     With respect to Mr. Bell's client, Mr. Bergmann, is either

14  side advancing any additional evidence?

15         **MS. CASTRO:**  Your Honor, I do have some redirect.  I

16  don't know if I should reserve that.

17         **THE COURT:**  Okay.  Well, that's a good point.

18     Okay.  So we have finished the cross of this agent,

19  Mr. Bell and Ms. Kudman?

20         **MS. KUDMAN:**  Yes, Your Honor.

21         **THE COURT:**  Okay.  Then let -- let Ms. Castro complete

22  the redirect of the -- this agent, and then I'll go from there.

23         **MS. CASTRO:**  Ms. -- I am so sorry.  Your Honor, are we

24  not going to also do the cross-examination with respect to

25  Mr. Ortiz at this stage?

1          **THE COURT:**  Well, the -- the request was to take

2    Mr. Ortiz up entirely at the end.

3          **MS. CASTRO:**  Oh.

4          **THE COURT:**  What's your pleasure, Ms. Holt?

5          **MS. HOLT:**  Yes, Judge.

6       If we can come sidebar briefly.

7          **THE COURT:**  Okay.

8                        (Unrecorded sidebar.)

9          **THE COURT:**  Okay.  So we did a little planning at

10   sidebar, too.

11      So for the benefit of everybody in the courtroom, Ms. Holt

12   is going to do her cross.  Ms. Castro is going to do her

13   redirect.  We're going to take a short break for court staff,

14   who has been going now since 10:00 o'clock without a break.

15      By that time, it's our expectation that the other agent

16   will be here.  We'll put that witness on.  If there's no other

17   witness that any side is calling, at that point, we'll see

18   where we are.  But any way around it, that's -- that's the

19   lineup for now, and let's see how far we get.

20      Okay.  Ms. Holt, you're up.

21          **MS. HOLT:**  Thank you, Judge.

22          **THE COURT:**  You have your client?

23      Ms. Holt, you know that Mr. Ortiz was not getting the

24   interpretation of the first part of the proffer, and it came in

25   a good five minutes in.

**FERLAZZO - CROSS / HOLT**

1    So do you have an ask with respect to that?

2         **MS. HOLT:**  One second, Judge.  I think he indicated

3    that he was okay.  He does speak some English, but let me just

4    confer with him that he's okay without repeating that.

5         **THE COURT:**  I -- just let me know how you want me

6    to -- yeah.  Thank you.

7                   (Counsel and client confer.)

8         **MS. HOLT:**  We're okay going forward without repeating

9    that first part of the proffer, Your Honor.  Thank you.

10        **THE COURT:**  Okay, Ms. Holt.  I appreciate that.

11    Okay.  Agent, you're still under oath.

12        **THE WITNESS:**  Yes, Your Honor.

13                   <u>**CROSS-EXAMINATION**</u>

14   BY MS. HOLT:

15   **Q.**   Okay.  So I want to start first with the meetings that you

16   were talking about that occurred in South Florida.

17        Now, I want to talk specifically about Mr. Pretel's --

18   what you know about where Mr. Pretel -- or when and where

19   Mr. Pretel attended.

20        So we're talking, according to your complaint, about

21   meetings between February and April of 2021; is that correct?

22   **A.**   I don't know about February, but maybe March through

23   April --

24   **Q.**   Okay.

25   **A.**   -- to May.

**FERLAZZO - CROSS / HOLT**

1  Q.   And you mentioned specifically, in the beginning of

2  March 21 -- of 2021 -- excuse me -- that there was a meeting in

3  Florida with Mr. Pretel Ortiz, Intriago, Veintemilla, and

4  others; correct?

5  A.   That's correct.

6  Q.   And that there were other meetings throughout the month;

7  right?

8  A.   That's correct.

9  Q.   But this is the only meeting that you identify

10  Mr. Pretel Ortiz as being involved in; correct?

11  A.   Yes.

12  Q.   All right.  What -- do you have evidence that he was

13  personally at other meetings in South Florida?

14  A.   I think what you're referring to is -- it's because of the

15  picture once again, but my understanding is that he was at

16  the -- the bulk of these meetings as well.

17  Q.   How many meetings, and when were they?

18  A.   Like I said, from the time frame of April to May, we're

19  talking about, I think, from various witness statements, 10 to

20  20 meetings.

21  Q.   Okay.  But you can't testify here today exactly how many

22  Mr. Pretel Ortiz was at --

23  A.   I cannot.  I cannot.

24  Q.   -- or when those meetings took place --

25  A.   Cannot.

1   Q.   -- specifically?

2        Okay.  Now, according to your theory, this plan, as you've

3   stated, sort of evolved over these couple of months; correct?

4   A.   That's correct.

5   Q.   And it started out as a plan to arrest President Moïse?

6   A.   I think it started out as a -- in the early stages, as a

7   hope that he would step down.

8   Q.   Okay.  And then it turned into a plan to arrest?

9   A.   Correct.

10  Q.   And then your theory is that, at some point, it turned to

11  a plan to kill?

12  A.   It did.

13  Q.   Okay.  And you mention a text message from Solages to

14  Intriago with a photo of himself around a table saying, "We're

15  conducting hitting plans right now"; right?

16  A.   That's correct.  I think that one is early Juneish, right.

17  Q.   And as you stated to the prior attorney, "hit" means

18  either kill or the arrest plan; right?

19  A.   Correct.

20  Q.   And that message did not go to Mr. Pretel Ortiz?

21  A.   That one did not.

22  Q.   Okay.  And he was not present at that meeting, based on

23  the photo?

24  A.   That's correct.

25  Q.   Okay.  Now, you have executed multiple search warrants in

FERLAZZO - CROSS / HOLT

1  this case?

2  **A.**   That's correct.

3  **Q.**   You have obviously, from your complaint, a lot of text

4  messages from phones; right?

5  **A.**   Yes.

6  **Q.**   You had search warrants for at least seven iCloud

7  accounts?

8  **A.**   Yes.

9  **Q.**   All right.  With -- are there other things that you've

10  gotten search warrant returns for?

11  **A.**   Yes.  They were also for -- for phones as well.

12  **Q.**   Okay.  And do you have, in any of these text messages or

13  accounts that you've reviewed, any communication in which

14  Mr. Pretel Ortiz is included that discuss specifically killing

15  the President?

16  **A.**   Specifically using the words "kill the President"?  No.

17  **Q.**   Any code word that you believe meant to kill as opposed to

18  arrest?

19  **A.**   Yes.  We already discussed that one call, where it was --

20  it was an audio message that we -- that we quoted that

21  Mr. Veintemilla was on with.  That was also Mr. Ortiz,

22  Paragraph 21.

23  **Q.**   Thank you, Agent.

24        Okay.  And this is the one where it talks about "Things

25  have to happen simultaneously" --

**FERLAZZO - CROSS / HOLT**

1  **A.**   Correct.

2  **Q.**   -- right?

3       And when the other -- the prior attorney questioned you,

4  you said "hit" in that case could mean kill or arrest; right?

5  **A.**   That's correct.

6  **Q.**   Okay.  So in the review of all of this evidence that

7  you've procured so far, is there any communication that

8  Mr. Pretel Ortiz is a part of that specifically discussed that

9  the plan is to kill the President?

10  **A.**   No.

11  **Q.**   Okay.  And you testified that there was a meeting on

12  July 6th in Haiti; correct?

13  **A.**   That's correct.

14  **Q.**   And that's where Solages announces now that the plan is to

15  kill President Moïse?

16  **A.**   That's correct.

17  **Q.**   And Mr. Pretel Ortiz was not present in that meeting?

18  **A.**   That's correct.

19  **Q.**   Okay.  Now, the financing for the items mentioned in the

20  complaint and that Mr. Veintemilla is alleged to have sent

21  that -- or people are alleged to have sent that -- the

22  financing comes from Worldwide; correct?

23  **A.**   That's correct.

24  **Q.**   It doesn't come from CTU?

25  **A.**   It's a -- correct.  It's a -- it's a CTU line of credit.

**FERLAZZO - CROSS / HOLT**

1   **Q.**   Right, but they're not actually putting up the funds?

2   **A.**   Correct.

3   **Q.**   Now, I want to draw your attention to Paragraph 24 of the

4   complaint.  In it, you say Rivera sends Mr. Pretel Ortiz a text

5   message stating, in substance, that they need these items you

6   previously mentioned, battering ram, black caps.

7        It says "in substance."  What did the text message

8   actually say --

9   **A.**   It was in Spanish.

10  **Q.**   -- versus an interpretation?

11  **A.**   It was in Spanish, and that was just -- it was a list.

12  When we looked at that summary of it -- it was essentially just

13  a summary of it.  It was just the fact -- we said "in

14  substance" because we weren't quoting because it was in

15  Spanish.

16  **Q.**   Is this a direct translation of the Spanish, or is this an

17  interpretation of what was said?

18  **A.**   It's not a word-for-word translation, if that's what

19  you're asking me.

20  **Q.**   Okay.

21        **MS. CASTRO:**  Could I -- could I ask, Your Honor, if

22  the defense could clarify that question?  What -- as an

23  interpretation as to what language?

24        **THE COURT:**  I'm sorry.  You can ask anything you want

25  on redirect, but I'm not going to tell Counsel what questions

 1   to ask.

 2   **BY MS. HOLT:**

 3   **Q.**   When I say "interpretation," I mean someone's -- not a

 4   language interpretation, but someone has read it -- has read

 5   it?

 6   **A.**   Correct.

 7   **Q.**   Translated it --

 8   **A.**   Correct.

 9   **Q.**   Translates it into Spanish?

10   **A.**   Correct.

11   **Q.**   And then summarizes or interprets the meaning of it, and

12   that's what's in Paragraph 24?

13   **A.**   Correct.

14   **Q.**   Okay.  Now, as you've said, Mr. Pretel Ortiz was

15   interviewed immediately after, or almost immediately after, the

16   killing on July 7th; is that right?

17   **A.**   That's correct.

18   **Q.**   Do you know what date he was interviewed?

19   **A.**   There were multiple dates, both by HSI and FBI.  I don't

20   know the dates off the top of my head.

21   **Q.**   How many interviews did he give?

22   **A.**   Two to three.

23   **Q.**   And these were voluntary; right?

24   **A.**   Yes.

25   **Q.**   Would it be fair to say these took place in approximately

FERLAZZO - CROSS / HOLT

1  July of 2021?

2  A.  That's correct.

3  Q.  Where did they take place?

4  A.  With both HSI and FBI.

5  Q.  Okay.  So Mr. Pretel Ortiz actually traveled to --

6  A.  He did.

7  Q.  -- the FBI or HSI office for these interviews?

8  A.  He did.

9  Q.  Okay.  And a search warrant was executed on his house in

10  approximately August of 2021?

11  A.  Yes.

12  Q.  And in it, they seized electronics?

13  A.  They did.

14  Q.  And that same day, Mr. Pretel Ortiz had been called into

15  either the FBI or HSI office?

16  A.  Yes.

17  Q.  And he voluntarily went?

18  A.  He did.

19  Q.  Okay.  And he voluntarily spoke with the agents there?

20  A.  He did.

21  Q.  And it was -- and in the meeting, he was told that some of

22  his colleagues and other people, now defendants in the case,

23  had hired lawyers?

24  A.  Yes, that sounds right, but I don't remember the specifics

25  of that.  I can't remember that specific line from it.

**FERLAZZO - CROSS / HOLT**

1  Q.  And after that, Mr. Pretel Ortiz hired lawyers?

2  A.  After the interview?

3  Q.  After the search warrant in August.

4  A.  Yes, as far as I know.

5  Q.  Okay.  And so that was approximately one and a half years

6  ago?

7  A.  Yes.

8  Q.  And since then, his lawyers have reached out to the

9  prosecutors on multiple occasions?

10  A.  Yes.

11  Q.  Okay.  And there's no evidence that, during that time,

12  Mr. Pretel Ortiz attempted to leave the United States?

13  A.  That's correct.

14  Q.  Now, when he was arrested, he was arrested at his home?

15  A.  He was.

16  Q.  And it was very early in the morning?

17  A.  It was.

18  Q.  It was a SWAT team; correct?

19  A.  Yes.

20  Q.  And when they arrived, they called over a megaphone for

21  him to come out?

22  A.  That's correct.

23  Q.  And he came out?

24  A.  He did.

25  Q.  And he complied?

**FERLAZZO - CROSS / HOLT**

1   A.   He did.

2   Q.   And his travel documents or his passport has been seized?

3   A.   I actually don't know that specifically.

4   Q.   One moment.

5   A.   We didn't take anything from him that morning.  So I

6   don't --

7   Q.   So you're not -- you don't know if his --

8   A.   I mean, I was on the arrest, and I didn't --

9   Q.   Okay.

10  A.   I didn't -- I didn't take it unless it was in his -- I

11  don't think it was on his person.  He even -- he left his

12  phone.

13  Q.   Do you know if it's been seized since?

14  A.   I don't think it has.

15          MS. HOLT:  Okay.  One moment, Your Honor.

16  BY MS. HOLT:

17  Q.   In one of the interviews in July of 2021 with

18  Mr. Pretel Ortiz, he did tell the Government or the FBI that

19  CTU had contracted and funded security personnel to travel to

20  Haiti?

21  A.   Correct.

22  Q.   Prior to his arrest, you conducted surveillance on

23  Mr. Pretel Ortiz?

24  A.   We did.

25  Q.   And that was approximately January 26th through

1   February 8th?

2   **A.**   Correct, after we did the -- the other coconspirators who

3   were arrested.

4   **Q.**   And as you previously stated, you did that because you

5   knew they would be alerted that other people were getting

6   picked up?

7   **A.**   That's correct.

8   **Q.**   And by "picked up" -- sorry -- I mean arrested.

9   **A.**   Yes.

10   **Q.**   Okay.  And during that surveillance, was there any

11   indication that Mr. Pretel Ortiz was trying to leave his house

12   or permanently move from where he was living --

13   **A.**   No.

14   **Q.**   -- or flee the country?

15   **A.**   No.

16   **Q.**   Even leave the city?

17   **A.**   I don't know about the city, but he's local to a point.

18   **Q.**   There was no indication he was packing up to go somewhere?

19   **A.**   Correct.

20        **MS. HOLT:**  Okay.  I don't have anything else.

21   Thank you, Agent.

22        **THE WITNESS:**  You're welcome.

23        **THE COURT:**  Ms. Castro?

24        **MS. CASTRO:**  Your Honor, may I proceed on redirect --

25        **THE COURT:**  Yes.

```
 1              MS. CASTRO:  -- as to any witness --

 2              THE COURT:  Yes.  Oh.  Any --

 3              MS. CASTRO:  -- or as to any defendant, or should --

 4    in a specific order?

 5              THE COURT:  No, all of the testimony of the agent, any

 6    redirect you have.

 7              MS. CASTRO:  Understood.

 8         Thank you, Your Honor.

 9                        REDIRECT EXAMINATION

10    BY MS. CASTRO:

11    Q.   All right.  So I'll just start -- I'm going to try to work

12    my way backwards here.

13         There was a question just now on the cross-examination

14    with respect to Mr. Ortiz.  There was some discussion of

15    interviews that were conducted in -- of Mr. Ortiz in July.  Do

16    you recall that?

17    A.   Yes.

18    Q.   And I think that came up in several of the

19    cross-examinations, when the defendants were first spoken to.

20    A.   Yes.

21    Q.   Do you recall that?

22         Can you just give an overview of some of the investigative

23    steps that law enforcement have been involved in since that

24    time leading to today?

25    A.   To conduct the investigation as a whole?
```

**FERLAZZO - REDIRECT / CASTRO**

1   **Q.**   That's right.

2   **A.**   Massive efforts spanning, you know, multiple countries,

3   multiple, multiple, multiple devices and -- and interviews

4   of -- of numerous individuals.

5   **Q.**   You mentioned devices.  If you had to estimate the number

6   of devices seized in connection with this case, how many would

7   you estimate?

8   **A.**   Around a hundred.

9   **Q.**   And fair to say that a review of those devices were all

10  part of this investigation?

11  **A.**   They were.

12  **Q.**   Now, there was also a reference from Mr. Ortiz's counsel

13  regarding his statements to you when he was first interviewed?

14  **A.**   Correct.

15  **Q.**   Or -- I apologize -- not to you, to law enforcement when

16  he was first interviewed?

17  **A.**   Correct.

18  **Q.**   Do you recall whether, during that interview, Mr. Ortiz

19  was asked about an alleged plan to arrest President Moïse?

20  **A.**   Yes.

21  **Q.**   What did he say?

22  **A.**   Which one are we talking about?

23  **Q.**   Mr. -- if -- I know there were several.  If we could try

24  to focus on the first interview with law enforcement, or

25  perhaps if -- if we can focus on -- have you -- have you

**FERLAZZO - REDIRECT / CASTRO**

1  reviewed the various interviews?

2  **A.**   I have.

3  **Q.**   Okay.  Do you know whether Mr. Ortiz acknowledged any

4  knowledge of an arrest warrant?

5  **A.**   Did he bring that up in those interviews?

6  **Q.**   Correct.

7  **A.**   No.

8  **Q.**   Okay.

9       **THE COURT:**  Can I understand that question?  Any --

10  any -- did he acknowledge any knowledge -- that he knew about

11  his own arrest warrant?

12       **MS. CASTRO:**  I apologize, that he knew about an arrest

13  warrant with respect to President Moïse.

14       **THE COURT:**  An arrest warrant?

15       **MS. CASTRO:**  I misspoke, Your Honor.  An arrest plan

16  with respect to President Moïse.

17       **THE COURT:**  Okay.

18       **MS. CASTRO:**  I apologize.

19  **BY MS. CASTRO:**

20  **Q.**   Let me re- -- let me reissue the question, just to make

21  sure that the record is clear.

22       What, if anything, did Mr. Ortiz say over the substance of

23  his interviews -- I know there were several -- about his

24  involvement in -- if any, in a plan to arrest President Moïse?

25  **A.**   He did not disclose his involvement.

**FERLAZZO - REDIRECT / CASTRO**

1  **Q.**   Okay.  What about the topic of the alleged immunity

2  agreement that was proffered during the Government's proffer?

3  Was that raised during Mr. Ortiz's interview?

4  **A.**   No.

5  **Q.**   Okay.  When I say "raised," did law enforcement ask

6  Mr. Ortiz about that immunity agreement?

7  **A.**   I don't know specifically.

8  **Q.**   Okay.

9  **A.**   Yeah.

10  **Q.**   There was also a mention by defense counsel about the

11  portion of the complaint into Mr. Ortiz, where it's referenced

12  that Mr. Solages announced the plan to kill President Moïse on

13  July 6th.  Do you remember that question?

14  **A.**   Correct.  Yes.

15  **Q.**   We talked already about the devices that have been

16  recovered and reviewed in this case.  Have you had a chance to

17  review communications between Mr. Solages and Mr. Ortiz?

18  **A.**   Yes.

19  **Q.**   How, generally, did Mr. Ortiz -- I apologize -- did

20  Mr. Solages respond to Mr. Ortiz, or what terms did he use to

21  refer to him during these communications?

22  **A.**    In general, Solages is reporting to him as the -- someone

23  superior to him, as his colonel.

24  **Q.**   Okay.

25              **THE COURT:**  Wait.  I don't understand.  Solages --

1    **THE WITNESS:**  Reporting to Ortiz as his superior.

2    **THE COURT:**  So you're telling us that there's

3    communications where he calls him "General"?

4    **THE WITNESS:**  "Colonel."

5    **THE COURT:**  "Colonel"?

6    **THE WITNESS:**  "Colonel."

7    **THE COURT:**  Okay.

8    BY MS. CASTRO:

9    **Q.**   And were there communications where Mr. Ortiz issued

10   directives to Mr. Solages?

11   **A.**   Where Solages issued directives?

12   **Q.**   Mr. Ortiz --

13   **A.**   Ortiz, yes.

14   **Q.**   -- issued directives to Mr. Solages?

15   **A.**   Yes.

16   **Q.**   And would Mr. Solages receive and accept those directives?

17   **A.**   He would.

18   **Q.**   Now, there was some question about the way that messages

19   were interpreted that were originally in Spanish.  Do you

20   recall that?

21   **A.**   Yes.

22   **Q.**   Can you describe the process that you went through to

23   decipher and translate into English messages that were

24   originally written in Spanish?

25   **A.**   A native Spanish-speaker would -- would write those

FERLAZZO - REDIRECT / CASTRO

1   sentences.

2   **Q.**   Okay.  Based on their translation of the -- the words

3   used?

4   **A.**   Correct.

5   **Q.**   Okay.  Now, I do want to reference -- there was reference

6   from Mr. Veintemilla's attorney regarding a whiteboard.  Do you

7   recall that?

8   **A.**   Yes.

9   **Q.**   And there was some questions about what was specifically

10  on the whiteboard.  Do you remember that?

11  **A.**   Yes.

12  **Q.**   Okay.  Have you seen a photograph of that whiteboard

13  before?

14  **A.**   I have.

15          **MS. CASTRO:**  Your Honor, if I may approach the witness

16  with an exhibit.

17          **THE COURT:**  Are you putting it in evidence?

18          **MS. CASTRO:**  I would, Your Honor.

19          **THE COURT:**  Okay.

20          **MS. CASTRO:**  It's marked as Government's Exhibit 1,

21  and I will show it to defense counsel.

22       (Government's Exhibit 1 marked for identification.)

23          **MS. CASTRO:**  I do, yes.  I apologize.  I think it was

24  originally my -- okay.  Very good.

25       I'm just getting a copy for defense counsel.

1           Okay.  We will provide a copy to defense.  We're just

2   receiving it, but I'm just going to continue with questioning.

3           Okay.  May I approach the witness, Your Honor?

4               **THE COURT:**  Yes, ma'am.

5   **BY MS. CASTRO:**

6   **Q.**   Okay.  Special Agent Ferlazzo, do you recognize that --

7   that picture?

8   **A.**   I do.

9   **Q.**   What is it?

10  **A.**   It's a whiteboard that -- within CTU that was sent, and it

11  has a picture of the -- the palace.  And it -- it outlines

12  potentially different security personnel but then potential

13  actors that would be going in opposition to it, is my

14  interpretation of it.

15  **Q.**   Okay.  Now, you said that this was a photo from within

16  CTU.  What do you mean by that?

17  **A.**   It was a photo taken inside CTU from a whiteboard.

18  **Q.**   Okay.  And I believe that there was some -- there was some

19  challenge from defense counsel on what exactly was depicted on

20  the whiteboard.  Do you recall that?

21  **A.**   Yes.

22  **Q.**   Can you just identify for the Court what some of the terms

23  were used to refer to the men or the -- what terminology did

24  you use on this whiteboard?

25  **A.**   It looks like they're saying there was a -- a militia

1   team.

2   **Q.**   Okay.  Any other words that --

3   **A.**   And operators and warriors, the neutralizers.

4   **Q.**   Neutralizers?

5   **A.**   Yes.

6   **Q.**   Okay.  And this is a photo that Mr. Ortiz circulated to

7   other members of the conspiracy; is that right?

8   **A.**   That's correct.

9   **Q.**   Okay.  And there was some challenge from Mr. Veintemilla's

10   counsel on whether he ever received a copy of the whiteboard.

11   Let me --

12        **MS. CASTRO:**  Yes.  Do we have the pic- -- the original

13   picture to give her as -- oh.  You already gave it to her.

14        We'll give a copy, marked now as Exhibit 2, to

15   Mr. Veintemilla's counsel.

16        (Government's Exhibit 2 marked for identification.)

17        **MS. CASTRO:**  And if I may approach the witness.

18        **THE COURT:**  Yes, ma'am.

19        Just remember that if you're not on a microphone, you're

20   not part of the transcript.

21        **MS. CASTRO:**  Understood, Your Honor.

22   **BY MS. CASTRO:**

23   **Q.**   Mr. Ferlazzo -- Special Agent Ferlazzo, do you recall --

24   actually, can you just take a moment to review the exchange in

25   front of you?

FERLAZZO - REDIRECT / CASTRO

1   **A.**   I've reviewed it.

2   **Q.**   Okay.  Are you familiar with that exchange?

3   **A.**   I am.

4   **Q.**   All right.  You saw it before today?

5   **A.**   Yes.

6   **Q.**   All right.  Can you just identify who the speakers are in

7   this exchange?

8   **A.**   Arcangel Pretel Ortiz and Walter Veintemilla.

9   **Q.**   Okay.  And what is being communicated from Mr. Ortiz over

10  to Mr. Veintemilla?

11  **A.**   This picture, Exhibit 1.

12  **Q.**   That's a picture of the whiteboard that we were just

13  discussing that references neutralizers?

14  **A.**   Correct.

15  **Q.**   Okay.  And when did he send that message to

16  Mr. Veintemilla?

17  **A.**   On the 5th of May --

18  **Q.**   Of May?

19  **A.**   -- of 2021.

20  **Q.**   Okay.  Now, I'll also just refer -- also to what I've now

21  marked as Government's Exhibit 3, and I believe defense already

22  showed you a copy of this document.

23        (Government's Exhibit 3 marked for identification.)

24  **BY MS. CASTRO:**

25  **Q.**   I'll put it in front of you again now.

FERLAZZO - REDIRECT / CASTRO

```
 1        Do you remember defense counsel showed you that earlier?
 2   A.   Yes.
 3   Q.   And what is it, just generally, for -- for the record?
 4   A.   A fund draw request from -- from Worldwide Capital.
 5   Q.   And -- and Worldwide Capital is, again, operated by who?
 6   A.   Walter Veintemilla.
 7   Q.   And what's the date on that fund draw request?
 8   A.   This one is from the 19th --
 9   Q.   Okay.
10   A.   -- of May.
11   Q.   And what is the fund draw request for?
12   A.   This is for transportation requested by Sanon.
13   Q.   Okay.  So as defense counsel was eliciting, this is from
14   Mr. Sanon's travel to Haiti; is that right?
15   A.   Yes.
16   Q.   Okay.  And so this is a May 19th travel fund draw request
17   from Mr. Sanon?
18   A.   It is.
19   Q.   After this message on May 6th with respect to neutralizers
20   being sent to Mr. Veintemilla?
21   A.   Correct.
22   Q.   Okay.  There was also reference, from Mr. Veintemilla's
23   counsel, about Mr. Veintemilla declining to offer additional
24   funds towards July 6th.  Do you remember that line of
25   questioning?
```

FERLAZZO - REDIRECT / CASTRO

1  **A.**    I do.

2  **Q.**    Did Mr. Veint- -- do you remember why it was that

3  Mr. Veintemilla was declining to give additional funds at that

4  point?

5  **A.**    At that point, they felt like they had not accomplished

6  their goal of removing the President.

7  **Q.**    Okay.  And did Mr. Veintemilla specify anything in

8  particular that would need to happen before more funds would be

9  available?

10 **A.**    I'd need to see the exact -- what the exchanges say

11 exactly, but I think it was --

12          **MS. KUDMAN:**  Your Honor, I'm going to object to "I

13 think it was."

14          **MS. CASTRO:**  Okay.

15          **THE WITNESS:**  I'm asking to see it.

16          **THE COURT:**  Are you moving to strike or --

17          **MS. KUDMAN:**  Yeah, I move to -- I move to strike.

18          **THE COURT:**  Agent, if you have a basis for knowledge

19 and you want to complete your answer --

20          **MS. CASTRO:**  Your Honor, I do have the document that

21 he's requesting.  I'm happy to offer that.

22          **THE COURT:**  It's -- it's not my witness, Ms. Castro,

23 however you want to handle it.

24          **MS. CASTRO:**  Thank you, Your Honor.

25 ///

1    BY MS. CASTRO:

2    **Q.**    Right.

3         Okay.  If I can actually just refer you,

4    Special Agent Ferlazzo -- do you still have a copy --

5    **A.**    I do.

6    **Q.**    -- of the complaint?

7    **A.**    Which paragraph?

8    **Q.**    It's Paragraph 33.

9         And I'll just refer you to the second sentence where

10   Mr. -- regarding Mr. Veintemilla's response to Mr. Ortiz and

11   Intriago.

12   **A.**    Yes.  So that it took too long and that Individual 2 has

13   not been sworn in, and the President is not out of office yet.

14   **Q.**    Okay.

15        **MS. KUDMAN:**  Your Honor, I'm going to object.  That's

16   not what it says.

17        **MS. CASTRO:**  Your Honor, I'm happy to just read

18   directly from the complaint.

19        **THE COURT:**  Let -- sorry, but when we object to the

20   testimony, is the ask, Ms. Kudman, to strike, or do you want

21   redirect, or do you want to put the exhibit in evidence?

22        **MS. KUDMAN:**  I'm going to move to strike --

23        **THE COURT:**  The last answer?

24        **MS. KUDMAN:**  -- and ask for redirect.

25        **THE COURT:**  Okay.  Will you ask another question,

FERLAZZO - REDIRECT / CASTRO

1    Ms. Castro, whether it's the same question or it's your next
2    one?
3           MS. CASTRO:  Well, Your Honor, it is in the record in
4    Paragraph 33 of the complaint.  I just want to be clear on the
5    point.  If we can just have the agent read the exact sentence
6    that's in the complaint, we won't have him summarize it.
7           THE COURT:  You can read it.  Go ahead.
8           MS. CASTRO:  Okay.  I will read it.  Thank you,
9    Your Honor.
10        "Veintemilla responded, in substance, that things took too
11   long, and there was no money or investors, that until
12   Individual 2 is sworn in and President Moïse was out of office,
13   the investors would not contribute any more money."
14   BY MS. CASTRO:
15   Q.   Do you remember swearing to that in this complaint?
16   A.   I do.
17   Q.   Is that still your testimony today?
18   A.   It is.  It is.
19   Q.   Okay.  Now, you've also talked about -- well, at least the
20   Government did in its proffer -- about a purported immunity
21   agreement that was circulated amongst the coconspirators.  Do
22   you recall that?
23   A.   I do.
24   Q.   Do you -- do you review any communications -- well, do you
25   know whether Mr. Veintemilla ever received a copy of that

1    immunity agreement?

2    **A.**    He did.

3    **Q.**    Okay.  And, again, that immunity agreement was signed by

4    whom -- allegedly signed by whom?

5    **A.**    Allegedly by Individual 2.

6    **Q.**    Okay.  Defense counsel for Mr. Veintemilla made some

7    statements of -- or asked you some questions about the

8    interpretation of the phrase "Hit the rat" that appeared from

9    Mr. Veintemilla alongside reference to a simultaneous plan.  Do

10   you recall that questioning?

11   **A.**    Yes.

12   **Q.**    Can you explain how you understood, based on your

13   knowledge of the investigation, what the simultaneous plan was

14   and how that interacted with the notion of "Hit the rat"?

15   **A.**    It was two separate operations:  One, the arrest or kill

16   the President, and then the other was to kind of create the

17   distraction elsewhere by people hitting the streets and further

18   fomenting public uprise.

19   **Q.**    Okay.  Mr. Veintemilla's counsel also asked a line of

20   questions about Mr. Veintemilla's company being essentially a

21   mortgage company.  Do you recall that?

22   **A.**    Yes.

23   **Q.**    Just a moment.

24         And then she -- she also made reference to Mr. Veintemilla

25   coordinating security for Mr. Sanon in Haiti.  Do you recall

FERLAZZO - REDIRECT / CASTRO

1   that line of questioning?

2   **A.**   Yes.

3   **Q.**   Can you describe the kind of terminology that

4   Mr. Veintemilla would use when he referred to ammunition he was

5   sending to Haiti -- or funding for Haiti?

6   **A.**   They're screws or nails.

7   **Q.**   In your training and experience, were those ordinary terms

8   that legitimate security services use?

9   **A.**   No.

10          **MS. KUDMAN:**   I'm going to object to that.

11          **THE COURT:**   Basis?

12          **MS. KUDMAN:**   He hasn't laid a foundation for knowing

13   what usual terms people in that field would use.

14          **THE COURT:**   Overruled.

15   **BY MS. CASTRO:**

16   **Q.**   Special Agent Ferlazzo, are you familiar with reading

17   coded language?

18   **A.**   I am.

19   **Q.**   Can you explain some of your history and the work you do?

20          **THE COURT:**   Actually -- I'm sorry -- it's already laid

21   out in the complaint, which has been made part of this record.

22          **MS. CASTRO:**   Understood, Your Honor.

23       I'll move on.

24   **BY MS. CASTRO:**

25   **Q.**   Now, there was also reference, during Mr. Veintemilla's

1   attorney's questioning, to the portion of the complaint that

2   referred to Mr. Ortiz's history as a source for the FBI.  Do

3   you recall that line of questioning?

4   **A.**   Yes.

5   **Q.**   We already talked about the fact that Mr. Veintemilla was

6   interviewed by law enforcement; is that right?

7   **A.**   That's correct.

8   **Q.**   When Mr. Veintemilla was interviewed by law enforcement,

9   did he, in any way, assert or claim that he believed his

10  actions in Haiti were sanctioned by the U.S. government?

11  **A.**   No.

12  **Q.**   Did he, in any way, assert or claim that his actions in

13  Haiti were sanctioned by the Department of Justice?

14  **A.**   No.

15  **Q.**   The FBI?

16  **A.**   No.

17  **Q.**   Going back to the term "private" -- to the reference to

18  Mr. Veintemilla offering private security -- well, I'll move on

19  from that.  I withdraw.

20        There -- there was also questioning from defense counsel

21  for Mr. Veintemilla regarding what meetings Mr. --

22  Mr. Veintemilla may have been in attendance at.  Do you recall

23  that?

24  **A.**   I do.

25  **Q.**   Did you review any photographic evidence with respect to

FERLAZZO - REDIRECT / CASTRO

1   these meetings?

2   A.   Yes.

3   Q.   Did you ever see Mr. Veintemilla pictured in any

4   photographs at these meetings?

5   A.   Yes.

6   Q.   And in those photographs, was he pictured align --

7   alongside other coconspirators in this case?

8   A.   Yes.

9   Q.   Including Mr. Ortiz?

10  A.   Yes.

11  Q.   There was also a line of questioning from

12  Mr. Veintemilla's counsel that I think -- I believe came up --

13  I apologize -- that I believe came up across the various

14  cross-examinations, which was this notion of a self-surrender

15  by the defendants.  Do you remember that?

16  A.   Yes.

17  Q.   Can you describe as -- how long you've been a law

18  enforcement officer?

19  A.   Coming up on 14 years.

20  Q.   Can you describe some of the operational hazards that are

21  entailed in a self-surrender?

22  A.   It's just an increase to the -- the risk of flight when

23  you're actually letting someone know that you actually finally

24  have an arrest warrant, yes.  Your hand is shown, so to speak.

25  Q.   Fair to say that there's concern about permitting anyone

 1   to self-surrender if you believe they are a risk of flight?

 2   A.   Correct.

 3   Q.   There's been a lot of characterizations --

 4   characterizations by defense counsel as to the evolving phases

 5   of the conspiracy.  Do you recall that?

 6   A.   I do.

 7   Q.   Based on your knowledge of the investigation, is it your

 8   view that assassination was only ever the discussion at the

 9   very end of this conspiracy?

10   A.   No.

11   Q.   Can you explain what you mean?

12        MR. BELL:  Objection to "view."  We were talking about

13   evidence and not his opinion.

14        THE COURT:  I understand, but I understand it's him --

15   to be asking about his perspective on the evidence.  Overruled.

16        THE WITNESS:  You know, based from -- from witness

17   testimony, the -- the theme of assassination was either

18   accepted as collateral damage early on or specifically thought

19   of.

20        MS. KUDMAN:  Your Honor, I'm going to object to the

21   vagueness of this testimony.  Who are they -- who's having

22   these discussions?  When are these discussions happening?

23   Who's present for these discussions?

24        I mean, these kinds of generalizations are truly

25   objectionable.

1          **THE COURT:**  They're also just not helpful in terms of

2    where we are in this hearing, having reviewed in a chrono- --

3    chronological order what the correspondence were.

4          **MS. CASTRO:**  I understand, Your Honor.

5       I'll move on.

6    **BY MS. CASTRO:**

7    **Q.**   I want to go back to Mr. Bergmann, and we talked about the

8    vests -- and it came up in cross as well -- that Mr. Bergmann

9    shipped to Haiti; is that right?

10   **A.**   Correct.

11   **Q.**   Do you know -- actually, withdrawn.

12      Do you know what some of the gear was that the assassins

13   used when they entered the President's home on July 7th?

14   **A.**   Yes, the vests.

15   **Q.**   The same vests we've been talking about?

16   **A.**   The same vests.

17   **Q.**   Okay.  I just wanted to make that clear.

18      Now, there was also a line of questioning from

19   Mr. Bergmann's attorney regarding whether Mr. Bergmann ever, at

20   any point, expressed surprise in the assassination of Mr. -- of

21   President Moïse.  Do you remember that?

22   **A.**   Yes.

23   **Q.**   Did you ever see any text messages where Mr. Bergmann

24   attempted to rebuke Mr. Intriago for the outcome in -- in

25   Haiti -- or let me rephrase it -- expressed surprise at the

FERLAZZO - REDIRECT / CASTRO

1  outcome in Haiti?

2  **A.**   You're talking about days afterwards?

3  **Q.**   Yes.

4  **A.**   Yes.

5  **Q.**   Okay.  Could you just give, like, a substance of your

6  memory of that communication?

7  **A.**   Days after, what I read was things had kind of went

8  against the things that he had said earlier, talking about --

9  claiming that he was never supportive of any violence.

10 **Q.**   Okay.  So I want to be clear.  When you say the statements

11 that you were reading from Mr. Bergmann days after went against

12 the statements that he -- who had made earlier?

13 **A.**   Bergmann himself --

14 **Q.**   Okay.

15 **A.**   -- as far as being aware of what the --

16 **Q.**   Okay.

17 **A.**   -- the actions were.

18 **Q.**   All right.  Now, there was also questioning as to whether

19 Mr. Bergmann was attendance -- Mr. Bergmann was in attendance

20 at any of the meetings that were held in South Florida

21 regarding the suggested coup.

22     Do you know whether Mr. Bergmann said anything about

23 attending these meetings in his interview with law enforcement?

24 **A.**   I think he spoke to them as well.  He just -- he might

25 have said May in his interview.  I can't remember specifically

```
 1   without the report in front of me.
 2   Q.   Understood, but without recalling the specific date, you
 3   recall him referencing attending such meetings?
 4   A.   Correct.
 5            MS. CASTRO:  Okay.  Just one moment, Your Honor.
 6        Your Honor, that -- that concludes our redirect at this
 7   time.
 8            THE COURT:  Okay.  All right.  Ms. Kudman, you wanted
 9   redirect of that last question?
10            MS. KUDMAN:  Your Honor, if I can redirect on just a
11   couple of other very quick points.
12            THE COURT:  Okay.  I'm going to ask everybody to be
13   cognizant of the fact that this has been going on --
14            MS. KUDMAN:  I understand.
15            THE COURT:  -- for two hours and not revisit any
16   grounds that have been covered before.
17        Mr. Bell, are you at the podium because you likewise wish
18   to redirect -- redirect?  Okay.
19            MR. BELL:  I don't think I have any questions with
20   regard to my case.
21            THE COURT:  Okay.  Ms. Kudman?
22            MS. KUDMAN:  Thank you, Judge.
23                       RECROSS-EXAMINATION
24   BY MS. KUDMAN:
25   Q.   Okay.  Agent, directing your attention to Paragraph 33,
```

1  where you say that Veintemilla responded, in substance, that

2  things took too long, and there was no money or investors.

3  Mr. Veintemilla specifically said "and until Moïse was out of

4  office"; correct?

5  **A.**  Correct.

6  **Q.**  He didn't say "until Moïse is dead"; correct?

7  **A.**  That's correct.

8  **Q.**  And in terms of the text message of the whiteboard to

9  Mr. Veintemilla --

10       **MS. KUDMAN:**  Your Honor, do you have a copy of this?

11       **THE COURT:**  I don't.

12       Thank you, Ms. Kudman.

13       Is this what you -- you want me to keep, or do you want

14  it --

15       **MS. KUDMAN:**  I just want you to take a look at it.

16  **BY MS. KUDMAN:**

17  **Q.**  There's no explanation of what that is when the text is

18  sent -- correct? -- to Mr. Veintemilla?

19  **A.**  So I actually think it's accompanied by a longer audio,

20  where he's describing it in Spanish, but not that I have a

21  memory of -- that's going to give it clearer than what I

22  already stated.

23  **Q.**  There's no description of, like, what that is showing or

24  what the plan is or who each of those people are or --

25  **A.**  No.

 1   **Q.**   -- anything; correct?

 2   **A.**   No.

 3   **Q.**   Okay.  Now, there's been mention of an arrest document for

 4   President Moïse; correct?

 5   **A.**   Yes.

 6   **Q.**   And that document was actually signed by a Supreme Court

 7   Justice in Haiti; correct?

 8   **A.**   That's correct.

 9   **Q.**   It was also signed off on by several deputies in Haiti;

10   correct?

11   **A.**   I'm only familiar with the ones -- the signature of the

12   one judge, but there might have been another signature at the

13   bottom, but I can't say whether it's several or one.

14   **Q.**   Okay.  And you would agree with me that my client is not a

15   lawyer; correct?

16   **A.**   Correct.

17   **Q.**   He's certainly not a lawyer in Haiti; correct?

18   **A.**   That's correct.

19   **Q.**   Okay.  So you wouldn't expect him to know who has

20   authority to arrest whom; correct?

21           **MS. CASTRO:**  Objection, Your Honor.

22           **THE COURT:**  Sustained.

23   BY MS. KUDMAN:

24   **Q.**   Now, in that same message in Paragraph 33, there's

25   reference to investors; correct?  I'm sorry.  I'll let you take

1    some time to look at it.

2    **A.**    Yes, 33.

3    **Q.**    Mr. Veintemilla mentioned that investors would not

4    continue to provide any funding to CTU; correct?

5    **A.**    That's correct.

6    **Q.**    So is it your understanding that the line of credit was

7    actually not issued by Mr. Veintemilla personally?

8    **A.**    Issued by him, but to -- to your point, he has investors

9    in this initiative.

10   **Q.**    Right.

11         It's not his money.  It's investor money; correct?

12   **A.**    I don't know if it's not -- if it's all investor money or

13   if he doesn't -- isn't contributing some of his own.  I'm not

14   actually sure of the -- the breakdown from where this came

15   from.

16   **Q.**    So you don't know if he invested or not?

17   **A.**    I don't know how much he contributed himself.  I don't.

18   **Q.**    Okay.  But you --

19   **A.**    No.

20   **Q.**    -- know that, certainly, this line of credit was funded by

21   investors?

22   **A.**    Correct.

23   **Q.**    Thank you.

24         **MS. KUDMAN:**  I have nothing further.

25         **THE COURT:**  Okay.  Does that conclude our examination

```
 1   of this witness?

 2            MS. CASTRO:  It does -- oh.  No, it doesn't.

 3            MR. BELL:  Yes, Judge, for me at least.

 4            THE COURT:  Okay.  Well, then, as promised, I need to

 5   give my court staff a break.

 6            MR. BELL:  Of course.

 7            THE COURT:  Okay.  Okay.  All right.  We're going to

 8   break until 1:30.

 9            THE CLERK:  All rise.

10            MR. CARUSO:  Your Honor, Michael Caruso on behalf of

11   Mr. Pretel Ortiz.

12       May I beg the Court's indulgence for one second?

13            THE COURT:  Yes, sir.  Go ahead.

14       Everybody else, sit back down.

15            MR. CARUSO:  I'll be fast.  You don't have to sit

16   down.

17       Do you have any intention of addressing the conflict issue

18   today?

19            THE COURT:  The -- in the manner that I spoke to

20   Ms. Holt about at sidebar.

21       So, Ms. Holt, did you convey to Mr. Caruso what we're

22   going to do?  Sorry.

23            MR. CARUSO:  Okay.

24            THE COURT:  So the short answer is I'm not going to

25   take the substance of it up.  It was just filed, and so I'm not
```

1  going to arraign him today.

2      I'm so sorry.  You've been here for three hours for that?

3          **MR. CARUSO:**  I found it very interesting, though.

4                          (Laughter.)

5          **MR. CARUSO:**  It's not -- it's time well spent.

6          **THE COURT:**  I'm sorry.

7          **MR. CARUSO:**  No.

8          **THE COURT:**  Okay.

9          **MR. CARUSO:**  I mean, he's -- Mr. Pretel Ortiz is my

10  client as well.  So you don't have to apologize.

11         **THE COURT:**  I understand.  I understand, Mr. Caruso.

12     Okay.  All right.  Is it 1:30?

13         **THE CLERK:**  I'll go down and get her.

14         **THE COURT:**  We'll see everybody back at 1:30.  Okay?

15                     (Recess taken at 1:12 p.m.)

16                 (Proceedings resumed at 1:32 p.m.)

17         **THE CLERK:**  All rise.

18         **THE COURT:**  Okay.  All right.  Please be seated.  I

19  apologize for the delay.

20     Okay.  Ms. Castro --

21         **MS. CASTRO:**  Yes, Your Honor.

22         **THE COURT:**  -- do you have another agent?

23         **MS. CASTRO:**  We -- I do, Your Honor.  My colleague,

24  Ms. Goldbarg, had an opportunity to talk with him while I was

25  doing my other presentation.  So she's actually going to do a

1   very quick direct with that agent.

2          **THE COURT:**  I appreciate it.

3      Go ahead.

4          **MS. GOLDBARG:**  Yes, Your Honor.

5      The Government would like to call Justin Carsten to the

6   stand.

7          **THE CLERK:**  Sir -- sir, raise your right hand.

8                          **JUSTIN CARSTEN**,

9   called as a witness for the Government, having been duly sworn,

10  testified as follows:

11         **THE WITNESS:**  I do.

12         **THE CLERK:**  Thank you.  Please be seated.

13     Speak into the microphone.  State your name.  Can you

14  spell your last name for the record and tell us where you're

15  employed?

16         **THE WITNESS:**  Justin M. Carsten, C-a-r-s-t-e-n,

17  Federal Bureau of Investigation.

18         **MS. GOLDBARG:**  May I inquire, Your Honor?

19         **THE COURT:**  Yes.

20                      **DIRECT EXAMINATION**

21  BY MS. GOLDBARG:

22  **Q.**   Special Agent Carsten, were you one of the agents that

23  arrested Walter Veintemilla on February 14th of this year?

24  **A.**   Yes, I was.

25  **Q.**   At what time approximately did you arrive at -- at

1    Mr. Veintemilla's house?

2    **A.**   We arrived at his house at approximately 5:10 a.m.

3    **Q.**   Can you explain to the Court what it is that you did once

4    you arrived at his house?

5    **A.**   Once we arrived at his house, we positioned the vehicles

6    in front of the house, including a police car and an FBI

7    official vehicle with red and blue flashing lights, and then we

8    deployed the personnel around the house and called

9    Mr. Veintemilla using my cell phone.

10   **Q.**   Did you call him?

11   **A.**   I did, using my phone.

12   **Q.**   Okay.  Did you speak with him?

13   **A.**   I did, yes.

14   **Q.**   What did you say?

15   **A.**   I informed him -- I addressed him by name and informed him

16   that I was -- of my name and that I was calling from the FBI

17   and asked him to come outside.

18   **Q.**   What, if anything, did he say?

19   **A.**   He asked me if he could use the restroom before he came

20   outside, and he asked if he was under arrest.

21   **Q.**   And what -- what response did you give to him?

22   **A.**   I asked him if he could delay his restroom visit until he

23   came outside and spoke to us but assured him we would allow him

24   to use the bathroom, and I deferred the question as to

25   whether -- his arrest and told him we'd talk about that when he

1   came outside.

2   **Q.**   Okay.  Did you instruct him of what he should or should

3   not have in his hands when he came out of the house?

4   **A.**   I did.  I told him that he could put on clothing before he

5   came outside but that he should have his -- he could stay on

6   his phone, because he was on his cell phone with me, and he

7   could keep the cell phone with him but that, when he came

8   outside, he should have his hands up.  He should have no other

9   objects with him or on his person or in his hands.

10  **Q.**   And what happened next?

11  **A.**   Mr. Veintemilla came to the front door.  He came outside.

12  He was given instructions by another agent verbally on where to

13  walk.  He was asked to walk to one of the vehicles, turn

14  around, and he was handcuffed by one of the task force

15  officers.

16  **Q.**   What happened after that?

17  **A.**   I spoke to him very briefly, asked him if he'd like to

18  change clothes, you know, take care of some personal items, use

19  the restroom.  He indicated he would like to.  We discussed

20  going back into his house to do that, and then we took him back

21  into the house to do those things.

22  **Q.**   What happened when you got into the house?

23  **A.**   Once we got into the house, we met his wife at the front

24  door.  We briefly explained to her what was happening.  And

25  when we walked into the house, there were two other females by

1    the stairs.  We went back to his bedroom/bathroom area.  He was

2    allowed to use the restroom, change clothes, and then we picked

3    up his medication.

4    Q.   And then what happened before you left the house?

5    A.   Before we left the house, we gave him a few minutes to say

6    goodbye to his other family members who were there, his wife,

7    make sure to get his medication and gave him a few minutes to

8    coordinate with his wife so he could contact -- or she could

9    contact his attorney for him.

10   Q.   Can you describe the general interaction that you had with

11   Mr. Veintemilla?

12   A.   It was calm, polite, and professional.

13   Q.   Did he, at any point in time, resist any of your

14   instructions?

15   A.   No.

16   Q.   Okay.  Approximately how long did this interaction take?

17   A.   I couldn't say how long we were at the house exactly.

18   There would be a -- there would be a record of that by when we

19   started transport.  So I wouldn't want to guess.  We were not

20   there a long time, though.

21        **MS. GOLDBARG:**  Nothing further.

22        **THE COURT:**  Okay.

23                       **CROSS-EXAMINATION**

24   BY MS. KUDMAN:

25   Q.   Good afternoon, Agent.

1   **A.**   Good afternoon.

2   **Q.**   Okay.  Thank you for being here.

3        How long had you been involved in this investigation prior

4   to the arrest of Mr. Veintemilla?

5   **A.**   I'm not involved in this investigation other than my

6   participation assisting in particular operations.

7   **Q.**   Okay.  Were you told about Mr. Veintemilla's personal

8   circumstances with his child being ill?

9   **A.**   I was told by other agents that he had a child who was

10  special needs, yes.

11  **Q.**   Okay.  And were you told that anybody had concerns about

12  him being a danger to you or your agents in arresting him?

13  **A.**   Not specifically.  Like any -- like an unusual

14  circumstance or something like that?

15  **Q.**   Well, did anybody indicate to you that they thought that

16  Mr. Veintemilla might be violent when you went to arrest him?

17  **A.**   Other than normal concerns for safety, nothing unusual,

18  no.

19  **Q.**   Okay.  Did everybody indicate to you that Mr. Veintemilla

20  had previously asked to be able to voluntarily surrender if it

21  was decided to arrest him?

22  **A.**   That was never discussed with me, no.

23  **Q.**   Okay.  And when you asked him to come out on the phone,

24  did Mr. Veintemilla, in any way, indicate to you that he didn't

25  want to come out?

1    **A.**    No.

2    **Q.**    He immediately told you that he wanted just to put on some

3    clothes and come out to you?

4    **A.**    Mr. Veintemilla was completely compliant, and when he

5    asked to get dressed and things like that, it was -- he was not

6    being noncompliant.  He was just asking.

7    **Q.**    Okay.  And in return, you extended him some nice

8    courtesies by allowing him to change into clothes that he might

9    be more comfortable in?

10   **A.**    That's correct, yes.

11   **Q.**    Okay.  And you allowed him to take time through his home

12   and get medications that he needed?

13   **A.**    I believe his wife got the medications.

14   **Q.**    Okay.  And he indicated to you that he's diabetic, and so

15   he needed medicine for diabetes?

16   **A.**    Not at that time.  We did not ask what -- at least to my

17   recollection, I don't recall asking what medications

18   specifically he was taking.  We just asked him if he needed any

19   medical attention, if he needed -- if he had any -- any

20   conditions, if he needed to bring any medications, to bring

21   them.

22   **Q.**    Okay.  And he indicated that he did indeed have some

23   conditions that needed some treatment?

24   **A.**    He did, yes.

25   **Q.**    Okay.  And did you later understand that Mr. Veintemilla

1   is diabetic and needs medication for that?

2   **A.**   He later told us he was diabetic, yes.

3   **Q.**   Okay.  And, indeed, his wife packed up his pill bottles

4   for that; correct?

5   **A.**   She placed a number of pill bottles in a plastic Ziploc

6   bag, and we did take them with us, yes.

7   **Q.**   Okay.  And Mr. Veintemilla was compliant at all times?

8   **A.**   Absolutely, yes.

9   **Q.**   He didn't seem surprised when you were there?

10  **A.**   I couldn't say whether or not he appeared surprised.  I

11  think that would be beyond what I could say, but he didn't --

12  he was not resistant or -- and he was completely compliant.

13  **Q.**   And he was polite?

14  **A.**   He was polite and professional the entire time.

15  **Q.**   Thank you.

16          **MS. KUDMAN:**  I have nothing further.

17          **MS. GOLDBARG:**  Nothing further for him.

18          **THE COURT:**  Okay.  Thank you, Agent.  Thank you for

19  coming forward.

20          **THE WITNESS:**  Thank you, Your Honor.

21          **THE COURT:**  Okay.  Does that conclude the evidentiary

22  portion except for what I've discussed with Ms. Holt?

23          **MS. KUDMAN:**  Yes.

24          **MR. BELL:**  Judge, I -- I do have some photographs I

25  wanted to show the Court.

```
 1            THE COURT:  Okay.  Go ahead, Mr. Bell.

 2            MR. BELL:  And I would proffer, although I do have a

 3    witness here, if it's necessary -- I don't think it's

 4    necessary, but if it turns out to be, we can do that.

 5            THE COURT:  Okay.

 6            MR. BELL:  But --

 7            THE COURT:  Go ahead, Mr. Bell.  You've got the floor.

 8            MR. BELL:  Huh?

 9            THE COURT:  You've got the floor.

10            MR. BELL:  So, Judge, there was some -- I think

11    Agent -- and I'm going to mispronounce his name, and I don't

12    mean to be rude when I say that, but Agent Ferzzalo or --

13            MS. CASTRO:  Ferlazzo.

14            MR. BELL:  -- Ferlazzo testified he wasn't present

15    when my client was arrested but that he had understood that my

16    client's wife opened the door and that my client was holding

17    something.

18        I would proffer, Number 1, he wasn't there.  He admitted

19    that.  Number 2, if necessary, my client will contradict that,

20    and my client's wife will testify Mr. Bergmann actually opened

21    the door.  And the reason he had something in his hand --

22            THE COURT:  Mr. Bell, just remember that if you're not

23    on the microphone, then you're not on the transcript.  So --

24            MR. BELL:  The reason he had something in his hand is

25    because of the locking device on his door.  He didn't go fetch,
```

1  as the Government apparently argued at one point, a curtain rod

2  to answer the door.

3       And, again, I would proffer that Tracey Martin, my

4  client's wife of over 20 years, is sitting here in court.  She

5  was sitting next to me throughout the Court's hearing.  And, if

6  necessary, she would testify that he answered the door, and he

7  put that device down as soon as he was instructed to.

8            **THE COURT:**  Okay.  Okay.

9            **MR. BELL:**  Then with respect to argument, if I may --

10  I don't know if anybody else has --

11            **THE COURT:**  I just want to get confirmation that

12  there's no one else who intends to advance evidence.

13       From the Government?

14            **MS. CASTRO:**  No, Your Honor.  Thank you.

15            **THE COURT:**  Ms. Kudman?

16            **MS. KUDMAN:**  No, Your Honor.

17            **THE COURT:**  Okay.  All right.

18            **MR. BELL:**  So just a second, Judge.

19       All right.  So -- so, Judge, first of all, my client does

20  not present a serious risk of flight, which the Government has

21  the burden of demonstrating here today to obtain detention as

22  the relief that they're seeking.

23       Their own witness, as to the more serious charges and

24  allegations that are being made in this case generally, which

25  are lodged in Counts 1 through 3 of the indictment, that

1    include the offense of conspiring to not just depose Mr. Moïse

2    but to assassinate him -- he conceded that there's no probable

3    cause that my client was involved in those offenses, that he

4    committed those offenses.  And as such, he wasn't charged with

5    those offenses.

6          And I'd point that out to start here because I think, on

7    some level, my client has been lumped in unfairly in the

8    request for detention as if he was charged with those offenses;

9    and, therefore, he would be facing God knows how much time for

10   having allegedly committed those fences -- offenses and,

11   therefore, might have an incentive to flee.

12         Okay.  And the bottom line is when I questioned the agent

13   multiple times, the only thing that he could suggest that might

14   indicate my client is a risk of flight is that he receives

15   mental health treatment or that he was anxious when they

16   arrested him.  I think most people would probably be anxious

17   when they arrested them.

18         And as shown in the Pretrial Services report, my client

19   does receive mental health treatment.  And I would proffer to

20   the Court -- and his wife would testify, if necessary -- that

21   he is seeing a doctor.  The doctor has a name.  The doctor

22   prescribes specific medications for his condition.

23         So, of course, anybody under those circumstances might be

24   anxious, but that's not a grounds from which any Court can find

25   or infer that the defendant is a risk of flight, much less a

 1   serious risk of flight.

 2         Mr. Bergmann, Your Honor, is a 63-year-old man, a

 3   native-born United States citizen, with strong ties to the

 4   communities and none really outside the United States.  I would

 5   proffer to the Court he's lived at the same home, as verified

 6   in the Pretrial Services report, with his wife in Tampa and

 7   that he's lived in the Tampa area for 20 years, approximately.

 8         He's married to Tracey Bergmann.  They've been married

 9   since 2002 -- -2, and they have a daughter, who lives with them

10   at that home.  Their daughter has severe HDHD [sic], anxiety

11   disorder, and executive function disorder.  My client obviously

12   takes part in making sure that she gets the appropriate care

13   and treatment for those sorts of things.  She also takes

14   medications for those conditions.

15         Tracey Martin is here in court, came here from Tampa.

16   Tracey Martin is willing to cosign a bond.  She's, again, been

17   married to my client since 2002.  She's a pediatrician, and

18   she's been working at the same practice in Tampa since 1998.

19   Before that, she was in the Air Force.  She is the model of

20   stability, the model of the sort of surety this Court would

21   want.

22         Together -- again, as you heard already, when my client

23   was colloquied with respect to the appointment of counsel, and

24   as set forth to some extent in the Pretrial Services report --

25   but I'll proffer that they own the property listed.  They live

1  at the property listed in that Pretrial Services report.

2      They have a mortgage on it of roughly half a million

3  dollars, although Tracey Martin, his wife -- or Dr. Martin

4  informs me that they do have substantial equity in their house

5  because of the fair market value, although it's not clear how

6  much.

7      But it's north of $500,000 or somewhere -- well, I'm

8  sorry.  Not north of 500,000 dollars -- dollars, but somewhere

9  in the neighborhood of $500,000 of equity, give or take, maybe

10  somewhere in between 3- to $500,000.  But the point is there's

11  substantial equity, and there's a lot for her to lose,

12  including her house.

13      They also own together the property where Mr. Bergmann's

14  parents live.  That's 3146 Waverly Park in Tampa.  As shown in

15  the Pretrial Services report, they together have over $200,000

16  in equity there.

17      So between those two properties, they both have a lot to

18  lose should my client flee, leave the jurisdiction, fail to

19  comply with bond, and that sort of thing.

20      Additionally, my client's wife, Dr. Martin, has a property

21  that he doesn't own.  He's not on the title because she owned

22  it and lived in it before they got married years ago.

23  Apparently, she still uses it for purposes of deriving rental

24  income, but she owns the property.  It's at 3132 Waverly Place

25  in Tampa, Florida.

1     If you look at Mr. Bergmann's background, Your Honor, his

2  extensive ties to the community, his marriage of 20-plus years,

3  it shows that he presents little or no risk of flight.  Again,

4  the standard here is whether he's a serious risk of flight,

5  that he'll flee.

6     As to the nature of the case, which I think the Government

7  has been sort of relying on to some extent to say, "Well, this

8  shows that he's likely to flee," again, he's charged solely

9  with three offenses all revolving around the unlawful smuggling

10  of these vests.

11     I've run the guidelines on those offenses.  Without

12  acceptance of responsibility, it's 63 to 78 months.  Now,

13  certainly, that's some time.  I wouldn't make fun or make light

14  of a 63-month sentence, but it's not the kind of sentence that

15  a 64-year-old man, who's lived his entire life in the

16  United States, who's a United States citizen, whose wife is

17  signing on a bond that, if he ran, his own parents would lose

18  their house, is likely to run for -- or run away from.

19     And, again, as it relates to the nature of the case and

20  its notoriety and the fact that, unfortunately, it did

21  revolve -- result in the death of Mr. Moïse, who was the

22  then-President of Haiti, my client is simply not charged with

23  those offenses, and that agent testified there's no probable

24  cause that he committed them.

25     The other thing is look at the Bail Reform Act.  The

statute in this case -- case doesn't favor detention.  It's not
a rebuttable presumption case.  In fact, the opposite is true.
This doesn't involve a crime of violence with a stat max of
over ten years.  It's not a crime with a life of -- max
imprisonment of life, a drug trafficking or controlled
substance offense with a mandatory minimum, or any other sort
of the classic cases identified there.

Additionally, and importantly, Mr. Bergmann undeniably,
uncontrovertedly, has known about this investigation for some
time.  The agent verified in cross-examination that, in July of
2021, his colleagues or coagents, if you will, went to my
client's house, and they talked to him.  It was, quote/unquote,
"obvious" why they were there, and they talked to him about the
subject matter of this investigation.

And you can infer that Mr. Bergmann may have realized or
seen that other persons who were now defendants were arrested
before him, and he didn't flee.  According to the agent's
testimony, Homeland Security surveilled him in anticipation of
his arrest, and they did not see or hear anything that
suggested he might flee.  He was compliant when they showed up
at his house and submitted to their authority.

In short, Your Honor, there are bond conditions that the
Court can and should grant that will reasonably assure
Mr. Bergmann's appearance in court.  Detention, simply put, is
unwarranted -- -warranted.  And the record in this case, in its

 1   totality, both as to his background, his lack of any meaningful

 2   criminal history -- there's nothing in his background that

 3   suggests he would fail to appear.

 4        He knew about this.  He knew it was coming, and he was

 5   found at his house.  He had a lot of opportunities to flee, and

 6   apparently -- and, obviously, he didn't take those

 7   opportunities.  The record simply doesn't support detention in

 8   any way.  We propose that the Court grant him bond.  I can be

 9   specific.

10        I think you should combine -- you should grant a

11   combination bond, if you will, Your Honor -- or bonds, plural.

12   One would be a high personal surety bond.  I would suggest at

13   about $550,000 cosigned by Tracey Bergmann, who is here in

14   court.  And the other would be a 200,000-dollar/10 percent bond

15   that, of course, would require a 20,000-dollar deposit with the

16   Clerk of the Court.

17        I'd proffer to the Court that my client's wife put that

18   money already in my trust account so that, if -- if you grant

19   bond, I could get ahead of this and get the money deposited

20   right away and that those funds come from her USAA savings

21   account from a lifetime of savings.

22        Again, the totality of the circumstances here favor bond,

23   and Tracey Berg- -- Tracey Martin -- she goes by her family

24   name -- is an excellent, excellent surety, given the

25   circumstances.

 1      And there's nothing here to suggest that Mr. Bergmann

 2   would flee the jurisdiction, resulting in his wife and daughter

 3   losing their home, his parents losing their home, and his wife

 4   losing the home that she had before she met him.  There's just

 5   nothing about him to suggest that he would ever do that to

 6   them.

 7           **THE COURT:**  Okay.  Thank you, Mr. Bell.

 8       Have I heard you out?

 9           **MR. BELL:**  I'm sorry?

10           **THE COURT:**  Have you -- your -- I want to turn to the

11   Government.  Have I heard everything?

12           **MR. BELL:**  Oh, yes, of course.

13       Thank you, Judge.

14           **THE COURT:**  Okay.  Ms. Castro?

15           **MS. CASTRO:**  Thank you so much, Your Honor.

16       It's the Government's position that Mr. Bergmann is

17   absolutely a serious risk of flight, and I'm going to begin by

18   referencing the net equity just briefly with respect to

19   Mr. Bergmann's homes because I know that was -- that was

20   somewhat explored at the time of CJA appointment.

21       And it was unclear, in the pretrial report, what the

22   equity was in Mr. Bergmann's homes.  He acknowledged he was

23   unsure of it in the pretrial report.  But to defense counsel's

24   point, we do have documentation that Mr. Bergmann has

25   approximately 1-point -- nearly a million and a half dollars in

1    equity in his two homes.

2        Now, I understand defense counsel is proffering that that

3    means there is a substantial property or a substantial amount

4    that could be used to secure Mr. Bergmann's potential return,

5    but I would submit it also shows that he has resources that

6    could be liquidated to facilitate flight should he choose to go

7    down that path.

8        **THE COURT:**  Why isn't that alleviated by a condition

9    that -- of nonencumbrance?

10       **MS. CASTRO:**  I couldn't --

11       **THE COURT:**  If -- just as to that specific argument --

12       **MS. CASTRO:**  Sure.

13       **THE COURT:**  -- if the homes are used first to secure

14   the bond, and I separately impose the condition that they are

15   not able to encumber or otherwise sell the property during the

16   condition of bond, then they wouldn't be able to liquidate and

17   have -- is that what you're arguing, is that they have a lot of

18   assets?

19       **MS. CASTRO:**  Yes, Your Honor, but I would also note

20   that this seems to have not been fully represented by

21   Mr. Bergmann at the time of the initial, and so the Government

22   does have some concern that there was not complete candor in

23   this regard.

24       **MR. BELL:**  Well, I disagree with that.

25       **MS. CASTRO:**  I think that's relevant to Your Honor's

```
 1   consideration.
 2          THE COURT:  I appreciate it, but I'd really also
 3   appreciate everyone not interrupting each other.
 4          MR. BELL:  Understood.
 5          THE COURT:  Again, if we ever need to make a
 6   transcript of this hearing, it's got to be clean and clear.
 7          So I will say, Ms. Castro, that at the time of the
 8   initial, as is my practice, when I saw that it was the -- or I
 9   think I asked him, "That's the home where you and your wife
10   live in?"
11          Then I don't press the value because if there was another
12   person who was living in that house and has the right to, it's
13   not usually the asset that we are looking to, for purposes of
14   appointment of counsel, making themselves to hire an attorney.
15          So I didn't press on the assets.  I'm -- I'm just hesitant
16   to put too much weight in my failure to ask questions.
17          MS. CASTRO:  Understood, Your Honor.
18          I'll move on from that point.
19          THE COURT:  I don't mean to cut you off.
20          MS. CASTRO:  No.  I understand.
21          THE COURT:  I'm just telling you how I'm
22   contextualizing it because once I knew that he and his wife
23   lived there, I wasn't going to make him sell it to hire an
24   attorney.
25          MS. CASTRO:  I understand, Your Honor.
```

 1    With respect to the remainder of the Government's

 2   argument, the defense -- defense counsel has talked at length

 3   about the fact that Mr. Bergmann suspected he was perhaps a

 4   suspect in this investigation.  And, of course, that was clear

 5   over -- as the witness was being examined.

 6    But the situation is very different today.  Mr. Bergmann

 7   is now indicted.  Mr. Bergmann has now read, in a complaint,

 8   the wealth of evidence that the Government has against

 9   Mr. Bergmann, which is to say that his incentive to flee is

10   today the strongest that it has ever been.

11    At the time of the original interview, Mr. Bergmann did

12   not know that the Government had text messages where

13   individuals were talking to Mr. Bergmann about a, quote, "coup

14   meeting."  Mr. Bergmann did not know that the Government had

15   text messages where he was engaged in discussions as to

16   providing screws and nails in furtherance of a coup to remove

17   President Moïse.

18    Now, I understand defense counsel's point that he's not

19   charged at this stage with an involvement in a conspiracy to

20   kill or kidnap.  But the evidence in the complaint lays out, at

21   minimum, exposure for Mr. Bergmann not only as to the current

22   charges but as to charges that may be coming down the road.

23   And that is a relevant consideration for Mr. Bergmann's risk of

24   flight.

25    He's also an individual who is older in age and is facing

1    potentially 20 years in prison, and that, too, would suggest a

2    risk of flight as to Mr. Bergmann, considering that that could

3    be the equivalent, for him, of a life sentence.

4         But at the heart of what's in the complaint is that

5    Mr. Bergmann practiced in deception.  Mr. Bergmann notably lied

6    to send ballistic vests that were worn by assassins when they

7    went into the President's home to kill him.

8         Mr. Bergmann was captured in communications openly talking

9    about how he could properly or best lie on the shipping forms

10   in order to help the Colombians that were retained get this

11   equipment.  At the time that he was originally interviewed, he

12   was also not aware of that.

13        And Mr. Bergmann's deception didn't just happen over the

14   course of the conspiracy.  It happened later, during his

15   interview.  When he was confronted by law enforcement, he

16   shifted the blame to the shipping company and said, "Well, no.

17   It was the shipping company who told me to lie on these forms."

18        The evidence also shows that Mr. Bergmann not only himself

19   lied but was coaching his coconspirators on how they could

20   further his deception to facilitate the receipt of these vests

21   in Haiti.

22        There were messages that he sent to Mr. Sanon confirming

23   what needed to be said to the individual in Haiti with respect

24   to receiving this equipment and why the medical equipment might

25   be needed, further evidence that this is an individual who

1    practices in deception.

2        Mr. -- Mr. Bergmann did not know at the time that he was

3    originally interviewed, for example, that the Government had

4    communications where he talked about, quote, "Battle happening

5    now."  The evidence in this case shows that Mr. Bergmann was

6    completely unsurprised and -- was completely unsurprised when

7    he learned that there had been an attack on the President's

8    residence.

9        And I understand that he's not currently charged with

10   that, but it does speak to the nature and circumstances of

11   the -- of the offense, and it does speak to the characteristics

12   of this defendant.

13       The conduct that this defendant engaged in does not

14   suggest that he has respect for the rule of law or that he

15   would be an individual who is inclined to comply with the terms

16   of conditional release.

17       **THE COURT:**  I have to interrupt you for a second.

18   It's always my practice to tell everybody where their uphill

19   battle lies.

20       **MS. CASTRO:**  Yes, Your Honor.

21       **THE COURT:**  So your argument so far has gone, it seems

22   to me, very much to the strength of the evidence, which is

23   significant.

24       So I don't -- you can argue any way you want to, but I

25   don't think that's your uphill battle.  Okay?

```
 1            MS. CASTRO:  Understood.

 2            THE COURT:  And, likewise, the nature and the

 3    characteristics of the offense -- or the characteristic of

 4    the -- of the crimes that are alleged collectively in the

 5    complaint, I also understand.

 6        But I don't think you're addressing serious risk of

 7    flight, other than he's named in an indictment now.

 8            MS. CASTRO:  Your Honor, I don't want to disregard

 9    Your Honor's comment on what is not -- is or is not my uphill

10    battle.  My point, with respect to the nature and circumstances

11    of the offense, is I do believe that they suggest this

12    defendant is a risk of flight.

13        This is an individual -- I think that his actions, as

14    memorialized in the complaint and set out in the evidence, do

15    not speak to a nature of being willing to comply with pretrial

16    conditions.

17        This is someone who, from his home, was able to play a

18    role in funneling resources to the assassination of a

19    President.  And that is a very bold -- that's a very bold step

20    for an individual to take.  And so I think that the nature and

21    circumstances here do not suggest that Mr. Bergmann is suitable

22    for pretrial release.

23        I do want to speak --

24            THE COURT:  Like I tell you, it's just -- it's a very

25    generic argument like "He broke the law, and so he'll do it" --
```

1    "he won't comply with bond."

2         **MS. CASTRO:**  Well, I think it's not just that he broke

3    the law, but the manner in which he broke the law is that he is

4    deceptive.  He showed a willingness to be extremely deceptive.

5         And the fact that he was willing to deceive law

6    enforcement, he was willing to lie on shipping paperwork, all

7    in furtherance of trying to unseat a President -- I don't

8    know -- presumably for some financial gain, begs the question

9    of what he might be willing to do, what deception he might be

10   willing to -- to engage in in order to avoid potential criminal

11   liability on the charges at issue here.

12        I do also want to reference the -- the mental health

13   issues that were raised by defense counsel and that have been

14   talked about.  The evidence came in that Mr. Bergmann,

15   immediately upon learning that there was an arrest warrant into

16   him, instructed his wife to Baker Act him.

17        We also know, from the evidence that was proffered, that

18   immediately after the assassination, Mr. Bergmann also sought

19   to be Baker Acted or was Googling the Baker Act.  This can mean

20   to the Government one of two things:

21        Either Mr. Bergmann legitimately, himself, believes that

22   he is a danger potentially to himself or others, which does not

23   speak well of his ability to comply with the conditions -- or

24   the terms of conditional release, which suggests instability;

25   or it could mean that Mr. Bergmann is malingering, and he is

1  willing to potentially commit himself in order to avoid

2  potential incarceration.

3      Either way that evidence comes out, it does not counsel in

4  favor of releasing this defendant, based on the evidence that

5  he now knows is presented against him.

6      **THE COURT:**  But you're traveling on serious risk of

7  flight, Ms. Castro.  So as you argue that -- and -- I mean,

8  without overindulging, those were not the only times that the

9  Pretrial Services report indicates that kind of treatment.

10     So you're right.  I don't know whether it's malingering or

11  it's legitimate.  The history seems to suggest, and I think the

12  testimony at the time of the arrest seems to suggest, that

13  there is, as of yet, unaddressed mental health problems that

14  are one of the characteristics -- or one of the facts that are

15  enumerated in 3142(g) that I have to take into account.

16     But I -- but I don't -- I'm not sure that I'm following

17  your argument that it makes him a serious risk of flight.

18     **MS. CASTRO:**  Well, Your Honor, if it is the case that

19  the defendant was malingering and he's willing to

20  potentially --

21     **THE COURT:**  Oh.

22     **MS. CASTRO:**  -- you know, submit to --

23     **THE COURT:**  I'm with you.

24     Okay.  Now I understand.  Sorry.

25     **MS. CASTRO:**  Understood.

 1          **THE COURT:**  Okay.  Now I have your argument.  I

 2   understand it, though, for what it's worth -- and, Mr. Bell,

 3   you'll still have a chance to respond -- does it not, for me,

 4   give rise to a concern about whether or not he will be able to

 5   comply with the conditions of his bond and the commands of the

 6   Court, depending on the -- I mean, that's why it is one of the

 7   enumerated factors in the statute.

 8       So I do want the mental health addressed.

 9          **MR. BELL:**  So, Judge, just because he's receiving

10   mental health treatment doesn't mean that he wouldn't comply

11   with the conditions of court.

12          **THE COURT:**  But that's not what the evidence is,

13   Mr. Bell.  I agree with you.  If he was just seeing a

14   therapist, I would --

15          **MR. BELL:**  So --

16          **THE COURT:**  -- be hard-pressed.

17          **MR. BELL:**  So -- and, again, as the Pretrial Services

18   report -- there are incidents of hospitalization in 2010, '19,

19   '20.  All that predates these things, again, July 2021.  I'd

20   proffer that he's seeing a specific doctor and that the

21   doctor's prescribing him specific medications.  None of that

22   suggests that he would not comply with bond.

23       Actually, what it suggests to me is that if he's at FDC,

24   which, in my considered judgment, as an experienced -- and

25   fielding calls from lawyers every other week in this town about

1  FDC, is not likely to render or give him the treatment he

2  needs.  It's only going to make this case more difficult to

3  move forward and deal with.

4      What makes sense is that he be released on bond, that the

5  conditions of release include that he continue to see his

6  doctor and whatever other condition you think is necessary to

7  make sure that he receives appropriate treatment and he

8  continue to receive his medications.

9      I can assure you this, that at FDC, I'll bet dollars to

10  doughnuts he won't get those -- that medication.

11          **THE COURT:**  I understand.  We're not there, and -- but

12  the mental health issue is considerable.

13      What about a third-party custodian?

14          **MR. BELL:**  Well, Judge -- I mean, I -- I've talked to

15  Ms. Bergmann with respect -- I'm sorry -- Dr. Martin.  I

16  apologize -- my client's wife about that.  And, obviously,

17  she's willing to do it -- I don't think it's necessary -- or

18  maybe a third-party custodian with respect to the medical

19  treatment.  Yeah, I don't have -- we don't have an objection to

20  that.  If you impose it, we'll live by it.

21      But -- but, you know, this -- I think the mental health

22  treatment is necessary.  I think he has to continue to see his

23  doctor, based on what I read in the Pretrial Services report.

24  But I don't think, like, we're dealing with some crazy person

25  who can't abide by -- with bond conditions.  And, in fact --

 1  and during his arrest, he complied, submitted to their

 2  authority, and essentially gave himself up when they asked him

 3  to.

 4      So -- but a third-party custodian is within your

 5  discretion, and she'll do it.  Uh-huh.

 6          **THE COURT:**  Okay.  Back to you, Ms. Castro.

 7          **MS. CASTRO:**  Your Honor --

 8          **MR. BELL:**  And -- I'm sorry, Judge.  May I -- I

 9  apologize.  One more thing.  May I?

10      So with respect that -- that my client is deceptive, the

11  manner in which he committed the offense --

12          **THE COURT:**  Sorry, but Ms. Castro is still in the

13  middle of her argument.  You'll get last word.

14          **MR. BELL:**  Oh.  I thought -- I thought it was my turn.

15          **THE COURT:**  No.  I interrupted because I wanted to ask

16  a question.

17          **MR. BELL:**  Oh.  I'm sorry.

18          **THE COURT:**  Sorry.

19          **MR. BELL:**  I misunderstood.  I apologize.

20          **THE COURT:**  Ms. Castro?

21          **MS. CASTRO:**  Thank you, Your Honor.

22      The only point -- and I don't want to belabor the point

23  because I think it's already been addressed by the Court.  But,

24  again, I just want to reiterate that either Mr. Bergmann

25  legitimately did need to be Baker Acted, which would suggest

1   that he believed he, himself, is a danger to himself and

2   others; or he did not legitimately need that, and he preferred

3   to put himself into a psychiatric ward to avoid being detained

4   in this case.

5        And I think that does suggest that he's a serious risk of

6   flight.  And I've touched on the point, and I will move on,

7   Your Honor.

8            **THE COURT:**  Understood.

9            **MS. CASTRO:**  The only other thing I will point is

10  something that did -- point to is something that did come up

11  briefly during the initial appearance was, again, the conduct

12  that Mr. Bergmann engaged in after the assassination.

13       We talked initially about communications that he had with

14  Mr. Sanon about whether or not a diplomatic vehicle was going

15  to be retrieving the guys, which we understand to be the

16  Colombians that had been retained by CTU and sent to Haiti on

17  behalf of this general mission to unseat President Moïse.

18       This suggests that he's communicating with Sanon about

19  potentially helping these individuals escape after they had

20  been involved in an attack on the President's residence.

21       And I did proffer today additional facts where, after the

22  President had been assassinated, Mr. Bergmann appeared to be

23  attempting to get funds again to funnel towards the guys that

24  were in Colombia [sic], again, presumably to assist with their

25  extraction or their -- their circumstance there in the

1   aftermath of the assassination.

2       So I think, to the extent there's evidence that

3   Mr. Bergmann was trying to help people who were involved in

4   this assassination somehow evade capture, it does speak to his

5   potential risk of flight.

6       And just one more point.  I will also add the reference to

7   "It's time for people to hit the streets."  As we've discussed,

8   "hit the streets" was part of the plan to help cover up the

9   crimes -- cover up the raid into the President's home.

10      So "hit the streets" is entirely consistent with an effort

11  to, again, help those who had engaged in these crimes avoid

12  capture or avoid being implicated in them, and that was a

13  statement from Mr. Bergmann.

14          **THE COURT:**  So you'll recall that, when Mr. Bell

15  resisted even a hearing for this, I had focused on that

16  sentence.  And I now, with the benefit of having your full

17  proffer and your agent's testimony, think that I misunderstood

18  it.

19      When I had read it in the complaint, I thought it

20  suggested Mr. Bergmann -- "hit the streets" meaning flee, like,

21  literally, like, "It's time for you guys to hit the skids."

22  And -- but as I understand it now, it's proffered that it's

23  time for sort of the -- I know we've been talking about

24  uprising --

25          **MS. CASTRO:**  Yes, Your Honor.

1          THE COURT:  -- for people to protest.

2          MS. CASTRO:  Right.

3          THE COURT:  Well, my point is this.

4          MS. CASTRO:  Yes, Your Honor.

5          THE COURT:  So -- and it's with apologies.  I put

6   exaggerated importance on a piece of evidence in the complaint

7   that I didn't really understand.

8       So now that I understand that not to mean that he -- that

9   particular statement.  I understand your general argument,

10  though, that others told him that people were trying to flee.

11  His response is "It's time for the protests" and that you

12  collectively interpret that to mean to conceal their --

13         MS. CASTRO:  Yes, Your Honor.

14         THE COURT:  -- role or --

15         MS. CASTRO:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MS. CASTRO:  Help conceal the crimes that occurred.

18  Yes, Your Honor.

19         THE COURT:  I understand it better.  I just put that

20  out there because I know that I had made those statements at

21  our last hearing.

22      I think that the arguments on serious risk of flight are

23  those that would apply to anyone who has been charged in an

24  indictment and, you know, circumstances that involve a lack of

25  truthfulness, which I think, in this district, is most of the

```
 1   indictments that involve some level of fraud or deceit.

 2       The -- I think that if we really distill down what's being

 3   said, the argument travels on two things, the mental health and

 4   the -- I mean, the global nature of this conspiracy.  I

 5   understand that he's not charged in Counts 1, 2, 3, Mr. Bell.

 6   You don't have to tell me again.  I know.  Okay?

 7            MR. BELL:  I'm -- I'm quietly listening, Judge.

 8            THE COURT:  But he is -- I understand, but -- but, you

 9   know, the -- it's incredibly serious, the nature of the offense

10   in which he's -- or the persons that he has associated with in

11   his role.  It's very hard, frankly, in this hearing, to

12   delineate being able to say, you know, the global thing without

13   referring to the part that he's charged with alone.

14       But in terms of a serious risk of flight, knowing that he

15   knew that he was under investigation and being watched for a

16   year and a half, with no indication -- and the agent

17   affirmatively testified to no indication -- of him trying to

18   rid himself of the assets or otherwise prepare for or try to

19   leave the country in any way, shape, or form -- and he was

20   under surveillance.  Excuse me.

21       You know, the Government bears the burden here of

22   demonstrating it, and I don't think it's met.  I think that the

23   conditions that you're describing -- or the concerns that

24   you're raising -- even as you're saying them, I think that

25   they're reasonably assured with conditions that can reasonably
```

```
 1   be set.
 2       But I'll say this.  I strongly suspect that you are going
 3   to appeal that decision.  So what I plan to do is just write it
 4   up in a release order rather than taking the rest of the day
 5   from everybody.
 6       So -- right?
 7           MS. CASTRO:  I understand, Your Honor.
 8       Yes, we would at least ask for a stay so that we can have
 9   time to contemplate whether we'll be filing a notice of appeal.
10           THE COURT:  Right.
11       I mean, I understand --
12           MR. BELL:  Judge, I object to a stay.  It's another
13   weekend my client is sitting in jail.  We're ready.  We can
14   post the bond today.
15           THE COURT:  I -- I understand, and yet -- well, let me
16   do this.
17       Okay.  In terms of the -- I don't know, Ms. Castro, if
18   you've done this with me before.  But I always tell my AUSA
19   that, notwithstanding your position that no bond was the right
20   bond, I still would hear from you on conditions.
21       What I intend to do is articulate the bond that I would
22   enter.  Then I would like for you two to talk.  It is without
23   prejudice to your position.  Okay?
24           MS. CASTRO:  Understood, Your Honor.
25           THE COURT:  But if there is anything else that you two
```

 1   would want or that you would advance, you'll tell me.

 2       Okay.  So what I'll do is I'll finish up the other

 3   defendants, and then you two can talk about, you know, how long

 4   you need for a stay or whatever it is.

 5       Mr. Bell, I know you're going to object.  I understand.

 6   Without staying --

 7           **MR. BELL:**  You made a finding that they haven't met

 8   their burden.  I seriously doubt that's going to -- I mean --

 9           **THE COURT:**  I understand, but --

10           **MR. BELL:**  -- this is not a case to -- to appeal or

11   stay, Your Honor.  Well, in any event --

12           **THE COURT:**  Well, I understand, but let me just

13   articulate here what it is that I think is the right bond with

14   respect to Mr. Bergmann, who is, you know, as we've said, a

15   U.S. citizen without any meaningful criminal history, who has

16   demonstrated no flight over the year and a half, who, you know,

17   has asset stability.

18       Anyway, I agree in part with the bond that you would have

19   proposed.  That is a 550,000-dollar personal surety bond to be

20   cosigned by his wife.  The issue that I take is with the cash

21   component in terms of the security.

22       I agree with you that both bonds should be secured by both

23   houses, his parents' and his wife's property as well as his

24   own, the logistics of which -- I will let you talk to

25   Ms. Castro and your client or his wife to articulate exactly

1    how it is.

2        But I think all three properties should have skin in the

3    game, and I think that Dr. Martin -- I think that -- I would

4    have Dr. Martin act as a third-party custodian.  I'm going to

5    address her quickly.

6        The -- and then the other conditions -- special conditions

7    to be surrender and not obtain any travel documents or

8    passport, to report to Pretrial Services as --

9            MR. BELL:  We have them here today and can turn them

10   in.

11           THE COURT:  I understand.

12       To report to Pretrial Services as directed.  In addition

13   to the third-party custodian, home confinement with GPS

14   monitoring, to be paid for -- well -- and that's a question

15   that I would have, Mr. Bell, in terms of the ability to pay.

16       Obviously, I have found that CJA counsel here qualifies.

17   But I would, at least before the monitor goes on, have

18   questions about whether or not he can contribute -- or defer to

19   Pretrial Services to inquire with you and him about whether or

20   not he can participate in that payment.

21       No firearms, no contacts with witness -- or victims or

22   coconspirators except through counsel.  Participation in mental

23   health assessment and treatment as ordered by Pretrial

24   Services, which -- if satisfied by his private doctor, that's

25   up to Pretrial Services.  Okay?

```
 1        And I -- I -- okay.  So those are the conditions that I
 2   would impose, but I'm going to give you both a chance to speak
 3   and both talk to me about how that would financially be
 4   secured, like, the language.  But I want you to talk to
 5   Ms. Castro about it first.
 6             MR. BELL:  Understood.
 7        I do want to say that my understanding is that, by having
 8   her sign the bond and imposing a condition that she can't sell
 9   or further encumber --
10             THE COURT:  What about the parents?
11             MR. BELL:  No.  They own -- the parents don't own that
12   house.  He and his wife do.
13             THE COURT:  Oh.  I thought it was their house.  It's
14   just where they're residing?
15             MR. BELL:  It's where they're residing.
16             THE COURT:  That's right.  I remember that.
17             MR. BELL:  So by -- by putting her on the bond --
18             THE COURT:  Okay.
19             MR. BELL:  -- you've put all her assets in play --
20             THE COURT:  Okay.
21             MR. BELL:  -- including that particular property,
22   which seems to be the one that you're concerned about.
23             THE COURT:  Okay.  So no encumbrance of property, no
24   sale.
25        Okay.  All right.  So notwithstanding, I'm still going to
```

1    ask you-all to take --

2              MR. BELL:  Sure.  Of course.

3              THE COURT:  -- the time that you need -- now, I know,

4    Ms. Castro, you've got a whole team there --

5              MR. BELL:  Oh.

6              THE COURT:  -- but you've got two other defendants up.

7        So can you -- can someone legitimately talk to Mr. Bell?

8              MS. CASTRO:  Of course.

9              THE COURT:  Okay.

10             MS. CASTRO:  Yes.  Yes, Your Honor.

11             THE COURT:  While I turn to the others.

12       And -- and, Pretrial, you'll have another chance up to

13   tell me if there were other conditions as well.  Let me just

14   hear from the parties.

15             PRETRIAL SERVICES OFFICER:  Thank you, Your Honor.

16             THE COURT:  Okay.  Okay.  And so then let me --

17   Ms. Holt, Mr. Caruso, can I -- should I finish out the other

18   defendant and then, in the manner that we've discussed, finish

19   out your hearing?

20             MS. HOLT:  Yes, Judge.  I am happy -- I just have a

21   few arguments regarding that issue.  We could do it at sidebar,

22   as long as it's on the record.  I'm fine with that.  I don't

23   need to ask questions of the agent.

24             THE COURT:  Okay.  Okay.

25             MS. HOLT:  So however Your Honor wants to proceed with

 1    that.

 2         THE COURT:  I'm soliciting suggestions.  So if there's

 3    another procedure that you want me to do, just tell me now.

 4         MS. HOLT:  I can make the bulk of my argument

 5    regularly.  And then just a couple arguments --

 6         THE COURT:  Okay.

 7         MS. HOLT:  -- that I wanted to make, we can do at

 8    sidebar on the record, if that suits the Court.

 9         THE COURT:  All right.  Okay.  Then if I just stay an

10    order and take up the next defendant and then do yours then?

11         MS. HOLT:  That works, Judge.

12         THE COURT:  Okay.  All right.  So, Ms. Kudman?

13         MS. KUDMAN:  Thank you, Your Honor.

14         THE COURT:  Same -- same thing.  I always tell

15    everybody what I'm thinking, and then you can structure your

16    argument.

17         MS. KUDMAN:  Yes.

18         THE COURT:  And I will tell you that a number of

19    incredibly meaningful points were brought out in your

20    cross-examination.  None of it was lost on me.

21         MS. KUDMAN:  Okay.

22         THE COURT:  The presumption here attaches on your

23    defendant.

24         MS. KUDMAN:  Understood.

25         THE COURT:  And so the question that I am singularly

 1  focused on is whether it's been overcome.  And even if it has,

 2  that presumption remains ever-present, and it's -- I mean, in

 3  some cases, it's just there.  But in this case, it's also tied

 4  to the circumstances of the offense, the strength of the

 5  evidence, like it's everywhere.

 6         **MS. KUDMAN:**  Understood.

 7         **THE COURT:**  Okay.  And in terms of, you know, his --

 8  his compliance and his lawfulness over the last year and a

 9  half, honestly, what's running through my head is, is that

10  enough to meaningfully overcome the presumption in this case?

11      So that's the question that at least is going through my

12  head.  Now you know.

13         **MS. KUDMAN:**  Understood, Your Honor.

14      And, Your Honor, this is a very serious allegation --

15  there's no question -- and, obviously, the presumption attaches

16  because of that.

17      But what I would ask the Court to remember is that the

18  presumption is to be considered with all other evidence in the

19  record but does not affect the ultimate burden of proof, which

20  remains with the Government to show --

21         **THE COURT:**  All times.

22         **MS. KUDMAN:**  -- both dangerousness and risk of flight.

23  So there's no -- but -- I mean, the case law --

24         **THE COURT:**  I under- --

25         **MS. KUDMAN:**  -- that I can --

1      **THE COURT:**  I understand that.  I understand.

2      **MS. KUDMAN:**  You know, *U.S. v. Quartermaine*.

3      **THE COURT:**  Uh-huh.

4      **MS. KUDMAN:**  It's very clear that the Government still

5   has to prove that there's a danger to the community and a risk

6   of flight here.

7      And, of course, when we're dealing with serious cases with

8   serious allegations, that is why Congress chose to adopt this

9   addition to the Bail Reform Act because there is a different

10  calculation when you're dealing with this type of case.

11     But at the end of the day, it's just a burden of

12  production that is on the defendant now, not a different burden

13  of proof.  The Government still maintains the burden of proof.

14  And if you look at the facts here, Your Honor, I think that the

15  Government has, in fact, itself proven that we don't have a

16  danger to the community or a risk of flight.

17     Since July of 2021, Mr. Veintemilla has been living in

18  this community, of which he is a U.S. citizen, with three

19  children, who he is raising.  Now he's -- he's remarried and

20  has a wonderful, stable marriage of 11 years.  But the mother

21  of his children passed away, and he has a severely handicapped

22  child that he is really the sole caretaker for.

23     And he has remained here.  He has made no indication that

24  he has any desire, or has made any attempt, to sell his home,

25  to dispose of assets, to do anything to -- to prepare himself

1   to leave this territory.  He engaged counsel immediately.  He

2   spoke with the Government.

3        Now, the Government doesn't believe his version of events.

4   They don't believe that he didn't realize this was going to

5   turn into a, quote -- they're calling it kidnapping.  Some

6   might call it an arrest, slash, assassination.

7        But he did go and voluntarily speak with the Government.

8   For a year and a half, we have been regularly communicating

9   with the Government, engaged in discovery with the Government

10   in terms of -- there was a privilege team that was put in

11   place, and we've been working with them successfully.

12        Mr. Veintemilla has asked me repeatedly to tell the

13   Government, "Please, if they want me to surrender myself, I'm

14   here.  I have a child at home who's severely handicapped.  My

15   children are already traumatized from the search warrant that

16   was executed in his [sic] home."

17        We -- I have communications for the Court, regular

18   communications, where we are checking in, saying

19   Mr. Veintemilla is ready to, you know, come in voluntarily and

20   surrender himself.

21        He has known that the Government has been considering

22   charging him with these very serious offenses for a year and a

23   half, and the only thing that he has done is hire an attorney

24   to face and confront the allegations against him and cooperate

25   with the Government's investigation.

1    Your Honor, for your evidence, there was reference to four

2    additional individuals being charged a week ago, and that

3    started some additional surveillance.  Mr. Veintemilla notified

4    me immediately because he observed the agents following him and

5    surveilling his home.  He asked me to, again, reach out to the

6    Government and say, "Look, if they want to arrest me, please

7    just let me know.  I'll come in.  Tama, drive me there."

8        I reached out to the Government.  And if Your Honor wants,

9    I can hand up the email.

10            **THE COURT:**  I mean, you --

11       **MS. KUDMAN:**  "Good morning, everyone.  Can we please

12   arrange for a call.  Mr. Veintemilla and I are aware of recent

13   arrests in this matter, and Mr. Veintemilla believes that he's

14   being followed by agents."

15       "Mr. Veintemilla is concerned for the emotional welfare of

16   his children under these circumstances and has asked me to

17   reach out to let you know that if an indictment is pending or

18   anticipated to be filed against him, he will turn himself in

19   voluntarily so that his family can avoid the trauma of seeing

20   him arrested."

21       "As you know, Mr. Veintemilla has made himself available

22   to the Government throughout this process and will continue to

23   do so.  We ask that you extend this courtesy to him and his

24   children.  Thank you in advance."

25       We have consistently been here.  He has gone nowhere.  And

1    I would emphasize to Your Honor that the charge of providing

2    material assistance to a potential assassination or kidnapping

3    is very serious, but his participation was financial.  It's not

4    alleged that he's a dangerous person.  My point is he has no

5    criminal history.  This is not a person that we have to worry

6    about going out on the streets and hurting somebody.

7         Okay.  The danger that he posed -- quite frankly, you

8    know, it's over.  He has no history of violence whatsoever at

9    all.  He is diabetic.  He's on medication.  He's a family man.

10   His entire family now lives here.

11        He was born in Ecuador, but he is a U.S. citizen.  When

12   the search warrant was executed on his home, all of those

13   travel documents for both the United States and Ecuador were

14   seized.  He has made no attempt to renew any of those

15   documents, and his whole family is here, other than his elderly

16   father.  The last time he visited Ecuador was in 2016.

17        So this is not a person who travels regularly.  He is

18   squarely here in the United States.  And, again, no assets have

19   been disposed of, moved, nothing.  And although his new wife is

20   wonderful and has assisted him tremendously with the rearing of

21   his children, he is responsible.  He is the primary caretaker

22   of his severely disabled child.  He has every reason in the

23   world to stay here and to clear his name through the jury

24   process.

25        The agents have told you that, on the day that they went

1   to arrest him, they called him on the phone.  That is a

2   courtesy that is not generally extended to people that they

3   intend to arrest.  They were not anticipating any resistance

4   from him whatsoever.  They didn't show up with a SWAT team.

5   They showed up with two patrol cars because they knew that he

6   would walk out and turn himself in.

7       They extended to him the courtesy of going in and changing

8   his clothes and hugging his family and saying so long to his

9   children because they knew he was not a danger, and he was not

10  going to do anything to evade law enforcement or to be

11  dangerous to them.  And I would submit to you that there are

12  conditions that can be imposed to neutralize any perceived

13  either danger to the community or risk of flight.

14      First of all, Your Honor, I would tell you that this

15  courtroom -- I would ask everybody who's here for

16  Mr. Veintemilla to stand up.  Your Honor, we have spoken with

17  eight individuals, in total, who are willing to sign personal

18  surety bonds on his behalf, and we would propose an amount of

19  $2 million.

20      We additionally have five individuals, including his wife,

21  who is a co-owner of their family home, who are willing to

22  secure that personal surety bond with their homes.  Included

23  among those people are his former brother and sister-in-law,

24  the -- the brother and sister-in-law of his first wife, who

25  passed away.

1      Although they are no longer blood -- you know,

2   theoretically related to Mr. Veintemilla, they love him.  They

3   believe in him, and they trust him, and they are willing to

4   secure the bond with their home, five people who are willing to

5   do that.  We have over $3 million of equity between all of the

6   homes, including Mr. Veintemilla's, that is willing to be

7   pledged to secure a bond.

8      In terms of dangerousness, in -- in this way, Your Honor,

9   it would be suggested that he have no access to computers, to

10  banking.  We can put in place a GPS monitor.  His wife is

11  willing to be his custodian and report to the Court if he does

12  anything that's not in compliance with the bond, and we would

13  be willing to impose a third party as well.

14      Your Honor, I would also note that one of the concerns

15  usually in a conspiracy involving violence is that a person

16  who's free on bond might intimidate witnesses or try to

17  obstruct justice.  Mr. Veintemilla has been living freely for

18  over a -- close to two years now, and there has been no

19  allegation that he has had any improper conduct with anybody

20  involved in this case.

21      And so, again, there is simply no indication that

22  Mr. Veintemilla -- Veintemilla is a threat or a danger to his

23  community or that he is a risk of flight.  He gladly submits to

24  any conditions that the Court deems appropriate.

25      Now, Pretrial indicated that there's financial instability

1  because Mr. Veintemilla -- since this has been in the news,

2  his -- his financial business has obviously been harmed.  His

3  income is lower, but that also speaks to the fact that he

4  doesn't even have the means to flee.

5       And as to his house, which we estimate -- there -- there

6  are encumbrances on his house, but we estimate there's anywhere

7  from 500,000 to a million dollars of equity in the home.  The

8  Government has already placed a lis pendens on that house

9  because there's a forfeiture allegation.

10      I don't understand the forfeiture allegation, to be honest

11  with you, because there's no allegation that the house was used

12  in the commission of this crime.  I've asked the Government why

13  there's a forfeiture allegation.  They've told me to speak to

14  the forfeiture people.  I just don't know.

15      But notwithstanding that, we can still pledge that house

16  as part of the security package, and we do so.  But in terms of

17  other assets, Mr. Veintemilla really -- they're struggling to

18  support the household as it is.  He does not have the means to

19  go anywhere.

20      Your Honor, I would also like to cite from a recent

21  opinion written by Magistrate Reinhart up in West Palm Beach.

22  "Even if there is a risk of nonappearance and/or risk of danger

23  to the community, detention is only warranted if those risks

24  cannot be sufficiently mitigated by conditions of release, and

25  those risks cannot be mitigated completely.  A person cannot be

1    detained if there are conditions that reasonably would assure

2    the appearance and the safety of the community."

3         I submit to you that we have proposed such conditions, and

4    I would say this, Your Honor.  It's impossible to have zero

5    risk.  In any case, there's a risk of flight.  Anybody can

6    choose one day to try to flee.

7         But with GPS monitoring, with his entire family and

8    friends, people unrelated to him, willing to put these

9    tremendous assets, their -- their most substantial assets, on

10   the line for him, I think that speaks to who they believe he

11   is, and I think his actions confirm that.  He has been here.

12        I would also note -- actually quote Mr. --

13   Magistrate Reinhart in saying, "Given the choice at the margin

14   of release or detention, Congress chose the former."  So if

15   you're teetering between, you know -- this is a very serious

16   case, and there is a presumption, and it's always present.

17        But on the other hand, if we've got all of these

18   conditions that are being proposed and all these people who

19   believe in him and his actions that speak of his willingness to

20   subject himself to this Court and this proceeding, then you

21   have to, under the law, err on the side of giving him bond.

22   Congress set it up that way.

23        So, again, Your Honor, if there are any other specific

24   concerns that I can address -- you know, we -- we have the

25   technology to secure him at his home, to make sure he does not

1   flee.  We can cut him off from any communications that could

2   possibly -- I don't know what danger he could possibly pose to

3   the community.

4       The Government has not articulated that he is a presently

5   dangerous person.

6           **THE COURT:**  Well, on that note, the Government

7   actually hasn't had a chance to argue at all.  And so when you

8   say is there anything else that you can address, the answer is

9   maybe.  You'll get the last word, and I'm going to turn to the

10  Government for their presentation.

11          **MS. KUDMAN:**  Thank you, Your Honor.

12          **THE COURT:**  Okay.  Thank you, Ms. Kudman.

13          **MS. CASTRO:**  Thank you, Your Honor.

14      First, I just have to --

15          **THE COURT:**  Are you okay?

16          **THE CLERK:**  Yeah.

17          **THE COURT:**  Okay.  Sorry, Ms. Castro.

18          **MS. CASTRO:**  Yes.

19      I just -- I disagree wholeheartedly with the assertion

20  that the Government does not deem Mr. Veintemilla dangerous,

21  just as I disagree with the notion that Mr. Veintemilla, quote,

22  "just offered money."  Let's be clear about what happened in

23  this case.

24      Mr. Veintemilla funded the travel of soldiers that were

25  sent to Haiti and ultimately went into the President's home and

assassinated him.  This does not occur without the money that
Mr. Veintemilla funneled into this endeavor -- okay? -- and he
did it solely for his own potential financial gain and the fact
that he thought he had an opportunity to benefit from this
human being's demise.

So the question stands.  What, again, could he do if he
stands to save his own life?  Because he now faces life
imprisonment.  He's now indicted on charges for which he faces
life imprisonment.  If he's willing to funnel his resources
into helping the assassination of a President because he might
get some money out of it, what might he be willing to do in
order to avoid potential life in prison?

His money paid for the soldiers that went down to Haiti.
His money paid for ammunition.  He wired $15,000 to be sent for
ammunition, "screws and nails," for the soldiers that were
there to help oust President Moïse.

This is absolutely someone who, as the presumption
suggests -- I apologize -- for a nature of -- for a charge of
this case -- of this nature, represents a danger to the
community and a risk of flight.

Now, I understand, as defense counsel asserted, that --
she made a reference to there was no fear that Mr. Veintemilla
was going to run out and start shooting at the agents.

First, I want to be clear that the manner in which his
arrest was conducted is entirely consistent with my

1  understanding of how arrests are conducted generally.  I would

2  also note that there was particular concern with sensitivities

3  that had been raised as to Mr. Veintemilla's children.

4      So to the extent that certain courtesies were afforded to

5  avoid trauma to the children, I don't think that that suggests

6  that the Government or the agents on the scene did not believe

7  that Mr. Veintemilla could be a potential danger.

8      Moving on from that point, back to the reference of him

9  coming out and -- you know, and potentially shooting at the

10 agents, I don't think that it should inure to Mr. Veintemilla's

11 benefit that he stayed within the safety of his home, where he

12 funneled money to this endeavorer and sent messages on his

13 phone and communicated with people on the ground who went in

14 and actually did the assassination.

15     The fact that he was pulling the purse strings from behind

16 the scenes makes him just as dangerous as the people whose

17 violence he facilitated in Haiti, and the communications in

18 this case make clear that Mr. Veintemilla was well aware that

19 he was assisting an endeavor that could potentially result in

20 violence and certainly death.

21     The references to, quote, "Hit the rat" cannot be

22 characterized as anything other than an expected attack on the

23 President, particularly not when one considers that this is

24 alongside coded communications referring to screws and nails.

25     If Mr. Veintemilla was there to provide security for

Mr. Sanon because he wanted Mr. Sanon to be safe, he would have called them by their actual terms.  He used those coded references because he knew he was engaged in criminal conduct, and he wanted to cover his tracks.

The evidence makes clear that Mr. Veintemilla was well aware of the usage of, for example, the term "neutralizers" to -- as terminology for the men that had been sent to Haiti. This is going back to this whiteboard, where they outlined a potential attack on the palace.

The word of "warriors and neutralizers," all sent to Mr. Veintemilla before he further funded travel by Mr. Sanon over to Haiti.  This is absolutely someone who represents a danger to the community and, of course, a risk of flight.

I understand that Mr. Veintemilla, again, had an indication that he was -- he had been implicated, but he now knows that he is indicted.  He now faces life in prison.  He now sees the significant evidence against him that he is likely to be convicted of the charges that were presented in the indictment.

**THE COURT:**  May I ask a question?

**MS. CASTRO:**  Yes, Your Honor.

**THE COURT:**  You just -- you just -- and it was probably part of somewhere in the last five-hour hearing, and I apologize.

**MS. CASTRO:**  Yes, Your Honor.

```
 1            THE COURT:  But the -- there was evidence that there
 2    was money sent by Mr. Veintemilla after the whiteboard was sent
 3    to him?
 4            MS. CASTRO:  Yes, Your Honor.
 5        So this was the -- these are the two exhibits -- and I can
 6    hand them up to the Court -- that I had presented.
 7            THE COURT:  I have the whiteboard here, but --
 8            MS. CASTRO:  Yes, the whiteboard.  And so that's
 9    Exhibit 1.
10        I had also presented Exhibit 3 to Mr. Ferlazzo, and this
11    is the fund draw request that actually defense had initially
12    raised, and this was funding Mr. Sanon's travel to Haiti.  And
13    that request happened on, I believe, May 19th.
14            THE COURT:  That's what this one says.
15        And the whiteboard was what date?
16            MS. CASTRO:  And the whiteboard -- the communication
17    that the agent testified contained the whiteboard being sent to
18    Mr. Veintemilla showed that it was sent to him on May 6th.
19            THE COURT:  Okay.  I took you off script.  Thank you
20    for answering that question.
21            MS. CASTRO:  No.  Of course, Your Honor.
22        I am looking to identify -- just one moment.
23        Okay.  I want to also refer Your Honor to the reference to
24    Mr. Veintemilla sending $15,000 for screws and nails, weapons
25    and ammunition.  That was on June 3rd of 2021.  So that's
```

1  nearly a month after Mr. Veintemilla received this message with

2  the whiteboard referring to warriors, neutralizers, and

3  snipers.

4       And, again, going back to the notion that all he did was

5  provide money, if you look at the way that this unfolded, as

6  this escalated to the -- towards the night of the

7  assassination, what we have is Mr. Veintemilla, as he loses

8  more and more money, sending messages insisting that the

9  operation go forward, making statements that "We have to have

10  the party," warning his coconspirators that it's getting very

11  dangerous for them and, quote, "This is why we are pressuring

12  for things to happen."

13       He says the party has to happen, or the personnel is

14  leaving, is coming back.  The personnel are the Colombian

15  soldiers who were sent to Haiti to carry out this operation

16  against President Moïse.  He's essentially telling these

17  people, "You make it happen, or I'm getting your armed men out

18  of there."

19       This does not come to fruition without Mr. Veintemilla's

20  funding and insistence.  And I'll remind the Court that on

21  July 6th, immediately before the assassination, Mr. Veintemilla

22  says, "That's it.  Until Individual 2 is present" -- "is

23  President, I can't get you any more money."

24       What happens within 24 hours?  President Moïse is dead.

25  This is by no accident.  Mr. Veintemilla was absolutely adding

1  the pressure, and those on the ground in Haiti, who he sent to

2  Haiti, knew that he was going to cut off the money, and so

3  things needed to happen immediately.  And then we find

4  Mr. Moïse shot 12 times in his bedroom, with his wife also

5  suffering gunshot wounds.

6      So I disagree with the idea that he, quote, "just provided

7  money."  Without the money, none of this happens.  I think the

8  record here makes absolutely clear that, even without the

9  presumption, this is a defendant that facilitated a murder

10  knowingly, and he should be detained.

11          MS. KUDMAN:  Your Honor, if I could respond.

12          THE COURT:  Please.

13          MS. KUDMAN:  Actually, on July 6th, what

14  Mr. Veintemilla said is "Until President Moïse was out of

15  office and the new President sworn in, there would be no more

16  funding for security for Sanon."  All of the messages that

17  they're referencing talk about Sanon, and they, themselves,

18  posit this notion of two different conspiracies.

19      The Government has stated that, initially, there was this

20  conspiracy to have Moïse removed by popular marching and

21  demonstration and people -- what's the word I'm looking for? --

22  demonstrating and putting pressure on Moïse to step down and

23  then Sanon becoming President.  And then, later on, there's

24  talk about installing another individual who's then going to be

25  President.  And over time, it becomes more violent.

1      Your Honor, the reason that I handed up to you that white

2  paper for you to look at is because, if you look at that, I --

3  I couldn't tell you what that sheet means.

4          **THE COURT:**  Are you talking about the whiteboard?

5          **MS. KUDMAN:**  The whiteboard.

6      And that's where the terms "neutralizers" -- the

7  understanding is that -- that Moïse is a dangerous President

8  who uses, I mean, his police force basically like gangs, and he

9  goes after people who are dissenters and who are challenging

10  his Presidency.  People have been known to be abducted,

11  arrested, et cetera.

12      The term "neutralizer" -- I mean, there's a lot of

13  interpretation here by the Government that I don't see any

14  basis for.  They're surmising that "neutralizer" means, like,

15  assassins.  "Neutralizers" can also mean people who are there

16  to protect Sanon and make sure that these gangs of thugs can't

17  threaten him when he's demonstrating, when he's speaking to the

18  people.

19      There was supposed to be a day where there was supposed to

20  be a demonstration, and it was all supposed to converge to put

21  pressure on Moïse so he would step down and so that

22  President Sanon could, in effect, step up to power.  And as the

23  Government itself conceded, the discussions of violence and

24  perhaps arresting him came much later.

25      And although he got that email on May -- by the way, a

 1   month after it was originally sent to another person, it's sent

 2   to Mr. Veintemilla, and there's no explanation as to what it

 3   is.  He doesn't know what he's looking at.  And so this notion

 4   that he knows he's sending guerillas to go in and -- and

 5   assassinate the Haitian President at that time back in May --

 6   there is absolutely no evidence to support that.

 7        He only signed the line of credit with CTU on April 30th,

 8   and so this is seven days later.  This is early.  This is when

 9   they're still thinking Sanon is going to try to become the next

10   President of Haiti and reinstate a democratic government with

11   real democratic processes.

12        So, again, the Government keeps talking about him funding,

13   him being willing to use money to effectuate this change.  This

14   is a line of credit that the agent admitted is being financed

15   by investors.

16        These are people who believe that they are investing in an

17   operation to bring stability and safety and a real democratic

18   institution to Haiti with public works projects.  They think

19   that they're doing water projects, electric projects.

20        The financial incentive that the Government is talking

21   about is that Mr. Veintemilla had met with one of the mayors of

22   one of the districts in Haiti over the phone, and there was an

23   interest in being able to supply clean water to that district.

24   This was not, like, some, like, golden opportunity for

25   Mr. Veintemilla to make a fortune of money.  These are all,

```
 1    like, bond projects.
 2         So, you know, I don't know what financial incentive
 3    they're talking about.  This is what Mr. Veintemilla does.  He
 4    goes to third-world nations and helps them to build
 5    infrastructure.  That's what he was doing, and Moïse had no
 6    interest in doing that.  None of that could take place unless a
 7    democratic President was elected so that democratic
 8    institutions could -- could be in place.
 9         But when he agreed to condone this line of credit and to
10    put investors in place for it, again, this is early.  They were
11    talking about demonstrations that would lead to Moïse to step
12    down, because he lacked popular support, and for Sanon to
13    hopefully be able to be in contention to be President.
14         THE COURT:  Ms. Kudman, I'm going to cut you off to
15    make the observation that, while your arguments are incredibly
16    powerful, I think that they also very much go to the merits of
17    the indicted allegations.  And for purposes of my hearing --
18         MS. KUDMAN:  I know.
19         THE COURT:  -- I mean, I contextualize it as strength
20    of the evidence, but you've already noted that it's -- it
21    depends on interpretation.
22         MS. KUDMAN:  Yep.
23         THE COURT:  And so I accept that a jury may hear this
24    very differently.  But from where I sit, I have an indicted
25    case, and I've heard substantial testimony --
```

1          **MS. KUDMAN:**  I understand, Your Honor.

2          **THE COURT:**  -- that I have to look at in a -- you

3    know, collectively, as you said.

4          And so, you know, the -- again, the arguments are

5    incredibly powerful, and they will have their day.  I just

6    don't know that they're -- well, I'll just -- it is not moving

7    the needle for me in terms of the -- okay.

8          So from my perspective, in terms of telling you that, I

9    understand that the bond you are recommending is probably the

10   most substantial bond -- or one of the most substantial bonds I

11   have heard in five years and -- in terms of overcoming

12   conditions.

13         And yet the concern that I have or what -- as I sit here,

14   wondering whether the presumption has been rebutted but -- or,

15   more importantly, whether those conditions meaningfully assuage

16   or assure the safety of the community/risk of flight, what I'm

17   looking at is a complex, multi-month, multi-defendant,

18   multi-country conspiracy to accomplish something that could not

19   have been facilitated but for your client's role.

20         And what, at least, I have here is fairly strong evidence

21   to support the allegation that he not only knew but fully

22   intended the outcome with which he's been charged.  I am not

23   going to try your case, but -- you know what I mean?  Like --

24   so --

25         **MS. KUDMAN:**  Which is what I'm trying to address,

1    Your Honor --

2           **THE COURT:**  Right.

3           **MS. KUDMAN:**  -- because, you know, the Government is

4    focusing in on -- you know, on May 15th, there's -- or

5    May 19th --

6           **THE COURT:**  19th.

7           **MS. KUDMAN:**  -- there's this draw- --

8           **THE COURT:**  Yes.

9           **MS. KUDMAN:**  -- -down on the line of credit.  First of

10   all, the line of credit had been issued on April 30th.

11          **THE COURT:**  I understand.

12          **MS. KUDMAN:**  So it was theirs to draw down on.  These

13   are memorializations of the drawdowns.  So --

14          **THE COURT:**  Understood.

15      I understood that proffer to essentially say, "Look, by

16   May 5th, they send him a battle plan, and he doesn't cut it

17   off.  He allows them to continue to draw down on it."

18          **MS. KUDMAN:**  Right.

19          **THE COURT:**  That's how I understand the proffer.

20          **MS. KUDMAN:**  But I'm trying to explain that there's no

21   evidence he understood that battle plan because there's no

22   explanation with that plan.  There's no -- there's nothing

23   about that, quote/unquote, "battle plan."

24          **THE COURT:**  I understand your position.  I think that,

25   in the context, and limited to this hearing, there are -- there

1    is circumstantial evidence that allows me to at least to make

2    that inference here today.

3         **MS. KUDMAN:**  But I would ask that you also consider

4    that there are alternative -- alternative explanations for what

5    that map is, which is they're talking about a demonstration

6    where Sanon has his security people and the people they're

7    putting in place to provide security for hopeful --

8    presidential hopeful Sanon.

9         So, you know, the terms that they're -- they are asking

10   you to interpret as battle plans for an assassination or

11   kidnapping can also very strongly, on this evidence, be

12   interpreted in a more neutral way, which is "We're setting up

13   for a demonstration.  We're trying to get an unpopular,

14   murderous President to step down so that a more democratic

15   President can step up."

16        And by the way, Your Honor, I'm not saying anything that

17   the United States itself didn't say.  I mean, at this time, the

18   United States -- several Senators were putting pressure for

19   regime change in Haiti.  So --

20        **THE COURT:**  How do I contextualize that for this

21   argument?

22        **MS. KUDMAN:**  And you can't.  But my point is,

23   Your Honor, that looking at that map tells you nothing because

24   the Government is saying to you, "Oh, interpret it this way."

25   And I'm saying to you, "Oh, interpret it that way."  The point

1    is you don't have the evidence in front of you to help you

2    interpret it either way.  That's what a trial is for.

3         And what I'm suggesting to you is there are multiple ways

4    to interpret this, and none of it suggests that Mr. Veintemilla

5    was aware that there was going to be an assassination or -- or

6    kidnapping at that point.  The -- the Government itself --

7    their own agent said it didn't move to that until later.  In

8    fact, I believe the agent's testimony was it wasn't until late

9    May or June that some parties of the conspiracy were starting

10   to talk about that.

11        And, certainly, there's no evidence, I mean, other than

12   that whiteboard, which -- we don't know what it is -- was sent

13   to Veintemilla.  And, again, this is a man with zero history of

14   participating in social unrest, never mind a full-out

15   government coup.

16        He has no criminal history.  He has friends and family

17   willing to put their entire financial futures on the line for

18   him.

19            **THE COURT:**  Interestingly -- or unintentionally, I

20   mean, where you -- where you've ended is exactly what's run

21   through my head in terms of the -- the nature of the

22   allegations and the -- the difficulty that I have in finding

23   that there are bond conditions that reasonably -- reasonably --

24   I agree a hundred percent.  That's exactly what the statute

25   says, and there is no certainty, and the Bond Act doesn't allow

1    me to require it.

2          And yet as I have sat here -- and I have had all week to

3    think about conditions that I thought -- assuming that the

4    presumption was rebutted, what conditions would reasonably

5    assure.  And the nature of his role in the conspiracy, for

6    which there was substantial evidence -- I -- you know, I don't

7    find that there are conditions that I could set that reasonably

8    assure.

9          I think, though, that -- you know, you've mentioned -- and

10   I understand that -- you know, where the burden ultimately

11   lies.  But in terms of, you know, keeping the -- either the

12   hearing open or remove -- moving to reopen for evidence or see

13   if Judge Martinez sees it differently.

14         But with respect to what he's been doing over the last

15   year and a half, each side has argued what that should mean in

16   terms of this hearing.  And I don't know -- and I'm trying not

17   to rule in the hypothetical -- what additional evidence there

18   would -- would look like or mean.

19         But on the evidence that I have -- I have considered your

20   bond package, and I disagree that it reasonably assures the

21   safety of the community or the risk of flight.  And a written

22   order will follow so that you can decide what you want to do

23   with it.  So don't take all of my comments here in court to be

24   fulsome.

25         The work in the other countries -- while neither side has

1   argued it extensively, I will at least tell you that it weighs

2   on my mind in terms of a risk of flight, that that is -- that

3   is how, as I understand it, he comes into or perceives it.  But

4   the ties to the other -- other countries is, again, a factor

5   that I have to consider under the bond statute.

6       I only enumerate it because, to be clear, I'm not really

7   sure how to evaluate it.  It's, like, a thing, but I don't know

8   how much of a weight it should --

9           MS. KUDMAN:  Your Honor --

10          THE COURT:  -- deserve in this particular hearing.

11  It's just an additional piece of evidence.

12          MS. KUDMAN:  Your Honor, he hasn't left the country

13  since 2016, and all of his work there was voluntary with, like,

14  relief organizations.

15          THE COURT:  Okay.  Well, then I'm glad I raised it.

16          MS. KUDMAN:  He has no family in any of those

17  countries.  This is a man who has spent his life in community

18  work projects to better the lives of people.  So, you know --

19  and, again, the Government has his travel documents, and he has

20  made no attempt to replace them or go anywhere.

21      Your Honor, I just have to ask, for the record, what

22  danger is it that you would want to see nullified so that

23  perhaps I can address a condition that might satisfy your

24  concerns?

25          THE COURT:  I'll answer you on the condition, though,

 1  that you look to a written order as well.

 2          **MS. KUDMAN:**  I will.

 3          **THE COURT:**  Okay.  Because I'm, candidly, doing the

 4  best that I can after five hours --

 5          **MS. KUDMAN:**  Understood.

 6          **THE COURT:**  -- of trying to --

 7          **MS. KUDMAN:**  We're all skating.

 8          **THE COURT:**  -- stay focused also on your -- your

 9  client, in particular.

10      But as -- at least in my notes and with respect to the

11  nature of the offense and his role in it, with respect to their

12  communications and what he here tried to accomplish by

13  essentially removing a President from another country, there --

14  I think it speaks to a threat not only of -- as you've pointed

15  out, there's not another President -- I'm sorry that that

16  sounds callous -- that there's any reason to think about

17  deposing but, rather, a willingness to hurt people for private

18  gain, which could be witnesses.

19      Truly -- I mean, on these facts, I'm not really sure who

20  it would be limited to.  But the willingness to encourage,

21  counsel, fund, and participate in these acts for private --

22  personal gain speaks to his dangerousness.

23      I -- I appreciate that you suggested the lack of access to

24  a computer.  The problem is, though, the -- and I'm sorry to

25  take experience from another case, but the last time that I had

 1  someone go after a witness, they did so by word of mouth, and

 2  so the access to the computer didn't help.

 3      And, again, it's not "no risk."  It's reasonable

 4  assurance, and this was a complex conspiracy among many

 5  conspirators, who communicated in a lot of different ways.

 6      So, candidly, Ms. Kudman, that's the -- that is the

 7  dangerousness that I see.

 8      **MS. KUDMAN:**  So eliminating computers from the home

 9  or -- and denying him a phone wouldn't satisfy that concern,

10  Your Honor?

11      **THE COURT:**  I think it speaks to it, but is it enough

12  to reasonably assure his -- you know, I hope that I've been

13  transparent enough to tell you what I was thinking, and

14  that's -- that is the concern in terms of, you know, what the

15  nature of -- and how many people had to be involved to pick up

16  one piece after another.

17      There was no one person.  You know, his role is not

18  sufficient to have gotten the whole thing done; right?  They

19  all worked together.

20      I'm going to just say that anything else, I would try to

21  memorialize in the order so that you can decide whether it's

22  that you want to move to reopen and then do something else or

23  make a different suggestion in terms of the bond package or

24  just to appeal to Judge Martinez.

25      **MS. KUDMAN:**  Okay.

| | |
|---|---|
| 1 | **THE COURT:**  Okay.  Because -- lest I get less careful |
| 2 | with my words. |
| 3 | **MS. KUDMAN:**  Thank you, Your Honor. |
| 4 | **THE COURT:**  Okay.  Ms. Kudman, that was a really |
| 5 | thoughtful presentation, and you gave me a run for my money |
| 6 | here, and I tell you that I really have -- I kept an open mind, |
| 7 | but I've been thinking about it all week. |
| 8 | **MS. KUDMAN:**  Thank you. |
| 9 | **THE COURT:**  Thank you. |
| 10 | Alicia, do you need a break before Ortiz? |
| 11 | **THE CLERK:**  No.  I'm good. |
| 12 | **THE COURT:**  Okay.  Okay.  Ms. Holt? |
| 13 | **MS. HOLT:**  Thank you, Judge. |
| 14 | **THE COURT:**  So as going last, you hear the benefit of |
| 15 | all the concerns.  You said that you had a proffer.  Is it |
| 16 | anything you wouldn't anticipate me to understand from what I |
| 17 | already know from the sidebar proffer, or are there additional |
| 18 | facts? |
| 19 | **MS. HOLT:**  Yes, Judge, a few. |
| 20 | **THE COURT:**  Okay. |
| 21 | **MS. HOLT:**  Do you want to take those first? |
| 22 | **THE COURT:**  I do. |
| 23 | I also just -- I don't -- I mean, it's an open courtroom, |
| 24 | and anyone who wants to be here is welcome to go, but it's sort |
| 25 | of a shift change as well.  So as we switch to Mr. Ortiz, if |

1    your hearing is over and you want to go, no one's offended by

2    you standing up.

3         Go ahead, Ms. Holt.

4              **MS. HOLT:**  Thank you.

5                        (Unrecorded sidebar.)

6              **THE COURT:**  Okay.  Ms. Holt, I appreciate your

7    proffer, which we'll note was not disputed by the Government.

8    So we're not going to call a witness to that.

9         Let me ask, logistically, whether we can finish out the

10   hearing and do the waiver or whether we need to do it, or

11   what's your position, Ms. Holt, with respect to that?

12             **MS. HOLT:**  With regard to the conflict, Your Honor?  I

13   believe we can finish out the hearing --

14             **THE COURT:**  Okay.

15             **MS. HOLT:**  -- and --

16             **THE COURT:**  Okay.

17             **MS. HOLT:**  -- and then --

18             **THE COURT:**  All right.  And then address it?

19        Okay.  That's fine.

20             **MS. HOLT:**  Yes, Judge.

21             **THE COURT:**  Sorry.  I just want to make -- I'm trying

22   to just logistically keep track of things still.  Sorry.

23        Go ahead, Ms. Holt.  You -- when you go last, you have had

24   the unfortunate, and probably too much, benefit of what my

25   thought process here is on the strength of the evidence.  We

1   haven't talked about your client's role at all, and you haven't

2   had a chance to tell me what bond it is that you're proposing.

3           **MS. HOLT:**  Yes, Judge.  So I can start there.

4       Mr. Pretel Ortiz does not have the resources of the prior

5   two defendants that this Court has considered.  With that, I

6   would be asking for a personal surety bond cosigned by his

7   wife, who could not be present today but I spoke with yesterday

8   on multiple occasions -- understands the responsibility of a

9   cosigner.

10      She, herself, is a permanent resident in the United States

11  and understands that cosigning on this bond could have

12  significant implications for herself, despite them not having

13  significant assets here.  As you can see in the

14  Pretrial Service report, they do have some cash that they have

15  saved.

16      So I would be asking the Court for a combination, with the

17  personal surety bond, of a 5 percent/100,000-dollar bond.

18  Along with that, I would be asking for house arrest, GPS, and

19  any other conditions this Court deems -- would deem be

20  appropriate.  Mr. Pretel Ortiz is certainly willing to abide by

21  any of those conditions, Your Honor.

22      As you stated, I have had the benefit of hearing the

23  Court's concern.  I've also had the benefit of hearing the

24  Government's response.  And what I have heard so far and only

25  is the Government is relying solely on the charges in this

1    case, and that's simply not the only factor this Court should

2    be considering.  If that were enough, Your Honor, then this

3    would be a nonbondable offense.

4         Income --

5              **THE COURT:**  Sorry, but in fairness, the Government

6    hasn't actually argued about Mr. Ortiz yet.  So I just want to

7    make sure that I'm following your arguments.  You know, you're

8    not rebutting nothing.  They just haven't had a chance to go

9    yet.  The --

10             **MS. HOLT:**  If they would like to go first,

11   Your Honor -- and I can -- it is their burden.

12             **THE COURT:**  Yep.  I just -- it's usually my practice,

13   if they make a motion for pretrial detention, to allow my

14   defendant to go first and last and have a last word and

15   explain, you know, the bond package.  But I can hear from the

16   Government first.

17             **MS. HOLT:**  Your Honor, I can continue.  I just wanted

18   to address what -- what I think we have heard the prior issues

19   are --

20             **THE COURT:**  Okay.

21             **MS. HOLT:**  -- in -- in the spirit of efficiency.

22        But I think, you know, as noted in the prior case, this is

23   a presumption case.  However, as -- as the prior attorney

24   stated, the Government -- the -- or the burden remains with the

25   Government despite that, Your Honor.

1        And as the Court has discussed, we don't have to guarantee

2   Mr. Pretel's -- Pretel Ortiz's appearance or the safety of the

3   community.  We just have to reasonably assure that.  And in

4   order to rebut the presumption, we, again, do not have to -- we

5   don't have a burden to assure the Court of that.  We simply

6   have to present some evidence.

7        It's a burden of production, and the evidence presented to

8   this Court and in the Pretrial Services report has done that.

9   I think that we have heard, in much discussion previously,

10  about this approximately 18 months in which Mr. Pretel Ortiz

11  knew of this investigation, had every opportunity to flee, and

12  did not do so.

13       And that is very significant, and I know the Court was

14  saying that you have heard from both sides.  But I don't think

15  there is any other way to interpret that, other than someone is

16  aware that they are being investigated for a very serious

17  allegation, has not just a week, not a month, but 18 months to

18  make some move about -- to -- to escape that investigation.

19       And Mr. Pretel Ortiz chose not to do that.  He hired

20  lawyers.  As Your Honor heard, these lawyers were in contact

21  with the Government throughout this time, indicating he is

22  available.  He is still here.  The Government has previously

23  argued -- and, again, I can wait for them to argue it in this

24  case -- that now it's different.  Now that he's been indicted

25  and charged, it's somehow different.

1      I don't think that applies here, and I don't think the

2  Government can inter- -- can -- can point to any evidence

3  showing that there's a difference of thought or intent or

4  mentality here.  If someone --

5          **THE COURT:**  I agree with you on that.  Sorry, but -- I

6  did interrupt you, but I agree with you that we don't have -- I

7  don't have evidence to show that.  They're just arguing it;

8  right?

9      So in terms of whether or not you have an uphill battle

10  there, that's an argument -- right? -- that, from the

11  prosecutors' perspective, there's a different risk factor.

12  It's not so much that.

13     The -- and I think that you heard -- I don't mean to cut

14  you off, Ms. Holt, but I just want to tell you where you don't

15  have to fight; right?

16         **MS. HOLT:**  That's fine, Judge.

17         **THE COURT:**  But the -- I think it's very meaningful.

18  I think that I said already, like, is that enough to rebut the

19  presumption that, 18 months later, there was not, in fact, any

20  change in wealth or movement of assets or any other violation

21  of the law, period?

22     I agree with you.  I guess where -- where I continue to --

23  to struggle is, even assuming that rebuts it, that that's

24  enough, are there conditions that reasonably assure with

25  respect to this defendant?  And so I know that Ms. Castro is

1  going to argue and -- and contextualize evidence for me.

2      But as I see the role of your client in this, that gives

3  me pause and wants -- and that I want you to address is at

4  least the allegations that he played such a managerial role,

5  that he orchestrated, because for purposes of bond -- this is

6  not your trial.

7      For purposes of bond, what I'm considering is whether

8  there are conditions I can reasonably -- that will reasonably

9  assure that he will not apply those skills to hurt our

10 community or otherwise flee.

11     So that's, to me, the question that at least -- that I

12 would ask you to address.

13         **MS. HOLT:**  Yes, Judge, and I certainly can.

14     I think, with respect to the charges themselves, you heard

15 from the agent that they have done, as one would imagine,

16 extensive investigation in the case.  They have -- I believe,

17 on redirect, the Government talked about how many telephones

18 they've gone through.  They have iCloud accounts, through all

19 of this, that they've investigated.

20     There is no evidence that they could point to today to

21 indicate that Mr. Pretel Ortiz knew that there was a plan to

22 kill President Moïse.  The Government themselves has -- have

23 proffered this sort of dual strategy or evolving plan.  And

24 even looking at their interpretation of the evidence, at most,

25 they can say that he -- he was participating in a plan to

arrest President Moïse.

There -- with this mountain of evidence that they've procured thus far, there is nothing to indicate that he knew -- or even suggest or hint that he knew the plan was to kill President Moïse.  The evidence was that this -- the -- sort of the definitive moment, when this was communicated, was on July 6th, the day before the killing, at a meeting where Mr. Pretel Ortiz was not present.

So I think that go -- I understand the Court's position about the strength of the evidence and the seriousness of the charges.  But my initial response to that is, even understanding the charges, the Government has not presented evidence and, it seems like, cannot, even with all they have, that Mr. Pretel Ortiz understood or believed or knew that that was the plan going into July 7th.

Additionally, Your Honor, when we're looking at danger to the community, as I was saying, the fact of the charge or the fact that someone is charged with such a serious crime is insufficient alone to say someone will be a danger to -- to the community.

In order to -- to detain someone under -- or as a danger to the community, the Court must find that he presents an identified and articulable threat to an individual or the community.  It's not sufficient that it just be someone is charged with this very serious crime; therefore, they must be

```
 1    detained.  Congress could have said that.  They could have
 2    said, under 956(a) offenses, people cannot receive a bond, and
 3    they have not.
 4         And it's hard to imagine a situation in which someone can
 5    be more assured of appearance or lack of danger to the
 6    community, with a charge even as serious as this, than what we
 7    have today, where someone has cooperated with every request of
 8    law enforcement since the incident at issue, has remained at
 9    their home in the community without committing any other
10    crimes, without threatening any witnesses, without any hint or
11    suggestion that they were going to do something untoward,
12    illegal, dangerous.
13         And that's what we have here, Your Honor.  It -- as I
14    said, it's hard to imagine a situation in which -- if this is
15    not the one where someone gets a bond in such a charge, then
16    what -- what case would that be?
17         How else could someone assure the Court, with these
18    serious charges, that they would not be a danger or show up to
19    court other than what Mr. Pretel Ortiz has done, which is,
20    again, to remain in the community, to give no indication that
21    he was going to flee, and to -- and to show that he can live
22    amongst the community for the past 18 months without doing
23    anything to harm anyone in the immediate community, the larger
24    community, the world community, Your Honor?
25         And we know, again, that we cannot look specifically at
```

1  the charge, and that is insufficient because Congress allowed

2  this charge and the charges that Mr. Pretel Ortiz has -- to

3  allow a defendant to be on bond.  He has no prior criminal

4  history, Your Honor.  And -- and as I said, there must be

5  something identified and articulable -- there must be an

6  identified and articulable threat going forward.

7      And the Government -- again, we can let them argue, and

8  perhaps they can say something different for Mr. Pretel Ortiz's

9  case, and I will respond to that.  But from what I've heard so

10  far, their argument rests solely on the charges and the facts

11  in this case, Your Honor.

12      With respect to rebutting the presumption with risk of

13  flight and danger to the community, we certainly have rebutted

14  that presumption.  Mr. Pretel Ortiz has significant ties to

15  this community.  His wife of four years lives here.  He has --

16  he has significant employment history.  He's been working for

17  the last five years as a shuttle driver with the company that

18  you can see in the Pretrial Service report.

19      As I said, his wife is willing to cosign on the bond for

20  him.  He has no drug history, no mental health history.  He

21  does believe that his passport was seized when his -- during

22  the search of his house in August of 2021.  We can certainly

23  confirm that, and if --

24      **MR. BELL:**  (Inaudible) what she says, but I think it's

25  going to be home detention.

1        **MS. KUDMAN:** -- that is -- we will -- if the Court

2    gives a bond, we can certainly sort out surrender of any travel

3    documents.

4        One moment, Your Honor.

5        Similarly, Your Honor, with -- I think what supports that

6    we have rebutted that presumption and the fact that

7    Mr. Pretel Ortiz will not be a risk of flight or danger to the

8    community, along with that -- that 18 months that we've talked

9    about -- we also have the knowledge that people were being

10   arrested for it.

11       So, again, you heard that -- from the agent that towards

12   the end of January, they had arrested people on this case.  And

13   so they started to surveil Mr. Pretel Ortiz because they

14   knew -- they knew --

15           **MR. BELL:** Okay.  Thanks.

16           **MS. KUDMAN:** -- that other people were being arrested.

17       So not only do we have someone who knows they're being

18   investigated, then -- and willingly goes in to the FBI and HSI

19   offices three -- two to three times in July, then his house is

20   searched in August, still staying, still staying, then in

21   January is learning that other people are getting arrested,

22   being surveilled, and still not any indication that he is

23   making any move to flee.

24       And importantly, again, Your Honor, the fact that he has

25   already been in the community for 18 months and has not been a

1   danger to any witnesses, anyone -- there's nothing to indicate

2   that will change now.  I think those facts are very, very

3   significant, absolutely rebut this presumption, and not only

4   rebut the presumption but show this Court that he will appear

5   to -- to all of his court appearances and not be a danger to

6   anyone, Your Honor.

7        Thank you, Judge.  For those reasons, we would ask for a

8   bond.  And, again, if there are any additional conditions the

9   Court would like to add, Mr. Pretel Ortiz is 100 percent

10  willing to abide by any condition this Court thinks is

11  appropriate.

12          **THE COURT:**  Thank you, Ms. Holt.

13          **MS. CASTRO:**  If I may, Your Honor.

14          **THE COURT:**  Please.

15          **MS. CASTRO:**  Thank you, Your Honor.

16       I'll just start first with defense counsel's reference to

17  the indication that it's the Government's position that no one

18  would ever be bondable just by virtue of this charge being at

19  issue.  I want to be clear that it's not just the charge.  It

20  is also Mr. Ortiz's role and conduct, as laid out in the

21  evidence.

22       The evidence against him is, as Your Honor noted, that

23  Mr. Ortiz acted in a managerial role.  Mr. Solages, who was on

24  the ground in Haiti, reported directly to Mr. Ortiz.  He

25  responded to him in text messages with "Yes, sir" and

```
1    "Understood."  The messages that he was receiving from

2    Mr. Ortiz gave him directives on what to do in Haiti, and

3    Mr. Solages complied.

4         So I would submit that there should be no comfort that

5    this Court should find in Mr. Ortiz being in South Florida when

6    Mr. Solages gives the announcement that "We're going in to kill

7    the President."

8         I want to note that just before the President was

9    assassinated, the evidence shows that Mr. Ortiz was telling

10   Mr. Veintemilla, "You'll feel different about the success of

11   this operation by tomorrow."  That goes to Mr. -- to defense

12   counsel's suggestion that there's no evidence that Mr. Ortiz

13   knew that there was a plan to kill the President.

14        I think what the witness said was that Mr. Ortiz was not

15   captured using the word "kill the President" because, of

16   course, he's no fool, for the same reason that Mr. Ortiz and

17   the other coconspirators referred to ammunition with the

18   terminology of "screws and nails" and "tools and instruments."

19   These are individuals who are not going to be so foolhardy as

20   to use the word "kill" or "assassinate" in their communications

21   with each other.

22        But there's absolutely an abundance of evidence that

23   suggests that Mr. Ortiz was absolutely aware that violence was

24   going to be used to unseat President Moïse and that he was

25   completely on board with that reality.
```

1        I'll just refer Your Honor to a couple of the messages,

2   the request for ammunition, including hand grenades, including

3   rocket-propelled grenades, sent to Mr. Ortiz; a request from

4   Mr. Solages saying, "This is the equipment that we need"; a

5   document titled "Fighter for the Liberation of Haiti."

6        It cannot be seriously contested that the recipient of

7   that document was somehow unaware that there was a risk of life

8   and even death and violence as a result of what he was putting

9   into place.

10       I want to also say that Mr. Ortiz also played a managerial

11  role as to Mr. Rivera.  Mr. Rivera is one of the soldiers that

12  was sent to Haiti, funded by Mr. Veintemilla, to be one of the

13  leaders of the Colombian national -- nationals ultimately

14  retained to carry out this task.

15       Just as Mr. Solages was reporting to Mr. Ortiz, Mr. Rivera

16  was reporting to Mr. Ortiz.  So when Mr. Rivera sends Mr. Ortiz

17  a message saying that he needs a battering ram, it's because

18  he's reporting to his superior the equipment that he needs to

19  carry out the task at hand.

20       I'll refer Your Honor to an April 20- -- April 23rd, 2021,

21  message where Mr. Ortiz is directing Mr. Solages, "See, with

22  your own eyes, the security at the palace."  I'll also direct

23  Your Honor, as to Mr. Ortiz saying to Mr. Solages, a reference

24  that "You could face 25 years in prison for conspiracy" and

25  telling Mr. Solages to delete any compromising messages.

1    Again, this goes to consciousness of guilt.  Again, this

2    goes to an intention to obfuscate the evidence of their crimes

3    or to hide the evidence of their crimes.

4    I know we've already talked about the whiteboard quite a

5    bit, Your Honor, but that was circulated by Mr. Ortiz to his

6    coconspirators.  And I submit that no one looking at that would

7    have many questions about the fact that it uses terminology

8    like snipers, neutralizers, warriors, and shows arrows, for the

9    warriors and neutralizers, pointing in the direction of the

10   Presidential Palace.

11   I think there's strong evidence that this was, in fact, an

12   assault plan that Mr. Ortiz is circulating to Mr. Rivera, one

13   of the individuals on the ground that is responding to him and

14   who is the leader of the retained soldiers down -- one of the

15   leaders of the retained soldiers down in Haiti.

16   I'm not going to belabor the point that I've already made

17   various times today, Your Honor, as to how the circumstances

18   are different today.  I understand that Mr. Ortiz was visited

19   shortly after the assassination, but, as I believe was

20   proffered, he was not honest about his role in the

21   assassination.

22   He maintained that he knew nothing about the arrest

23   warrant.  He denied any knowledge of an immunity agreement,

24   which -- to be clear, the evidence shows Mr. Ortiz was

25   circulating to the coconspirators seeking to conceal or get

1  coverage for their actions in Haiti.

2      So there's every reason to believe that Mr. Ortiz walked

3  away from his meeting with the FBI thinking he potentially got

4  away with it.  And, of course, he is now facing a plethora of

5  evidence making clear that that is, in fact, not the case.

6      So I want to be clear that it's not just the charge or the

7  statute that is charged, but it is the conduct of Mr. Ortiz

8  throughout the course of these events that make it abundantly

9  clear that he represents a danger to the community and a risk

10  of flight.

11      And I think I'll rest on that point unless Your Honor has

12  further questions.

13          **MS. HOLT:**  May I respond, Your Honor?

14          **THE COURT:**  You can.

15      I'll tell you, Ms. Holt, that I forgot that it was this

16  defendant who told the other conspirator to "Delete evidence of

17  your involvement."  I don't -- I don't know why.  I just share

18  that with you.  I just -- it was a point that I had forgotten

19  from the proffer.

20      Go ahead.

21          **MS. HOLT:**  Your Honor, first, just going one by -- or

22  in order of -- of what the Government presented, they -- they

23  mentioned directives from Mr. Pretel Ortiz to Solages.  The

24  agent testified generally about some directives.  There was

25  nothing specific.

 1          Additionally, Your Honor, I think what's important is

 2     there is another defendant that we have not heard a lot about

 3     today, Mr. Intriago.  And it's clear, from the complaint, that

 4     he was the one who signed these initial agreements with CTU and

 5     Worldwide and, I believe, Mr. Sanon.  And that was not

 6     Mr. Pretel Ortiz who signed those original agreements.

 7          So I think it's important we don't forget about that when

 8     we're talking about who we think was the manager and who we

 9     think was -- was assuming that role here.

10          There is no evidence about what directives

11     Mr. Pretel Ortiz gave Solages, and that cannot then be assumed

12     or interpreted or speculated to mean that he gave some

13     directive about changing the plan to killing President Moïse.

14          It very well could be Mr. Intriago or any of the other

15     coconspirators in this case.  Even assuming the Government --

16     or taking as true the Government's evidence, that's pure

17     speculation that that is something that Mr. Pretel Ortiz did.

18          I also want to emphasize that when I asked the agent about

19     did they have any evidence that Mr. Pretel Ortiz knew that this

20     plan was to kill the President -- and he said, "No."  But it

21     wasn't just about whether he ever used this word "kill" in the

22     many text messages and emails and all of the other evidence

23     they had.

24          I also asked him if there was any code or any indication

25     at all, based on their testimony, that there had been a lot of

```
 1    communication using code.  And there's nothing, Your Honor.

 2    It's -- there's not "code."  There's not "hit."  There's not

 3    "suggestion."

 4         And I think that's very important, and we can't overlook

 5    even -- I think the Government's wrong to characterize it as

 6    they just weren't not smart enough to use the word "kill."

 7    There was nothing.  There's nothing, in this mountain of

 8    evidence, to indicate Mr. Pretel Ortiz knew that that was the

 9    plan, gave a directive that that was the plan.

10         Again, going back to the whiteboard -- I know we -- we

11    have talked a lot about this, but I echo the attorney before

12    me, her argument, that there's no way to know what that means.

13    There's no way to tell whether -- what they're drawing is a

14    plan or what they're drawing is based on the current situation

15    or setup of the palace, Your Honor.

16         The Government has highlighted, or -- or alleged, that

17    Mr. Pretel Ortiz was not honest in his communications with law

18    enforcement, despite going in multiple times voluntarily after

19    July 7th of 2021.

20         I know Your Honor knows this, but bond is not

21    contingent -- contingent on someone giving a confession.  As we

22    sit here today, Mr. Pretel Ortiz is presumed innocent and is

23    not required, in order for him to get a bond, that he make a

24    full confession, as the Government determines, in order to get

25    a bond, Your Honor.
```

1    Their argument is that he could very well have thought,

2  then, walking away from that meeting, that he got away with his

3  involvement here.  And the evidence contradicts that.  In fact,

4  it showed that he continued to go in.

5    So he had those two to three meetings in July, where he

6  voluntarily went to the offices.  But then his house is

7  searched in August, which is another significant indication

8  that he, quote, "has not gotten away with anything" but that he

9  is yet still under very significant investigation by law

10  enforcement.

11    And, in fact, then he hires lawyers.  And, again, then

12  time passes, and we get to January, where they are arresting

13  other people.  And, again, he does not flee, even knowing that

14  his colleagues are getting arrested.

15    I also would like to point out, Your Honor, one thing the

16  agent did say is that -- and -- that is made clear in the

17  complaint.  The resources were not coming from CTU.  They were

18  coming from somewhere else, and I think that's significant.

19    One, I think it shows that Mr. Pretel Ortiz does not have

20  the resources to put up a bond proffered by -- by the other

21  folks before me, but it shows he also doesn't have the

22  resources to flee.  He is working as a shuttle driver for a

23  hotel, makes okay money, but is not in a position where he

24  would be able to procure -- really procure the items necessary

25  to flee the country.

1    With that, Your Honor, with his conduct over the last 18

2    months, a bond cosigned by his wife, with an ankle -- a GPS

3    ankle monitor, a cash bond with the amount of money that he has

4    saved up now, and 24/7 home detention could assure this Court

5    that he will not be a danger to the community and that he would

6    appear for all of his court hearings.

7    The Government, in their argument, still has not

8    articulated how he is -- they have not identified, nor

9    articulated, a specific threat to the community going forward,

10   and that's what the law requires them to do.  Without that, if

11   we're looking at the charge, if we're looking at his alleged

12   involvement in this offense, that is not sufficient,

13   Your Honor.

14   They must show that there is some danger to an individual

15   or the community that they can articulate and identify, and

16   they cannot do so.  They also cannot proffer any evidence

17   suggesting to this Court that he will not show up to court.

18   The evidence has shown the opposite.

19   And for those reasons, Your Honor, a bond is appropriate

20   in this case.

21   **THE COURT:**  Ms. Holt -- okay.  I guess a question that

22   I would have, though -- when you say the Government has not

23   articulated a specific defendant -- or danger that this

24   defendant presents going forward and the -- I heard you both

25   say that they're relying on the charges -- charges and the

1    facts.

2         I agree with you that I think that the motion for

3    detention travels almost exclusively on the facts of the

4    crime -- Ms. Castro, correct me if I'm wrong, but, no, I think

5    that that's correct -- but the -- I would -- actually, I'm not

6    going to put you on the spot.

7         I will tell you that I would tend to disagree that that

8    doesn't also speak to the other factors under (g), including

9    characteristics of the defendant, in terms of what conduct here

10   has been shown.

11        I'll also, just for whatever it's worth -- because,

12   ultimately, I do not think that there are conditions that I can

13   impose here that reasonably assure the safety of the community,

14   and a written order will follow that articulates it better.

15   But I think that there is an insistence that the evidence of

16   written correspondence is the only evidence on which I can

17   rely.

18        But both the proffer and the agent's testimony refer to

19   statements of witnesses, which I can't look at an email in --

20   and some of them, I recall, being articulated in the

21   complaints -- the two complaints in this case, with respect to

22   your client, obviously, the main complaint.  But it still

23   constitutes evidence.

24        So the email correspondence themselves, I think, is where

25   your argument largely travels in the absence of -- of proof

1    that Mr. Ortiz knew of the plan to kill the -- the President.

2    The -- the nature of the conspiracy, though, is also to -- to

3    kidnap, to displace, resulting in his death.

4         So I have trouble -- and I say this all out loud because

5    if you think that I misunderstand your argument, I would like

6    to hear it differently.  But I -- but, ultimately, the concern

7    that I have in -- again, in a presumption case, where -- is the

8    absence of evidence.  And even that, I have trouble deciding

9    exactly how much weight to attribute to.

10        There was testimony that the -- Mr. Ortiz was under

11   surveillance by the agents, but I -- but I don't know how much

12   surveillance.  I don't -- meaning I don't know how much

13   evidence there really is of noncriminality during that time.

14        I only point that out because I just am really having

15   trouble weighing how to treat that factor.  For me, it comes --

16   it is more meaningful for the absence of flight during that

17   time as opposed to danger to the community.

18        Again, for whatever it's worth, I'm sharing this with you

19   so that you can tell me that -- if you think I'm wrong, I'd

20   like to hear it, but it seems meaningful for purposes of risk

21   of flight but not as much for dangerousness.

22        So, again, to reiterate, the nature of this conspiracy and

23   how it was performed and the role that your client is alleged

24   to have fulfilled in that conspiracy and the evidence that I've

25   heard today, with respect to the instructions and the

1    intention, make it -- ultimately, it's my finding that I can't

2    think of conditions that would reasonably assure that the --

3    with that level of sophistication and coordination, safety of

4    the community.

5        But I think that addresses risk of flight, which your bond

6    potentially would otherwise address.  I'm not sure your client

7    has quite the same -- it's not a comparison, but not quite the

8    same ties to the community as some of the -- as the preceding

9    defendant, but there's international ties.

10       When you tell me he doesn't have the means to flee, I

11   don't know that I'm limited -- this isn't traveling under

12   (f)(2)(A).  A serious risk of flight, you know, comes down to

13   whether there are conditions I can otherwise impose if the

14   presumption is rebutted.

15       So even assuming the presumption is rebutted with the

16   absence of evidence of criminal activity or obstruction in the

17   last 18 months, considering the facts and evidence relating to

18   the -- I'm trying to find another word -- instruction to

19   destroy evidence and the role that he played in the offense, I

20   don't find that there are conditions that I could here impose

21   that would reasonably assure the safety of the community.

22       **MS. HOLT:**  Your Honor, in response to that, I think

23   you have to find that there was no criminality.  I think that

24   the Government -- we -- our system is not set up such that, if

25   there's no evidence, we don't know what the answer is.

```
1        If there's no evidence, we know what the answer is, which

2    is there is -- there has been no criminality.  We cannot assume

3    or speculate that there may have been, and we just don't know

4    about it.

5            THE COURT:  Well --

6            MS. HOLT:  There's no basis to do that.  If there was

7    something, the Government has the burden of proving that.

8            THE COURT:  But -- I may have misled you.  I'm not

9    sitting here thinking, "But he could have," even though there

10   wasn't evidence.  That wasn't my point.

11       I'm just maybe being too candid in telling you that I'm

12   not sure, for purposes of dangerousness, how much weight I

13   should afford the fact that there was no criminality or there's

14   no evidence of criminal conduct in the last 18 months, not that

15   I'm sitting here thinking, "But he could have" because there

16   wasn't -- you're right -- any evidence of that.

17           MS. HOLT:  I think that's huge, though, Your Honor, if

18   we're talking about whether we need to lock someone up because

19   we think they're going to be a danger to the community,

20   "community" meaning neighbors commit new crimes or "community"

21   meaning witnesses in the case or people involved in the case.

22       And we have a period of 18 months where this person has

23   known he's under investigation, has been out in the community,

24   without any of that.  That -- there's no reason that that

25   behavior is going to change now.
```

1    And if we're looking at -- I don't -- and perhaps I'm

2    misunderstanding how you're using this term, but when you say

3    "lack of evidence," I think that's a lot of evidence.  That's

4    18 months' worth of evidence that he is not a danger to the

5    community, that he can be in -- in our community without any

6    issue.

7         And that's what we have to look at, and I think that

8    speaks volumes here such that -- not only that the presumption

9    has been rebutted but that it can reasonably assure -- and I

10   would argue more than reasonably assure -- this Court that he

11   could be out for the length of the -- of this case without any

12   harm coming to anyone.

13        **THE COURT:**  I understand.

14        I can't remember now -- and I apologize -- if it was you

15   or Ms. Kudman who pointed out that, if I was waffling, I had to

16   err on the side of release.  And I'll just tell you, Ms. Holt,

17   I'm not waffling, but Judge Martinez may see it differently.

18        I'll enter a written order with my findings and my

19   reasoning for you to decide whether -- you know, again, if you

20   think that I misunderstood the evidence or should present

21   something different, and you want to move to reopen or ask

22   Judge Martinez to review it.

23        But that's the -- that's the ruling.

24        **MS. HOLT:**  Thank you, Judge.

25        **THE COURT:**  Thank you, Ms. Holt.  That was

 1  well-argued.

 2      Mr. Ortiz has not really had a chance to come down to the

 3  podium.

 4      I know, Mr. Bell, that it's only a quarter to 4:00, and

 5  you'd like to go, but before --

 6          **MR. BELL:**  No.  Listen, I'm --

 7          **THE COURT:**  -- so that I can excuse Mr. Ortiz --

 8          **MR. BELL:**  I'm committed to whatever it takes.

 9          **THE COURT:**  -- can I finish -- I --

10                          (Laughter.)

11          **THE COURT:**  Sorry, Mr. Bell.

12      Ms. Holt, if I can finish out for Mr. Ortiz --

13          **MS. HOLT:**  Oh, yes.

14          **THE COURT:**  -- and then we could excuse him at least.

15  He's also been here since 10:00, like everybody else, but --

16          **MS. HOLT:**  Oh.  I got it.

17          **THE COURT:**  Okay.  Good afternoon, Mr. Ortiz.  I'm

18  sorry I haven't addressed you personally and sooner.

19      Is the device still working for you, sir?

20          **DEFENDANT PRETEL ORTIZ:**  Perfectly, Your Honor.

21          **THE COURT:**  Okay.  Good.

22      Mr. Ortiz, let me just address you directly with respect

23  to the issue of your attorney.  The Government has made a

24  motion here -- and we'll ask Judge Martinez to decide, but the

25  Government has raised the issue of a conflict.

```
 1        Okay.  The motion -- I don't know if you've seen it --
 2   says that the Office of the Federal Public Defender was
 3   previously appointed on -- to represent a codefendant, who's
 4   now named in this indictment.
 5        Okay.  He wasn't part of your complaint, but he's now part
 6   of the indictment that you're also charged in.
 7        Do you understand me so far?
 8             DEFENDANT PRETEL ORTIZ:  Yes.  Correct.
 9             THE COURT:  Okay.  So it's my understanding that there
10   was a period of about seven days where that Federal Public
11   Defender, or Assistant Federal Public -- Public Defender, was
12   assigned to the case.
13        Okay.  So as you know, this week, I appointed the office
14   to represent you in this matter.  To be clear, it is your right
15   not only to have counsel appointed, if necessary, but to have
16   conflict-free counsel, meaning an attorney who represents your
17   best interests and isn't conflicted by somebody else's
18   interests.
19        Do you understand that?
20             DEFENDANT PRETEL ORTIZ:  Yes, I understand.
21             THE COURT:  Okay.  And, again, this full conflict
22   issue is going to be decided by Judge Martinez.
23        All right.  For purposes of today's hearing, and for your
24   representation now, understanding that someone from Ms. Holt's
25   office previously represented a codefendant in this case, is it
```

 1  your decision to continue with Ms. Holt, or do you want to seek

 2  different counsel?

 3             **DEFENDANT PRETEL ORTIZ:**  I would like to continue with

 4  her.

 5             **THE COURT:**  Okay.  All right.  So the motion was just

 6  filed tonight?  Last night?

 7             **THE CLERK:**  It was yesterday, Your Honor.

 8             **THE COURT:**  Okay.  So I don't know if you guys are

 9  going to ask Judge Martinez for expedited briefing, but,

10  Ms. Holt, I'm not going to arraign your client now.  I'm going

11  to let Judge Martinez -- so what I'll do is I'll just set a --

12  I'm going to just set it out for 14 days.

13       Okay.  And then if you guys need more time to resolve

14  it -- or Judge Martinez can decide, if he wants, to refer it to

15  his paired Magistrate Judge.

16       Does that sound appropriate, Ms. Holt?

17             **MS. HOLT:**  That's fine, Judge.

18             **MS. GOLDBARG:**  Yes, Your Honor.

19             **THE COURT:**  Okay.  All right.  So 14 days from today

20  is the 3rd of March, different Magistrate Judge.  I think

21  there's someone else in the case who also hasn't been

22  arraigned.  So I don't think it's a significant lag in the

23  defendants' arraignment times.

24       But, anyway, if you need to have it changed, you'll either

25  let mag court know, move for a continuance, or ask

1    Judge Martinez to address it at the same time.

2              **MS. HOLT:**  That's fine, Your Honor.

3              **THE COURT:**  Okay.  Anything else, then, with respect

4    to Mr. Ortiz?

5              **MS. CASTRO:**  Not for Mr. Ortiz, Your Honor, but I'm

6    now asking myself if Mr. Veintemilla was arraigned before he

7    left court today.  And I, candidly, don't recall the answer.

8              **THE COURT:**  Yes.

9              **MS. CASTRO:**  Okay.

10             **THE COURT:**  I always do it before the detention

11   hearing.

12                  (Discussion regarding another case.)

13             **THE COURT:**  Okay.  All right.  Mr. Bell, we broke --

14   your client is still here.  So we broke and needed to take

15   up -- I still want to colloquy the -- Dr. Martin.

16             **MR. BELL:**  Uh-huh.

17             **THE COURT:**  And I asked your positions.  Again,

18   different prosecutors seem --

19             **MR. BELL:**  Judge, we have an agreement, if that helps.

20             **THE COURT:**  Yes, Mr. Bell.  Go ahead.  I'll say less.

21             **MR. BELL:**  No.  No.  I'm -- I didn't mean to

22   interrupt -- interrupt.  I apologize.

23             **THE COURT:**  Go right ahead, sir.

24             **MR. BELL:**  We've agreed, rather than the 10 percent

25   bond, to do a $1.5 million personal surety bond cosigned by

1    Dr. Martin, who's here, and, you know, all the conditions that

2    you mentioned before, including her as a third-party custodian.

3              THE COURT:  Okay.

4              MR. BELL:  I have "Surrender all passports and travel

5    documents; report to Pretrial Services as directed; participate

6    in mental health assessment and/or treatment, as set forth in

7    the special conditions of bond; avoid all contact with

8    codefendants and defendants in related cases except through

9    counsel; refrain from possessing a firearm or destructive

10   device, as set forth in the special conditions."  That's

11   Letter K.

12        You also said, "As set forth in Letter L, none of the

13   signatories may sell, pledge, or further encumber any of their

14   real property."

15        Then you also said that he's to participate in the

16   location monitoring program with an active GPS monitor for

17   purposes of -- if I understood you correctly, to enforce home

18   detention.

19              THE COURT:  That's correct.

20              MR. BELL:  On the term -- there are -- in terms of

21   home detention --

22              THE COURT:  Allowances?  Is that where you're heading?

23              MR. BELL:  Yeah.

24        There are allowances here for -- that would apply, based

25   on your other conditions.

1      **THE COURT:**  Can I cut you off for a split second to

2  say that it's always my practice to defer to Pretrial Services

3  on allowances.

4      And so unless there's something that you-all have

5  particularly stipulated to permit or not permit -- otherwise, I

6  let the officer interview and decide what's right.

7      **MR. BELL:**  So there are two -- two or three things, I

8  think, at least -- I'd like to create a record, if I may.

9      **THE COURT:**  That's okay.

10      Will you use the microphone, Mr. Bell?

11      **MR. BELL:**  Yeah.  Sure.

12      **THE COURT:**  Go ahead.

13      **MR. BELL:**  One is for medical; the other, again, based

14  on your own conditions, mental health treatment.

15      And one that's not explicit or listed here, but that I did

16  speak to Ms. Goldbarg of the United States about, is an

17  allowance that permits him to continue to go to see his

18  parents, who live less than a mile away, to participate in

19  their care and go to their doctors' appointments.

20      **THE COURT:**  Okay.

21      **MR. BELL:**  Is that fair?  Have I -- I just want to

22  make sure I've characterized what we have -- what we spoke to

23  fairly.

24      **MS. GOLDBARG:**  We were -- Your Honor, in our

25  discussion, I was aware that he does take care of his -- of his

```
 1   parents.
 2        And so the request was that there would be, you know, a
 3   structured time, but that can be approved by Pretrial, the
 4   issue --
 5             THE COURT:  Right.
 6             MS. GOLDBARG:  -- of taking his parents to the
 7   doctors' appointment.  As long as it's preapproved by
 8   Pretrial Services --
 9             THE COURT:  Right.
10             MS. GOLDBARG:  -- and there's no deviations from that,
11   then the Government doesn't have a problem with it.
12             MR. BELL:  And that's fine.  I would expect that he'd
13   be required to provide them some kind of schedule they approve
14   beforehand --
15             THE COURT:  That's -- so --
16             MR. BELL:  -- based on my experience with these
17   things.
18             THE COURT:  So for what it's worth, what that usually
19   requires is your officer will ask you, a week in advance, to
20   provide a schedule of where it is that you are looking to be.
21   That's what it usually entails.
22        So I'll include it as an allowance, the preapproved
23   visitation of parents and medical visits of parents, but just
24   know that that's what it usually means.
25             MR. BELL:  So, Judge, just -- so to be clear, I'll
```

```
 1   check off medical.  I'll check off substance abuse, court

 2   appearances, attorney visits --

 3           THE COURT:  Substance abuse?  What are you -- what are

 4   you doing?

 5           MR. BELL:  No, not substance abuse.  It's next to

 6   "mental health."  I apologize.

 7           THE COURT:  Okay.

 8           MR. BELL:  I misspoke.

 9       Court appearances, attorney visits, and court-ordered

10   obligations.  He does live in a different district, and I

11   think --

12           THE COURT:  Right.

13           MR. BELL:  -- conditions of release should allow

14   pre- -- you know, pre-notice to Pretrial Services, travel

15   between the Middle and Southern Districts of Florida, so that

16   he can come to court, Number 1; and, Number 2, see his

17   attorney.

18           THE COURT:  Okay.

19           MR. BELL:  And then finally, as you pointed out, the

20   preapproved schedule relating to the parents.  I'll -- I'll

21   write that in.

22           THE COURT:  Okay.  Does --

23           MR. BELL:  Yes.

24       And, Judge, to be clear, for the record, one of the

25   conditions of release is that none of the signatories can sell
```

1    or further encumber the bond, which means by both the defendant

2    and his wife signing the bond --

3            **THE COURT:**  Right.

4            **MR. BELL:**  -- this bond is effectively collateralized

5    or secured, if you will, by the three pieces of real estate,

6    which I mentioned to the Court:  Number 1, where the defendant

7    and his wife live; Number 2, where his parents live; and then

8    the third address, which I gave as to Ms. Martin alone.  She

9    owns --

10           **THE COURT:**  Right.

11           **MR. BELL:**  -- the home she used to live in before she

12   met him.  That -- all three of those properties are the subject

13   of this condition of release -- and I think -- I'm doing this

14   for the record for the Government -- meaning that they may not

15   sell or encumber any one of those properties or any other, if

16   they exist.

17           **THE COURT:**  Right.

18       Okay.  All right.  Does that effectively memorialize the

19   parties' full agreement with respect to the bond conditions?

20           **MS. GOLDBARG:**  It does, Your Honor.

21           **THE COURT:**  Then can I talk to Dr. Martin?

22           **MR. BELL:**  Yes, of course.

23           **THE COURT:**  Anything else?  Anything else?  Pretrial,

24   anything else?

25           **PRETRIAL SERVICES OFFICER:**  No, Your Honor.  I think

1  we've covered everything.

2      **THE COURT:**  Okay.  All right.  Dr. Martin, it's my

3  understanding -- well -- and I've seen you literally all day.

4  So I know that you were present throughout this entire

5  proceeding, and I'll just ask you a couple of quick questions.

6     Okay.  Tell me your name for the record.

7      **DR. MARTIN:**  Tracey Martin.

8      **THE COURT:**  And it's my understanding you're willing

9  to cosign on a $1.5 million bond on behalf of

10  Federick Bergmann.

11     I'll have you, for the record, tell me your relationship

12  to him.

13      **DR. MARTIN:**  I'm his wife.

14      **THE COURT:**  And how long have you known him?

15      **DR. MARTIN:**  At least 20 years.

16      **THE COURT:**  Okay.  And I understand that you have some

17  of your own real estate, as well as the real estate that you

18  own with your husband; is that right?

19      **DR. MARTIN:**  That's right.

20      **THE COURT:**  Okay.  And do you feel like you fully

21  understand the commitment you are undertaking here?  I'm going

22  to ask you to do two things.

23     Okay.  I'm asking you -- or you're being asked to cosign

24  on this bond -- we're going to talk about that -- and I'm

25  asking you to act as a third-party custodian.  I don't know yet

1    if anyone has had a chance to talk to you about that, but it

2    would require you essentially to rat out your husband if he

3    doesn't comply with the conditions of his bond.

4        Okay.  So those conditions that -- among others, that I'm

5    having you act as his custodian on will mean participating in

6    mental health treatment -- okay? -- attending his doctors'

7    visits, taking his medicine that's prescribed.

8        Do you understand that part of the bond?

9        **DR. MARTIN:**  Yes.

10       **THE COURT:**  Reporting to Pretrial Services as

11   directed.  He's going to have to answer to a probation officer.

12   He's going to have to stay within the home and -- except for

13   when he has allowances to leave.

14       So if he leaves the house without your permission -- or

15   without your probation officer's permission, you'll have to

16   report him.

17       Are you prepared to do that?

18       **DR. MARTIN:**  Yes, I -- yes, I -- yes.

19       **THE COURT:**  Okay.  And then he'll also only be able to

20   travel back and forth between this district and where you live.

21   You can't go anywhere else.

22       Do you understand that?

23       **DR. MARTIN:**  Yes, I understand that.

24       **THE COURT:**  Okay.  This is really onerous.

25       Are you sure you want to -- want to undertake this

```
 1    commitment?

 2              DR. MARTIN:  Well, I guess, yes.  Uh-huh.  Yes.

 3              THE COURT:  Okay.  And you're sure you understand it?

 4              DR. MARTIN:  I understand it.

 5              THE COURT:  Okay.  And you're so convinced that your

 6    husband will comply as ordered that you're willing to cosign on

 7    this bond and to be his third-party custodian?

 8              DR. MARTIN:  Yes.

 9              THE COURT:  Okay.  Thank you, Dr. Martin.

10              DR. MARTIN:  Uh-huh.

11              THE COURT:  Okay.

12              MR. BELL:  Okay.  I just need him to sign it, if I

13    may.

14              THE COURT:  I appreciate that, and I have one last

15    thing to say to him.

16         Mr. Bergmann, I must inform you that separate offenses are

17    established for the knowing failure of a defendant to appear

18    before a court, as required by the conditions of release, and

19    for the commission of a crime while on pretrial release.

20         Any terms of imprisonment imposed pursuant to either

21    provision of the law is consecutive to the sentence of

22    imprisonment for any other offense.

23         Any violation of a condition of your release may result in

24    immediate issuance of a warrant for your arrest, prosecution

25    for contempt of court, revocation of release, and forfeiture of
```

```
 1   any bond and collateral that's been posted.
 2        Mr. Bergmann, do you understand the impact that it would
 3   have on your wife if you fail to appear before a court or
 4   otherwise violate any of the conditions of my bond, which will
 5   include no contact with any victim, any witness, any
 6   coconspirator, anyone at all that the Government --
 7   Ms. Goldbarg, I don't know that I told you, but within -- oh.
 8   Today is Friday at 4:00.
 9        So by Tuesday, you're to provide a list to defense counsel
10   and to Pretrial Services of the list of persons that he's
11   prohibited from having contact with.
12        Do you understand?
13             MS. GOLDBARG:  Yes, Your Honor.
14             THE COURT:  Okay.  So the list that you get from
15   defense counsel -- you can have no contact with them except
16   through counsel.
17        Do you understand?
18             DEFENDANT BERGMANN:  Yes, I do.
19             THE COURT:  Do you think you appreciate the
20   consequence it will have on your wife and parents if you
21   violate this bond?
22             DEFENDANT BERGMANN:  Yes.
23             THE COURT:  Okay.  I hope so.
24        I will only see you again if you violate.  So let's let
25   this be our last time together.
```

```
 1        Is that it?
 2                          (Laughter.)
 3          MS. CASTRO:  I think so, Your Honor.
 4          MS. GOLDBARG:  Let's hope so.
 5          THE COURT:  Okay.  I was just thinking, "Is that it?"
 6          MR. BELL:  Yes.  I'm just having him sign.
 7          THE COURT:  Okay.  Okay.  Then --
 8          MR. BELL:  Thank you, Judge, and thank you for your
 9    time and patience.
10          THE COURT:  No.  I -- listen, I appreciate the
11    presentation that everyone's made here.  It was incredibly
12    thoughtful and -- and fulsome.
13        That ends the morning calendar.
14                          (Laughter.)
15          THE COURT:  And for everybody who's been here since
16    2:00, I'm really sorry.  I've got to give my court --
17          MR. BELL:  When I get in trouble, call Ms. Kudman or
18    Ms. Holt.
19          THE COURT:  Yeah.
20        Deputy, what's our situation with our 2:00 o'clock?
21          THE MARSHAL:  I'm sorry?
22          THE COURT:  Are -- do we have them?
23          THE MARSHAL:  We're waiting on them.
24          THE COURT:  Oh, God.
25        Okay.  I'm so sorry.
```

1          THE MARSHAL:  No problem.

2          THE COURT:  Alicia, what do you want to do?

3     Everyone's excused.

4               (Proceedings adjourned at 4:28 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

## **CERTIFICATE OF TRANSCRIBER**

4      I certify that the foregoing is a true and correct

5 transcript, to the best of my ability, of the above pages of

6 the official electronic sound recording provided to me by the

7 U.S. District Court, Southern District of Florida, of the

8 proceedings taken on the date and time previously stated in the

9 above matter.

10      I further certify that I am neither counsel for,

11 related to, nor employed by any of the parties to the action in

12 which this hearing was taken, and further that I am not

13 financially nor otherwise interested in the outcome of the

14 action.

15

16 DATE:  Monday, March 6, 2023

17

18

19

20       /S/ James C. Pence-Aviles

21    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
         U.S. Court Reporter

22

23

24

25