```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                      CASE NO.  22-cr-20104-JEM
 3


 4
         UNITED STATES OF AMERICA,
 5
                          Plaintiff,
 6
             vs.
 7
                                            Miami, Florida
 8                                          September 12, 2023
         CHRISTIAN SANON,                   Pages 1-95
 9
                          Defendant.
10       _____

11              TRANSCRIPT OF PRETRIAL DETENTION HEARING
               BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
12                   UNITED STATES MAGISTRATE JUDGE

13
         APPEARANCES:
14
         FOR THE PLAINTIFF:    Monica Castro, A.U.S.A.
15                             Andrea Goldbarg, A.U.S.A.
                               United States Attorney's Office
16                             99 Northeast 4th Street
                               Miami, Florida 33132
17


18

19       FOR THE DEFENDANT:    Zeljka Bozanic, Esq.
20                             Bozanic Law, P.A.
                               2847 Hollywood Boulevard
20                             Hollywood, FL 33020

21


22

         TRANSCRIBED BY:       DAWN M. SAVINO, R.P.R., C.R.R.
23                             Official Federal Court Stenographer
                               400 N. Miami Avenue, 10S03
24                             Miami, Florida  33128
                               Telephone:  305-523-5598
25                             Dawn_Savino@flsd.uscourts.gov
```

PROCEEDINGS RECORDED BY COURTROOM DIGITAL AUDIO RECORDING
TRANSCRIPT PRODUCED BY MECHANICAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

1                    P-R-O-C-E-E-D-I-N-G-S

2              COURTROOM DEPUTY:  All rise.  The United States District

3    Court for the Southern District of Florida is now in session, the

4    Honorable Alicia M. Otazo-Reyes presiding.

5              THE COURT:  Good morning, everyone.  Please be seated.

6              COURTROOM DEPUTY:  The United States of America versus

7    Christian Sanon, case number 22-20104-criminal-Martinez.

8              MS. CASTRO:  Good morning, Your Honor.  Monica Castro

9    and Andrea Goldbarg for the United States.

10             MS. BOZANIC:  Good morning, Your Honor.  Zeljka Bozanic

11   on behalf of Mr. Sanon, who is present.

12             THE COURT:  All right.  We're here on a pretrial

13   detention hearing?

14             MS. BOZANIC:  Yes, Your Honor.

15             THE COURT:  All right.  I have a note, stipulated

16   pretrial detention entered on 2-1-23 is that accurate?

17             MS. BOZANIC:  Yes, Your Honor.

18             THE COURT:  All right.  So this was entered with respect

19   to the original indictment?

20             MS. BOZANIC:  Well, it was, with the right to revisit,

21   Judge.  And at this time we would like to revisit.

22             THE COURT:  Okay.  So you want to have a detention

23   hearing now?

24             MS. BOZANIC:  Yes, Your Honor.  Or after you finish.  I

25   don't know how long the calendar is, but it's probably going to

1   be a little more lengthy than --

2           THE COURT:  Well, every other case is a detention

3   hearing so --

4           MS. BOZANIC:  Okay.

5           THE COURT:  All right.  Stephanie, do you have a

6   notebook?  Sorry.

7           COURTROOM DEPUTY:  We have a small one.

8           THE COURT:  Yeah.  That's fine.  All right.

9           So, let's see.  Was there any kind of hearing in the

10  past or it was just a stipulation?

11          MS. BOZANIC:  No, Your Honor, there was never a hearing.

12  It was just a stipulation.

13          THE COURT:  Okay.  All right.  So the government wants

14  to proceed by way of proffer?

15          MS. CASTRO:  Yes, Your Honor.

16          And just one point of clarification, there had been

17  detention hearings in this case, just not as to this defendant.

18          As to the factual proffer, the first thing that I would

19  note is that the agent who will be testifying is also fully

20  adopting a complaint that was filed against Mr. Sanon, and so we

21  would seek to incorporate that by reference into our factual

22  proffer.  And that is -- the magistrate's case number for that

23  was 22-MJ-04161.  I have a copy of it here if it's useful to the

24  Court.

25          THE COURT:  Hand it up to Stephanie, please.

1          MS. CASTRO:  And if I may proceed with the remainder of

2     the factual proffer.

3          THE COURT:  How do you mean the remainder?  Are you

4     adopting what's here in this complaint?

5          MS. CASTRO:  Yes, Your Honor, but there are additional

6     facts that we would also like to proffer in connection with our

7     arguments today.

8          THE COURT:  All right.  But to really make it a coherent

9     whole, you just want to plug in your facts and assume I've read

10     this, which I haven't?

11          MS. CASTRO:  Yes, Your Honor.  What I drafted here was

12     meant very much to be as minimally redundant to the complaint as

13     possible.  So there will certainly be some overlap, but I would

14     say the facts in the complaint largely are subsumed in what I've

15     written here with an attempt to not be extremely redundant and

16     simply just be reading the complaint into the record.

17          THE COURT:  Okay.  So make sure that what you put on the

18     record is a complete picture.

19          MS. CASTRO:  Understood, Your Honor.  The only other

20     thing I'll note before I read the factual proffer, this part is

21     -- there's two documents related to public court filings as to a

22     bankruptcy that the Defendant filed that I believe are relevant

23     to the question of risk of flight.  I have made these documents

24     available to the defense and I have copies for the Court.

25     Essentially we would be asking the Court to take judicial notice

1    of these documents.  It's not really part of the witness's

2    testimony, but I do think they're relevant to the proceedings

3    today, and I can hand those up.

4            THE COURT:  Do you want to make them a court exhibit?

5            MS. CASTRO:  That would be great, Your Honor.  We'll go

6    ahead and put a sticker on these.

7            THE COURT:  Okay.

8            MS. CASTRO:  Zeljka, just so you know, these are the

9    exact two copies so that you have the ones I'm offering handy.

10   Those are for you.  Yeah.  Okay.

11           All right, Your Honor.  If I may now proceed with the

12   factual proffer?

13           THE COURT:  Go ahead.

14           MS. CASTRO:  Thank you, Your Honor.

15           On July 7, 2020, the president of Haiti, Jovenel Moise,

16   was assassinated in his residence in Port-au-Prince Haiti.  That

17   morning armed assailants, wearing ballistics vests, entered the

18   president's residence.  He was shot 12 times and died as a

19   result.  His wife, the first lady, survived, but she also

20   suffered multiple gunshot wounds.

21           The Investigation into the events of that day reveal

22   that President Moise's assassination was the culmination of

23   months of planning spearheaded by defendants that participated

24   from -- participated in the enterprise from the Southern District

25   of Florida.  This includes Defendant Arcangel Pretel Ortiz and

1    Antonio Intriago who are co-defendants of Mr. Sanon, they're

2    principals of related South Florida companies that will be

3    collectively referred to throughout my proffer as CTU.

4          The conspiracy was also funded by Worldwide Capital

5    Lending Group through its principal Walter Veintemilla, who is

6    also a named co-defendant in this case.

7          Ortiz, Intriago and Veintemilla were each motivated by

8    the expectation of financial opportunities in Haiti should they

9    succeed in ousting President Moise and replacing him with their

10   intended successor.  Initially, that intended successor was to be

11   the Defendant Christian Sanon.  Sanon was a Haitian political

12   hopeful who opposed President Moise's administration and aspired

13   to become the president of Haiti.

14         Beginning in about February 2021, Ortiz and Intriago, as

15   principals of CTU, agreed to support Sanon with his political

16   aspirations in Haiti.  That alliance is documented, amongst other

17   places, in a nondisclosure agreement dated on or about February

18   2021.  In that agreement, CTU and Sanon agreed, amongst other

19   things, that neither would disclose the procedures, services and

20   merchandise that CTU agreed to provide to Sanon in connection

21   with his political hopes in Haiti.  This agreement was signed by

22   Antonio Intriago on behalf of CTU, and was also signed by the

23   Defendant Christian Sanon.

24         As for worldwide and its principal Veintemilla, by the

25   end of April 2021 Veintemilla agreed to finance CTU's support of

1    Sanon and extended a $175,000 line of credit in furtherance of

2    that effort.

3         Witness interviews, flight records and seized electronic

4    evidence and additional documents confirm that CTU and worldwide

5    hosted meetings amongst co-conspirators in South Florida in April

6    and May 2021 which Sanon attended.  According to witness

7    interviews and electronic evidence at these meetings,

8    conspirators discussed how to forcibly remove President Moise and

9    install Sanon as president.  Their discussions included how to

10   acquire weapons and military equipment to facilitate the

11   conspirators' plan to remove President Moise and replace him with

12   Sanon.

13        As to how to remove President Moise, initially the

14   conspirators planned to film a public uprising aimed at ousting

15   President Moise and installing Sanon as president.  Over the

16   course of the conspiracy, the plan to bring Sanon to power

17   involved attempts to physically remove President Moise from

18   power.  To aid them in their efforts in Haiti, CTU thus retained,

19   with the financial support from Worldwide, at least 20

20   ex-soldiers who were transported from Colombia to -- I'm sorry.

21   Who were former soldiers in the Colombian military who were

22   transferred to Haiti or traveled to Haiti with the benefit of

23   funding from worldwide.

24        Over time, the plan also included discussions of

25   arresting Moise pursuant to a purported arrest warrant signed by

1    Haitian authorities in 2019.  Efforts to physically remove Moise

2    from power also included an unsuccessful effort to seize him when

3    he returned from a trip and spirit him away by airplane to a

4    location outside of Haiti.

5        When that operation failed, the conspirators shifted

6    their support from Mr. Sanon to another individual who I'll refer

7    to as Individual 2.  This was a different candidate who they

8    intended to act as Moise's successor, but as will be discussed

9    further, the evidence shows that despite this shift in CTU's

10   support to Individual 2, in the wake of the assassination Sanon

11   retained the hope that the conspiracy's efforts would lead him to

12   office.  Indeed, when the conspiracy culminated in the

13   president's assassination on July 7th, the evidence shows Sanon

14   discussing with his co-conspirator and named co-defendant

15   Federick Bergmann about his expectation of, quote, being hired,

16   which we understand is a reference to his expectation that the

17   president's murder would result in Mr. Sanon taking office.

18       Indeed, over the course of the conspiracy, conspirators

19   exchanged a number of written communications like the ones we saw

20   between Mr. Bergmann and Mr. Sanon there.  They also included

21   audio communications in furtherance of their operational

22   planning.

23       Begin with some communications that were exchanged in

24   April of 2021.  In one message on April 21, 2021, co-defendant in

25   this case James Solages told Mr. Ortiz I'm going to meet with J3,

1    this is a Mr. Joseph Joel John, another named defendant in this

2    conspiracy.  The meeting was to discuss the equipment that they

3    have available and to discuss how we can purchase, if necessary.

4    Ortiz responded writing "copy."

5         Now, there's additional information on what exactly that

6    equipment was in a message that is sent that same day by Solages

7    to Ortiz and the Defendant Mr. Sanon.  It contained a list of

8    military equipment needed for this, quote, operation.  The

9    document was titled Fighter for the Liberation of Haiti, which

10   included, among other things, weapons like M4 rifles, M60 machine

11   guns, I'm not going to say this correctly, Kalashnikov rifles,

12   combat boots, hand grenades, gas masks, full bulletproof vests

13   and RPGs, specifically six RPGs, which we understand to be rocket

14   propelled grenades, and over 20,000 rounds of ammunition.  Sanon

15   responded to the message making clear he received it, asking who

16   had prepared it, and Solages responded by identifying that it was

17   J3, a moniker that was applied to the Defendant Joseph Joel John

18   who, as I mentioned, is named in this case.

19        In other communications in May, the Defendant continued

20   to participate -- showed that the Defendant continued to

21   participate in the conspiracy even after receiving this message

22   showing this effort to obtain weapons and ammunition.  In fact,

23   it shows that the Defendant was so confident he would assume the

24   presidency that he was working with his co-conspirators on

25   drafting an acceptance speech.

1      In a May 13, 2021 e-mail, co-defendant Bergmann sent a

2   message to the Defendant Sanon and another co-conspirator where

3   he attached a document titled, quote, Freedom Speech.  There

4   Bergmann wrote attached as we discussed.  The drafting of the

5   speech was very careful to, among other things, not have the

6   appearance of a US takeover.  This is a freedom initiative led by

7   community leaders, religious leaders, et cetera.  The speech

8   appears intended to be used by Sanon once he had assumed power in

9   Haiti after an apparent community uprising that the defendants

10  originally hoped they could use to oust President Moise.  The

11  language in the speech makes clear that the co-conspirators

12  envisioned that that ouster would require some form of violence.

13  Tellingly, the speech states "who could question your actions to

14  defend yourselves" -- this is the speaker of the speech speaking

15  to presumably the people of Haiti.  "who could question your

16  actions to defend yourselves and your family from the danger of

17  the evil.  I take no pleasure in violence, but the Bible says

18  those that plow evil and those who sow trouble reap it.  Job 4.

19  It's a quote from a speech that was intended to be Mr. Sanon's

20  acceptance speech of the presidency in Haiti.

21      Next, on or about May 17, 2021, nearly three weeks after

22  Solages sent around this weapons list, Sanon entered into a

23  contract whereby CTU agreed to provide him with the equipment

24  needed to support his, quote, private military forces.  The

25  agreement was signed by Sanon.  Pursuant to this consultant

11

```
 1   agreement, CTU provided 25 ballistics vests, among other things,
 2   for use by those in Haiti, including the Colombian nationals
 3   hired by CTU in support of this contract.  According to witness
 4   statements, on or about May 21, 2021, Sanon and Intriago
 5   transported approximately five CTU branded ballistic vests aboard
 6   a private flight from the Southern District of Florida to Haiti,
 7   and some of those vests were provided to the Colombian nationals.
 8   Not long after on May 28, 2021, Sanon texted someone a
 9   resignation letter that had been drafted for President Moise
10   stating, quote, we have prepared it from him to sign.
11         Communications amongst the co-conspirators during this
12   time frame made clear they were contemplating forcing a
13   resignation via a coup.  For example, on or about June 2, 2021,
14   an individual with knowledge of the co-conspirators' activities,
15   who we'll refer to as Individual One, texted co-defendant
16   Federick Bergmann.  He asked him what time is the next coup
17   meeting, using the word "coup."  Followed by, you can bridge me
18   into the call with Christian, believed to be a reference to the
19   Defendant Christian Sanon.  Notably, a few hours after the
20   assassination, on or about July 7, 2021, Bergmann texted the same
21   individual stating "it happened" and, quote, battle right now.
22   Such language is consistent with the fact that the documentation
23   of the funds from Worldwide -- the documentation of the funds
24   that Worldwide extended to Sanon showed funding for ammunition
25   or, as the conspirators referred to it, screws and nails, all
```

1   consistent with the fact that these conspirators understood

2   violence was being contemplated.

3        On or about June 7, 2021, Veintemilla also sent Ortiz a

4   document.  This document is titled Loan Provided to Christian

5   Sanon.  It included this $15,000 sum to James Solages for screws

6   and nails.  It also identified a sum of $250,000 attributed to,

7   quote, 100 complete vest kits, believed to be a reference to the

8   ballistic vests.  The investigation confirmed that CTU had access

9   to a large number of armored vests, and had planned to use these

10  vests to outfit the Columbian nationals and others for the

11  benefit of Sanon.

12       In or about early June of 2021, Bergmann suggested to

13  Intriago, another named co-defendant in this case, that they ship

14  CTU's ballistic vests to Haiti for use by the Columbian

15  nationals.  The shipment was to go through a company which we'll

16  just refer to as the shipping company that Bergmann had used in

17  the past to ship medical supplies to Haiti for Bergmann's Florida

18  based company GCP Clinical Research.

19       On or about June 9, 2021, Veintemilla sent a text

20  message to Bergmann warning him that the operation to replace

21  President Moise had likely leaked, naming specifically that the

22  Defendant, Mr. Sanon, had held a number of meetings relating to

23  his presidential aspirations and therefore the conspirators were

24  risking arrests by the President's personnel.  Veintemilla urged

25  Bergmann to help move the operation forward quickly because

1    otherwise it was very dangerous for those involved if they were

2    to get caught.

3          Now Bergmann, who has a history with the Defendant

4    Mr. Sanon, forwarded that message to Sanon.  And I'll read that

5    message into the record.  "It's very important that you and

6    everyone there understand that we've lost the element of

7    surprise.  Every day Mr. P" -- and that's understood, Your Honor,

8    to be a reference to the Defendant, Mr. Sanon, as a moniker that

9    was applied to him throughout the conspiracy was Mr. President.

10   "Every day Mr. P and everyone there run the risk of having 200 to

11   300 personnel of the rat", which is how the co-conspirators

12   referred to President Moise, "going there and arresting everyone.

13   If this happened, then what are you going to do.  From what we

14   are told, Mr. P", that's Mr. Sanon, "has meetings with many

15   people and anyone of these people can inform the rat.  This is

16   very dangerous for this reason as that we are pressuring for

17   things to happen where we do not want for you guys to tell us why

18   didn't you factor this in and let us know.  So please understand

19   the party" -- "the party is coming back" -- sorry.  "The party

20   has to happen or the personnel is coming back because they do not

21   want to get in the situation."  As to "the party", that is a term

22   that the co-conspirators used for their operation against

23   President Moise, and "the personnel" we believe to be a reference

24   to these Colombian soldiers who were sent to Haiti in furtherance

25   of the conspirators efforts there.  As I said, this message was

1   forwarded to Mr. Sanon on the same day.

2        On the same day that Bergmann got that message from

3   Mr. Veintemilla and then forwarded it to Sanon, he also texted

4   Sanon copies of the commercial invoice and shipper's letter of

5   instruction that falsely claimed that these ballistic vests that

6   they were shipping to Haiti were, quote, medical x-ray vests and

7   Sanon responds to that message saying "I got it.  Thank you."

8        Messages on June 9, 2021 between Bergmann, Sanon and

9   Intriago just show them discussing the logistics of shipping

10  these ballistic vests to Haiti.

11        Bergmann states "Christian", reference to Sanon, "the

12  plane arrives in Port-au-Prince at 2:30 p.m.  I assume that" --

13  and here he named an associate of Mr. Sanon's, "will handle" so

14  and so -- that individual, I'll call him Individual Three --

15  "will handle Customs including any fees and the coordination of

16  ultimate delivery of the supplies will be handled by you guys on

17  the ground."  Sanon replied "confirmed."  Bergmann later texted

18  Sanon to see if the ballistics vests had cleared Customs in Haiti

19  to which Sanon replied "not yet."  Additional discussions between

20  Bergmann and Sanon regarding this shipment of ballistic vests for

21  use by the Colombian nationals showed Sanon stating -- sorry.

22  Shows Bergmann stating to Sanon "these guys say they were ready

23  and waiting for surgical instruments but no x-ray vests",

24  question mark?  When Sanon responded asking for more information

25  simply stating "what", Bergmann responded "the x-ray vests that

1   are coming tomorrow.  Seems likely they needed these", question

2   mark.  Sanon replied, "yes, they do."

3          And I'll fast forward briefly to the Defendant's

4   post-Miranda statements that he made in Haiti where he denied any

5   knowledge initially of ballistic vests being shipped to Haiti,

6   only to later admit that he was aware of ballistic vests being

7   shipped to Haiti which is to say that here, the Defendant and

8   Mr. Bergmann, when they are talking about x-ray vests, are

9   clearly talking about the lie they're going to be using to

10  illegally export these ballistic vests to Haiti.

11         On June 10th of 2021, Bergmann and Intriago shipped the

12  branded ballistic vests from the Southern District of Florida to

13  Haiti.  Bergmann paid for and completed the shipping paperwork

14  for the shipment, Intriago delivered the package.  Notably,

15  Bergmann also texted the shipping declarations to the Defendant

16  Mr. Sanon.  The declaration falsely stated that the items being

17  shipped were, quote, medical x-ray vests and school supplies,

18  that the value of the vests was $1,000 total, also incorrect, and

19  was significantly below their value, and it stated the exporter

20  was GCP Clinical Research.  It also stated that co-signing in

21  Haiti was a medical services provider.  Bergmann signed that

22  letter with this false information, right above the signature

23  line where he attested that the information was true and correct.

24  And again, those false documents were sent to the Defendant,

25  Christian Sanon, in advance of the shipment.

1          The United States Department of Commerce Bureau of

2     Industry and Security conducted a license check of CTU's

3     ballistic vests that were used in furtherance of the

4     assassination.  They determined that an export license was

5     required for a shipment to Haiti, that no relevant license

6     exception existed, and that no one had applied for an export

7     license that would have authorized the shipment of these

8     ballistic vests to Haiti.  So this was a clear violation of the

9     regulations.

10          The vests were also shipped without the required export

11     information filing.  Specifically pursuant to Chapter 15, Section

12     758.1 and 30.2 Code of Federal Regulations, shipment of the vests

13     would require what's called an EEI filing based on the fact that

14     the vests were valued over $2,500, and the fact that they

15     required a license for shipment.  We've confirmed that no such

16     filing was made.  Because the ballistic vests required an export

17     license to ship to Haiti and were valued over $2,500, this filing

18     was required for the export.  However, the false information

19     provided on these documents that were shared with the Defendant

20     prevented the proper filings and the proper information going

21     through.

22          Sanon coordinated the Customs processing and delivered

23     the vests to the Colombian nationals in Haiti, and texts between

24     Sanon and Bergmann show Sanon agreeing to provide false

25     information to facilitate that shipment.  The same day the vests

were shipped, Bergmann texted Sanon stating "please explain we
have to use these type of vests so healthcare providers can be
protected from harmful effects of x-rays."  Sanon, who again was
well aware that no actual medical x-ray vests were being shipped
responded "okay, I will let him know that."  The vests were
CTU-branded ballistic vests, affixed with CTU patches and labels.
It's notable that some of the Colombian nationals detained in the
wake of the president's assassination were seen wearing vests
that appeared to be these very same ballistic vests shipped by
the Defendant.

Continued communications show additional efforts by the
co-conspirators to secure equipment and weapons after these
ballistic vests were shipped.  On or about June 15, 2021, a
message from one of the leaders of the Colombian nationals,
Mr. German Herrera, who recently pled guilty in this case, sent
Ortiz a text message stating in substance that the Colombian
nationals needed equipment like a battering ram to breach doors
as well as black caps, cash, gun holsters and other materials.
Communications between Sanon and Bergmann make clear they
understood that they were in the midst of an enterprise that
contemplated potential criminal conduct and violence.

For example, on June 27, 2021 Bergmann texted Sanon
"please tell these people that are willing to risk their lives
that they don't have to do jail time.  I don't think this is good
way to start an administration that the world would look at based

1   upon human rights."  He even asked the Defendant and Mr. Sanon to

2   call him back.  I'm sorry.  He asked for the Defendant and

3   Mr. James Solages to call him back.

4   　　　During this time frame, members of the conspiracy

5   notably continued to refer to the Defendant by the term

6   "Mr. President", a moniker that applied to him from early on in

7   the conspiracy.  Nevertheless, in or around mid June of 2021, the

8   conspirators discussed that Sanon, in fact, lacked the necessary

9   qualifications to serve as president of Haiti.  In a message that

10  Ortiz sent to Rivera on June 10, 2021, he advised that Sanon was

11  barred from being president under Haiti's Constitution, but that

12  Sanon had been stating he would simply be intending to rewrite

13  that Constitution.  Around this time, the conspirators also began

14  to shift their support to Individual Two to serve as the

15  president of Haiti in place of Mr. Sanon.  As I've already said,

16  the investigation still shows that Sanon continued to communicate

17  with the co-conspirators and continued to support President

18  Moise's forcible removal presumably in the hopes of obtaining a

19  political position in the new Haitian government.

20  　　　On July 4th -- I'm sorry, Your Honor.  A sign of the

21  continued support that Mr. Sanon offered to the members of the

22  conspiracy are messages from Antonio Intriago on July 4, 2021,

23  that's three days before the president is assassinated.  There

24  Antonio Intriago, who calls the Defendant Mr. President in the

25  message, asks Sanon for help obtaining food, funds for food and

1   groceries for the Colombian nationals who carried out this

2   assassination.  Sanon agreed to help, and he referred to the

3   Colombians who needed the funds as quote "our men."  Notably, in

4   a post-Miranda statement to law enforcement in Haiti, the

5   Defendant maintained that he was not involved at all with the

6   Colombian nationals by at least June 2020, another clear lie.

7          Days later, on July 6, 2021, several co-conspirators met

8   prior to the assassination at the home of a family member of

9   Jaar's which was located near the president's residence.  I will

10  note to make it clear that the Defendant was not present at that

11  location.  At that meeting, firearms and equipment were

12  distributed to co-conspirators, and one of the co-conspirators

13  falsely announced to the group that it was a, quote, CIA

14  operation, and explained that he, in substance, meant the mission

15  would involve killing President Moise.

16          According to witness interviews, on July 7, 2021

17  co-conspirators drove a convoy to President Moise's residence.

18  One of the group of -- once the group of conspirators arrived

19  outside the residence, one falsely announced to those inside that

20  they were engaged in a DEA operation in an attempt to ensure

21  compliance by the president's security, some of whom have been

22  bribed with money provided by one of the defendants who's pled

23  guilty in this case, Rodolphe Jaar, in order to comply with their

24  commands.  A subset of the Colombian co-conspirators including --

25  well, a subset of the Colombian co-conspirator was assigned to

1    find the president and assassinate him, and in fact the president

2    was killed in his house that night.

3            Now, after the president was assassinated, there is

4    phone communications showing that after calling Sanon multiple

5    times, Ortiz messaged him asking him to call another individual

6    and sending photographs of certain of the Colombian nationals who

7    at that point found themselves in a fire fight with the Haitian

8    National Police.  In these photographs the Colombian nationals

9    appeared to be wearing the same CTU-branded ballistic vests that

10   were shipped to Haiti.

11           Phone communications show that there was contact or

12   attempted contact between Ortiz's phone and Sanon's phone in the

13   wake of this assassination beginning at about 4:50 in the

14   morning.  Then there was contact or attempted contact between

15   Sanon's phone and Bergmann's phone at approximately 4:59 a.m.

16   Notably, it's after that contact from Ortiz to Sanon and then

17   Sanon to Bergmann that Bergmann texted his associate stating,

18   quote, battle right now, suggesting that these were

19   communications discussing the reality of the assassination that

20   had been carried out at the president's home.

21           Later that morning Bergmann texted Sanon a news article

22   stating that President Moise had been murdered and asked "are you

23   okay?"  Sanon responded "yes, I am and safe."  Bergmann replied

24   "thank God, what about the guys", presumably a reference to the

25   Colombian nationals.  "I've been so worried" stated Bergmann.

1   Sanon stated "there's a diplomatic vehicle that crossed over to
2   reach them, I don't know what's happening."  The continued
3   discussion shows that in the aftermath of the assassination,
4   Sanon had two goals:  Assist the Colombians who assassinated the
5   president, and continue to pursue his own ambitions.  Bergmann
6   responded "it's time for people to hit the streets", a reference
7   to this plan of a public uprising that supposedly would bring
8   Mr. Sanon to power.  Mr. Sanon replied "the leaders are working
9   on that."  Bergmann stated "we are all on standby once you know
10  what is going on."  Notably, these messages which appear in
11  Mr. Bergmann's phone were, in fact, deleted from Sanon's phone on
12  his own device.
13          The next day Bergmann asked Sanon if Bergmann needed to
14  hire someone.  Sanon says that he was not sure.  Then Sanon says
15  "I have not been hired."  When Bergmann asked Sanon what his
16  supporters are doing to help, Sanon answers "financially nothing,
17  but their voice support counts a lot for the position we are
18  waiting for at this time."  Later, Sanon says in essence he was
19  not hired and confirms that he needs a lawyer.  I believe these
20  are references -- these references to being hired are references
21  by Sanon that the murder of the president might still result in
22  him coming to political power in Haiti.
23          Sanon also forwarded Bergmann several pictures of the
24  captured Colombians and told Bergmann to help them with the
25  lawyer.  Bergmann responded by asking what the other

1  co-conspirators were doing.  He ultimately said "I've asked for
2  someone to look for lawyers but who will pay.  I don't know what
3  happened or why, but this will probably get back to them, the
4  three stooges", this being a reference to Walter Veintemilla,
5  Mr. Ortiz and Mr. Intriago.  It says "they are immoral and
6  responsible for this mess, not sure what they were thinking."
7  Sanon replies "I don't know who will pay, but you are right about
8  them."
9          Sanon was ultimately taken into Haitian custody as I
10 mentioned.  He submitted to two voluntarily Mirandized interviews
11 with US law enforcement.  There he mentioned that he owned
12 property in Haiti that he estimated was valued at $1 million.  I
13 noted in the Pretrial Services Report he now estimates that it's
14 only valued at 700,000.  It's not clear where the lie is there,
15 but there was a lie there somewhere.
16         He also mentioned that he received his medical schooling
17 in the Dominican Republic, and is relevant to the question of
18 risk of flight.  The Defendant, in fact, resided in the Dominican
19 Republic as reported in the Pretrial Services Report from 2012 to
20 2015.  I'll also note that his border crossing records do show
21 extensive travel by the Defendant to at least five other
22 countries aside from Haiti:  That would be the Dominican Republic
23 from 2012 to 2015, travel to Panama in 2018, travel to Canada
24 between 2018 and 2021, travel to Mexico in 2014 and travel to
25 Venezuela in 2012.

1          The Defendant also lied, as I've already mentioned, in

2     this post-Miranda statement where he denied initially knowing

3     anything about the ballistic vests being shipped.  He then

4     admitted that he knew the ballistic vests were being shipped, but

5     adopted a new lie which was to claim that he was completely

6     unaware of the fact that they had been mislabeled.  Of course the

7     text messages between him and Mr. Bergmann show them explicitly

8     discussing what lie would be used to label these vests,

9     specifically the reference to the medical x-rays.

10          Tellingly, as I've already mentioned, he also disavowed

11    having any involvement with the Colombian nationals as of June

12    20th, when we know that only three days before the assassination

13    he was working to get them funds for groceries.  And I'll note

14    that there are further communications amongst the co-conspirators

15    showing a conspirator confirming that the Defendant, Mr. Sanon,

16    had approved a sum of $3,000 going to fund those Colombian

17    nationals who ultimately assassinated the president only three

18    days later.

19          As I mentioned, the Defendant was detained in Haiti

20    initially.  He, of course, has now been transferred into US

21    custody and has been there since January 31st of this year.

22          That would conclude the factual proffer by the

23    government, Your Honor.  We do have Special Agent Mike Ferlazzo

24    who we can tender for questioning and cross-examination by the

25    defense.

1    THE COURT:  All right.

2    MS. BOZANIC:  Yes, Your Honor.  I would like to

3 cross-examine the agent.

4    THE COURT:  Have the agent come up.

5    COURTROOM DEPUTY:  Raise your right hand.  Do you

6 solemnly swear to tell the truth, the whole truth and nothing but

7 the truth so help you God?

8    THE WITNESS:  I do.

9    COURTROOM DEPUTY:  You may be seated.

10    Please state your full name for the record and spell

11 your last name.

12    THE WITNESS:  Mike Ferlazzo, F E R L A Z Z O.

13    MS. BOZANIC:  May I proceed?

14    THE COURT:  Go ahead.

15    MS. BOZANIC:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17 BY MS. BOZANIC:

18 Q.  Good morning, Agent.

19 A.  Good morning.

20 Q.  Did you hear the proffer offered by the government this

21 morning?

22 A.  I did.

23 Q.  Do you fully adopt it as your own?

24 A.  I do.

25 Q.  Is there anything you would like to change about the proffer

25

1    that the government presented today?

2    A.   No.

3    Q.   All right.  You also testified in previous bond hearings or

4    detention hearings for three other individuals, correct?

5    A.   That's correct.

6    Q.   All right.  Is there anything you would like to change

7    regarding the testimony that you provided previously?

8    A.   No.

9    Q.   All right.  Now, you're familiar with the criminal complaint

10   in this case against Mr. Sanon, correct?

11   A.   I am.

12   Q.   Did you write it?

13   A.   No.

14   Q.   Okay.  Are you familiar with the indictment, the fourth

15   superceding indictment in this case?

16   A.   I am.

17   Q.   And you're also familiar with the fact that the only people

18   out of this whole conspiracy that have different charges, meaning

19   not having the conspiracy to murder the president, are Bergmann

20   and my client, Mr. Sanon.

21   A.   That's correct.

22   Q.   You know that the charges against Mr. Sanon are very

23   different from the other people who were charged with conspiracy

24   to murder the President Moise.

25   A.   It's a different charge, yes.

1   Q.  And you or your agents in the complaint never charge him with

2   anything relating to murdering or conspiring to murder the

3   president.

4   A.  The Neutrality Act violation is still part and parcel with

5   this action.

6   Q.  Okay.  But there was no conspiracy to murder the president

7   when it comes to Mr. Sanon filed?

8   A.  He was not charged with 2339.

9   Q.  Were you present for Mr. Sanon's arrest?

10  A.  No.

11  Q.  Okay.  Do you know who was present for his arrest?

12  A.  I do.

13  Q.  Okay.  Who was that?

14  A.  Let me think back.  I think actually I was on that trip.  I'm

15  sorry.

16  Q.  You were present there at the time of the arrest?

17  A.  Yes.

18  Q.  Were you the one -- were you present for Mr. Sanon being

19  taken into custody?

20  A.  I was.

21  Q.  And that was at a house in Haiti, correct?

22  A.  I'm talking about his federal transfer of custody when we --

23  Q.  Okay.  Do you know who arrested him in Haiti initially?

24  A.  I do not.

25  Q.  Do you know anything about the circumstances around that

1    arrest?

2    A.  I do not.

3    Q.  And you don't have any information to offer to the Court that

4    he attempted to flee or resisted the arrest?

5    A.  I do not.

6    Q.  Okay.  Now, there were two -- let's talk about this

7    conspiracy to murder, because obviously the government talked a

8    lot about it even though my client is not charged with it.  There

9    were two different plans.  Would you agree with that?

10   A.  One plan for removal that kind of changed over the course of

11   time.

12   Q.  Okay.  So the initial plan was for Mr. Sanon to get support

13   from everybody to run for president, right?

14   A.  Political support for Moise to step down.

15   Q.  Okay.  That plan did not involve any mention of killing

16   President Moise, correct?

17   A.  Not initially.

18   Q.  Okay.  And when Mr. Sanon started getting the support from

19   CTU, there was no mention -- you don't have any evidence to

20   present that anybody talked about killing President Moise in

21   front of Mr. Sanon, correct?

22   A.  Not at that time.

23   Q.  Okay.  In fact, there was a meeting in April where CTU did a

24   presentation for people, and Mr. Sanon was present.  Correct?

25   A.  That's correct.

1   Q.  And I think the government proffered that and mentioned

2   something about the meeting was about how to forcefully remove

3   President Moise.  Did you hear that proffer?

4   A.  I did.

5   Q.  Do you agree that that meeting was about forcefully removing

6   President Moise?

7   A.  So we're still about the removal of Moise in the sense that

8   there -- part of that meeting was definitely the infrastructure

9   contracts that Worldwide could provide for Haiti.  But still, at

10  that time it was past the point of any groundswell happening

11  early where Moise was going to step down.

12  Q.  So would you agree with the government's proffer that the

13  conversation at that meeting in April of 2021 was about how to

14  forcefully remove, and I'm highlighting the "forcefully remove"

15  President Moise.  Would you agree with that or would you

16  characterize it differently than the government?

17  A.  I would characterize it as a meeting where he was selected as

18  the next president, but there were not details spoken about

19  forcibly or killing him at that meeting.

20  Q.  Okay.  So you would agree with me that the government's

21  characterization of what happened at the meeting might have been

22  wrong or off.

23  A.  I'd present my own, yes.

24  Q.  Now, the reason why I ask you that is because isn't it true

25  that at that meeting there were two FBI agents present.

A.   So there were multiple meetings at that time, and that was
not a reference to the one where the FBI was present.

Q.   All right.  So sometime in April there's a meeting at CTU
which is in Doral Florida, correct?

A.   Correct.

Q.   And there were FBI agents who were invited to the meeting.

A.   Correct.  And that meeting was -- the pretense of that was
that there was apparently terrorism information in Haiti that
they were going to relay to the agents, as well as potentially
some drug-trafficking issues.

Q.   And would you agree that had the FBI agents heard anything
about forcefully removing a president or using any type of
violence, they would have acted on that tip.

A.   Correct.  That's why I said there were multiple meetings.

Q.   And obviously FBI never acted on any type of tip of violence
because obviously they did not stop the killing of the president.

A.   That's correct.  To my knowledge, violence was not discussed
at the meeting the agents were at.

Q.   Isn't it also true that the person present at multiple
meetings was Ortiz who was a government informant at the time?

A.   That's correct.

Q.   And worked under the government, the US Government.

A.   On separate issues, correct.

Q.   Okay.  Now, just to make it clear because the proffer talks
about all this equipment being shipped for the soldiers.  At the

1    beginning, is it your understanding that the soldiers that were

2    hired, there were not 20 soldiers, at the beginning there was

3    possibly three soldiers or so, or three individuals who were only

4    protecting -- providing security for Mr. Sanon.

5    A.   There was a smaller contingent in the beginning, yes.

6    Q.   Okay.  And the mention of 20 soldiers didn't really happen

7    until sometime in late June or July?

8    A.   I want to say might be earlier in May.

9    Q.   Okay.  Well, when did these Colombians, the 20 Colombians,

10   arrive to Haiti?

11   A.   They didn't come until June.

12   Q.   Okay.  Now, when Mr. Sanon initially signed a contract with

13   CTU, it was for CTU to provide security for him.  Correct?

14   A.   That's correct.

15   Q.   Would you agree that somebody who may be running for

16   president or trying to become a president in Haiti would need

17   security?

18   A.   Security, yes.

19   Q.   Okay.  Would you also agree that Haiti was and is a pretty

20   violent place and people often use security?

21   A.   They do.

22   Q.   Okay.  Was there anything out of the ordinary of Mr. Sanon

23   having a few men as security while he was in Haiti?

24   A.   What was definitely out of the ordinary was the equipment

25   that they were asking for them.  I've been on many security

1    details and I've never packed out RPGs.

2    Q.   All right.  Now, initially those three men who provided

3    security for him basically only needed -- do you know what

4    equipment they needed or they asked for?

5    A.   Not specifically.

6    Q.   Okay.  There were no mentions of grenades at that time,

7    correct?

8    A.   Not specifically.  The document -- it was proffered, but I

9    forget the date where that came.

10   Q.   Okay.  So there were no mentions of, you know, machine guns

11   or any of that information that was provided.  All of that came

12   later on when this whole organization switched it to a killing of

13   the president, correct?

14   A.   The time line was what was proffered.  I forget the date that

15   the list was.  But when the Colombians came in June, that was the

16   time frame where that was asked for, and that's when the

17   Defendant wrote the list.  So he was still involved at that

18   point.

19   Q.   And you would agree with me that sometime in June Mr. Sanon

20   was no longer considered to be a presidential candidate or a good

21   fit for a president?

22   A.   That's correct.

23   Q.   And that was because there was some mention of him first of

24   all not -- being a US citizen which disqualifies you from being a

25   president in Haiti, correct?

1    A.   It was a residency requirement.

2    Q.   Okay.  And he lived here in Florida.

3    A.   That's correct.

4    Q.   And the second reason was he wasn't really getting -- the

5    people who were financing this and organizing it and the people

6    who actually got charged with conspiracy to murder the president

7    and the people who are responsible for murdering the president

8    did not feel that he was getting the support from the people, and

9    that he wasn't really in line with their -- with what they

10   wanted, correct?

11   A.   It was not a different viewpoint, it was clear the

12   technicality was that he wasn't a viable candidate at that point,

13   and that's when they switched to the other individual.

14   Q.   But that also included the fact that he wasn't really getting

15   the support that they expected from the people and other parties.

16   A.   No one was getting the support.  It was really just who would

17   be a viable candidate, so they picked someone else.

18   Q.   The reason why they picked the other individual was because

19   she was going to -- she entered into an agreement with these

20   individuals who killed the president, correct?

21   A.   She did.

22   Q.   And the second individual actually signed the contract saying

23   that she would grant the immunity to these people who killed the

24   president.

25   A.   Immunity, yes.

1   Q.  Okay.  And the reason why she could grant the immunity is

2   because she's a supreme court justice in Haiti, correct?

3   A.  I'm not an expert on Haitian law, but that would be the

4   assumption was more that if she took office.

5   Q.  All right.  So isn't it true that this person, the supreme

6   court justice, also signed some type of an arrest warrant for

7   President Moise?

8   A.  No, it was someone else who signed the arrest warrant.

9   Q.  Okay.  But it purported to be her signature.

10  A.  Correct.  There was multiple documents, but I think the one

11  that you're referring to was a different supreme court justice

12  that signed a separate warrant.

13  Q.  Okay.  Did you ever establish whether it was a supreme court

14  justice who signed the warrant or whether that signature was

15  forged.

16  A.  All of that is still unclear.

17  Q.  So you cannot testify to this Court whether a supreme court

18  justice signed that warrant for the arrest of President Moise

19  before he was murdered.

20  A.  From my recollection of it it was -- someone signed an arrest

21  warrant, but like the body was taken from another so we question

22  the legitimacy of it.

23  Q.  This Individual Two who agreed with these conspirators and

24  with people who killed the president agreed to also give them

25  certain contracts in Haiti if she was elected to be the

1    president, correct?

2    A.   That's correct.

3    Q.   Which meant financial support and financial income for

4    different companies, and these people who were trying to overturn

5    the president and essentially kill the president.

6    A.   That's correct.

7    Q.   And she also told them and signed the documents saying that

8    she would give them contracts, and include in that contract CTU

9    which was owned by, I think, Intriago and Ortiz; am I correct?

10   A.   Correct.

11   Q.   And Worldwide Financing which was owned by Veintemilla?

12   A.   Yes.

13   Q.   And these are all the people who are charged with conspiracy

14   to murder the president.

15   A.   They are.

16   Q.   Not Mr. Sanon.

17   A.   Different charges, yes.

18   Q.   Okay.  Now, Mr. Sanon is accused of sending vests to Haiti,

19   correct?

20   A.   As proffered, the knowledge.

21   Q.   And you don't have any evidence to show that he had knowledge

22   that these vests would be used in this murder or conspiracy to

23   murder the president, correct?

24   A.   We have evidence that he knew who they were going to.  That

25   they were going to the Colombians.  That can be inferred from

1   that.

2   Q.  You also agree that at that time he thought that the

3   Colombians were there to protect him and to provide security.

4   A.  Once again, these were the other vests.  So these are the 20,

5   right?  So this is the multiple vests.  So if he only thought it

6   was the three vests for his security detail, that doesn't jibe

7   with the larger shipment.

8   Q.  Well, people also used vests.  He would use a vest if he

9   needed it, correct?

10  A.  Correct, but we're saying this is for the larger group that

11  you're saying only -- he thought it was only for his security.

12  Q.  Again, he had no knowledge of these Colombian men being

13  transported from different countries to Haiti for the purposes of

14  going to kill the president.  Would you agree with that?

15  A.  You're asking for my opinion or what he ultimately thought

16  these men would do.

17  Q.  I'm asking for your investigation and as what you are able to

18  testify to.

19  A.  He knew that the additional Colombian forces were coming.

20  Q.  Okay.  But you cannot testify to this Court that he knew

21  about this conspiracy to kill the president.

22  A.  So he knew about the failed June attempt at the airport which

23  is going to be an arrest of the president when he came back that

24  never happened.  If you're asking specifically if he was a party

25  to the conversations in late July, I do not have evidence of

1    that.

2    Q.  Okay.  Now, let's talk about the airport.  That was not a

3    conspiracy to murder the president, correct?

4    A.  So it was unclear what they thought.  They were going to take

5    him somewhere else, so it was not specifically a murder.  It

6    involved -- you know, their plan was to at one point administer a

7    drug to the president.  It was -- or take him somewhere else and

8    potentially bring him to other authorities.  But it was kind of a

9    half-cocked plan to accost him at the airport when he returned

10   from a travel.

11   Q.  Can you testify as to what Mr. Sanon knew about that plan to

12   intercept the president and serve him with a warrant when he was

13   coming back from another country.

14   A.  Not specifically.  I would have to look at the text messages.

15   Q.  Wouldn't you agree with me that the plan was changed in the

16   last minute, I think it was Solages who presented this new plan

17   to kill the president sometime in -- a few days before the

18   killing in July.

19   A.  So, yes.  That's what -- ultimately the last desperation

20   effort was for a kill mission.

21   Q.  And that's because Walter Veintemilla's company wouldn't send

22   anymore funds because they didn't see obviously anything

23   happening, and the whole operation seems to be unfruitful,

24   correct?

25   A.  Correct.  Time was running short.

Q.  So James Solages and other co-conspirators decided to flip it into let's kill the president.

A.  Correct.

Q.  Mr. Sanon was not present at those meetings.

A.  He was not.

Q.  And there were some Colombians who, I guess, were interviewed at some point and expressed their concern about changing it to killing the president and were told that if they opened their mouth, they would be killed as well, correct?

A.  I don't know specifically who you're talking about as far as them being killed, but definitely there were some that expressed some reservations.  But ultimately, all went along with it.

Q.  So this killing of the president happened on July 7th of 2021, right?

A.  That's correct.

Q.  Mr. Sanon was no longer being supported as of mid-June of 2021?

A.  He was no longer their chosen candidate, correct.

Q.  Okay.  And all the support kind of shifted to this other individual, the supreme court justice.

A.  Correct.  That's who they were planning to swear in.

Q.  So Mr. Sanon is charged with shipping vests only, correct?

A.  And the Neutrality Act violation.

Q.  Okay.  I'm talking about the exporting charges, it's only vests?

1    A.   Correct.

2    Q.   There's no shipping guns?

3    A.   The guns were acquired locally.

4    Q.   There was no shipping ammunition?

5    A.   Acquired locally, correct.

6    Q.   There was no shipping grenades?

7    A.   Correct.

8    Q.   Tear gas or any other type of grenades that the government

9    proffered, and I don't have the actual name, but nothing else

10   that would have been used to kill the president, right?

11   A.   Those items were not shipped.

12   Q.   Okay.  At some point on June 9, 2021, Veintemilla messaged

13   Bergmann and said that Sanon started leaking this info that he

14   aspired to become the president, and Veintemilla was obviously

15   concerned because he didn't want anybody to know and they were

16   scared of the president coming back and arresting people.  Do you

17   recall that message?

18   A.   It's a message that was proffered about Mr. Sanon still

19   meeting people.

20   Q.   Would you agree with me that Veintemilla was unhappy with

21   Sanon openly telling people that he would like to run for

22   president?

23   A.   Correct.  That was the message that he's meeting with too

24   many people and it posed a risk to the operation.

25   Q.   This was June 9th, and shortly after that there was no more

1    support for Mr. Sanon, correct?

2    A.   Correct.

3    Q.   Mr. Sanon was not a recipient of the text message, I think it

4    was called a white board, a picture from the white board, that

5    one of the co-conspirators took and whatever military equipment

6    they needed, correct?

7    A.   Correct.

8    Q.   So he had no knowledge what these people were planning or

9    what they needed, whatever was written on that white board.

10   A.   He didn't receive that white board text, correct.

11   Q.   Okay.  Can you tell me what was on that white board?

12   A.   I'd have to look at the picture.

13   Q.   I may a picture.  Would that help?

14   A.   Sure.

15         MS. BOZANIC:  Judge, may I approach the witness?

16         THE COURT:  Yes.

17      BY MS. BOZANIC:

18   Q.   Agent, would you take a look at that picture and let me know

19   if that refreshes your recollection?

20   A.   It does.

21   Q.   Okay.  And what was on that white board picture?

22   A.   The schematic of the palace, and a break down of different

23   teams that may be positioned at different locations.

24   Q.   Would you agree that that was sort of a plan of this

25   assassination?

1    A.  So this was kind of unclear because it's the palace, not the

2    home.  So it's ultimately kind of unclear what this was.

3    Q.  When was that message sent and who was it sent by?

4    A.  I don't remember.

5    Q.  Okay.  Would you say June, July, May?

6    A.  I don't remember.  I'd really have to look at that time

7    record.

8    Q.  Okay.  May I approach to get it back?

9    A.  Sure.

10   Q.  There are no text messages planning to kill the president in

11   which Mr. Sanon is a party?

12   A.  Correct.

13   Q.  And do you have any evidence -- what evidence can you show

14   that he's a risk of flight?  Have you had anyone, any of the

15   agents, tell you that he tried to flee or anything in this case

16   that suggests he may flee?

17   A.  No agent said -- described any instance of him attempting to

18   flee.

19   Q.  You're aware of the conversations of the president at that

20   time, President Moise, eliminating or arresting people who went

21   against him.

22          MS. CASTRO:  Objection, relevance and foundation.

23          THE COURT:  I'm sorry.  What was the question?

24          MS. CASTRO:  I would object to the relevance of the

25   question.

1        THE COURT:  I know.

2        MS. BOZANIC:  The question was, Judge, whether the agent

3    was aware of President Moise at the time going after people who

4    stood up to him, meaning arresting them or eliminating them.

5        THE COURT:  What's the relevance of that?

6        MS. BOZANIC:  Judge, the relevance is why my client

7    needed security.

8        THE COURT:  Okay.  I'll allow it.

9        MS. CASTRO:  Your Honor, I also object as to the

10   foundation that the witness -- she's not established he's aware

11   of any of that.

12       THE COURT:  Well, she's asking the agent if he's aware

13   of President Moise threatening his political opponents.  I guess

14   that's another way of phrasing your question.

15       MS. BOZANIC:  Yes, Your Honor.

16       THE WITNESS:  I think through the message that we saw in

17   this case, it was that that was the fear, but I have not seen

18   messages from the president.

19   BY MS. BOZANIC:

20   Q.  You're aware there were arrests in Haiti back in February

21   that were ordered by President Moise, correct?

22   A.  Correct.

23   Q.  And those arrests had to do with people who stood up to him

24   or who were in his way?

25   A.  His political opposition, yes.

1    Q.  So would you agree then that Mr. Sanon asking for security

2    was a reasonable thing to do, having to stand up against a

3    president or run against a president who would arrest or, you

4    know, do something with people who would get in his way?

5            MS. CASTRO:  Your Honor, that calls for speculation,

6    Your Honor.

7            THE COURT:  Yes.  I think the agent has testified to the

8    extent of what he knows, and everything else is inferences and

9    assumptions.

10           MS. BOZANIC:  That's fine, Judge.  I'll move on.

11       BY MS. BOZANIC:

12   Q.  Did Ortiz ever come back and discuss any of this plan with

13   any of the government as a government agent?

14   A.  No.

15   Q.  So the government had no idea that people were attempting to

16   overthrow President Moise?

17   A.  That's correct.

18   Q.  Having a confidential informant who worked for the government

19   be one of the main participants.

20   A.  That's correct.

21           MS. BOZANIC:  I don't have any other questions, Judge.

22   Thank you.

23           THE COURT:  Any follow-up?

24           MS. CASTRO:  Your Honor, if I may some redirect?

25           THE COURT:  Yes.

1          MS. CASTRO:  Just one moment Your Honor, I apologize.

2                     REDIRECT EXAMINATION

3      BY MS. CASTRO:

4      Q.  All right.  Hi, Agent Ferlazzo.  So there was some discussion

5      during the questioning about this weapons list.  Do you recall

6      that line of questioning?

7      A.  Yes.

8      Q.  Okay.  And I think there was -- I think you testified you

9      couldn't recall exactly when the weapons list was circulated; is

10     that right?

11     A.  That's correct.

12     Q.  Okay.

13          MS. CASTRO:  If I may approach the witness with what I

14     intend to offer as an exhibit?

15          THE COURT:  Yes.

16          MS. CASTRO:  Let me get a copy for the defense.  I

17     apologize, Your Honor.  That's the photo that is in there.  14.

18     BY MS. CASTRO:

19     Q.  All right.  Special Agent Ferlazzo, if you could just take a

20     moment to review the document, let me know when you've had an

21     opportunity to do so.

22     A.  I have.

23     Q.  Okay.  Do you recognize those communications?

24     A.  I do.

25     Q.  Can you just describe what they are?

44

1    A.   Text communications from Dr. Sanon and the list being sent to

2    him from 4-21.

3    Q.   Okay.  The list being a reference to this weapons list?

4    A.   Correct.  The list.

5    Q.   And just to clarify for the record, that weapons list was

6    sent in April of 2021.

7    A.   That's correct.

8    Q.   And I understand that the picture's a bit blurry, but if you

9    could look at the weapons list and identify some of the weapons

10   that are referenced in that list sent to Dr. Sanon?

11   A.   As described earlier, the M4s, Kalashnikovs, M60 machine

12   guns, ammunition, fragmentation grenades, and -- this is blurry.

13   Q.   If that's all you're able to read at the moment, there's no

14   need to belabor it.

15   A.   Yeah.

16   Q.   You said this was sent in April of 2021, correct?

17   A.   That's correct.

18   Q.   And in fact, Dr. Sanon was meeting with other members of the

19   conspiracy in April of 2021?

20   A.   That's correct.

21   Q.   So there was a line of questioning about when he -- exactly

22   the discussion of force being used came about.  Do you remember

23   that?

24   A.   I do.

25   Q.   And I want to be clear because there's force and then there's

1   murder and assassination.  Fair?

2   A.  That's correct.

3   Q.  Okay.  So stopping shy of assassination, fair to say that the

4   co-conspirators talked about some element of force causing the

5   president to resign from early on.

6   A.  Correct.

7   Q.  Okay.  Clearly they weren't talking about the president just

8   throwing up his hands and saying "okay, I resign."

9       MS. BOZANIC:  Objection, calls for speculation.

10      THE COURT:  All right.  We don't need the dramatics.

11      MS. CASTRO:  I'll rephrase, Your Honor.  I apologize.

12   BY MS. CASTRO:

13   Q.  For example, one of the things talked about was a public

14   uprising that would cause the president to resign.

15   A.  That's correct.

16   Q.  And those were early-on discussions.

17   A.  That's correct.

18   Q.  Same time frame that the co-conspirators are circulating a

19   weapons list that has grenades on it?

20   A.  That's correct.

21   Q.  Understood.  Okay.  Now, there was also talk about this

22   supposed arrest warrant for the president.  Do you recall that?

23   A.  Yes.

24   Q.  And that was signed in 2019; is that correct?

25   A.  Yes.

1    Q.   So years before these individuals started meeting to talk

2    about how to remove President Moise.

3    A.   Correct.

4    Q.   Okay.  And to be clear, to your knowledge does anyone who was

5    a member of this conspiracy have legal authority in Haiti like

6    you have legal authority in the United States to conduct arrests?

7    A.   No.

8    Q.   This airport operation, was there ever any discussion amongst

9    the co-conspirators that the president would just willingly get

10   on a plane that they were trying to get him on?

11   A.   No.

12   Q.   But again, to clarify, the difference between force to some

13   degree and assassination, I think your testimony is clear, and

14   you'll let me know if I'm wrong, that the exact timing of when

15   assassination was the definitive answer is somewhat unclear.

16   A.   That's correct.

17   Q.   Okay.  Now, there was also talk about this white board.  Is

18   that right?

19   A.   Yes.

20   Q.   Okay.  And I believe we handed you an image of the white

21   board.  Do you still have it there?

22   A.   No.

23   Q.   Okay.  I have it right here.

24        And if I may approach the witness, Your Honor.

25        Now, this white board, I think you already testified,

1  involved some sort of an attack on the palace, the presidential

2  palace?

3  A.  Correct.

4  Q.  And I know that in your cross-examination you mentioned that

5  the exact timing of when this white board was circulated amongst

6  the co-conspirators you couldn't recall right at the moment; is

7  that fair?

8  A.  That's correct.

9  Q.  Okay.  So I'd actually like -- do we have two copies of this

10  so I can show Zeljka?  Okay.  That's this one.  And there's one

11  more.  We can just do it with one.  That's fine.

12          And if I may approach the witness again, Your Honor.

13          Just again, take a moment to review the exchange and let

14  me know when you've had a chance to get through it.

15  A.  I have.

16  Q.  Okay.  Now, what do you recognize it as?

17  A.  The white board image was sent within a What's App chat on

18  April 27th of 2021.

19  Q.  Okay.  So that's six days after Mr. Sanon is receiving the

20  weapons list from the co-conspirators?

21  A.  That's correct.

22  Q.  Okay.  Now, there was also questioning by the defense on

23  whether Mr. Sanon was aware of this white board; is that right?

24  A.  That's correct.

25  Q.  And I believe your testimony was you don't have evidence that

1    he received that specific image, fair?

2    A.  That's correct.

3    Q.  Okay.  Now, I want to refer your attention to Mr. Rivera's

4    post-Miranda statements when he was in Haiti.  Have you had an

5    opportunity to review those?  I apologize, I think I said Rivera.

6    Mr. Sanon's post-Miranda's statements when he was in Haiti.  Have

7    you had a chance to review those?

8    A.  It's been a while.

9    Q.  Okay.  Have you seen them before?

10   A.  Correct.

11   Q.  Okay.  Would taking a look at them refresh your recollection

12   on some of the notes?

13   A.  Yes.

14         MS. CASTRO:  Okay.  Do you have an objection to me

15   showing him the notes?  I'm trying to point him to a specific

16   part of it.  Do you have an objection to that?  I just don't want

17   to waste our time.  Okay.

18         THE WITNESS:  I've reviewed it.

19         MS. CASTRO:  I'm sorry.

20         THE WITNESS:  No worries.

21    BY MS. CASTRO:

22   Q.  Okay.  Having reviewed the notes, do you recall some of

23   Mr. Sanon's statements about a plan with respect to the palace?

24   A.  I do.

25   Q.  And what was that?

1    A.  It was for -- in June of '21 for the palace to be surrounded

2    by Mr. Sanon's supporters and so CTU security forces could force

3    the president to resign.

4    Q.  Okay.  Now, in fairness, in these notes it sounds like

5    Mr. Sanon thought that idea wouldn't work; is that fair?

6    A.  That is correct.

7    Q.  But nevertheless, fair to say it sounds familiar to what's

8    depicted on this white board?

9    A.  It does.

10   Q.  Okay.

11          MS. CASTRO:  I don't have any further questions, Your

12   Honor.

13          THE COURT:  All right.

14          MS. BOZANIC:  May I have just a brief redirect, or

15   recross I should say?

16          THE COURT:  Of course.  Yes.

17          MS. BOZANIC:  Thank you.

18                          RECROSS EXAMINATION

19   BY MS. BOZANIC:

20   Q.  Agent, on the white board issue of April 21st, you testified

21   that there were some text messages between Mr. Sanon and somebody

22   else.  Do you know who that other person is?

23   A.  These are between Ortiz and Intriago.

24   Q.  The messages are between Ortiz and Intriago?

25   A.  That's correct.

1    Q.   Okay.  So how is Sanon involved in that?

2    A.   He's not on this chain.

3    Q.   Okay.  The government showed you some messages, and I can

4    approach and show them to you, between Buckman and Dr. Sanon.  Do

5    you recall that?

6    A.   Yes.

7    Q.   And who is Buckman?

8    A.   Saved in his phone.  It's slipping my mind right now.  Not

9    Dr. Sanon.

10   Q.   Okay.  So when this list is sent to Mr. Dr. Sanon by Buckman,

11   Mr. Sanon says "who prepared", correct?

12   A.   That's correct.

13   Q.   And when this person responds with J3, he says "okay, I

14   understand he needs the tools", correct?

15   A.   I'd have to see it for the exact wording.

16   Q.   All right.  Now, I can approach and refresh your

17   recollection?

18   A.   Sure.

19            MS. BOZANIC:  Judge, may I approach again?

20            MS. CASTRO:  Might be there still.  Copy might still be

21   there.

22            THE WITNESS:  I think this is Solages.

23       BY MS. BOZANIC:

24   Q.   So somebody, you believe it's Solages, is suggesting or

25   sending this photograph of what they need to Mr. Sanon and he

1   questions it, correct?

2   A.  He just asked who prepared the list, correct.

3   Q.  And he says "okay, I understand he needs the tools for his

4   company", correct?

5   A.  I got to see the second page.  I don't know if it said "for

6   his company" or what he said.  Yeah, he says "his company", but

7   Solages writes back and says "his company", question mark.

8   Q.  And then what happens in the conversation?

9   A.  Then they call each other or they have a missed call.

10  Q.  Okay.

11  A.  Looks like "call me back when you can", so J3 did not have a

12  company.

13  Q.  The reason why they're sending this to Mr. Sanon is because

14  at that time Mr. Sanon was getting security detail from CTU,

15  correct?

16  A.  Correct.  And he was still the -- I mean, in this time frame

17  he's still their candidate and they sought him for approval on

18  many things.

19  Q.  And Veintemilla is the one who has a credit line that is

20  going under Mr. Sanon's name because he's being provided the

21  security, correct?

22  A.  Correct.

23  Q.  So he doesn't necessarily question the fact that people may

24  need guns and things like that, because that's something that

25  security detail would have in Haiti, correct?

1   A.  Once again, that's coming from J3 who he knows is not part of

2   those companies.  He's there on the ground part of the effort.

3   Q.  And would you agree with me that that picture is very blurry

4   and you even had problems reading it, correct?

5   A.  It is blurry, but you can make it out on a computer when you

6   blow it up.

7   Q.  Okay.  This was sent in a text message to Mr. Sanon, correct?

8   A.  Correct.

9   Q.  Do you believe or do you have any evidence to testify today

10  that he could actually make out the words on his phone, on a

11  small phone, of that blurry picture?

12         MS. CASTRO:  Calls for speculation, Your Honor.

13         THE COURT:  I'm sorry.  The blurring is from the

14  printing, right?

15         MS. BOZANIC:  It is printed.  That was the only copy

16  that was provided by the government.  I don't have a clear copy,

17  Your Honor, so I'm inquiring from the agent whether they have a

18  better photo and whether this photo --

19         THE COURT:  How is he going to know if it's blurry from

20  the phone if all he's looking at is the printing?

21         MS. BOZANIC:  Judge, I'll rephrase.

22         THE COURT:  Okay.

23     BY MS. BOZANIC:

24  Q.  Were you involved in the search warrant of -- different

25  search warrants, I think there were about a hundred phones that

1 were seized in this operation?

2 A. That's correct. There were multiple phones.

3 Q. Okay. And were you a part of that investigation and, I

4 guess, getting the information from different phones?

5 A. I was in receipt of them all. I was not assigned to the case

6 at the time that they were initially downloaded.

7 Q. Okay. At this time are you able to testify whether that

8 photograph can be seen on the phone in a better version?

9 A. In its original form I'd have to see the image on a device.

10 Q. Do you have any knowledge -- have you seen that image on a

11 device?

12 A. I mean, I know even a picture of it on a phone is even better

13 that I myself have kind of expanded, and that was even a picture

14 of a picture where it's more visible obviously when you can

15 expand it.

16 Q. But have you yourself seen it in a better version than that?

17 A. I've seen it magnified on my own computer and my own phone.

18    MS. BOZANIC: Okay. No further questions, Judge.

19    THE COURT: All right.

20    Now, let me just -- following up on that line of

21 questioning, we're talking about the weapons list, what's been

22 called the weapons list that that was what was sent to him that

23 we've been discussing whether it was blurry or not. Correct?

24    MS. BOZANIC: Yes, Your Honor. It was the white board

25 that somebody took a photograph of.

1          MS. CASTRO:  There's the white board and the weapons

2     list.  I don't want to create confusion.

3          MS. BOZANIC:  I stand corrected, Judge.

4          THE COURT:  So your questions go to the weapons list?

5          MS. BOZANIC:  Yes, Your Honor.

6          THE COURT:  That there is evidence that he did receive

7     it, and your line of questioning was whether it was blurry or

8     not.  But there's no dispute that he did receive that weapons

9     list in April 2021.

10          MS. BOZANIC:  Judge, which was a different, I would

11     argue -- this is more of an argument, that it's a different

12     weapons list of what was actually sent later on to the

13     Colombians.  It had nothing to do with the assassination of the

14     president.

15          THE COURT:  But this weapons list that we're talking

16     about, that you claim was blurry, from April 2021, had -- from

17     what the agent has been able to read off the blurry copy had --

18     am I right?  I'll tick them off and you tell me.  Grenades?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  Kalashnikovs.

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  What else?

23          THE WITNESS:  Machine gun, M4 rifles.

24          THE COURT:  M4s and Kalashnikovs are different things.

25          THE WITNESS:  Correct.  One is the America style, the

1   M4.

2           THE COURT:  That's what I thought.  Okay.

3           THE WITNESS:  And the ammunition for both of those

4   weapons, 5.56 versus 7.62 for the Kalashnikovs.  And Your Honor,

5   I would be clear that in any version of this document the title

6   of the document is extremely clear and it is not "security

7   forces", it is "fighter for the liberation of Haiti."

8           THE COURT:  Okay.  That's fine.  I just wanted to make

9   sure we had, you know, things defined.

10          And the issue of the white board, that's the one where

11  we're not really sure whether he got it, except that Mr. Sanon

12  acknowledged post-Miranda seeing some plan to surround the palace

13  which, according to the government, is similar to what was on the

14  white board.  But we don't have evidence of him receiving a

15  picture of the white board.  So we got everything in the little

16  pigeon hole.

17          MS. CASTRO:  That's correct.

18          THE COURT:  All right.  Thank you.  All right.

19          Anything else by way of evidence?

20          MS. BOZANIC:  No, Your Honor.

21          MS. CASTRO:  Not from the government.  Thank you, Your

22  Honor.

23          THE COURT:  So let me hear from the government, you're

24  proceeding under what and why.

25          MS. CASTRO:  Your Honor, we're proceeding only under

1 risk of flight at 18 USC 3142(f)(2)(a).  We submit that here in

2 this case this Defendant has a strong incentive to flee and he

3 both -- actually, can we allow Agent Ferlazzo off the stand, Your

4 Honor?

5    THE COURT:  Yes.  Of course.  Sorry about that.

6    MS. CASTRO:  Thank you, Your Honor.

7    THE COURT:  I thought you liked it there.

8    MS. CASTRO:  Thank you, Special Agent Ferlazzo.  I

9 apologize, Your Honor.

10    So the government's view here is that this Defendant has

11 strong motive to flee, and also has the means to be able to do

12 it.

13    I want to begin by talking about the Defendant's

14 motivation to flee.  So first, this is a Defendant who is 64

15 years old.  He is now charged with four felonies on this case.  I

16 say "this case", because he is also facing potential charges in

17 Haiti.  Indeed, the government brought him into US custody out of

18 Haitian custody, which is to say even an acquittal here does not

19 bring an end to the Defendant's legal woes.  The four counts that

20 he's charged with, if they were to be run consecutively, the

21 Defendant could face over 20 years in prison.  For someone who is

22 of his age, that could be butting up right against what could be

23 a potential life sentence for this Defendant.  It's also notable

24 that the guidelines could potentially score out to a guidelines

25 of life, depending on which guidelines in particular would apply

1    to the Neutrality Act violations.

2           And the agent made some reference to the Neutrality Act

3    violations.  Those violations are essentially charging this

4    Defendant with engaging in an expedition to run a coup against a

5    foreign nation.  Depending on the guidelines that could apply, he

6    could be subjected to a guideline sentence of up to life, and we

7    would argue that those are the guidelines that apply for that

8    violation.  But as I said, he faces a significant term even under

9    the statutory penalties.

10          Now, those penalties, when we combine with it the

11   strength of the government's case, show that this Defendant has a

12   strong incentive to flee.

13          Now, there was some talk by the defense about the

14   reality, which the government acknowledges that the Defendant has

15   not been charged at this stage with a conspiracy to kill and

16   kidnap.  Nevertheless, his conduct over the course of this

17   conspiracy clearly included him knowingly assisting the

18   conspiracy and continuing it with discussions of force and

19   weapons abounding.  And I say that to speak to his history and

20   characteristics.  And we can talk about that a little bit more

21   later.  But the strength of the evidence as to what he is charged

22   with is overwhelming.

23          He is charged with illegally and fraudulently exporting

24   vests, ballistic vests which he -- by the way, if he was using

25   them for legitimate security detail, could have transported them

1    through proper channels and labeled them properly.  But he

2    clearly mislabeled them and abided by a plan to mislabel them

3    because he was trying to obstruct evidence of his actual crimes

4    or hide them from being revealed.

5            There's text messages showing that he received the

6    shipping forms where his co-defendant lied about what these

7    documents actually were, or what these materials actually were.

8    There is also text messages where he is talking with his

9    co-defendant, Mr. Bergmann, about what the lie is going to be;

10   the fact that they're going to refer to this as medical x-ray

11   vests when he well knew that there were no medical x-ray vests

12   being shipped to Haiti.  He admitted that in his post-Miranda

13   statement to the agents.  Although he initially lied about

14   knowing about the ballistic vests, he later admitted in his

15   post-Miranda statement that he knew they were going.  So when

16   he's texting with Mr. Bergmann about calling them medical x-ray

17   vests, he is captured talking about illegally exporting these

18   vests.  There is no question about it in the text messages.

19           In terms of the Neutrality Act charges, the evidence is

20   equally overwhelming.  In the government's proffer we talked

21   about the fact that this Defendant again was communicating about

22   the need to acquire weapons, this weapons list that he was

23   received in April, months before the president's assassination,

24   and he continued to participate in this conspiracy for months

25   after receiving the weapons list.  After he got that weapons list

1    is when we see this Defendant circulating a, quote, resignation

2    letter that the conspiracy had drafted for President Moise.  The

3    notion that in the wake of receiving this weapons list this

4    resignation letter was something that they anticipated achieving

5    through something other than force simply belies any common

6    sense.

7           Now, they also -- the Defendant also circulated his

8    quote, unquote, acceptance speech, or the Freedom Speech as was

9    titled by his co-defendant Mr. Bergmann, where he was, in theory,

10   accepting his new position in Haiti once President Moise had been

11   removed.  That comes after this weapons list.  And the language

12   that he used in that speech makes clear, again, that this was an

13   expedition, again, it's charged in the Neutrality Act, against a

14   nation because he's talking about violence.  And he makes a

15   reference to a verse from the Bible, from the Book of Job where

16   he says "I don't take pleasure in violence, but you reap what you

17   sow."

18          THE COURT:  I'm sorry.  Someone else drafted this

19   speech, right?

20          MS. CASTRO:  Yes, Your Honor.  But it was e-mailed to

21   Mr. Sanon and it was drafted -- we submit it was drafted in

22   contemplation --

23          THE COURT:  It's not his work product.

24          MS. BOZANIC:  He did not draft it, Judge.

25          MS. CASTRO:  It was drafted by, as we understand it --

1    let me clarify that one point.  It was forwarded by Mr. Bergmann.

2              THE COURT:  Right.

3              MS. CASTRO:  So to say he specifically wrote every line

4    of it, I don't want to go that far, but I know that Mr. Bergmann

5    sent the speech to Mr. Sanon.

6              THE COURT:  Well, so I think the fair inference is --

7              MS. CASTRO:  That he drafted it.  I just wanted to be

8    clear, Your Honor, I wanted to make sure it was clear.  I wanted

9    to be precise.

10             THE COURT:  All right.

11             MS. CASTRO:  But again, Your Honor, this speech, even

12   setting aside who drafted it, it's talking about a new president

13   coming into power and having done so in the wake of some

14   violence, right?  So candidly even if it was contemplating

15   someone else, which I would say is inconsistent with the rest of

16   the evidence, it's still evidence of his involvement in a coup.

17             THE COURT:  But let me ask you this:  You said you're

18   traveling under risk of flight, right?

19             MS. CASTRO:  Yes, Your Honor.

20             THE COURT:  So all this stuff is violence, danger to the

21   community.  How does that play into risk of flight?

22             MS. CASTRO:  I'm offering this, Your Honor, specifically

23   as to the strength of the evidence, because I think this goes to

24   the strength of the evidence of the Neutrality Act violations.

25             THE COURT:  All right.  You're just bringing it for the

1  strength of the evidence.

2          MS. CASTRO:  Yes, Your Honor.

3          THE COURT:  Not that you're going under danger.

4          MS. CASTRO:  We're not proceeding under danger, Your

5  Honor.

6          THE COURT:  Just making sure.

7          MS. CASTRO:  Yes, Your Honor.

8          THE COURT:  All right.

9          MS. CASTRO:  So the point that I'm hoping to make is

10 that the strength of the evidence of the Defendant's involvement

11 in the crimes he's charged with here give him substantial

12 incentive to flee in the event that he were to be released.

13          Now, I also submit that the Defendant has the means to

14 effectuate flight if he chose to take that route.  First it's

15 notable that he has significant ties to other countries.  He has

16 a history of doing business in other countries, and he has an

17 extensive history of international travel.

18          I want to begin first, clearly it's known that the

19 Defendant was a former Haitian citizen and traveled extensively

20 to Haiti.  But in addition to that, the Defendant also traveled

21 in the last 10 years to Venezuela, Mexico, Canada, Panama and he

22 actually lived in the Dominican Republic for three years where he

23 says he obtained his medical schooling.  So he clearly has ties

24 to other countries.

25          I also made a reference to a history of doing business

1   --

2           THE COURT:  I'm sorry.  When you say ties to other

3   countries, you have travel to other countries?

4           MS. CASTRO:  Yes, Your Honor.

5           THE COURT:  And when did he get his medical degree at

6   the D.R.?

7           MS. CASTRO:  I know he resided in the Dominican Republic

8   between 2012 and 2015, that's in the Pretrial Services Report.  I

9   assume that during that residency is when he was obtaining his

10  medical schooling.

11          THE COURT:  Okay.  All right.  But you have that medical

12  school back in the 2012 to 2015.  Because you said ties to other

13  countries.  But all you've shown is travel.  You haven't shown

14  that he has businesses anywhere else.

15          MS. CASTRO:  I was going to make a reference to

16  businesses, Your Honor.  So two of the documents that I passed

17  forward refer to a bankruptcy that the Defendant was a part of,

18  and one of the documents that was filed in connection with that

19  bankruptcy -- and I'll look for it in a moment because I'm

20  realizing I didn't actually hand that specific document to the

21  Court, but I'll be sure to do so.

22          There's a moment in the bankruptcy where the Defendant

23  had to identify businesses that he had an interest in, and one

24  was a business in the Dominican Republic.  And so he does have

25  significant ties in particular to the Dominican Republic.  And

1   beyond that, yes, has traveled to other countries as recently as

2   2018.

3          THE COURT:  So you're saying his bankruptcy disclosure

4   shows a business in the D.R.

5          MS. CASTRO:  Yes, Your Honor.

6          THE COURT:  Okay.  And you've shared that with defense

7   counsel.

8          MS. CASTRO:  I have a copy of it here.  I sent some of

9   the documents to the defense yesterday.  If, Your Honor, I can

10   grab it at the end or I can grab it right now.  Whatever is best

11   for the Court.

12          THE COURT:  I think it's only fair to show --

13          MS. BOZANIC:  Judge, as far as the businesses in the

14   D.R., I did get some documents which are mostly court documents.

15   I don't recall getting a business in D.R. document, but we can

16   review.

17          THE COURT:  Sounds like it's one of those bankruptcy

18   forms that people have to fill out.  What is the date of the

19   bankruptcy?

20          MS. CASTRO:  He filed for bankruptcy in 2013, but there

21   were additional filings in 2014 and I believe that's when the

22   D.R. business was referenced.  I'm going to just grab the

23   document.

24          THE COURT:  This sounds like co-existing with the timing

25   of the medical.  2012 to 2015, 2013, 2014.  I mean, what

1    information do you have about those businesses still existing?

2          MS. CASTRO:  I can't claim to know the current status of

3    that business Your Honor.  I'm happy to try to get that

4    information if it's useful for the Court's determination.

5          THE COURT:  Well, it's not useful but, you know, you're

6    saying -- first you said travel to the D.R.  Then you said

7    business in the D.R.  Then it's from 2013 to 2014.  I'm trying to

8    get that part straight, just like I tried to get the white board

9    part straight.

10          MS. CASTRO:  Yes, Your Honor.  It's close.  It's both

11   travel to the D.R. and there is business in the D.R.  Now, I know

12   that the Defendant was involved in this business at least in

13   2013.  I would submit the point is that this Defendant has a

14   history of ties to the Dominican Republic.

15          THE COURT:  A history as opposed to current ties.

16          MS. CASTRO:  I apologize.  I wasn't intending to be

17   unclear, Your Honor.  I'm trying to find an unmarked copy of it.

18   Okay.  So this is one copy of it.  I highlighted it.  We'll get

19   you an unmarked copy.  If Your Honor will forgive the fact that

20   there's one highlight on the document, I can hand up a copy to

21   the Court that I've already shown to the defense that does

22   identify the business in the Dominican Republic.

23          THE COURT:  All right.  All right.  You can hand it

24   back.

25          MS. CASTRO:  May I proceed, Your Honor?

1      THE COURT:  So you were saying ties to the D.R. and then

2  what did you say about Haiti?  He is a US citizen, right?

3      MS. CASTRO:  He's a US citizen.  I understand to be a

4  dual citizen, Your Honor, also having retained his citizenship in

5  Haiti and, of course, extensive travel to Haiti.

6      Now, I understand -- I'm sure defense will argue that

7  he, you know, has no incentive to flee to Haiti, specifically

8  given his outstanding charges there, which is why I wanted to be

9  sure to reference the Court to the reality that he does have

10  connections to other countries and he has travel to other

11  countries.

12      THE COURT:  Okay.  All right.

13      MS. CASTRO:  I also want to talk about the funding that

14  might be available to this Defendant should he choose to flee

15  from prosecution.  We mentioned in the proffer that in his

16  post-Miranda statement the Defendant referenced to law

17  enforcement that he had a property valued at $1 million that he

18  possessed in Haiti.  He then, in his Pretrial Services Report,

19  said that the property he had in Haiti was valued at around

20  several hundred thousand dollars.  I say that to say, again, you

21  see a recurring propensity for deception, but to say it just

22  remains unclear what funds are available to this Defendant if

23  he's to be taken at his word when he met with law enforcement in

24  Haiti, he has significant funds available to him if he were to

25  dispose of any property that he possesses in Haiti.  And he

1    wouldn't have to travel to reap the benefit of any attempt to

2    dispose of that property.

3            And I think that's relevant in particular when they talk

4    about this bankruptcy proceeding.  The documents that I passed up

5    to the Court at the beginning of the proceeding showed that

6    Mr. Sanon, along with his wife, filed for bankruptcy in 2013.

7    When after the bankruptcy resulted in all of the -- all of his

8    debt being discharged, a filing was made by the trustee noting

9    that the Defendant had failed to disclose property in Haiti,

10   something that was discovered by the trustee through documents

11   that showed he was, in fact, attempting to sell that property

12   after having failed to mention it during his bankruptcy and

13   having had his debt discharged.  He also failed to identify,

14   according to the filing from the trustee, which the Defendant did

15   not contest this filing.  This filing stated that the Defendant

16   failed to disclose the property in Haiti, then tried to sell the

17   property in Haiti, failed to disclose several businesses, at

18   least seven that he had an ownership or equity interest in during

19   the course of the bankruptcy.  He later made a filing saying --

20   after the debts had been discharged, he later made a filing

21   saying yes, there are these seven businesses, but as outlined in

22   the filing from the trustee, there's an additional four

23   businesses that the trustee identified that the Defendant never

24   disclosed at all.  The trustee ultimately told the Court that

25   this Defendant had obtained the discharge of his debt through

1    fraud, and the Defendant did not contest that and consented to

2    revocation of the discharge of his loans.  This shows a history

3    of lying and obfuscating the funds that are available to this

4    Defendant when it serves his interests, and I would submit that

5    it serves his interests here, just as it served his interest to

6    avoid his obligations being held to account as to the debt that

7    was at issue in the bankruptcy.  Here, it service his interests

8    because he can hide what might be available to him should he

9    choose to flee from the potential conviction in this case.

10          I also want to note that the evidence that came out in

11   the course of the investigation shows that this Defendant has a

12   particular skill for persuading people to fund his endeavors.

13   Bear in mind that this is a Defendant who had no qualifications

14   to run for the presidency of Haiti and managed to secure $175,000

15   line of credit from one of his co-conspirators for a presidency,

16   a seat that was already occupied by somebody else and for which

17   he was not even eligible.  That's pretty impressive that he was

18   able to get that much money made available to him.  He didn't

19   secure it with any property.  The point being that should this

20   Defendant need to call upon those powers of persuasion, I submit

21   he could do so again to get assistance from whoever he may need

22   to get assistance in order to facilitate any potential flight

23   from the jurisdiction.

24          And something else that was just seen throughout the

25   course of the case, just the Defendant's propensity for

1   dishonesty.  He was dishonest and he lied with respect to the

2   shipment of the ballistic vests; he lied with respect to his

3   qualifications to run for president; he lied when he was

4   interviewed by law enforcement in Haiti, and in that instance in

5   particular to obstruct their investigation; he lied about things

6   about still being involved with the Colombians days before the

7   assassination.  He did that because it potentially exposed him to

8   criminal liability, and I submit that those are characteristics

9   that should give this Court no confidence that the Defendant will

10  abide by the orders of this Court, that the Defendant will comply

11  with the terms of conditional lease, the Defendant will report to

12  court as suited.

13          What is shown of his characteristics over the course of

14  this investigation and in these allegations is that he will lie

15  when it serves his self interests, and the lengths to which he

16  will go to obtain his goals is also apparent over the course of

17  this case.  This is a Defendant who had political aspirations,

18  and he persisted in participating in a conspiracy with rampant

19  discussion of potential violence, discussions of surrounding the

20  palace, discussion of getting all these weapons, and he did this

21  to achieve his own ends.

22          We also talked about the fact or the way that the

23  Defendant responded when the president was assassinated.  He was

24  undeterred.  He was still awaiting to, quote, get hired.  He was

25  awaiting to assume the presidency.  I submit that he would apply

1   that same tenacity to flight because it serves his self interests

2   here just as his self interests were served by his conduct in

3   this investigation.

4           Based on these facts, Your Honor, I don't believe this

5   is a Defendant who can be counted upon to be honest with the

6   Court, who can be counted upon to be accountable when the Court

7   calls him to appear, and who can be counted upon not to flee the

8   jurisdiction.

9           THE COURT:  All right.  Ms. Bozanic.

10           MS. BOZANIC:  Judge, my client does not present a

11   serious risk of flight, which the government has the burden to

12   present here today for pretrial detention.  He is not charged

13   with conspiracy to murder the president, and therefore it is the

14   government's burden to present that he is a serious risk of

15   flight.  Obviously that's the theory they're traveling under.

16           Mr. Sanon is a US citizen.  He is 64 years old.  He is a

17   medical doctor, he's also a pastor.  His whole family lives here.

18   His two sons and one daughter live here in Florida, and his wife

19   as well.  He has been married to his wife for 37 years.  She is

20   present today and will co-sign for any bond necessary, as well as

21   his sons and his brothers as well.

22           Judge, let's talk about the charges here.  You know the

23   government is talking about this risk of flight, but if you look

24   at his charges, he is charged with conspiracy to export medical

25   vests -- I'm sorry, not medical vests, the vests.  And the

1    maximum term of imprisonment on Count 6, 4 and 6, is five years.

2    Count 8 is smuggling goods from the United States, maximum

3    imprisonment is 10 years, and the government superseded recently

4    with this count under 18 USC 960, expedition against friendly

5    nation, which carries a maximum term of imprisonment of three

6    years.  And he also has the false or misleading export

7    information which is, again, a five-year count.

8         Judge, I ran his guidelines back before this new charge

9    of a three-year maximum, and he was somewhere at 63 months

10   without acceptance.  That means that with acceptance, he would be

11   way lower than that.  For the government to present this whole

12   case, and they say that he's a risk of flight based on the

13   charges against him, I think just overstates the situation.

14   Obviously there's a different group of people, they were charged

15   with conspiracy to kill the president of Haiti.  There's a reason

16   why my client wasn't charged with that, because he had no idea,

17   and they know very well that sometime in June he wasn't even a

18   candidate for this presidency and he had no knowledge about these

19   people changing the plan into killing the president.

20        This is not a crime of violence with a statutory maximum

21   of over 10 years.  There is no imprisonment of life here.

22   There's no controlled substance case with a minimum mandatory,

23   and I think that the government failed to show that my client is

24   a risk of flight.

25        As far as the evidence, Judge, against him, even if he

1   was to plead guilty to the charges against him right now, he

2   would end up serving less than five years.  I don't think that's

3   an incentive for a man who is a medical doctor, who is a pastor,

4   whose whole family is here, to flee.  He's 64 years old.  The

5   government is talking about this sentence could mean life for

6   him.  It would not.  He is 64 years old.  That is not old.

7           The qualifications, the government talked about his

8   ability to lie and that he lied about having qualifications for

9   the president.  He never lied.  There's no evidence presented

10  that he lied about that.  The fact that he was a US citizen and

11  that disqualified him, there's absolutely no agent or no proffer

12  or anybody talking about him lying about that.  That was just an

13  issue that came up later on.

14          As far as the bankruptcy, that's what I wanted to talk

15  about.  The bankruptcy that the government keeps stressing on to

16  present that somehow he's a risk of flight or his ability to lie,

17  was filed in 2013 by him and his wife.  It was a Chapter 7 which

18  is often filed by people to discharge debt.  He had a residence

19  in, I think it was Clearwater or Tampa area, Bradenton maybe, and

20  they say that was right after the whole market crash.  They

21  sought to discharge that debt and some other credit card debt.

22  In the filing there was an amendment in 2014.  The reason -- and

23  the government doesn't have any evidence as to why this became an

24  adversary hearing.  When a bankruptcy is filed, usually there's

25  no hearing unless the trustee, this wasn't a judge, a trustee

1    opened up an adversary hearing because one of his business

2    associates had a disagreement with an investor or somebody who

3    alleged that Mr. Sanon owned the property.  That was never proven

4    because Mr. Sanon did not own any type of property.  He amended,

5    then the trustee started asking about these businesses, the

6    businesses that were amended, and added to the petition were

7    businesses that were either closed or had no assets.  As Your

8    Honor knows, many people own businesses.  You may have something

9    on SunBiz or whatever is the equivalent in a different country,

10   the business has no assets and is not operating, and that's why

11   it wasn't initially listed.  There is no evidence that Mr. Sanon

12   lied on this petition.  And for the government to say that he

13   didn't contest it, it was basically worked out without response

14   and they agreed to remove the bankruptcy discharge and that was

15   it.  There is no evidence that the government can present that he

16   lied on any type of a bankruptcy issue.  And without the

17   government putting on a witness or somebody who had closer

18   knowledge about what happened or some type of a certified

19   document that shows that somebody found him to be lying, I would

20   ask the Court not to consider this because it's completely

21   irrelevant and I think it's not even in context, and the

22   government doesn't really know what happened here.

23          As far as their point that there was a Dominican

24   Republic company listed in the filing, this was in 2013.  This

25   Dominican Republic business had no assets, based on my

1    conversations with my client, and was closed one year after.  It

2    was supposed to be some type of a business for medical equipment,

3    something related to his occupation.  It never really went

4    anywhere and it was closed.  That was one of the reasons why it

5    was never even disclosed.

6           As far as the history and ties with D.R., the only

7    history of the ties with the Dominican Republic the government

8    can show to is that 2013, 2014 business.  I would also submit

9    that I was provided with a list of Mr. Sanon's travel for the

10   last 10 years from 2012, and I can tell the Court that in his

11   travel document it shows that the last time he flew to Dominican

12   Republic was back on March 16, 2014.  That was nine years ago.

13   So for the government to get up here and say that he's a risk of

14   flight because he has ties to the Dominican Republic based on

15   something that happened nine years ago I think is without merit.

16          As far as his travel records, Judge, I do see between

17   2018 -- between 2014, 2018 there's absolutely no travel.  2018

18   there's travel to Haiti mostly.  There's also something called an

19   airport with the initials YUL, and I believe that may be Canada.

20   In 2018 he had a few meetings in Canada.  He's a businessman.

21   And between 2018 and 2020 he mostly flew to Haiti with the

22   exception of I think, Canadian, two, three trips.  So Judge, as

23   far as his ties to other countries, obviously he had businesses.

24          And he is a well-known person, he obviously cannot go

25   back to Haiti at this point.  Where is he going to flee.  He is a

1    well known person who had aspirations to become the president.

2    Everybody knows him.

3           His guidelines here are not that high.  His family is

4    present and willing to put up any type of a bond that the Court

5    requests -- I mean, that the Court imposes if Your Honor would

6    consider it.

7           As far as his skills to persuade people to fund his

8    businesses, I mean, that's a whole different story with 175,000

9    line of credit from Walter Veintemilla who is now charged with

10   conspiracy to kill the president.  This man lent so much money to

11   other people, I think it was like the range of $700,000, and when

12   the plan changed -- and he was doing it because he wanted to get

13   lucrative contracts with the Haitian government and wanted to

14   place somebody in the position of being a president or being able

15   to approve his contracts.  It was for his own personal gain.

16          So, Judge, again, what I would ask the Court to do is

17   allow Mr. Sanon to post a bond.  I think there are reasonable

18   conditions this Court can impose to make sure that he will come

19   back to court and will not flee.  I don't think that the

20   government has presented their burden of him being a serious risk

21   of flight.  The agent testified that he's not aware of him trying

22   to flee at the time he was arrested in Haiti.  There is

23   absolutely no evidence presented that he tried to flee.  He spent

24   between 2021 and 2023, almost two years, in a Haitian jail.  The

25   conditions were obviously not as nice as in the United States

1   jail.

2           He has medical issues right now.  His blood pressure is

3   over 200 right now.  The food in FDC, we all know what it is, and

4   it's affecting him seriously.

5           His son is here.  His name is also Christian Sanon the

6   II.

7           His father passed away last Monday, his name was

8   Christian Sanon as well.  His funeral services are this Saturday

9   in Brooklyn New York.

10          The reason why we're coming back to court at this time

11   to ask for a bond, we've been waiting, we've been waiting to see

12   if there's any other evidence of Mr. Sanon somehow being drawn

13   into this whole conspiracy.  I have personally been waiting to

14   see if there's any evidence that he had anything to do with this

15   conspiracy to murder the president, and it is clear to me from

16   the discovery and from whatever is presented here today that he

17   had nothing to do with that.  Yes, he had some aspirations to

18   become the president, and this blew out of proportion.  But he

19   withdrew from whatever discussions he had with these people way

20   before.  They already found another candidate, they were going

21   after that other candidate some time in mid-June.  The killing of

22   the president happened July 7th.  Regardless, Judge, he's not

23   charged with any of that.

24          So he wasn't able to see his father because he passed

25   away.  He's been asking me about the bond.  We talked about it.

1   His father suddenly passed away.  We thought he was getting

2   better.  Would he like to go and pay his respects to his father

3   in Brooklyn.

4           His family 100% believes in him.  No one has any fear of

5   him being a risk of flight.  I will note that Bergmann, who is

6   also a co-defendant, the only co-defendant in this indictment

7   that was allowed bond by Judge Louis, and he's the only other

8   person aside from Mr. Sanon who has basically the same charges of

9   Mr. Sanon.  Nothing to do with the killing of the president.  In

10  his case, I believe that the bond was 1.5 personal surety bond --

11  and the government can correct me if I'm wrong, but that's what I

12  read from the transcript -- co-signed by his wife.  Judge, and I

13  don't know if they -- I think they posted -- maybe posted a

14  collateral property.

15          In this case, Judge, I have Mr. Sanon's brother, Jean

16  Sanon, who owns a property in Greenacres property free and clear.

17  The property is worth about $400,000.  I can tell you that Zillow

18  showed me 382,000 but, you know, whether Zillow is correct or

19  not, the family believes it's over 400.  He is a mortgage broker.

20  Has been a mortgage broker for many, many years, I think 20

21  years.  He bought the property about 10 years ago for 60 or

22  $70,000, something less than $100,000.  The property is paid off.

23  He's willing to put that as collateral.

24          Whether it's through just a collateral for the bond or

25  through a corporate surety bond if the Court feels that the

1    corporate surety bond is necessary, obviously we would prefer

2    some type of a 10% bond so that they could get the money back,

3    but if the Court and the government feel more safe with a

4    corporate surety bond, they're also prepared to do that.

5         His son, Christian Sanon the II, is a therapist.  He

6    owns his own therapy business.  He deals with children that are

7    on the spectrum and have issues.

8         I can also note that Mr. Sanon's daughter is autistic

9    and he used to help his wife take care of his daughter.  She has

10   some recent issues with Baker Acting, and it just affected the

11   whole family with him not being there.

12        So to go back to his son Christian Sanon the II, he's

13   present here with his wife.  He is able, first of all, to put up

14   his property as collateral.  His property is worth about $292,000

15   and the mortgage on it is about $150,000.  He owns it with his

16   wife Tiffany Sanon.  She's also present, she also works in his

17   business.  And he also has money to put up for 500,000 10% bond

18   which would be $50,000.  He's prepared to do that today.  I

19   looked over his bank statements and I do see it all comes from

20   his business.  I looked through his taxes.  His company makes

21   money.  He's willing to do that for his father, as well as

22   collateralize and agree not to encumber the property he lives in

23   with his wife.

24        In addition to that, the wife is present, she can also

25   sign a personal surety bond for any amount that this Court sets,

1  whether it's a million, million and a half, more or less.

2  Everybody here in the family is willing to co-sign any type of a

3  personal surety bond that the Court requires.

4       So Judge, we have the family, we have the assets

5  probably with equity of about -- I want to say $400,000, maybe a

6  little more than $400,000 that can be put up as collateral.  We

7  have about $50,000 that can be either a part of a 10% 500,000

8  bond, or perhaps a 250 corporate surety bond where they would put

9  15% with a bondsman.  And any type of a personal surety bond.  I

10 think that's more than enough to ensure that Mr. Sanon would

11 return to court.  His whole family would be putting themselves

12 out there.

13      As far as there was some mention of the properties that

14 are owned.  Mr. Sanon's dad, who just passed away, his name is

15 also Christian Sanon.  So sometimes when -- I think there was

16 mention in the Pretrial Services Report, and I spoke to my client

17 before today's hearing, and he told me that was actually owned by

18 his father.  But obviously he's the oldest of the sons, and he's

19 next in line and he often talks about the fact that whatever his

20 father owns that he owns as well.  That is not in his name.  But

21 the father just passed away, so I'm not even sure how that would

22 play out.

23      So as far as him having properties in Haiti or assets

24 anywhere else, he does not have any assets, any significant money

25 where he could actually just flee and sell anything immediately

1    and provide for himself for the rest of his life to be in hiding.

2    I don't think that's the goal of Mr. Sanon.  I don't think he

3    would put his family into that danger, into a financial hole.  If

4    we're talking about millions of dollars of the family putting up,

5    I don't think Mr. Sanon is going to flee considering that he's

6    charged with conspiracy against the government, a five-year max,

7    there's a 10-year max, and his guidelines are less than five

8    years.

9            Mr. Sanon has been waiting patiently.  I really would

10   love to have him be able to go to his dad's funeral.  That's

11   another reason.

12           But aside from that, Judge, you know, we've been here

13   for since February I think, and he's been in custody, and I think

14   at this point it is clear that Mr. Sanon does not present a risk

15   of flight.  Obviously the government is not traveling under the

16   danger.

17           And for those reasons, Judge, if you would like to hear

18   from any of the family members -- I do have the addresses of the

19   collaterals they would be willing to put up, and they're willing

20   to sign anything that the Court requires.  And I do have the

21   statements of about 50,000.  If the Court wanted more, I think

22   the uncle is willing to chip in.  He's a mortgage broker, and

23   everybody can help.

24           THE COURT:  All right.  Anything else from the

25   government?

1        MS. CASTRO:  Your Honor, I do just want to clarify a

2  couple of points about the property.

3        With respect to the property that the Defendant owns in

4  Haiti, I was taking that directly from the Pretrial Services

5  Report and the Defendant's own words.  So he told Pretrial

6  Services that he purchased 2.5 acres of land in Haiti in 2019, he

7  says it's worth 30,000.  He also told them that he owns a home in

8  Jacmel valued at 120,000, which he said he purchased in 2015.

9  Again, when he was speaking to law enforcement in Haiti, he told

10  them that he also owned a property valued at $1 million.

11        I don't want to belabor the point also on the

12  bankruptcy, but the notation from the trustee, the filing there

13  says -- and this is in the papers I gave to the Court at

14  Paragraph 15 after discharge -- it was discovered by the trustee

15  they received information that the debtors, that's Christian

16  Sanon and his wife, owned interests in undisclosed businesses,

17  and also this property in Haiti which they were attempting to

18  sell, and the trustee says that he actually received a copy of an

19  agreement with a date which stated debtors agreed to transfer the

20  land in Haiti.  So I say that to say, you know, this suggestion

21  that there's just nothing to back up that this property was

22  hidden, I disagree with that.  This document clearly states that

23  they were trying to sell this property after the discharge of

24  their debts through the bankruptcy.  It specifically alleges that

25  the Defendant got his debts discharged through fraud and again,

he did not contest that.  He filed something with the Court

saying I do not contest the allegations that are in that

complaint.  I submit that that's an admission, Your Honor, that

they were never entitled to the discharge that they sought to

obtain, and I do think it speaks to a tendency to hide the funds

actually available to him.

And all this confusion about what property he does or

does not own or purchased in Haiti speaks to the very same point.

There's just lack of clarity here, and I submit that the

Defendant is playing a role in preventing there from being

complete clarity.

There was a reference to Mr. Bergmann and the suggestion

that Mr. Sanon should be treated from Mr. Bergmann.  I will say

that there's a significant difference which is the Defendant,

unlike Mr. Bergmann, is shown receiving these weapons lists as

part of a conspiracy that he's a part of.  I don't say that for

dangerousness, I say that for the strength of the evidence of the

charges that he was engaging in a coup that involved an

expedition against a nation, involved soldiers against a nation.

So the evidence that Mr. Sanon was made aware of the Defendant's

trying to acquire all of these weapons, we don't have that same

document going to Mr. Bergmann.  That makes him a little

differently situated.

I also want to just make clear that unlike what defense

counsel said, there is no evidence that this Defendant withdrew

1    from the conspiracy.  She used the term "withdrew from the

2    conspiracy."  There is no instance where we've seen him say "I am

3    out."  To the contrary, three days before the assassination he is

4    authorizing $3,000 to go to the funding of the food and the needs

5    of the Colombian nationals that carried out the assassination.

6    Whether he knew every detail, he had certainly not withdrawn from

7    the conspiracy, and there is nothing to suggest that he had.

8            THE COURT:  All right.

9            MS. CASTRO:  That's all I have at this time, Your Honor.

10           THE COURT:  All right.  Thank you.  All right.

11   Everybody has a had their piece?

12           MS. BOZANIC:  Yes, Your Honor.  I have the family if

13   Your Honor would like to hear from any of them.  They're all

14   sitting in the back.

15           THE COURT:  Thank you.  I acknowledge the presence of

16   the family and appreciate your attendance at this hearing.

17           All right.  Okay.  So as I've listened, I have kind of

18   made myself a little list of what the Defendant is actually

19   charged with, and Counts 4 and 5 relate to what the agent called

20   the Neutrality Act conspiracy, to violate it, and -- violation,

21   and that involves attempt to affect a friendly country with a

22   military expedition, something along those lines.  I don't need

23   to repeat the language, but basically the language involves

24   military expedition.  Then the other three charges, Counts 6, 8

25   and 9 relate to the ballistic vests.  And it's conspiracy to

1   export them, smuggling them in false, and this basically all

2   stems from trying to have those go to Haiti as x-ray protection

3   vests.  So those are the counts.

4          I specifically asked the government, because the

5   government seemed to be making much emphasis about the violence

6   and the violence of the violation of the Neutrality Act.  The

7   government is not traveling under, you know, risk of violence,

8   danger to the community, the government is traveling under risk

9   of flight.  So I understand Ms. Castro saying this was to, you

10  know, make sure that the Court was aware of the strength of the

11  evidence, but basically for purposes of the detention hearing,

12  because the government is traveling under risk of flight, then

13  what we need to look at is has the government established, by a

14  preponderance of the evidence, that the Defendant cannot be

15  relied upon to appear in court as required.  So that's the

16  standard that needs to be applied, and of course we look at the

17  strength of the evidence, but we don't as -- in the danger to the

18  community we don't look at the Defendant's prior history or

19  anything like that, which we don't have.

20         So the government seems to be relying heavily, also

21  aside from the strength of the evidence, on the connections with

22  the D.R.  And I specifically asked a lot of questions about that

23  because the bankruptcy, the travel to the D.R., this supposed

24  property that got the bankruptcy discharge reversed and all that,

25  all that is approximately 10 years old.  That goes back to that

84

1    time.  There is no evidence, and I asked specifically of current

2    business interests in the D.R.

3          And then the other travel which defense counsel pointed

4    out was to Haiti and Canada, and the defense counsel is making

5    the point that the Defendant, my words, would be crazy to go back

6    to Haiti because there's charges against him there and he just

7    spent two years in jail in Haiti.  So that's as far as the travel

8    and the ties to other countries.

9          The government is emphasizing this business of

10   propensity for dishonesty as being indicative of Defendant's

11   inability to comply with bond conditions or to appear in court.

12   Honestly, I have not, in my experience, considered that for risk

13   of flight.  I've looked at ties to the community, I've looked at,

14   you know, the ability to flee and so on.  The government seems to

15   be making -- aside from this propensity for dishonesty that the

16   government claims, I think the government seems to be alluding

17   that there may be some hidden assets that the Defendant is not

18   disclosing that would be available to him for flight.  But I

19   think that the concept of him fleeing to Haiti is sort of a

20   nonstarter.  I don't know where else he would want to flee.

21         I note that there is family ties, there's family here.

22   There's a wife.  There are grown children.

23         Let me ask, are there grandchildren also?

24         MS. BOZANIC:  Yes, Your Honor.  There are two.

25         THE COURT:  Okay.  All right.  So there's three

1  generations of family here.  So I think it's very

2  well-established that the Defendant, being a US citizen, does

3  have ties to the community.

4          So having considered all of these conditions and all of

5  these factors, and the fact that the charges are not related

6  other than this military expedition concept for the violation of

7  the Neutrality Act, but because the government is not going on

8  violence, that kind of neutralizes that concept which I thought

9  the government was going on, but they've assured me that they're

10  not.

11          So in any event, I do find that there's a set of

12  conditions that I can fashion to ensure that the Defendant will

13  appear in court as required, including the financial conditions

14  that have been proffered.

15          I will require the $500,000 10% bond, with the son and

16  the brother and the son's wife and the brother's wife -- I think

17  they're also on that property -- to be co-signers.  So all of

18  those would be co-signers.  If the government wants I would allow

19  a Nebbia requirement to be imposed on that.

20          I would also impose the personal surety bond, and that

21  personal surety bond would be for $1 million.  And I would have

22  as co-signers the Defendant's wife, the Defendant's -- let's see,

23  he has two sons?  Did I get that right?

24          MS. BOZANIC:  Yes, Your Honor.  He does have two sons.

25  One is Christian, one is Christoforus.  And I think Christoforus

1    is downstairs taking care of the sister who is autistic.  She

2    couldn't come in, she didn't have an ID.

3            THE COURT:  Okay.  The two brothers, I mean the

4    brothers, the son willing to co-sign?

5            MS. BOZANIC:  Yes, Your Honor.  Do you require both of

6    them to co-sign?

7            THE COURT:  Yes.  Both brothers co-sign.

8            Does the other brother have any property?

9            MS. BOZANIC:  No, Your Honor.

10           THE COURT:  Okay.  So all right.  So both brothers

11   co-sign, not the daughter that you said has issues, so we won't

12   go there.  And the wife obviously.  I will also require the

13   brother to co-sign the personal surety bond.

14           MS. BOZANIC:  Jean Sanon.

15           THE COURT:  The brother.

16           MS. BOZANIC:  Mr. Sanon's brother, Jean Sanon.

17           THE COURT:  Yes.  I am sorry.  I am giving you my

18   sympathy on the passing of your brother, but I will not allow

19   travel.  Okay.

20           MS. BOZANIC:  Judge, since the funeral is on Friday, and

21   I know that Your Honor mentioned that you would put a Nebbia if

22   the government required it, I can proffer to the Court, and I do

23   have Christian Sanon, he is really the one who would be putting

24   up the 50,000.  I do have his bank statement and his tax, and if

25   the Court has any questions --

```
 1            THE COURT:  Well, let's see if the government would want

 2       Nebbia or not.

 3            MS. CASTRO:  Your Honor, at this stage the government

 4       was actually intending to request a stay so that we can consider

 5       whether we would file an appeal.

 6            THE COURT:  That's fine.  But if it gets upheld, I'm

 7       giving you that option.

 8            MS. CASTRO:  Yes, Your Honor.  If it's upheld we would

 9       reserve the right to have a Nebbia hearing.

10            THE COURT:  That's fine.  All right.

11            MS. BOZANIC:  Judge, so how long is the stay?  How long

12       is Your Honor, considering there's a funeral.

13            THE COURT:  I know, but I said I was not allowing him to

14       travel, so that doesn't --

15            MS. CASTRO:  He won't be able to go anyway.  I'm so

16       sorry, Your Honor.  Listen to the Judge, not me.

17            THE COURT:  I'm sorry.  I guess you didn't hear me.

18       I've said it three times now, and I looked at Mr. Sanon and I

19       told him he has my sympathy on the passing of his father, but I

20       am not allowing the travel.  So travel is irrelevant.

21            MS. BOZANIC:  Okay, Judge.

22            THE COURT:  So the stay is for -- let's see.  It used to

23       be one way and now it's another way.

24            MS. CASTRO:  Your Honor, I am so sorry to cut you off.

25            THE COURT:  It goes to the duty judge.
```

1          MS. CASTRO:  I think it would go to the judge who is

2    assigned to the case, in this case Judge Martinez.

3          THE COURT:  Okay.

4          MS. CASTRO:  It's my understanding that it's generally a

5    three-day period.  That being said, we just want an opportunity

6    to consult, and we promise to make a decision as quickly as

7    possible.  We don't wish to belabor the point.

8          THE COURT:  All right.  So the stay, how soon can you

9    decide if you're going to appeal?

10         MS. CASTRO:  By Friday, Your Honor.

11         THE COURT:  By Friday.

12         MS. CASTRO:  Yes, Your Honor.

13         THE COURT:  All right.  So it's stayed until Friday.

14         MS. CASTRO:  Thank you, Your Honor.

15         THE COURT:  If it's appealed, then of course until

16   decision.  If it's not appealed, then it's lifted on Friday.

17         MS. BOZANIC:  Thank you, Your Honor.

18         THE COURT:  Is that clear?

19         MS. BOZANIC:  Yes, Your Honor.

20         THE COURT:  All right.  I will require house arrest with

21   him being able to leave the house only for purposes of medical

22   needs, court appearances, attorney visits, religious worship.

23   And is he employed?  Is he looking to work?

24         MS. BOZANIC:  Judge, he is not employed now, but being

25   that he's a doctor, he may want to work.

1      THE COURT:  So that would be as decided by probation.

2      MS. BOZANIC:  So he can go out for work purposes.

3      THE COURT:  So the work schedule would need to be worked

4  out with probation.

5      PROBATION OFFICER:  Good morning, Your Honor.  Sherika

6  Prospere with US Probation.  That will be fine.  Once he gets

7  employment, we can just verify it and --

8      THE COURT:  Right.  Once he gets employment, then the

9  work schedule would be worked out with probation.  All right?

10     MS. BOZANIC:  Yes, Your Honor.

11     THE COURT:  And he is CJA, so the monitoring at the

12 discretion of probation to be paid for by probation.

13     All right.  He's to surrender any travel documents.  I

14 will require that his wife also surrender her travel.

15     MS. BOZANIC:  Judge, I was informed that he does not

16 have any travel documents.  I believe that the agents, at the

17 time of the arrests, took whatever documents were there, and I

18 would ask the government to confirm, but he does not have any

19 travel documents.

20     THE COURT:  I will require the wife.

21     MS. BOZANIC:  I'm sorry, the wife's travel documents?

22     THE COURT:  Yes.

23     MS. BOZANIC:  Okay.

24     THE COURT:  Report to Pretrial Services as directed.

25     Seek employment as we discussed.

1          No contact with victims, witnesses or co-defendants

2    other than through counsel.

3          The properties will need to make a record of the

4    properties, that they may not be encumbered, which are the son's

5    and the brother's.

6          MS. BOZANIC:  Yes, Your Honor.  Would you like me to

7    read the address into the record?

8          THE COURT:  Yes.

9          MS. BOZANIC:  All right.  So the son's property, and

10   this is Christian Sanon, I'm sorry, the Second, 6419 64th Way,

11   West Palm Beach, Florida, 33409.

12         And the property of the brother, Jean Sanon, is located

13   at 413 Perry Avenue, that's 413, P E R R Y, Avenue, city is

14   Greenacres, Florida, and the zip code is 33463.

15         THE COURT:  Will also make it a requirement, given this

16   lack of clarity from the government's point of view as to whether

17   there's other property in Haiti, that none of the property, if it

18   exists in Haiti, be disposed of or encumbered in any way.

19         MS. BOZANIC:  Yes, Your Honor.

20         THE COURT:  And to do so would be a violation of the

21   bond.

22         May not visit any transportation establishment.

23         I already said the home confinement.

24         And may not leave the Southern District of Florida.  And

25   again, I'm sorry for your loss, sir.

1           Anything else?  And it's stayed until?

2           MS. CASTRO:  Friday Your Honor.

3           THE COURT:  Could we make it Friday noon?  Just in case.

4           MS. CASTRO:  Yes.

5           THE COURT:  If you don't appeal, he can go home for the

6    weekend?

7           MS. CASTRO:  Of course Your Honor.

8           THE COURT:  All right.  That's how we'll do it.

9           MS. BOZANIC:  Yes, Your Honor.  And Judge, as far as the

10   Nebbia order, if we do stipulate can we send it to Your Honor?

11          THE COURT:  For Nebbia, if you both sign off on it, I

12   don't need to have a hearing.  So you may want to, in an

13   abundance of caution, do the Nebbia.  I'm sure the government

14   doesn't want to sign it because that means they agree.  But they

15   have it and if they don't appeal, then they can sign it.  But you

16   can review it and decide if it's good enough.

17          MS. CASTRO:  Yeah.  Of course.  Yes.

18          THE COURT:  So everything will be kind of frozen until

19   Friday at noon.

20          MS. BOZANIC:  Thank you, Your Honor.

21          Could I just ask the Marshals to hold my client so I

22   could have him sign two pieces of paper?

23          THE COURT:  Right.

24          Let me just say this, I will be out of town Thursday and

25   Friday.  Judge Damien will be covering for me.  If bond papers

1    need to be signed, I can sign them ahead of time and if the

2    government doesn't appeal, then they're good enough to go.  If

3    they appeal, then they just sit.  I just don't want to create

4    work for Judge Damien.

5           MS. BOZANIC:  Yes, Your Honor.

6           THE COURT:  Let's see what the government says.

7           MS. CASTRO:  I'm so sorry, Your Honor.

8           MS. BOZANIC:  Judge, may I approach just to get the --

9           MS. CASTRO:  I apologize, Your Honor.  We were just

10   discussing, we may reserve the right, if we end up not appealing,

11   to maybe fashion a different bond that we may want the Court to

12   consider.  I don't have that right now because our position has

13   been that we would object to his release.  So I would just say no

14   objection to the Court, you know, pre-filling out the paperwork

15   of course, but I just wanted to make clear that the government

16   may, if we choose not to appeal, propose some other

17   considerations in terms of to what the final bond should be.

18           THE COURT:  Right.  But then I think since you have

19   until 12 noon to appeal, I think maybe that would need to wait so

20   he would be let out on the bond, and then you can ask for it to

21   be changed and I'll be happy to address it next week when I'm

22   back.

23           MS. CASTRO:  Understood.  Thank you, Your Honor.

24           THE COURT:  I'm just trying not to burden Judge Damien.

25           MS. CASTRO:  Understood.

1         THE COURT:  All right.  All right.  So we're good?

2 Let's take a 10 minute -- wait.  Probation needs to speak.

3         PROBATION OFFICER:  Sorry, Your Honor.  Just a few

4 things.  The victim list just so we can advise the government, if

5 she can provide the list to us for --

6         THE COURT:  Let me see, I kind of added that.  Does the

7 government have any victim list issue?  If not, I can just say

8 co-defendants.

9         MS. CASTRO:  I mean, we do have victims in this case,

10 Your Honor.  I can certainly provide the list to Pretrial

11 Services.

12         THE COURT:  The other bond, did it have that

13 requirement?  The one for the other co-defendant?

14         MS. CASTRO:  Your Honor, I'm struggling to recall.  My

15 belief is yes.

16         THE COURT:  You did have a victim's list.

17         MS. CASTRO:  We do have a victim's list, and I can

18 provide it to probation.

19         THE COURT:  We're good to go.

20         PROBATION OFFICER:  Thank you, Your Honor.

21         Also regarding the home confinement and the location

22 monitoring, would the technology be determined by Pretrial

23 Services?

24         THE COURT:  Yes.  That's what I said.

25         PROBATION OFFICER:  Okay.  And also, will the Defendant

1    be residing on the address listed in the Pretrial Services

2    Report?  I think it's 5040 Rose Hill Road, Apartment 203.

3              MS. BOZANIC:  Yes, Your Honor.

4              PROBATION OFFICER:  Thank you.

5              THE COURT:  Anything else?

6              PROBATION OFFICER:  No, Your Honor.

7              THE COURT:  All right.  We're going to take a 10 minute

8    break.

9              MS. BOZANIC:  Thank you, Your Honor.

10             MS. CASTRO:  Thank you, Your Honor.

11             COURTROOM DEPUTY:  All rise.  Court's in recess.

12             (PROCEEDINGS CONCLUDED)

13                          *  *  *  *  *

14                    C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
15   digital audio recording of proceedings in the above-entitled
     matter.

16

17   9-15-2023            /s/ Dawn M. Savino, R.P.R., C.R.R.
     Date                 DAWN M. SAVINO, R.P.R., C.R.R.

18

19

20

21

22

23

24

25

1                           **I N D E X**

2                           **WITNESSES**

3      ALL WITNESSES:                                    PAGE:

4      For Government:

5        Mike Ferlazzo:
           Cross-Examination by Ms. Bozanic           24:16
6          Redirect Examination by Ms. Castro         43:2
           Recross-Examination by Ms. Bozanic         49:18
7
                             **EXHIBITS**
8
       None
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25