UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20104-CR-MARTINEZ

UNITED STATES OF AMERICA,

v.

FREDERICK J. BERGMANN, JR.

    Defendant.

_____/

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

    Defendant, FREDERICK J. BERGMANN, JR., files his sentencing memorandum.[1]

## I.    INTRODUCTION

    Mr. Bergman does not receive the benefit of the acceptance of responsibility reduction under the Sentencing Guidelines despite clearly having accepted responsibility for his criminal conduct.  Mr. Bergmann's role in the crimes to which he pleaded guilty is distinguishable and materially different from those of the other defendants in this matter. His background shows that he is a person of exceptional selflessness and kindness. Mr. Bergmann suffers from mental health issues and debilitating back pain that are sure to receive scant care and treatment from the Bureau of Prisons.  And Mr. Bergmann presents no risk of recidivating.

_____

[1] Portions of the instant memorandum are filed with reactions because they refer explicitly to HIPPA protected health information.  An unredacted copy is being filed under seal with the Court and served on the government.

For reasons more fully explored below, Mr. Bergmann requests that the Court impose a sentence below 120 months or 10 years imprisonment as set forth in the PSI. PSI at ¶ 92.  First, Mr. Bergmann argues for downward variance or departure pursuant to *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995).  Then, we analyze the statutory sentencing factors under 18 U.S.C. § 3553(e) as they apply to Mr. Bergmann.

## II.    VARAINCE OR DEPARTURE FOR ACCEPTANCE OF RESPONSIBILITY

Despite pleading guilty and accepting responsibility for his criminal conduct in this case, Mr. Bergmann is not receiving the benefit of the acceptance of responsibility reduction under Section 3E1.1 of the Guidelines because the applicable guideline range exceeds the statutory maximum sentence of ten (10) years of imprisonment. Nevertheless, it is well recognized that this Court – the sentencing court – is empowered to remedy that fact. *See United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995).

In *Rodriguez*, the defendant had pleaded guilty to crimes for which the applicable guideline range exceeded the statutory maximum sentence by 100 months. The defendant objected to the fact that he was not receiving any reduction in his sentence for having accepted responsibility. On appeal, the 11th Circuit held that the district court had the authority to reward the defendant's acceptance of responsibility by departing downward where application of the sentencing guidelines rendered the acceptance of responsibility reduction under U.S.S.G. § 3E1.1 ineffectual in reducing the defendant's actual sentence. Because The Supreme Court decided *Rodriguez*

before it rendered the sentencing guidelines advisory, cases like *Booker[2], Rita[3]* and *Gall[4]* have since increased this Court's authority.

Mr. Bergmann faces a similar situation as the defendant in *Rodriguez* did. His guidelines exceed the statutory maximum sentence of 10 years imprisonment and therefore the guidelines fail to account for his acceptance of responsibility. For having admitted his crimes early on and having saved the government and the Court substantial time and resources for a trial against him, the Court should reward Mr. Bergmann with a downward departure or variance crediting him for accepting responsibility. *See e.g. United States v. Mark Maher*, Case No. 00-cr-08064-Hurley, ECF 73 at 7) ("The court grants downward departure based United States v. Rodriguez"); *United States v. Jon Michael Smith*, Case No. 11-60273-cr-Dimitrouleas (Court imposed a sentence of 36 months imprisonment in tax fraud case in which the defendant faced a statutory maximum sentence of 5 years in case in which the guideline range was 87-108 months imprisonment); *United States v. Andrew Martin*, Case No. 22-cr-20556-Altman (Judge granted the defendant a 30-month departure below the statutory maximum sentence of 20 years because of the defendant's decision to plead guilty, accept responsibility, and forgo trial in Hobbs Act robbery case).

Here, to credit Mr. Bergmann's decision to forego trial and accept responsibility, the Court should depart 3 levels from the guideline level that

---

[2] *United States v. Booker*, 534 U.S. 220 (2005.
[3] *Rita v. United States*, 551 U.S. 338 (2007).
[4] *Gall v. United States*, 552 U.S. 38 (2007).

corresponds with the 10-year maximum sentence he faces. The guideline level which corresponds with 10 years is level 31, which renders a range of 108 to 135 months. Granting a departure of 3 levels from there results in a level 28, which provides for a range 78 to 97 months' imprisonment.

## III.   ANALYSIS OF § 3553(a) FACTORS

A lengthy discussion of the applicable case law holding that the guidelines are advisory and are not to presumed reasonable is unnecessary. The Court knows the law, and it is *well* established that the Court *must* tailor the sentence to be imposed in line with the factors or considerations set forth in 18 U.S.C. § 3553(a). *See Nelson v. United States*, 555 U.S. 350, 352 (2009); *Rita v. United States,* 551 U.S. 338, 351 (2007); *United States v. Hunt*, 459 F.3d at 1180 1184 (11th Cir. 2016).

Below we discuss the salient § 3553(e) factors as they apply to Mr. Bergmann.

## A.   The Nature and Circumstances of the Offense.

Mr. Bergmann pled guilty to conspiracy to violate the Neutrality Act (count 4), and conspiracy to (1) unlawfully export to Haiti ballistic vests in violation of export laws and regulations, and (2) knowingly submit false export information in connection with the export of the ballistic vests, in violation of 18 U.S.C. § 371 (count 6). While these are serious offenses, and the evidence shows that Mr. Bergmann's c-conspirators participated in assassinating Haitian President Jovenel Moise on July 7, 2021, it is critical to note that Mr. Bergmann was not involved in the assassination. Nor did he plot to assassinate Mr. Moise.

Mr. Bergmann was recruited into a conspiracy to support a public uprising that would, if successful, lead to Mr. Moise's ouster and make defendant Christian Sanon President of Haiti.  Mr. Sanon was a long-time friend of Mr. Bergmann, who has a history of charitable works in Haiti and befriended Sanon, a Haitian doctor and Pastor, who engaged in charitable activities in Haiti and who also had for years held political aspirations. In or about April or May 2021, Mr. Sanon sought Mr. Bergmann's help and introduced him to some of the other defendants, Antonio Intriago, Walter Veintemilla, and Archangel Pretel Perez, who had apparently been communicating and meeting with Mr. Sanon about making him President of Haiti so that they could then profit from government contracts that Sanon would be steer to them. Mr. Bergmann never acted in this matter with a profit motive. Rather, he was helping his friend, Mr. Sanon.

Upon meeting with Mr. Sanon and Messrs. Intriago, Veintemilla and Perez and others, Mr. Bergmann learned that they had hatched a plan to force Mr. Moise out of the presidency. Mr. Sanon and his new associates believed that Mr. Moise had unlawfully stayed in power beyond his term in office and that he had violently crushed dissent to his rule.  Moise was a dictator as far as they were concerned.  Thus, in their minds at least, Moise's illegitimacy created an opportunity or rationale to topple Mr. Moise and for Mr. Sanon to assume the presidency with the support of the public who they believed (or erroneously hoped) would rise-up and run the "dictator" from office. Admittedly, Mr. Bergmann appreciated that the public demonstrations or uprisings that the conspirators were discussing or trying to plan might lead to a

violate clash between the demonstrators and Mr. Moise and his police and security forces.

In supporting Mr. Sanon and his plan to foment demonstrations that would usher him into the presidency, Mr. Bergmann helped Mr. Intriago export or ship 20 ballistic vests to Mr. Sanon in Haiti that were to be used by CTU's security personnel to protect Mr. Sanon Specifically, Mr. Bergmann suggested that they use a shipping company he had before used, he submitted false shipping documents concealing that the vests were ballistic vests, and he paid the roughly $1,000 they were charged to export and ship the vests to Haiti. To be clear, Mr. Intriago's company Counter Terrorist Unit Security (CTU) owned the vests that he was "selling "to Sanon. Intriago packed the vests, and, on June 10, 2021, he personally shipped them off to Mr. Sanon to outfit the security personnel that CTU had provided Mr. Sanon with. Mr. Bergman's role was limited to facilitating the shipment. And when Mr. Bergmann shipped the vests, he did not believe or understand that CTU's personnel would later wear them during a later assassination of President Moise.

Mr. Bergmann also paid $5,000 of hotels bill in Haiti for Mr. Sanon, he sent him $3,200 to pay personal expenses and buy new suits, and, at Mr. Sanon's behest, he paid the $200 airfare for a flight taken by James Solages.

Later, the evidence shows, and the government admits, Perez, Intriago, Veintemilla, and others, who did *not* include Mr. Bergmann, soured on Sanon because he failed to deliver the public demonstrations that he had promised. Hence, they gave up on the idea of any public demonstrations that would force Mr. Moise from office

and sifted their aim to make a former justice of the Haitian Supreme Court president. *See United States v. Ortiz, Intriago, and Veintemilla*, Case No. 23-mj-02256-Reid, Criminal Complaint ECF 3, at 6-7 of 17 (describing that, as the plan evolved, Ortiz, Intriago, and Veintemilla, and others shifted their objective to make a former Haitian Supreme Court Judge president). In doing so the *other* conspirators, many of whom Mr. Bergmann did not know and never met, hatched a new conspiracy to kidnap and or assassinate Mr. Moise, a plan and conspiracy in which Mr. Bergmann was *not* involved.

Further, although Mr. Sanon's security personnel, later turned assassins, wore the subject ballistic vests when attacking Mr. Moise, the vests are not offensive weapons but rather protective gear. Mr. Bergman was not involved in the other conspirators' efforts to arm CTU's personnel with firearms and weapons. *See* Government's Motion to Revoke Magistrate Judge's Release Order, ECF 412, at 16 (Government stating that "*Bergmann was not included in communications involving firearms and weapons*") (emphasis added). To be sure, Mr. Moise's assassination was a violent and terrible crime. And Mr. Bergmann exercised poor judgment and was wrong to commit the crimes to which he pled guilty. Nevertheless, in weighing the facts and circumstances of the offense, it is only fair that the Court not lump Mr. Bergmann in with those who assassinated President Moise.

B.   **History and Circumstances of the Defendant.**

This factor is especially important in this case. As one court eloquently stated with respect to the history and characteristics of the defendant:

> But, surely, if ever a man is to receive credit for the good
> he has done, and his immediate misconduct assessed in the
> context of his overall life hitherto, it should be at the
> moment of his sentencing, when his very future hangs in
> the balance. This elementary principle of weighing the
> good with the bad, which is basic to all the great religions,
> moral philosophies, and systems of justice, was plainly part
> of what Congress had in mind when it directed courts to
> consider, as a necessary sentencing factor, "the history and
> characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.) A reading of Mr. Bergmann's life and history compels that he receives "credit for the good he has done" as put by Judge Rakoff in *Adelson*.

*First*, Mr. Bergmann's selflessness and kindness is extraordinary and weighs heavily in his favor. Having graduated from the University of Florida with honors, becoming a CPA, and then later becoming a business owner, Mr. Bergmann did well. He and his business partner owned and operated a diagnostic imaging business and later a laboratory testing business. *See* McCroskrie Letter and David Bergman Letter. One former employee described him as "100 % the best employer I ever worked with." *See* Letter from Marsha Sloan. Ms. Sloan described him as generous and kind. And she described how he went out of his way to help his employees. Indeed, she expresses anger and sadness because, as she put it, Mr. Bergmann's kindness was taken advantage of. *Id.*

In 2009, Mr. Bergmann and his business partner sold their laboratory business. *See* McCroskrie Letter. After selling his business, Mr. Bergmann then became heavily involved in charitable works in Haiti. *See* McCroskrie Letter

(describing that Mr. Bergmann sought to use his newly acquired financial position and medical knowledge to provide much needed radiology and laboratory services in Haiti and the Dominican Republic). He donated relief supplies to Haiti following the 2010 Earthquake. He paid for doctors and nurses to go to Haiti following the earthquake. Mr. Bergmann deployed the first CT scanner used in Haiti, which was especially helpful in helping Haitian doctors diagnose encephalitis in children. He set up and donated blood testing laboratory in Haiti. He helped build a school in Haiti. He also made similar donations in the Dominican Republic.

A constant and undeniable theme through the letters, written by those who know him best, is Mr. Bergmann's selflessness, kindness, and generosity. His former business partner described how Mr. Bergmann helped him through his depression. *See* McCroskrie Letter. An employee described how he bought an office assistant a car so she could drive to work. *See* Sloan Letter. His brother and father described how he cared for his mentally ill and dying brother Carl, an experience that devastated him and further undermined his mental health.[5] *See* David Bergman Letter and Frederick J. Bergmann Letter. Mr. Bergmann is the primary caretaker of his elderly parents, both of whom face serious and debilitating health conditions, his mother suffering from Alzheimer's Disease. Thanks to Mr. Bergmann, they have been able live together at home during their last years, which is his father's "strong wish." *See* David Bergmann Letter. Mr. Bergmann is also an especially supportive father to his daughter, Carly, who suffers from multiple mental health diagnosis. *See* Carly

---

[5] Mr. Bergmann's brother, Carl Bergmann, died on January 9, 2021.

Bergmann Letter. Mr. Bergmann is a family-man in the best sense of the term. And he made substantial efforts to better the lives of people in Haiti and the Dominican Republic.

It is only fair that the Court does not judge Mr. Bergmann solely based on his worst moments – the conduct in this case- and consider the good and valuable contributions he had made throughout his life and continues to make.

*Second*, in imposing a sentence, the Court should also weigh and consider Bergmann's mental health and medical conditions. Mr. Bergmann's childhood, to say the least, left much to be desired because he was bullied, and his mother suffers from paranoid schizrenia. PSI at ¶¶ 122 and 124. The son a of a military father, Mr. Bergmann's moved frequently when he was a child, making it hard for him to make friends and have a sense of stability. PSI at ¶ 124. Because of his small stature, he was bullied. *Id.* And had few friends. *Id.* During Mr. Bergmann's childhood, Mr. Bergmann's mother was institutionalized because of her severe mental illness. PSI at ¶ 122. *See also* Frederick J. Bergmann Letter (Mr. Bergmann's father describes that his wife was institutionalized on and off for 5 years when his son, the defendant, was between 4-9 years of age). Sadly, she physically abused Mr. Bergmann and his brothers, often beating them with a large wooden spoon. PSI at ¶ 124. The Military deployed Mr. Bergmann's father to Vietnam, which added to the instability of Mr. Bergmann's childhood. *See* Frederick J. Bergmann Letter. As Mr. Bergmann put it, he had a horrible childhood. *Id*.

Unfortunately, both Mr. Bergmann and one of his brothers, Carl, inherited mental illness which is common in their family.   PSI at ¶ 123; Letter of David Bergmann (defendant's brother stating that his family's curse is mental illness and providing diagram showing family history of mental illness). For years, Mr. Bergmann's mental health has not been well. ████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████ ███████████████

██████████████████████████████████████

████ ██ ████ ███ ███████ ███████ ██ ███ █ ████

██████████████████████████████████████

██████████████████████████████████████

███████████████

████████████████████████████████████

██████████████████████████████████████

█████████████████████████

███████████████████████████████████
████████████████ ██████████ █████ ████████ █████

_____

█ ████████████████████████████████████
██████████████████████████████████████
██████████████████████
██████████████████████████████████
████████████████████████████████████████
█████████████



While Mr. Bergmann is no doubt guilty of the offenses to which he pled guilty, his mental health and alcohol abuse played a role in his poor judgment and misconduct, something which the § 3553(a) factors require that the Court weigh and consider. A friend and therapist, Dr. Harriet Raiano, opines that Mr. Bergmann is a brilliant man; however, he is childlike, naïve and too trusting." Harriet Raitano, DCH, PhD, Letter.  Consequently, according to Dr. Raitano, Mr. Bergmann "has been conned out of most of his money." *Id.* Mr. Bergmann's brother, in his letter to the Court, described in painful detail the extent of mental health disease throughout his family and how mental illness impacted his brother. He also wrote:

> Unlike our mother and brother, Fred's mental health issues appeared later in his life, but they hit him hard, completely altering his outlook and behavior. Beginning about 15 years ago mental illness and related bouts with alcohol abuse slowly robbed him of good judgement, and the ability to organize and reason. Suddenly, my strong, successful and generous brother became easy to manipulate. He started making shockingly bad decisions. I barely recognize the Fred of today, but I truly admire him for his valiant fight against his mental illness.

David Bergmann Letter.

Mr. Bergmann's close friend of nearly 45 years and former business partner, John H. McCoskrie, also wrote to the Court about Mr. Bergmann. He also painfully details how Mr. Bergmann slid from successful businessman to humiliation, demoralization and of the "steep spiral" of Mr. Bergmann's mental health. *See* John H. McCroskrie Letter.  He pointedly appeals to the Court:

> I am asking the Court to consider that good men can be influenced to do stupid things by others taking advantage of good intentions.  I am also asking the Court to consider the degenerating effects of business failures, shady influencers,

mental illness and related alcohol abuse as they relate to poor decision making. I want to help my friend recover from his ways and support him in his steps to full recovery. Because of the assassination, Fred is a broken man, a shell of what he used to be, but with the Court's consideration I know that a better husband, father, and man will regain his place in our society for the remainder of his life.

*Id.*

Mr. Bergmann also suffers excruciating pain, stemming from vertebrae fractures in 2019 from which he has never recovered. PSI at ¶ 131.



Mr. Bergmann's need for mental health and medical treatment mitigates in favor of a less severe sentence than 10 years imprisonment. Indeed, 18 U.S.C. § 3553(a)(2)(D) specifically requires sentencing courts to consider the need for the sentence imposed to "to provide the defendant with needed... medical care... in the *most* effective manner. Unfortunately, the BOP cannot be trusted to provide Mr. Bergmann, and inmates, with appropriate medical care. Its history of insufficient and substandard care is well documented and well known. According to the Justice

Department's Office of Inspector General back in 2016, staff shortages and poor training undermine the prison systems' ability to care for inmates, especially aging inmates who are more costly to incarcerate because of their medical needs. *See* Office of the Inspector General, U.S. Department of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015).   More recently, NPR investigated the BOP's medical care and inmate deaths, detailing numerous examples of systematic substandard medical care. Meg Anderson, *1 and 4 Inmate Deaths Happens in the Federal Prison. Why?*, NPR (Sept. 23, 2023, 6:00 a.m.), https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates. Indeed, NPR even found the BOP's Federal Medical Centers had lost its Joint Commission accreditation. *Id*. In short, BOP will not provide Mr. Bergmann with adequate and effective mental health and medical treatment, exposing him to unnecessary pain and cruelty. *See United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (affirming sentence of probation for defendant guilty of possession of child pornography who faced guideline sentence of 27-33 months because of the defendant's need to continue medical treatment with his psychologist); *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (relying on both U.S.S.G. § 5H1.4 and *Booker* authority to uphold sentence of probation upon drug trafficking defendant where the guideline were 60 months of imprisonment and the defendant had undergone multiple heart surgeries, received graft bypass surgery in his leg, and he suffered from severe coronary artery disease and other serious medical conditions); *United States v. Springer*, 416 F.3d 708 (8th Cir. 2005) (reversing and remanding sentence

because section 3553(a)(2)(D) required that the district court consider the need to provide medical care in the most effective manner; defendant suffered from high blood pressure that caused kidney failure and he required dialysis and surgery); *United States v. Dweck*, 09-21018-Cr-Jordan (imposing a sentence of 24 months upon a 75 year old doctor guilty of health care fraud who faced a guideline range of 70 to 87 months because of his serious physical and medical conditions which required the defendant to receive regular medical treatment and take several medications).

C.   **The Need to Promote Respect for the Law and Deterrence**.

These factors are intertwined and revolve around the message a sentence sends to the defendant and would-be-offenders to dissuade them from committing similar offenses. There are two kinds of deterrence, specific deterrence, and general deterrence.

As for specific deterrence, Mr. Bergmann, who is 65 years old, does not present any risk of engaging in any criminal conduct like that here ever again.   He is a father and a husband, with substantial familial responsibilities, and his background indicates that he would not recidivate, much less committing an offense which resembles the offense conduct underlying his guilty plea.   Mr. Bergmann's background and extremely low likelihood of recidivating may justify a downward variance or departure. In *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007), the Eleventh Circuit affirmed a sentence of 60 months based on the district court's view that the defendant was unlikely to reoffend, even though the defendant's guideline range was 188-235 months. The Eleventh Circuit stressed that a sentencing court is

"require[d] . . . to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *Id.* at 745. *See also, United States v. Chase*, 828, 831 (8th Cir. 2009) (finding that lack of criminal history can be considered as a basis for downward variance even though it is considered in calculating the guideline range); *United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Urbina*, 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"). *United States v. Ruiz*, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."); *United States v. Olis*, 03 Cr. 217 (SL), 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

A sentence of 10 years imprisonment is simply unnecessary to deter Mr. Bergmann from future criminal behavior. In fashioning an *individualized* sentence, the fact that Bergmann is highly unlikely to recidivate favors leniency.

General deterrence is a more difficult factor to weigh and measure. However, in assessing how severe a sentence the Court should impose upon Mr. Bergmann to send a deterrent message to others like him, the Court should consider the fact that that it is the certainty of being caught and punished rather than the length of a sentence which best serves to deter potential offenders. Studies have shown that increasing the severity of a person's sentence does little to deter future crime. U.S. Dept. of Justice, Nat'l Inst. Of Justice, *Five Things About Deterrence* (May 2016) (citing Daniel S. Nagin, *Deterrence in the Twenty-First Century, Crime and Justice: A Review of Research*, vol. 43 (2013)). Further, lengthy prison sentences are actually *less* likely to reduce the likelihood of recidivism. *See* Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity in Punishment* 7 (2010) (finding that "[a]mong low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences"). Instead, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science Panels…. reached that conclusion, as have every major survey of the evidence."); Zvi D. Gabbay, *Exploring the Limits of the Restorative*

*Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Here, it is worth noting that we are dealing with especially unique and out of the ordinary offense conduct. Although count 6, which relates to export violations, may not be unusual, the export violations are at the heart of Mr. Bergmann's conduct in the conspiracy to violate the Neutrality Act (count 4). It is not like there is an epidemic of similar Neutrality Act conspiracies with potential offenders that requires the Court to impart a message of general deterrence to them. Indeed, there are few, if any, cases like this one.

Further, although sending a deterrent message is important, the Court should avoid over-emphasizing general deterrence. *See United States v. Gardellini,* 545 F.3d 1089, 1095 (D.C. Cir. 2008) (rejecting government's contention that affirming a probationary sentence imposed in criminal tax case would lessen deterrent value of criminal law "because it elevates one § 3553(a) factor - deterrence - above all others. As § 3553(a) makes clear, the district court at sentencing must consider and balance a number of factors- not all of which will point in the same direction."). The Court can send an effective deterrent message with a sentence of less than 10 years, especially when considering that the Court has sentenced *all* the defendants, who the government charged with, or participated in, the assassination of Mr. Moise and who have pled guilty, to life in prison. No one will

get the impression that somehow the Court went soft or easy in sentencing defendants for the crimes committed in this case.

**D.     A Sentence of 10 Years is Harsher than Necessary to Meet the Goals of § 3553(a).**

In sum, a review of the salient § 3553(a) factors teaches that 10 years of imprisonment is simply too harsh a sentence to impose on Mr. Bergmann.  He is 65 years old.  He suffers from debilitating back pain because of fractured vertebra. He suffers from multiple mental health conditions that require extensive treatment and medications.  The BOP, which is known to provide substandard medical care, is not equipped to effectively treat Mr. Bergmann. Mr. Bergmann is the primary caretaker of his elderly ill parents. He plays a critical role in caring for and guiding his daughter who has multiple mental health issues.  And his limited role and offense conduct in this matter does not weigh against leniency for Mr. Bergmann.  Lenity, in other words, is appropriate in Mr. Bergmann's case.

It has long been understood that § 3553 (a)'s admonition that a sentence should not be greater than necessary to meet the goals of the statute means that mercy should be a worthy and serious consideration when sentencing a person:

> Mercy is seldom included on the list of "traditional" rationales for sentencing. It is, however, evinced by the federal sentencing statute, 18 U.S.C. §3553(a), which provides, as noted above, that the lowest possible penalty consistent with the goals of sentencing be imposed…….
>
> The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route.

*United States v. Blarek*, 7 F. Supp. 2d 192, 211 (E.D.N.Y. 1998) (Weinstein, J.).

## IV.   REQUEST   FOR   VOLUNTARY   SURRENDER   TO   AND RECOMMENDATION FOR DESIGNATION AT BUTNER, NC.

Although the Court does usually permit defendants to delay their surrender following sentencing, Mr. Bergmann's situation is unique and weighs heavily in favor of making an exception for him. It is well documented that Mr. Bergmann suffers from significant mental health and physical conditions which require medical care and treatment. It would be counter-productive to both Mr. Bergmann's imprisonment and medical care for the Court to remand Mr. Bergmann at sentencing to FDC- Miami where the mental health treatment and medical care is notoriously substandard. Hence, the Court should (1) recommend that the BOP designate Mr. Bergmann to serve his sentence at the Federal Medical Center in Butner, North Carolina and (2) delay Mr. Bergmann's surrender 90 days to permit him to surrender at Butner after the BOP designates him.  Mr. Bergmann does not present any risk of flight. The government has no objection to the instant request.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on May 13, 2024, a true and correct copy of the

foregoing has been furnished electronically via CMCEF to all counsel of record.

Respectfully submitted,

**BELL ROSQUETE REYES ESTEBAN, PLLC**
Henry P. Bell
999 Ponce De Leon Blvd.
Suite 810
Coral Gables, Florida 33134
Telephone:   (305) 570-1610
Facsimile:   (305) 570-1599
Email:       hbell@bresq.com
***Counsel for Frederick Bergmann, Jr.***

By:   <u>*S/ Henry P. Bell*</u>
      Henry P. Bell
      Fla. Bar No. 0090689