UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
    Plaintiff,
v.
                                                      CASE NO.: 22-20104-CR-MARTINEZ/BECERRA

ANTONIO INTRIGIAGO, et al,
    Defendants.
_____/

**DEFENDANT, ANTONIO INTRIAGO'S CORRECTED MOTION TO DISMISS FIFTH SUPERSEDING INDICTMENT**

COMES NOW, the Defendant, Antonio Intriago ("Intriago") by and through the undersigned counsel, and pursuant to Rule 12(b), Federal Rules of Criminal Procedure hereby moves for dismissal of the Fifth Superseding Indictment (the "Indictment") as to Counts VII, VIII, and IX, on the grounds set forth more fully below, and in support states as follows:

BACKGROUND

1. On June 20, 2023, Intriago indicated under a multi-count Indictment, alleging:

    a. Conspiracy to Provide Material Support and Resources to Carry out a Violation of Section 956(a)(1), Resulting in Death, in violation of 18 U.S.C. § 2339A(a) [Count I];

    b. Providing Material Support and Resources to Carry out a Violation Resulting in Death, in violation of 18 U.S.C. § 2339A(a) [Count II];

    c. Conspiracy to Kill and Kidnap a Person Outside the United States in violation of 18 U.S.C. § 956(a)(1) [Count III];

    d. Conspiracy to commit Offenses Against the United States, in violation of 18 U.S.C. § 371 [Count IV];

    e. Expedition Against Friendly Nation, in violation of 18 U.S.C. § 960 [Count V]; and

1

    f.   Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371 [Count VI];

    g.   Exportation of Goods in Violation of the Export Control Reform Act, in violation of 50 U.S.C. § 4819 [Count VII];

    h.   Smuggling Goods from the United States, in violation of 18 U.S.C. § 554 [Count VIII]; and

    i.   Submitting False or Misleading Export Information, in violation of 13 U.S.C. § 305 [Count IX].

2. Substantively, it is alleged that between February and July of 2021, Intriago (among other named co-defendants) provided resources as part of a conspiracy to assassinate then-president Jovenel Moise.

3. Intriago specifically is alleged to have participated in the provision of tactical vests. More specifically, the Government claims that on May 21, 2021, Intriago transported a small number of tactical vests on his person, on a private flight from Florida to Haiti several weeks before the date of assassination.

4. Thereafter, weeks later, on June 8, 2021, it is alleged that Intriago participated in arranging a *shipment* of ballistic vests from Florida to Haiti. These tactical vests were then apparently shipped by co-Defendant Bergman, after Intriago delivered the vests in Miami, from Florida to Haiti, on June 10, 2021. Bergman shipped the vests from Haiti to Florida.

5. It is notable that other named co-defendants apparently "falsely described" the vests as "medical x-ray vests" on applicable shipping documentation. However, there are no allegations that Intriago was responsible for the completion of these forms.

6. Although the vests are undeniably capable of classification as "body armor" they are ranked as "Ballistic Protection NIJ 0101.06 **Level IIIA**."

7. The National Institute of Justice ("NIJ") indicates that this classification is tested to "stop .357 SIG and .44 Magnum ammunition fired from longer-barreled handguns" but does not provide "rifle ammunition protection." *See* UNDERSTANDING NIJ STANDARDS 0101.06 ARMOR PROTECTIVE LEVELS, https://cjtec.org/files/5fac30b37ad3a (last visited Aug. 21, 2024).

8. Higher levels of protective gear such as Level III and IV are tested to stop steel core armor piercing rifle ammunition. *Id.* The NIJ further notes that this level is not designed for "military use", which would best be protected against utilizing Level IV armor. *Id.* ("Level IV plate is the best choice for protection among the armors on the Ballistic Amor Compliant Product List (CPL).").

9. Likewise, and in addition to the fact that the body armor is not effective to defend against military grade weapons, per the NIJ's own guidelines, there is nothing novel or particularly advanced regarding the NIJ 0101.06, Level IIIA body armor that was shipped in this case.

SUMMARY OF THE ARGUMENT

10. In June of 2024, the United States Supreme Court overruled the *Chevron* doctrine, which previously required courts to give absolute deference to the regulations of an administrative agency. In doing so, the Supreme Court held that a court applying a statute must "exercise independent judgment" and may not defer to the agency's interpretation thereof.

11. Given this directive, Intriago submits that reviewing Title 50 of the United States Code, and the allegations in Counts VII, VIII, and IX, his conduct of exporting low-level, non-extraordinary body armor vests, which would not afford protection against military grade

weapons under the NIJ's own standards, does not violate the statute. As such, the Indictment must be dismissed as to these counts.

12. Alternatively, Intriago submits that the statutory scheme upon which the charges in Counts VII, VIII, and IX are based is unconstitutionally vague because applying the complex structure of CFR provisions, NIJ standards, and attempting to rationalize them both together does not put a person of ordinary intelligence on notice of what conduct is prohibited.

MEMORANDUM OF LAW

I.     LEGAL STANDARD

"A motion to dismiss an indictment is governed by Fed. R. crim. P. 12(b)." *See United States v. Mendez*, 2022 U.S. Dist. LEXIS 73326 (S.D. Fla. Apr. 21, 2022). "A defendant may challenge an indictment [under that rule] on various grounds, including failure to state an offense." *Id.* "When considering a motion to dismiss an indictment, [the] court must take the allegations set forth in the indictment as true and viewed in the light most favorable to the Government." *See United States v. Zayas*, 2023 U.S. Dist. LEXIS 139307 (S.D. Fla. Aug. 9, 2023). *See also United States v. Estupinan*, 2023 U.S. Dist. LEXIS 47475 (S.D. Fla. Mar. 9, 2023) ("The sufficiency of a criminal indictment is determined from its face, and the allegations therein are assumed to be true and are viewed in the light most favorable to the government.").

II.    INTRIAGO'S CONDUCT DOES NOT VIOLATE 50 U.S.C. § 4819 OR OTHER APPLICABLE STATUTES UNDER *RAIMONDO*.

In 1984, the United States Supreme Court decided *Chevron U.S.A., Inc. v. NRDC, Inc.*, and announced the rule which required the judiciary to give deference to "an executive department's construction of a statutory scheme it is entrusted to administer" unless the relations are "arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. 837, 843-44 (1984). This rule, however,

4

was quashed by the Supreme Court in its decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). In overruling the so-called *Chevron* doctrine, the Supreme Court emphasized an "unremarkable, yet elemental proposition [which is codified by the APA] [and] reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.* at 2261.

Per the *Raimondo* Court, it rationally followed that "agency interpretations of statutes – like agency interpretations of the Constitution – are *not* entitled to deference. [Instead], it remains the responsibility of the Court to decide whether the law means what the agency says." *See Raimondo*, 144 S. Ct at 2262 (emphasis added). While courts may "seek aid from the interpretation of those responsible for implementing particular statues" they must nevertheless "exercise independent judgment in determining the meaning of statutory provisions." *Id.* When a statute expressly delegates authority to an agency, the court must "fix the boundaries of the delegated authority and ensur[e] the agency has engaged in reasoned decision-making within those boundaries." *Id.* at 2263.

Ultimately, the fatal flaw to the *Chevron* doctrine is its insistence that "courts mechanically afford *binding* deference to agency interpretations, including those that have been inconsistent over time." *Raimondo*, 144 S. Ct. at 2265. Given its flaws, the Court stated emphatically "*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 2273. In doing so, the court may give "careful attention" to the judgment of an agency, and if a "statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation while ensuring that the agency acts within it." *Raimondo*, 144 S. Ct at 2273. However, "courts need not and under the

5

APA <u>may not</u> defer to an agency interpretation of the law simply because a statute is ambiguous" or silent as to a particular topic. *Id.* (emphasis added).

As applied here, Intriago has been charged with violations stemming from his exportation of certain tactical vests from Miami to Haiti in violation of 50 U.S.C. § 4819, in Count VII. That statute provides that no person can solicit, aid, or abet conduct that violates "this subchapter." *See* 50 U.S.C. § 4819(a)(2) (2023). Such a prohibition includes ordering, buying, removing, concealing, storing, using, selling, loaning, disposing of, transporting, financing, or negotiating to export an item that is "otherwise subject to the Exportation Administration Regulations" (the "EAR") with knowledge that their action will violate, or is intended to violate the same. *Id.* at (2)(E). The EAR[1] are defined as regulations "promulgated, maintained, and amended under the authority of the International Emergency Economic Powers Act" codified in Subchapter C of Chapter VII of title 15, Code of Federal Regulations. *See* 50 U.S.C. § 4801(4) (2023).[2]

In considering the scope and applicability of the above-quoted provision, this Court must strongly weigh the stated purpose of the statutory scheme, which is set forth in 50 U.S.C. § 4811 and which provides, in full, as follows:

> The following is the policy of the United States: (1) To use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary— (A) to restrict the export of items which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States; and (B) to restrict the export of items if necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations. (2) The national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled for the

---
[1] The Export Administration regulations are set forth and defined in 15 CFR § 30.16 (2023).
[2] The "Code of Federal Regulations" ("CFR") is agency created and would come within the range of administrative interpretation no longer subject to deference after *Raimondo*. *See e.g., EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984) (recognizing that the CFR are "regulations promulgated" by agencies of the United States).

6

following purposes: (A) To control the release of items for use in— (f) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure. (B) To preserve the qualitative military superiority of the United States. (C) To strengthen the United States defense industrial base. (D) To carry out the foreign policy of the United States, including the protection of human rights and the promotion of democracy. (E) To carry out obligations and commitments under international agreements and arrangements, including multilateral export control regimes. (F) To facilitate military interoperability between the United States and its North Atlantic Treaty Organization (NATO) and other close allies. (G) To ensure national security controls are tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States. (3) The national security of the United States requires that the United States maintain its leadership in the science, technology, engineering, and manufacturing sectors, including foundational technology that is essential to innovation. Such leadership requires that United States persons are competitive in global markets. The impact of the implementation of this subchapter on such leadership and competitiveness must be evaluated on an ongoing basis and applied in imposing controls under sections 4812 and 4813 of this title to avoid negatively affecting such leadership. (4) The national security and foreign policy of the United States require that the United States participate in multilateral organizations and agreements regarding export controls on items that are consistent with the policy of the United States and take all the necessary steps to secure the adoption and consistent enforcement, by the governments of such countries, of export controls on items that are consistent with such policy. (5) Export controls should be coordinated with the multilateral export control regimes. Export controls that are multilateral are most effective and should be tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States and its allies. (6) Export controls applied unilaterally to items widely available from foreign sources generally are less effective in preventing end-users from acquiring those items. Application of unilateral export controls should be limited for purposes of protecting specific United States national security and foreign policy interests. (7) The effective administration of export controls requires a clear understanding both inside and outside the United States Government of which items are controlled and an efficient process should be created to regularly update the controls, such as by adding or removing such items. (8) The export control system must ensure that it is transparent, predictable, and timely, has the flexibility to be adapted to address new threats in the future, and allows seamless access to and sharing of export control information among all relevant United States national security and foreign policy agencies. (9) Implementation and enforcement of United States export controls require robust capabilities in monitoring, intelligence, and investigation, appropriate penalties for violations, and the ability to swiftly interdict unapproved

transfers. (10) Export controls complement and are a critical element of the national security policies underlying the laws and regulations governing foreign direct investment in the United States, including controlling the transfer of critical technologies to certain foreign persons. Thus, the President, in coordination with the Secretary, the Secretary of Defense, the Secretary of State, the Secretary of Energy, and the heads of other Federal agencies, as appropriate, should have a regular and robust process to identify the emerging and other types of critical technologies of concern and regulate their release to foreign persons as warranted regardless of the nature of the underlying transaction. Such identification efforts should draw upon the resources and expertise of all relevant parts of the United States Government, industry, and academia. These efforts should be in addition to traditional efforts to modernize and update the lists of controlled items under the multilateral export control regimes. (11) The authority under this subchapter may be exercised only in furtherance of all of the objectives set forth in paragraphs (1) through (10).

*See* 50 U.S.C. § 4811 (2023).

The statute itself, then, limits the authority to "use export controls" (a) "only after full consideration on the economy of the United States" and then only to the extent <u>necessary</u> to: (b) restrict export of items that would "make significant contributions to the military potential of any other country" or (c) "if necessary to further significantly the foreign policy of the United States." *Id.* at (1). This directive from Congress forms the breadth of the <u>scope</u> of administrative <u>power</u> to form regulations, and guidelines to carry out the purpose of the act.

In the Indictment, the Government cites several CFR provisions, including 15 CFR §§ 764.2; 30.2; 758.1 and 13 CFR § 30.71, which Intriago purportedly violated to support its allegations in Counts VII, VIII, and IX. The first such provision, 15 CFR § 764.2 prohibits "engaging in prohibited conduct" or aiding, and abetting, attempting, or conspiring to engage in transactions that are "subject to EAR", among other things. *See* 15 CFR § 764.2(a)-(d). To define "subject to the EAR" the reader is directed to 15 CFR § 734.3, which defines items that are "subject to the EAR", as: "[all] items in the United States . . . or moving in transit through the United States from one foreign country to another; (2) all U.S. origin items wherever located" in quantities exceeding

a "de minimis level" as defined in other provisions of 15 CFR §§ 734.4(a), (c) and (d). *See* 15 CFR § 734.3 (2023).

The same section defining "subject to EAR" also directs the reader to review the Commerce Control List (CCL) to determine "whether an item or activity is subject to EAR." *See* 15 CFR § 734.2(a)(1) (2023).³ The Commerce Control List has an index which is 79 pages in length. *See* ALPHABETICAL INDEX TO THE COMMERCE CONTROL LIST https://www.bis.doc.gov/index.php/documents/regulations-docs/13-commerce-control-list-index/file (last visited Aug. 15, 2024). The CCL includes "Bulletproof and bullet resistant vests" under ECCN Citation 1A005. *Id.*⁴ The ECCN Citation 1A0005 contains several "notes" the first of which indicates: "Soft body armor not manufactured to military standards or specifications must provide ballistic protection equal to or less than NIJ level III (NIJ 0101.07 July 2008) to be controlled under 1A005.a." The "NIJ Standard 0101.07 [which ECCN directs the reader to review] is divided into fourteen sections and eight appendices." *See* NATIONAL INSTITUTE OF JUSTICE STANDARD BODY ARMOR, https://www.ojp.gov/pdffiles1/nij/307346.pdf (last visited Aug. 15, 2024).

These provisions taken collectively make it extremely difficult to reasonably ascertain whether (even assuming deference to the EAR categories) the vests at issue are even subject to control in

---

³ In fact, determining whether an item is "subject to EAR" is so complex that a person may ask "BIS for an advisory opinion or commodity classification determination". *See* 15 CFR § 734.6 (2023).
⁴ As noted in Section III, *infra*, body armor is also subject to classification under ECCN 1A613.d.1. depending on whether it is classified as "military grade" and of a particular "Type" under the NIJ. It is not clear whether the body armor here, classified as Type IIIA by the NIJ standard would be subject to 1A005 or 1A613.d.1 because the ECCN does not account for the subtype "A" while the NIJ standards make such a distinction as to both Type II and Type III body armor class types.

9

the first instant.[5] Assuming for argument's sake that they are: The final provision at issue, 15 CFR § 758.1 provides that an Electronic Export Information ("EEI") is required for all items "subject to the EAR" which are exported. *See* 15 CFR § 758.1 (2023). Ultimately, each of the above CFR provisions turns on whether a particular item is "subject to EAR", which requires following a chain of convoluted definitions, subparts, regulations, and non-regulatory standards. Under *Raimondo*, this Court is not required to defer to any of the regulatory scheme set forth in the CFR and must simply interpret Title 50 of the United States Code and apply it by its plain terms.

As noted previously, 50 U.S.C. § 4811 specifically provides that "export controls" should be used only "after full consideration of the impact on the economy" and the only to the "extent necessary" to restrict export of items "which would make a significant contribution to the military potential of any other country"; or to restrict "to further significantly the foreign policy of the United States." *See* 50 U.S.C. § 4811(1) (2023). The conduct at issue here involves exportation of exceedingly *low level* tactical gear, which would not make a "significant contribution" to the "military potential" of another country. One wonder what, if any, contribution these vests made to the "military potential" of Haiti? Accordingly, the vest at issue should not be subject to export controls under Title 50. If the items are not subject to such regulations, then there can be no violation of 50 U.S.C. § 4819 as a matter of law.

Assuming *arguendo* that Title 50 specifically furnishes the authority to promulgate regulations, through 50 U.S.C. § 4820, this Court need not apply or defer the CFR regulations if they (a) exceed the scope of authority delegated by Congress; and/or (b) are not based on "reasonable decision-making". *See Raimondo*, 144 S. Ct. at 2263. As to the first prong set forth above, Intriago submits

---

[5] Again, as explained in Section III, *infra*, body armor may be classified under the USML depending on its NIJ classification which case it is specifically not subject to EAR.

that the scheme set forth in Title 15 is so extraordinarily broad, complex, arbitrary, and all-encompassing that it exceeds the scope of authority afforded by Congress. As stated above, the regulations under Title 50 are expressly required to strike a balance between free trade and economy and the danger of increasing the military capacity of other countries. None of the above factors apply here.

As stated above, the low-level and run-of-the mill gear exported in this case does not place any danger on increase on the potential military capacity of sister nations. In fact, there is nothing special about the technology of the vests, and it has low capacity to protect against violence as only being adequate for protection against handgun caliber weapons.[6] Furthermore, the USDJ description of the vests at issue indicates that they are not capable of withstanding "military grade" projectiles. *See* n. 4, *supra*. While the ultimate *use* of the tactical vests in this case had undoubted political implications, those were unknown to Intriago when the vests shipped, and were not apparent on, or implicit in, the vests themselves. By crafting a CFR scheme that is so broad to include an index that is almost eighty pages in length and encompasses all items "moving in transit through the United States" the agency has far exceeded its authority, assuming such authority is implicit in 50 U.S.C. § 4820.

Furthermore, the classification of items subject to EAR appears to be wholly arbitrary in nature and cannot be deemed the product of reasonable decision-making. The items included in the CCL

---

[6] The United States Department of Justice ("USDJ") published its NIJ Standards for NIJ Standard 0101.06 I July of 2008 (the "Standards"). *See* BALLISTIC RESISTANCE OF BODY ARMOR NIJ STANDARD – 0101.06 https://www.ojp.gov/pdffiles1/nij/223054.pdf (last visited Aug. 21, 2024). The Standards indicate that Type IIIA armor (like the armor sold here) can withstand .44 Magnum bullets with certain mass and velocity. *Id.* This contrasts with more sophisticated armor, such as Type III (which can withstand rife or "steel jacketed bullets" up to United States military designation M80) and Type IV which can withstand an armor piercing rifle of United States miliary designation M2 AP. *Id.*

range from arsenic [1C350.b.1], bacteria [1C351.c]; and biocontainment chambers [2B352.g.2] to explosives [1C239] and firearms (except shotguns) [0A501], to body armor [1A005.1] and fireworks [1C608.j]. 15 CFR 783.2 explains the "structure" of the CCL but does not necessarily indicate how the determination is made to place an item on such a list. *See* 15 CFR § 738.2 (2023). The long and short is that the agency has far exceeded its authority and crafted regulations which are not based on reasonable decision-making, assuming that their authority is expressly delegated.

Regardless, under *Raimondo* this court is directed to apply its own judgment and legal experience in interpreting and applying 15 U.S.C. § 4819,[7] with which Intriago has allegedly violated. In doing so, the court must consider whether the items "exported" in this case are capable of being subjected to export controls, given the stated purposes set forth in 50 U.S.C. § 4811. Reviewing the purposes set forth in 50 U.S.C. § 4811 and the specific conduct at issue here – the exportation of low-level bullet proof vests – there is only one conclusion that can be reached. The vests at issue are not "subject to export controls" and accordingly their exportation cannot be deemed a violation of the applicable statutory scheme, as a matter of law.

III. EACH OF THE QUOTED STATUTES ARE UNCONSTITUTIONALLY VAGUE

Finally, Intriago submits that even assuming his conduct in this case violated 50 U.S.C. § 4819, 18 U.S.C. § 554, or 13 U.S.C. § 305 substantively, each of these statutes is unconstitutionally vague, given the convoluted classification scheme set forth by the CFR. "A criminal statute is

---

[7] These same propositions are true with respect to Counts VIII and IX which charge Intriago with violations of 13 U.S.C. § 305 and 18 U.S.C. § 554 respectively. The first of these provisions criminalizes the failure to file or knowingly false filing of a document through the AES. *See* 13 U.S.C. § 305(a)(1) (2023). The AES 'guidelines' are found in the CFR in 15 CFR part 30. Likewise, 18 U.S.C. § 554(a) prohibits fraudulently exporting or sending merchandise "contrary to any law or regulation of the United States." *See* 18 U.S.C. § 554(a) (2023). The "regulations" which would be applicable here are those found in 15 U.S.C. § 4819, which in turn relies on the additional 'guidelines' set forth in the applicable CFR cited herein.

unconstitutionally vague when it fails to provide a person or ordinary intelligence fair warning or authorizes arbitrary and discriminatory enforcement." *See United States v. Atkinson*, 532 Fed. Appx. 873 (11th Cir. 2013). Stated differently, "[an] ordinary person with common sense should be able to comprehend and comply with a statute that is not unconstitutionally vague." *See Wacko's Too, Inc. v. Cty of Jacksonville*, 522 F. Supp. 3d 1132 (M.D. Fla. Mar. 1, 2021).

Outside the context of first amendment claims, "the statute in question is generally analyzed on an as-applied basis." *See Islam v. Sec'y, Dept. of Homeland Sec.*, 997 F. 3d 1333 (11th Cir. 2021). "[As]-applied challenges address whether a statute or policy is unconstitutional on the facts of a particular case or to a particular party." *See Culver v. Withers*, 2022 U.S. App. LEXIS 20738 (11th Cir. Jul. 27, 2022). Here, each of the above-quoted statutes require a reference to the CCL, described in Section II, *supra*. As noted previously, items that are "subject to the EAR" are those listed on the Commerce Control List. *See* 15 CFR § 734.3(c) (2023). The CCL itself explains that if an item is described in the United States Munitions List ("USML") there is "no need to review the CCL with respect to whether it describes the item." *See* Commerce Control List, https://www.bis.doc.gov/index.php/documents/regulations-docs/2345-774-2/file (last visited Aug. 26, 2024). This is the first hurdle with respect to body armor, and determining whether it is subject to EAR, and if so, which ECCN classification may be applicable.

More specifically, in reviewing the USML "personal protective equipment" ("PPE") is indicated in Category X. *See* 22 CFR 121.1, Category X (2023). The USML provision for PPE includes "body armor providing a protection level equal to or greater than NIJ Type IV." *See* 22 CFR § 121.1 (2023). The 'note' to this provision indicates that "body armor providing a level of protection of Type I, Type II, Type IIA, Type IIIA, or Type III" are accounted for in ECCNs 1A005 and 1A613. *Id.* While the CFR recognizes that NIJ classifications have subparts (i.e., IIA and IIIA)

13

the ECCN to which is cites does not make such a distinction or otherwise contain the same distinction. Turning to the ECCN 1A005 provision, such provides that:

> (1) Bulletproof and bullet resistant vests (body armor) providing NIJ Type IV protection or greater are 'subject to the ITAR'. (2) Soft body armor and protective garments manufactured to military standards or specifications that provide protection equal to or less than NIJ Level III or 'equivalent standards' are classified under ECCN 1A613.d.1. (3) Hard armor plates providing NIJ level III or equivalent standard ballistic protection are classified under ECCN 1A613.d.2. (4) Police helmets and shields are classified under ECCN 0A979. (5) Other personal protective equipment specifically designed for military applications not controlled by the USML or elsewhere in the CCL is classified as ECCN 1A613.e. (6) for "fibrous or filamentary materials used in the manufacturer of body armor, see ECCN 1C010.

*See* EXPORT ADMINISTRATION REGULATIONS, https://www.federalregister.gov/documents/2021/03/29/2021-05481/export-administration-regulations-implementation-of-wassenaar-arrangement-2019-plenary-decisions (last visited Aug. 26, 2024). *See also* COMMERCE CONTROL LIST, CATEGORY 1, https://www.bis.doc.gov/index.php/documents/federal-register-notices-1/3315-ccl1-11/file (last visited Aug. 26, 2024).

*See* Notably, however, ECCN 1A005 provides in the "licensing requirement notes" that: "Soft body armor not manufacturer to military standards or specifications must provide ballistics protection less than NIJ Level III (NIJ 0101.06 July 2008) to be controlled under 1A005.a." *Id.* ECCN 1A005.a applies to "soft body armor not manufacturer to military standards or specifications, or to their equivalents, and 'specifically designed' 'components' therefor." *Id.* As to ECCN 1A613.e, which is cited in ECCN 1A005, this provision provides that several types of body armor are subject to the CCL including: body armor that is "d.1." "soft body armor and protective garments manufactured to military standards . . . that provide ballistic protection equal to or less

14

than NIJ level III" or equivalent standards; and "d.2" "hard body armor plates that provide ballistic protection equal to NIJ Level III or equivalent standards. *Id*.

All these definitions rely on a classification by the NIJ, which directs the reader necessarily to consider the NIJ and locate these additional rules and regulations in determining whether the "body armor" at issue is subject to EAR. NIJ Standard 0101.06 is applicable to body armor, and this standard is contained in a nearly ninety-page handbook. The "classifications" of vests in NIJ 0101.06 indicates that as to Type III and IV, there are "military designations" that are protected against; however, as to Type IIIA (the type at issue here) there is no military grade protection. Again, the ECCN does not distinguish between any particular "Type" of body armor (i.e., I, II, III, or IV) and its corresponding subtype "A", although the NIJ does make such a distinction. *See* NIJ STANDARDS, https://ojp.gov/pdffiles1/nij/223054.pdf (last visited Aug. 26, 2023) (distinguishing between "Type II" and "Type IIA" as well as "Type III" and "Type IIIA").

From this complicated scheme, which incorporates statutory authority, federal regulation provisions, and standards from the NIJ it is nearly impossible for a person of ordinary intelligence to be on "notice" as to what "level" of vests are subject to EAR, and/or whether there is some applicability of the USML (in which case the EAR specifically does not apply) and to what extent there are regulations involved in exportation. This is particularly true as applied to Intriago because his conduct involved Level IIIA vests, which are not specifically delineated in the ECCN, and provide difficulty in classification, accordingly. As stated both ECCN 1A005 and 1A613.d.1 reference "Level III" vests, but neither makes a distinction as to whether the reference includes IIIA, or whether that is a "greater" or "lesser" classification. This presents problems in determining whether Level IIIA would be classified in ECCN 1A005 or 1A613.d.1.

Each provision, of the indictment at issue, beginning with 50 U.S.C. § 4819 directs the reader to review the EAR to determine whether conduct is prohibited. The EAR, in turn directs the reader to the CCL, and the CCL (in this instance) directs the reader to consult the NIJ standards. The CCL, however, and the NIJ cannot necessarily be read cohesively together because the NIJ standards include subclassifications in Type II and III, adding a Type IIA and Type IIIA which are never addressed or included in the CCL and corresponding ECCN classifications pertinent to body armor. An ordinary person, reading these statutes and attempting to comply with these statutes cannot even make it past the classification of body armor let alone determine whether a separate CFR scheme presents an applicable exception to export regulations (i.e., price, or personal use).

Other practical considerations also give pause at the classification system in the ECCN, its reliance on the NIJ, and whether a particular piece of body armor is "subject to EAR" given its NIJ "Type" classification. First and foremost, such a scheme relies on the manufacturer classification to a particular vest, when produced. A manufacturer is motivated to *over* classify a vest's capability due to monetary concern (higher grade vests fetch a higher price). Second, what happens if a particular NIJ Type classified vest is tested, and is determined to be less effective than its manufacturer classification? Would the individual shipping the vest then not be guilty of violating a particular statute, assuming that the vest was marked Type III, but was in reality only capable of providing the protection of a Type I vest?

Third, the ambiguity in what vests would be included in a Level III of the ECCN, without any regard to the NIJ scheme of subtype A Level III vests could lead to arbitrary classification under the EECN and accordingly arbitrary prosecutions. Given the foregoing, even assuming *arguendo* that Intriago's conduct violates the statutes at issue in Counts VII, VIII and IX of the applicable indictment after the death of the so-called *Chevron* doctrine, the statutory schemes are

unconstitutionally vague, as applied. For this reason, the applicable Indictment should be dismissed.

## CONCLUSION

**WHEREFORE**, Intriago respectfully requests this Court: (1) grant this Motion to Dismiss the Indictment, as to Counts VII, VIII and IX; (2) find that the Court is not required, and in fact *may not* give deference to the CFR scheme of regulations pertinent to applying 15 U.S.C. § 4819 under *Raimondo*; (3) find that applying Chapter 15 of the United States Code, in light of the express purposes set forth in 15 U.S.C. § 4811, the conduct at issue in the Indictment does not amount to a violation of the statute as a matter of law; and (4) order that Counts VII, VIII, and IX are hereby dismissed.

Respectfully Submitted,

By: *Emmanuel Perez*
Emmanuel Perez, Esq.
Fla. Bar # 586552
LAW OFFICE OF EMMANUEL PEREZ & ASSOCIATES, P.A.
901 Ponce De Leon Blvd., Suite 101
Coral Gables, FL 33134
Tel: (305) 442-7443
Fax: (305) 441-9218
E: perez@lawperez.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading has been electronically filed and served via EM/ECF on this 28th day of August 2024.

By: *Emmanuel Perez*
Emmanuel Perez, Esq.