UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cr-20104-BECERRA

UNITED STATES OF AMERICA

v.

JAMES SOLAGES,

    Defendant.

_____/

## DEFENDANT JAMES SOLAGES'S MOTION TO SUPPRESS COERCED STATEMENTS

COMES NOW, the Defendant, JAMES SOLAGES, by and through his undersigned counsel, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the Fifth Amendment to the Constitution, *Miranda v. Arizona*, 384 U.S. 436 (1966), and the additional authorities set forth in the incorporated memorandum of law, requests that this Court preclude the government from introducing into evidence at trial any and all self incriminating statements Mr. Solages made to Agents of the United States Government, including prosecutors from the Department of Justice during the course of his introogations conducted in Haiti on February 8, 2022.

REQUEST FOR HEARING

Mr. Solages respectfully requests a hearing on this motion. The motion presents weighty issues related to the Fifth and Sixth Amendment protections for Americans interrogated by American prosecutors abroad, as well as the impact of torture on subsequently obtained statements during a custodial interrogation. To the extent the interrogation transcript does not speak for itself, the Court may benefit from live testimony from percipient witnesses concerning

the circumstances of the interrogation and the involuntariness of Mr. Solages's compelled statements.

INTRODUCTION

After local authorities in Haiti detained and tortured Mr. Solages, the then-lead AUSA and federal agents prosecuting this case travelled to Haiti to interrogate Mr. Solages in the same Haitian prison where he had been abused. Mr. Solages was already represented by counsel, as the AUSA and agents knew and acknowledged. Yet despite Mr. Solages's repeated requests to speak with his lawyer, the Government persisted in the interrogation, suggesting that only his "willingness to take responsibility" would facilitate his extradition to an American facility where he would finally be safe from the Haitian penal system in which he had been tortured.

Mr. Solages's statements during that custodial interrogation, as well as any derivative evidence, must be suppressed for two independent reasons. First, as the interrogating American prosecutor and agents acknowledged at multiple points during the interview—including at its conclusion—Mr. Solages had clearly and continuously invoked his right not to answer questions outside his lawyer's presence. Indeed, more than 45 minutes into the hour-long interrogation, one of the agents admitted that anything Mr. Solages might say was "not going to be admissible because your lawyer didn't give us permission to talk … , you're not willing to talk to us, you haven't signed the consent." The plain failure to stop Mr. Solages's interrogation immediately when he asserted his right to counsel demands that his statements be suppressed.

Second, even apart from that unambiguous *Miranda* violation, the conditions of Mr. Solages's confinement—and the Government's use of those conditions as leverage to coerce cooperation—render his statements involuntary. The agents reminded Mr. Solages of the torture

he had endured earlier in his time in Haitian custody, and suggested that making statements that result in extradition to the United States would keep him safe from such abuse in the future. Either of those violations alone, and certainly their combination, rendered Mr. Solages's statements involuntary and thus require suppression.

## FACTUAL BACKGROUND

Mr. Solages was arrested and detained by Haitian police in July 2021. In February 2022, Assistant United States Attorneys Frank Russo and Emma Ellenrieder—the prosecuting attorney in this case—traveled to Port-au-Prince, Haiti, to interrogate Mr. Solages while he remained in Haitian custody. AUSAs Russo and Ellenrieder met with Mr. Solages on February 8, 2022, along with two federal agents, Special Agents Tillis and another agent whose name is unknown.

AUSA Russo began the interview by reminding Mr. Solages of his rights under the Fifth Amendment of the U.S. Constitution: "We are representatives of the United States government. Even though we are not in the United States, the United States laws provide you with certain rights in the dealings with us. Before we ask you any questions, you must understand your rights." (01:00–1:10.)[1] "You have the right to remain silent, even if you have already spoken to others, you do not have to speak to us now." (*Id.* at 01:15–01:20.) "Anything you say can be use against you in court." (*Id.* at 01:20–01:25.) "You have the right to talk to a lawyer for advice before we ask you any questions." (*Id.* at 01:30–01:35.) "You have the right to have a lawyer with you during questioning." (*Id.* at 01:40–01:45.) "If you cannot afford a lawyer, you have a right to have one appointed for you before any questioning if you wish." (*Id.* at 01:45–01:53.) "Our ability to provide you with counsel at this time, however, may be limited by the decisions

---

[1] Timestamps in parentheticals refer to the recording of the interrogation produced to the defense. Defense counsel will file the recording with the Court in advance of any hearing on this motion, or upon the Court's request.

of local authorities or the availability of an American trained attorney." (*Id.* at 01:55–02:05.) "If you decide to answer questions now, without a lawyer present, you have the right to stop answering at any time." (*Id.* at 02:10–02:15.) "That last one is really the main key, we can start this conversation, and after five seconds you can say, 'You know what, I changed my mind and I want to stop.'" (*Id.* at 02:20–02:30.)

AUSA Russo then instructed Mr. Solages that if he wished to proceed with the interrogation, he must sign at the bottom of the form waiving his right to remain silent and right to counsel. Mr. Solages spoke briefly with AUSA Russo, but then unequivocally invoked his right to speak with his attorney before speaking with either the AUSAs or the FBI agents: "I would like to use the options that Mr. Russo gave me, by calling my lawyer for legal advice." (*Id.* at 04:20.) Mr. Solages followed his invocation with a reminder that he did not feel safe speaking to American officials as a result of his lengthy mistreatment in the Haitian prison. (*Id.* at 04:30.)

Despite Mr. Solages's clear and unequivocal invocation of his right to speak with his attorney—and his telling refusal to sign the proffered waiver form—AUSA Russo continued to press him to discuss the case at hand. AUSA Russo explained that "the recommendation [he] would make" as to whether the United States would seek Mr. Solages's extradition—which would alleviate the concerns Mr. Solages had just expressed regarding his safety in the Haitian jail—"depends upon . . . [Mr. Solages's] willingness to take responsibility." (*Id.* at 06:55–07:05.) Only afterwards did AUSA Russo acknowledge that "we can't talk to" a witness who is represented by counsel (*Id.* at 07:15) and suggested perhaps calling Mr. Solages's attorney—or making a recording of the interrogation available to the attorney—rather than inviting Mr. Solages's attorney into the interrogation.

Despite Mr. Solages' invocation of his right to speak to counsel, the AUSAs and FBI agents continued to speak with him, sporadically acknowledging that he was represented by counsel and had asserted his right to confer with counsel before questioning. ASUA Russo stated, "Before we go further though, we still have to clarify the attorney situation, if you have the number of the attorney we could call . . . when you're represented, we have obligations to the court, we cannot question you without the presence or the say-so of your lawyer." (*Id.* at 11:30.)

Because Mr. Solages did not know his attorney's phone number, Agent Tillis proceeded to try to contact Mr. Solages's attorney through various third parties, including Mr. Solages's wife. While Agent Tillis did so, AUSA Russo again confirmed his understanding that Mr. Solages was represented by counsel and had declined to waive his counsel right: "let's settle this lawyer thing first." (*Id.* at 16:10.) The federal agents' attempts to contact Mr. Solages's attorney, AUSA Russo asserted, should "give[] you a little bit of comfort in working with us." (*Id.* at 20:00–20:15.) But before Mr. Solages had a chance to speak with his lawyer, AUSA Russo advised Mr. Solages of his view that Mr. Solages's relationship with his retained counsel might be improper. The fact that Mr. Solages shared an attorney with his co-defendant, AUSA Russo asserted, was "concerning . . . because that would not be allowed in the United States," and was "a problem." (*Id.* at 22:25–23:20.)  (In fact, ethics rules permit joint representations if there is no actual conflict and both defendants give informed consent.  *See* Fla. Stat. Ann. Bar R. 4-1.6, 4-1.7, 4-1.9.)

The conversation then turned to Mr. Solages's conditions of confinement. Mr. Solages explained that he had, for example, "receive[d] a lot of helmet [*sic*] from the police officers," specifically directed at a previously injured leg, resulting in "a lot of pain," for which he generally received "no medication" from the Haitian authorities. (Audio Recording, *supra*, at

25:10–25:20.) At times, Mr. Solages recounted, he had gone without food until the prison's director had intervened. (*Id.* at 29:20–29:40.)

Nearly a half hour after Mr. Solages had first invoked his right to counsel, during which the AUSA's had continued to question him, Mr. Solages Agent Tillis finally connected with Mr. Solages's attorney. Agent Tillis and Mr. Solages's attorney spoke briefly in Haitian Creole before Agent Tillis advised the AUSAs that Mr. Solages's attorney wanted to speak with his client before any interview took place. (*Id.* at 34:05–34:10.) After another brief exchange in Creole, Agent Tillis instructed Mr. Solages to speak with his attorney in Creole. Agent Tillis, the only American official in the room who spoke Haitian Creole, left the room. The others, who assert they do not speak Haitian Creole, remained in the room while Mr. Solages spoke with his attorney. During this conversation, the recording device was turned off. (*Id.* at 35:10.)

When the recording device was turned back on, Agent Tillis explained what occurred in the meantime: "I spoke to your lawyer, and your lawyer pretty much asked that, we, if we cannot get you out of here, for us not to talk to you because he feared for your life … if you continue to talk to us." (*Id.* at 35:45–35:55.) Despite this unequivocal direction, the AUSAs and the FBI agents continued to interrogate Mr. Solages. During this interview, Mr. Solages explained the basis for his attorney's fear for his safety: The last time Mr. Solages had spoken about the case to Haitian officers, he had been under "a lot of pressure, torture, pain—oh, I flew in the air. . . . honestly, I thought that I was going to be dead." (*Id.* at 37:30–37:40.) An "officer ke[pt] telling [Mr. Solages], 'We are going to shoot you, we are going to shoot you.'" (*Id.* at 37:40–37:45.)

Mr. Solages asked, whether, if he were to maintain his invocation of his right to counsel, the AUSAs and FBI agents will "understand me and not feel[] that, you know, [Mr. Solages] has been compromised or anything." (*Id.* at 38:10–38:15.) AUSA Russo told Mr. Solages "this is

your choice," (*Id.* at 38:20) and "it is not something we hold against you." (*Id.* at 38:40.) AUSA Russo then reiterated that Mr. Solages's attorney "told you not to talk to us because of your safety, . . . but at the end of the day, this decision is up to you." (*Id.* at 39:00.) Mr. Solages then recounted the dangers of speaking to investigators while in Haitian custody, explaining that although in other circumstances he might "want to talk" (*Id.* at 39:15), Haiti "is a question-mark place," and "is not a safe place to be." (*Id.* at 39:50–40:00.)

AUSA Russo then asked Mr. Solages questions about his prior conversations about the case with Haitian investigators. (*Id.* at 41:00.) As Mr. Solages had indicated a few minutes earlier, that prior interrogation had been punctuated by torture: he was "in so [much] shock" that "I just could remember that my life has been saved—that's all I can remember." (*Id.* at 41:20–41:40.) Thus, he explained, he felt that he "had to open up" to the investigators, "because I was in my cell and getting threats that 'tonight we're going to get your head.'" (*Id.* at 41:20–41:40.) Shortly thereafter, Agent Tillis then reminded Mr. Solages that, unlike what Mr. Solages had experienced in Haitian custody, U.S. officials "don't use any force tactics to get people to talk to us." (*Id.* at 42:30.)

The other three U.S. officials then left the room, leaving Mr. Solages alone with Agent Tillis. After a brief period of small talk unrelated to the substance of the case, Mr. Solages asked a question about others who were allegedly involved. (*Id.* at 46:15.) Agent Tillis advised Mr. Solages, consistent with AUSA Russo's earlier representations, that any discussion on that subject was "not going to be admissible because your lawyer didn't give us permission to talk to us [sic], you're not willing to talk to us, you haven't signed the consent." (*Id.* at 46:40–46:50.) The other FBI agent, after returning to the room at that point, expressed agreement and extolled the virtues of adhering to proper procedures. (*Id.* at 47:00–47:30.)

Nevertheless, the agents continued to interview Mr. Solages, including about the substance of the case. Mr. Solages reiterated that despite his general inclination to "want to speak," "I don't know what is going on." (*Id.* at 59:15.) Mr. Solages explained he was "facing Haiti law [and] U.S. law," while possessing "no knowledge on law." (*Id.* at 01:00:00.) He summed up, "I'm lost. And I hope the lawyer is making the right decision. And I hope you guys, of course, understand it's not really up to me." (*Id.* at 01:00:10.) After eliciting additional statements about the case, Mr. Solages returned to his fear that in Haiti, he would "be killed like a dog in a corrupt system by telling the truth." (*Id.* at 01:03:20–01:03:25.) Concluding the interview, AUSA Russo remarked, "We're going to cut this here. . . . Your attorney doesn't want you to speak to us. So before we get too far into, you know, the rabbit hole of things where something might be said, we'd like to stop it here."

## LEGAL STANDARD

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), when the government interrogates an individual in custody, it must "warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." *Hall v. Thomas*, 611 F.3d 1259, 1284–85 (11th Cir. 2010) (quoting *Fare v. Michael C.*, 442 U.S. 707, 717 (1979)). "The government cannot introduce a suspect's statement taken without the presence of an attorney without first showing that the suspect made a voluntary, knowing, and intelligent waiver of his *Miranda* rights." *Id.* at 1285. "The government bears a heavy burden to demonstrate that the waiver was voluntary, knowing, and intelligent . . . by a preponderance of the evidence." *Id.* (internal quotation marks omitted).

## ARGUMENT

I.  **Mr. Solages's Statements Should Be Suppressed Because He Was Interrogated Without Counsel Present Despite Clearly Invoking His Right to Counsel.**

The Constitution's command that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, "go[es] to the roots of our concepts of American criminal jurisprudence," *Miranda*, 384 U.S. at 439. Because "the compulsion inherent in custodial surroundings" is otherwise "at odds with [that] principle[]," *Miranda* requires "the use of procedural safeguards" against the introduction of compelled custodial statements, including that a suspect subject to custodial interrogation be advised of his "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id.* at 458, 444. A core purpose of such a warning is to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Id.* at 468. Therefore, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

The recording makes clear that Mr. Solages's statements at the February 2022 interrogation were made without counsel present, despite the AUSAs' knowledge that he was represented and his explicit invocation of his right to counsel. Indeed, the government admitted as much multiple times, including at the interrogation's conclusion. Because Mr. Solages never waived this right—which applies fully to statements made outside the United States—these statements must be suppressed. Any evidence the government obtained from this poisonous tree must likewise be suppressed. *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) ("[T]hose subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (*or evidence derived from their statements*) in any subsequent criminal trial." (emphasis modified)); 3 Wayne R. LaFave et al., *Criminal Procedure* § 9.5(a)

(4th ed. Nov. 2024) ("Although the Supreme Court has never had occasion expressly to adopt that position, it is unquestionably correct." (footnote omitted)).

### A. Agents Failed to Honor Mr. Solages's Clear Request for Counsel

A person invokes his right to counsel by "articulat[ing] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). That standard is plainly met here, because Mr. Solages repeatedly stated that he wanted to speak with his lawyer and to heed his attorney's advice not to speak with investigators without his attorney present. Indeed, three different U.S. officials in the interrogation room—including the lead prosecutors in this case—each explicitly acknowledged that Mr. Solages had made such a request. *See supra* pp. 3-4, 6-7.

"[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick*, 498 U.S. at 153. This rule "bar[s] police-initiated interrogation unless the accused has counsel with him at the time of questioning" because "[a] single consultation with an attorney does not remove the suspect from . . . the coercive pressures that accompany custody and that may increase as custody is prolonged." *Id.* For decades, therefore, the Supreme Court has been clear that investigators violate a suspect's rights when there is any "further police-initiated custodial interrogation" after the suspect "asks for counsel." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

The bar on "interrogation" following assertion of the right to counsel is broad. The Eleventh Circuit "has stressed that 'once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of

cooperation.'" *United States v. Thomas*, 521 F. App'x 878, 882 (11th Cir. 2013) (quoting *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991)); *accord Christopher v. Florida*, 824 F.2d 836, 845 (11th Cir. 1987) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion)) ("questions or . . . statements which 'open up a more generalized discussion relating directly or indirectly to the investigation,' . . . constitute[] interrogation"). And precedent precludes any assertion that a short interruption in the interrogation is sufficient to render subsequent statements a "reinitiation" rather than a continuation of an unlawful interrogation. To escape *Edwards*'s brightline rule, any reinitiation by a suspect "must come *prior to* the further interrogation; initiation only becomes an issue if the agents follow *Edwards* and cease interrogation upon a request for counsel. Once the agents have . . . violated *Edwards*, no claim that the accused 'initiated' more conversation will be heard." *Gomez*, 927 F.2d at 1539 (emphasis added).

Here, the agents spoke to Mr. Solages for nearly 30 minutes after he invoked his right to counsel, but before he had the opportunity to speak with his attorney. That is a straightforward *Edwards* violation. After Mr. Solages's brief discussion with counsel, during which the attorney told the Government that they did not have permission to speak to Mr. Solages, agents discussed the case with him further without counsel present and against counsel's express direction, despite Mr. Solages's repeated assertions of his intention to follow his attorney's advice not to speak with them. "The law on this issue is clear: *Gomez* bars post-interrogation statements . . . made only a 'few minutes' after an *Edwards* violation." *Thomas*, 521 F. App'x at 883; *see also, e.g.*, *Minnick*, 498 U.S. at 156 (noting that *Edwards* contemplated that a violation may not occur when the suspect initiates a separate "conversation or discussion[]").

Courts in this Circuit routinely apply this rule strictly in situations far less egregious than here. In *United States v. Hughett*, for example, the defendant had told the interrogating officer, "I need my lawyer," and the officer apparently recognized this an assertion of the defendant's right to counsel, responding, "So you're telling me you want your attorney and that you no longer wish to speak with me?" No. 10-CR-41, 2010 WL 3958681, at *2 (M.D. Fla. Oct. 8, 2010). The defendant's subsequent response that "we can keep talking" did not change the fact that his prior statement constituted "an unequivocal and unambiguous request for counsel," after which the officers should have "immediately ceased questioning" him. *Id.* at *2, *4 (applying *Edwards*, 451 U.S. 477). Because they did not immediately stop, the ensuing statements were suppressed. *Id.* at *4.

The same result is appropriate here. Promptly after being informed of his right to counsel, Mr. Solages stated he "would like to use the options that Mr. Russo gave me, by calling my lawyer for legal advice." *Supra* at p. 3. But rather than "immediately ceas[ing]," agents continued to speak to Mr. Solages for nearly an hour, interrupted by only a brief attorney consultation, after which Mr. Solages continued to assert his rights, as the agents themselves recognized. Because they continued to interrogate him when bedrock constitutional protections required them to stop, Mr. Solages's statements must be suppressed.[2]

---

[2] Even if—contrary to *Gomez*—Mr. Solages could be said to have reinitiated interrogation, that is merely one of two necessary criteria for his statements to be admissible. When "a conversation tak[es] place after the accused has expressed his desire to deal with the police only through counsel, . . . the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw*, 462 U.S. at 1044 (quotation marks omitted); *accord, e.g., United States v. Roper*, 842 F. App'x 477, 480 (11th Cir. 2021) (defendant must have "initiated further discussion *and* knowingly and intelligently waived the right he previously invoked" (emphasis added)). No knowing waiver can exist where the agents interrogating Mr. Solages repeatedly assured him that they understood him to be asserting his *Miranda* rights.

### B. *Miranda*'s Protections Against Interrogation After Invocation of the Right to Counsel Apply with Full Force to Custodial Interrogation by American Prosecutors of an American Citizen Abroad

Because it safeguards trial rights in American courts, *Miranda* bars the admission of improperly obtained statements no matter where interrogation occurs. The *Miranda* rule flows from "the Fifth Amendment's right against self-incrimination," a violation of which "occurs only when a compelled statement is offered at trial against the defendant." *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 199 (2d Cir. 2008); *accord, e.g., United States v. Clarke*, 611 F. Supp. 2d 12, 28–29 (D.D.C. 2009) (finding it "well established" that "the Fifth Amendment privilege against self-incrimination" applies in any "criminal trial in the United States even where the questioning by United States authorities takes place abroad," and noting that the government there "concede[d] the applicability of the Fifth Amendment" to an FBI interrogation that had occurred in Trinidad and Tobago). "For this reason, it naturally follows that, regardless of the origin—*i.e.,* domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was 'compelled.'" *In re Terrorist Bombings*, 552 F.3d at 199. And *Miranda*'s twin objectives of "trustworthiness and deterrence" are equally acute for interrogations conducted by American agents abroad. *Id.* at 202 (quoting *Oregon v. Elstad*, 470 U.S. 298, 308 (1985)).

Consistent with those objectives, courts of appeals across the country have at least assumed that *Miranda*'s protections apply to custodial interrogations overseas, even where—unlike here—foreign officials were involved in the interrogation. *See id.* at 203 ("When U.S. law enforcement agents or officials are involved in overseas interrogation, however, [*Miranda's*] deterrence rationale retains its force."); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980) ("[I]f American officials participated in the foreign search or interrogation, or if

the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked."); *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) ("Under the joint venture doctrine, evidence obtained through activities of foreign officials, in which federal agents substantially participated and which violated the accused's Fifth Amendment or Miranda rights, must be suppressed in a subsequent trial in the United States."); *Cranford v. Rodriguez*, 512 F.2d 860, 863 (10th Cir. 1975) ("Our assumption is that the Miranda doctrine would apply" where "Mexican Police were acting on behalf [of American officials]."). To be sure, "U.S. agents acting overseas need not become experts in foreign criminal procedure to comply with *Miranda*; nor need they advocate for the appointment of local counsel on a foreign suspect's behalf." *In re Terrorist Bombings*, 552 F.3d at 198; *see also United States v. Dopf*, 434 F.2d 205, 207 (5th Cir. 1970) (holding that investigators appropriately tailored *Miranda* warning to reflect the availability of counsel and consular advice during interrogation in Mexico). But *Miranda*'s core guarantee of the right to refuse interrogation without counsel applies with no less force abroad.

If anything, the foreign context of Mr. Solages's interrogation heightens the risk that interrogation without counsel would have coercive effect:

> [T]he inherent coerciveness of [custodial interrogation] is clearly no less troubling when carried out beyond our borders and under the aegis of a foreign stationhouse. It is, on the contrary, far more likely that a custodial interrogation held in such conditions will present greater threats of compulsion since all that happens to the accused cannot be controlled by the Americans. . . . Substandard detention conditions could further contribute to the toll. Worst yet, local authorities may privately engage in aggressive practices, both legal and illegal in their own nation, but certainly not tolerated within the United States. As such, by the time U.S. agents are finally on hand to ask questions of their own, strong countervailing forces will already have run head first into the free will of the accused.

*United States v. Bin Laden*, 132 F. Supp. 2d 168, 186 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings*, 552 F.3d 177. And though the United States is not "always . . . responsible for the acts of a foreign sovereign," "[t]he great wisdom of *Miranda* . . . is equally prescient, if not more so, when U.S. agents are conducting custodial interrogations in foreign lands, where certain factors impinging on voluntariness will simply be out of their control." *Id.* at 186–87. "The inherent difficulties [of an interrogation abroad] notwithstanding, [a defendant's] statements cannot be used against him in a U.S. prosecution unless he waived his rights before questioning." *United States v. Zaitar*, 858 F. Supp. 2d 103, 116 (D.D.C. 2012). Ultimately, the rule remains that "if an attorney, whether appointed or retained, is truly and absolutely unavailable, and that result remains unsatisfactory to the suspect, he should be told that he need not speak to the Americans so long as he is without legal representation." *Bin Laden*, 132 F. Supp. 2d at 189.

## II.     The Fifth Amendment Bars Introduction of Mr. Solages's Involuntary Statements.

Even if—contrary to its own contemporaneous admissions—the Government could show that Mr. Solages had waived his right to counsel, that would be insufficient to make his statements admissible. "The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial." *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005). Therefore, if a court "first decide[s] [that] the law enforcement officers complied with the requirements of [*Miranda*] . . . [it] then determine[s] if the confession was voluntary." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994). The government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). To make this showing, "the totality of the circumstances surrounding the interrogation [must] revea[l] . . . an uncoerced choice" to speak. *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010).

Independent of the *Miranda* violation described above, Mr. Solages's recent torture in Haitian custody—coupled with American prosecutors' suggestion that his "willingness to take responsibility" would spare him from such "force tactics"—rendered his statements involuntary. A confession is plainly "coerced" when "the interrogating [law enforcement] officer ha[s] promised that if the accused confessed, the officer would protect the accused" from the "threat of physical violence." *Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991). The Supreme Court has consistently held that the coercive effect of threatened violence by third parties suffices to make statements involuntary. *See Fulminante*, 499 U.S. at 286 (threat of violence from other inmates); *Payne v. Arkansas*, 356 U.S. 560, 564 (1958) (threat of violence from angry mob).

Here, while the U.S. officials made no explicit promises to Mr. Solages about his safety, they repeatedly suggested that he would be free from torture in an American facility, and that cooperation during the interrogation was the key to get there. Mr. Solages raised his lack of safety less than five minutes into the interview. U.S. officials asked him about an injury that had been exacerbated by abuse he faced in the jail. When Mr. Solages's lawyer again raised the issue of the torture Mr. Solages had faced, agents followed up by eliciting detailed information about the abuse and the role it had played in Mr. Solages's prior interrogation by Haitian authorities. They then made clear that such tactics are off-limits in the United States, and that their decision to recommend extradition or leave him in Haitian custody would hinge on how the interview went. Compounding the coercive effect of those statements, prosecutors "explicitly assured [Mr. Solages] that anything he said" without signing a *Miranda* waiver could "not be used to prosecute him." *United States v. Lall*, 607 F.3d 1277, 1287 (11th Cir. 2010) (confession involuntary where officers told suspect his statements would not be used against him).

"That [Mr. Solages] was not physically tortured [by U.S. officials] affords no answer to the question whether the confession was coerced, for there is torture of mind as well as body; the will is as much affected by fear as by force." *Payne*, 356 U.S. at 566. Mr. Solages's statements are involuntary in view of this repeated discussion of how Mr. Solages had previously been tortured, how a prior decision to make statements to Haitian law enforcement had temporarily ameliorated that torture, and how extradition to the United States could further bolster his safety.

When assessing a defendant's statements to U.S. officials after being subjected to torture by foreign officials, "the court may take into consideration the continuing effect of the prior coercive techniques on the voluntariness of any subsequent confession." *United States v. Karake*, 443 F. Supp. 2d 8, 87 (D.D.C. 2006) (citing *Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944); *Lisbena v. California*, 314 U.S. 219, 240 (1941)). To admit the statements, the court must "ensure that there exists a 'break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before.'" *Id.* (quoting *Clewis v. Texas*, 386 U.S. 707, 710 (1967)). Thus, in *Karake*, where American officials traveled to Rwanda to interrogate suspects who "remained in Rwandan custody at all times and were returned to [Rwandan authorities] at the conclusion of each interrogation by the Americans," statements made to the American officials were suppressed as involuntary based on torture conducted by the Rwandan authorities. *Id.* at 87–89. The same result should follow here: American prosecutors questioned Mr. Solages in the same Haitian jail where he had recently been tortured, returning him to Haitian custody after the interrogation. The prospect of being returned to Haitian custody—where he had undergone torture on multiple prior occasions—if his cooperation did not warrant extradition to the United States was hanging over his entire interview.

In addition to protecting a defendant's basic rights, the ironclad rule against admission of involuntary statements protects the Court's interest in excluding unreliable evidence. Even in circumstances (unlike here) where the accused arguably lacks Fifth Amendment due-process rights, "another legitimate reason to suppress the fruits of torture is the 'likelihood that the confession is untrue.'" *Bostan v. Obama*, 674 F. Supp. 2d 9, 30 (D.D.C. 2009) (quoting *Karake*, 443 F. Supp. 2d at 50–51) (alteration adopted); *see also, e.g., Jackson v. Denno*, 378 U.S. 368, 385–86 (1964) (recognizing the "probable unreliability of confessions that are obtained in a manner deemed coercive"); *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) (holding that the risk a non-defendant "witness was coerced into making *false* statements" suffices to give a defendant grounds to move to suppress statements as coercive, even though a defendant cannot directly invoke the witness's Fifth Amendment rights).

Thus, although U.S. officials did not themselves torture Mr. Solages or make any explicit threats, the government cannot carry its burden to prove his statements were voluntary. The lack of torture during the U.S. interview does not resolve this inquiry. *Payne*, 356 U.S. at 566. Rather, the "continuing effect of the prior coercive techniques" is plain throughout the discussion. *See Karake*, 443 F. Supp. 2d at 87. Combined with the officers' nods toward extradition, and the suggestion that Mr. Solages would be returned to the potential of Haitian abuse unless he "t[ook] responsibility" during his interview, the totality of the circumstances points to an interrogation inescapably infected by the inhumane punishment meted out by Mr. Solages's jailers. It must therefore be suppressed.

## CONCLUSION

For the foregoing reasons, the Court should suppress the statements Mr. Solages made while being interrogated in Haiti.

Dated: May 2, 2025

Respectfully submitted,

JONATHAN S. FRIEDMAN, P.A.
Attorney for James Solages
101 N.E. 3rd Ave.
Suite 1500
Fort Lauderdale, Florida 33301
Telephone: (954) 713-2820
Facsimile: (754) 301-5109
JFriedmanlawfirm@gmail.com

 /s/ Jonathan Friedman
_____.
JONATHAN S. FRIEDMAN, ESQ.
Florida Bar Number: 0973297


PATRICK DRAY, P.A.
Attorney for James Solages
18501 Pines Blvd.
Suite 344
Pembroke Pines, FL 33029
Telephone:  (954) 374-4323
Facsimile:   (786) 513-2244
pat@patdray.com

/s/ S. Patrick Dray

_____
S. PATRICK DRAY, ESQ.
Florida Bar Number: 0180157

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on May 2, 2025, the foregoing motion was served via ECF to all counsel of record.

                Respectfully submitted,

                JONATHAN S. FRIEDMAN, P.A.
                Attorney for James Solages
                101 N.E. 3rd Ave.
                Suite 1500
                Fort Lauderdale, Florida 33301
                Telephone: (954) 713-2820
                Facsimile: (754) 301-5109
                JFriedmanlawfirm@gmail.com

                /s/ Jonathan Friedman
                _____.
                JONATHAN S. FRIEDMAN, ESQ.
                Florida Bar Number: 0973297