UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cr-20104-BECERRA

UNITED STATES OF AMERICA

v.

JAMES SOLAGES,

Defendant.

______________________________/

**DEFENDANT JAMES SOLAGES'S MOTION TO DISMISS THE FIFTH SUPERSEDING INDICTMENT**

COMES NOW, the Defendant, JAMES SOLAGES, by and through his undersigned counsel, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, and the additional authorities set forth in the incorporated memorandum of law, requests that this Court enter an order dismissing the Fifth Superseding Indictment, filed with this Court on February 13, 2024.

## INTRODUCTION

The Fifth Superseding Indictment marks an unprecedented and unlawful attempt to interpose federal criminal law into the internal affairs of a foreign state. After former Haitian President Jovenel Moïse overstayed his term of office, a judge of Haiti's highest court and a prosecutor in its capital solicited aid in executing a warrant for Moïse's arrest and guaranteed immunity for those who did so. Defendant James Solages is charged for his alleged involvement in that operation. But a supposed conspiracy to undertake conduct in a foreign state authorized by that state's judicial and law enforcement officers is not a cognizable offense under federal law.

On its face, the indictment is defective for two interrelated reasons. First, the charged offenses do not extend to conduct contemplated or undertaken within the territory of a foreign

sovereign. Longstanding presumptions rooted in international law foreclose an interpretation of the relevant criminal statutes that would supplant foreign sovereign authority within that sovereign's territory. And the statutory text confirms that Section 956(a)(1) applies only to offenses outside *any* sovereign's territorial jurisdiction. Second, as a matter of law, the Letter of Request for International Assistance vitiates multiple elements of the charged offenses. Section 956(a)(1) by its plain terms imposes liability only for conspiring to commit an *unlawful* kidnapping or murder; neither that statute nor Section 960 prohibit activities authorized by officials in the jurisdiction where they occurred. And under the act of state doctrine, federal courts lack authority to second-guess the propriety of an official act of foreign judicial and law enforcement officers. At bottom, this Court has no business adjudicating an internal dispute about the presidential succession in Haiti, the merits of an order to arrest Haiti's recalcitrant president, or whether conduct authorized by Haitian officials in Haiti comported with Haitian law. The charges against Mr. Solages should be dismissed in their entirety.

## BACKGROUND[1]

### A. President Moïse Overstays His Term of Office and Haitian Authorities Request Assistance

In early 2021, then-President of Haiti Jovenel Moïse plunged the country into a "constitutional crisis" when he refused to leave office.[2] As the Department of State explained:

> Jovenel Moise was elected as president for a five-year term and took office in February 2017. Controversy arose early in the year regarding the length of his

[1] The background set forth herein is based on the indictment's allegations, documents incorporated by reference in the indictment, and news articles and foreign judicial documents properly subject to judicial notice. *See, e.g.*, *United States v. McPhee*, 336 F.3d 1269, 1276 (11th Cir. 2003) (holding district court properly took judicial notice of foreign sovereign's territorial claims on motion to dismiss an indictment). Solages does not admit the truth of allegations in the indictment.

[2] Jacqueline Charles, *'On the Verge of Explosion': Violence, Constitutional Crisis Push Haiti to the Brink*, The Miami Herald (Feb. 2, 2021), https://bit.ly/433DNGX.

> mandate and whether it expired in February 2021 or 2022, due to ambiguities in the constitution. Despite opposition from most political actors and civil society, President Moise remained in power until his assassination on July 7.[3]

In the weeks following the expiration of his term, Moïse thwarted the transfer of power. He refused to hold parliamentary or presidential elections, leaving the parliament without a quorum and "ruling by decree."[4] Meanwhile, he sought to change the Haitian constitution to permit him to serve a second term.[5] Police exchanged gunfire with protestors.[6] And Moïse purported to "retire" three Haitian Supreme Court Justices—who were first in line in the presidential succession—in an action Haitian legal organizations called "a violation of the constitution."[7] As seven members of the United States Congress explained in a letter to the Secretary of State, President Moïse's "extra-constitutional decrees" amounted to "attempts to hold onto the Presidency at the expense of the democratic process."[8]

In June 2021, Haitian Supreme Court Justice Windelle Coq Thélot and Port-au-Prince prosecutor Gérald Norgaisse issued in their official capacities a Letter of Request for International Assistance to the Counter Terrorist Unit (CTU), a private security company of which the letter identified Defendant Antonio Intriago as CEO. Appendix A (Letter of Request).[9]

---

[3] *2021 Country Reports on Human Rights Practices: Haiti*, U.S. Dep't of State (April 12, 2022).
[4] Sandra Lemaire, *Haitians Alarmed After President Retires 3 Supreme Court Justices*, Voice of America (Feb. 9, 2021), https://bit.ly/4jFsnjI.
[5] Evens Sanon & Dánica Coto, *Haiti Opens Depate on Proposed Constitutional Changes*, Associated Press (Feb. 3, 2021), https://bit.ly/4jBA76a.
[6] Lemaire, *supra* note 4.
[7] *Id.*
[8] *Clarke and Meeks Co-Lead Letter to Secretary Blinken Urging the U.S. to Condemn the Undemocratic Actions of President Moïse, and Support the Establishment of a Transitional Government in Haiti* (Feb. 6, 2021), https://bit.ly/43aUUro.
[9] The Letter of Request for International Assistance—described there as "a purported Haitian immunity agreement"—is incorporated by reference in the indictment, *see* Fifth Superseding Indictment (S5), ECF 552, at 7, and in any event would be judicially noticeable as a foreign judicial record. *See Makro Cap. of Am., Inc. v. UBS AG*, 436 F. Supp. 2d 1342, 1350 (S.D. Fla.

The letter stated that an "order of imprisonment" had issued for Moïse and requested CTU to assist Haitian authorities in removing Moïse from the office he unlawfully occupied. It further granted "immunity" for those doing so. *Id.* As the Department of Justice has characterized the letter, it "request[ed] assistance to further the arrest and imprisonment of President Moïse" and "claimed to provide immunity in Haiti to those who participated in the operation."[10] *See also* Criminal Complaint, ECF 1, at 3 (explaining that the letter "included a written request for assistance to further the arrest and imprisonment of President Moise" and "purport[ed] to provide Haitian immunity for such actions").

**B. Federal Prosecutors Charge Solages for Alleged Conduct Immunized by Haitian Judicial and Law Enforcement Officers**

Federal prosecutors charged Mr. Solages in connection with Moïse's July 7, 2021 death at his residence in Port-au-Prince, Haiti. As alleged in the Fifth Superseding Indictment, Mr. Solages aided CTU employees in an operation to remove Moïse from office, including by "deliver[ing] a purported Haitian immunity agreement" to alleged CTU employees. S5 at 5–7.

The indictment charges Mr. Solages with five offenses: (1) conspiracy to provide material support to carry out a violation of Section 956(a)(1), in violation of 18 U.S.C. § 2339A(a); (2) providing material support to carry out a violation of Section 956(a)(1), in violation of 18 U.S.C.§ 2339A(a); (3) conspiracy to kill and kidnap a person outside the United States, in violation of 18 U.S.C. § 956(a)(1); (4) conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371; and (5) expedition against friendly nation, in violation of 18 U.S.C. § 960. *Id.* at 2–8. Counts 1, 2, and 3 rest on an alleged conspiracy to kill and kidnap a

---

2006), *aff'd*, 543 F.3d 1254 (11th Cir. 2008).The Haitian immunity agreement will be filed under seal as it has been identified as "RESTRICTED MATERIAL" in the government's discovery.

[10] *Additional Four Charged in Connection with Plot to Kill Haitian President*, U.S. Dep't of Justice (Jan. 31, 2023), https://bit.ly/4iIfX9e.

person outside the United States. Counts 4 and 5 charge participation in a military expedition against the territory of a foreign state and a related conspiracy. No count of the indictment charges Mr. Solages with any conspiracy to undertake an unlawful act within the United States.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b), a defendant may move to dismiss an indictment for "failure to state an offense." "In reviewing a motion to dismiss, the court must accept all well pleaded facts in the indictment as true. Under Rule 12(b), however, an indictment may be dismissed where there is an infirmity of law in the prosecution." *United States v. Velez*, No. 05-cr-20770, 2009 WL 10710482, at *2 (S.D. Fla. Feb. 20, 2009) (citation omitted); *see also United States v. Torkington*, 812 F.2d 1347, 1354 (1987) (considering whether "the factual allegations in the indictment, when viewed in the light most favorable to the government, were sufficient to charge the offense as a matter of law"). Courts in this district have recognized that questions regarding the impact of "foreign law" are legal issues properly assessed on a motion to dismiss an indictment. *E.g.*, *Velez*, 2009 WL 10710482, at *2.

## ARGUMENT

### I. Section 956(a)(1) Does Not Criminalize Conspiracy to Engage In Ordinary Criminal Conduct Within Another Sovereign's Territorial Jurisdiction

Counts 1, 2, and 3 of the indictment fail because 18 U.S.C § 956(a)(1) does not criminalize a conspiracy to engage in acts constituting murder or kidnapping in the territory of a foreign sovereign. The firmly established canon of statutory construction that American criminal statutes do *not* criminalize conduct occurring exclusively in the jurisdiction of a foreign sovereign, coupled with the text, structure, history, and purpose of Section 956(a)(1), requires that result.

American criminal statutes are presumed *not* to criminalize conduct occurring exclusively in a foreign country. American courts have long recognized that statutes "should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting); *see id.* at 816 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963)); *Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) (statutes should be construed, if possible, to avoid violations of international law); *see also United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) (same). The Supreme Court thus "ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).

One of the clearest norms of international law is the presumption that sovereigns do not regulate ordinary criminal conduct that occurs within the territorial jurisdiction of a foreign sovereign. As the *Restatement (Third) of Foreign Relations Law* § 403 cmt. g (1987) states: "A United States statute is to be construed to apply to a person or activity only to the extent consistent with § 402 and this section, unless such construction is not fairly possible." And Section 402 provides, in relevant part, that international-law norms typically permit a state to exercise prescriptive jurisdiction only with respect to conduct that occurs within its territory or that directly affects its nationals, national security, or other narrow categories of state interests. *Restatement (Third) of Foreign Relations Law* § 402 (1987); *see id.* §§ 403(1), 403(2); *accord Restatement (Fourth) of Foreign Relations Law* §§ 404–405 (2018).

This heavy "presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petrol. Co.*,

569 U.S. 108, 113 (2013); *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *McCulloch*, 372 U.S. at 19 (refusing to construe the National Labor Relations Act as including foreign flagged vessels within its coverage because doing so "would inevitably lead to embarrassment in foreign affairs"); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957) ("For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed."); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945) (L. Hand, J.) (declining to "impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States.").

The strength of this presumption is such that in the absence of any "affirmative intention of the Congress clearly expressed," *McCulloch*, 372 U.S. at 21–22, the presumption overrides even plain language in a statute. For example, in *United States v. Palmer*, the Supreme Court addressed the prohibition of murder and piracy on the high seas in the Crime Act of 1790. 16 U.S. (3 Wheat.) 610 (1818). On its face, the statute reached conduct by all persons without limitations regarding nationality, territoriality, or jurisdiction. But the Court held that "general words" such as "any person or persons," which are literally "broad enough to comprehend every human being," must nevertheless be construed as "limited to cases within the jurisdiction of the state." 16 U.S. at 631.[11] The Court reaffirmed this principle a year later in *United States v. Klintock*, 18 U.S. (5 Wheat.) 144, 152 (1820). Interpreting the same Act of 1790, the Court held that "general words of the act of Congress applying to *all persons whatsoever* … ought not to be

[11] The United States did not disagree, arguing that a felony which does not amount to general piracy under universal jurisdiction "cannot be tried by the courts of the United States, if committed by a foreigner on board a foreign vessel, on the high seas; because the jurisdiction of the United States, beyond their own territorial limits, only extends to the punishment of [universal] crimes which are piracy by the law of nations." *Palmer*, 16 U.S. at 620.

applied to offences committed against the particular sovereignty of a foreign power." *Id.* (emphasis added). To the extent such general words are applied to foreign extraterritorial conduct, the Court limited them to "offences committed against all nations … by persons who by common consent are equally amenable to the laws of all nations"—*i.e.*, offenses of universal jurisdiction like high-seas piracy. *Id*.

Significantly, in *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 195–96 (1820), issued two weeks after *Klintock*, the Court found that this presumption mandated reading even the *same words* in a piracy statute differently in different cases to ensure consistency with the law of nations. The Court stated that in assessing the scope of the phrase "person or persons" in the 1790 statute, it would "test each case by a reference to the punishing powers of the body that enacted it. The reasonable presumption is that the legislature intended to legislate only on *cases* within the scope of that power." 18 U.S. at 195–96 (emphasis added). And because "the crime of murder," unlike high-seas piracy, is not "an offence within the [universal] criminal jurisdiction of all nations," the Court held that the statute should not be read to "punish murder in cases with which [the United States] had no right to interfere." *Id.* at 197–98. In other words, the Court used international law as a "key" to unlock the meaning and scope of the facially universal language, *id.*, and applied the statute on a case-by-case basis only as far as international law would allow.

As demonstrated by *Palmer, Klintock*, and *Furlong*, when a statute conflicts with international jurisdictional principles, even broadly worded statutes must be read subject to this limiting construction. Significantly, this rule of construction is distinct from (and *stronger* than) the similar presumption against extraterritoriality. *See United States v. Campbell*, 798 F. Supp. 2d 293, 308 n.6 (D.D.C. 2011) (under "the presumption against extrajurisdictionality," "federal law

does not extend beyond the jurisdictional limits set by international law" (quotation marks omitted)); *see also Yunis*, 924 F.2d at 1091. While the extraterritorial reach of a statute is a matter of policy and may "be inferred from the nature of the offense" without express Congressional direction, *United States v. Bowman*, 260 U.S. 94, 98 (1922), the presumption against extrajurisdictionality is rooted in fundamental norms of international law that "not even the omnipotence of legislative power can" override, *Furlong*, 18 U.S. at 198.

Construed against those background principles, the indictment here does not charge a crime that violates Section 956(a)(1). The text of that provision provides:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

18 U.S.C. § 956(a)(1). Murder, kidnapping, and maiming, while undoubtedly serious, are ordinary offenses whose punishment is typically reserved to the sovereign in whose territory they occur, not extraordinary crimes like piracy that are subject to universal jurisdiction. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781, 794–96 (D.C. Cir. 1984) (Edwards, J., concurring) (identifying the few categories of crimes subject to universal jurisdiction under customary international law); *see Hamdan v. Rumsfeld*, 548 U.S. 557, 595–613 (2006) (plurality opinion) (holding that even "conspiracy" to commit war crimes is not a universal-jurisdiction offense). Thus, the only available reading of the language of Section 956(a)(1) in light of the presumption against foreign sovereign interference is that it criminalizes "conspir[ing]" to commit "murder, kidnapping, or maiming" in places outside the United States that are *not otherwise within the jurisdiction of a foreign sovereign*, such as offenses on the high seas or otherwise outside the

territorial jurisdiction of any state. Section 956(a)(1) thus sensibly performs a gap-filling role: it permits the United States to punish conspiracies to commit offenses that would otherwise fall outside any sovereign's territorial jurisdiction. Nothing in that provision gives the required clear indication necessary to displace international-law norms and subject to American criminal jurisdiction conduct appropriately regulated by a foreign sovereign.

To the contrary, the statute's text and structure confirms that Section 956(a)(1), unlike Section 956(b), criminalizes only conspiracies to commit criminal acts outside the territorial jurisdiction of any sovereign. In the very next paragraph, the statute expressly prohibits a narrower class of offenses against property in a foreign country owned by a foreign government:

> (b) Whoever, within the jurisdiction of the United States, conspires with one or more persons, regardless of where such other person or persons are located, to damage or destroy specific property *situated within a foreign country* and belonging to a foreign government … shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be imprisoned not more than 25 years.

18 U.S.C. § 956(b) (emphasis added).  Thus, in stark contrast to subsection (a)(1), the text of subsection (b) *expressly specifies* that it applies within the jurisdiction of foreign countries. There is no remotely similar clear statement indicating an express wish to criminalize the garden-variety crimes of murder, kidnapping, or maiming "within a foreign country" in the text of subsection (a)(1).

As the Supreme Court has repeatedly held, and reaffirmed just last month, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. EPA*, 145 S. Ct. 704, 713–14 (2025) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *accord Gallardo v.*

*Marstiller*, 596 U.S. 420, 429–30 (2022); *Salinas v. Railroad Retirement Bd.*, 592 U.S. 188, 196 (2021); *Azar v. Allina Health Services*, 587 U.S. 566, 576–77 (2019); *Kucana* v. *Holder*, 558 U.S. 233, 249 (2010); *Carcieri v. Salazar*, 555 U.S. 379, 389–90 (2009); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). Congress's decision to expressly include conduct occurring within a foreign country in subsection (b), while omitting such language from subsection (a)(1), is thus a strong textual indication that subsection (a)(1) has a narrower scope.

The legislative history and purpose of Section 956(a)(1) confirm that the statute was enacted and expanded primarily as an *anti-terrorism* measure, not as a general assertion of federal authority over ordinary criminal conduct occurring in foreign countries. When Congress amended Section 956 through the Antiterrorism and Effective Death Penalty Act of 1996, it did so to close a perceived loophole that allowed domestic conspirators to plot terrorist violence abroad—such as assassinations or bombings—without federal criminal liability. Committee reports, DOJ testimony, and the statutory structure all reflect a focused purpose: empowering federal authorities to disrupt international terrorism a with a substantial U.S. nexus. *See, e.g.*, 141 Cong. Rec. S 2,517 (Feb. 10, 1995) (explaining that "the new subsection 956(a) is intended to ensure that the government is able to punish" offenses "committed by terrorists"); 141 Cong Rec S 2,503 (Feb. 10, 1995) (statement of Sen. Biden) ("The bill . . . prohibits persons in the United States from conspiring to commit *terrorism* overseas." (emphasis added)). The title of the AEDPA in which the amendment to Section 956 appears is entitled "Criminal Law Modifications to Counter Terrorism." Nothing in the statute's history suggests that Congress intended to displace foreign sovereigns' authority over ordinary crimes like murder or kidnapping arising from disputes within their borders. Indeed, Section 956's codification among foreign relations and national security offenses underscores that its intended reach is narrow and exceptional.

The United States has no special sovereign or territorial interest in regulating "murder, kidnapping, or maiming" in foreign countries (where it is instead subject to the jurisdiction of that foreign sovereign), *especially*—as here—without regard to the content of those foreign countries' laws.  Congress drafted Section 956(a)(1) only with reference to the United States' *own laws* against murder, kidnapping, or maiming in the special maritime and territorial jurisdiction of the United States.  Thus, the most natural reading of that provision is that—rather than a worldwide global regulation of conspiracy to commit murder anywhere in the *entire world* so long as even one incidental act in the conspiracy touched the United States—Section 956(a)(1) instead prohibits only conspiracy to commit conduct outside the territorial jurisdiction of any sovereign. The most natural understanding of Section 956(a)(1) is that it is the special conspiracy statute for conspiracy to commit "murder, kidnapping, or maiming" where no sovereign's laws would otherwise reach.

The Supreme Court has repeatedly cautioned that broad phrases in statutes should not be given an "aggressive interpretation" where other traditional indicia of meaning counsel a narrower reading.  *Yates v. United States*, 574 U.S. 528, 546 (2015) *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 860–62 (2014); *FCC v. AT&T Inc.*, 562 U.S. 397, 405–06 (2011); *Johnson v. United States*, 559 U.S. 133, 141–42 (2010) (rejecting broad interpretation of "violent felony"); *Watson v. United States*, 552 U.S. 74, 78–79 (2007) (rejecting broad interpretation of "use").  Given the heavy presumption against foreign sovereign interference by criminal laws, Section 956(a)(1) cannot be construed to reach conspiracy to commit offenses not subject to universal jurisdiction—like murder—that takes place within the territorial jurisdiction of another sovereign.

## II.     The Haitian Officials' Formal Request for International Assistance Vitiates

**Essential Elements of the Charged Offenses as a Matter of Law**

The indictment fails for the separate and independent reason that the charged offenses do not prohibit conduct (or conspiracy to commit conduct) authorized or immunized by foreign officials in the jurisdiction where the conduct occurs. A heavy presumption weighs against reading *any* United States criminal law to prohibit conduct authorized by foreign officials in the jurisdiction where it occurs, and the specific offenses charged here by their plain terms do not encompass it. Under the act of state doctrine, American courts may not second-guess the validity of the Letter of Request for International Assistance, which as alleged, promised "immunity" for the charged offense conduct. S5, at 7.[12] That Haitian judicial and law enforcement officials authorized the charged offense conduct thus vitiates essential elements of the charged offenses.

**A. There Is a Heavy Presumption in American Law That Conduct Authorized by Foreign Officials in the Jurisdiction where it Occurs Is Not Criminal**

The indictment fails because there is a presumption in every United States criminal law—including the laws charged in this case—that acts that (1) are expressly authorized by officials of a foreign state, (2) are lawful in the foreign state; and (3) take place in the foreign state ("foreign authorized conduct") are not criminalized by United States law. The rule of non-interference discussed above is supercharged where conduct is not merely subject to the territorial jurisdiction of a foreign sovereign, but also *authorized* by foreign judicial or law enforcement officials.

As a general matter, American law itself does not criminalize conduct that is justified because it is carried out for an authorized purpose. It is black-letter law that acts expressly authorized by legal authority—such as police use of necessary force, a court-authorized search,

[12] *See also Additional Four Charged in Connection with Plot to Kill Haitian President*, *supra* note 10 (characterizing the letter as "claim[ing] to provide immunity in Haiti to those who participated in the operation").

or an undercover operation conducted by federal agents—are not criminal. The reason is straightforward: conduct performed under lawful authority lacks the "unlawfulness" element essential for criminal liability. *See, e.g.*, *In re Neagle*, 135 U.S. 1, 75 (1890) (officer acting to protect a federal official pursuant to lawful authority was, for that reason, not guilty of murder); LaFave & Scott, Substantive Criminal Law § 10.2 (3d ed.) ("A public officer is justified in using reasonable force against the person of another, or in taking his property, when he acts pursuant to a valid law, or court order or process, requiring or authorizing him so to act."); ALI Model Penal Code §§ 3.03 Execution of Public Duty (Am. L. Inst.) (recognizing "public duty" as a justification in criminal law). Although these examples typically address U.S. authority, the same principle—that justified conduct is not unlawful—applies *a fortiori* in the international context when another sovereign's officials expressly authorize the conduct in its own territory. Congress often expressly codifies a requirement that the act be "unlawful" or "without authority" to constitute a crime. *E.g.*, 18 U.S.C. § 1111 (murder is "unlawful killing"). Thus, if the conduct is lawful where performed and is specifically authorized by that sovereign's officials, it falls outside the ambit of an "unlawful" act.

The presumption that criminal statutes do not punish foreign authorized conduct is further reflected in Section 415 of the Restatement (Third) of Foreign Relations Law, which states that when conduct is "required under the law or by governmental order of another state," the exercise of jurisdiction to punish that conduct becomes improper. *See Restatement (Third)* § 415 cmt. J. In other words, when two sovereigns have opposing commands—one authorizing the act, the other purporting to prohibit it—that scenario triggers a "true conflict" in which United States law should yield to the law of the sovereign in whose territory the charged or contemplated conduct occurs. The Supreme Court's decision in *Hartford Fire Insurance Co. v. California*, 509 U.S.

764 (1993), although arising in the antitrust setting, is instructive. There, the Court recognized that a "true conflict" between United States and foreign law would threaten international comity and require construing United States law narrowly absent a clear statement to the contrary. *Id.* at 798–99. The First Circuit echoed this in *United States v. Nippon Paper Industries. Co.*, explaining that "comity concerns would operate to defeat the exercise of [U.S.] jurisdiction" where United States and foreign law impose conflicting obligations. 109 F.3d 1, 8 (1st Cir. 1997). Interpreting American criminal statutes to criminalize that same conduct creates an impermissible conflict. It is precisely this scenario that compels construing the charged offenses *not* to extend to foreign authorized conduct absent a clear indication to the contrary.

**B. The Charged Offenses Do Not Encompass Foreign Authorized Conduct**

Beyond the general interpretative presumptions that apply to all federal criminal statutes, the specific offenses charged here do not encompass foreign authorized conduct.

Because the object of a conspiracy under Section 956(a)(1) must be an *unlawful* detention or killing, the statute does not prohibit agreements to detain or kill authorized by foreign officials in the jurisdiction where those acts are contemplated. To violate that provision, a person must conspire with others "to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 956(a)(1). And an act constitutes the offense of murder or kidnapping if committed within the United States' special maritime and territorial jurisdiction only if that act is unlawful.

Neither kidnapping nor murder, as defined under federal law, includes conduct undertaken with legal authorization. The general federal murder statute defines murder within the special maritime and territorial jurisdiction of the United States to include only an "*unlawful*

killing of a human being with malice aforethought." 18 U.S.C. § 1111(a) (emphasis added); *see also id.* § 1111(b); *see, e.g.*, *United States v. Sanchez*, 741 F. Supp. 215, 217–18 (observing that the federal murder statute, like those of many states, prohibits only "the *unlawful* killing of a human being" (emphasis added)), *aff'd in relevant part*, 992 F.2d 1143 (11th Cir. 1993). Indeed, the Eleventh Circuit has read materially identical language in a state murder statute to include a separate element of "unlawfulness"—that is, that a person caused death without lawful "justification." *Lamb v. Jernigan*, 683 F.2d 1332, 1336 (11th Cir. 1982). And kidnapping within the special maritime and territorial jurisdiction of the United States similarly requires that a defendant "*unlawfully* seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person." 18 U.S.C. § 1201(a) (emphasis added); *see also id.* § 1201(a)(2). Thus, an agreement to arrest or even kill a foreign national in a foreign country pursuant to authorization by that country's judicial or law enforcement officers—as charged in the indictment—falls outside the statute's reach. As a matter of law, such an agreement does not have as its object "an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States." *Id.* § 956(a)(1). Counts 1 and 2 of the indictment, which charge providing and conspiring to provide support for a Section 956(a)(1) violation, fail for the same reason.

Section 956's history and structure confirm that it imposes no criminal liability for foreign authorized conduct. As discussed above, Section 956(a)(1) was adopted as part of the AEDPA—an anti-terrorism statute—and situated in Chapter 45 of Title 18 among other offenses bearing on the foreign relations of the United States. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996); *see also* 18 U.S.C. ch. 45 (covering offenses related to "Foreign Relations"). But read as the government has charged it in this case, the statute would *prohibit* counterterrorism operations

abroad planned by security contractors in the United States, even if those operations were duly authorized by officials in the country were the operations would take place. Such an interpretation would radically expand the statute beyond the "terrorism conspirac[ies]" it was designed to punish to include even the duly authorized law enforcement operations of a foreign state within its own territory. Message from the President of the United States Transmitting a Draft of Proposed Legislation to Improve the Ability of the United States to Respond to the International Terrorist Threat, H.R. Doc. No. 104-31, at 69 (1995); *see also* 141 Cong. Rec. S 2,527 (Feb. 10, 1995) (statement of Sen. Specter) (explaining that the statute sought to prohibit "conspiracies to plan overseas terrorist attacks in this country"). As then-Senator Biden explained when discussing Section 956(a)(1), the provision covers only "those individuals who, *without appropriate governmental authorization*, engage in prohibited conduct that is harmful to the foreign relations of the United States." 141 Cong. Rec. S 2,527 (Feb. 10, 1995) (emphasis added).

Counts 4 and 5, which charge a military expedition and enterprise against the territory of a foreign state and conspiracy to do the same, fare no better. Section 960 imposes criminal liability on one who "knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state … with whom the United States is at peace." 18 U.S.C. § 960. But conduct authorized by a foreign state's judicial or law enforcement officers cannot, as a matter of law, amount to a "military or naval expedition or enterprise … against the territory" of that state.

First, controlling Supreme Court precedent forecloses an interpretation of Section 1960 that would extend to conduct authorized by judicial and law enforcement officers of the foreign

state against whom an expedition is allegedly undertaken. Since enactment of the relevant statutory language in 1794, the Supreme Court has read it to require "mak[ing] war on [a foreign] government." *Wiborg v. United States*, 163 U.S. 632, 653 (1896); *see J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (collecting cases construing similar statutory language), *vacated on other grounds*, No. 24A931 (U.S. Apr. 7, 2025). Security contractors *invited* to a foreign state by its judicial and law enforcement officers, by definition, do not make war against that government by heeding its invitation. And the Supreme Court's more recent interpretation of the word "against" confirms that Section 960 does not prohibit foreign authorized conduct. "[A]gainst" means "in opposition to." *Borden v. United States*, 593 U.S. 420, 430 (2021) (citation omitted). Under that "oppositional" definition, *id.* at 431, conduct authorized by foreign state officials cannot amount to an "expedition … *against* the territory" of that state, 18 U.S.C. § 960 (emphasis added). Such conduct is undertaken pursuant to the foreign sovereign's authority, not "in opposition to it." *Borden*, 593 U.S. at 430.

Second, Section 960's recodification in the same chapter of Title 18 containing other foreign-relations offenses weighs against an interpretation that would criminalize foreign authorized conduct. Like Section 956(a)(1) and other offenses "contained in chapter 45 of title 18," Section 960 prohibits only conduct undertaken "without appropriate governmental authorization." 141 Cong. Rec. S 2,527 (Feb. 10, 1995).

### C.    The Act of State Doctrine Forbids This Court to Second-Guess Haitian Officials' Authorization of the Charged Offense Conduct

The indictment's allegation that Mr. Solages acted pursuant to a "purported Haitian immunity agreement," S5 at 7, is a sufficient ground to determine that it fails to state an

offense.[13] Longstanding precedent forbids American courts to adjudicate the validity of official acts of foreign governmental officials. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 439 (1964). Simply put, it makes no difference whether issuance of the Letter of Request for International Assistance comported with Haitian law—a highly disputed matter entirely inappropriate to resolution in American courts. Because a public act of Haitian officials performed in Haiti authorized the charged offense conduct, the indictment fails to state offenses under Sections 956(a)(1) and 960, or for support or conspiracy to violate those statutes.

"Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The act of state doctrine operates as a "*principle of decision* binding on federal and state courts alike": "the act within its own boundaries of one sovereign State . . . becomes . . . a rule of decision for the courts of this country." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (quoting *Sabbatino*, 376 U.S. at 427 (first quotation), and *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918) (second quotation) (ellipsis in original)). "Adopted for reasons of comity, it forbids U.S. courts from adjudicating the acts of a foreign sovereign in its own territory." *Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545, 552 (11th Cir. 2015). "It 'requires that the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.'" *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006) (some quotation marks omitted) (quoting *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1293 (11th Cir.

[13] To the extent it is not incorporated into the indictment by reference, the text of the Letter of Request for International Assistance is appropriately subject to judicial notice as a foreign judicial record. *See* supra, note 1. But the indictment is facially defective even without considering the immunity agreement's text.

2001)).

The act of state doctrine applies to a wide range of official acts by foreign governmental officials, and plainly governs an official immunity agreement executed by foreign judicial and law enforcement officers in their official capacities. The Supreme Court has made clear that "an official's acts can be considered the acts of the foreign state, and that 'the courts of one country will not sit in judgment' of those acts when done within the territory of the foreign state." *Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) (quoting *Underhill*, 168 U.S. at 252). For example, the Supreme Court has applied the doctrine to forbid adjudication in American courts of a decision by a military officer to withhold a passport. *See Underhill*, 168 U.S. at 254. And the Eleventh Circuit has applied it to bar challenges to the validity of foreign official acts ranging from a government agency's decision to place a company in receivership, *see Fogade*, 263 F.3d at 1293, to consent by diplomatic officials to extradition, *see United States v. Knowles*, 390 F. App'x 915, 928 (11th Cir. 2010), to investigative activities of foreign prosecutors and judicial officers, *see Dvoinik v. Philipp*, No. 23-12240, 2024 WL 95440, at *4 (11th Cir. Jan. 9, 2024) (unpublished). A letter signed by a Haitian Supreme Court Justice and a prosecutor in their official capacities authorizing law enforcement activities in Haiti falls squarely within the foreign official acts that "must be deemed valid and cannot be subject to review in a United States court." *Fogade*, 263 F.3d at 1293.

Any other rule would present profound concerns for international comity. Under the theory charged in the indictment, for example, a foreign state could adjudicate the validity of American warrants, the proprietary of cooperation agreements entered into by American prosecutors, or whether American law enforcement officers acted reasonably in performing investigative functions. For more than a century, the act of state doctrine, like presumptions

against the application of domestic criminal law to conduct undertaken in foreign states or authorized by foreign officials, has safeguarded "the independence of every other sovereign state … within its own territory." *Underhill*, 168 U.S. at 252. The indictment's suggestion that this Court should second-guess the decisionmaking of Haitian officials in matters of internal governance marks an unprecedented departure from that norm.

Under the act of state doctrine, the Letter of Request for International Assistance provides the "rule of decision" for this Court. *Kirkpatrick*, 493 U.S. at 406 (citation omitted). Because that document, as alleged in the indictment, on its face authorized the charged offense conduct, the indictment fails to state an offense as a matter of law.

## III. At the Very Least, the Rule of Lenity Bars This Prosecution

If there were any doubt whether the charged offenses apply to conduct in a foreign country or authorized by foreign officials, the rule of lenity would nonetheless require resolving any uncertainty in Mr. Solages's favor. The rule of lenity requires courts to construe ambiguous criminal statutes narrowly and in favor of the accused. *See United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). This principle "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985) (citing *United States v. Bass*, 404 U.S. 336, 347–348 (1971)).

As discussed above, longstanding presumptions rooted in customary international law raise at least serious questions about whether Sections 956(a)(1) and 960 may appropriately be applied to conduct occurring in a foreign country or authorized by foreign officials. And the plain text of those statutes, their codification within Chapter 45 of Title 18, and the circumstances of their enactment give every indication that they do not. Against that backdrop,

only construing those statutes narrowly in conformance with international-law norms will ensure those statutes provide "fair warning" of the conduct they proscribe. *Id.* The rule of lenity applies with particularly strong force where, like here, a broad construction of a criminal statute would "criminalize a broad range of apparently innocent conduct." *Id.* at 426. Individuals engaging in conduct in Haiti authorized by a Haitian Supreme Court Justice and a Port-au-Prince prosecutor would have no reason suspect that an American court would inject itself into the Haitian political process and second-guess the official acts of high-ranking Haitian officials. No sound reason exists for this Court to do so.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Fifth Superseding Indictment against Mr. Solages in its entirety.

Dated: May 2, 2025

Respectfully submitted,

JONATHAN S. FRIEDMAN, P.A.
Attorney for Defendant
101 N.E. 3rd Ave.
Suite 1500
Fort Lauderdale, Florida 33301
Telephone: (954) 713-2820
Facsimile: (754) 301-5109
JFriedmanlawfirm@gmail.com

/s/ Jonathan Friedman
______________________________.
JONATHAN S. FRIEDMAN, ESQ.
Florida Bar Number: 0973297

PATRICK DRAY, P.A.
Attorney for James Solages
18501 Pines Blvd.
Suite 344
Pembroke Pines, FL 33029
Telephone: (954) 374-4323
Facsimile: (786) 513-2244
pat@patdray.com

/s/ S. Patrick Dray
______________________________
S. PATRICK DRAY, ESQ.
Florida Bar Number: 0180157

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 2, 2025 the foregoing motion was served under seal via ECF to all counsel of record.

JONATHAN S. FRIEDMAN, P.A.
Attorney for Defendant
101 N.E. 3rd Ave.
Suite 1500
Fort Lauderdale, Florida 33301
Telephone: (954) 713-2820
Facsimile: (754) 301-5109
JFriedmanlawfirm@gmail.com

/s/ Jonathan Friedman
______________________________.
JONATHAN S. FRIEDMAN, ESQ.
Florida Bar Number: 0973297

PATRICK DRAY, P.A.
Attorney for James Solages
18501 Pines Blvd.
Suite 344
Pembroke Pines, FL 33029
Telephone: (954) 374-4323
Facsimile: (786) 513-2244
pat@patdray.com

/s/ S. Patrick Dray
______________________________
S. PATRICK DRAY, ESQ.
Florida Bar Number: 0180157