UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20104-BECERRA

UNITED STATES OF AMERICA

v.

JAMES SOLAGES,
    a/k/a "Yacov,"
    a/k/a "Junior,"

    Defendant.
_____/

### UNITED STATES' OPPOSITION TO DEFENDANT JAMES SOLAGES' MOTION TO SUPPRESS COERCED STATEMENTS

The United States, by and through the undersigned attorneys, hereby files its opposition to the motion to suppress filed on May 2, 2025 by Defendant James Solages. (DE 1033). The Court should deny Solages' motion.

As a threshold matter, the February 8, 2022, recorded meeting, attached hereto as Exhibit A, speaks for itself—there is no need for an evidentiary hearing. *See* Exhibit A, February 8, 2022, Recorded Meeting with Solages. And the Government will not, during its case-in-chief, admit or use any of the statements made by Solages to U.S. prosecutors and agents during the February 8, 2022, recorded meeting, rendering Solages' motion moot.

Equally important, the U.S. investigative team did not "interrogate" or "press" Solages, or engage in the functional equivalent of interrogation, during the February 8, 2022 meeting. (DE 1033 at 4, 6). Upon Solages' invocation of his right to counsel, which occurred early in the meeting, the investigative team did not ask Solages any substantive questions nor did they use any words or actions intended to elicit an incriminating response from Solages. Instead, it was Solages who repeatedly and voluntarily tried to substantively engage with the U.S. investigative team, even

1

asking one of the agents to have an off-the-record "gentleman conversation." The only "press[ing]" by the U.S. investigative team, as alleged by Solages, was done to repeatedly educate Solages that the team could not speak with him about the substance of the investigation because he had invoked his right to counsel and had not signed the waiver of rights. Accordingly, Solages' motion fails on the merits.

## Factual Background

Solages was arrested by Haitian authorities after the assassination of President Jovenel Moise on July 7, 2021. While in Haitian custody, Solages was interviewed multiple times in July 2021 by U.S. law enforcement officers. *See* USA_000000150, USA_000000460, and USA_000423940. Each of those interviews started with an advisement of rights, an acknowledgement by Solages that he understood his rights, and an executed waiver of rights. *Id.* After waiving his rights in each of those July 2021 interviews, Solages delved deep into the facts of the assassination plot, including the role that he and his co-defendants and co-conspirators played in the ousting of President Moise. *Id.* Solages does not challenge the July 2021 interviews.

On February 8, 2022, members of the U.S. investigative team traveled to Haiti to meet with Solages, who remained in Haitian custody. Like the July 2021 interviews, the February 2022 meeting began with an advisement of rights and an acknowledgement by Solages that he understood his rights. (Ex. A at :30). The U.S. investigative team went so far as to offer Solages a Haitian Creole interpreter to ensure that he fully understood his rights, which he turned down. (*Id.* at :34). After being advised of his rights, Solages elected to "use the option that Mr. Russo gave me by calling my lawyer for advice, legal advice" and asked whether it was "safe while I'm here to even open my mouth to say anything." (*Id.* at 4:10).

2

Former Government Trial Attorney Frank Russo ("Mr. Russo") responded by candidly explaining to Solages why the investigative team was in Haiti, namely that the team was in the process of making charging decisions, which included a determination of Solages' willingness to cooperate with the United States. (*Id.* at 5:05). To manage expectations, Mr. Russo then addressed head-on the issue of whether Solages would be brought to the United States, making no guarantees, but telling Solages that he (Mr. Russo) would recommend that Solages be charged and brought to the United States, depending on Solages' "candor and willingness to take responsibility for [his] actions." (*Id.* at 6:32).

After Mr. Russo's introductory explanation, he immediately moved to the issue of Solages' attorney:

> You have said that you have an attorney in Haiti and you are not sure whether or not they are licensed in the United States. We need to figure that out because we can't talk to you if that's the case, which is fine, that is not something that we hold against you, that's your right as a United States Citizen. But to respect the law, we want to make sure that's taken care of.
>
> Sometimes the attorney can be on the phone, sometimes they'd like to be present. Because we are in Haiti, we can't control what happens whether or not they would let such a person in. We can probably call them up and let them listen in and maybe they can give you advice – I don't know what the arrangements here.

(*Id.* at 7:05).

Turning then to Solages' safety concerns, one of the agents asked Solages if people from the U.S. Embassy had been visiting Solages in custody and whether Solages had expressed his safety concerns to Embassy staff. (*Id.* at 9:25). Solages responded, "Absolutely," and then proceeded to offer a long monologue about not wanting to burden the United States with his safety concerns because he got himself "into a dirty scene." (*Id.* at 9:28; 10:45).

Recognizing that Solages was veering into the substance of the investigation, Mr. Russo quickly cut him off:

3

- RUSSO: "Before you go further though, we still have to clarify the attorney situation if you have the number of the attorney we can call." (*Id.* at 10:53)

- SOLAGES: "I don't have the number, unfortunately." (*Id.* at 11:00)

- RUSSO: "Okay, but I don't want you to feel like you have to say anything to us if . . ." (*Id.* at 11:03)

- SOLAGES: "It is my willingness to say anything." (*Id.* at 11:09)

- RUSSO: "No, I understand that, but if you are represented we have obligations to the court that we cannot question you, right, without the presence or the say so of your lawyer so we want to make sure that that's respected. We understand, we get a sense of what you have said already, but it makes me uncomfortable if you are here saying I would like to talk to my lawyer first and then now you start talking which is okay but it makes me uncomfortable because **you are not talking before you've had a chance to talk to your lawyer**." (*Id.* at 11:11) (emphasis added).

Because Solages did not know the phone number for his attorney, the parties exchanged ideas regarding different ways they could reach the attorney, settling on a phone call to Solages' wife as the first stop. (*Id.* at 11:55). While one of the agents tried to call Solages' wife, another reiterated how important Solages' invocation was and how seriously the investigative team was taking it:

> You know it is our responsibility that with these cases, any case, if someone wants an attorney that's their right as a U.S. Citizen, and we have to, and we want to because that's the right thing, that's how the system should work, and so that's why we take this seriously in making sure you are afforded that right and we don't put you in a position that you shouldn't be in.

(*Id.* at 12:36). Solages responded, "Either way, I want to speak with you guys." (*Id.* at 13:00). Mr. Russo brought Solages back: "Sure, but it's not an all or nothing thing, there may be a time in the future you can do it after you've had a chance to . . . ." (*Id.* at 13:10).

As the investigative team continued to attempt to contact Solages' attorney, Solages again began to veer into the substance of the investigation. (*Id.* at 15:46). Mr. Russo cut off Solages again—"We can talk about that, I don't want you to . . . let's settle this first." (*Id*. at 16:07). As

4

the attempts to contact Solages' attorney continued, Mr. Russo and Trial Attorney Emma Ellenrieder asked Solages about his conditions of confinement.  (*Id.* at 16:30).

The continued attempts to contact Solages' attorney revealed that Solages and co-defendant Joseph Vincent were represented by the same Haitian attorney, an issue that was spotted and addressed by Mr. Russo.  Mr. Russo noted that the issue-spotting was not meant to discourage Solages from having his attorney involved but instead offered as a caution that the U.S. investigative team could not control what the Haitian attorney would tell other people, including Mr. Vincent.  (*Id.* at 22:04; 23:59).

Approximately 34 minutes into the meeting, the U.S. investigative team, after multiple attempts, was finally able to reach Solages' attorney, and the recording was turned off to allow Solages to speak with his attorney.  (*Id.* at 34:20).  After speaking with Solages, Solages' attorney reportedly told one of the investigating agents that unless the investigative team could get Solages out of Haiti, the investigative team was prohibited from speaking with Solages.  (*Id.* at 35:32). Solages described his attorney's advice as "very unfortunate" because he "want[ed] to talk" and "fully, and fully, and fully cooperate with the U.S. authorities."  (*Id.* at 36:06; 39:12; 40:15). Sensing that Solages was conflicted on the issue, Mr. Russo told Solages that Solages' invocation and adherence to the advice of his attorney was not "something we hold against you" and that the U.S. investigative team would not "be upset or change our thinking about things in terms of your case."  (*Id.* at 38:18).

At approximately 43:07 into the meeting, an unidentified male voice can be heard asking to talk to the two attorneys, Mr. Russo and Ms. Ellenrieder, who left the room.  With the attorneys out of the room, one of the agents *again* reiterated that Solages' decision to not talk to the investigative team would not affect the team's willingness "to want to try to work with you."  (*Id.*

5

at 43:35).  The agent continued, "We still have your lawyer's number, we're still going to call him . . . trying to see what we can work out, but I just want you to know this doesn't affect anything going forward, we still would like to talk to you.  I'd advise you to continue to talk to your lawyer so we can try to see if we can get something arranged."  (*Id.* at 43:39).

Undeterred by repeated admonitions, and with the attorneys still out of the room, Solages *again* tried to speak substantively about the investigation:

> Can I ask you a question, I know by law I shouldn't talk, but this is not about law, this is a gentleman conversation.  There's a lot of people involved into this whole entire mess that claim to be State Department, Justice Department, are they all real?

(*Id.* at 45:55).  One of the agents rebuffed Solages' renewed attempt: "Your lawyer didn't give us permission to talk to us [sic], you are not willing to talk to us, you haven't signed the consent, you know what I mean, so I can't technically discuss any of that with you."  (*Id.* at 46:42).  Solages replied, "That's what I said, that's not the law it is gentleman . . ."  (*Id.* at 46:52).  After which another agent wisely chimed in, "It's all the law to us."  (*Id.* at 46:57).

Eventually the attorneys returned to the room and Mr. Russo advised:

> I apologize for having to step out here.  And again, we respect your attorney's judgment and what your judgment is as to what your safety is.  Because we can't give you legal advice, your attorney is qualified under Haitian law to give you legal advice.  They know the community here better than we do and it is completely up to you as to whether or not you speak to us.
>
> We are not going to get involved, we are not going to opine on whether that advice is correct or good, we just want to make sure that you have that available to you. We respect that you want to follow that advice, that's fine, we don't hold that against you, okay?  It is not going to change our ultimate recommendations here, okay?
>
> And you know, like I said, we may have a chance to speak again in the future hopefully in better conditions, but that's not up to me, I can't promise that.  I understand your attorney wants more of a promise that you're going to get out of here and that's not a promise we can make at this point.  Any questions for us?

6

(*Id.* at 56:40). Mr. Russo continued, "We want to respect your lawyer's advice to you, and your decision, more importantly." (*Id.* at 58:57). In response, Solages offered another conflicted monologue, expressing his desire to speak to U.S. authorities but also wanting to respect the advice of his attorney. (*Id.* at 59:03).

Even in the face of such recurrent ambivalence on the part of Solages, the U.S. investigative team asked no substantive questions of Solages, finally cutting him off by saying, "So we're going to cut this here just so that we don't talk to you too long, you've spoken to your attorney and your attorney doesn't want you to speak to us so before we get too far into the rabbit hole of things or something like you said, we'd like to stop it here." (*Id.* at 1:03:35).

## Argument

I. **The Government Will Not Use Any of Solages' February 8, 2022 Statements During its Case-in-Chief, Rendering Solages' Motion Moot**

The Government will not, during its case-in-chief, admit or use any of the statements made by Solages during the February 8, 2022, recorded meeting, rendering Solages' motion moot. However, should Solages elect to testify at trial, the Government reserves the right to use them during cross examination.

"While even voluntary statements will be excluded from evidence if they are deemed unwarned, 'the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted' for all other purposes." *United States v. Gilkeson*, 431 F. Supp. 2d 270, 283 (N.D.N.Y. May 9, 2006) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). For example, statements in violation of *Miranda* can be used for cross-examination of a defendant at trial. *See, e.g., Harris v. New York,* 401 U.S. 222 (1971), and *Oregon v. Hass*, 420 U.S. 714 (1975). Just as "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk

7

of confrontation with prior inconsistent utterances," *Hass*, 420 U.S. at 722, Solages should not be granted the same, should he testify at trial, in this case.

## II.    The Investigative Team's Interactions with Solages on February 8, 2022 Were Reasonable and Did Not Constitute an Interrogation

A common sense, rational review of the February 8, 2022 recording reveals that Solages' statements are not the product of any custodial interrogation or its functional equivalent. *See United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir. 1985) (citing *Miranda v. Arizona*, 384 U.S. 436, 478 (1966); *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980); *United States v. Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984)) and reiterating that "[v]oluntary incriminating statements . . . not made in response to an officer's questioning are freely admissible."). To describe the actions of the U.S. investigative team with phrases like "continued to press," "continued to question," "persisted in the interrogation," as Solages does in his motion, is conclusory, ignores the law, and is a gross mischaracterization of the reasonable and lawful behavior of each member of the investigative team during their February 8, 2022 interactions with Solages.

For purposes of *Miranda*, interrogation is "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. "The functional equivalent of express questioning is 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Moton*, No. 2:18-cr-00534-KOB-SGC, 2021 U.S. Dist. LEXIS 240717, at *25-26 (N.D. Ala. Nov. 10, 2021) (magistrate judge's report and recommendation) (quoting *Innis*, 446 U.S. at 301). "Once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation." *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991); *see also United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) ("It best serves all interests, especially

law enforcement, to remain close to the 'bright line': interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.").

But this bright line prohibition on post-invocation interrogation requires two conditions precedent—a request for counsel *and* interrogation. *See Innis*, 446 U.S. at 301 ("*Miranda* safeguards come into play whenever a person . . . is subjected to either express questioning or its functional equivalent."). Attempting to define "interrogation," the *Innis* Court explained that interrogation encompasses "any words or actions . . . that are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted). In its continued attempt to define "interrogation," the Supreme Court later reasoned, "In deciding whether particular police conduct is interrogation, [a Court] must remember the purpose [of *Miranda*]: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987).

In *Suggs*, the Eleventh Circuit found that a defendant, after being advised of *Miranda* warnings and invoking his right to silence, made a series of incriminating statements after being shown the indictment and subjected to various officer comments regarding "prison conditions, family pressure, and the like . . . ." 755 F.2d at 1541-42. The *Suggs* court found that the defendant's incriminating statements were not the product of interrogation or its functional equivalent and reiterated that "[v]oluntary comments unresponsive to governmental questioning are admissible even after *Miranda* rights are asserted." *Id.* at 1542.

Finally, the Eleventh Circuit recently weighed in on the definition of "interrogation" in *Bowen v. Sec'y, Fla. Dep't of Corr.*, 92 F. 4th 1328, 1334-36 (11th Cir. 2024). After reviewing *Innis* and *Mauro*, the court reiterated that coercion is a "fundamental requirement" in "deciding

whether police conduct is the functional equivalent of interrogation" and that the core principle underlying the rights afforded by the Fifth Amendment is "a proscription against compelled testimony." *Id.* at 1336.

Here, Solages unequivocally requested counsel. However, Solages wholly misses the mark in labeling the U.S. investigative team's conduct, post-invocation, as interrogation or its functional equivalent. After his invocation, the U.S. investigative team did not ask Solages any substantive questions and they did not discuss the investigation, despite Solages' repeated attempts to the contrary. The U.S. investigative team also did not engage in any coercion or action that was likely to elicit an incriminating response from Solages after his invocation.

Instead, the U.S. investigative team—as clearly captured in the recording attached hereto as Exhibit A—respected Solages' invocation, even in the face of his continued ambivalence and his repeated, self-initiated attempts to veer into the substance of the investigation. They creatively tried multiple different avenues to reach Solages' attorney and respected Solages' attorney's instruction. To the extent they asked any questions, the investigative team merely inquired about Solages' well-being and the conditions of his confinement. *See Suggs*, 755 F.2d at 1541-42. They also repeatedly told Solages that they would not hold Solages' invocation against him.

To be clear, the U.S. investigative team discussed the potential charging landscape with Solages. However, the recording makes clear that they only did so to manage Solages' expectations that he might be brought to the United States and not be subject to charges. The U.S. investigative team never attempted to coerce Solages into waiving his rights and speaking with the investigative team. (*See* Ex. A at 1:02:57) (RUSSO: "I just want you to understand that if you come it's not like you are being brought as a witness, you are going to be brought as a defendant and charged with a crime."). And regarding potential benefits of cooperation, Mr. Russo was

equally clear with Solages, early in the meeting during Mr. Russo's explanation of why the team was in Haiti, that there were no promises on what could be offered but said generally that people who have cooperated in the past could ask for leniency. (*Id.* at 5:37). In short, neither the actions nor the words of the investigative team on February 8, 2022 could be construed as an interrogation or its functional equivalent.

The U.S. investigative team's conduct on February 8, 2022 was measured, reasonable, and entirely lawful. After Solages' invocation, none of the actions or words of the investigative team were intended to elicit an incriminating response. To the contrary, as the recording shows, Solages repeatedly and voluntarily tried to discuss the substance of the investigation, giving the team every opportunity to try to engage in a "psychological ploy" (*Mauro*, 481 U.S. at 527) to elicit an incriminating response. They never did. Instead, the investigative team repeatedly cut off Solages, even when he voluntarily tried to have an off-the-record "gentleman conversation." Indeed, thanks to the investigative team's interventions, Solages never delved into the facts of this case during the February 8, 2022 interview. Instead, much of the discussion focused on tangential matters like the conditions of Solages' confinement, his health, and other non-substantive topics—of little value to either party in this case. Solages was never subjected to interrogation or its functional equivalent. His motion should be denied.

[No further information on this page.]

## Conclusion

Solages' motion should be denied. Not only is it rendered moot by the Government's express representation that it will not use any statements made by Solages on February 8, 2022 during its case-in-chief, but it also fails on the merits because Solages was never subjected to interrogation or its functional equivalent.

Respectfully submitted,

| | |
|---|---|
| HAYDEN P. O'BYRNE<br>United States Attorney | SUE J. BAI<br>Supervisory Official for the National<br>Security Division |
| By: */s Sean T. McLaughlin*<br>Sean T. McLaughlin<br>Assistant United States Attorney<br>Court ID No. A5501121<br>11200 NW 20th Street, Suite 101<br>Miami, FL 33172<br>(305) 715-7642/7654<br>Sean.McLaughlin@usdoj.gov | */s Andrew Briggs*<br>Andrew Briggs<br>Trial Attorney<br>Court ID No. A5503251<br>National Security Division – Department of Justice<br>950 Pennsylvania Avenue<br>Washington, DC 20530<br>(202) 514-7739<br>Andrew.Briggs2@usdoj.gov |
| /s *Jason Wu*<br>Jason Wu<br>Assistant United States Attorney<br>ID No. A5502299<br>99 NE 4th Street<br>Miami, FL 33132<br>(305) 961-9226<br>Jason.Wu@usdoj.gov | |
| */s Altanese Phenelus*<br>Altanese Phenelus<br>Assistant United States Attorney<br>FL Bar No. 112693<br>99 N.E. 4th Street<br>Miami, FL 33132<br>(305) 961-9375<br>Altanese.Phenelus@usdoj.gov | |

**Certificate of Service**

I hereby certify that on May 16, 2025, I filed the foregoing document with the Clerk of the Court via CM/ECF.

/s *Andrew Briggs*
Andrew Briggs
Trial Attorney
