UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                    CASE NO.22-CR-20104

v.

ANTONIO INTRIAGO, et al

      Defendant.

_____/

## AMENDED NOTICE OF FILING DEPOSITION DESIGNATIONS FOR WITNESS EDWIN BLANQUICET

      Defendant, Antonio Intriago, pursuant to the Court's Order Setting Procedures for

Deposition Designations, submits the following deposition designations in page: line format for

Witness, Edwin Blanquicet. A true and correct copy of the deposition transcript of Edwin

Blanquicet is attached hereto as **Exhibit "A."** The parties' respective designations are highlighted

in different colors, and the specific objections to the opposing party's designations are included in

the margins of the transcript.

| Affirmative Designations (Page: line) | Objections to Designations | Ruling | Counter Designations | Objections to Counter Designations | Ruling |
|---|---|---|---|---|---|
| 25:5 – 26:23 | Relevance (25:11-25; 26:1-10; 26:18-23) | | U.S. Des. 31:25; 32:1-7 | | |
| 27:4 –16 | Relevance | | U.S. Des. 43:10-16 | | |
| 29:9 – 31:23 | Hearsay (30:15-20) Leading (31:17-23) | | U.S. Des. 91:13-24 | | |
| 32:16 – 34:22 | | | U.S. Des. 97:18-21 | | |
| 35:2 – 36:17 | | | U.S. Des. 98:8-25; 99:1-13 | | |
| 36:22 – 41:14 | | | U.S. Des. 100:5-7 | | |
| 42:8 –14 | | | U.S. Des. 101:14- | | |

| | | | 19 | | |
|---|---|---|---|---|---|
| 43:5 –8 | | | U.S. Des. 103:1-25; 104:1-10 | Relevance | |
| 43:17 – 46:8 | | | U.S. Des. 104:24-25; 105:1-25; 106:1-7 | Argumentative | |
| 46:17 – 49:10 | | | U.S. Des. 106:9-25 | | |
| 49:21 – 59:8 | Leading (52:20-25; 53:1-7) Hearsay (56:21-25; 57:1) | | U.S. Des. 108:10-25; 109:1-25; 110:1-9 | | |
| 59:16 – 72:18 | Leading (62:17-25; 63:1-10) Asked and Answered (66:25; 67:1-8) | | U.S. Des. 118:7-25; 119:1-25; 120:1-25; 121:1-25; 122:1-25; 123:1 | | |
| 74:5 –24 | | | U.S. Des. 123:10-25; 124:1-25; 125:1-25; 126:1-8 | | |
| 75:4 – 79:22 | Speculation & Relevance (78:16-25; 79:1-22) | | U.S. Des. 126:22-25; 127:1-25; 128:1-2 | | |
| 80:6 – 81:3 | Speculation, Relevance, Hearsay (80:6-21) | | U.S. Des. 129:22-25; 130:1-4; 130:12-25 | | |
| 81:8 – 83:4 | Leading, Speculation, Relevance (82:10-16)  Relevance (82:18-22)  Relevance & Leading (82:24-25; 83:1-4) | | U.S. Des. 132:14-25; 133:1-25; 134:1-9 | | |
| 83:12 – 84:22 | Relevance, Argumentative, Vague (83:12-17)  Relevance (84:9-22) | | U.S. Des. 134:20-22 | | |

| | | | | | |
|---|---|---|---|---|---|
| 85:6 – 88:7 | Calls for narrative, Relevance, Hearsay (85:6-25; 86:1-18)<br><br>Relevance, Speculation, See also DE 1302 re Haitian charges (87:2-25; 88:1-7) | | U.S. Des. 135:2-25; 136:1-23 | | |
| 131: 2 – 12 | | | | | |
| 143:14 – 145:25 | | | U.S. Des. 137:22-25; 138:1-25; 139:1-13 | | |
| 148:2 – 149:3 | Relevance & Hearsay | | U.S. Des. 140:6-19 | | |
| 151:12 – 155:12 | Leading & Hearsay (154:6-13) | | U.S. Des. 141:1-25; 142:1-25; 143:1 | | |
| 159:19 – 162:6 | Compound & Calls for a narrative (159:19-25; 160:1-3)<br><br>Leading, calls for legal conclusion (160:5-13)<br><br>Leading (160:15-23)<br><br>Speculation, calls for a legal conclusion (161:11-18) | | U.S. Des. 146:6-25; 147:1-7 | Argumentative | |
| | | | U.S. Des. 149:15-23 | Speculation & Calls for a Legal Conclusion | |
| | | | U.S. Des. 150:3-7 | | |
| | | | U.S. Des. 153:3-15 | | |
| | | | U.S. Des. 156:2-25; 157:1-20 | | |
| | | | U.S. Des. 157:22-25; 158:1-8; | | |

| | | | 158:12-18 | | |
|---|---|---|---|---|---|
| | | | U.S. Des. 159:15-18 | | |
| | | | U.S. Des. 160:24-25; 161:1-10 | | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on March 4, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which sent e-mail notification of such filing to all CM/EFC participants in this case.

**EMMANUEL PEREZ & ASSOCIATES, P.A.**
901 Ponce De Leon Blvd. Suite 101
Coral Gables, Florida 33134
Tel: (305) 442-7443
Fax: (305) 441-9218
Email: courtmail@lawperez.com

By: ____*/s/ Emmanuel Perez*_____
        Emmanuel Perez, Esquire
        F.B.N. 586552

Exhibit "A"

**Live Deposition Edwin Blanquicet Vol. 1**

**United States of America vs. Arcangel Pretel Ortiz, et al.**

**November 19, 2025**



Fernandez&Associates
court reporters

Rivergate Plaza, Suite 714
444 Brickell Avenue
Miami, FL 33131

service@fernandezCR.com
305-374-8868

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cr-20104-JB

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.

ARCANGEL PRETEL ORTIZ, et al,

                    Defendants.

_____ X


                    400 North Miami Avenue
                    Miami, Florida
                    November 19, 2025
                    10:15 - 3:02 p.m.



                    VOLUME I

              REMOTE DEPOSITION OF

        EDWIN ENRIQUE BLANQUICET RODRIGUEZ


        Taken before Suzanne Fernandez, Notary

Public in and for the State of Florida at

Large, pursuant to Notice of Taking Deposition

filed in the above cause.


                - - - - - - -

```
 1        APPEARANCES:

 2
           ON BEHALF OF THE UNITED STATES:
 3
               U.S. Attorney's Office
 4             11200 NW 20th Street, Suite 101
               Miami, FL 33172
 5             BY:  Sean T. McLaughlin, AUSA
                    Sean.McLaughlin@usdoj.gov
 6                     and
               99 NE 4th Street
 7             Miami, FL 33132
               BY:  Jason Wu, AUSA
 8                  Jason.Wu@usdoj.gov
                       and
 9                  Altanese Phenelus, AUSA
                    Altanese.Phenelus@usdoj.gov
10                     and
               950 Pennsylvania Avenue
11             Washington, DC 20530
               BY:  Andrew Briggs, Trial Attorney
12                  Andrew.Briggs2@usdoj.gov

13         ON BEHALF OF DEFENDANT ARCANGEL PRETEL ORTIZ:

14             Do Campo & Thornton, P.A.
               Chase Bank Building
15             150 SE 2nd Ave, Suite 602
               Miami, FL 33131-1571
16             BY:  Orlando Do Campo, Esq.
                    od@dandtlaw.com
17                     and
                    David A Howard, P A
18                  25 SE 2nd Ave, Ste 1105
                    Miami, FL 33131-1605
19             BY: David Howard, Esq.
                    david@davidhowardlaw.com
20                     and
                    Daniela Jaramillo
21                  150 SE 2nd Ave Ste 602
                    Miami, FL 33131-1571
22             BY:  Daniela Jaramillo, Esq.
                    Dj@dandtlaw.com
23

24

25
```

```
 1      ON BEHALF OF DEFENDANT ANTONIO INTRIAGO:

 2           Emmanuel Perez & Associates, P.A.
             901 Ponce De Leon Blvd, Ste 101
 3           Coral Gables, FL 33134-3059
             BY:  Emmanuel Perez, Esq.
 4               Perez@lawperez.com
                     And
 5           Barzee Flores, Attorneys at Law
             Courthouse Center, Penthouse I
 6           40 NW 3rd St
             Miami, FL 33128-1838
 7           BY:  Hector Flores, Esq.
                 Hectorflores@barzeeflores.com
 8
        ON BEHALF OF DEFENDANT WALTER VEINTEMILLA:
 9
             Kudman Trachten Aloe Posner LLP
10           7108 Fairway Dr, Ste 130
             Palm Beach Gardens, FL 33418-3768
11           BY:  Tama Beth Kudman, Esq.
                 Tkudman@kudmanlaw.com
12
        ON BEHALF OF DEFENDANT CHRISTIAN SANON:
13
             Humberto R. Dominguez, PA
14           9100 S Dadeland Blvd, Ste 1500
             Miami, FL 33156-7816
15           BY:  Humberto Dominguez, Esq.
             Bert@hdominguezlaw.com
16                   and
             Bozanic Law, P.A.
17           101 NE 3rd Ave, Ste 1500
             Fort Lauderdale, FL 33301-1181
18           BY:  Zeljka Bozanic, Esq.
                 Info@bozaniclaw.com
19

20      ON BEHALF OF DEFENDANT JAMES SOLAGES:
             Jonathan S. Friedman, P.A.
21           101 NE 3rd Ave, Ste 1500
             Fort Lauderdale, FL 33301-1181
22           BY:  Jonathan Friedman, Esq.
                 Jfriedmanlawfirm@gmail.com
23                   and
             S. Patrick Dray, P.A.
24           11900 Biscayne Blvd, Ste 459
             North Miami, FL 33181-2726
25           BY:  Simon Dray, Esq.
                 Pat@patdray.com
```

4

```
1       ALSO PRESENT IN FLORIDA:

2       Thomas Pavletic, FBI
        Joelle Haspil, Interpreter
3       Fiorella Warger, Interpreter
        Hernando Soto, Interpreter
4       Susana Starosta, Interpreter

5

        ALSO PRESENT IN HAITI:
6       Brunel Bienvenu, FBI Contractor
        Pierre Antoine Chrispin, Esq.
7       Thermitus Joseph, Esq.
        Francia Altidor, Esq.

8
        Erica Valencia, Colombian Consul
9

10

11                 I N D E X

12
        Witness: Edwin Enrique Blanquicet Rodriguez
13
                    Direct/Redirect  Recross/Cross
14
        By Mr. Perez        23
15      By Ms. Bozantic                  88
        By Mr. Friedman                  91
16      By Mr. McLaughlin                97

17

18

19                 E-X-H-I-B-I-T-S

20      Description               Page
        GOVERNMENT EXHIBIT 2A       108
21      GOVERNMENT EXHIBIT  4       110

22

23

24

25
```

5

```
1              (Whereupon, the following proceedings
2         were had:)
3              MR. BIENVENU:  She's from the
4         embassy, Colombian embassy.
5              MS. VALENCIA:  Consul.
6              MR. BIENVENU:  Consulate.
7              MS. PHENELUS:  Hi.  Good morning.
8         Could you give us your full name and your
9         title.
10             MS. VALENCIA:  Erica Valencia,
11        Colombian consulate in Haiti.
12             MS. PHENELUS:  Thank you.
13             Okay, Brunel.  Can we have whoever's
14        next introduce themselves.
15             MR. BIENVENU:  And then is the
16        lawyer.
17             MS. PHENELUS:  Good morning.  Could
18        we please have your full name.
19             MS. ALTIDOR:  This is Altidor,
20        attorney -- licensed attorney from
21        Port-au-Prince.
22             MS. PHENELUS:  And the gentleman?
23             MR. CHRISPIN:  Chrispin, Pierre
24        Antoine.  Licensed attorney from
25        Port-au-Prince.  Yes.
```

1          MS. PHENELUS:  Just to confirm, you

2     represent Edwin Blanquicet?

3          MR. CHRISPIN:  Yes.  Yes.

4          MS. PHENELUS:  Thank you.

5          And who's next, Brunel?  I think

6     there are more people in the room.

7          MR. BIENVENU:  This is it.

8          MS. PHENELUS:  Okay.  Thank you.

9          And just to confirm, the other people

10     in the room, Brunel, with you is Ansi, who

11     is the tech person?  Right?

12          MR. BIENVENU:  Exactly.  Yes.

13          MS. PHENELUS:  And anyone else?

14          MR. BIENVENU:  No.  Everyone else

15     will be asked --

16          MS. PHENELUS:  Could you say that

17     again?

18          MR. BIENVENU:  No.  I'm going to ask

19     anyone else to please step out.

20          MS. PHENELUS:  If that's possible at

21     this time, yes.

22          Hey, Brunel?

23          MR. BIENVENU:  Yes.  According to the

24     lawyer, she says there is another lawyer

25     on the way.

1        MS. PHENELUS:  Yeah.  That's fine.

2     That's perfectly fine.

3        The officers, are they able to step

4     out?

5        MR. BIENVENU:  Yes.  Okay.

6        MS. PHENELUS:  Thanks so much.

7     (Interpreters were duly sworn)

8        THE WITNESS:  First and foremost,

9     good morning to all of you that are on the

10    screen.  I'd like to know, first and

11    foremost, if my deposition or statements

12    are for the defense or the prosecution.

13       MR. MCLAUGHLIN:  Mr. Blanquicet, I'm

14    Assistant United States Attorney Sean

15    McLaughlin.  We're going to explain that

16    all to you in a short while.

17       THE WITNESS:  Thank you.  Nice to

18    meet you.  I am Edwin Blanquicet

19    Rodriguez.  Very nice to meet you.  And

20    thank you.  I am ready to give a

21    statement.

22       MR. MCLAUGHLIN:  Madam interpreter,

23    can you please swear in the witness?

24  Thereupon:

25      EDWIN ENRIQUE BLANQUICET RODRIGUEZ,

1        was called as a witness by the defendants, and

2        after being first duly sworn through the

3        interpreter, was examined and testified under

4        oath as follows:

5                THE WITNESS:  The truth before God.

6            I've always said so.

7                MR. MCLAUGHLIN:  Very well.

8                Good morning, Mr. Blanquicet.  As I

9            told you earlier, I'm Assistant United

10           States Attorney Sean McLaughlin with the

11           U.S. Department of Justice.

12               Also with me at counsel table are

13           assistant United States attorneys Jason Wu

14           and Altanese Phenelus; DOJ trial attorney

15           Andrew Briggs; and FBI Special Agent Tom

16           Pavletic.

17               THE WITNESS:  It's my pleasure to

18           meet you.

19               MR. MCLAUGHLIN:  And for the record,

20           it's approximately 10:17 a.m.

21               At this time, I'm going to let the

22           defense attorneys state their appearances

23           for the record and who they represent.

24               MR. PEREZ:  Good morning,

25           Mr. Blanquicet.  My name is Emmanuel

1      Perez, and I represent Mr. Antonio

2      Intriago.

3           We are sitting at counsel table with

4      all of the defendants and all with their

5      lawyers.  I'm going to swing my camera

6      around for you to be able to look at

7      everybody that is here with their lawyers.

8           We'll probably be asking you

9      questions, and then you may be asked

10     some -- you will be asked some questions

11     by the government.

12          Good morning, sir.

13          THE WITNESS:  Before you start with

14     your questions, I want you to know that I

15     will be stating the truth.  I am not going

16     to be declaring in favor of the defense.

17     Rather, I will be answering questions

18     posed to me by the prosecutors' office of

19     the United States.

20          MR. MCLAUGHLIN:  Mr. Blanquicet, this

21     is not a forum for you to give us

22     speeches.  You're here to listen to what I

23     tell you.  Do you understand?

24          THE WITNESS:  For the very same

25     reason, Mr. -- Counsel, with all due

```
1          respect, I am not here to declare in favor
2          of the defendants.
3               MR. MCLAUGHLIN:  What I'm going to
4          do, Mr. Blanquicet, is read you a series
5          of statements to let you know the ground
6          rules for this proceeding.  Do you
7          understand?
8               THE WITNESS:  Yes.  Yes.
9               MR. MCLAUGHLIN:  All right.
10              First, the U.S. district court judge,
11         Jacqueline Becerra, presiding over the
12         case here in the Southern District of
13         Florida, criminal case number 22-20104,
14         titled "United States vs. Arcangel Pretel
15         Ortiz, Antonio Intriago, Walter
16         Veintemilla, Christian Emmanuel Sanon, and
17         James Solages," has permitted these five
18         U.S. defendants to convene this deposition
19         proceeding today.
20              The Haitian government has also
21         permitted this deposition to occur today.
22              So you understand, Mr. Blanquicet,
23         the deposition today is not being
24         conducted at the request or direction of
25         the U.S. government, and no one in the
```

1          U.S. government, including the U.S.

2          Department of Justice or the United States

3          judge, can force you, require you, or

4          order you to participate and answer

5          questions today.

6               Do you understand that?

7               THE WITNESS:  I understand

8          everything.  But I'm going to ask my

9          attorneys to see what my attorneys say.

10              MR. MCLAUGHLIN:  Just please listen

11         to what I have to say.

12              So you understand as well, no one

13         from the Haitian government and no one

14         from the Colombian government can force

15         you, require you, or order you to

16         participate and answer questions today.

17              Do you understand that?

18              THE WITNESS:  Yes, Counsel.

19              MR. MCLAUGHLIN:  In fact,

20         Mr. Blanquicet, this deposition is being

21         conducted solely at the request of

22         Defendants Ortiz, Intriago, Veintemilla,

23         Sanon, and Solages.

24              Do you understand that?

25              THE WITNESS:  Yes, I do understand

1     that.

2          MR. MCLAUGHLIN:  Now, the United

3     States judge here has required that you be

4     provided with certain advisements prior to

5     any testimony that you give.  That's done

6     to ensure that you understand your rights

7     under U.S. law as well as rulings that the

8     United States judge has already made in

9     the case against these five U.S.

10    defendants.

11         Do you understand?

12         THE WITNESS:  I do understand that.

13         MR. MCLAUGHLIN:  First,

14    Mr. Blanquicet, you're appearing here

15    today voluntarily.  Again, you are not

16    required to attend or participate in this

17    deposition, you are not required to answer

18    questions, and you can decline and refuse

19    to participate in this deposition.  You

20    can also stop answering questions at any

21    time.

22         Do you understand everything I've

23    just said to you?

24         THE WITNESS:  Yes, Mr. Prosecutor.

25    Very kind of you.

13

```
 1              MR. MCLAUGHLIN:  However,
 2         Mr. Blanquicet, if you decide to
 3         participate but later refuse to submit to
 4         cross-examination or other questioning,
 5         the testimony that you earlier provided
 6         during this deposition may not be usable
 7         at the trial for the five U.S. defendants
 8         or in any U.S.-case-related proceedings.
 9              Mr. Blanquicet, do you understand,
10         again, what I've just told you?
11              THE WITNESS:  I do understand once
12         again, Mr. Prosecutor.  Very kind of you.
13              MR. MCLAUGHLIN:  And based on what
14         I've just told you, do you wish to
15         participate in this deposition today?
16              THE WITNESS:  Mr. Prosecutor, would
17         you be kind enough to allow me a couple of
18         minutes so that I can consult with my
19         attorneys?
20              MR. MCLAUGHLIN:  Absolutely.
21              THE WITNESS:  Thank you.  Very kind
22         of you.
23              (Pause in proceedings)
24              THE WITNESS:  Hello?
25              MR. MCLAUGHLIN:  Yes.
```

```
1              Mr. Blanquicet, have you had a chance to
2         consult with your attorneys?
3              THE WITNESS:  Yes, I did.  I am going
4         to give a statement.  I have nothing to
5         hide.  I have -- I'm going to --
6              MR. MCLAUGHLIN:  Again --
7              THE WITNESS:  -- declare --
8              MR. MCLAUGHLIN:  -- do you wish to
9         participate?  Yes or no.
10             THE WITNESS:  Yes, I am going to
11        declare, because I'm going to talk about
12        the truth.  I have nothing to hide.
13        However, I'd like for Mr. Prosecutor to be
14        kind enough to allow me a couple of
15        minutes to give a statement.
16             MR. MCLAUGHLIN:  That's not going to
17        happen, Mr. Blanquicet.  I'm going to
18        continue on with the advisements that the
19        judge asked us to provide you.
20             THE WITNESS:  Yes.
21             MR. MCLAUGHLIN:  Now, we expect this
22        deposition today to last for approximately
23        six hours, although we will attempt to
24        take a lunch break and any other breaks as
25        necessary for folks to use the bathroom.
```

```
 1                THE WITNESS:  Yes.
 2                MR. MCLAUGHLIN:  Please let us know
 3       if you need to use the restroom so we can
 4       stop and the people in the room with you
 5       can allow you to use the bathroom.
 6                Do you understand what I just told
 7       you?
 8                THE WITNESS:  Yes, Mr. Prosecutor.
 9       Thank you.  Very kind of you.
10                MR. MCLAUGHLIN:  Next,
11       Mr. Blanquicet, your decision to attend
12       and to participate today subjects you to
13       questions from all of the attorneys,
14       including an attorney from the U.S.
15       Department of Justice.
16                Do you understand?
17                THE WITNESS:  Yes.
18                MR. MCLAUGHLIN:  You must answer
19       questions from each of the attorneys
20       truthfully.
21                Do you understand?
22                THE WITNESS:  Yes.
23                MR. MCLAUGHLIN:  You should expect to
24       be questioned first by an attorney from
25       each of the five defendants, and then to
```

1     be cross-examined by a U.S. Department of

2     Justice attorney.

3          Do you understand?

4          THE WITNESS:  Yes.

5          MR. MCLAUGHLIN:  And after the U.S.

6     Department of Justice attorney cross-

7     examines you, the defense attorneys may or

8     may not ask you some follow-up questions.

9          Do you understand?

10         THE WITNESS:  Yes.

11         MR. MCLAUGHLIN:  Now, it's important

12    for you to understand, Mr. Blanquicet,

13    that none of the attorneys attending this

14    deposition here in the United States,

15    including myself, represent you or can

16    offer you legal advice.

17         Do you understand that?

18         THE WITNESS:  Yes.

19         MR. MCLAUGHLIN:  Now, we must also

20    inform you about your rights under U.S.

21    law.  I'm going to now ask that the

22    interpreter read to you a form explaining

23    those rights in Spanish.

24         THE WITNESS:  Yes.

25         (Interpreter reads document.)

1          THE WITNESS:  Yes.  But I have my

2     attorneys here, present, behind me.

3          MR. MCLAUGHLIN:  Do you understand

4     the rights that have just been read to

5     you?

6          THE WITNESS:  Yes.

7          MR. MCLAUGHLIN:  All right.  And do

8     you agree with the statements, meaning

9     that you agree to waive certain rights and

10    answer the questions that are going to be

11    posed to you by both sides in this

12    deposition?

13         THE WITNESS:  Yes.

14         MR. MCLAUGHLIN:  All right.  And now

15    to confirm with you again, Mr. Blanquicet:

16    No one has made or can make any promises

17    to you about whether or how the

18    information that you provide today in this

19    deposition might be used against you.

20         THE WITNESS:  I didn't hear you.

21         MR. MCLAUGHLIN:  All right.  I'll

22    repeat.

23         Has anyone made any promises to you

24    about whether or how the information that

25    you provide today can be used against you

```
1          in other legal proceedings?
2               THE WITNESS:  Well, no one has
3          promised me anything, because I was just
4          notified a short while ago that I had to
5          come over here.
6               MR. MCLAUGHLIN:  All right.  So
7          Mr. Blanquicet, you are aware that the
8          information that you provide today might
9          be used against you in legal proceedings
10         in the United States, again in legal
11         proceedings in Haiti, and maybe even in
12         Colombia.
13              THE WITNESS:  Yes.
14              MR. MCLAUGHLIN:  You understand?
15              THE WITNESS:  Yes.
16              MR. MCLAUGHLIN:  Now, Mr. Blanquicet,
17         no one from the U.S. government, so you
18         are aware, is offering you immunity or any
19         other benefit for your testimony.
20              Do you understand that?
21              THE WITNESS:  Yes.
22              MR. MCLAUGHLIN:  All right.  And
23         again, no -- based on everything I just
24         told you, do you still wish to participate
25         in this deposition?
```

1            THE WITNESS:  Yes.

2            MR. MCLAUGHLIN:  Very well.

3            Before this deposition can begin,

4       Mr. Blanquicet, we've been informed that

5       your criminal defense attorney in the

6       Haitian criminal case against you --

7       Ms. Altidor and Mr. Chrispin Antoine?  Are

8       those their names?

9            THE WITNESS:  Yes.  They're the ones

10      representing me.

11           MR. MCLAUGHLIN:  All right.  And

12      they're present with you?

13           THE WITNESS:  Yes.  They're behind

14      me.

15           MR. MCLAUGHLIN:  Very well.

16           Mr. Blanquicet, so you are aware,

17      because the five U.S. defendants requested

18      this proceeding to potentially use your

19      testimony at their own upcoming trial,

20      this entire deposition is being recorded

21      electronically.

22           In addition, there is a court

23      reporter who is transcribing everything we

24      say, and this recording of you may be

25      eventually submitted as evidence in the

```
1          U.S. trial.
2               Do you understand what I just told
3          you?
4               THE WITNESS:  Yes.
5               MR. MCLAUGHLIN:  Now, it's possible
6          that the internet connection or video
7          technology that we are using may become
8          interrupted during the day.  Now, if the
9          screen freezes or you no longer see us or
10         can hear our voices, please let us know.
11         And if that happens while you're answering
12         a question, please stop speaking so we can
13         reconnect.
14              Do you understand?
15              THE WITNESS:  Yes, Mr. Prosecutor.
16              MR. MCLAUGHLIN:  Now, there's a few
17         more guidelines I need to go over with
18         you.
19              First, please wait for the
20         interpreters here to finish translating
21         the attorney's entire question before
22         giving your answer.
23              Second, please answer every question
24         audibly.  Meaning that if you're saying
25         the words "yes" or "no," say the words
```

```
 1              "yes" or "no."  Don't just shake your head
 2         or nod your head.
 3              Do you understand?
 4              THE WITNESS:  Yes.  I do understand
 5         perfectly well.
 6              MR. MCLAUGHLIN:  Third, at some point
 7         during questioning, an attorney may say
 8         "Objection."  When that happens, allow the
 9         attorney to finish stating their
10         objection, but you should still answer the
11         question that you've been asked.
12              THE WITNESS:  Yes, Mr. Prosecutor.
13              MR. MCLAUGHLIN:  You understand?
14              THE WITNESS:  Yes, Mr. Prosecutor.
15              MR. MCLAUGHLIN:  Also, some of the
16         attorneys may show you exhibits.  Those
17         could include pictures, videos, documents,
18         or other items.
19              We're going to do that in this
20         deposition by sharing a screen with you.
21         Meaning that you will see that item on
22         your screen.  But you will still hear our
23         voices while we ask you questions about
24         that item.
25              Now, if you do not see the item that
```

```
 1              we are talking about, on the screen,

 2         please let us know.

 3              THE WITNESS:  Yes, Mr. Prosecutor.

 4              MR. MCLAUGHLIN:  Last, when you

 5         finish your deposition, the rules of U.S.

 6         court proceedings prohibit you from

 7         speaking to any other witnesses about your

 8         testimony, including the questions that

 9         you were asked and the answers that you

10         gave.

11              That means that you cannot speak to

12         any other people who may be witnesses,

13         including the other Colombians that you

14         are in prison with in Haiti, about what

15         you say to us today.

16              THE WITNESS:  I'm sorry,

17         Mr. Prosecutor.  We got interrupted --

18              MR. MCLAUGHLIN:  Okay.

19              THE WITNESS:  -- by the point where

20         you said not to divulge information.  I

21         am -- and I couldn't hear what you said.

22              MR. MCLAUGHLIN:  All right.

23              Again, Mr. Blanquicet, so you're

24         aware, you cannot speak to any other

25         people who may be witnesses in this case,
```

```
 1              including the other Colombians that are in

 2              prison with you in Haiti, about what you

 3              say to us today.

 4                   Do you understand that?

 5                   THE WITNESS:  Yes, Mr. Prosecutor.

 6                   MR. MCLAUGHLIN:  Do you agree to

 7              abide by that rule?

 8                   THE WITNESS:  I am in total

 9              agreement, Mr. Prosecutor.

10                   MR. MCLAUGHLIN:  And one last time

11              before we start.  Do you, Mr. Blanquicet,

12              still wish to participate in this

13              deposition today?

14                   THE WITNESS:  Yes.

15                   MR. MCLAUGHLIN:  Very well.

16                   Defense, your witness.

17                   MR. PEREZ:  Thank you.

18                    DIRECT EXAMINATION

19         BY MR. PEREZ:

20              Q.   Mr. Blanquicet, good morning.  How

21         are you?

22                   THE INTERPRETER:  I can't hear you,

23         Counsel.  Could you please approach the

24         mic?  Thank you.

25         BY MR. PEREZ:
```

```
 1          Q.   As I indicated earlier, I represent
 2     Mr. Intriago, and I will be asking you some
 3     questions.  But before I do that, I'd like to
 4     clarify a few things that Mr. Prosecutor
 5     said -- the prosecutor said to you.
 6               All of the defendants that are
 7     accused in the United States requested for all
 8     of the Colombians that were in Haiti to
 9     testify in this case as witnesses as to what
10     actually happened that evening.
11               MR. MCLAUGHLIN:  I'm going to object
12          to this line of questioning as irrelevant.
13     BY MR. PEREZ:
14          Q.   As a result of the judge hearing our
15     pleas, a court order was entered selecting a
16     number of you to testify in this case by
17     virtue of a federal court judge order.
18               MR. MCLAUGHLIN:  I'm going to object
19          to this entire line of questioning as
20          narrative.  We're here to do a deposition,
21          to ask questions, not to read to the
22          witness.
23               MR. HOWARD:  Objection noted, Sean.
24          Please continue.
25               MR. PEREZ:  Thank you.
```

BY MR. PEREZ:

    Q.   You are neither a witness for the defense nor the government.  We ask that you only say the truth.

       Please give us your full name for the record, sir.

    A.   Edwin Enrique Blanquicet Rodriguez.

    Q.   And you presently have both of your lawyers behind you.

    A.   Yes.

    Q.   Is one of those lawyers Nathalie Delisca?

    A.   No.

    Q.   How long has she not represented you or the other Colombians?

    A.   It was mid -- around mid-July, when we started going before the hearing before the appeals court judge.

    Q.   Are you aware that as late as two days ago, Ms. Delisca represented to the United States government that she represented you?

    A.   I was not aware, because we are not in any sort of communication.  Up till today, I was told early on to take a shower because I

Relevance

service@fernandezCR.com
305-374-8868

1    was going to be brought to this hearing.

2        Q.    So if Ms. Delisca made that

3    representation to the government -- that is,

4    that she represented you -- that would not be

5    true.  Is that correct?

6        A.    The last time we spoke to her, I

7    believe she no longer represented me or

8    represented us.  The attorneys that are behind

9    me are the ones representing me.

10        Q.    Thank you, sir.                          Relevance

11              Sir, you're presently detained in

12    Haiti, correct?

13        A.    Yes.

14        Q.    And approximately how long have you

15    been in custody there?

16        A.    Forty-eight -- no.  Fifty months?

17    No.  Fifty-three months.

18        Q.    Sir, let me ask you, the room that

19    you find yourself in, are you -- have you been

20    in that building before?

21        A.    I was in this room before that, where

22    my interrogation was, without an attorney

23    present.                                           Relevance

24        Q.    Mr. Blanquicet, I'm sorry.  Please be

25    patient.  I know you have things to say, and

1    you'll have the opportunity with my questions

2    and the questions of the other -- the other

3    defense attorneys.

4            I want to ask you if you feel

5    comfortable in that room or if you feel in any

6    way any type of coercion or pressure from any

7    police authority in Haiti or judicial

8    authority.

9        A.    I do feel a lot of pressure.   And I

10   do not feel comfortable in this room because

11   of everything that has happened:   the

12   interrogations without the presence of a --

13   the presence of an attorney, the lack of

14   jurisdiction or competent authority, and some

15   horrible things that have happened in this

16   room as well.                                          Relevance

17       Q.    Sir, what I want to know is if at

18   this moment, because of the individuals that

19   are in the room -- which my understanding is

20   that it's your lawyers, a representative from

21   the U.S. embassy, the IT person, and someone

22   that represents the judicial branch of Haiti.

23   Are those the only individuals that are

24   presently in the room listening to your

25   statement?

```
 1          A.   Yes.  Those are the only people that
 2     are with me.
 3          Q.   Okay.  Now, aside from this
 4     deposition, or this interview, have you
 5     provided prior statements to the FBI or to
 6     anyone else in the media?
 7          A.   Yes.  I did provide information to
 8     the FBI without the presence of an attorney.
 9          Q.   Okay.  Have you also provided any
10     kind of radio or TV interviews to newspaper or
11     media outlets?
12               MR. MCLAUGHLIN:  Mr. Blanquicet, can
13          you still hear us?
14               MR. WU:  We are pausing the recording
15          at 11:01 a.m. to correct the technical
16          issue.
17               (Thereupon, a recess was taken, after
18          which the proceedings continued as
19          follows.)
20     BY MR. PEREZ:
21          Q.   Mr. Blanquicet, the last individual
22     that walked in, is that your lawyer as well?
23          A.   Yes.  He's my attorney.
24          Q.   I want you -- I think we all want you
25     to feel completely comfortable in your
```

 1          surrounding.  If at any point you feel that

 2     there is any pressure or any coercion on the

 3     part of anyone in Haiti, please let me know.

 4          A.   Yes.

 5          Q.   We're here in a public courtroom,

 6     which is open to the public, so you

 7     understand.

 8          A.   Yes.

 9          Q.   I'm going to proceed in a

10     chronological fashion from the beginning.

11              Am I correct that you are a former

12     soldier from Colombia that served

13     approximately 20 years in the Colombian

14     military?

15          A.   Yes.  Twenty-one years.

16          Q.   And at some point, when did you

17     retire?

18          A.   In February of 2021.

19          Q.   Okay.

20              How did you learn that there was an

21     opportunity to work in Haiti?  Who did you

22     learn that from?

23          A.   On June 3rd, 2021, I was having lunch

24     with my children when I received a call from

25     Mr. Capador, Duberney Capador.

```
 1          Q.    And how did you know Mr. Capador?
 2          A.    The truth is, I never met him -- I
 3    never met him before.   I met him for the first
 4    time here in Haiti.
 5               When Capador called me, I asked him
 6    who had given him my number.   A colleague of
 7    mine had given him my number.   And I said,
 8    "Why are you calling, then?"   He says, "For a
 9    work proposal."
10          Q.    And what was that work proposal that
11    Mr. Capador proposed?
12          A.    To work for two U.S. companies.   And
13    those companies worked for the Department of
14    State and for the FBI.
15          Q.    And this is what Mr. Capador told
16    you?
17          A.    Yes.   Because the representatives
18    from the company told him.
19               MR. MCLAUGHLIN:   Objection; hearsay.
20    BY MR. PEREZ:
21          Q.    All right.   What did Mr. Capador tell
22    you your duties would entail working in Haiti,
23    and how much were you going to get paid?
24          A.    The work proposal was in Central
25    America.   He never mentioned Haiti.   It was
```

Hearsay

```
 1     going to be in Central America on the 4th.  It
 2     was early, around 3, or early around 3:30 or
 3     4:30 p.m.  We were going to leave from Bogota,
 4     and we arrived in Punta Cana, at the Hotel
 5     Aladino.
 6              At night, there was a video call
 7     between Mr. Capador and Mr. Rivera, that a
 8     function -- that a -- that an officer from the
 9     Haitian embassy was asking for our passports,
10     our documents.  And that was then when I found
11     out that I was going to Haiti.
12        Q.   Okay.  Let me stop you there and just
13     clarify a few things, if I may.
14              So Mr. Capador proposed a job in what
15     you believed to be Central America.
16        A.   In Central America, yes.
17        Q.   Working with a company that was
18     linked somehow to the U.S. government.
19              MR. MCLAUGHLIN:  Objection; leading.
20              THE WITNESS:  Yes.  It's call -- it
21     was called CTU.  And another company,
22     Worldwide, that worked for the Department
23     of State and the FBI.
24     BY MR. PEREZ:
25        Q.   Did you ever ask Mr. Capador how he
```

Leading

1    knew or believed that this company or these

2    individuals were connected to the U.S.

3    government?

4         A.   Because when Mr. Tony Intriago came

5    to talk to us in mid-July, he confirmed that

6    he did, in fact, work for the Department of

7    State.   And there is an audio to that effect.

8         Q.   Yes, sir.  We're going to get to

9    that.  I'm asking you, for the moment, how you

10   got that impression from Mr. Capador.

11        A.   That's what the managers from that

12   company transmitted that information to him.

13        Q.   Okay.  So when you arrived --

14        A.   And that it came from a high level.

15        Q.   I'm sorry.

16             So when you arrived at the Dominican

17   Republic was when you first learned that your

18   job was going to be in the country of Haiti?

19        A.   Yes.   When they stamped the visa on

20   the passport.

21        Q.   How did your passport get stamped in

22   the Dominican Republic with a legal entry into

23   Haiti?

24        A.   It was stamped in the Haitian

25   embassy.   And that's what I asked myself.

1      This was probably organized so that either the
2   embassy or the consulate would then stamp the
3   passports.
4          Q.   So it was your understanding that the
5   Haitian consulate approved your entry from the
6   Dominican Republic into Haiti?
7          A.   Yes.   That's what Mr. Capador said,
8   that on orders from the company, that an
9   officer would come and pick up the passports,
10  would take them in the morning and would bring
11  them back at night.
12         Q.   All right.   So let me understand
13  this.   Mr. Capador took all of the passports
14  belonging to all of you, he took it to the
15  U.S. -- I'm sorry -- he took it to the Haitian
16  embassy to get it stamped?
17         A.   Let me clarify to the counsel that
18  Mr. Capador at that moment was in Haiti.
19  Capador made a video call with Mr. Rivera, and
20  they were talking to all of us that were
21  present there.
22              And he gave an order that an officer
23  was going to come in the morning, pick them up
24  in the morning, and would bring them back in
25  the afternoon.

1              Capador did not pick them up.  They

2     were picked up by an officer from the Haitian

3     embassy.

4          Q.   In other words, you gave your

5     passport to someone from the Haitian embassy

6     in the Dominican Republic in order for it to

7     get stamped?

8          A.   Yes.   At the Hotel Aladino.

9          Q.   And this Haitian diplomat, or the

10    person that worked at the embassy, picked up

11    the passport from you personally?  Or --

12         A.   Yes.   He picked all of them in

13    person.

14         Q.   And did you see this individual?

15         A.   Well, I saw him, and he was Haitian

16    and he spoke kind of tangled.

17         Q.   Okay.   Approximately how long did

18    they have the passports between the -- before

19    they returned it to you?

20         A.   The passports were taken before six

21    in the morning and were brought back around

22    six in the evening, or around five, six.

23         Q.   Did the same person return the

24    passports to you?

25         A.   I don't know, because at that time, I

```
 1         was at a shopping mall buying some toiletries.
 2              Q.   How many of you, and how did you get
 3         into the Dominican Republic?
 4              A.   There were 20 of us.  We entered
 5         legally into the Dominican Republic.  We
 6         entered like any other person, like any other
 7         citizen normally, legally.
 8              Q.   You came in by a bus or van over
 9         land?
10              A.   You're asking me how I entered the
11         Dominican Republic or how I entered Haiti?
12              Q.   No, sir.  How you entered Haiti.  I
13         know you flew over to the Dominican Republic.
14              A.   Well, to Haiti, we entered on
15         June 6th.  We went in through a border.  I
16         don't remember exactly what border.  At the
17         Dominican Republic, they asked us to get off,
18         and then they asked us for our passports.
19              Q.   And you cleared the Customs with
20         Haiti?
21              A.   Yes.  At the Haitian border, they --
22         the Dominican, U.S. and Custom -- Dominican
23         customs asked us for our passport.  They
24         checked our passport, they saw that we were
25         legal, that we had the stamps necessary to go
```

1    into Haiti as legal citizens.

2        Q.    Did you possess any firearms or

3    anything like that?

4        A.    When I entered into the country, I

5    did not have any weapons whatsoever.    I only

6    went with the grace of God and with the

7    willingness of working to get my children

8    ahead.

9        Q.    Once you got to the capital, Port-au-

10   Prince, what were your assigned duties, and

11   who gave you those duties?

12       A.    Once we got to Haiti, we were taken

13   to a house where Mr. Duberney Capador was

14   there, along with Rivera, along with James and

15   other Haitian civilians.    That's where we were

16   told and they explained to us what we were

17   going to be working on, what project.

18       Q.    Mr. Blanquicet, try and break down

19   your responses so that the translator has an

20   opportunity to translate.

21       A.    Yes.

22       Q.    So you said you went to a home where

23   Mr. Capador was present.    That was the first

24   time you met him?

25       A.    Yes.    That's where I met Mr. Capador

```
1        for the first time, Mr. Alejandro Rivera,
2    James Solages, and White.
3         Q.   When we -- when you're speaking about
4    Mr. Rivera, you're talking about German
5    Rivera.
6         A.   Yes.  German Rivera.
7         Q.   Okay.  What were you told to do once
8    you got there, and who asked you to do these
9    things?
10         A.   They introduced themselves,
11    Mr. Capador as the head of the company.
12    German Rivera was a colonel.  Mr. James worked
13    for the company.  White worked for the FBI,
14    for the DEA.
15              And that's when we were told about
16    the job proposal in Haiti.  We were going to
17    work at a hydroelectric in Jacmel, and the
18    initial salary that we were going to be paid
19    was $2,800.
20              From there, we were taken to the
21    Hotel Audubon.  From there, there was a team
22    of four Colombians.  Four Colombians came by
23    airplane.  And I was -- we were also told that
24    we were going to be VIP for officers, or
25    security in Haiti.
```

1          Those four people came to the house

2     of a man by the name of Sanon, and the rest of

3     us went to the hotel.

4          Q.   And what were your responsibilities

5     with regard to security or whatever it is that

6     you were instructed to do there?

7          A.   My responsibilities would be to wait

8     for the plan to be set to work for the -- this

9     electric plant.  And in the meantime, we were

10    going to provide security for this politician,

11    this political figure by the name of Sanon.

12         Q.   So correct me if I'm wrong.  You were

13    instructed to do two different things, or you

14    believed that you had to do two different

15    things, which was protect this individual by

16    the name of Sanon, and the second was that you

17    were going to work at an electric -- or

18    hydroelectric plant, as well, in Jacmel?

19         A.   Yes.  That was one of the projects

20    that the manager from the company told us when

21    he came to Haiti.

22         Q.   All right.  So tell me about your

23    daily routine with Mr. Sanon.

24         A.   Well, I had to go twice to

25    Mr. Sanon's.  I went on the 15th or 16th until

1          the 23rd or 24th.

2                    He kept upstairs, and we would be

3     downstairs.   So whenever he would leave the

4     office, we had to tend to him, whether he

5     needed a drink, water, a soda.   He always kept

6     himself -- kept upstairs to him -- he kept to

7     himself, and he didn't talk to us.

8                    That's what I saw in that house.   I

9     didn't see anything strange.   Everything was

10    normal.

11        Q.   What kind of individuals would you

12    see would visit Mr. Sanon while you were

13    serving as his security?

14        A.   Well, since I don't understand the

15    Haitian language, many people would show up,

16    but I don't know what kind of people they

17    were.

18        Q.   But this was open and notorious.

19    You -- Mr. Sanon was not hiding -- these were

20    individuals that visited him openly?

21                THE INTERPRETER:   I'm sorry.

22          Counsel, may I -- we're switching

23          interpreters.   May I have your question

24          again?

25                MR. PEREZ:   Yes.

BY MR. PEREZ:

Q.   These were open and notorious visits. There was nothing in hiding, was there?

A.   At no time I saw anything strange. As a military person, he -- I can attest that there was nothing strange.

Q.   Okay.

A.   If something was bad or right -- I mean, everything was fine.  Even young people from school, young children, they were given speeches about COVID at that time.  Nothing strange in that house.

Q.   Okay.

Was that consistent with your view that this was just part of a political type of candidacy?

A.   Well, even though one doesn't understand the language, you can see the signs and you can understand, you can tell it had something to do with politics.

Q.   Okay.  And you don't know any of these individuals that visited Mr. Sanon?

A.   No.  I had never in my life seen them and met them.

Q.   You mentioned an individual

1    yesterday -- earlier today by the name of

2    Mr. White.

3        A.    Yes.    That person, since we got here,

4    we always knew him as White, White, White,

5    White.    I never knew of another name.

6        Q.    Do you know his name to be Joseph

7    Vincent?

8        A.    After everything happened, in the

9    media, they talked about Joseph Vincent.    And

10    when we got to the penitentiary and they put

11    us all together in a yard, that's when I

12    learned that it was Joseph Vincent.    But

13    before all that happened, I knew him as White,

14    White, White.

15        Q.    All right.

16        So you said that you believed that he

17    worked for the CIA or the DEA.    What gave you

18    that impression?

19            THE INTERPRETER:    May I ask the

20        witness to give us a chance?

21            THE WITNESS:    Well, when I worked in

22        the military, I worked together with the

23        command forces of the United States, and

24        when they mentioned the fact that they

25        were working with the state department, I

```
1              felt pretty -- I could trust them.
2                   MR. MCLAUGHLIN:  Objection.
3         BY MR. PEREZ:
4              Q.   Mr. --
5                   MR. MCLAUGHLIN:  Objection;
6              nonresponsive.
7         BY MR. PEREZ:
8              Q.   Did Mr. White show you any kind of
9         identification or did he wear any kind of
10        lapel pins that would indicate that he worked
11        for the U.S. government?
12             A.   I once saw a badge he had that looked
13        like an FBI badge.  I wasn't able to identify
14        it or to see what it was because it was far
15        away.
16             Q.   So he had credentials or
17        identification that you believed to be
18        associated with the U.S. government?
19                  MR. MCLAUGHLIN:  Objection; counsel's
20             testifying.  And also leading.
21                  MR. PEREZ:  I'll rephrase the
22             question.
23        BY MR. PEREZ:
24             Q.   You saw a badge or you saw an
25        identification card?
```

```
 1              THE INTERPRETER:  May I have the
 2         question again, Counsel?
 3              MR. PEREZ:  Yes.
 4    BY MR. PEREZ:
 5         Q.   Did you see a badge or an
 6    identification card?
 7         A.   Yes.  A badge.  Like around his belt.
 8    But I saw it from far away.
 9         Q.   Yes, sir.
10              Did you feel a need to look at it
11    closer and verify its authenticity?
12         A.   What happened is, at that moment,
13    they were going to relieve the other -- my
14    partners from the -- from Mr. Sanon, and since
15    White also lived at that hotel, I didn't pay
16    attention to that badge.
17         Q.   Okay.  How long were you serving as
18    security for Mr. Sanon?
19         A.   On the first time, I was -- I served
20    as security for him twice.  First time was for
21    eight days.  The second time, it was for ten
22    days.
23         Q.   And did you all take pictures in your
24    uniforms or in the outfits that you were
25    wearing, at the hotel?
```

1      A.   Yes.   We did take pictures with the
2   manager, or the head of the company,
3   Mr. Intriago, at the hotel.
4      Q.   Okay.   At some point, Mr. Antonio
5   Intriago came to visit in Haiti.   Is that
6   correct?
7      A.   Yes.
8      Q.   And that would have been the first
9   time that you met him?
10      A.   Yes.   For the first time.   That was
11   the first time.
12      Q.   So I have a picture of Mr. Intriago
13   to show you, but rather than do that, I'm
14   going to shift my camera over so that you're
15   able to see him next to me here.
16          Is this the individual that you met
17   in Haiti?
18      A.   Yes.   That was the gentleman that
19   came to Haiti, that was the manager of the
20   company, that got us all hyped up and
21   illusioned.
22      Q.   Okay.   And what did Mr. Intriago tell
23   you?
24      A.   He showed us, through the computer
25   that he brought, certain projects that he was

```
 1        going to undertake, such as trash projects,
 2        hydroelectric power plant and the project that
 3        was about to be done in Jacmel, and VIP
 4        security.
 5            Q.    All right.
 6            A.    There is also a recording of that
 7        meeting, that was recorded on that day.
 8            Q.    Yes, sir.
 9                  Is it your understanding that it was
10        Mr. Guerrero who was the person that did a
11        recording of Mr. Intriago's presentation?
12            A.    Yes.  He was the one who did it.
13            Q.    All right.  At any time during any of
14        those presentations, did you hear Mr. Intriago
15        talk about the kidnapping or the murder of
16        a -- of the president of Haiti?
17            A.    He never mentioned such thing.  Nor
18        the ones that were in charge of the company
19        that were in Haiti ever mentioned such a
20        thing.  Thank God.
21            Q.    Okay.  If they had said something
22        like that, what would you have done?
23            A.    That goes against my principles as a
24        military man, as a person, and for my family.
25        I spent 21 years in the military.  I left in
```

1    good terms thanks to my God.  I did everything

2    legally so that I would not have any legal

3    issues with the justice.

4         Q.   Approximately how many days was

5    Mr. Intriago there?

6         A.   At the hotel, he was there for not

7    that long.  Maybe, at the most, two hours.  I

8    don't recall exactly.

9         Q.   Okay.  Let me go forward about three

10   weeks from the time that you arrived, to the

11   first week of July of 2021.

12            THE INTERPRETER:  This is again the

13       interpreter.  I'm sorry, Counsel.  May I

14       have the question again?

15            MR. PEREZ:  Yes.

16   BY MR. PEREZ:

17        Q.   Let me move forward about three weeks

18   after your arrival, until the first week of

19   July of 2021.  We're moving into the first

20   week of July of 2021.

21        A.   Well, the first week of July was

22   normal.  We stayed at the hotel.  I would

23   study English, I studied French with the

24   devices that we all had, to learn the language

25   here, and to wait for the teams to relieve

1     each other there where Mr. Sanon was.

2               And one thing that was strange; that

3     is, that a drone started coming and flying

4     over at night over the house of Sanon, at

5     night.  It was a white drone.

6          Q.   Can you describe the drone that was

7     flying over Mr. Sanon's house?  Did you see

8     it?

9          A.   It was not at the house of Mr. Sanon.

10    It was at the hotel.

11         Q.   All right.  Did --

12         A.   I thought it was strange.  Why would

13    that drone show up every two or three days?

14    It was a strange situation.

15         Q.   Did you bring this to the attention

16    of Mr. Sanon or Mr. Capador?

17         A.   No.  Because that was not at

18    Mr. Sanon's house.  That was at the hotel.

19    Mr. Sanon had no knowledge of that.  It was

20    mentioned to Mr. Rivera and Mr. Capador.  We

21    thought it was strange, this drone always

22    flying over us.

23         Q.   Did other members of your group make

24    the same observations?

25         A.   Well, every time we were outside when

1    we would call our children or our families, we

2    would see the drone doing rounds and then

3    leaving.

4        Q.   Now, let me bring you to July 4th,

5    5th, 6, and 7.

6        A.   Yes.

7        Q.   All right.  On the evening of

8    July 6th, where were you located?

9        A.   So on July 6th, I was at Mr. Sanon's

10   house with Enalber Vargas, John Jairo Suarez,

11   Alex Gersain -- no -- Alex Pena -- I'm

12   sorry -- Alex Pena, and Gersain Mendivelso.

13       Q.   Did you receive instructions from

14   anyone to go somewhere else other than where

15   you were located at the time?

16       A.   On July 6, in the afternoon, I did

17   not receive any order.  That order to provide

18   assistance to police, I received at about

19   11:30 p.m.

20       Q.   Right.  And --

21       A.   And Mr. Capador told us that a police

22   officer from the national police was going to

23   pick us up.  As he told me, on July 7th at 12

24   a.m., midnight, a police came by from the

25   national police.

1    Q.   Let me stop you there and ask you a

2    question.

3         At that point, had a firearm of any

4    kind, or weapon, been given to you?

5    A.   At no time up until now.  I was not

6    given a weapon here in Haiti.

7    Q.   So you were there for approximately

8    four weeks and you had no firearms or weapons

9    until the evening of July 6?

10   A.   I didn't have any weapon at no time.

11   Q.   Okay.  Now, you said that Mr. Capador

12   said that a policeman would be picking you up

13   at a certain time, and in fact, according to

14   what you've testified, a policeman did show up

15   to pick you up?

16       THE INTERPRETER:  From the

17       interpreter, can we please repeat the

18       question?

19       MR. PEREZ:  Yes.  I'm sorry.

20   BY MR. PEREZ:

21   Q.   According to what you said,

22   Mr. Capador told you that a policeman would be

23   picking you up, and in fact, a policeman did

24   pick you up?

25   A.   Well, he did not send the police.  He

1    told me, "A policeman is going to pick you

2    up."

3        Q.   I'm sorry.  You -- in other words,

4    you don't know if Capador sent him, but

5    Mr. Capador had knowledge that a policeman

6    would be picking you up?

7        A.   Yes.  He said, "Get ready."  I

8    received a call from Mr. Capador around 11:30

9    or 11:40.  He said that he was going to give

10   the order for a policeman to pick me up to do

11   a movement with the police.

12       Q.   All right.  When you say "movement,"

13   could you describe for those of us that don't

14   have military background what a movement is?

15       A.   Which term?

16       Q.   A movement.  What do you mean by

17   "movement"?

18       A.   It could be going with the police,

19   accompanying the police.

20       Q.   Okay.  Did a policeman, in fact, pick

21   you up that evening?

22       A.   Yes.  A van came by, and it said on

23   the side, "National Haitian Police."

24       Q.   Okay.  So a vehicle showed up with

25   "National Haitian Police" stamps on it.  And

1      there were how many individuals that came to

2      pick you up?

3            A.   Only a driver, who was wearing a

4      uniform from the national police.

5            Q.   And you had seen that uniform for at

6      least three weeks prior to him picking you up?

7                 MR. PEREZ:  No.  I -- the

8            translation -- I have an issue with the

9            translation.  It's not a person, but that

10           uniform, that he had seen that uniform,

11           not the person in the uniform.

12                THE INTERPRETER:  Thank you.

13                THE WITNESS:  Yes.  Because when we

14           were doing the -- we were relieving people

15           at the hotel with Mr. Sanon, we would

16           always see the police wearing that

17           uniform.  Or when you would watch TV, you

18           would see the news with policemen wearing

19           that uniform.

20     BY MR. PEREZ:

21           Q.   In other words, what I'm asking you

22     is, you were familiar with the uniform when

23     you saw that police officer pick you up that

24     night?

25           A.   Well, I'm familiarized with it

1    because, you know, you saw it.

2        Q.   Okay.   So when he picked you up, you

3    must have felt comfortable in terms of being

4    supported by the police force there?

5        A.   Of course.   Because it's a state

6    institution.

7        Q.   In other words, the work that you

8    were doing and what you were told was

9    consistent with what you were observing from

10   the Haitian police?

11       A.   Well, at that moment, I wasn't given

12   an order to do something.

13       Q.   Right.

14       A.   I was working, accompanying the

15   police.   And when the police arrives at

16   Dr. Sanon's, he takes us to the hotel.   And at

17   the hotel, Mr. Chase was there.   And he waited

18   there for a minute, and then we were taken to

19   a house in the mountains.

20       Q.   Right.   But what I wanted to clarify,

21   sir, and just to make sure is that you didn't

22   think that was a counterfeit uniform and a

23   fake police officer.   You saw them as real

24   police from Haiti.

25            MR. MCLAUGHLIN:   Objection; leading.

Leading

```
 1              Objection; narrative.

 2                  THE WITNESS:  Well, yes.  Because I

 3         thought it was real.  I mean, the car said

 4         "National Police," and then the officer

 5         had a uniform that said "National Police."

 6         I'm not from this country.  I thought

 7         everything was legal, within the frame.            Leading

 8    BY MR. PEREZ:

 9         Q.   All right.  So you said you traveled

10    with a police officer to a house that you

11    describe as a house on the mountain.

12         A.   Yes.  When we left Mr. Sanon's, we

13    went first to the hotel.  Yes, we first went

14    to the hotel.  We stayed there for about --

15    shortly past one, and then Mr. Chase came out

16    from that hotel and we headed out to the house

17    in the mountain.

18         Q.   All right.  And when you arrived at

19    the house in the mountain, who was there?

20                  MR. MCLAUGHLIN:  Excuse me, madam

21         interpreter.

22                  THE WITNESS:  Well, we arrived when

23         it was dark and late.

24                  THE INTERPRETER:  I'm sorry?

25                  MR. MCLAUGHLIN:  Is it Mr. James or
```

1          Mr. Chase?

2                THE INTERPRETER:  Oh, James.  So

3          sorry.  James Solages.

4                THE WITNESS:  And so we arrived.  It

5          was very late.  And there were a lot, a

6          lot, of police presence.  A lot.

7     BY MR. PEREZ:

8          Q.   So when you arrived at the house on

9     the mountain, there were other police officers

10    there?

11         A.   Yes.  There were more police there.

12    A lot of police.

13         Q.   How many police officers were there

14    at the house on the mountain?

15         A.   Well, I couldn't tell because it was

16    dark.

17         Q.   Okay.  Fair enough.  There were other

18    police officers there?

19         A.   Yes.  There were a lot of police

20    officers.  They were all uniformed.

21         Q.   All right.  And what were you told

22    was the purpose of your rendezvous at the

23    house on the mountain?

24         A.   Well, when we arrived there with the

25    other people that I just mentioned,

```
 1        Mr. Capador told us that we are going to
 2   undertake an operation accompanying police.
 3        Q.   Did he get into the details of what
 4   that operation entailed?
 5             THE INTERPRETER:  Would you please
 6        repeat your question.
 7             MR. PEREZ:  Yes.
 8   BY MR. PEREZ:
 9        Q.   Did Mr. Capador tell you what that
10   movement or that support that you were
11   providing to the police would be?
12        A.   Yes.  He said that the police was
13   going to conduct a procedure, that the
14   ride-along or movement that we were going to
15   do was ordered from the CTU, top level, since
16   the police had acquired the support of this
17   company to do so.
18        Q.   Did he give it -- did he give you any
19   specifics as to who was going to get arrested
20   or --
21        A.   I was not told.  All the gentlemen
22   who were there with me, Mr. Vargas, Suarez,
23   Pena, Jason, never told us anything.  Just
24   they told us that we were going to do a ride-
25   along with the police.
```

1      Q.   Okay.   Were you issued any firearms
2   at that point?
3      A.   We were the last ones in arriving
4   there, the last ones from the group that
5   arrived there, so at that point in time, they
6   did not give us any firearms.   So the weapons
7   that were given by the police were not enough,
8   and some of them were not even carrying any
9   weapon.
10      Q.   All right.   But did you see the
11   Haitian police issue firearms to your
12   Colombian compatriots?
13      A.   When I arrived, my colleagues were on
14   a higher ground.   They were there with arms --
15   firearms.   And I suppose that the police was
16   there with weapons, too.
17      Q.   All right.   Did --
18      A.   So when this operation was going to
19   be conducted, it was the police who would hand
20   over the weapons.
21      Q.   All right.   Did any of your Colombian
22   colleagues indicate to you that the weapons
23   were issued by the Haitian police?
24      A.   Yes, yes.   That was --
25           MR. MCLAUGHLIN:   Object to the answer

Hearsay

Hearsay

1          as hearsay.

2     BY MR. PEREZ:

3          Q.    All right.   Who was present at the

4     house, that you recognized, at that time?

5          A.    In the house, I met the Colombians.

6     I had never met them before.   I met them at

7     the El Dorado Airport.   At that house in the

8     mountain, the only ones I saw were the

9     Colombians and Mr. Rivera, Mr. James, and

10    White.

11         Q.    All right.   So you saw Mr. White

12    there?   You saw some of the Colombians?

13         A.    Yes.   We were all at that house in

14    the mountain.

15         Q.    Okay.

16         A.    And so was the police.   The police

17    was there.

18         Q.    Do you know whose house that was?

19         A.    Actually, I am not familiar with

20    Haiti, so I didn't really know who that house

21    was from.

22         Q.    Okay.

23         A.    I arrived to that house on July 7th

24    at around 1:30 or 1:30 -- or 1:40.   I had no

25    knowledge about whose house that was.

1    Q.    Okay.  When you say 1:30, you're

2  talking about 1:30 a.m.?

3    A.    It was the early morning of 2021.

4    Q.    So if I understand you correctly,

5  sir, you were never issued or carried a

6  firearm?

7    A.    All five who arrived late there were

8  not, because the police told Mr. Capador that

9  there were not enough weapons for everyone, to

10  go around.

11    Q.    So you were not issued a firearm?

12    A.    No.  I was not given any service

13  weapon at all.

14    Q.    Did you see at that home an

15  individual who was charged with you in Haiti

16  by the name of Felix Badio?

17    A.    Well, like I told you, I arrived in

18  the early morning there, and everything was

19  dark.

20        And I got to meet him for the first

21  time when we were taken to the appeals hearing

22  courtroom.  That was the courtroom where the

23  appeal was lodged.  And that was when his name

24  was first mentioned.  Mr. Felix Badio.  That

25  was the first day when I was able to

1    distinguish that was -- that that was

2    Mr. Felix.

3        Q.    At that house, was there a chalkboard

4    or a whiteboard that was detailed concerning

5    the cars that were traveling that night?

6        A.    There -- when I arrived, there was

7    one outside the house and there was a row of

8    pickup vans -- pickup trucks.

9        Q.    Okay.  No.  I'm asking you if there

10   was a chalkboard or a whiteboard that

11   contained any writing as to what the procedure

12   would be for --

13       A.    No, no.  Never did I ever see any

14   writings on anything.

15       Q.    Okay.

16            Did you then get into the vehicles as

17   directed?

18       A.    Yes.  As I was directed.  And I was

19   the last -- before the last one.

20       Q.    Okay.  So do you remember what kind

21   of vehicle you drove?

22       A.    The same one that took us to the

23   mountain house.  That vehicle took us from

24   Mr. Sanon's house to the hotel and from the

25   hotel to the house.

1      Q.    Yes, sir.   But do you remember --

2      A.    They -- that police officer, in the

3  presence of Mr. Capador, turned the key to

4  Mr. Vargas.

5      Q.    Okay.   So you -- what I think you're

6  telling me -- telling us is that you saw a

7  policeman hand Mr. Capador the keys to the

8  vehicle.

9      A.    Yes.   The same police agent who took

10  us to the mountain house was the one who

11  turned the keys to Mr. Vargas.

12      Q.    Okay.   Let me go back to the question

13  I asked.   Do you remember the make and model

14  of the vehicle that you drove?

15      A.    No.   The truth is, I just know it was

16  a pickup truck, but I don't remember the make

17  or model.

18      Q.    Okay.

19            Who was in the truck with you?

20      A.    In that truck, there was Mr. Vargas,

21  Mr. John Jairo Suarez Alegria, Mr. Gersain

22  Mendivelso, Mr. Carlos Guerrero, and myself.

23  We were five.

24      Q.    Were there any firearms in the pickup

25  truck, even if you didn't have one?

1      A.   Yes.   The ones that were being

2   carried by Mr. Guerrero.

3      Q.   Was he the only one in your vehicle

4   that carried a firearm?

5      A.   Yes.   He was the only one.   'Cause

6   there was the driver who was not carrying any

7   weapon.   And we were the last ones arriving

8   there from Mr. Sanon's house, and we had the

9   two nurses, the male nurses, and I was the

10   assistant of the male nurse.

11      Q.   All right.   When you say "nurse,"

12   explain that to us.

13      A.   Yeah.   Those are combat nurses.

14   How -- that's how we call them in the

15   military.

16      Q.   All right.   Is it fair to say that

17   that's an individual that accompanies the

18   group in the event that there's an injury by

19   one of you?

20      A.   Yes.   Yes, sir.

21      Q.   Thank you.

22          How far was the drive to your

23   destination from the house in the mountain?

24      A.   From the hotel to the mountain house,

25   the driving time was -- I reckon it to be from

```
 1        a half hour to 40 minutes.
 2            Q.    All right.
 3            A.    I can't tell you exactly, because
 4        we're talking about a mountain, that we were
 5        climbing a mountain.
 6            Q.    In the caravan that you were in, were
 7        there police officers that accompanied that
 8        caravan?
 9            A.    Of course.  The first pickup trucks
10        were filled with a lot of police officers.
11            Q.    Was there any -- other than police
12        officers, did you observe anyone that you
13        believed to be from the Haitian government
14        that was not in uniform?
15            A.    No.  Actually, the only thing I saw,
16        the little I saw was just uniformed police.
17            Q.    Okay.  So at that point at 1:30 in
18        the morning on that evening, had anyone
19        discussed the kidnapping and murder of anyone,
20        and particularly the president of Haiti?
21                MR. MCLAUGHLIN:  Objection; lack of
22            knowledge.  Objection; leading.
23                THE WITNESS:  Since the moment I got
24            there, I -- was never mentioned anything
25            about a kidnapping or murder.
```

Leading

```
1              As I told my colleagues and the
2         justice in the United States, I don't put
3         my hand in the fire for anyone.
4              And there were two different units
5         there, so I didn't know.
6    BY MR. PEREZ:
7         Q.    Okay.   So --
8         A.    I was never called -- or never told
9    anything about assassinating anyone.   If they
10   had told me, I would have said no.                      Leading
11        Q.    All right.   So when you arrived at
12   the next location, had you now learned that
13   that was the president's home?
14        A.    So in the mountain house, another
15   operation with police was performed.
16        Q.    Right.
17        A.    So they went to another place, which
18   I'm not familiar with.
19              Yes.   When the caravan arrived, the
20   police got out, at a Y, at a bifurcation of a
21   road.   When I got there, since we were one --
22   at that point, since we were one of the last
23   ones, I got out of the truck.
24              So the police was going forward, so
25   I, with my colleagues, we went to -- went
```

```
 1          toward the right, next to some houses.
 2                  When I got there, I was surprised.  I
 3          was -- I didn't know.  I mean, everything was
 4          dark, and the atmosphere was, like, heavy.
 5          You could smell gunpowder a lot.
 6                  So then Mr. Capador -- well, at that
 7          point, there was like -- one, two, three --
 8          four houses away, there was a house that had a
 9          slab.  So I went there.  Because everything
10          was strange.  Everything was, like, in
11          silence.
12      Q.   Okay.  Let me break that down.  Let
13          me --
14      A.   So I got up on that slab, and then I
15          saw four people leaving another house.  So I
16          told Mr. Capador that four people had left
17          that house, and he told me to let the other
18          people know about -- let my colleagues know.
19                  So I told one of my colleagues to be
20          on the lookout because there were some people
21          leaving toward the back.  So I went back to
22          the position where I was and where I was told
23          to stay.
24      Q.   Okay.  So let me break that down, if
25          I may, sir.
```

1          When you arrived there, you went to

2    an adjacent house, not where the operation was

3    going to take place, correct?

4          A.   No.  I got to the bifurcation, or the

5    Y.  In like -- one, two, three -- four houses

6    up, there was one with, like, a slab.

7          Q.   Okay.

8          A.   And that place felt, like, very

9    hostile and a very heavy atmosphere.

10         Q.   All right.  And I believe you said

11   that you had smelled gunpowder.

12         A.   Yes.  As though they had fired shots

13   before we got there.  I told the appeals court

14   at the appeals hearing that when we were

15   coming back from the mountain house that I had

16   heard gunfire that had been shot.

17         Q.   Yes, sir.  We're going to get into

18   the detail of that now.

19         All right.  So you were in an

20   adjacent house overlooking this other house on

21   a concrete slab.

22         A.   No.  The slab was where I was at.  It

23   was like a slab, a cement slab.

24         Q.   Right.  That's what I'm saying.

25         A.   A small slab.  I'm sorry.

1      Q.   And -- yes.

2           Just to be clear, you were at a house

3      that was adjacent to a larger house?  Is that

4      fair?

5      A.   Yes.  A little bit away.

6      Q.   All right.  And you were able to

7      observe the movements of your colleagues as

8      well as the house?

9      A.   No, no, no.  I was not -- I didn't

10     see colleagues.  Because I was by myself.

11          It's just that there was a lamp in

12     the back of the house, and I saw some movement

13     and I saw some people coming out.  These

14     people looked like they were doing some

15     tactical -- military tactical exercise,

16     because they left one right after the other.

17     Q.   All right.  When you say "military

18     tactical exercise," did they have firearms?

19     A.   I don't know.  Because it was dark,

20     and the reflection.  So I only saw that they

21     left from the back part.

22     Q.   Did you hear any gunfire?

23     A.   Yes.  As I was coming down from the

24     mountain house, you could hear gunfire.

25     Q.   All right.  And I believe you said

Asked and
Answered

1    that you saw some individuals come out of the

2    back of that house.

3              MR. MCLAUGHLIN:  Objection; asked and

4        answered.

5              THE WITNESS:  Yes.  When I got onto

6        the small slab, I did notice and saw some

7        strange people coming out from the back

8        part of the house.

9    BY MR. PEREZ:

10       Q.   All right.  And when you say

11   "strange," you mean people you didn't

12   recognize?

13       A.   Yes.  People that I didn't recognize.

14   But it was very strange because these were

15   people running in the back part of the house.

16       Q.   Did you notice any drones?

17       A.   Also.  Yes.  In that house, in that

18   sector, there was also a drone, and the drone

19   was -- had similar characteristics of the

20   drone at the hotel.

21       Q.   When you say "similar

22   characteristics," I believe you described it

23   as a large white drone.

24       A.   Yes.  Not very, very, very big, but

25   it was kind of like medium size, yes, when

Asked and
Answered

```
1        they left us there at the house and they were

2        going to take us back to the hotel and

3        Mr. Rivera said to take us back to the hotel

4        because everything was looking kind of strange

5        at that house.

6            Q.   Sir, did you see these men leave the

7        back of the house after you heard the shots

8        and smelled the gunpowder?

9            A.   No.   I heard the gunfire as we were

10       coming down from the mountain house.   When I

11       reach the sector, the place where the police

12       took us, took me, you can really smell gunfire

13       powder.

14             THE INTERPRETER:   Gunpowder.   Sorry.

15       BY MR. PEREZ:

16           Q.   I see.   So as you were coming towards

17       the second home, you heard gunshots, and then

18       as you got closer to your destination where

19       the concrete slab was, then you smelled the

20       gunpowder smell?

21           A.   I'm going to explain it to you so

22       that we are clear on this subject matter.

23       Okay?

24             The operation started at the house,

25       or the place where the police was going to
```

```
1        conduct the operation.  From that operation,

2        as we were going down, I heard gunfire, since

3        in Haiti this is normal and you can hear

4        gunfire all the time and you could hear

5        gunfire throughout the night.

6                When I got there and I got off from

7        the vehicle, that's when you could smell the

8        gunpowder.

9                From that Y intersection, there's --

10       about one, two, three, or four house down the

11       road, there is the house with the small slab.

12               A few minutes afterwards, Capador

13       calls me and tells me to go check out what's

14       going on because there is -- to go check that

15       house because there was something strange

16       going on at the house.

17               When I went to the house, then I saw

18       four people coming out.  I found it strange

19       because they were in combat formation.

20               When I told Mr. Capador that there

21       were some people coming out from the rear of

22       the house that was dark, he tells me to go

23       ahead and go inform the people that were ahead

24       to be very careful.

25          Q.   And that's because the people that
```

1    were with you had not yet entered the house?

2         A.   No, they had not entered the house.

3         Q.   And how did you know that they had

4    not entered the house?

5         A.   Because when I went to inform them,

6    all the Colombians were outside.   And then I

7    went back, and I went back to the same very

8    position where they were.

9              From there on, I don't know what else

10   happened because I don't know whether they

11   went in or not.

12        Q.   All right.   So at some point, did you

13   see your colleagues, the other Colombians,

14   leave the area --

15        A.   Mr. Capador tells us all to leave

16   because that's kind of strange because the

17   police left us by ourselves.

18        Q.   Okay.   So if I understand correctly,

19   you arrived at the house with the police and

20   the police that accompanied you took off, they

21   left.

22        A.   Yes.   They left us alone there.

23        Q.   Did you find that to be unusual?

24        A.   I found it very unusual.   Because one

25   doesn't know the area, but the Haitians do

1     know the area, so why did they have to leave

2     and leave us alone?

3         Q.   Okay.   At some point, how did you get

4     back in the vehicle?   How did you leave that

5     area?

6         A.   Okay.   So at that time, Mr. Capador

7     comes back and says that "What are we going to

8     do?   They left us by ourselves.   It's time for

9     us to go back to the hotel."

10        Q.   Okay.

11        A.   So as we were heading down to the

12    hotel, we started descending the mountain road

13    and we got to a park, like it was a setup, as

14    though they had prepared everything, ready to

15    kill us.

16        Q.   All right.   You're --

17        A.   We did not get to the hotel.

18        Q.   All right.   Let me go back to the --

19    you describe it as an ambush?   Is that the

20    word?

21        A.   Yes.   As though -- they had

22    everything prepared, as though everything was

23    ready and set.

24        Q.   And you were -- your group was the

25    target of that ambush?

1    A.   Yes.   Pretty much we were the target.

2    Q.   And for those of us that do not have

3  military experience, how do you know it was an

4  ambush?   Describe it for us.

5    A.   An ambush is when the guerilla is all

6  ready and they have intelligence on the enemy

7  group, and they have prepared an area prior

8  because they do some planning.

9         From the time we went down the

10  mountains to the time we arrived to that

11  place, the setup that was there really tells

12  you that it had been organized and set up and

13  took a long time to be set up that way.

14    Q.   And you know that from your military

15  experience?

16    A.   According to my military experience,

17  that area before we got there had been set up

18  way before, long time before.

19         MR. PEREZ:  Mr. Blanquicet, I have

20    been instructed to break for lunch.  I

21    hope that you get lunch today.

22         THE WITNESS:  Yes.  Because over

23    here, they only feed you once, and I

24    haven't had breakfast.

25         MR. MCLAUGHLIN:  We will break for

service@fernandezCR.com
305-374-8868

```
1          30 minutes.
2               (Thereupon, a recess was taken, after
3          which the proceedings continued as
4          follows.)
5               MR. WU:  We are back on the record at
6          1:39 p.m.
7   BY MR. PEREZ:
8          Q.   Mr. Blanquicet, we're back.  Are you
9   ready to commence?
10         A.   Yes.
11         Q.   Okay.  Has anything changed in the
12  room that you're located?  Any new persons
13  have come in?  You still feel comfortable
14  going forward?
15         A.   Same people are here.
16         Q.   Okay.  We were talking about the
17  ambush when we left off.
18         A.   Yes.
19         Q.   And I asked you how you knew it was
20  an ambush, and you described that they were
21  very well prepared.  What type of weapons did
22  you detect that they had?
23         A.   During the day, we were there, we
24  were -- they set us up.  In the morning, every
25  time, somebody would come up to speak with
```

```
 1          James.  So we were concerned, because if we
 2          went to the police -- because the police
 3          basically wanted to murder us.  So during the
 4          day, we didn't know why that was going on.
 5              Q.   Okay.  But this is what I was asking
 6          you:  The people that were attacking you, that
 7          set up this ambush, these were Haitian police
 8          officers?
 9              A.   Yes.  They were all policemen from
10          Haiti.
11              Q.   Okay.  And how did --
12              A.   The attack started at around 3:30 in
13          the afternoon.  They had two 50-points.
14              Q.   50-caliber?  Is it a -- I'm sorry.
15          Sir, did they have 50-caliber machine guns?
16              A.   Yes.  Yes.  Machine guns.  Point-50.
17          They had rifles, 7072.  They had 556 rifles.
18          There was one attack with hand grenades.
19                  That attack was pretty hard, because
20          we didn't have even a spoon to defend
21          ourselves, and the few ones that had weapons
22          were told not to shoot at any policemen so
23          nothing major would happen.  The integrity of
24          the policemen was always maintained.
25              Q.   Sir, let me ask you this.
```

```
 1           A.   So people like us, who are in the
 2      military, always offer our lives in place of
 3      some -- of other people.
 4           Q.   Okay.  Sir, let me ask you this.  Let
 5      me just -- sir, let me ask you this:  At that
 6      point -- did you carry or use a firearm at any
 7      point?  Once --
 8           A.   At no point.  Because my colleagues
 9      who had guns --
10           Q.   So in other words, they --
11           A.   -- were using the guns that were not
12      theirs.
13           Q.   Okay.  So they were shooting at least
14      at you, and you were unarmed?
15           A.   No.  Because I sought refuge because
16      I saw -- when they started shooting at us with
17      a point-50 caliber, we sought refuge at the
18      house where Mr. Rivera was at.
19           Q.   Sir, let me go back -- let me ask you
20      this question for those of us that don't have
21      military experience.  50-caliber machine guns
22      are usually something that have to be set up
23      with a base in order for the gun to be fired.
24      Is that correct?
25                MR. MCLAUGHLIN:  Objection.
```

1            THE WITNESS:  Yes.  With an armored

2       car.  Because these attacks are from a

3       fixed position.

4    BY MR. PEREZ:

5       Q.   There was no doubt in your mind that

6    this was the Haitian police that was shooting

7    at you?

8       A.   Because they were there in the

9    morning -- they went up in the morning to talk

10   to Mr. James Solages, and I don't know what

11   they talked about.

12      Q.   All right.  So at some point, you saw

13   Mr. Solages speaking to the police?

14      A.   Yes.  Because the police were there

15   with him.

16      Q.   All right.  Did Mr. Solages at that

17   point surrender himself, to your knowledge?

18      A.   When the attack started, he was there

19   with us.  Later on, he went down and he

20   surrendered.

21      Q.   All right.  Did he surrender with

22   anyone else?

23      A.   No.  He surrendered by himself.

24      Q.   Okay.  So at some point you said that

25   you looked for shelter when the 50-caliber

1    machine guns were fired at you.  Where did you

2    go, if you know?

3         A.   I stayed at a house where they were

4    attacking us with a 50-caliber for around 40

5    to 50 minutes, until night arrived or the fire

6    stopped, to be able to escape from where the

7    police were --

8         Q.   Sir, do you know --

9         A.   -- had surrounded the area.

10         Q.   Sir, do you know if this was a

11    Taiwanese embassy?

12         A.   At no time when I got there along

13    with my colleagues did they mention that it

14    was the Taiwanese embassy.

15         Q.   How did you get into the embassy?

16    Not you, but the group.

17         A.   Well, I cannot tell you, because I

18    didn't meet with them at the embassy.

19         Q.   Okay.

20         A.   I was the first one to get out of the

21    attack.  I hid under -- in a garden, under

22    some leaves.  And that's why I was able to

23    seek refuge or shelter.  And then the police

24    were passing by.  They were just a few

25    centimeters away from me.

1                    And hours later, around seven or

2    eight at night, since I was close by from the

3    house where the attack occurred, Mr. Capador

4    was injured, and he begged not to be killed.

5        Q.   Do you know who shot him?

6        A.   I'm explaining to you that part.

7        Q.   Yes.  I'm sorry.  Go ahead.

8        A.   So I heard Capador and more than one

9    of my colleagues that were close by that we

10   weren't able to leave that area.  And Capador

11   kept begging, and we could hear him begging

12   for his life, to please not kill him.  Capador

13   was shot in the head as the coup de grâce.

14   They shot Capador in the head as the coup de

15   grâce.

16       Q.   Sir, do you know if the person that

17   shot Capador in the head was Mr. Leon Charles,

18   the chief of police?

19               MR. MCLAUGHLIN:  Objection.

20               THE WITNESS:  I am going to clarify

21   quite a few points regarding this subject

22   matter.  I hope that the prosecutor as

23   well as the defense attorney has some

24   patience with me so that I can explain.

25               MR. MCLAUGHLIN:  Objection.

Speculation
& Relevance

service@fernandezCR.com
305-374-8868

1        THE WITNESS:  The drone flew over on

2    that morning, the drone with the same

3    characteristics as the one that had

4    hovered over the hotel, to the house where

5    we were taken.

6        There was a chief security officer,

7    from the president, who went into the

8    house, where he found Capador, and it is

9    suspected that he was --

10        MR. MCLAUGHLIN:  Objection.

11        THE WITNESS:  -- the one who

12    assassinated Capador.

13        MR. MCLAUGHLIN:  Objection.

14        THE WITNESS:  The intention of the

15    police was to kill all the Colombians and

16    not --

17        MR. MCLAUGHLIN:  Objection.

18        THE WITNESS:  -- leave a shred of

19    evidence.  Because if we were told, we all

20    would have surrendered -- to surrender, we

21    all would have surrendered.  They did not

22    want us to surrender.

Speculation
& Relevance

23        MR. MCLAUGHLIN:  Objection.

24        THE WITNESS:  In August of 2021 --

25        MR. MCLAUGHLIN:  Objection.

service@fernandezCR.com
305-374-8868

```
 1                  THE WITNESS:  -- Mr. Rivera --
 2                  MR. PEREZ:  Let me -- sir, I'm going
 3          to get to that.
 4                  THE WITNESS:  -- was tortured.
 5      BY MR. PEREZ:
 6          Q.   Let me go back to what you mentioned
 7      regarding Capador.  You said that Mr. Capador
 8      was in a house and you saw the chief security
 9      officer enter that house.
10          A.   I did not see him.  That part is not
11      that clear.  That is why I'm going back to
12      August 2021 where we were taken to the prison.
13                  MR. MCLAUGHLIN:  Objection.
14      BY MR. PEREZ:
15          Q.   Okay.  All right.  So you later
16      learned that that's what had happened, but you
17      didn't actually observe that yourself.
18          A.   We heard the gun -- gunshots.
19                  MR. MCLAUGHLIN:  Objection.
20                  THE WITNESS:  And we heard when he
21          was begging for him not to be killed.
22      BY MR. PEREZ:
23          Q.   All right.  And was there anyone else
24      there other than Mr. Capador and the chief of
25      security?
```

Speculation,
Relevance,
Hearsay

1    A.   That's why I'm telling you.  Some
2    police officers went in, and that's why I want
3    to clarify this with August.
4         MR. MCLAUGHLIN:  Objection.
5         MR. PEREZ:  Okay.  It's fine.  Let's
6    move on.
7    BY MR. PEREZ:
8    Q.   Sir, tell us about how you were
9    arrested.  How did you get yourself arrested?
10   A.   I was arrested right there where the
11   attack occurred.  I told a person, a civilian,
12   that I wanted to surrender to the police, to
13   get the police so that I could surrender.  So
14   this person went to the police, and then at
15   that time, the population gets kind -- on an
16   uproar.
17        So the police came, but they did not
18   offer me any kind of safety for my life.  So
19   basically the police unleashed the population
20   on me, and that's why I suffered 17 machete
21   hacks on my hand and I am losing that hand.
22   The police threw the population at me, and
23   then they started hacking me, 27 slashes of
24   machete.  I had a fractured skull.
25   Q.   Did you receive medical attention?

1          A.   Not immediately, because as I was

2     saying -- I did not get it immediately because

3     I was taken out with my colleagues, out of the

4     city of Port-au-Prince, to kill us, to murder

5     us.

6               Afterwards, there was a call made to

7     the police that were with us, and one police

8     hit the truck, and they took us back to the

9     hospital.

10         Q.   In other words, they were taking

11    you -- you believe that they were taking you

12    out of town to kill you and then they -- and

13    you came back?

14              MR. MCLAUGHLIN:   Objection.

15              THE WITNESS:   I wasn't thinking.

16         They took us out of the city.                    Leading,
                                                            Speculation,
17    BY MR. PEREZ:                                          Relevance

18         Q.   At some point, were you interrogated

19    by the Haitian police?

20         A.   I was interrogated without the

21    presence of an attorney.

22              MR. MCLAUGHLIN:   Objection.               Relevance

23    BY MR. PEREZ:

24         Q.   And the answer is yes to that.   You

25    were interrogated by the police, by the         Relevance &
                                                       Leading

service@fernandezCR.com
305-374-8868

1    Haitian police?

2              MR. MCLAUGHLIN:   Objection.

3              THE WITNESS:   Yes.   The Haitian

4       police interrogated me.

Relevance &
Leading

5    BY MR. PEREZ:

6       Q.   Do you recall that there were

7    pictures taken of you and the rest of the men

8    with guns on a table?

9       A.   I wasn't there at that place because

10   I was very injured.

11      Q.   I see.

12              When you were interrogated by the

13   police in Haiti, were you mistreated?

14              MR. MCLAUGHLIN:   Objection.

15              THE WITNESS:   Not physically, because

16      I was injured, but they did -- but

17      psychological, yes.

Relevance,
Argumentative
Vague

18   BY MR. PEREZ:

19      Q.   Okay.   At some point, did the FBI

20   interview you in Haiti?

21      A.   Yes.   They interrogated me in Haiti.

22      Q.   And the story that you told them was

23   what you're telling us here under oath?

24      A.   The same thing.   And there was, I

25   believe, a Mexican that came, and you can

1    verify that with him.  FBI.

2         Q.   When you're talking about a Mexican,

3    you're talking about an FBI agent who's a

4    Mexican-American.

5         A.   Yes.  His accent was Mexican.

6         Q.   Okay.  And he didn't tell you he was

7    Mexican.  You figured it out from the accent?

8         A.   Because of the accent, yes.

9         Q.   Okay.  And did you tell the FBI --

10   did you have a lawyer at the time the FBI

11   interviewed you?

12        A.   I did not have an attorney.

13        Q.   Did they offer you a lawyer?

14             MR. MCLAUGHLIN:  Objection.

15             THE WITNESS:  No, I was not offered

16        an attorney.

17   BY MR. PEREZ:

18        Q.   Did you sign a form waiving the right

19   to a lawyer?

20        A.   I had to sign a document that said

21   that if I didn't sign it, I would be in

22   trouble with the American authorities.

23             THE WITNESS:  Mr. Prosecutor, may I

24        be allowed to go to the bathroom, please?

25             MR. PEREZ:  Yes.

Relevance

1           MR. MCLAUGHLIN:  Certainly.

2           (Thereupon, a recess was taken, after

3       which the proceedings continued as

4       follows.)

5   BY MR. PEREZ:

6       Q.   Mr. Blanquicet, you mentioned that

7   something occurred in August with the chief of

8   security, that you wanted to explain --

9           MR. MCLAUGHLIN:  Objection.

10  BY MR. PEREZ:

11      Q.   -- that involves Capador?

12      A.   Yes.

13      Q.   Tell us what that is.

14          MR. MCLAUGHLIN:  Objection.

15          THE WITNESS:  Mr. Rivera, when he was

16  arrested, he was tortured.  They pulled

17  his nails.  He was beaten up in -- he was

18  beaten up with handcuffs on his feet, that

19  his feet got swollen.

20          On August at the prison, we all went

21  together, all the Colombians, to give a

22  statement regarding the tortures and

23  everything that happened to us at DCPG.

24          So Mr. Dimitri approaches us, who was

25  the chief security officer of the

Calls for
narrative,
Relevance,
Hearsay

1         president.

2              I don't know how he found out that we

3    were going to write a document regarding

4    the tortures to the human rights --

5    regarding our human rights.

6              And he said not to get him in

7    trouble.  That's when he told us that he

8    was there in the evening hours -- or the

9    area where the attack occurred.  He said

10   that that night he saw one of us injured.

11             So given our experience, we came to

12   the conclusion that he was the one who

13   assassinated Capador.

14             On that day, Mr. Dimitri was quite

15   desperate.  And you can verify this with

16   German Rivera that says that these police

17   officers were desperate because of the

18   attack on us.

19   BY MR. PEREZ:

20        Q.   Okay.  So let me go back, if I may.

21             Sir, when -- you understand that

22   Dimitri Herald was the head of the

23   presidential security?

24        A.   Yes.  When he arrived at the jail and

25   that they left us there, right there at the

Calls for
narrative,
Relevance,
Hearsay

1    yard.

2         Q.   Sir, you -- let me ask you this:   Are

3    you aware that Mr. Dimitri Herald was charged

4    with you, in Haiti, as a conspirator?

5              MR. MCLAUGHLIN:   Objection.

6    BY MR. PEREZ:

7         Q.   In Haiti.

8         A.   I do not recognize myself being an

9    accomplice along with this gentleman.

10        Q.   I understand that, sir.   My question

11   is:   He was charged as a conspirator with you.

12   Are you aware of that?

13        A.   Yes.   Yes.   He was charged with our

14   same charges.

15        Q.   Okay.   So -- and at some point,

16   Mr. Dimitri Herald became a fugitive, 'cause

17   he escaped from the jail, to your knowledge?

18        A.   Mr. Prosecutor and Mr. Defense

19   Attorney, there you go.   You have your answer

20   concerning the assassination of the president.

21   There was no police injured.   There were no

22   other people injured.   No police died.   No

23   injured police.

24        Q.   Are you aware --

25             MR. MCLAUGHLIN:   Objection.

Relevance,
Speculation

1    BY MR. PEREZ:

2        Q.    -- that Mr. Herald is now a fugitive?

3            MR. MCLAUGHLIN:   Objection.

4            THE WITNESS:   Yes.   We were there at

5    the jail, along with all of us.   And then

6    we did not leave to clear our names, but

7    he did, along with his old team.

8            MR. PEREZ:   Anything else?

9            I have no further questions.   I thank

10   you very much, sir.

11           THE WITNESS:   Thank you.   Very kind

12   of you.

13           MR. WU:   You will now be asked

14   questions by the next defense counsel.

15           THE WITNESS:   Yes.

16               CROSS EXAMINATION

17   BY MS. BOZANIC:

18       Q.    Good afternoon, sir.

19       A.    Good afternoon, ma'am.

20       Q.    I am -- I represent Christian Sanon.

21   Do you know who that is?

22       A.    Yes, ma'am.

23       Q.    You provided security to -- to

24   Dr. Sanon at some point, correct?

25       A.    Not security.   There's a difference

Relevance,
Speculation

```
 1        between security and escorting.
 2            Q.   Okay.  Can you please clarify what
 3        you did for Dr. Sanon.
 4            A.   Well, to Mr. Sanon, I provided
 5        escorting without weapons.
 6            Q.   Okay.  That was going to be my next
 7        question.  Did you ever have any weapons or
 8        armor when you were with Mr. -- with
 9        Dr. Sanon?
10            A.   No.  Because the company never
11        provided any weapons for that.
12            Q.   When you moved to the other place,
13        the other house, you never saw Dr. Sanon after
14        that, correct?
15            A.   On that July 7th when I left
16        Mr. Sanon's house, I never saw him again.
17            Q.   Did you ever speak to Dr. Sanon about
18        anything that would be relevant or anything
19        that you remember in your conversations?
20            A.   Not for me, because I don't -- I
21        wasn't at that level to -- in order to talk to
22        him.  Only the greetings.
23                MS. BOZANIC:  I'm sorry?
24                THE INTERPRETER:  Only greetings.  Or
25            saying hello.
```

```
 1              MS. BOZANIC:  All right.

 2      BY MS. BOZANIC:

 3         Q.   Do you know who Diamante is, or

 4      Mrs. Coq?

 5              THE INTERPRETER:  From the

 6          interpreter:  Mrs. . . .

 7              MS. BOZANIC:  Mrs. Coq.

 8              THE WITNESS:  I never saw her.  I

 9          never recognized Ms. Diamante.

10      BY MS. BOZANIC:

11         Q.   Did you hear anything about her?

12              THE INTERPRETER:  From the

13          interpreter:  Can you repeat the question.

14      BY MS. BOZANIC:

15         Q.   Did you hear anything about Diamante,

16      or Mrs. Coq?

17         A.   During the month that I was -- that I

18      worked for the company or while I was with

19      Dr. Sanon, I never heard that name.

20         Q.   Okay.  Did you hear that name from

21      anybody else aside from Dr. Sanon?

22         A.   When I got here to the prison, at the

23      DCPG, they asked me about that name, and I

24      didn't know anything about that name.

25         Q.   Who asked you about that name?
```

```
 1          A.   The policeman that interrogated me.

 2          Q.   Would that be the FBI?

 3          A.   No.  The official -- the national

 4     police of Haiti.  The "judicial" police of

 5     Haiti.

 6               MS. BOZANIC:  Thank you, sir.  I have

 7          no further questions.

 8               THE WITNESS:  Thank you.

 9               CROSS EXAMINATION

10     BY MR. FRIEDMAN:

11          Q.   Good afternoon.  My name is --

12          A.   Good afternoon.

13          Q.   My name is Jonathan Friedman, and I

14     represent James Solages.   You know who James

15     Solages is, correct?

16          A.   I saw Mr. James Solages three times.

17          Q.   Okay.  And what was your

18     understanding of his role?

19          A.   He was a person in charge of the CTU

20     businesses here in Haiti.

21          Q.   Okay.  Did he ever translate for you?

22          A.   Well, he didn't translate for me,

23     because he doesn't understand Spanish and I

24     don't understand English.

25          Q.   Okay.
```

```
 1              You indicated that Mr. Solages was on
 2      the telephone when you were being held up,
 3      when the ambush occurred.  Do you remember
 4      that?
 5          A.   No, I didn't say he was on the phone.
 6      I said that I saw three police officers who
 7      went to talk to him.
 8          Q.   Okay.  Do you know what they were
 9      talking about?
10          A.   I don't know, because I don't
11      understand English or Creole and they were
12      speaking in one of those languages.
13          Q.   All right.
14              Why do you think that the police
15      wanted to kill all the Colombians and didn't
16      want them to surrender?
17              MR. MCLAUGHLIN:  Objection.
18              THE WITNESS:  Because there is one
19          person who's a mandatary, who is dead --
20          or president -- I'm sorry -- who's dead,
21          and there is no police who died or was
22          injured, and the house didn't have
23          security where it was.  The security.
24          He -- the secretary -- the minister of
25          secretary said on that day there were 30
```

```
 1          people guarding the president.  The
 2          diplomat said that.  Where were those 30
 3          people?
 4     BY MR. FRIEDMAN:
 5          Q.   Okay.  You indicated there were no
 6     injured police.  What does that suggest to
 7     you?
 8               MR. MCLAUGHLIN:  Objection.
 9               THE WITNESS:  What that suggests to
10          me?  Well, I don't have any proof, but
11          with my military experience is that their
12          own people assassinated their president.
13               MR. MCLAUGHLIN:  Objection.
14               THE WITNESS:  That if this is going
15          to cost my life here in Haiti, then I will
16          give my life for the truth to be known.
17     BY MR. FRIEDMAN:
18          Q.   Are there any other things that
19     you're aware of why you believe that this --
20     the president was killed by his own inner
21     security people?
22               MR. MCLAUGHLIN:  Objection.
23               THE WITNESS:  There's a very
24          important detail that I analyzed when the
25          appeal hearings were held, that caught my
```

1          attention a lot.

2     BY MR. FRIEDMAN:

3          Q.   What is that?

4          A.   That when the former -- first

5     minister at that time, when he was asked who

6     had murdered the president --

7               MR. MCLAUGHLIN:  Objection.

8               THE WITNESS:  -- this person replied

9          that he spoke Spanish.  And then the judge

10         asked him to look back and -- to see if he

11         recognized any Colombian, and he answered

12         no.

13              He looked at us with scared --

14         scared.  We as military know -- we -- as

15         military people, we recognize when

16         someone's lying.

17              And another detail:  He mentioned

18         that there was an internal political war

19         between them.  That tells us that it was

20         the police itself and their own politics

21         and they just needed one person to blame.

22     BY MR. FRIEDMAN:

23         Q.   Anything else?

24         A.   We are mercenaries here, and the

25     people that are behind me are mercenaries, and

```
 1      they know that this was a -- like a stupid

 2      thing to do.  We did everything legally in

 3      this country.  We didn't do anything illegal.

 4          Q.   Can you repeat that and clarify your

 5      answer.

 6              MR. MCLAUGHLIN:  Objection.

 7              THE WITNESS:  Which question?  So

 8          that I may clarify it.

 9      BY MR. FRIEDMAN:

10          Q.   Did you indicate and say you are a

11      mercenary or that you are being cast as a

12      mercenary?

13          A.   I'm not a mercenary.  They made

14      every -- I am not a mercenary.  We were held

15      for people to believe that we were

16      mercenaries.  This country, we came legally.

17      We never came in with bad intentions.

18          Q.   Okay.  You indicated earlier you had

19      27 slashes from a machete and you had a

20      fractured skull, and you talked about

21      psychological injury.  Can you give us an

22      example of -- or give us examples of how you

23      were psychologically injured.

24              MR. MCLAUGHLIN:  Objection.

25              THE WITNESS:  I have the first scar
```

```
 1          here in these fingers.
 2               When the -- when the deputy police
 3          was asking me questions, they would
 4          threaten my family.  Because I don't know
 5          which authority in Colombia, if it was the
 6          army, but they gave all information about
 7          us.  They didn't measure the consequences
 8          of the threats they were doing toward our
 9          families and our children.
10     BY MR. FRIEDMAN:
11          Q.  Who were you living with before you
12     went to Haiti?
13               MR. MCLAUGHLIN:  Objection.
14               THE WITNESS:  I am separated.  I live
15          with my mother and I take care of my
16          mother.
17               MR. FRIEDMAN:  I don't have any other
18          questions, but I do want to remind you
19          that you're not to discuss your testimony
20          here today with anybody else, including
21          when you go back to the jail or wherever
22          they're housing you.  Do you understand
23          that?
24               THE WITNESS:  That is the American
25          law, and the prosecutor who told me about
```

1       the rules.

2              MR. FRIEDMAN:  All right.  Thank you

3       so much.

4              MR. DO CAMPO:  On behalf of

5       Mr. Pretel Ortiz, we have no questions.

6              MS. KUDMAN:  On behalf of Mr. Walter

7       Veintemilla, I have no questions.

8              MR. WU:  All right.  We are going to

9       take a five-minute break.

10              (Thereupon, a recess was taken, after

11       which the proceedings continued as

12       follows.)

13              CROSS EXAMINATION

14   BY MR. MCLAUGHLIN:

15       Q.   Mr. Blanquicet, can you hear me?

16       A.   Yes, I can hear you.

17       Q.   Very well.

18              I'm Assistant United States Attorney

19       Sean McLaughlin.  I'm going to be asking you

20       questions on behalf of the U.S. Department of

21       Justice.

22              What's your date of birth?

23       A.   My birth date is January 15, 1982.

24       Q.   Very well.

25              So when you were in Haiti, you were

```
1        39 years old, correct?

2            A.   Would you please repeat your

3    question.

4            Q.   When you were in Haiti during June

5    and July of 2021, you were 39 years old,

6    right?

7            A.   Yes.

8            Q.   Now, you were in the military from

9    2000 until 2021, correct?

10           A.   Yes.

11           Q.   And you got out of the Colombian

12   military in February of '21, correct?

13           A.   Yes.

14           Q.   During your time in the Colombian

15   military, you were in the special forces,

16   correct?

17           A.   Yes.

18           Q.   Were you in special forces all 21

19   years?

20           A.   Not all 21 years, but all counter-

21   insurgency or counter-guerilla units.

22           Q.   So for 21 years, you were in counter-

23   insurgency and a counter-guerrilla unit?

24           A.   I was on counter-guerrilla and

25   special units.
```

```
 1        Q.    So how long were you in special
 2   forces, then?
 3        A.    Seven years.
 4        Q.    And you received combat training?
 5        A.    Yes.  I did receive enough.  Yes.
 6        Q.    Weapons training?
 7        A.    Yes.
 8        Q.    In fact, you qualified as an expert
 9   shooter in the Colombian military, correct?
10        A.    Yes.
11        Q.    You also received intelligence
12   training?
13        A.    Yes.
14        Q.    Conducted training -- or were trained
15   by the British military?
16        A.    Not with the British army.  With --
17   never.  But with the American army.
18        Q.    Where was that?
19        A.    That training, I received in
20   Colombia.
21        Q.    What kind of training was it?
22        A.    Direct action.
23        Q.    Very well.
24        A.    Combatting and confronting the
25   Colombian guerrillas, which is a type of
```

```
1          training that the Colombian army will provide.
2               Q.   Did you see combat in Colombia?
3                    THE INTERPRETER:  I'm sorry?
4     BY MR. MCLAUGHLIN:
5               Q.   Did you see combat in Colombia?
6               A.   Against the guerrillas, yes.  A lot
7     of combat.
8               Q.   Were you fired upon, ever?
9               A.   Too many times by the guerrillas.
10              Q.   Were you -- did you fire your weapons
11    at guerrillas when you were in the military?
12              A.   Yes, I did.  It was my duty to do so
13    for my country's sovereignty.
14              Q.   You ever kill anybody?
15              A.   You don't know whether you kill or
16    not somebody, because that depends on the
17    distance.
18              Q.   Did you ever kill anybody in the
19    military?
20                   MS. BOZANIC:  Objection.
21                   THE WITNESS:  Thank God I didn't, as
22         far as I know.
23    BY MR. MCLAUGHLIN:
24              Q.   Did you ever wound anybody in the
25    military?
```

```
 1              MS. BOZANIC:  Objection.
 2              THE WITNESS:  Let me repeat it again.
 3         Combat will take place within a 100 to 150
 4         range, so you never know if you're killing
 5         or wounding anyone.
 6              MR. MCLAUGHLIN:  Fair to say.
 7    BY MR. MCLAUGHLIN:
 8         Q.   But it's true that the Colombian
 9    military trained you to be a killer, right?
10         A.   The army never trained me -- the army
11    never trained -- the government army never
12    trained me to be a killer, but to defend the
13    national sovereignty of my country.
14         Q.   You learned how to shoot weapons,
15    correct?
16         A.   In the army.
17         Q.   Yes or no.  In the army, you learned
18    how to use weapons?
19         A.   Yes.
20         Q.   And in the military, you learned to
21    shoot those weapons at people, yes?
22         A.   I don't really understand your
23    question.
24         Q.   In the military, you learned to shoot
25    weapons at guerrillas and people, correct?
```

1          A.   You are trained to fight to defend

2     our lives.

3          Q.   Yes or no, Mr. Blanquicet.  You were

4     trained to shoot weapons at guerrillas and

5     others in the military?

6               MR. FRIEDMAN:  Objection.

7               THE WITNESS:  I was not trained or

8          taught to shoot at a person, but to defend

9          Colombian people and the Colombian

10         sovereignty.

11    BY MR. MCLAUGHLIN:

12         Q.   You certainly were an expert shooter

13    in the military, correct?

14               MS. BOZANIC:  Objection.

15               THE WITNESS:  Yes, I was.  Because

16         when you get into the army, you're put

17         through training courses to learn how to

18         defend people and defend the sovereignty

19         of our country.

20    BY MR. MCLAUGHLIN:

21         Q.   And the highest rank you got ascended

22    to in the Colombian military was sergeant

23    first class, correct?

24         A.   Yes.  First sergeant.

25         Q.   Very well.

103

```
 1              Now, you've been in Haitian custody
 2     since July 8th, 2021?
 3         A.    Since June 8th.
 4               Since July 8th.   Sorry.
 5         Q.    Yes.
 6               Correct?
 7         A.    Yes.
 8         Q.    And while you've been in Haitian
 9     prison --
10         A.    Since June 8th, 2021.
11         Q.    Since July of 2021, while you've been
12     in Haitian custody, you've been housed with
13     your fellow Colombians, correct?
14         A.    Yes.   I have been with them
15     permanently.
16         Q.    Sometimes you've even been in the
17     same cell, correct?
18         A.    Yes.   When we arrived to the
19     penitentiary, we were divided by six member
20     groups.
21         Q.    Yes or no, Mr. Blanquicet.   You've
22     been in the same cell with your fellow
23     Colombians, correct?
24         A.    Yes.
25         Q.    And during the time you've been in
```

Relevance

service@fernandezCR.com
305-374-8868

1    Haitian prison, you and your fellow Colombians

2    have had a lot of time to talk about this

3    case, correct?

4         A.    Yes.

5         Q.    And you've had a lot of time to talk

6    about how you would testify, correct?

7         A.    We have not been planning how we're

8    going to testify.  Each one has his own

9    version, and each one has given his own

10   version to the FBI.                                          Relevance

11        Q.    Now, while you were in Haitian

12   prison, you mentioned that you've seen some

13   other people related to this case.  Do you

14   remember that, during your direct testimony?

15        A.    Yes, I did say it, because they were

16   put in jail at the beginning, together with

17   us.

18        Q.    Did you see James Solages in Haitian

19   prison?

20        A.    James Solages and White.

21        Q.    And you saw Joseph Vincent?

22   Mr. White?

23        A.    Yes, sir.

24        Q.    And eventually, you saw Christian

25   Sanon in Haitian prison, correct?                           Argumentative

1        A.    He was there at the start with us,

2   but there was an earthquake, so he was moved

3   to another place.

4        Q.    Sure.   But when he -- when you saw

5   him there, he, in fact, offered you $2 million

6   not to mention his name, correct?

7        A.    At no time has that gentleman offered

8   me any moneys, just talked about helping us

9   with an attorney because we didn't have a

10  lawyer.

11       Q.    And in fact, Mr. Sanon offered to

12  help you get extradited to Colombia in

13  exchange for not mentioning him to the police,

14  correct?

15            MS. BOZANIC:   Objection.

16            THE WITNESS:   At no time has that

17       gentleman offered anything to me.

18  BY MR. MCLAUGHLIN:

19       Q.    And in fact, you and the other

20  Colombians talked about this offer at great

21  length, correct?

22       A.    We don't discuss that issue.   What we

23  do discuss is that we were laid a trap by the

24  police.

25       Q.    And in fact, you and your fellow

Argumentative

```
 1      Colombians discussed what you would do with
 2      the $2 million that Sanon offered you,
 3      correct?
 4              MS. BOZANIC:  Objection.
 5              THE WITNESS:  I don't know about any
 6          millions of dollars, because no money was
 7          ever mentioned to me.                          Argumentative
 8      BY MR. MCLAUGHLIN:
 9          Q.   Now, I'm going to take you back to
10      late May, early June of 2021.  You were
11      recruited by Duberney Capador, correct?
12          A.   Duberney, Mr. Alejandro Rivera, and
13      the CTU company.
14          Q.   Correct.
15              But at some point, Capador called you
16      on the phone, correct?
17          A.   Yes.  He did call me.
18          Q.   And your name and phone number was
19      then added to a WhatsApp group, correct?
20          A.   Yes.
21          Q.   And that was called Primeros 20?
22          A.   No, the name was not The First 20.
23      It was called Hermanos por la Fe, not Primeros
24      20.  Or Brothers for Faith.  Brethren for
25      Faith.
```

```
 1          Q.   And there was also a WhatsApp group
 2     called Primer Grupo.  You were part of that?
 3          A.   I was just in one group, the Brethren
 4     for Faith.  I was not in the other groups.
 5          Q.   In fact, all of the Colombians that
 6     went to the Dominican Republic with you, all
 7     20 of you were in this WhatsApp group, right?
 8          A.   Yes.
 9          Q.   And you would share pictures with
10     each other?
11          A.   Not between us.  We would take
12     pictures because the company gave us a tour.
13          Q.   You would share videos between each
14     other in this WhatsApp group?
15          A.   No.  Because that group was only
16     sharing information, and we attempted to
17     documentation, that sort of thing.
18          Q.   And you would share messages with
19     each other over this WhatsApp group?
20          A.   Not between us.  Like I told you,
21     messages about being aware of the account and
22     all the messages.
23          Q.   Mr. Blanquicet, you are aware that we
24     have seized a number of Colombian cell phones
25     that were captured in Haiti, belonging to some
```

```
 1      of your compatriots.  You're aware of that,
 2      right?
 3           A.   Yes, I'm aware.  And like I said, I
 4      won't put out my hands on the fire for anyone.
 5           Q.   What I'm going to show you here --
 6      you were first -- when you eventually heard
 7      from Capador, you were provided a plane ticket
 8      to fly to the Dominican Republic, correct?
 9           A.   Yes.  The company did.
10           Q.   I'm showing you what's been marked as
11      Government's Exhibit 2A for this deposition.
12           (Government Exhibit 2A is marked.)
13      BY MR. MCLAUGHLIN:
14           Q.   Do you recognize your name on this
15      document?
16           A.   I did not get that document.  Because
17      Mr. Capador had an arrangement with
18      Mr. Carmona.  Since we started this
19      relationship, we -- he had this relationship
20      with Mr. Carmona.
21           Q.   Mr. Blanquicet, do you see the
22      document here on the screen?
23           A.   Yes, I can see it --
24           Q.   That's your name right there,
25      correct?
```

```
1              A.    That's correct.
2              Q.    And if we look down here, we see a
3     flight from Bogota to Punta Cana in the
4     Dominican Republic, correct?
5                   MR. DOMINGUEZ:   Objection.
6                   THE WITNESS:   That's correct.
7                   MR. DOMINGUEZ:   I would object.   And
8     for the record, this -- he testified he
9     hasn't seen this document, so I'm
10    objecting to the document.
11    BY MR. MCLAUGHLIN:
12             Q.    And the flight date is June 4th,
13    correct?
14             A.    It's correct.   We left at 3:30 or 4
15    p.m.
16             Q.    And you flew to the Dominican
17    Republic at -- from Colombia on June 4th,
18    right?
19             A.    Yes.
20             Q.    I'm going to take you to the second
21    page of this document.
22                   In fact, you had a return flight and
23    a return ticket from the Dominican Republic to
24    Colombia on June 3rd, correct?   July 3rd.
25             A.    I never saw that ticket, because visa
```

1    was issued for one year.

2         Q.   Again, you had a return ticket to fly

3    from the Dominican Republic to Bogota on

4    July 3rd, correct?

5         A.   That response should be given to you

6    by Mr. Carmona from C- -- sorry -- Rivera from

7    CTU, because they are the ones who handled it.

8    I never saw that ticket.   I can attest to the

9    first ticket.

10        Q.   I'm going to show you Government's

11   Exhibit 4.

12        (Government Exhibit 4 is marked.)

13   BY MR. MCLAUGHLIN:

14        Q.   Do you recognize this photograph?

15        A.   That was the day of the tour given to

16   us by the company.   We were all happy on that

17   day.

18        Q.   Yeah.

19             And you're wearing the pink shirt

20   here, correct?

21        A.   Yes, that's me.

22        Q.   And if we look at this picture,

23   there's only 16 of you, correct?

24        A.   Yes.   Because there were five of them

25   who traveled on the 5th to the DR.

1        Q.   They were able to fly -- isn't it
2    true, Mr. Blanquicet, that four of you were
3    able to fly from the Dominican to Port-au-
4    Prince, but the rest had to take the bus?
5        A.   Yes, that's true.
6        Q.   And . . .
7             MR. MCLAUGHLIN:  All right.  And at
8        this time, Mr. Blanquicet, we're going to
9        call time for today, but we will start
10       again tomorrow.
11            (Pause in proceedings)
12            MS. PHENELUS:  Hi.  My name's
13       Altanese Phenelus.  I'm with the United
14       States government as well.  Specifically,
15       I'm an assistant U.S. attorney.  We will
16       begin tomorrow precisely at 9 a.m.
17            We need the -- we need Mr. Blanquicet
18       as well as at least one attorney there so
19       that we can begin exactly at 9 a.m.  The
20       courtroom is filled with many people, and
21       so we want to make sure we start on time.
22            Mr. Thermitus, I know we were talking
23       before.  I just want to make sure you or
24       one of you will be here on time tomorrow.
25       Right?

1        MR. JOSEPH:  We will do everything

2   possible to be there tomorrow.

3        MS. PHENELUS:  And can we have your

4   phone number for the record?

5        MR. JOSEPH:  4715247441390910.

6        MS. PHENELUS:  Area code 509, right?

7        MR. JOSEPH:  Yes.

8        MS. PHENELUS:  Thank you so much.  We

9   will see you tomorrow morning.

10        MR. WU:  We are concluding the

11   deposition for today.

12        (Deposition continued on November 20,

13   2025 in Volume 2.)

14

15

16

17

18

19

20

21

22

23

24

25

**Live Deposition Edwin Blanquicet - Volume 2**

**United States of America vs. Arcangel Pretel Ortiz, et al.**

**November 20, 2025**



Fernandez&Associates
court reporters

Rivergate Plaza, Suite 714
444 Brickell Avenue
Miami, FL 33131

service@fernandezCR.com
305-374-8868

1                UNITED STATES DISTRICT COURT.
                 SOUTHERN DISTRICT OF FLORIDA
2
                 Case No. 22-cr-20104-JB
3
     UNITED STATES OF AMERICA,
4
                     Plaintiff,
5
     vs.
6
     ARCANGEL PRETEL ORTIZ, et al,
7
                     Defendants.
8
     _____   X
9

10

11               400 North Miami Avenue
                 Miami, Florida
12               November 20, 2025
                 9:40 - 11:18 p.m.
13

14

15                    VOLUME 2

16               REMOTE DEPOSITION OF

17          EDWIN ENRIQUE BLANQUICET RODRIGUEZ

18

19          Taken before Suzanne Fernandez, Notary

20     Public in and for the State of Florida at

21     Large, pursuant to Notice of Taking Deposition

22     filed in the above cause.

23

24                 - - - - - - -

25

```
 1      APPEARANCES:

 2
          ON BEHALF OF THE UNITED STATES:
 3
              U.S. Attorney's Office
 4            11200 NW 20th Street, Suite 101
              Miami, FL 33172
 5            BY:   Sean T. McLaughlin, AUSA
                    Sean.McLaughlin@usdoj.gov
 6                      and
              99 NE 4th Street
 7            Miami, FL 33132
              BY:   Jason Wu, AUSA
 8                  Jason.Wu@usdoj.gov
                        and
 9                  Altanese Phenelus, AUSA
                    Altanese.Phenelus@usdoj.gov
10                      and
              950 Pennsylvania Avenue
11            Washington, DC 20530
              BY:   Andrew Briggs, Trial Attorney
12                  Andrew.Briggs2@usdoj.gov

13      ON BEHALF OF DEFENDANT ARCANGEL PRETEL ORTIZ:

14            Do Campo & Thornton, P.A.
              Chase Bank Building
15            150 SE 2nd Ave, Suite 602
              Miami, FL 33131-1571
16            BY:   Orlando Do Campo, Esq.
                    od@dandtlaw.com
17                      and
              David A Howard, P A
18              25 SE 2nd Ave, Ste 1105
                Miami, FL 33131-1605
19            BY: David Howard, Esq.
                  david@davidhowardlaw.com
20                      and
              Daniela Jaramillo
21            150 SE 2nd Ave Ste 602
              Miami, FL 33131-1571
22            BY:   Daniela Jaramillo, Esq.
                    Dj@dandtlaw.com
23

24

25
```

```
1        ON BEHALF OF DEFENDANT ANTONIO INTRIAGO:

2            Emmanuel Perez & Associates, P.A.
             901 Ponce De Leon Blvd, Ste 101
3            Coral Gables, FL 33134-3059
             BY:  Emmanuel Perez, Esq.
4                Perez@lawperez.com

5

6        ON BEHALF OF DEFENDANT WALTER VEINTEMILLA:

7            Kudman Trachten Aloe Posner LLP
             7108 Fairway Dr, Ste 130
8            Palm Beach Gardens, FL 33418-3768
             BY:  Tama Beth Kudman, Esq.
9                Tkudman@kudmanlaw.com

10       ON BEHALF OF DEFENDANT CHRISTIAN SANON:

11           Humberto R. Dominguez, PA
             9100 S Dadeland Blvd, Ste 1500
12           Miami, FL 33156-7816
             BY:  Humberto Dominguez, Esq.
             Bert@hdominguezlaw.com
13                   and
             Bozanic Law, P.A.
14           101 NE 3rd Ave, Ste 1500
             Fort Lauderdale, FL 33301-1181
15           BY:  Zeljka Bozanic, Esq.
                 Info@bozaniclaw.com

16

17       ON BEHALF OF DEFENDANT JAMES SOLAGES:
             Jonathan S. Friedman, P.A.
18           101 NE 3rd Ave, Ste 1500
             Fort Lauderdale, FL 33301-1181
19           BY:  Jonathan Friedman, Esq.
                 Jfriedmanlawfirm@gmail.com
20                   and
             S. Patrick Dray, P.A.
21           11900 Biscayne Blvd, Ste 459
             North Miami, FL 33181-2726
22           BY:  Simon Dray, Esq.
                 Pat@patdray.com

23

24

25
```

```
 1      ALSO PRESENT IN FLORIDA:

 2      Thomas Pavletic, FBI
        Joelle Haspil, Interpreter
 3      Fiorella Warger, Interpreter
        Hernando Soto, Interpreter
 4      Susana Starosta, Interpreter

 5

 6      ALSO PRESENT IN HAITI:
        Brunel Bienvenu, FBI Contractor
 7      Pierre Antoine Chrispin, Esq.
        Thermitus Joseph, Esq.
 8      Francia Altidor, Esq.

 9

10

11                   I N D E X

12

13      Witness: Edwin Enrique Blanquicet Rodriguez

14                   Direct/Redirect   Recross/Cross

15      By Mr. McLaughlin                    117

16      By Mr. Perez         147

17

18                   E-X-H-I-B-I-T-S

19      Description                  Page
        GOVERNMENT EXHIBIT 1A         123
20      GOVERNMENT EXHIBIT 6N         136
        GOVERNMENT EXHIBIT 8A         142

21

22

23

24

25
```

1      (Proceedings continued from 11-19-2025:)

2          CROSS EXAMINATION CONTINUED

3    BY MR. MCLAUGHLIN:

4      Q.   Good morning, Mr. Blanquicet.

5      A.   Good morning, Mr. Prosecutor.

6      Q.   We're going to continue with the

7    questions I have for you from yesterday.

8    Before we begin --

9      A.   Yes.

10     Q.   -- I want to confirm who is in the

11   room with you.  It's my understanding that you

12   are in the room, your attorneys are in the

13   room, and --

14     A.   Yes.

15     Q.   -- a representative from the U.S.

16   government is there to make sure that the

17   technology works.

18     A.   Yes.

19     Q.   And that's it?

20     A.   Yes.

21     Q.   Is anyone else in the room?

22     A.   No.  There's no one else.

23         MR. MCLAUGHLIN:  At this time,

24     Mr. Fernandez, do you want to inquire more

25     in terms of who is in the room, who is

1     not?

2          MR. HOWARD:  We're good.

3          MR. MCLAUGHLIN:  The defense has

4     indicated that they're ready for me to

5     proceed.

6   BY MR. MCLAUGHLIN:

7          Q.   Mr. Blanquicet, would you agree with

8   me that you never met Arcangel Pretel Ortiz

9   either while you were in Colombia, the

10  Dominican Republic, or Haiti?

11         A.   I have never met Mr. Arcangel Pretel.

12  I've never seen him until now.  I have never

13  seen him, and I've never met him in my life.

14         Q.   And you never communicated with him

15  over the phone?

16         A.   Never.  Thank God.

17         Q.   Now, you testified yesterday that in

18  fact you did meet Mr. Intriago, correct?

19         A.   Yes.  Yes.  Here in Haiti to talk

20  about what projects were going to be

21  performed.

22         Q.   Did you ever communicate with

23  Mr. Intriago over the telephone?

24         A.   Thank God, never.  I got to meet him

25  when he arrived here in Haiti.

FERNANDEZ & ASSOCIATES COURT REPORTERS
service@fernandezCR.com  *  305-374-8868

1          Q.   And Mr. Veintemilla.  You never met

2    Mr. Veintemilla in Haiti, in Colombia, or in

3    the Dominican Republic?

4          A.   Thank God, none of these places.  Nor

5    have I seen nor do I know who that gentleman

6    is.

7          Q.   And you never communicated with

8    Mr. Veintemilla over the phone, correct?

9          A.   Correct.  Correct.  Never.  Thank

10   God.

11         Q.   Now, you did meet Mr. Sanon in Haiti,

12   correct?

13         A.   Yes.  Yes, I did.  I did meet him

14   here in Haiti.

15         Q.   Did you ever communicate with

16   Mr. Sanon over the telephone?

17         A.   Thank God, no.  That level was not

18   within my prerogative.  I just went to the

19   house to serve as an escort.

20         Q.   Yes or no, Mr. Blanquicet.  You never

21   communicated with Mr. Sanon over the phone?

22         A.   Never, never, never.  No.

23         Q.   Now, you met James Solages in Haiti,

24   correct?

25         A.   To know someone infers a lot of other

1    things.   Because to know someone is to get to

2    know someone.   But I did meet him or got to

3    see him here in Haiti.

4         Q.   Did you ever communicate with

5    Mr. Solages over the phone when you were in

6    Haiti?

7         A.   Thank God, never.   Because I don't

8    speak either Creole or English.

9         Q.   So you would agree with me,

10   Mr. Blanquicet, that you have no idea what

11   these defendants were communicating about with

12   each other before you went to Haiti?

13        A.   Never.   Nor outside or inside.   The

14   only thing we would get were Capador's orders

15   or a job concerning documents or whatever the

16   company would instruct to do.

17        Q.   Yes or no, Mr. Blanquicet.   You have

18   no idea what these defendants were saying to

19   each other before you went to Haiti?

20        A.   No.   Because I never knew that.

21        Q.   And you have no idea what these

22   defendants were saying to each other while you

23   were in Haiti?

24        A.   As far as Capador and Mike, they

25   would meet amongst themselves.   For us, they

1    wouldn't tell us anything.  All we did was

2    work, work, work, work.

3         Q.   Yes or no, Mr. Blanquicet.  You were

4    not a part of any communications between

5    Mr. Ortiz, Mr. Intriago, Mr. Veintemilla,

6    Mr. Sanon, and Mr. Solages, correct?

7         A.   Correct.

8         Q.   Now, you testified yesterday,

9    Mr. Blanquicet, that Mr. Capador told you that

10   CTU worked for the U.S. Department of State

11   and another part of the U.S. government.  Do

12   you remember that testimony?

13        A.   It is correct.  And also the

14   gentleman from the company, Tony Intriago,

15   said the same thing.

16        Q.   Well, in March of 2022, specifically

17   March 11, 2022, you were interviewed by a

18   media outlet called Republica La FM, correct?

19        A.   Yes.  But that's from Colombia.  FM

20   is from Colombia.

21        Q.   And during that interview, you were

22   asked, quote, "You were told at some point by

23   American companies that they worked for the

24   U.S. government?"

25        A.   Yes.  They told us.

1        Q.    And --

2        A.    And I replied, "FBI and Department of

3    State."

4        Q.    In fact, during that interview, you

5    responded as follows, quote, "I have no

6    knowledge of that.  I was hired by the company

7    Worldwide and Mr. Veintemilla to provide

8    security for Sanon and an energy project."

9              That's, in fact, what you said,

10   right?

11       A.    Yes.  I've always said that the

12   company had hired me for projects that were

13   going to be held in Jacmel, as well as taking

14   care of Sanon and providing security.

15       Q.    And in fact, when -- if anyone told

16   you that the U.S. government was involved,

17   they could have been lying to you, correct?

18            MR. HOWARD:  Objection.

19            THE WITNESS:  As far as I'm

20        concerned, they lied to me.  And as I told

21        the appeals court judge, that was human

22        trafficking, then.

23   BY MR. MCLAUGHLIN:

24       Q.    And when you say "they," who are you

25   referring to?

```
 1        A.    The Worldwide company and CTU.

 2              MR. HOWARD:  Objection.  Move to

 3        strike.

 4              THE COURT REPORTER:  I'm sorry.

 5        Who's objecting?

 6              MR. HOWARD:  Mr. Howard for Ortiz.

 7              Objection.  Moving to strike the

 8        answer and the question.

 9        BY MR. MCLAUGHLIN:

10        Q.    Now I'm going to show you here on the

11        screen, Mr. Blanquicet, a document which is

12        entitled Government's Exhibit 1A.

13           (Government's Exhibit 1A is marked.)

14        BY MR. MCLAUGHLIN:

15        Q.    After you were arrested in Haiti, you

16        were interviewed by the FBI and the U.S. --

17        A.    Yes.

18        Q.    -- and the U.S. Department of

19        Homeland Security Investigations.

20        A.    Yes.

21        Q.    And prior to that interview, you were

22        provided an advisement as to your rights under

23        U.S. law, correct?

24        A.    Yes.

25        Q.    And the agents read that to you,
```

1    correct?

2        A.   He didn't read the paper for me.   He

3    just told me to sign here and that this paper

4    basically had consequences with -- concerning

5    the American justice system --

6        Q.   Well, are you aware --

7        A.   -- if I didn't sign.

8            THE INTERPRETER:   I'm sorry.

9    BY MR. MCLAUGHLIN:

10       Q.   Are you aware, Mr. Blanquicet, that

11   in fact, these are the very same rights that

12   were read to you in court yesterday?

13       A.   Yes, these are the same rights,

14   because I read them.

15       Q.   And you read them when they were

16   presented to you in -- on July 24th of 2021,

17   correct?

18       A.   Yes, I did read them.

19       Q.   All right.

20            And if we go down here on the

21   document, do you see where it says

22   "Signature"?

23       A.   Yes.   And that is my signature.

24       Q.   Very well.

25            Now, you were interviewed by two

```
1       agents, correct?
2           A.   Yes.   One was white.   And the other
3       one who had the Mexican accent.
4           Q.   And during that interview, they
5       showed you a series of pictures to see if you
6       could identify certain people, correct?
7           A.   They didn't show me pictures.   They
8       just asked me what had happened at the house,
9       the place of the events.
10          Q.   I'm going to show you now this
11      photograph.   Do you recognize this photograph?
12          A.   This is Mr. Tony.
13          Q.   Yes.
14               Is that your signature here?
15          A.   Yes.
16          Q.   Is that your handwriting?
17          A.   Yes.
18          Q.   So in fact, they did show you
19      pictures, correct?
20          A.   On the day that the investigator
21      interviewed me, he started asking me about
22      what had happened at the scene.
23          Q.   Yes or no, Mr. Blanquicet.   You were
24      shown photographs, correct?
25          A.   Yes.   They did, in fact, show me
```

```
1    pictures.  But they were asking me about what
2    had happened on the day of the event.  I was
3    injured, so -- at that time, so that's why I
4    couldn't remember.
5        Q.   And in fact, you signed the
6    photographs of the people you recognized,
7    correct?
8        A.   Yes.  Yes.
9        Q.   I'm going to show you now -- this is
10   page 3 of the document.
11           You did not recognize Mr. Ortiz,
12   correct?
13       A.   Yes.  I've never seen this gentleman.
14       Q.   You did not recognize the individual
15   on page 4.
16       A.   I don't know who that might be.  I
17   don't know if he's Haitian or if he's
18   American.
19       Q.   And because you didn't recognize
20   them, you would put an X there, correct?
21       A.   Yes.
22       Q.   Now showing you page 5.
23           You recognized Mr. Capador, correct?
24       A.   Yes.
25       Q.   And that's your handwriting and
```

```
 1        signature?

 2             A.    Yes.

 3             Q.    And the date?

 4             A.    Yes.

 5             Q.    I'm going to show you page 6.

 6                   You recognized Mr. Sanon, correct?

 7             A.    Yes.

 8             Q.    And that's your handwriting and

 9        signature?

10             A.    Yes.

11             Q.    I'm going to show you now page 7 of

12        this document.

13                   You recognized Mr. Solages, correct?

14             A.    Yes.

15             Q.    And that's your handwriting?   Date

16        and signature?

17             A.    Yes.

18             Q.    Now I'm going to show you page 8.

19                   You recognized Mr. Badio, correct?

20             A.    I -- it looked like Badio.   I had

21        been shown a picture of Badio and was told

22        that was Badio, and I said that this looked

23        like Badio.

24             Q.    That's your handwriting?

25             A.    Yes, that is my handwriting.
```

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

```
1        Q.   And that is your signature?
2        A.   Yes.
3        Q.   And in fact, you told the FBI that
4   you first met Badio at the mountain house,
5   correct?
6        A.   I never met him.  I saw someone
7   with -- wearing a tie on that night, and I
8   wasn't sure it was him.  I asked him if it was
9   him, and I was shown that picture at DCPJ and
10  I was told this is Badio.  I told them I
11  wasn't sure.
12       Q.   In fact, you told the FBI that
13  Capador told you that Badio had a mole inside
14  the president's security detail, correct?
15           THE INTERPRETER:  I'm sorry.  That
16       Capador had a what?
17           MR. MCLAUGHLIN:  Capador told
18       Mr. Blanquicet that Badio had a mole
19       inside the president's security detail.
20           THE INTERPRETER:  Okay.
21           THE WITNESS:  Could you repeat the
22       question again, because I did not
23       understand it.
24  BY MR. MCLAUGHLIN:
25       Q.   You told the FBI that Capador told
```

1      you and the other Colombians that Badio had a

2      mole inside the president's security detail,

3      correct?

4           A.   I lost -- I couldn't hear you.

5           Q.   In fact, he told you that,

6      Mr. Blanquicet, at the mountain house,

7      correct?

8                THE INTERPRETER:  I don't think they

9      can hear us.

10               MR. BIENVENU:  Give me a second.

11               Can you hear me?

12               MR. MCLAUGHLIN:  Yes, we can hear

13          you.

14               MR. BIENVENU:  He said that the

15      communication is off.

16               THE INTERPRETER:  Can you hear us?

17               THE WITNESS:  That's what Capador

18          said, the FBI had someone who was

19          infiltrated, along with the -- a security

20          agent in Haiti.

21      BY MR. MCLAUGHLIN:

22           Q.   Again, my question to you,

23      Mr. Blanquicet, is that Capador told you that

24      Badio had a mole inside the president's

25      security detail.  Badio.

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

1       A.   That's what Capador said.   And he

2   said that he had gotten that information

3   through the FBI.   That is why I'm telling you

4   that --

5       Q.   And in fact, you told the FBI that

6   Badio had a mole inside the detail?

7           MS. KUDMAN:   I'm going to ask that

8       the interpreter finish the original answer

9       by Mr. Blanquicet.   She was cut off.

10          THE INTERPRETER:   I don't recall.

11  BY MR. MCLAUGHLIN:

12      Q.   And in fact, Mr. Blanquicet, the

13  reason that you recognized Mr. Badio when you

14  were interviewed is that you first saw him at

15  the mountain house, correct?

16      A.   I saw him that night.   I don't know.

17  It seemed to me that's what the agents or the

18  attorneys that were with us said that night,

19  so that's why I said it looks like him.

20      Q.   I'm now going to show you page 9.

21           You recognize this photograph?

22      A.   Yes.   White.

23      Q.   That's your handwriting and your

24  signature?

25      A.   Yes.

1      Q.   I'm going to show you page 10.

2           You were shown this photograph?

3      A.   Yes.   But before FBI showed it to me,

4    DCPJ showed it to me.

5      Q.   And that's your handwriting?

6      A.   Yes.

7      Q.   And that's your signature?

8      A.   Yes.

9      Q.   And you first saw this individual at

10   the mountain house, correct?

11     A.   Yes.   He was the one that opened the

12   gate when I went in.

13     Q.   Very well.

14          I'm now going to . . . I'm now going

15   to take your attention back to when you were

16   in the Dominican Republic before you went to

17   Haiti.

18          When you first arrived in the

19   Dominican Republic, you attended a meeting in

20   the hotel room of Carlos Guerrero, correct?

21     A.   Yes.

22     Q.   And during that meeting is when you

23   first learned that you would be going to

24   Haiti.

25     A.   When they brought the visa, on that

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

1        same night, Capador told us.

2            Q.   And you were told what you would be

3        doing in Haiti, correct?

4            A.   The projects that the company had

5        mentioned.

6            Q.   You were told that you would be

7        coming to Haiti to do a protection detail and

8        also guard potentially a power plant in

9        Jacmel, correct?

10           A.   Yes.

11           Q.   And you were told approximately how

12       much you were going to be paid, correct?

13           A.   $2,800.

14           Q.   And you would agree with me,

15       Mr. Blanquicet, that at no time did CTU ever

16       pay you any money.

17           A.   They still owe me about five years of

18       income, salary.

19           Q.   They never provided you with an

20       employment contract either, correct?

21           A.   When Tony came here to Haiti, Tony

22       said that the contracts were being done by an

23       Ecuadorian attorney.

24           Q.   But they never gave you one, correct?

25           A.   No.   They always lied to us, that

1    they couldn't do the contracts, about the

2    flights.

3        Q.   Mr. Blanquicet, they also never took

4    you to Jacmel, correct?

5        A.   They never took us to Jacmel because

6    supposedly the company was holding the

7    materials.   Capador showed us a picture of the

8    supplies that were going to be sent there.

9        Q.   Mr. Blanquicet, you never went to

10   Jacmel in Haiti, correct?

11       A.   Yes.   Correct.   I never went.

12       Q.   You never visited a power plant

13   there?

14       A.   Never.

15       Q.   You never went to an energy plant in

16   Haiti?

17       A.   Never.

18       Q.   In fact, the only places you went in

19   Haiti were the -- prior to July 6th -- were

20   the hotel, Sanon's house, and a small

21   office --

22       A.   Yes.

23       Q.   -- next to Sanon's house?

24       A.   Yes.

25       Q.   Now, you were part of the group that

1      took the bus from the Dominican to Haiti,

2      correct?

3           A.   Yes.

4           Q.   And you told the FBI, when you were

5      interviewed, that Capador instructed Guerrero

6      to tell all of the Colombians that if they

7      were ever asked, that they were simply going

8      on a missionary trip to Haiti?

9           A.   Yes.   That's correct.

10          Q.   Didn't you find that strange?

11          MR. HOWARD:   Objection.

12          THE WITNESS:   Well, supposedly, since

13     there were problems at the border -- there

14     were problems at the border, and since we

15     were military -- since there were problems

16     at the border, Capador said that since we

17     were military and there were so many of

18     us, to say that.

19     BY MR. MCLAUGHLIN:

20          Q.   But you knew that you were not going

21     on a missionary trip to Haiti, correct?

22          A.   Correct.

23          Q.   But nonetheless, you still got on the

24     bus and you still went to Haiti, correct?

25          A.   Yes.   Because that came from the

1    company.

2        Q.    Now, when you got to Haiti, there

3    were approximately 20 Colombians, correct?

4        A.    When we got there, there were some

5    Colombians from previously already there.

6        Q.    Yes.   But aside from Capador and

7    Rivera, there were approximately 20 of you,

8    correct?

9        A.    Yes.   We had arrived, 20 Colombians.

10       Q.    And you were divided into teams,

11   correct?

12           THE INTERPRETER:   Excuse me.   Could

13       you please repeat the question.

14   BY MR. MCLAUGHLIN:

15       Q.    You were divided into teams, correct?

16       A.    Yes.

17       Q.    How many teams were there?

18       A.    Four.

19       Q.    Isn't it true that Romero was one of

20   the team leaders?

21       A.    Yes.

22       Q.    Carmona was a team leader?

23       A.    Yes.

24       Q.    Yarce was a team leader?

25       A.    Yes.

1    Q.    And you were a team leader?

2    A.    Yes.

3    Q.    Who was on your team?

4    A.    Enalbes Vargas, Alex Miyer Pena,

5    Gersain Mendivelso, and John Jairo Suarez

6    Alegria.

7    Q.    And when you guys -- when I say "you

8    guys," I mean the Colombians -- did your

9    eight-day protection detail for Sanon, you did

10   them in teams?

11   A.    Yes.   The first time we went to see

12   Sanon, I went with Carmona's team.

13   Q.    And if a team was protecting Sanon,

14   everybody else stayed at the hotel?

15   A.    Yes.

16   Q.    Going to show you Government

17   Exhibit . . . This is Exhibit 6N.

18       (Government's Exhibit 6N is marked.)

19   BY MR. MCLAUGHLIN:

20   Q.    Do you see this photograph?

21   A.    Yes.

22   Q.    Is that your team?

23   A.    Yes.

24   Q.    And where was this photograph taken?

25   A.    Can you put that photograph back.

137

```
 1              That was at Sanon's house.

 2        Q.   Very well.

 3              I'm going to show you the second

 4   photograph of this document.

 5        A.   Yes.  That's at Sanon's house.

 6        Q.   And who is depicted in this

 7   photograph?

 8        A.   Mendivelso, the one with the black

 9   shirt.  The next one is Pena.  The one next to

10   the camera is John Jairo Suarez Alegria.  And

11   the next one is Enalbes Vargas.

12        Q.   And then that's you right there.

13        A.   Yes.

14        Q.   And was this the same team that was

15   with you on the night of July 6th?

16        A.   Up until June 6th, yes.

17        Q.   July 6th?

18        A.   Yes.  On July 6th, I -- it was that

19   team.  And on July 7th, they took out Pena.

20   They took out Pena and they gave me Guerrero.

21        Q.   Very well.

22              I'm going to take you to the night of

23   July 6th.

24        A.   Yes.

25        Q.   You testified yesterday that you
```

service@fernandezCR.com
305-374-8868

138

```
1     arrived at the mountain house in the -- at
2     night, correct?
3          A.   On the 7th, early morning.
4          Q.   Was it dark out?
5          A.   When I got there, the person that you
6     showed me on the photo was the one who opened
7     the gate because the lights on the car --
8          Q.   Yes or no, Mr. Blanquicet.  Was it
9     dark out when you got to the mountain house?
10         A.   Yes.  It was dark.
11         Q.   And you arrived at the mountain house
12    with your team, correct?
13         A.   Yes.
14         Q.   And once you got to the mountain
15    house, you then entered a vehicle as part of a
16    convoy?  Correct?
17         A.   Yes.
18         Q.   But prior to getting into that
19    vehicle, you recognized Badio there, correct?
20         A.   It was a prosecutor.  I didn't
21    recognize him because I didn't know who he
22    was.
23         Q.   And in addition, you saw all of the
24    other Colombians at the mountain house,
25    correct?
```

```
1          A.    Yes.
2          Q.    And many of them had weapons,
3   correct?
4          A.    Some had weapons.
5          Q.    Were you all wearing ballistic vests?
6          A.    The company from Miami sent us that.
7          Q.    Correct.
8                And in fact, all of you had put
9   patches on those vests that said "DEA,"
10  correct?
11         A.    That was put there by White because
12  White was the one supposedly working for the
13  DEA.  That's what they let us know.
14         Q.    And after you got there, eventually
15  you got in the last vehicle, correct?
16                THE INTERPRETER:  Can you repeat the
17         question?
18  BY MR. MCLAUGHLIN:
19         Q.    When you arrived at the mountain
20  house, eventually you entered the last vehicle
21  of the convoy?
22         A.    Not the last one.  The one before the
23  last.
24         Q.    So you were in the second-to-last
25  vehicle?
```

```
 1          A.   Yes.
 2          Q.   And prior to getting inside the
 3     vehicle, you were briefed by Capador and
 4     others about the operation?
 5          A.   Yes.  To accompany the police.
 6          Q.   And you were briefed in the yard at
 7     the mountain house, correct?
 8          A.   The five of us were there right next
 9     to the car.
10          Q.   And all of the other Colombians were
11     there too, correct?
12          A.   Just the five of us when Capador told
13     us this.
14          Q.   So it's possible, you would agree,
15     Mr. Blanquicet, that there were discussions
16     before you arrived at the mountain house, that
17     you were not a part of?
18          A.   I cannot say whether there were
19     conversations or not.
20          Q.   But you would agree with me, if there
21     were conversations, you would have no idea
22     what was said?
23          A.   What I'm telling the prosecutor is
24     what Capador told me.  That -- that's what I
25     know.
```

FERNANDEZ & ASSOCIATES
(305) 374-8868

1     Q.    Again, any discussions that occurred

2   before your arrival at the mountain house, you

3   were not a part of, correct?

4     A.    I have no idea about those

5   conversations.

6     Q.    'Cause you weren't there, correct?

7     A.    Because I got to the house on the --

8   in the mountain at early morning on the 7th.

9     Q.    Now, once the convoy left the

10   mountain house, you encountered a series of

11   checkpoints en route to the president's

12   residence, correct?

13     A.    Well, there weren't checkpoints.

14   There were controls before getting to the

15   president's house.

16     Q.    Correct.

17         You told the FBI in July of 2021 that

18   the various Colombian teams approached these

19   checkpoints and restrained Haitian police and

20   took their weapons.

21     A.    I -- that is correct.   There were

22   some restraints on police officers.   I do not

23   know if they were part of the presidential

24   detail, they were part of the presidential

25   security team.   And I really don't know what

```
 1    happened there.
 2         Q.   Did you find it strange that if, in
 3    fact, you were with Haitian police, that
 4    Haitian police were arresting Haitian police?
 5              MR. HOWARD:   Objection.
 6              THE WITNESS:   I found that very
 7         strange, because after that, they stood up
 8         and then they shook hands.
 9    BY MR. MCLAUGHLIN:
10         Q.   Are you aware in Haiti --
11              THE INTERPRETER:   I'm sorry.
12    BY MR. MCLAUGHLIN:
13         Q.   Are you aware, Mr. Blanquicet, in
14    Haiti, that there are various gangs that are
15    also comprised of police?
16         A.   I didn't have any knowledge of that,
17    because I had just barely arrived into Haiti.
18    So I didn't have much knowledge about that.
19         Q.   Now, you testified yesterday that
20    you'd gone to the house.   I'm now going to
21    show you another exhibit.   This is Exhibit 8A.
22              (Government's Exhibit 8A is marked.)
23    BY MR. MCLAUGHLIN:
24         Q.   Do you -- can you see the picture in
25    front of you?
```

```
 1          A.    Yes.

 2          Q.    All right.  This is an overhead map

 3     of the president's residence.

 4                Now, taking you to the night of

 5     July 6th and July 7th of 2021.  Did you know

 6     who the president of Haiti was?

 7          A.    No, I did not know.

 8          Q.    Never heard his name?

 9          A.    The name, yes, because before going

10     to Haiti, you could see the name because there

11     was always news about Haiti.

12          Q.    You ever see a picture of him?

13          A.    I never saw pictures.

14          Q.    Now, you testified yesterday that

15     when you arrived at this residence you then

16     got out of your vehicle and jumped up on a

17     concrete slab.  Do you remember that?

18          A.    I did not jump on a slab.  Next door

19     to the president's house, there is a house

20     that does have a slab.

21          Q.    All right.  I'm going to -- you see

22     this map in front of you here?

23          A.    Yes.

24          Q.    I am circling where the president's

25     residence is.  Do you see that?
```

1          MR. PEREZ:   Let me just object for

2      the record.   We don't have a time stamp as

3      to this particular map.

4          THE WITNESS:   Yes.

5  BY MR. MCLAUGHLIN:

6      Q.   And where did you jump up on the

7  concrete slab?

8          MS. KUDMAN:   Objection.   Not what he

9      said.

10         THE WITNESS:   Right there, where that

11     little blue dot appears.

12 BY MR. MCLAUGHLIN:

13     Q.   Over here?

14     A.   Right there, there's a -- that house

15 has a slab.

16     Q.   All right.   So your testimony --

17     A.   And you can verify it.

18     Q.   You entered this residence by

19 yourself that night?

20     A.   What I told you was, that from that

21 house, three people came out.

22     Q.   I'm asking again --

23         THE INTERPRETER:   Four.   I'm sorry.

24     Not three.

25 BY MR. MCLAUGHLIN:

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

1      Q.   Where were you that night?  Were you
2  right here, on the map, where my -- the hand
3  is?  Do you see that?
4      A.   No.  Further.  Further to the left.
5  To the right.  Right.
6           No.  Where the blue dot is, a little
7  bit further up.
8      Q.   Over here?
9      A.   Right there.  A little bit further
10  up.  Up.
11           No, no.  By the blue dot.
12      Q.   Right here?
13      A.   Right there, at that house.
14      Q.   All right.
15           And you went there by yourself?
16      A.   No.  Not by myself.  Capador was
17  there, along with a truck.
18      Q.   You went there at night?
19      A.   On the night that we arrived, we all
20  arrived --
21      Q.   Without a weapon?
22           THE INTERPRETER:  I'm sorry?
23  BY MR. MCLAUGHLIN:
24      Q.   Without a weapon?
25      A.   Without weapons.

```
1          Q.   Did you have night-vision goggles on?

2               MR. HOWARD:  Object.  Object.  Object

3      to not allowing him to answer -- to

4      complete his answer.

5  BY MR. MCLAUGHLIN:

6          Q.   Did you have night-vision goggles on?

7          A.   No.  They didn't give us that.

8          Q.   Are you aware that the president's

9      residence is on top of a hill?

10              MR. PEREZ:   Objection to translation.

11      It's "loma."

12              THE INTERPRETER:  Loma.  Thank you.

13              THE WITNESS:  From what I was able to

14      see is that the house -- behind the house,

15      there were other houses and there were

16      some kind of mountains.

17  BY MR. MCLAUGHLIN:

18          Q.   Were you wearing x-ray vision goggles

19      to see through buildings?

20          A.   No.

21          Q.   Were you wearing a jet pack which

22      allowed you to fly in the air and see over the

23      president's house?

24              MS. KUDMAN:   Objection.

25              THE WITNESS:  No.  Because that house     Argumentative
```

1     has stairs --
2           MR. MCLAUGHLIN:   I have no further
3     questions of you, Mr. Blanquicet --
4           MS. KUDMAN:   Let her finish the
5     answer.
6           THE WITNESS:   The stairs are outside,
7     and you can climb the stairs from outside.          Argumentative
8           MR. MCLAUGHLIN:   I have no further
9     questions of you, Mr. Blanquicet.   Best of
10    luck to you.
11          THE WITNESS:   Thank you.
12          (Thereupon, a recess was taken, after
13    which the proceedings continued as
14    follows.)
15          MR. WU:   We are back on the record at
16    10:47 a.m.
17          REDIRECT EXAMINATION
18    BY MR. PEREZ:
19    Q.   Good morning, Mr. Blanquicet.
20    Hopefully, this is over soon for you.
21    A.   Good morning to everyone.
22    Q.   I have a few questions to ask you,
23    and we should be done with this shortly.   I'm
24    going to ask you some questions about the
25    prosecutor's questions that were posed to you

1      yesterday and today.

2              Today you were asked if you were

Relevance &
Hearsay

3      previously asked at the FBI interview -- and I

4      may have missed something in the translation.

5      But what did the FBI tell you would be the

6      consequences if you did not sign that

7      document?

8          A.   What he told me, that I have problems

9      with the American justice system.

10         Q.   And did you perceive that to be a

11     threat that you would be charged in the United

12     States for this offense?

13         A.   At that time, I considered that like

14     a coercion, because the FBI was torturing my

15     colleagues.

16             MR. MCLAUGHLIN:   Objection.

17             THE INTERPRETER:   I'm sorry.   Sorry.

18         Not the FBI.   The DCPG.

19             THE WITNESS:   I didn't have an

20         attorney on the -- for the Colombian

21         country.

22     BY MR. PEREZ:

23         Q.   Let's clarify that, if I may.   It was

24     not the FBI that was torturing your

25     colleagues; it was the Haitian authorities.

1    Is that right?

2        A.   Yes.   Yes.   The Haitian authorities.

3    Not -- physically and mentally.                    Relevance &
                                                         Hearsay

4        Q.   Okay.

5        You were also asked if you felt that

6    you had been lied to.

7            THE INTERPRETER:  I'm sorry.  May I

8        finish his answer?

9            THE WITNESS:  Not the FBI.  Thank

10       God.

11           THE INTERPRETER:  And Counsel, may I

12       have your question now?

13           MR. PEREZ:  I'm sorry.

14   BY MR. PEREZ:

15       Q.   You were also asked about being lied

16   to by the prosecutor.   Not the prosecutor

17   lying to you but, rather, that individuals at

18   Worldwide or CTU had lied to you.

19       A.   Well, the two companies, basically

20   they lied to me, because they were

21   trafficking -- they subjected me to

22   trafficking of people, because I've been here

23   already for five years.                           Speculation &
                                                       Calls for a
                                                       Legal
                                                       Conclusion
24       Q.   Okay.  Now --

25       A.   At this moment, I consider myself a

1    victim of this whole situation, of the -- a

2    victim of the two companies.

3        Q.   Is it fair to say that the majority

4    of the information that you received regarding

5    CTU came from Mr. Capador?

6        A.   From Mr. Capador and also when

7    Mr. Tony Intriago -- when he got here.

8        Q.   Mr. Intriago said that there was

9    going to be an infrastructure project, a

10   hydroelectric plant, things of that nature?

11       A.   Yes.

12       Q.   Okay.

13           And the prosecutor also asked you

14   about the electric plant as well, correct?

15       A.   Yes.

16       Q.   Was it your understanding that that

17   electric plant was an existing plant or it was

18   something for a future project?

19       A.   That was a project for the future.

20   And Capador told us that they were waiting for

21   the materials.  And he showed us a picture,

22   and that was materials required for the

23   security of the plant.

24       Q.   Okay.  So when the prosecutor asked

25   you about why you didn't go to an electric

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

1    plant, the truth is that there was no electric

2    plant to go to because it had not yet been

3    built?

4         A.   It wasn't -- it had not been built.

5    We were waiting for CTU to provide the

6    materials.

7         Q.   And you understood that from both

8    Mr. Capador and Mr. Intriago when he traveled

9    there?

10        A.   Yes.

11        Q.   Okay.

12             You were also asked by the prosecutor

13   didn't it seem extremely strange that

14   policemen were arresting other policemen.   Do

15   you recall that question?

16        A.   Yes.

17        Q.   Do you recall that the prosecutor

18   also said that a lot of the policemen are with

19   the gangs?

20        A.   I had no knowledge of that, because I

21   was arriving in Haiti and I didn't have much

22   information about this country.

23        Q.   I understand that.  But if you look

24   at the policeman's uniform, is there something

25   that tells you which one is with the gangs and

1    which one is not with the gangs?

2        A.   Well, in my experience and the way I

3    saw them that night, they looked like police,

4    like military.

5        Q.   Right.  There's no -- I'm sorry.

6    There's no way to distinguish the policemen

7    that is with the gangs and the ones that is

8    without -- not affiliated with the gangs?

9        A.   No.  Because that's information I

10   don't have.  CTU has the information as to

11   providing security for the police, or

12   escorting.

13       Q.   All right.

14            Now, you were in the car before the

15   last in the caravan.  Is that correct?

16       A.   Yes.

17       Q.   And as these checkpoints were

18   approached on the way to the house, who was in

19   charge of dealing with the individuals or the

20   policemen who were at the checkpoints?  Was it

21   yourself or was it the police that were in the

22   front of the caravan?

23       A.   The police -- it was the police that

24   was going ahead in the caravan.  And I'm going

25   to explain this part.

1    Q.   Please let me just ask you one

2    additional question, and you can explain it.

3         You also indicated that the policemen

4    were actually shaking hands as they went

5    through these control points?

6    A.   Yes.   They -- after they were

7    restrained, they threw them to the ground,

8    they removed their weapons.   And after that,

9    they shook hands.   That's what I thought was

10   strange.

11   Q.   It seemed like a setup, like it was

12   prepared?

13   A.   It seemed like everything had been

14   planned previously.   It was like a staging,

15   like a theater.

16   Q.   All right.

17        And you believed, because Mr. White

18   represented that to you and all the rest of

19   the group, that Mr. White was associated with

20   the DEA or the CIA.   Is that correct?

21   A.   No.   Not the CIA.   The DEA and the

22   FBI.

23   Q.   And how did you understand that?   Did

24   Mr. White communicate that to you, or did

25   Mr. Capador tell you that?

1          A.   When I arrived -- when we arrived the

2     first time.  And I told the prosecutor and I

3     told the attorneys here, present.  When they

4     made the introduction of the four of them.

5          Q.   All right.

6               And the mole that was supposedly

7     inside the president's house, you were told

8     was an FBI mole, correct?

9               MR. MCLAUGHLIN:   Objection.

10              THE WITNESS:   No.  The infiltration,

11         the FBI knew about it and Mr. Wayne, as

12         Mr. Capador told us when we arrived at the

13         house that night.

14    BY MR. PEREZ:

15         Q.   Do you know if the mole in the house

16    was the president's chauffeur?  Had you heard

17    that before?

18         A.   I had never heard that up until now

19    that you're mentioning it.

20         Q.   All right.

21              You were shown a picture of a person

22    that you identified as Mr. Badio, correct?

23         A.   It looked like it.  But when I saw

24    him in December, I don't know.  It just looked

25    like it.  I'm not sure.

Leading &
Hearsay

FERNANDEZ & ASSOCIATES
(305) 374-8868

service@fernandezCR.com
305-374-8868

1      Q.   And you wanted to be accurate in your
2  interview with the FBI.  Is that the reason
3  that you wrote underneath his picture the two
4  words in Spanish, "se parece"?
5      A.   I said it looks like it because now
6  he's older and it looks a little different.
7      Q.   That's why you wrote the two words in
8  Spanish, because you were not sure it was him?
9      A.   Yes.  Yes.  That's correct.  Because
10 he looked younger.  And if I write something
11 without knowing for sure, I would be doing an
12 injustice.
13     Q.   The other gentleman that you
14 identified was someone that was unknown to
15 you, whose name you did not know.
16     A.   No.  No, I did not know him.  I
17 haven't exchanged words with him.
18     Q.   Okay.  That's -- is that the reason
19 that you wrote underneath his name, in
20 Spanish, "the house on the mountain," because
21 that's where you saw him for the first time?
22     A.   When he opened the gate.  Because
23 when we came with the truck, he opened -- from
24 below, he opened the trunk.
25          THE INTERPRETER:  "The gate."  Sorry.

BY MR. PEREZ:

Q.   You also told the prosecutor that Mr. Capador told you to claim that you were missionaries when you went into Haiti.   Do you recall that?

A.   Yes.   Yes.   Because they were making a lot of problems at the border, and those were the instructions by the company.

Q.   And was -- is that what he told you after you had gotten on the bus and you were on your way to Haiti?

A.   No.   He told us when we arrived at the border of the Dominican Republic.   That's when he told us.

Q.   And did you get on a bus at that point, or were you already on the bus?

A.   We were already in the bus.

Q.   Okay.   So let me go back to my question again.   You left the Dominican Republic in a bus with all the other Colombians, and as you approached the border, Mr. Capador told all of you on the bus, "If we are asked, we are missionaries."   Is that correct?

A.   When we left the Dominican Republic,

1    we were on a bus.  And then in a town, we

2    transferred to another bus.  And when we

3    arrived at the border, that's when Mr. Capador

4    told Mr. Guerrero for us to say that.

5        Q.   So it was not Mr. Capador directly.

6    It was Mr. Guerrero who told you that you had

7    to say you were missionaries?

8        A.   Yes.  Yes.  Because Capador gave the

9    instructions to Guerrero, for Guerrero to tell

10   us that, because Capador didn't have

11   everybody's phone number.  He only had

12   Capador's.  And Guerrero was there to

13   coordinate everything.

14       Q.   And why did you understand that you

15   had to say you were missionaries?

16       A.   Because of the touchy situation at

17   the border, and we were military people and

18   the situation in the country and there were a

19   lot of criminal enterprises.

20           THE INTERPRETER:  "Gangs."

21   BY MR. PEREZ:

22       Q.   Was it your belief at that point that

23   you were working in conjunction with a company

24   that was associated with the U.S. department

25   of the United States government?

```
 1         A.   I was working for two companies, CTU
 2    and Worldwide, that somehow were affiliated
 3    with the Department of State and the FBI.
 4         Q.   And you believed that because of what
 5    Mr. Capador had told you?
 6         A.   Mr. Capador and also Tony, who was
 7    the manager of the company.  He also said
 8    that.
 9         Q.   So Mr. Intriago believed that he --
10              MR. MCLAUGHLIN:  Objection.
11    BY MR. PEREZ:
12         Q.   I'm sorry.  Mr. Intriago told you
13    that his company was affiliated or working in
14    conjunction with a government -- a U.S.
15    government agency?
16         A.   Yes.  For the Department of State.
17    When he arrived here at the United -- in
18    Haiti.
19         Q.   Do you believe that Mr. Capador was
20    lying to you?
21              THE INTERPRETER:  Counsel, may I have
22         your question again, please?
23              MR. PEREZ:  Yes.
24    BY MR. PEREZ:
25         Q.   Do you believe that Mr. Capador was
```

1    being lied to?  Not that he was lying to you,

2    but if he was being lied to.

3           THE INTERPRETER:  Thank you.  Thank

4    you.

5           THE WITNESS:  That, I don't know.

6       That's something that Capador would know

7       or the other four, Mr. White and

8       Mr. Rivera from the company.

9    BY MR. PEREZ:

10      Q.   Finally, sir, you were asked a series

11   of questions regarding individuals that you

12   did and did not communicate with via telephone

13   or text.

14      A.   Yes.

15      Q.   You never had any contact with

16   Mr. Intriago.  Remember that question?

17      A.   I had communication when he arrived

18   personally here in Haiti.

19      Q.   Does that change anything that -- the

20   fact that you didn't have communication with

21   these individuals, does that change the facts

22   that you have spoken about or testified to

23   here and what you told the FBI when you were

24   first interviewed?

25           MR. MCLAUGHLIN:  Objection.          Compound &
                                                  Calls for a
                                                  narrative

```
 1              THE WITNESS:  I have never lied.  My
 2       testimony was the same, and it will remain
 3       the same.
 4    BY MR. PEREZ:
 5       Q.   In other words, that you entered the
 6    country of Haiti legally?
 7              THE INTERPRETER:  Did you say
 8       illegally?
 9              MR. PEREZ:  Legally.
10              MR. MCLAUGHLIN:  Objection.
11              THE WITNESS:  Yes.  I crossed the
12       border legally with a visa granted by the
13       government of Haiti.
14    BY MR. PEREZ:
15       Q.   That you never carried a firearm as
16    well?
17       A.   I did not carry a weapon when I came
18    into this country, and the company never gave
19    me one.
20       Q.   And it was the police that took you
21    to the house in the mountain?
22       A.   It was police who went and picked me
23    up with a vehicle marked "Police of Haiti."
24       Q.   Why did you believe that Mr. Badio
25    was a prosecutor?
```

Compound & Calls for a narrative

Leading, calls for legal conclusion

Leading

1    A.    Because it was going to be the

2    prosecutors who were going to accompany us.

3    Q.    And why -- what was your

4    understanding as to why the prosecutors were

5    accompanying you in the caravan?

6    A.    That's something that I don't know.

7    That's something for Mr. Tony to say from the

8    company.    That's something -- I am at a lower

9    level, and that should be answered by the

10   people in charge of the company.

11   Q.    Were you aware that Mr. Badio was the

12   vice minister of justice for Haiti?

13        MR. MCLAUGHLIN:    Objection.

14        THE WITNESS:    I never learned that he

15   was the minister of justice.    On the day

16   he had his turn to testify at the hearing,

17   he said he was a government official but

18   nothing else.

19   BY MR. PEREZ:

20   Q.    And it was Joseph -- it was Mr. White

21   that told you to wear the DEA patches,

22   correct?

23   A.    White didn't say anything.    Because I

24   didn't understand his language.    I was just

25   told to put the patch on, and I did it.

Speculation, calls for a legal conclusion

1       Q.   Okay.   So you don't know who gave

2    that instruction, then?

3       A.   No.   That -- that's not on my level

4    for me to know, and I'm responding --

5    respectfully responding to that, to the

6    prosecutor and to you.

7              MR. PEREZ:  Mr. Blanquicet, I wish

8       you luck.  Thank you very much for your

9       testimony here.

10              Anyone else?

11              THE WITNESS:  Thank you.  To all of

12       you.  Thank you.

13              MR. MCLAUGHLIN:  Does anyone else

14       from the defense side have any redirect?

15              MR. FRIEDMAN:  No questions on behalf

16       of James Solages.

17              MR. DOMINGUEZ:  No questions on

18       behalf of Mr. Sanon.

19              MS. KUDMAN:  No questions on behalf

20       of Mr. Veintemilla.

21              MR. HOWARD:  No questions.

22              MR. MCLAUGHLIN:  All right.

23       Mr. Blanquicet, this concludes your

24       participation in the deposition today.  I

25       again -- I again advise you --

163

1          THE WITNESS:  Thank you,

2     Mr. Prosecutor.

3          MR. MCLAUGHLIN:  -- you are not to

4     speak to any other witnesses, including

5     your fellow Colombian inmates in Haiti,

6     about your testimony.  That includes the

7     questions that you were asked and the

8     answers you gave.

9          Do you understand?

10          THE WITNESS:  Yes, I do understand

11     that perfectly.

12          MR. MCLAUGHLIN:  Very well.  We are

13     concluded.  It is approximately 11:18 a.m.

14          (Deposition concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OATH

2

3      STATE OF FLORIDA:

4                   : SS.

5      COUNTY  OF  DADE:

6

7          I, the undersigned authority, certify

8      that Edwin Enrique Blanquicet Rodriguez

9      appeared before me via Webex and was duly

10     sworn.

11

12         WITNESS my hand and official seal on

13     December 3, 2025

14

15

16

17

18                      *Suzanne Fernandez*

19          _____
           Suzanne Fernandez
20         Notary Public-State of Florida
           Commission # HH 287210
21         My Comm. Expires 8/12/2026

22

23

24

25

                    FERNANDEZ & ASSOCIATES
                       (305) 374-8868

                     service@fernandezCR.com
                        305-374-8868

```
1                        CERTIFICATE OF REPORTER

2

3       STATE OF FLORIDA:
                 : SS.
        COUNTY  OF  DADE:

4

5            I, Suzanne Fernandez, Shorthand
        Reporter, certify that I was authorized to and
6       did stenographically report the foregoing
        deposition; and that the transcript is a true
7       record of the testimony given by the witness.
             I further certify that I am not a
8       relative, employee, attorney, or counsel of
        any of the parties, nor am I a relative or
9       employee of any of the parties' attorney or
        counsel connected with the action, nor am I
10      financially interested in the action.
        Dated on December 3, 2025.
11

12


                     Suzanne Fernandez
13                  _____
                       Suzanne Fernandez
14

15

16

17

18

19

20

21

22

23

24

25

                    FERNANDEZ & ASSOCIATES
                       (305) 374-8868
```

service@fernandezCR.com
305-374-8868