UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-CR-20104-JB

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Pages 1-136 |
| vs. | ) Miami, Florida |
| ARCANGEL PRETEL ORTIZ, ANTONIO INTRIAGO, WALTER VEINTEMILLA, CHRISTIAN SANON, and JAMES SOLAGES, | ) January 30, 2026<br>) 9:01 a.m. to 12:40 p.m. |
| Defendants. | |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:

SEAN THOMAS MCLAUGHLIN
DOJ-USAO
11200 NW 20th Street, Suite 101
Miami, Florida 33172

ANDREW BRIGGS
EMMA ELLENRIEDER
U.S. Department of Justice
950 Pennsylvania Avenue Northwest
Washington, DC 20530

JASON WU
ALTANESE PHENELUS
United States Attorney's Office
99 Northeast 4th Street
Miami, FL 33132

For Defendant Ortiz: DAVID ADRIAN HOWARD
David A. Howard, P.A.
25 SE Second Avenue, Suite 1100
Miami, FL 33131

ORLANDO DO CAMPO
DANIELA JARAMILLO
do Campo & Thornton, P.A.
150 SE 2nd Avenue, Suite 602
Miami, FL 33131

For Defendant Intriago: EMMANUEL PEREZ, ESQ
Emmanuel Perez & Associates P.A.
901 Ponce de Leon Boulevard
Suite 101
Coral Gables, FL 33114

HECTOR L. FLORES, ESQ
Barzee Flores, P.A.
Courthouse Center, Penthouse 1
40 Northwest Third Street
Miami, FL 33128

For Defendant Veintemilla:
TAMA BETH KUDMAN, ESQ
Kudman Trachten Aloe Posner, LLP
7108 Fairway Drive
Suite 130
Palm Beach Gardens, FL 33418

MARISSEL DESCALZO, ESQ.
Tache, Bronis, Christianson and
Descalzo, P.A.
150 Southeast Second Avenue
Suite 600
Miami, FL 33131

For Defendant Sanon: HUMBERTO ROLANDO DOMINGUEZ, ESQ
Humberto R. Dominguez, PA
9100 South Dadeland Boulevard
Suite 1500
Miami, FL 33156

ZELJKA BOZANIC
Bozanic Law, P.A.
17100 Royal Palm Boulevard, Suite 1
Weston, FL 33326

For Defendant Solages: SIMON PATRICK DRAY, ESQ
S. Patrick Dray, P.A.
Courthouse Center
40 Northwest Third Street
Suite 200
Miami, FL 33128

STENOGRAPHICALLY REPORTED BY:

VERNITA ALLEN-WILLIAMS, RPR, RMR, FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
Vernita_Allen-Williams@flsd.uscourts.gov

(Call to order of the Court at 9:01 a.m.)

THE COURTROOM DEPUTY: Case No. 22-CR-20104-Becerra, United States of America vs. Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, Christian Sanon, and James Solages.

Counsel, please state your appearances for the record, starting with the government.

MR. MCLAUGHLIN: Good morning. Sean McLaughlin on behalf of the United States. Also with me at counsel table is DOJ trial attorney Andrew Briggs, AUSA Jason Wu and Altanese Phenelus, and DOJ trial attorney Emma Ellenrieder.

MR. Do CAMPO: Good morning, Your Honor. Orlando do Campo on behalf of Mr. Pretel Ortiz, who is present before the Court, utilizing the services of the court interpreter.

MR. PEREZ: Good morning, Your Honor. Emmanuel Perez on behalf of Antonio Intriago, together with Mr. Flores, on behalf of Mr. Intriago, who is at counsel table, with the aid of the interpreter.

MS. DESCALZO: Good morning, Your Honor. Marissel Descalzo and Tama Kudman on behalf of Walter Veintemilla, who is present in court, and seated to my left.

MS. BOZANIC: Good morning, Your Honor. Zeljka Bozanic and Humberto Dominguez on behalf of Christian Sanon, who is present.

MR. FRIEDMAN: Good morning, Your Honor. Jonathan Friedman on behalf of James Solages, who is present in court.

Also present is cocounsel, Patrick Dray.

THE COURT: All right. I see that two of the defense counsel are standing. We don't have enough chairs for 15 on the defense side, which is what it is. I've spent a not inconsiderable amount of time this week working with the United States Marshals Service and our court staff to figure out the logistics of having the defense team sit at these tables.

We're going to bring in different chairs for all the lawyers that are a little less spacious than the ones you're sitting in now in the hopes that that affords us space for two more. I also encourage the defense -- this is going to be an eight- to ten-week trial, I am not sure that two lawyers are needed every single day for every day of the trial, so I would really encourage you folks to think that through and figure out who is going to be here every day and do two of you really need to be here every single day. That will certainly help.

But otherwise we're going to squeeze you in. You're standing in the back now. I can't put chairs back there because it's a security issue, so you basically have to be around the table. It's the best we can do. I know you all have investigators and paralegals. There will be 15 seats somehow on this table, and that's it. So I will reserve for the defense one row. So the row right behind you all for trial will be reserved for the United States marshals; so right behind you all, you can't have anybody from the defense.

09:03AM The row behind them I will reserve for the defense. I think one row should be sufficient for the defense; for your paralegals, right, for investigators, for you all, right. You might decide you're not going to be here all day; but you're coming in for a few hours and you will just sit in the row. If you think you need more space than that, please let Donna know right away so that we can always have, you know, two rows reserved. I'll reserve one row for the government. The government can have the row right behind it because there is not an issue with the marshals, obviously.

09:04AM And so like I said, I highly encourage you to make decisions about who needs to be here every day because I don't think all of you need to be here. Well, somebody has to be here on behalf of the defendant, but I don't think both lawyers necessarily need to be here. The only accommodation I could make was different chairs. That's the best we could do. There is nothing else I can do other than that. All right.

09:04AM We're going to go through as many of these motions as we can today. I think there is probably two that I won't be able to get to; mostly because I'm unsure that we're ready to get to them just yet. It seems like Mr. Howard is already sitting in the back. I see you're here. You can't object from there, but, you know, Mr. do Campo is here.

09:05AM We're going to try to get through all of them. My next hearing is at 1:00, Donna?

THE COURTROOM DEPUTY: Yes.

THE COURT: Right. So I can go straight through to 1:00. We will have to take some break for Vernita; I suppose I should take some break, too. But I have until 1:00 o'clock for you all today. And then the two that I think we have to reset, I've got time next week, and so we will probably reset them early next week. We still have one more status before we start the trial.

Anyway, I want to go through the motions today, but I also want to go through jury selection today because I have a jury selection plan and I want to go through it with you today, give you some time to think about what you're going to object to; or if you object to what I'm doing with the jury selection so that at the next status that we have in two weeks, if there is any issue with the jury selection, we can take care of it today.

So first things first, the government has already filed an exhibit and witness list. And, you know, I know there is always the caveat you reserve your right to amend, okay. I need to have a high degree of certainty that you're done with the exhibit list. Everyone welcomes things being removed from an exhibit list this size, but I need to know now where are you on your confidence level that this is the exhibit list because when I put the deadline, I assume this is it. So I'm already seeing that there is movement on the exhibit list, and the caveat that more exhibits are coming. I just want some understanding of where we're at.

MR. MCLAUGHLIN: Certainly, Your Honor. I would say it's 99 percent done; this is it. The only thing I can expect that might come in might be IRS records, but we might not get them in time. That would be the only thing that's new; otherwise 99 percent this is it.

And what we're in the process of doing, so the Court is aware, are stamping the exhibits now. We will provide a copy of that to the defense and the Court, and we're ready to go.

THE COURT: All right. You all heard that. Okay. So let's start.

You know you would think that doing the motions in order would be a good way of doing it. We're not doing it that way. I've organized them, for whatever reason, in my own head in the way that I think is best for me, so we'll have to do it that way. So let me start with two motions that I think there's issues with the clerk's office.

So the government filed a sealed motion in limine seeking admission of coconspirator statements. There is an issue with that motion because the government noted it in all of its filings later on as Docket Entry 1301. That is not Docket Entry No. 1301; 1301 is a different motion. And so I am concerned that something happened with the filing of that motion because my reading of that motion, I don't know, I could be wrong on this, the defense didn't always answer all the motions in limine, which is fine, some of them I don't think really needed a response, to be fair. But this

09:08AM one struck me as one that maybe the defense would have responded to, and so I am not sure they have it.

09:08AM 1301, like I said, the government thinks it's this admission of the coconspirator statements, but that's not what the docket is reflecting. And so I just want to confirm before we go any further that the defense did, in fact, receive 1301, which is 27 pages long, and concerns -- again, it's a sealed motion, so I don't want to put too much on the record because this is an open courtroom -- but it is a very lengthy motion that contains a significant amount of substantive information, as well as summaries -- or examples rather of coconspirator statements.

09:09AM So has everyone on the defense seen that one?

09:09AM MR. Do CAMPO: On behalf of Mr. Ortiz, Your Honor, we have. I am prepared to briefly address our view on that.

09:09AM THE COURT: No, no. I just need to know --

09:09AM MR. MCLAUGHLIN: Your Honor, we have as that as 1300, not 1301.

09:09AM THE COURT: Right, so that's 1300. It's not 1300; it's 1301. I'm sorry, it's not 1300.

09:10AM MR. MCLAUGHLIN: Okay.

09:10AM THE COURT: 1300, I think, are minutes. So this one is 1301, and then you had -- hold on. Let me get my notes on that.

09:10AM This is 1301, not 1300. What you have as 1301, which is the motion to preclude irrelevant and immaterial impeachment of government law enforcement witnesses, that's 1320.

09:10AM MR. MCLAUGHLIN: Thank you, Your Honor.
09:10AM MR. Do CAMPO: 1320? Two zero?
09:10AM THE COURT: Yes. Look, we're all struggling a little bit with the new rules on the sealed filings. I have no access to them. We have to go to the clerk's office to get them, so it's, you know. I don't know what to say other than we're all kind of struggling through it.
09:10AM All right. So the motion in limine to admit coconspirator statements then the defense has received. Mr. do Camp says he's received it.
09:11AM MR. PEREZ: On behalf of Mr. Intriago, we have as well.
09:11AM THE COURT: All right.
09:11AM MS. DESCALZO: Your Honor, on behalf of Mr. Veintemilla, we just received it, I think, earlier this week.
09:11AM THE COURTROOM DEPUTY: You're going to need a microphone. Let me give you a handheld.
09:11AM MR. DOMINGUEZ: We realized we were missing that this week or last week and we requested it from the government and we received it.
09:11AM MS. BOZANIC: We have it.
09:11AM MR. FRIEDMAN: On behalf of Mr. Solages, we have received it.
09:11AM THE COURT: We can't hear you.
09:11AM MR. FRIEDMAN: On behalf of Mr. Solages, we did receive it.

09:11AM THE COURT: All right. So you've received it.
09:11AM I'm happy to hear some argument for it. I didn't think that everybody had received it, so I don't think that I'm going to rule on it today. But let me hear from the defense as to any argument that they want to raise today on this one.

09:12AM MR. Do CAMPO: Your Honor, I mean, our position is that obviously the rules of evidence provide an exception to hearsay for coconspirator statements. If the government establishes a conspiracy or subject to establishing a conspiracy establish that the person uttering the statement is a conspirator and that it is in furtherance of the conspiracy, yeah, it's generally admissible.

09:12AM I don't think that needs to necessarily be addressed. But this is a very large case, the government has 86 witnesses that it's calling, and that doesn't even begin to include all the people who are involved in this case who are not being called and can't be called, so it's a very context-specific call.

09:12AM I don't think the Court can generally -- I mean there is no point in ruling that coconspirator statements meet the rule are admissible; that's the rule. I don't think we have more to say about that.

09:13AM THE COURT: Let me ask a question aout that because I think you're right on the law. I'm not faulting the government for filing the motion; they're helpful. They flag things for me. They put people on notice. It is what it is.

09:13AM But is there anything about this motion because the

09:13AM government did specifically identify people and statements, having read the motion, does the defense have any reason to believe that some of these individuals were not, in fact, coconspirators?

MR. Do CAMPO: Based on my memory -- I did not review that last night -- but based on my memory of having read it, the examples that they gave seemed to me to be garden variety coconspirator statements.

THE COURT: All right. This is how I'd prefer to do this on this motion in limine. I agree with Mr. do Campo, and obviously the government agrees, coconspirator statements come in. It is what it is.

The difficulty I have with granting the motion outright is that I can't grant all these statements sort of before trial without understanding what context you're bringing them in, before you've laid the predicate for these statements. You may or may not decide what path you're going with a particular coconspirator, so I don't feel comfortable doing that.

So my ruling on these is going to be to deny them without prejudice. I can't grant them because you will see later on there are some that if I grant it, then I think I would be limiting defense argument. For certain I'm going to allow the admission of coconspirator statements. I'm going to deny it without prejudice because I am not going to have a pretrial ruling that all of these statements are admissible.

However, I am telling the defense now, everybody go home

09:14AM and read this motion again because for the next status if you have reason to believe that one of these persons mentioned in fact was not involved in the conspiracy, then I want to hear it at the next status because that's pretrial stuff that I don't want to be taking 20 or 30 minutes in the middle of the trial and having the jury wait, right. So I'm going to expect that if the argument is that that guy wasn't part of the conspiracy, you know what statements they're trying to get in, that you'll alert the Court of that by the next status. All right.

09:15AM So my ruling then on Docket Entry No. 1301 -- actually, let me do this one because I think it might be easier. I'm going to grant it in part and deny it in part. I'm going to grant it to the extent that, of course, the government will be allowed to present and admit coconspirator statements. I will deny it with respect to the specific request that certain statements be found now to in fact be coconspirator statements. I am not going to go ahead and give you a pretrial ruling on that. I don't think that's necessary. But I will order the defense to be prepared at the next status conference to identify any individual that it believes is not appropriately identified as a coconspirator, all right. Okay.

09:16AM Then the next motion I want to address is Docket Entry No. 1316. Motion 1316 is Mr. Veintemilla's motion in limine to admit the Rule 15 deposition. The government responded to that at Docket Entry No. 1329. I was scratching my head on this one

because I signed an order back on the 14th of January with respect to the procedures for the deposition designations; except it wasn't docketed in the case.

So I was like, huh, well, this is interesting that nobody has filed the designations. After all of that, nobody has bothered. And so luckily my clerk was able to identify that it hadn't been filed, so I calmed down pretty quickly after that. I don't know what happened.

But this is the issue. What I had signed gave the party seeking to use the deposition 14 days from my order, which was Tuesday, right. I don't want to give you 14 days now because I don't want to be doing this the night before trial.

So let me ask Mr. Veintemilla's counsel: How long would you need to prepare your submission? Let me just tell you what my order says. You give a copy of your designations to the opposing party. The opposing party has five days to serve counterdesignations, and then five days to serve objections to those counterdesignations, and then you send them to me and I make a decision, right. So it's a built in ten days, plus the two weeks. Obviously we don't have that time.

So how quickly do you think you could serve it?

MS. DESCALZO: Your Honor, I have already started working on my designations because I wondered what the procedure was going to be for that. And so if you give me five days, I can ---

THE COURT: Okay.

09:18AM MS. DESCALZO: If you can give me five days --
09:18AM THE COURT: All right.
09:18AM MS. DESCALZO: -- I can accomplish that.
09:18AM THE COURT: So it will be easy to edit this order. We will just make it five days from today, and then it's five and five and then I will take care of it from there. I wish I knew what happened. Things happen. This docket has 1500 entries, and somehow this one just didn't get docketed, all right. So my apologies, but we will do that today.
09:18AM Yes, sir.
09:18AM MR. Do CAMPO: Just as a housekeeping matter, is it going to be remain 1314, or is it going to be a new order?
09:18AM THE COURT: It will be a new order.
09:18AM MR. Do CAMPO: It will be a new order?
09:18AM THE COURT: No, because it never got docketed.
09:18AM MR. Do CAMPO: So there is no 1314?
09:18AM THE COURT: No, no. This was 1316.
09:18AM MR. Do CAMPO: Sorry, 1316?
09:18AM THE COURT: 1316, 13 one six, is Veintemilla's motion, and the government responded at 1329. What you never had was my order. It never got docketed. It has no number. It is a signed order; but it didn't get docketed.
09:18AM I am going to amend it -- not amend it. We will change it to reflect today's date and the new dates. That will be filed today. So my apologies. You know, things happen. I am not sure

what it was. All right.

MR. MCLAUGHLIN: Your Honor, on a similar housekeeping matter, there are specific attorneys on our side that are going to argue certain motions; so when you call the motion, that attorney will stand up and argue it. Just so you're aware.

THE COURT: No problem. We will have to get at some point, sooner rather than later, how you're all going to be standing up and who is arguing what at trial because it's not a free-for-all for the government, right. I am not going to be tagged with five people standing up. And God knows I'm not doing 15 on this end either, okay. We will talk about that later.

The rule, at least for the government, is going to be one lawyer for the one issue and that's it. By Post-it notes, sign language, whatever you all need to do to communicate with each other, but it's one per issue. And for the defense, for most motions I will ask for you all to designate one defense lawyer to argue a motion if it applies to all of you; of course if it doesn't, I will hear from one lawyer for each defendant. But for those motions in which you have a different position -- by the way, let me just do this now.

Unless you tell me otherwise, I will assume that any objection and any argument made on behalf of one defendant is being made on behalf of all defendants. So listen carefully, right. Make sure that Mr. do Campo, Mr. Perez, or Ms. Descalzo is making the argument you want; because otherwise for any other

09:20AM purposes, should there be an appeal in this matter, that argument for the record will be accepted on behalf of all defendants. Once the trial starts, I am not going to be asking like I do for the statuses, you know, for everybody's position, okay.

09:21AM While I'm here, I will just do this now. The same thing for the sidebars. We're going to really try not to have too many of them. If we have a sidebar, there will be two attorneys only from the government that will be allowed at the microphone. I don't know if any of you -- maybe you haven't seen. The space here is small. And only one lawyer for each defendant will go up to the sidebar. The record will reflect for any sidebar the government's presence and that a lawyer for each defendant was present because otherwise you have to announce your appearance at the microphone every time we have sidebar because my court reporter won't necessarily be able to recognize all of your voices since there are so many of you.

09:21AM So the record will reflect that the argument at sidebar is made on behalf of all the defendants, and that all defendants were present at the sidebar discussion. So if one of you decided not to go sidebar or didn't hear what happened at sidebar, you will have to put it on the record at the break that you did not participate in the sidebar; otherwise, for the record, the court reporter will note that all defense counsel were present at the sidebar, okay.

09:22AM All right. Let's move on now to the United States's

09:22AM motion in limine to preclude irrelevant and immaterial impeachment on FBI and HSI witnesses. That's Docket Entry No. 1320. This is the one that you thought was 1301, but this one is 1320.

There wasn't any response from any defendant on this one. I assume it's because the defense on this one is conceding these. I mean is anybody really going to cross-examine an agent on whether she let her boyfriend copy her notes in law school?

MR. Do CAMPO: Glad to hear that the FBI's love life is going strong, Your Honor.

THE COURT: I have to tell you, all kidding aside --

MR. Do CAMPO: Even with the wives. It's fantastic.

THE COURT: But they're married. I mean some of this is, listen, you don't know what you don't know. They did disclose it. I am going to assume that the defense here agrees that these were not appropriate ways of impeaching any law enforcement officer.

And so the motion to preclude the irrelevant and immaterial impeachment, the agents can all take a deep breath, that won't be in the public record, that motion is granted. So Docket Entry No. 1320 is granted.

All right. Next we go to Docket Entry No. 1283. And this is the motion in limine to exclude prejudicial and cumulative summary exhibits. Let me hear from the government.

And this is the question I have for the government. You all will correct me if I'm wrong. So the way I understand the exhibit -- and I'm not going to rule on this today because I

19

haven't spent enough time with the exhibit myself to make a final decision -- but I don't understand exactly how the exhibit is going to be used.

So it didn't seem to me that -- it's not really a summary, right. You've taken all these phone calls and all of these WhatsApp chats and all this and you basically picked the ones you're going to use and created a 1400-page exhibit of the calls that you're going to use. Is that what this is?

MR. WU: They're mostly text messages, Your Honor. But yes, it is essentially a roadmap or chronology because they're of course many different conversations and occurring amongst different coconspirators on something like 17 or 18 different phones, and so the exhibit lines those up in close to chronological order.

THE COURT: And then are you admitting into evidence the documents, right? All of the chats, all of the phone calls, all of the WhatsApp, all the text messages, is that in evidence or not --

MR. WU: Yes.

THE COURT: -- or will it be in evidence?

MR. WU: It would be, Your Honor, because it comes in the form of those cell phone extractions that we have discussed before. However, they are extremely unwieldily. So when they come out of the cell phones, even to break them into a readable form, they end up in many hundreds of different subfolders. And

so imagine if we have that examination in court, it could take a month by itself because I would literally have to click a folder to read a single chat on a single day; and then the next chat I want can come from an entirely different phone, an entirely different subfolder; we have to get to that one, pull that chat up, it's a large PDF, scroll hundreds of images to find that chat. It will just be extremely burdensome and cumbersome.

THE COURT: So how do you intend to use that at trial? So typically when we have a summary, it's literally a chart, right, or it's, I don't know, five charts, ten charts. Just blow-ups, there is one, there's two, there's a summary. This is still a 1400-page document, right.

Give me a little color of how you're going to use that.

MR. WU: Yes. So there are two analysts who prepared the chart, the summary. They will testify, and I essentially walk them through it. But mostly they are going to testify to justify the arrangement of the chart, certain facts in the chart, like maybe phone numbers of people, and then they will read the messages. I will try to be very selective about what I have them read. I'm not going to have them read every word on every page.

Once that's done and the summary is admitted into evidence, we will try to use that with subsequent witnesses, including our cooperators, in lieu of showing them the underlying chats because, like I said, that is just going to be extremely slow.

THE COURT: But there is no way you're getting through 1400 pages of it, even --

I mean we really aren't going to be here for eight months, right?

MR. WU: No, no, no.

THE COURT: How do you get to that amount of information? You're not covering 12- or 1400 pages of information.

MR. WU: When the analysts initially present it, I do think we will go page by page. But again, we will try to be as quick and efficient as possible. I know, Your Honor.

THE COURT: You're not doing that. That's not happening. So that's not happening because that will take days.

MR. WU: It will take -- well, the trial is likely to take ten weeks. I think there will be about a week to present this evidence because it is going to come in in some form, and this is the most efficient form that it can happen because there are so many messages between these coconspirators.

And as you saw in the motion that you alluded to earlier, Docket Entry 1301, we list out and try to describe the roles of the conspirators. There are 40 conspirators by my count easily.

THE COURT: I know, but this is the problem I have with this. First of all, we're not doing that because I have to be assured that we have a jury that will be here for ten weeks. And to ask members of our community to sit here for a week to just go -- I mean we're not doing that. There is going to be a better

09:28AM way; I'm not sure I'm going to find it, but that can't be the way to do that.

09:28AM The records will be authenticated some other way. An analyst can say, well, this is what I did to put it together, right. But the analyst can't speak to the actual messages. You're not going to have the analysts walk through the messages, right?

09:29AM MR. WU: Well --

09:29AM THE COURT: You can have witnesses do that. But you're going to have the analysts -- two analysts for a week just read out loud what these messages from these people were?

09:29AM MR. WU: That is typically how text message summaries are presented in other trials. In my understanding, this is a common practice. You know we cite a number of cases in our motion. This is --

09:29AM THE COURT: And I assure you that it is not a common practice to have an analyst spend a week reading text messages. I assure you it is not.

09:29AM MR. WU: And we will continue to -- I think we will continue to brainstorm ways to make it more efficient.

09:29AM This is an important point. The cooperators will speak more to the substance of the messages, their understanding of them, and of course the events that are happening around them because obviously the messages -- some are more explanatory than others, but some are just going to say, hey, meeting at

10:00 p.m., and then the cooperator can explain -- thank you -- that this is what happened at the meeting at 10:00 p.m. on this date.

THE COURT: I'm good with that.

MR. WU: Yes, so we can streamline and make the presentation of the analyst portion more efficient. I understand what you're saying. We do not necessarily have to go through every single slide by slide. But there are certain slides that the analysts may share because they're self-explanatory, and then they can read the text message on that page just to confirm they found that text, it comes from that particular phone or that particular conversation between the two participants, and then they move on.

THE COURT: Right. So this is the concern I have, right.

What I don't want is there essentially to be two analysts that for a week tell the government's story. It can't be a week-long opening statement or a week-long closing statement, right. Because if what you have are analysts that are just walking through these statements and sort of telling the story of the communications, I'm starting to then feel uncomfortable about that because what typically happens in a trial is an analyst might say, because that's summaries are five pages, three pages, ten pages, an analyst might say, yeah, that February 2nd chat that says come pick up the dope, right, I did get that from his phone, right.

MR. WU: Correct.

THE COURT: So it's short, you know, it gives the jury the sense of where the phone came, it sets the stage, it authenticates the information, fine.

But you're talking about 1400 pages' worth, two analysts spending a week going through information. In my head I don't see how that is going to play out as anything other than an FBI analyst sort of telling the story of what the communications show, which you're free to do in opening if it's going to be in evidence, and you're certainly to do that in closing because all of that will be in evidence. And you're absolutely free to do it with cooperators because the messages are with them, so I think you're free to do that. This is assuming this comes in. I know we're not there yet, but I need to understand what you're going to use it for.

I am concerned that an FBI analyst will say and then we got this message, and then we got that message, and it's really just talking the government's case, like just -- like I said, a nice slow long week of what the government's version of events is.

MR. WU: But the contrast -- the alternative, Your Honor, is the analysts, by the same token, would be able to do it with the underlying text messages, so this is just a more efficient way of doing that. So instead of having two weeks of then saying did you look in Mr. Ortiz's phone? Did you find messages?

THE COURT: No, no. Hold on. Again, I want to make sure

09:32AM I understand.

09:32AM So I agree with you that an analyst could say I took Mr. Ortiz's phone, I did a data extraction, and I secured -- let's just do it in little numbers to make it easier -- and these are 50 text messages that I secured from his phone from this time period to this time period. An analyst can do that. There is no issue with the analyst doing that.

09:33AM Let's say the analyst has the nice little color-coded thing. You would ask the analyst, again, it's a short case, it's a month-long conspiracy, you could say to the analyst, let me draw your attention to March 15th. These text messages, what do these text say? Well, that text says I'm ready for the dope. Okay. Where did you get that one again? I got it from his phone. Did you confirm it with the date? Yes, I did. And sure, you know, we give the government leeway to do that, it's a couple of minutes, and the analyst sort of walks through it a little bit, right.

09:33AM Here if what the analyst is going to say is I created this chart. It has, I don't know -- again just round numbers -- 20 different cell phones. I took texts, I took this, I took that, we put them all together. We created this chart. Is this chart accurate? Yes, this chart is accurate. So the week long of walking the analysts through, unless the defense is objecting, which is something we'll get to in a minute, but let's assume for a minute that all these extractions are in evidence now. If they're in evidence, then what is the analyst doing? Why does the

analyst need to walk the jury through this exhibit for a week?

MR. WU: Because the -- so when the extractions are first put into evidence, we are not going to have each extraction witness, who is a CART examiner from a law enforcement agency or an analogues person from a different agency, we are not going to have them walk through the text messages. We're trying to avoid duplication.

THE COURT: Why is anybody walking through the text messages is my question? Why does an analyst have to walk through that many text messages? It's not for evidentiary purposes because they're in evidence.

MR. WU: But it's for presentation of our evidence to the jury. The jury will not see that evidence unless we find a way of putting it in front of them. So if it's just buried in massive phone extractions that are, yes, in evidence, but we don't have an opportunity to show his message to the jury, then they're not going to be able to absorb those messages.

This is actually the most intelligible way, even appreciating its length, for the jury to see the entire span of the conspiracy. This is a conspiracy, the issue of intent is highly relevant, and the most relevant way to show the intent of each of the five defendants and their coconspirators is what they were saying at each time.

So I completely hear what you're saying, Your Honor. This is something we have labored mightily on to make this as

short as possible. I know that's hard to believe. We have really worked to make this as efficient as possible, but it is simply a product of length and complexity of the case at hand.

40 coconspirators, four months, daily communications between them, it is very difficult to condense that into any other form. And so I understand it will be laborious for the analysts to sit there and present this over the course of a week or so. I hear you loud and clear, and those are my witnesses sadly for me, so I will try to find a way to make that as efficient as possible, but that is simply our evidence.

We should not be penalized because we have so much evidence that it's going to take a long time to present it to the jury.

THE COURT: Well, we're totally on a tangent because I don't think this goes to the admissibility of the document we're talking about. And I agree it is a complex case; I understand all of that.

But at some point an agent or an analyst walking through the messages goes from you presenting your evidence through a witness, which of course you're entitled to do, and the government spending a week essentially presenting their argument, right, presenting the case in a manner in which I don't think is necessarily appropriate to the jury because you don't have other witnesses, right.

So you're going to have some conspirators that are going

09:37AM to walk through it.

09:37AM MR. WU: Correct. Of course they only touch a portion of it, which is why it's helpful to have an initial witness do the entire day by day so that the jury can see the big picture; and then they get to zoom in with subsequent cooperators. The cooperators will say these are the days that I had meaningful communications. And I can tell you, right, every cooperator will only tell a slice or a part of the story.

09:37AM THE COURT: All right. Let's go back to the issue at hand, which is why this is admissible. I hear you. I have read your papers. I don't think I need any argument on that. Your position is that it's a summary exhibit and it should be allowed for that purpose; so I understand that.

09:38AM I'm still struggling with the mechanics of how that exhibit will be used in a trial. And of course I have an obligation to make sure that the trial is run efficiently and that it is run in a manner that is comprehensible for a jury and that makes the best use of their time.

09:38AM I understand what the document is. I'm really concerned that that would be a week of the jury's time is having an analyst say, and so on this Tuesday, this gentleman was telling this gentleman that. And you ask, well, what was going on that day. Well, on that day, you know, I'm concerned about what that's going to look like. I don't know what I'm going to do about that. I agree that some of it I have to let you do. You have a right to

present your case to the jury, but I'm a little concerned that that's how it's going to play out.

Who is going to be heard from the defense on this motion? Do you all need to be heard or? I think you all took the laboring oar on the response; is that correct, on the opposition?

MR. FRIEDMAN: We did, Judge.

THE COURT: So I have two questions for you.

So first of all, I assume that all material, all the extractions, let's call it the raw material, right. The defense has had all the raw material that the analysts used. I know it's massive; I get it. But that's all been available to the defense, right?

MR. FRIEDMAN: Yes.

THE COURT: And is there going to be any objection as to the authenticity or the admissibility of the raw material?

MR. FRIEDMAN: I don't want to speak for every particular codefendant with regard to the authenticity of every single phone because there has been issues with whether the phone extractions are the phone extractions that are really the phone extractions. I mean, there are issues regarding each and every different codefendant. So I don't want to just say we're stipulating to authenticity to everything at this moment. I don't think that's appropriate at this juncture, Judge.

With regard to the issue that we just spoke of, we all share the same concerns that the Court has.

09:40AM THE COURT: No, no, we're going to get to them. I have to get to this other issue first on the authenticity because I am trying to understand again for trial purposes, and I know there are some notices on the authentication.

09:40AM MR. FRIEDMAN: Yeah.

09:40AM THE COURT: And I know raw material is not the right way to describe it, but I think you all know what I mean. If the raw material, right, of the foundation of this exhibit, if all of that is going to be admitted into evidence, right, so I think we've got to cross that bridge first because if there are going to be challenges to any of that --

09:41AM So let's, for example, say that I agree and I don't let phone 732 in, then it's a different chart. Let's just start with that. I want to be sensitive. I'm not trying to have the defense sort of tell me what their strategy is, but we are not spending two weeks of a jury trial talking about whether the AT&T records are appropriate or whether that extraction meets Fourth Amendment standards. I'm not doing that, so we will do that beforehand. And that way if there is really objections to the raw material, I want to hear them before the trial because my general thought is if the raw material is admissible and the defense has had an opportunity to challenge this chart by saying, hey, you can't have these seven calls without these three, there is a completeness issue, or those five calls you've identified as my defendant are wrong, look, that's not letting the cat out of the bag here,

right. We should be able to do that before the trial.

And then I'll hear you on this issue how the government is going to use it, but I am concerned. Let's just talk about the admissibility of the underlying data first.

MR. FRIEDMAN: I think you need to address each particular codefendant with that because I do know that some of the phones were -- the extractions were done in Haiti and the actual phones aren't here in the United States, so I know there are various different issues with whether or not the extractions can be authenticated. Not necessarily from my client at this point, but I do know some of the other codefendants have those issues. So you're asking me, so.

THE COURT: No, I get it. So look, this is one that I had flagged as possibly not having a decision on today because what I'd like to do -- and I'll hear from each one of you on this first -- is I think what I should do first is go through whether or not all the raw data that went into this is in fact admissible. Because if it's not admissible, then of course the summary isn't admissible; so we have to actually start there.

If there are going to be objections to that, unless one of the defendants -- and I'll hear from each of you now -- objects to it, why are we not doing that now? Because if I agree with some of you and some of these extractions come out, then it's a different chart. And then I think we have to talk about how they're going to use this chart at trial because I am not inclined

09:43AM to let them sort of have two analysts walk through a chart for a week, but we don't have a chart yet.

MR. FRIEDMAN: Sure.

THE COURT: So let's, if you don't mind taking a turn to that, on behalf of your client, are any of the materials that form the basis of this chart, these raw materials, do you have an objection to any of them?

MR. FRIEDMAN: To the summary exhibits that the government is proposing?

THE COURT: No, not the summary. I know you object to the summary.

MR. FRIEDMAN: Yes, of course.

THE COURT: So do you have an objection to any of the evidence that is what this summary is summarizing, right? It's summarizing. Mr. Wu's position is this is all going to be admitted into evidence. This is a summary exhibit of admissible evidence and that they're going to admit it, right. They're going to bring this in and admit it. No juror is going to go through it, but their position is they're moving to admit it.

And I guess that's what I'm trying to figure out. On those exhibits, will you be objecting?

MR. FRIEDMAN: There may likely be objections. I would need some time to confer with counsel.

THE COURT: No, I'm talking about on behalf of your client.

MR. FRIEDMAN: No, I'm talking about James Solages. I just need some time to go through that again and make sure that I don't have some of the issues that I know are lurking with some of the co-defendants.

THE COURT: Look, I think that's what we have to do first.

MR. FRIEDMAN: Yeah.

THE COURT: What are we talking about? There is no summary. I mean I can't allow a summary to come in that's summarizes evidence that I didn't admit. And so if I'm not going to admit certain things, that's the first issue. I suppose I could wait till trial and do that; but, wow, talking about boring a jury to death if every time the government seeks to admit the cell phone records of X, Y, and Z, there is going to be objection and I'm going to need 20 minutes to hear what the objection is, and let's say I grant it, then you're going to be back every night with the analysts redoing this chart that you have spent a month working on and prepping an analyst on. I mean, that's chaos.

Because my thinking is this. If all the underlying -- once I admit all the underlying information, I probably will allow the government to use a summary; I will allow them to admit a summary into evidence and use it with their witnesses and analysts. I am not inclined to let them use it for a week because at some point that becomes an opening statement or a closing statement.

09:46AM I don't know at what point that will be, but it will be helpful to know whether we're talking about a 1200-page summary or a 50-page summary when I'm done with the objections. I don't know. I don't know what your objections are. Neither do you yet, so.

09:46AM MR. FRIEDMAN: Sure, Judge. But speaking to what you're speaking about, I mean the summary exhibits as you have them now, the 1400 or so pages, it's demonstrative evidence. It's a demonstrative. If the government intends or wants to use it in their closing argument, they can do that. But to now introduce it in the course of the trial, they're basically -- it's two closing arguments. It's giving the jury the closing argument in the jury room if it's admitted.

09:47AM So we share the same concerns you do. It's not --

09:47AM THE COURT: Let me tell you, a 1400-page closing argument is not particularly persuasive either; but if that's how they want to put their case in, I mean, you can always bore a jury to an acquittal or a hang or a verdict, I guess. I don't know. You all try the case you want. But I don't want to start talking about this "thing," this summary until I start talking about the documents that lay the foundation for it.

09:47AM I'm going to shift to Mr. Wu for just for one second.

09:47AM MR. FRIEDMAN: Sure.

09:47AM THE COURT: Is there a list, and I assume there is because you have the exhibit list, this summary chart, I assume

09:47AM it's very easy for the government to say or has said already this summary chart is a summary of the following 800 exhibits. That you know. That you've done already, right, because whoever made the charts knows where they took it from.

09:47AM And that's in the exhibit list, right, because you're moving all those exhibits in anyway, right?

09:48AM MR. WU: Yes, so we can certainly identify those. But by in large in our exhibits, there is a sequence of phones, and it's just all of the -- the majority of those phones I will say, actually some of them are not used in the summary, but yes it would be those phones, and then a very small select handful of paper documents seized during search warrants, which of course we can also -- we're happy to identify from the exhibit list.

09:48AM THE COURT: So I think that's the first thing that needs to happen. You want to submit a summary. It's a summary of what exhibits. You should tell the defense this is a summary of the following 50 exhibits. And then the defense should be able I think to argue pretrial -- I'll hear from everybody in a second if they're comfortable with doing this pretrial, maybe that's what we will do the next status, right -- say we object to these six exhibits, and I'll hear that objection now. I don't have to wait for trial on an evidentiary issue like that, I don't think.

09:48AM And if I grant some of them, then you're back to the drawing board on your summary. If I don't grant them, then your summary -- you have a reasonably high likelihood of confidence

that that's the summary you're going to be able to use. And we can talk about then how you're going to use it then.

But since I'm not sure what I'm going to do with these objections because nobody has made them yet --

And, you know, just give me a ballpark, Mr. Wu. It has to be at least 50 or 60 exhibits, or is it less?

MR. WU: It depends how you count. If you count each phone as a single exhibit, of course the number will be something like 30. If you count the subcomponents of a phone as different exhibits, the number rises quickly because if you count each chat file as a separate subexhibit that number would be higher.

But it's something like 18 phones. And then, like I said, two or three collections of paper documents or maybe four let's say paper documents that were seized during search warrants, so it's really -- the vast volume of it is phones. But we can identify those phones because I think for Your Honor's purposes, if we're discussing authenticity, the authentication would be for the entire phone extraction. They don't then need to authenticate each little document file, audio that comes out of the phone. If the phone is authentic, the whole extraction is authentic.

THE COURT: How did you get to some documents? How are some documents part of that summary?

MR. WU: The reason is that -- the guiding principle for the summary was communications for things exchanged between coconspirators, so during the conspiracy period. So for instance,

when two conspirators sign a contract with each other, that was a communication between the two of them. When we seized that paper document from, for instance, the offices of defendant Veintemilla, that will make it into the summary.

THE COURT: Oh, no. No, no, that would be different. No, you're not going to do that because that is a demonstrative aid that then you're just summarizing all the government's evidence.

I'm with you on summarizing extractions. But once you start putting those extractions in a timeline with other documents, that's a demonstrative aid. That's not substantive evidence of the case which I would be allowing you if I entered it.

This is what we've got to do with this summary because it's not fair to anybody, most importantly the jury, right, that this be done as the trial is going on. I think this is something we can handle pretrial.

Let me hear from you, counsel. Is there any objection? I'm going to ask the government to identify the list of all the exhibits that form the basis of the summary and then giving you a deadline to --

MR. FRIEDMAN: Sure.

THE COURT: -- file something that just says we're objecting to these, and then I will hear it in oral argument and I'll make decisions. The government might have to have folks

ready. It might have to be an evidentiary hearing now that I'm thinking about it. It depends on what the nature of the objection is, right. Maybe I need somebody here; I don't know.

But do you have any objection doing that and doing it before the 9th?

MR. FRIEDMAN: I mean I have no objection to that process. I think that's what we need to do. If we can do it before March 9th, yeah.

THE COURT: Let me hear from you, Mr. do Campo. Mr. Howard got to do the summary. That one is his. Okay.

MR. HOWARD: I understand we're discussing a couple of different components of the admissibility of this document, but I'd like to say a few statements that don't go directly to the Court's immediate inquiry. And I think the problem is the reason we're confronting this problem is because the rule is intended to summarize an exhibit; not a theory and not a group of exhibits.

A proper summary exhibit for Mr. Ortiz's phone would be a summary of his phone. Once you start to put it in a timeline and make a puzzle out of it, it's argumentation. So the summary exhibit by itself is inadmissible because it's not a summary; it's a summary of their case; it's a summary of their argument; it's not a summary of an item of evidence.

I think the government is perfectly within its right to give a summary exhibit of each extraction, maybe even a summary exhibit of each person's phone, phones if they have more than one.

09:53AM But making a puzzle out of it becomes argumentation, and it is now no longer a summary of their argument; and as the Court referenced, it's a summation, either an opening or a closing.

THE COURT: Depending how good the agent is.

MR. HOWARD: Yes. And what it does is it undercuts. And allowing an agent to do it undercuts the Sixth Amendment right to confrontation because these things are going to come and they're going to resonate with the jury as statements in the context that the government presents them, without an opportunity for the defense to confront them as they're coming in with people who are familiar with the substance as opposed to the fact that it was extracted. So that's one.

Two is that because there is material on Mr. Ortiz's phone, for example, doesn't mean the phone comes in. Because they seized his phone, it's statements on the phone that are relevant; not everything on the phone because it belongs to him. And so when they decide -- let me say it again.

THE COURT: No, no, I got you. I appreciate it. This is why people should come to the podium because you can see my facial expression. I had my eyes up like what are you talking about.

MR. HOWARD: So if he is talking about, for example, let's assume a birthday party for his child; it's not admissible evidence because it's on his phone. So we're not going to be stipulating to the admissibility of any phones in their entirety or the contents.

09:55AM If the government identifies specific information on the phone that belongs to our client that they intend to admit and it's all related, then I don't know that we'll stipulate, but we won't have an objection as to the relevancy.

However, statements can be innocuous. So because the government decided that the statement had a certain meaning and, therefore, seek to admit it, they have to establish its relevance and establish that it means what they purport; not that it's a statement and we decided it fits in this part of the puzzle and therefore we're going to throw it all to you.

They're summarizing their case; they're not summarizing evidence. And as Mr. Friedman said, that's a demonstrative that they're entitled to have in their presentation. But once it goes back to the jury, it's an actual substantive exhibit, then not only the statements themselves but the context in which the government has put them have now become -- pretty much go back with the imprimatur of the Court, and I don't think that is proper under the circumstances.

So I would suggest that if they want to offer a summary exhibit in order to shorten things and I think rule -- what is it -- 1006 is intended to do, then they present a summary of Mr. Ortiz's phone. That's fine if it comports with the rule and they're coconspirator statements and they're relevant. And then they do summaries of each phone. But once they start to compile it into one, it becomes argument de facto.

09:56AM The other problem with the manner which they're purporting to do this, as the Court knows, it's 1400 statements, and the --

THE COURT: Pages.

MR. HOWARD: -- pages, with how many odd statements, and the government has conceded they don't intend to cover each one of them. And so we again will be denied our opportunity to confront a statement if it's presented in a chart that's never mentioned to the jury during trial, and then during closing they're like, ah, get a load of this statement that nobody ever heard before within the context of the trial because it's in a document.

So you can argue stuff that comes in; but stuff that comes in that's relevant, we want an opportunity to confront. So let's say there are a thousand statements and they cover a hundred and then start to try and argue from the other body of evidence that was never addressed before a jury --

THE COURT: No, but they can do that if it's admitted; so that's the issue. You can always do that if it's admitted. That happens all the time.

MR. HOWARD: But the reason it gets admitted is because it's established as relevant and authentic within the context of the trial.

THE COURT: Correct. So that's why we have to start from the raw data. They say to me this is Ortiz's phone, these are all the communications in the phone that are relevant, and I admit

09:58AM that, this happens all the time, the witness might only address some of them, and they can always in closing talk about one that wasn't addressed because it's in evidence.

What I can't do is let it be in evidence because it's in the summary and then the summary contains things that the defense either objects to in part, have authenticity issues, right. We have to start at step one. Look, I am not opposed because it is done commonly and I think it's appropriate, if Mr. Ortiz has ten phones, a thousand messages, 800 are relevant because they're within the conspiracy, they're conversations with the coconspirators, that all gets admitted, and they want to bring in a chart because the jury is not going to look at 800 of them, the jury really is going to look at 300 of them and the analysts or a witness is going to refer to 50, I don't have any problem with that summary chart coming in as evidence because it is summarizing something that is already properly part of the record. I don't have a problem with that.

Where I start having a problem with is sort of jumping to the exhibit when I'm going to have all sorts of objections to what makes up the exhibit. And I am going to have some issue -- it's hard for me to wade through 1200 pages right now when I'm not really sure how much of it is going to be in. I am going to have issues with the overlays, and I am going to have issues with the documents because then it's a summary of the entirety of the government's case. I mean it would be great if in every case the

government could have somebody get up and say here is the summary of our entire case. We put it on a chart. It is starting to sound like that could be some of it. That I am not going to a allow because that's not what the rules allow.

They're going to have a chart. When this is all said and done, there is going to be a summary chart in this trial. The question is going to be how many of them and how long they're going to be.

MR. HOWARD: And what's their content.

THE COURT: And what's the content. Well, the content has to be admissible evidence.

MR. HOWARD: Right. But another thing, Judge, the Court did mention that 800 messages, 300 relevant, and 50 discussed. What are the rest coming in for? And when does anybody have an opportunity to test their admissibility if they're not presented and they're just stuck in a document?

THE COURT: We're going to be doing that, so that's my issue. Well, typically you do that in trial. That will be a disaster because at some point before Mr. Wu puts up the analysts to talk about this stuff, he is going to have to admit each phone, each thing into evidence.

And what I do not want happening is when he tries to put in Ortiz's WhatsApps, you object, and let's say it is an objection, now I have to hear that objection. Why are you objecting? Well, I'm objecting because half of these WhatsApps

are not part of the conspiracy, they're not relevant, they shouldn't be admissible. So what if I agree with you? What are we doing then? We're going to have to take a two-week recess for the government to take those things --

MR. HOWARD: That's the problem. And I think requiring the defense to, notwithstanding what a witness may say during trial, stipulate that a certain statement that they intend to bring is admissible as a coconspirator statement I think is unreasonable and untenable because there is no way for us to -- we do that based upon the evidence that comes out during trial.

We can't make a pretrial determination as to the admissibility of evidence where witnesses may come up and testify in a way that undercuts them. If they bring up a cooperator who says, oh no, we weren't talking about that then, we were talking about this then, it's something else, now the statement is no longer a coconspirator statement and we have stipulated to its admissibility.

THE COURT: No, I'm not asking the defense to stipulate to anything here. What I was proposing is that we have an evidentiary hearing or a hearing of some sort as to the authenticity and the admissibility of each of the raw files. And it might be that on one, you know, you object and your objection is I don't have enough information and I'm not stipulating, you object, I overrule your objection. And it might be I overrule your objection, and then midtrial you say, by the way, Judge, now

there's 50 statements that are no longer coconspirator statements. I have a remedy for that. I'll strike them and I'll direct the jury to disregard those statements. I can always do that.

MR. HOWARD: But we would have been irreparably prejudiced at that point. We can deal with the authenticity; I think we can definitely deal with that.

As to the admissibility, the relevance, whether they fall into a certain category of evidentiary exceptions, I don't think we're in a position to do that until it plays out, but I understand that's what the Court wants.

THE COURT: I don't agree. I'll see it, right. Because if what they're telling me is for this person's phone -- let's say every chat or everything that they want to include for your client, and I'm making this up now just for purposes of demonstrative purposes for the argument --

MR. HOWARD: Sure, sure.

THE COURT: If they're saying, look, every conversation we're putting in for this gentleman are conversations with codefendants and known coconspirators within the period of the conspiracy, it's going to be highly unlikely that we're going to have an incident at trial where those statements all of a sudden do not become relevant. I grant you that I might be doing it over your objection; but otherwise, it will take me eight weeks for us to authenticate every phone, everything that they're using. Let's not even talk about the summary exhibit.

How are we getting through the authentications? I think we can make some headway there. And look, maybe you're right. And as the government goes through exhibit by exhibit, you're like I can't possibly make these determinations now, and then I'll make a determination pretrial to some extent as to their admissibility because otherwise that's our eight weeks is arguing about the authenticity and admissibility of certain documents. You'll state your objections for the record if we have a pretrial evidentiary hearing on this.

And then like I said, I'm not inclined to let the government have a 1400-page summary of their case. I just don't think that's what the rule allows for. But if they have a 50-page summary of your client's chats and conversations, that's probably coming in.

MR. HOWARD: My client's?

THE COURT: Your client.

MR. HOWARD: Not each of the clients combined into one. I think I would like the Court to consider whether or not that would be the appropriate way --

THE COURT: Oh, I agree.

MR. HOWARD: -- to suggest.

THE COURT: But I don't have any way of knowing that yet because I still don't know how many of these phones and how much of this raw material is actually coming in. And then once I make a determination that that's all coming in, then Mr. Wu can tell

10:05AM me, oh, we've overlaid all of these, and then he can argue why that overlay is appropriate.

10:05AM That overlay for me, government, is smelling like, you know, a really nice way for you to make opening and closing statements; but I'll hear you on that in a minute, Mr. Wu. I just want to make sure if there is an objection from the defense to having an evidentiary hearing that addresses the admissibility of the raw data on the phones and the other electronic information that makes up the chart.

10:06AM MR. HOWARD: No objection to the proposal in theory.

10:06AM THE COURT: Right.

10:06AM MR. HOWARD: As to how it fleshes out is a different thing.

10:06AM THE COURT: Right. And you're not saying that you agree that --

10:06AM You're not stipulating to anything?

10:06AM MR. HOWARD: We have no idea if it will be a viable solution, but we have no objection to the effort.

10:06AM THE COURT: Okay. We will give it a try. Mr. Perez.

10:06AM MR. PEREZ: Your Honor, on behalf of Mr. Intriago, there is very few issues that the Court has not addressed concerning the summary exhibits, but I want to point something out to the Court.

10:06AM The volume of evidence in this case is overwhelming. You can divide the evidence really into two polar opposites. Some of it is very clean, U.S. admissibile evidence. And let me give you

an example. If you have a U.S. phone that's coming from a common carrier here in the United States there is no issue. Authenticity, foundation is laid, it gets in, and obviously can be used in a summary exhibit.

But some of the evidence in this case the Court will discover as it unfolds is highly corruptible, is unreliable, so that in the opposite example the government may be introducing a phone out of Haiti, and we would have issues regarding the foundation, the authenticity, who had the phone, and that may be not admissible. So you have evidence that is coming out of two sources. Out of what I call, you know, the clean U.S. source; and then you have Haiti.

And it's a good idea that the Court has in terms of setting an evidentiary hearing ahead of time, but I would suspect that the majority of the lawyers here are going to object to the majority of it because we're hoping that the government won't be able to lay a foundation as to the authenticity and then be able to use it in a summary chart. I would imagine that if a list is put out, the majority of that will be objected to because we don't know how it is going to play out in court when the actual witness testifies and whether they lay a foundation or not.

So I am inclined to agree with the Court that this is sort of let's see how it goes, let's play it by ear. Whatever gets in can obviously then be used in a summary exhibit. And the way that I have always seen it is the raw data gets in, the

analyst says, hey, yes, this is a collection, a compilation of the raw data that is already in, and then the government makes arguments from the summary exhibits at closing argument.

What I don't think that is appropriate is for someone to be on the stand for a week and actually make the arguments that should be made by the government at closing from the summary exhibits because this person is not a fact witness; this person is just there to give us the assurance that this is coming from the raw data.

THE COURT: All right. So it sounds like you're giving me the A for effort. You don't object. Let me just say something else.

It's possible, let's just use as again an example a Haiti phone, that I will have an evidentiary hearing, they, you know, put in the foundation at the evidentiary hearing so the phone could be admissible, you object, I overrule your objection. I'm not suggesting that that doesn't also play out in front of the jury, right. Because I think you have a right if your cross-examination of the agent with respect to the corruptibility and the reliability, you know, I think those are things that maybe the jury hears. We all know that I'm likely to overrule that objection because I already had an evidentiary hearing on it.

I'm not going to necessarily cut the defense off at the knees and then you don't have the evidence to argue to the jury, you heard the analyst, you know, it's in evidence, but you heard

what the reliability of this is, right. I'm going to let you play that out at trial as well.

What I don't want is for that to play out at trial and 20, 30 percent of the time I agree with you; and then every time I do that, Mr. Wu tells me, and rightly so, Judge, I need three days now or four days now because a summary exhibit that this jury is entitled to have and that we're entitled to present I don't have it now. I've got to redraft it, because then I would have to let him do that, and I don't think I want to be in that position.

So it sounds like no one is agreeing that they're waiving anything or stipulating to anything. But you're not opposed to having an evidentiary hearing on the authenticity and admissibility of the raw materials?

MR. PEREZ: Right. And then also the last point I was going to make, which ties into a point that you made earlier, is that this is not necessarily a singular conspiracy consisting of 40 people, or perhaps even more. Some of these people that the government is claiming are conspirators may not be conspirators at all, so. Or it may be a parallel conspiracy.

THE COURT: Right. But that goes to Mr. Howard's point. And look, that's why I need to know exactly what's coming in because, you know, you and Mr. Wu might disagree on that; but if he's not putting those statements in there anyway, who cares? If they're not going to be in the record and they're not in the summary, I don't care about them either. I hear you, but that may

10:11AM not be what he's trying to do. I doubt he is trying to do that because he has enough problems already; why does he want to start introducing a bunch of things that don't have anything to do with the one conspiracy he's trying to prove, so I don't think he's going to go there. But I hear you on that.

MR. PEREZ: Thank you.

THE COURT: All right. Let me hear from you, Ms. Kudman.

MS. KUDMAN: Judge, the only other issue that I'd like to raise with the Court is if the government's permitted to have their analyst put in this evidence and talk about all these excerpts that they chose for this summary exhibit, then the defense is going to be in a position where we're going to put together our own summary exhibits --

THE COURT: Correct.

MS. KUDMAN: -- and where again that same analyst is going to be on the stand, if two weeks was bad from the government, I mean, can you imagine all five of us going through all of the evidence that was excluded on behalf of our clients?

THE COURT: I will let you do that, as long as it's relevant. If you're wasting the jury's time, I am going to ask you to sit down. But if Mr. Wu picks ten statements and leaves five that are really relevant out, absolutely you get to cross-examine the analysts about why those were not included or the fact they weren't included.

MS. KUDMAN: But then really this whole trial is going to

descend into a battle of the summary exhibit, and that's not what the trial is supposed to be, right. I think at the end of the day what we're getting is a bunch of summations. And, you know, to me the evidence -- and this has been argued ad nauseam already -- but it's duplicative, it's not probative, it cuts off our ability to cross-examine the individuals.

There are so many issues attendant to the way the government is trying to do this -- and I know you already have a problem with the overlay -- but again, I think that all of that really needs -- when we have our meeting next to discuss this, is to really discuss they should be able to perhaps summarize an admissible extraction to the extent that those pieces are relevant, but then it should be a summary exhibit with respect to that extraction rather than becoming this demonstrative device.

THE COURT: Look, I am going to hear as to which of these pieces is admissible. And if I find, again just to use round numbers, if I find that ten phones are admissible, then I think the government is entitled to summarize, for sure they're going to be entitled to summarize each phone, then we're going to get to the overlay, right. If Mr. Wu says to me, listen, phone one, two, and three need to be overlaid for these reasons and this makes sense and it's not cumulative and it's not prejudicial, I may let him do that.

The overlay with the documents, government, no. That's a hill you're not going to win. I just don't understand how I'm

going to let you do that. That's a bridge too far. But we do these every day, right. There is a phone, there's a thousand messages. The government, you have the thousand messages, you have been able to challenge authenticity. They want to put up a summary exhibit that only has their best hundred and you have 30 that you want to clobber them on because they didn't include them, yes, this is a long trial.

MS. KUDMAN: Judge, with respect to the overlay, to me again that's argument, right. That's a summation of what the evidence shows. If they want to, for example, in their summation hold up or put on a board overlays of various conversations to make their point, I would argue that that's appropriate. That's demonstrative, right.

But to do that through an analyst who is going to sit here and say, yeah, I cut out these excerpts and put it in this timeline, again, I would argue that's argument.

THE COURT: We'll see. Look, I think right now it's all hypothetical. Let's look to see what the admissibility of all these things are, and then we'll take it from there.

Because I'll tell you the problem with not allowing them to do some overlay -- and again I don't know what they're trying to overlay just yet -- is if the government wanted to just have the analysts say here are the 50 conversations and the analyst would then say let's look at the next chart and this chart had 40 conversations, Mr. Wu would clearly ask the witness, okay, go to

Exhibit 1. On what day on Exhibit 1 did you see this? I see this. And what do you see on Exhibit 2? Well, on Exhibit 2 I see this. He could do that. And so that's just going to take him longer, and it is going to make everyone crazy, including me and 16 jurors, right. So that's why I need to see exactly what's coming in. And then once it's in, I think I can give the government some direction on some things I'm not going to allow in the overlay as to other documents, right.

But if they want to overlay certain phone conversations and it's something he is going to be able to do by, right, combining Exhibit 1 and Exhibit 2, look, maybe I let a summary of each phone in and those overlays are just demonstrative; they're not substantive evidence, right. Because there is a difference between him using a demonstrative with a witness and it going back to the jury room; that's different. That's different. So maybe I let the analyst have charts that are summations, but that's not evidence, right, because I don't see why I wouldn't. I mean, he can easily do that.

So let's just go to the first proposition, which is: Is this admissible? Do you have any objection with the Court setting an evidentiary hearing where we go through the admissibility of the raw data?

MS. KUDMAN: To the extent that we can, sure.

THE COURT: All right. Let me hear from you, Ms. Bozanic.

MS. BOZANIC: Judge, I think Ms. Kudman covered my part. I think the overlay is demonstrative. I don't think any overlay that the government intends to present would be a summary exhibit. If they want to do a phone-by-phone summary exhibit, and then at some point we can go through what's admissible -- I just think it's premature for us to at this point even talk about what we would agree to.

So if they prepare their phone-by-phone exhibits and then as we go to trial, we will take care of as much as we can in pretrial motions.

THE COURT: I'm not strong-arming the defense to stipulate to stuff. You have a right to challenge it. I'm not going to do that.

But I just want to make sure that if there's arguments that I can resolve pretrial, I do that because I do think some of it might be a waste of the jury's time.

MS. BOZANIC: Judge, I think it's really demonstrative evidence. What they're trying to introduce right now, I think it's demonstrative; it is not a summary exhibit. Because overlay of this and that and this phone and the other phone and on top of that, the documents, that's just beyond the scope of just a summary.

THE COURT: All right. Well, I already heard from him.

All right. So I am going to set an evidentiary hearing on this. What I'm going to do is the government is no later than

close of business Monday to just identify what are the pieces of evidence that are the foundation for the summary they intend to use, all right. I am going to give the defense until next Wednesday simply to tell the government which ones they dispute and which ones they don't. Because if it's an AT&T record, I don't think anyone is disputing the authenticity or the relevance or the admissibility of that. But it sounds like there might only be very few of those; that's fine. However many there are, there are.

And then I will probably set a hearing for that following week. We have a status that week anyway, but it sounds like we're going to spend more time than we might have imagined that week going through the arguments. I want to do it sooner rather than later because to the extent the government has to rework these charts, they need to get going on that.

MR. WU: Your Honor, could I just be briefly heard on issue of overlay?

THE COURT: You can, briefly.

MR. WU: I hear you on the documents, so let's put that to the side.

The reason why it's so essential to have the conversations, they're not overlaid in the sense that we're not connecting them by argument. The analysts are not going to write on the page, oh, see Veintemilla is doing this because Ortiz told him to do it on the prior page. It is simply because those

conversations are happening simultaneously that they're going to be on consecutive pages of the summary.

The issue with breaking it out by individual phones is that will double the length of this presentation or worse because then we have to show the chat on each individual's phone. Let me give an example.

THE COURT: No, I know exactly what you're talking about. But there is a difference between it being evidence in the case and it being a demonstrative, right. It's all about what goes back to the jury room.

So I understand the overlay is really important. I do think that even if I didn't allow the overlay, you effectively could do it with the witnesses; it would just take a long time.

MR. WU: Yes.

THE COURT: I may allow you to have a demonstrative for purposes of the witness testifying; but then it really comes to the question as to whether that overlay is appropriate as evidence.

MR. WU: Yes. And two points on that, Your Honor.

So the first is that when the rule was amended in 2024, it was substantially amended because their use and they're viewed that these sort of cumulative summaries were not themselves evidence; they were demonstratives as you're referring to. And the entire purpose of the 2024 amendment was to say these are substantive evidence.

The second point is that this exact kind of -- I will use your terminology -- overlay is exactly what the case law discusses. For instance, the Menendez case that I cited out of the SDNY, obviously a major trial, a high-profile case, the agent compiled information from various sources, text messages, email, WhatsApp, lots of different sources combined. And when the court considered a challenge to that testimony posttrial, it specifically said that there was no authority to support this notion that you only have to have a single source for a substantive summary. And, in fact, courts regularly admit summary charts pursuant to Rule 1006 that compile information from several sources.

So this distinction, this idea that it's substantive evidence when broken up phone by phone and demonstrative when combined together or overlaid is a fiction. It doesn't exist in the law. It doesn't exist in the text of Rule 1006.

THE COURT: Okay. Look, I'll hear you when I know what that summary looks like and what it is that you're trying to do and I have a better sense of what the phones are.

We're not going to make this an academic exercise and waste the jury's time with it when I know it's something you're going to get to the jury that way, but it's academic at this point. I will set a schedule for that issue.

MR. HOWARD: May I ask a question, Your Honor, on that point?

THE COURTROOM DEPUTY: Microphone, please.

MR. HOWARD: Sorry. Thank you.

If the defendants all got together and had an investigator or two get up there and we have 2- or 300 pages with one investigator mapping out our theory of the defense, either in combination or individually, would that be admissible? Should we work on that?

THE COURT: Why would that not be admissible? So if it's in evidence and you pulled 500 phone calls or messages and these are 500 that you're essentially using to rebut the government's summation of evidence, I don't see why you couldn't do that.

MR. HOWARD: We could have one investigator sum it all up for us?

THE COURT: I would be curious to see what Mr. Wu's objection to that would be. He's not going to agree to it right now, as you might imagine; but yeah, you get to do that.

MR. HOWARD: Okay. It sounds like he did just agree to that in his argument.

THE COURT: Maybe, but I am not going to put him on the spot. But my point is that's exactly what they're trying to do. It would be curious what argument they would have against it if that's what you tried to do.

Again, if the evidence is admitted and your investigator pulls 500 chats that they didn't pull that tell a different story, that's what trials are for, right. I mean, it's in evidence.

60

They chose to look at the evidence one way; you can choose to look at it another way. Again, I'm not telling you, you can do it. We will have to have the same discussion, but it seems to me you could.

MS. BOZANIC: Judge, so the government has the devices and the defense would most likely like to meet them and let's say they file this on Monday night. Could we have an extra day or two or until Friday to respond so that we could have time to all meet and discuss what we would object to?

THE COURT: Sure, I will give you till Friday. I don't have an objection to that. But then that following week, whatever day our status is, this is probably be more like a two-day status because this might take a day or a half a day to go through the issues of authenticity, and the government is going to need to maybe have some witnesses for that.

MS. BOZANIC: Thank you, Judge.

MR. WU: Your Honor, I will just note if the defense has that summary of their own conversations, I would ask when are we going to receive that? We've received no exhibits from the defense. The trial is only six weeks away. We would need to see that to be able to formulate objections the same way that they have.

I will also note that if it's coming from the same phone content that we're using that we produced to them in discovery, then I assume they have no objections to those phones because they

cannot use chats and then say that we cannot use chats out of the same phones.

THE COURT: I know. That's why you don't have a chart yet, right. They're going to wait to see what I do with what you can get in and what I do with the chart; then they will make their decisions then. Look, it's always tricky to have the defense -- require them to provide you that kind of information. They have a right to a defense; you don't have a right to an early peek at it, right. We will cross that bridge when we get to it.

If they dump a huge chart on you that takes you several days to review and I have to recess the trial for three days, that won't happen, people; so just take that into account. I'm not going to do that. So if that's what's coming, I'm not going to be giving you that kind of time, right. You're going to have to give the government some time to make sure that at least what you're portraying is accurate because, I mean, they have a right to make sure that what your analyst did is correct.

Okay. Let's move on.

MS. KUDMAN: Judge, just very quickly for scheduling purposes, are you planning on us coming back February 13th to argue this?

THE COURT: I haven't looked at whatever that week is. I don't have the calendar in front of me.

MS. KUDMAN: I just want to raise that my son is getting married that weekend; so if possible, if we could not have the

hearing on the 13th, I would appreciate that.

THE COURT: The issue is --

THE COURTROOM DEPUTY: The status is on the 11th.

THE COURT: We have a status on the 11th. So I'm thinking either we do it the 10th and the 11th. And look, that's why you have Ms. Descalzo, unless you invited her to your son's wedding, in which case you're going to have an empty seat at the table because she's going to be here.

It will probably be before then. I need to do this sooner rather than later because the trial is upon us, and I'm worried that this might require some change in this chart, and I want to give the government a fair opportunity to make the changes they need to. All right.

Let's go to 1310; it's the motion in limine seeking admission of crime scene and autopsy photos. No objection specifically was filed as to this. Let me hear from you, Mr. Do Campo.

MR. Do CAMPO: Your Honor, the government is still finalizing its exhibit list. I don't know that there are going to be any changes.

Generally speaking, the autopsy photographs and crime scene photographs I think are relevant and admissible. There may be one or two or five autopsy photos that I think may not be necessary as an evidentiary matter; not to be too graphic.

THE COURT: That's my note. So this is my note on the

autopsy photos: Can you bring them to me at the status conference? I want to see them. They're obviously going to be relevant, but I also don't want to because I've been working quite a bit on jury selection, you know, and I don't have lots of questions for or any question for the jury as to whether or not seeing that kind of evidence or anything like that is going to be an issue, but I want to see what the pictures look like myself so that I can make a determination, one, are they all necessary; and should I include that in the voir dire to make sure that I don't have then jurors with issues.

MR. Do CAMPO: I think, Your Honor, on behalf of Mr. Ortiz you probably should give some sort of warning because even ones that I would concede are admissible are pretty gruesome. There are some others that are pretty gruesome that I really don't think move the ball evidentiarily, and I will make my case at the time now that the government is going to bring the photos and we will all look at them.

THE COURT: Yes, let's do that at the status. You're going to bring the photos, we will go through them one by one, you will tell me why you need each one of them. And like I said, I am inclined to let them in. I'm not saying they don't come in because they're gruesome; but to the extent that they're unnecessary or cumulative, I will hear you on that. And then I really want to see what they look like so I can handle it appropriately in selection. Mr. McLaughlin.

MR. MCLAUGHLIN: Just so the Court knows, when we provided our exhibits in December, they had not been cut down, so I think there were 300 that you guys got. I have pared that down substantially. I actually was the one to do it, and I have organized them by -- essentially by wound, tried to minimize the amount of blood and gore as humanly possible, and make those photographs relevant to Dr. Quincy's testimony.

So we will bring those, but I want to let the Court know that we have pared down the earlier production substantially.

THE COURT: I appreciate it. And look, it is what it is, right; but I need to look at them myself. I don't want to be sitting up here thinking, oh, my God, I've got two jurors fainting now, and they had no idea that they were going to see this kind of evidence. All right. So we'll handle that at the status. Bring all the pictures, and we'll go through it then.

All right. The next is so the government at Docket Entry No. 312, this is not a motion, it's the notice of intent to admit summary exhibits. I just want to call this one out because here there is the issue of the summary exhibit we just talked about, but it does look like there's other summaries the government intends to use because they noticed bank records on this one, right.

So that's a different summary exhibit, correct?

MS. PHENELUS: Yes, Your Honor, that's correct.

THE COURT: All right. All right. This is a notice;

10:30AM it's not a motion. I don't think I need to have a separate evidentiary hearing on this if they're bank records. They're bank records. I suspect there will be less issues with bank records. So again, this is just a notice. I just wanted to make sure that I was reading that correctly. There are other summaries; not just the big summary that they have objected to. All right.

So Docket Entry No. 1313 is the notice of intent to seek admission of self-authenticating records. There was an amendment to that that was filed to this morning or at least we got this morning. It looks like you filed it yesterday. Again, it is a sealed document. I saw it this morning.

There is not a filed objection. Is there going to to be an objection to these documents? Do we all agree that these are self-authenticating? I don't see anybody from the defense standing.

Let me just say this, this way. If there is going to be an objection to something the government has noticed as self-authenticating, I want to hear it at the status. I don't want to hear that at trial because, I mean, they've noticed it. They look self-authenticating to me, but what do I know. If there is something up, you will let me know at the status.

All right. Motion in limine, again Docket Entry No. 1314, these are to preadmit self-authenticating records. These are foreign records. There is no objection that was filed by the defense. Again that's Docket Entry No. 1314.

10:32AM If the defense is going to take the position that these are not self-authenticating, I want to hear it at the status. I know you have a right to wait to trial. We're not doing that with a ten-week trial with a jury. So you let me know at the status, it's soon enough before the trial. If you have an issue with the self-authenticating documents, you should be able to tell me at the status. All right.

Let's go to Docket Entry No. 1314, which is the notice to admit inextricably intertwined evidence. This is really six motions, not one. So this is the motion to admit the lack of medical employment by Mr. Sanon. Mr. Solages's lack of military history is the second. The third is Mr. Veintemilla's lack of State Department employment. The fourth is the source of Mr. Veintemilla's phones. The fifth is Ortiz and Intriago's prior attempt to obtain government contracts in Bolivia. And the sixth is Mr. Intriago's prior application for use of an export license for ballistic vests. So it's filed at one motion, but there's really six different things going on. By my count, three of them have no objection; so let me just make sure that that is accurate; that there is no objection to that coming in.

So with respect to Mr. Sanon's lack of medical employment history, I didn't see any objection to that evidence. Is there an objection to that?

MR. DOMINGUEZ: Judge, there really isn't an objection to that; it's just it's not at issue. That's only thing I would say

10:34AM if it comes up as being relevant at some point. But it's accurate what they filed; he didn't work here as a doctor, but that's not an issue in this case.

10:34AM THE COURT: So you are objecting to it, right? They're saying it's inextricably intertwined to the facts.

10:34AM MR. DOMINGUEZ: Well, then it's just going to make the trial much longer because if they put that in, then I get to respond, obviously, in like kind. If that's what they want to do, then that's fine. I'm not going to object to it because it's true.

10:34AM THE COURT: Well, then there is no objection. Again, if you're not objecting, you're not objecting. My sense of it was correct; there is no objection to his lack of medical employment history coming in.

10:35AM The second one that I saw that didn't appear to be objected to was the third category, which is Veintemilla's lack of State Department employment. Is anybody objecting to that? I don't see any written objection to that. All right. There is no objection, so that part of the motion is granted.

10:35AM And then Mr. Ortiz and Mr. Intriago's prior attempts to obtain prior government in Bolivia; is there any objection to that?

10:35AM MR. Do CAMPO: No, Your Honor.

10:35AM MR. PEREZ: None.

10:35AM THE COURT: All right. So those three the motion is

granted. It's not a motion; it's your notice. There is no objection to it, so it's not a question of granting or denying it at this point, just a notice. But you'll hear from the defense there is no objection to that coming in.

Now, the lack of Mr. Solages's military history, there is an objection to that, as well as to the source of Mr. Veintemilla's money as to the application of the export license. I am going to take a ten-minute break so that Vernita can take a break. When we come back -- let me just give you my thinking on it so that everybody can formulate their thoughts.

The lack of military history to me, it seems that we can have a limiting instruction. All of these -- not all of these, but the issue of the limiting instruction, I don't think anyone is objecting to how to use that. To me it seems inextricably intertwined.

I also think that Mr. Intriago's application comes in as well. You can certainly cross-examine the expert. I think that comes in.

The source of the Veintemilla money, I have real issues with that. I have issues with when it was disclosed. And remember, just because you found something late, that's fine. Maybe you discovered that in December. But if it's something you could have discovered a year ago that doesn't mean that just because you got around to it in December now it's timely, right; so I do have an issue with the timeliness of the M.R., right.

10:37AM I also have an issue with it coming in because I do think it is a side trial, does it really matter where Veintemilla was getting that money? Whether that money was part of a fraud. First of all, he didn't even know it was part of a fraud. I have no idea how it comes in.

10:37AM But let's just for argument's sake say that he even participated in that fraud; that it was his fraud. I don't see why it really matters at all whether he took it out of his 401(k) or whether it was fraudulent or not. The government's arguments in that notice that it goes to intent, that it's more likely that he knew what the conspiracy here was because he was involved in a financial conspiracy, I don't buy. I don't follow it.

10:38AM I see it as a complete sideshow that's not inextricably intertwined, may be untimely, and could be prejudicial to the co-defendants for whom, of course, this is not even an issue. So that's my public service announcement. That's what my thinking is so that when we come back we can get to it.

10:38AM Let's take about ten minutes. Everybody stretch your legs, and we'll be back.

10:38AM (Recess at 10:38 a.m.)

10:55AM (Back on the record at 10:58 a.m.)

10:58AM THE COURT: All right. You may all be seated. So let's go to the issue of Mr. Solages's military history. Let me hear from Mr. Solages's counsel on why it is not inextricably intertwined.

10:58AM MR. FRIEDMAN: Judge, we did file a response at Docket Entry 1335; so I mean we're going to rely, obviously, on what we've articulated in that response.

10:58AM But the fact that he may have lied about actually being in the military, although he has experience and other types of training which may amount to or surpass some military training, it's not an element of the offense. You know, it's not an element whereby they have to prove in this conspiracy that he lied about military experience; so it's not a material element. It's not intrinsic because the government can prove their case.

10:59AM And the other point is, Judge, that Mr. Solages, he was at the direction -- he worked for CTU. He was an employee of CTU; so anything -- maybe what he did represent, he was representing what was represented to him and moving forward in what took place in Haiti.

10:59AM If Mr. Solages decides to become a witness in this case, I could see, perhaps, they could cross-examine him on that issue and he can testify as to what his training is and what other experiences he's had. But other than, Judge, it's really not intrinsic because it's not a material element of the charge that needs to be presented to this jury for them to decide whether or not the government's proven their case.

11:00AM THE COURT: I know, but it is part and parcel of their story, right. I mean, I don't see how the government puts its case forward without some of that information coming out, right.

Because if part of the story or the story the government is putting forth to the jury is that they all were coming in, you know, the CTU guys were hired, he was sort of the security guy for Mr. Sanon and they were going back to take Moise out of power, right, how is his military training -- how does that come out? I don't even know how they would get it out of evidence.

MR. FRIEDMAN: I don't know either, Judge.

THE COURT: But that's why it's inextricably intertwined.

MR. FRIEDMAN: But it's also shifting the focus of the trial from the proof that's required to be proven, to a collateral inquiry; whether or not, you know, he actually served. To bring in documents of U.S. military to show his name is not listed on U.S. Army rolls, it's sort of --

THE COURT: Because he's wearing U.S. Army gear is sort of the issue. So the problem is we've got the whole public authority defense. We've got a lot of stuff going on. I think they're allowed to do it. I have two concerns, and I will hear from the government on that.

One is I agree with you to the extent that how much of this is coming in. This is not a day worth of jury trial time, right. How much of this is coming in? Is it too much? And then I think a limiting instruction is warranted because it doesn't go to propensity or things like that; so I think maybe a limiting instruction is warranted.

Let me hear from the government. What does your evidence

here look like in terms of amount, if you will? I don't think it's a lot, but what do I know. And then I want to hear from you as to whether or not you object to a limiting instruction.

MS. PHENELUS: Your Honor, the amount of evidence to discuss Solages's lack of military history is not voluminous. As you just noted, it will be some of the photos, which shows that he is wearing uniforms that say U.S. Army, which is entirely part of their plan in carrying out this coup and making it seem as though the United States authorized their entire coup plot; so it will be limited to that.

And then of course, as we have already noticed in our self-authenticating records, you have seen also in our motion here, is the lack of employment with the Department of Defense, FBI. And then of course very limited cooperator testimony about what he said, and then that is what their understanding was or if they believed him or not.

THE COURT: What's your position on the limiting instruction?

MS. PHENELUS: If it's 404(b), of course limiting instruction, we welcome that; and I know that that is what the Court would do.

But if it's inextricably intertwined, the government would have no issue as well in tailoring it.

THE COURT: I am inclined to allow that. I think whether or not I give a limiting instruction will depend, in large part,

11:03AM of how much evidence there really is. I'm hearing you saying it's not much. If it's, you know, three hours of testimony, then it might bleed into something for which I think a limiting instruction is required.

11:03AM So the defense will have to make its motion for a limiting instruction at the time, but that's what I am going to do with that.

11:03AM All right. Government, let's talk about the source of the Veintemilla money. Who drew that one?

11:03AM MS. PHENELUS: That's also me, Your Honor.

11:03AM THE COURT: There you go. Okay. Tell me how that is at all relevant. It is prejudicial to be telling this jury that he is involved in, you know, a fraud or that he knew that the money was fraudulent; so let's start with that.

11:03AM Is the government's argument or evidence that he knew that they were fraudulent funds and/or that he was involved in a fraud?

11:04AM MS. PHENELUS: Yes, Your Honor, it's both.

11:04AM But if I could start by setting the scene of what the defense's theme and theory has been throughout this entire case, and that is state of mind. Throughout this entire case, each and every one of them has said I didn't know --

11:04AM THE COURT: I have no idea how this goes to state of mind.

11:04AM MS. PHENELUS: And that's what I'll get to, Your Honor,

absolutely.

So each of them has said I didn't know I couldn't kidnap the president because of this Haitian arrest warrant. I didn't know that I couldn't be involved in this assassination because of this immunity agreement. I didn't know that I couldn't be engaged in this because I thought the U.S. was involved. And so that sets out what all of them have said in terms of their intent.

And so specifically with Veintemilla, we expect that he will also argue that he was just the money man; he didn't know that he was funding a coup plot in Haiti; he didn't know that his funds would go towards paying for vests and firearms that ultimately assassinated or were involved in the assassination of a president. And so from the government's perspective, the best evidence to prove his knowledge and his intent about being this money man and being the source of funds is how he sourced those funds. Because if he truly had no ill-intent and he truly knew that this was a legitimate operation, then he would have walked into a banking institution and just gotten a loan, or he wouldn't muddy up Sanon's presidential campaign with illegitimate funds.

And so that is the government's position about his knowledge and his intent, particularly because intent is a huge feature of each of the defendants' theories here.

THE COURT: So your argument is -- and I think this is what I understood in the papers and I just don't agree with it. Your argument is that he knew these funds were fraudulent; and

that because he knew the money was fraudulent, that goes to his knowledge that this was an illegal act because you wouldn't use fraudulent money to support a legal act?

I mean I'll tell you, the fourth floor of the U.S. Attorney's office will have a lot less to do with that theory, right. That just doesn't bear out to my experience at all; that people don't use fraudulent funds. I mean, isn't that money laundering? Then you turn it over into something legal.

I don't buy at all that that goes to the intent of this crime. And what you're articulating worries me more because if that's what you're doing, then it's the spillover effect. I'm sure the other four defendants are going to tell me we want a severance. Because if you're going to start saying that this guy knew about this crime because he knew he was involved in this fraud, it will only be a matter of seconds before a motion for severance is filed on that. Because even you articulating, saying they all had this intent and this goes to intent --

And by the way, why does it matter? Who cares? Who cares if he went to a bank? He could have gone to a bank and used clean funds, right, and knew he was a assassinating a president. So like I don't even see the connection necessarily. And I also don't know how strong your evidence is that he knew that these were --

Like, what's his connection to the fraud?

MS. PHENELUS: So if I could talk about your question

about trying to put this on all of the defendants. That wasn't my intent when I set the scene. I was just saying that --

THE COURT: Oh, no, I know that's not your intention. But that is what happens when you set the scene, right.

MS. PHENELUS: And so, one, it doesn't go to each of their intent; but I'm just mentioning intent as to really the theory of this entire case.

But the evidence that shows that he was involved in this fraud or knew about it will mainly come from the bank statements. The bank statements, which were previously produced in 2023 -- at least two and a half years ago, I believe, Your Honor -- they actually say SBA and they provide information that shows that they were PPP frauds, right.

THE COURT: No, no, no. No, no, they don't do that.

MS. PHENELUS: Or PPP loans. Excuse me.

THE COURT: Right. They show they were loans; not a fraud.

MS. PHENELUS: Thank you, Your Honor. Yes, that's correct.

And the other evidence would be from the testimony of witnesses, and we've identified them in our papers.

THE COURT: But those are witnesses that came up in December.

MS. PHENELUS: Jacob Israel and Rainer have been known.

THE COURT: Okay. Those two are different. But those

two aren't going to say -- I mean those two might say that that was a fraud.

Are they going to say that the defendant knew it?

MS. PHENELUS: Yes, Your Honor, we do believe that they will say that. And just moving to Margaret Roseman -- they will say that.

But moving to Margaret Roseman, I understand that we interviewed her in December. But again going to the bank statements, they had already been produced to defendants for some years. You see her name in the bank statements.

THE COURT: That's not the way rules work, right. Just because the defendant knew it or the defense counsel had those documents or had that name doesn't allow you to come in in December and say, well, this is what she was saying, right. Because if that were the case, then the government could do whatever it wanted; there would be no thing such as notice. You'd say, well, they know their client did this. But also they knew. They should have just talked to their client about it; so that one is a little farfetched for me.

I think the problem I still have with this is -- and by the way, the M.R. stuff I think is late. But I really have a problem with this notion unless the defendant testifies. Now, if the defendant testifies or if Ms. Kudman or Ms. Descalzo argue to this jury that their client is obviously innocent because he took this money that he'd worked so hard for, he took legitimate money

and was investing it, and he wouldn't have been doing that if he thought that there was, you know, if he thought that what they were doing in Haiti was wrong, then maybe they have opened the door to the government coming in and saying, hey, you know, that's not the case.

But to affirmatively try to link his intent in the assassination plot with his knowledge that the funds were fraudulent, I don't see it.

Let me ask Ms. Kudman or Ms. Descalzo, one of you. I mean I assume that your case isn't going to be -- or it might be, but do you disagree with me if you argue to this jury in opening or through cross-examination if your argument to this jury is going to be this is a hardworking man, he legitimately invested in something as a businessman, if that's your argument, then isn't it proper rebuttal?

MS. KUDMAN: Your Honor, of course anytime a lawyer makes an argument that opens the door, it opens the door. But you know at this point for the government to simply say that these funds are derived by the way from some distant PPP fraud from other third parties that he doesn't know about, first of all, even if we opened up the door to intent evidence, which we're not intending to do, the evidence that they're proposing is not probative of that in any way.

But no, at this time we have no intent of making those arguments.

11:12AM THE COURT: I don't think this evidence is probative of intent. And even if it were probative of intent to some degree, I'm very concerned about the prejudicial effect and the spillover effect with the other defendants.

First of all, I really don't see how it goes to intent. This could have been drug money he was using, right. What that would show is he is a drug dealer. That would show he's a bad guy, right. What does that do with the other defendants? Right. I mean, I think the spillover is problematic. I think the prejudicial effect outweighs any relevancy.

And if he is not connected to that fraud, at best he had reason to know that, at best, that there was a fraud because these witnesses suggested to him or gave him the understanding that those funds were not legitimate. It seems very far afield to me.

MS. PHENELUS: Your Honor, let me just note a couple of things.

One, he is directly involved in it; not just through the testimony of those cooperators, but also through his own company Ultimate Insurance Group, which we've already noticed and included in evidence about an EIDL loan that he obtained and then used for the purposes of this coup, so he is directly involved in this. And then just to --

THE COURT: But he's not charged with that. You didn't charge him with PPP fraud. You didn't charge that.

MS. PHENELUS: Right.

THE COURT: You had three years to charge it, and you didn't charge it. Or four or five or however many years we've been around here already.

MS. PHENELUS: I was just pointing that out to say that he is directly involved, and that's why, you know, just to say that it's not completely out of his viewpoint, he's directly involved.

The other thing, Your Honor, is as to M.R. -- and putting the fraud aside of PPP and EIDL -- but he personally deceived from an investor that he was claiming --

THE COURT: How is that not late because if you had M.R.'s name three years ago, you had M.R.'s name, I get it, there's a lot going on, you don't get to M.R. till December, after this case has been set for trial for two years, why would I let the government at this point bring in that evidence after I have repeatedly said there are deadlines to those things and it is clearly quite late?

MS. PHENELUS: One, because of what I mentioned with her and the bank statements, which I understand what you said and you pointed out.

Two, as the government is preparing for trial and interviewing witnesses, it's bound to come up with new information, which we immediately disclosed to opposing counsel.

THE COURT: Oh, listen, I know when you get ready for trial, all sorts of things come up. There is a difference between

11:14AM something that comes up that you had no reason to know would have come up. You did your due diligence, the government indicts the case, has been preparing and something just came up, that can happen. And, you know, it would be difficult to limit the government from presenting something that came up that it didn't have any reason to know existed beforehand.

It seems to me like no one bothered to talk to her. If they knew about her two years ago, so did you. You talk to her now and she says something -- I'm not suggesting that the government shouldn't be getting ready for trial and trying to find out as much information as it can at all times, of course you do that; even during the trial. The question is whether you should be allowed to use it against the defendant.

I have to tell you, I don't see who this is -- I don't even see how it goes to -- it is definitely inextricably intertwined. I don't see how you have enough on the 404(b) based on what you filed, based on the description of what you filed. At best it seems he may have had some knowledge, maybe had some knowledge that these funds were not clean, for lack of a better word. But I see real problems with allowing this evidence in.

And by the way -- not that you have to take trial advice from me -- why do you need this? Like, really? We're going to have, like, some three-day sideshow on a PPP loan on a case where the accusation is that he's helping fund the assassination of a head of state? And you think the jury is going to be persuaded

that he knew that because he knew this was a PPP loan? Like, I'm not seeing it. I'm not seeing it.

Look, obviously if the defense opens the door, and I hear you on that. Ms. Kudman gets up here and says, you know, he or somebody, you know, made a legitimate investment, why would he have made a legitimate investment if he thought this was corrupt; if she says that, you've opened the door. That's a whole different bottle of wax. And you've got good reason to think she may say that based on everything we've been talking about. But defense lawyers say all sorts of things; and then when the trial comes, they know not to open the door, so it's a whole different ball game.

So you're right; if she gets up here and says he is this great -- like she's argued at every bond hearing we have had in this case, right -- she's argued, oh, this is a legitimate businessman and he's broke, whatever, and if she wants to argue that in opening, she's going to have walked into it, and then I will hear you then. But as affirmative evidence, I'm not inclined to allow it. Not only do I think it's not relevant, the M.R. stuff is late, and I think it's more prejudicial than probative.

I am very concerned about the prejudicial spillover with the other defendants. I could potentially cure that with an instruction; and if it comes in, that's exactly what I am going to do is cure it because I'm concerned about it. I don't think it would require a severance, but I think it would require some sort

of instruction on my part. But I don't think you've got enough to put it in affirmatively.

Let's see what opening statements are. Let's see what they say in opening. I hear you. I heard her; she's said a lot of things about her client being -- at the bond hearing. You weren't around for the bond hearing. You should have heard what she said at the bond hearing. You say that in opening, we're going to hear all about this loan. My guess is she won't. She's not going to say that in opening; but who knows. All right. So that's my ruling on that.

Again, that was just a notice, but Mr. Veintemilla followed up on the notice as a motion to exclude it. So I'm going to grant the motion without prejudice to the government coming back. Let's hear what they have to say in opening.

MS. PHENELUS: Thank you, Your Honor. And just to note one thing.

On Docket Entry 1368, we filed an updated notice of intent to rely on 404(b). It does not change anything about what's included in this motion that we just discussed; it just really lays out by bullet point what you have already ruled on.

But one of the things I do want to mention is that it doesn't only talk about Solages's lack of military history as the reason for us using this lack of employment from FBI, DOS, and DOD, it's about really all of the defendants' lack of employment for that and the coconspirators as well.

THE COURT: What's the number on the amended? I don't think I tagged the amended on this one.

MS. PHENELUS: It's Docket Entry 1368, Your Honor.

THE COURT: I will take a look at 1368. But my ruling stands, unless somebody brings something else to my attention on that limitation. It doesn't sound like it's really changing anything that we've been talking about.

MS. PHENELUS: Thank you, Your Honor.

Just finally, the ruling on Intriago's 2019 export license.

THE COURT: Yes. So I am inclined to admit that. Look, I saw the expert. I understand how it plays in. I gave the expert some limitations on what he could do with that. I think all of that still stands.

I've read your papers. If you have something to add, I'll hear you on that; but I'm allowing the government -- I think that's an appropriate piece of evidence. Your briefs were pretty comprehensive on that.

MR. PEREZ: May I briefly be heard on it?

THE COURT: Sure, you can be heard on it briefly.

MR. PEREZ: Your Honor, we're talking about the 404(b) evidence on the issue of the permit in order to export the license. I want to briefly address that.

First of all, that is not a prior bad act. That is --

THE COURT: It's not a bad act at all.

MR. PEREZ: I understand.

THE COURT: It's not a bad act.

MR. PEREZ: That is just an act that occurred three years prior to that for the exportation of vests that were not even of the same type or category as the vests that were actually exported.

Our position on that is that this may become a moot issue if the Court rules on the motion to dismiss that is presently pending. But I want to point something out to the Court that was not contained in the response because this occurred to me about a week ago, and I received the transcript recently of the expert that testified at the Daubert hearing.

And he testified during cross-examination concerning the permits that were used to export to Brazil. The bulletproof vests that were sent to Brazil were not of the same specifications and were not at the same level of protection, which is actually what this is all about.

There are certain types of vests that are allowed to be exported to countries. The CFRs contain complicated regulations as to the level of protection that can be exported, say, to Brazil.

If I may approach, Your Honor?

THE COURT: Oh, I remember the testimony. I mean, I think that's proper cross-examination, right. And I think that's what it's for, right. The government I think can put this piece

of evidence in. And your argument is well taken, and it's good cross-examination for the expert; that these were different processes, that they were different countries and a different time period.

But I think the government is well within its right to use the expert to say this had been done correctly before, and you'll argue to the jury what he did before had nothing to do with this. But part of your argument is that it was so confusing that the fact that he didn't get the right license isn't evidence, right, of intent.

I think they have a right to say it's not so confusing; he did it before. And you'll say what he did before was different.

MR. PEREZ: Well, I mean ignorance of the law is never an excuse. If he ignored the law as it pertained to it, that's something that the government can argue. But the fact that he previously pulled the permit because he was exporting to a country that had completely different specifications and completely different levels of protection for that type of vest, I understand the Court's ruling, and --

THE COURT: It's good cross. I mean I'm not going to limit your cross on that at all.

MR. PEREZ: Your Honor, I have another appointment. Mr. Flores is going to sit in for me for the remaining of the hearing.

THE COURT: Not a problem.

MR. PEREZ: Thank you, Your Honor.

THE COURT: Let's go now to --

MR. MCLAUGHLIN: Your Honor, if I may be heard.

Just some clarification on the Veintemilla loan issue, are we going to be required to redact out of the bank records the source of the funds that come into his account? Or is it more we're not allowed to get into the fraudulent nature of the loans themselves?

THE COURT: No, I don't see why you would have to redact the source.

MR. MCLAUGHLIN: Okay.

MS. KUDMAN: I would ask that the references to the SBA loan money be redacted, Your Honor. I think it's inflammatory to the jury to see that he received an SBA loan and that there might be an insinuation that he improperly used those moneys, so I would ask for redaction of records.

THE COURT: No. There is nothing inflammatory about an SBA loan. They don't have to redact that from the records.

MR. MCLAUGHLIN: Very well.

MS. KUDMAN: Thank you, Your Honor.

I would ask for a limiting instruction directing the government not to highlight or point that out in any way to the jury.

THE COURT: No. Look, they're going to put their trial forward. If they highlight it in a way that I think is

inappropriate, I will hear you then; but I'm not going to do that now. They may not even --

You're allowed to do it in eight weeks. So if we're talking SBA loans, I am going to need more coffee and Diet Coke than I've already bought. I bought ten cases of Diet Coke, and it won't be enough if you do that.

MR. MCLAUGHLIN: Thank you, Judge.

THE COURT: All right.

MR. MCLAUGHLIN: I just want to be clear in terms of what the scope of it was.

And I think my understanding of what the Court's saying is, hey, you're not allowed to get into the fraudulent or nonfraudulent nature of that loan. We can still show that it was, in fact, a loan --

THE COURT: You can show that it was a loan.

MR. MCLAUGHLIN: -- and where it came from?

THE COURT: You have to show that he financed this venture. That's what you're showing. I don't have any problem with you doing that. I have a problem with you arguing that he financed it by using fraudulent funds; and the fact that he knew that those were fraudulent funds make it more likely that he knew that this was also a different crime. That's too many bridges for me on this one.

MR. MCLAUGHLIN: And on to the second point, I think it is important for us to tell the Court now the government is in the

process of finalizing what we expect to be two information pleas for two coconspirators in this case that, to the Court's statement earlier, should have been done years ago. There is a new sheriff in town here. We're taking care of things.

But I wanted to let the Court know both of those people were on our witness list in December, they are in the text messages. They are very visible to the defense in terms of who they are. We expect those pleas to be approved and filed in the next week. We will disclose anything additional that we need to. We will not use any proactive evidence we've obtained from them. We will disclose it, but we will not use it.

But I want to let the Court know both of those witnesses are going to testify how they raised the money for this coup, the discussions that were had, and Veintemilla's state of mind in terms of needing to get funds that way to fund it; so it's going to come up.

THE COURT: You said "that way"; "getting funds that way." What does that mean?

MR. MCLAUGHLIN: They're going to need to find illegitimate money to fund this because there is no legitimate money that's going to fund a coup, so it's going to come up.

THE COURT: Right. Okay. I understand that the government is going to argue that he helped fund it. If there is conversations, hey, if we don't have real money, we have to get whatever we have to get to fund this, that's one thing.

When the government wants to put evidence forward though that he knew or was involved in a separate fraud in order to fund it, that's going to be a bridge too far for me. I know you're going to get right up on the line; I understand that.

MR. MCLAUGHLIN: Okay.

THE COURT: I know we're all going to dance on this line. Don't cross it because if you cross it, I'm just going to stop you, right --

MR. MCLAUGHLIN: Understood.

THE COURT: -- unless she opens the door. I understand nobody is going to come in here --

You're not going to come in here and say because it wouldn't be the evidence as you know it that he took his money out of this 401(k), right. You're going to put on evidence where he got that money from. But once you start suggesting that that money was from a fraud he was involved in, I'm going to stop you there because I think that's a bridge too far.

First of all, I don't think you need to go there. And I think going there creates this side trial, which has a prejudicial effect and isn't necessary.

MR. MCLAUGHLIN: Completely understood, Judge. Thank you.

THE COURT: All right. Let's go to 1302 --

Donna, on that case, have them come in and stand here. I've settled a civil case while this was going on and I need to

have a small little hearing; so nobody leave once the lawyers are over here. Have them come in once they're ready, and I will take a two-minute break to settle a case.

All right. So let's talk about 1302. This is the motion in limine to preclude admission of the Haitian charging document vis-à-vis the first lady. All right. These are my thoughts, and then I'll hear from you all.

The Haitian charging document that we're speaking of -- and I think Mr. do Campo's response addressed this -- no longer exists. Poof, there is no charging document, okay, because they dismissed it. It could be that on March 10th with our luck they charge her. March 7th, you know, in the middle of the trial before closing arguments they charge her, okay. That's fine.

Let's just assume that there is no charging document. If there is no charging document, you can't bring the charging document in and you can't charge her on a document that no longer applies, and I don't even think anybody is trying to do that.

Now, that's different -- so let's talk charging document. If a charging document appears before she testifies, I'll cross that bridge when I get to it because the fact that she has been charged with the very crime that is being charged here, the defense I think can say during cross-examination, you have an interest in testifying against these people because if these guys are guilty, you're not. And I think that's -- I mean I obviously horrifically oversimplified that line. But that's one line of

cross-examination, right; that she wants to cast blame on other people.

That line of questioning, whether or not there is a charging document, if they have information -- and I don't know that they do, but we'll get to that because they can't just randomly say, oh, you were involved in it, right, without evidence of that -- but if they have some reason to believe or they have evidence to suggest or they can in good faith make the argument that she has a reason, a bias against these defendants because it protects her, why would they not be allowed to cross-examine her on that? Who has the first lady? You do, Mr. Wu.

MR. WU: Hi, Your Honor. So the reason for that is that bias impeachment, which is what they're talking about, really only applies when the government has offered the person some promise or they have an expectation of some kind of benefit from us related to their pending charges. And those were the cases that we cite in our reply. Specifically on page 2, they were a number of binding precedents cited from the old Fifth Circuit or the Eleventh Circuit that say this exactly.

So I think the case most on point was the Hawkins case that I cited. It's one where there were two government witnesses, they had foreign arrests. And the court's analysis was if there is no evidence that the government assisted them in any way in connection with their foreign charges and the defense counsel presented no evidence to the contrary, that whole line of

cross-examination got precluded.

THE COURT: So that's the line of cross-examination in which you say you've been indicted in Haiti. And isn't it true that you believe that if you give the government good testimony here, they're going to speak to the Haitian government and you're going to get a break.

MR. WU: Exactly.

THE COURT: They will not be allowed to cross-examine her on that if, A, there is no Haitian charging document; and, B, the government -- we're not there yet -- but the government represents that it has no intention and no communication with the Haitian government. I think the law on that, I agree with you, is pretty well settled.

Forget that there is a charging document now. There is no charging document, but the defense has evidence that she was involved -- I don't know that they do, but let's work with me here -- but if they have evidence that she was involved, why would they not be able to cross-examine her on her motive to provide false testimony because it would put light on other people in the conspiracy and not her?

MR. WU: Oh, absolutely. So that's the distinction I wanted to make. And that's the carve-out we made in our initial motion. So Footnote 2 on page 4 of the initial motion, that's what I was trying to get at. If they could independently show that she is guilty or even any suspicion of her guilt, of course

they can cross-examine her on that.

But they don't need to use and cannot use the fact that the Haitians charged her with a crime to get there.

THE COURT: Well, first of all, there is no Haitian charge; so right now they can't do it at all because that doesn't exist.

Assuming they charge her, then I will have to cross that bridge. If they charge her but the government gets up and says we have no agreement with the government of Haiti, this will mean nothing, they're going to argue that that's ridiculous, and of course it matters. I will hear them then on it; but I'm not going to hear anybody on something that hasn't happened.

MR. WU: Makes sense.

THE COURT: As we're sitting here, she has no charge. But if they can show me, and they might have to do it ex parte, that bridge I can cross at trial because that won't be that long of a bridge to cross. If they can show me, look, we have enough here that we want to be able to ask her about other bias, and I have to tell you I think they'll have it because she's been charged in the past. And even the government has said in its papers that they expect she will be charged, right; so there is some reason that you've said that in the public record that you expect that there is a charging decision coming and that she is likely to be charged again.

Again, them mentioning the Haitian government has charged

11:33AM her, I have issues with that. But them arguing that she has reason to cast doubt or cast blame on other people, I think they're probably going to be able to get there.

11:34AM MR. WU: And we're not even moving to preclude that, so.

11:34AM THE COURT: Are they here?

11:34AM THE COURTROOM DEPUTY: Yes, Judge.

11:34AM THE COURT: Give me one minute.

11:34AM (Recess at 11:34 a.m.)

11:39AM (Back on the record at 11:39 a.m.)

11:39AM THE COURT: So let me hear from the defense on this issue. It seems to me that the old Haitian charging document is not at issue. If there is a new one, you will let me know. And it sounds like the government is not objecting to you exploring with her culpability in the offense.

11:39AM MR. Do CAMPO: Your Honor, while we largely agree with everything that the Court has said, it's why we think that these motions are largely premature. I will give you one example.

11:39AM I don't know when she sat down and gave the government the statement that we anticipate will be the subject of her testimony. It's very likely that at the time that she gave that statement, she was under the charging document since the indictment was only dismissed, I believe in September. So it's a very factually intensive inquiry that I think the Court needs to hear what she has to say before whether that indictment that at the time she spoke with the government and made her statement was

still pending over her head could potentially be a factor.

But for the most part what we are talking about is what the Court has said. Obviously, there is a lot of speculation and a lot of statements that she has made and others have made in Haiti that could potentially implicate her in this assassination. And to the extension that we have a good-faith basis to ask those questions, we should be permitted.

I can't tell the Court whether the charging document might find its way to be relevant. Obviously, it's been flagged and, you know, I don't think anyone would blurt it out without bringing it to the Court's attention. But I could certainly see a situation where it could become relevant, depending on what her testimony is. Obviously if there is a new charging document, that's a whole other ball of wax, and we'll cross that bridge when we get to it.

THE COURT: All right. With respect to the old charging document, which is really the substance or the meat of the government's motion, I am going to grant that motion without prejudice to the defense asking her about it if her testimony gives you good cause to do so.

If anybody mentions the word Haitian indictment, charging document without letting me know first, it will be a bad day for everybody; but mostly people on the defense side. I'll let the government free on that one. No, like, that's something obviously you're going to tell me about; any mention of any kind of charging

document.

And like I said, she might say things that you think is credible and I might agree with you; but you're not doing that unless you come sidebar or you let me know in the morning or the afternoon before. All right.

MR. FRIEDMAN: Your Honor, real quick?

THE COURT: Yes.

MR. FRIEDMAN: Because the indictment was dismissed in Haiti but it's been publicly acknowledged and even the government in their pleadings have referenced and alluded to this investigation, which, by the way, the Haitian government said they were going to collaborate with the United States and Canada, are we prohibited from -- if Ms. Moise knows that there is a pending investigation in which the government -- the United States is now being relied upon by the Haitian officials, because they're going to file something -- they're definitely going to file something from what we all know, isn't that something that could be asked of the witness; about her understanding of a pending investigation for potential charges in Haiti?

THE COURT: Yes, I think you can ask that. You can't say that she was previously charged or who was previously charged or show her the previous charging document; that I am not going to allow. This is what I think is the same part and parcel of what I was saying before.

You can cross-examine her on the fact that the case

continues to be investigated; that people in Haiti could be charged; that she might be charged one day in Haiti. I think that's all fair game.

Now, once you say isn't it true that you've already been charged once, no, you're not doing that unless you -- look, you might convince me. We'll see what she says on direct. You might convince me, but I have to see what she says on direct.

MR. FRIEDMAN: Thank you.

THE COURT: Let me take another interruption for trial mechanics.

These defense table microphones drive everybody crazy. Because there are so many of you on this side and you all talk to each each other and your clients, which of course you're entitled to do, and it picks up a bunch of noise for Vernita. It picks up sometimes for the interpreters. Sometimes I can hear you all. And so I think what we're going to do is we're going to talk to our IT folks, I think what might happen to the defense is you will still have microphones there; but you won't be very close to them at all. And you might each just have a lapel microphone; so that if you're getting up to say something, you will just turn on the lapel. Because if I don't do that, then you're all going to be, like, fighting over the microphone. And when you leave those microphones there, we hear a lot. It's not a question of, like, you're saying anything that is going to affect the trial; it's for Vernita's purposes, it's annoying; and even I'm hearing it a lot

11:44AM sometimes.

11:44AM And so there's a lot of you, and I get it, you have to talk to each other, but you're probably going to be using lapel pins; so bear that in mind. Which I think will be fine because when we start arguing motions or when things happen, I expect to hear from one of you; at least a team, and maybe just one of you, period. Like I said, once somebody gets up and makes an argument, you've all adopted it unless I hear otherwise. All right. So we will work on the lapel pins. Hopefully we will have an answer on that soon.

11:45AM All right. I do want to take the motion at 1303, 1305, 1306, 1307, and 1309. These are all motions in limine for which no defense response was filed. I do not think that that means that they should be granted. I'm not granting these motions. They're all going to be denied; obviously, without prejudice.

11:45AM So, for example, the first motion at 1303 is the motion to preclude questioning or argument concerning charging decisions. I'm not letting the defense get into charging decisions; but if you have a cooperator, they're going to get into the agreement. They can do that. That is what it is. The jury is going to be able to figure out what these charges mean. They'll figure out that -- that's just trials. But I'm not going to preclude them from questioning them or arguing it because when I start doing that, then they're wondering what I've precluded and how close -- can they do this or that. I don't want to be limiting their

defense. I don't think I need to do that. They're officers of the Court. If they make an improper argument, I will sustain an objection. So 1303 is denied without prejudice, of course, to the government objecting if any improper argument is made.

The same thing goes for 1305. That's just impeachment of a witness. Again, another small public service announcement with respect to trial management. I am going to get some of the exhibits, I assume; some exhibit books, right. Of course the 302s are not in there; like, those are not exhibits. Okay. I need those though, and you can give them to me the night before or the morning of.

I can't have the defense -- they can impeach with a 302, right. They may not be able to show it, they may not be able to complete an impeachment with a 302; but if they're trying to impeach with a 302, they can do some of that. But then I'm sitting here and I have no idea whether what they're doing is fair or not.

So to the extent you have cooperators or you have 302s, you can give those to me. I'm not going to look at them unless, you know, Mr. do Campo or Ms. Kudman starts doing something with a witness, then I typically like to see the 302 and see what's really happening. So if you can make those available to me, I would really appreciate it.

MR. MCLAUGHLIN: What we would plan to do, Judge, is the exhibits are going to come to the Court on a hard drive. We can

11:47AM do the same thing for the 302s then break them out by witness; so the folder will have the witness and you will see the 302s for each witness. So all you'll have to do is plug it in, click, there you have it.

11:48AM THE COURT: All right. So if you do that because I'm a Mac person and what I have up here is a Mac, you just have to give that to me. It doesn't matter if you even give it to me the first day of the trial. I just need the IT folks and you to know that I use a Mac up here.

11:48AM MR. MCLAUGHLIN: Certainly.

11:48AM THE COURT: I have different ports. By the way, I know nothing other than I use a Mac; so my technological skills are zero, but I do know I use a Mac. So make sure that whatever you give me I can plug into; because I don't want to be blind with a 302. I don't expect any of the defense lawyers to improperly use it, but I don't want to be in the dark either; so make sure I have those.

11:48AM MR. MCLAUGHLIN: We will make sure both hard drives are Mac compatible.

11:48AM THE COURT: Thank you. So I will deny that without prejudice.

11:48AM 1306 is the jury nullification. That's denied without prejudice. Let me just say though on this one, the defense at some point I am sure it will come up that President Moise was, you know, not the pillar of democratic rule, right. That's part of

their argument. Part of their argument is that he was improperly at the presidential palace. That's not what this case is about, but that's going to come up. That's not nullification. So I'm going to deny it without prejudice. Some of that is going to be fair game.

This will not be a trial on, you know, his presidential time, right; we're not doing that. But some of that is going to come out and I'm going to let it come out because that's part of their defense, right; that there was a warrant out for him, and some of this stuff is going to come out. I don't think that's nullification. I'm going to be listening carefully, right. Because if the argument is, you know, this was a good thing that happened, no, you're not arguing that. I can't imagine any of these lawyers are going to do that.

But some of the this wasn't a hero of the Haitian people -- and by the way, I'm not saying that that's true or not, I'm just saying that's going to be their argument -- to the extent that some of that comes out, that is their defense; and whether it's true or not is not for this jury. But to the extent some of that is going to come out, that's going to come out. I will not have an issue with it because that's part of their defense.

1307, I'm sure Mr. do Campo got a chuckle when he saw this because I have not given him classified information. I'm not going to be mentioning that any time soon, so that motion is denied.

And 1309, this is the admission of self-serving out of court statements. Again, I have to deny that now. Obviously they can't introduce their own self-serving statements. I mean, that's just the rules of evidence. That being said, I can envision all sorts of cross-examination where some of that comes out, and I will allow it, right. If they have a cooperator who said X and that's not what they say their client said or their client also said Y, they're going to be permitted to cross-examine on that. That's basic cross-examination; so I will deny it without prejudice. Just be aware that some of it I think, by the way, I think does come out. Those are game day decisions. All right. So those are my rulings on those. So that I will deny without prejudice to the government objecting.

All right. Let's go to Government Exhibit 1333, the nullification evidence and the argument concerning Maduro. Again, I don't think the government or the defense is going to get up and say, oh, look, this is exactly what happened with Maduro. I don't think the word Maduro is going to come out of any of their mouths; and if it is, someone let me know before you say it.

That being said, hey, if you were watching the news January 3rd, there might be some jurors who are sitting there thinking maybe not so farfetched. I can't control that. I'm not going to tell the jury to disregard the American action in Venezuela. I'm not going there. They could have also thought that was plausible given what the United States did with Noriega,

I don't know.

The jury is going to be instructed that they are to make a decision based on the evidence they heard in this courtroom and put everything else out. That's the instruction they're going to get, and so I think that's sufficient.

Were any members of the defense planning to argue or present evidence with respect to U.S. v. Maduro? I see no one saying yes. I didn't think they were going to go there. So this motion is going to be granted. Again, I understand things change. It's granted without prejudice. If the defense thinks that it somehow became relevant, you will let me know before you mention Maduro; but otherwise, it's granted on that one.

All right. Let's go to 1304. This is the motion to preclude evidence concerning consequences of conviction. This will be denied without prejudice. Again, I can't just grant it because the issue of a conviction, the issue of punishment, some of that seeps out with the cooperators, and so they're not going to be limited from exploring that with cooperators. So 1304 is denied without prejudice.

Look, these defense lawyers all know there is that one question too many, right; or that one insinuation at closing. I'll sustain those objections if they make it; but they too get to go up to the line a few times; they just can't cross it.

All right. Let's look at 1308. This is the news articles. And there was even, I think, a reply on this. I had to

read this one a couple of times. I don't think that Mr. do Campo's response was suggesting that there was going to be some evidentiary issue with the expert. I think he was just making a point that sometimes experts get to use news articles; but other than that, I'm going to deny this without prejudice.

If someone tries to introduce a news article, I'll take it up when they try to do that. Again, I think there's lots of other things to talk about other than newspaper articles, but I don't know. I understand we had the issue of a report in a motion to suppress. Again, that was a motion to suppress. I don't expect to see that kind of stuff at trial.

All right. That leaves me with the issue of the public authority defense and entrapment, which means that I am a lot more efficient than I thought I was going to be. I think I will be able to do this, and we're going to get to the jury issues because I have about 45 minutes. All right.

Let's talk about the public authority defense for a minute. And I'm hoping I can rule on this one today, but this one I might have to rule on at the status. This is what I don't understand from the government's position. Two of the defendants noticed the public authority defense. The government did not, you know, cross notice any kind of discovery on that.

Whether or not I give them a jury instruction on that, I don't know that they'll ever get there. I don't know, but I don't know what their defense is. I mean I don't know what they're

going to put on and if they put on a case. I'm certainly not deciding now whether I'm going to instruct the jury, right.

It seems to me that the government wants me to go a step further and say now that either because their notices are deficient or based on the government's view of the evidence they shouldn't be allowed to cross-examine, argue, question or cross-examine witnesses on this issue that they believed, correctly or incorrectly, that the government of the United States had some involvement or had somehow had authorized this.

So, one, I want to hear some argument as to why the deficient notice, like the notice issue goes to limitation because I don't think that's what the law is. I do think if they have no information, they can't make a public authority -- I mean you can never make any defense if you don't have some good faith or colorable argument.

I am trying to understand what limitation exactly the government wants from me on this based on kind of where we're at. So who has this one on behalf of the government?

Briggs, you're going to lose that spot in that chair unless they give you something else to do.

MR. BRIGGS: You're right, Your Honor.

THE COURT: I mean that's prime real estate, that chair; unless you're a buffer between Wu and McLaughlin, which I don't know what goes on; maybe.

Let me hear from you, counsel.

MS. ELLENRIEDER: So as it relates to deficient notice under Rule 12.3, as well as the colorable argument, so the case law is clear that a public authority affirmative defense has two required components; one is the notice, which is a procedural component. And we have two defendants who filed at least some notice.

THE COURT: Let me just stop you there.

What was deficient about their notice? And why is that deficiency sufficient to limit the defense?

MS. ELLENRIEDER: Our position is more focused on the substantive common law requirements.

THE COURT: Okay.

MS. ELLENRIEDER: They have made their notice, we are ready to effectively move on and argue as it relates to. And case law as relates to the common law hurdle is clear that they need to make a prima facie case that establishes evidence as it relates to each element of that affirmative defense, and our position is that they have not done that.

THE COURT: All right. So do they have to do that now in order to present any evidence? We're not at the jury charge. So I agree with you they would have to do it to get get the jury charge.

But are you seeking that I preclude them now from attempting any of that evidence because you don't believe that they will be able to actually have sufficient evidence during the

11:58AM trial? I'm really asking, like, what do you want me to do.

11:58AM MS. ELLENRIEDER: Yes, to preclude them from making an affirmative defense case at the trial. The Eleventh Circuit cases that we cite go to that. I mean there are cases that discuss, you know, whether at the end of the case, of the trial, whether for jury instructions, but there are a lot of cases that preclude them from introducing those line of arguments during the pretrial stage.

11:59AM And so the Eleventh Circuit cases have said if the defendants have failed to make an accurate pretrial proffer of proof and a viable theory of defense that they should not be allowed to raise that at trial.

11:59AM And there is also the Supreme Court decision along that line that if the evidence is insufficient as a matter of law to support a defense, the court should exclude that.

11:59AM THE COURT: All right. But how do I get there when, look, they filed their notice, they cited, you know, they have included in that notice FBI agents, right, agents of the United States that they believe they had conversations with. The government hasn't produced anything, hasn't challenged that. What do I do?

12:00PM Like literally mechanically how do I get to a ruling? Because in those other cases, you know, if a CI gets up here and says the agent told me to do it and there is no reason to think that, no basis for that, the agent denies that -- first of all,

again I'm oversimplifying -- but I could understand then saying you don't get to just say that, right. The defense can't just argue that to the jury; there is no evidence of that.

But here they've noticed specific things. The government really hasn't challenged the substance of that notice. I'm not telling you they're going to be able to get a jury instruction; I'm not there yet. I don't understand what my basis is on this record to preclude a defense.

MS. ELLENRIEDER: So I think there are two bases.

First, is that none of the government officials that they have noticed had actual authority to authorize the criminal acts charged in this case. And so as a matter of law, these two affirmative defenses fail.

THE COURT: Okay.

MS. ELLENRIEDER: And then, second, they have not provided, you know, pretrial proffer to meet the elements. The standard is a prima facie case, and our position is they have not made that.

So for example, for the elements of the public authority defense, in addition to that the law enforcement officer must have had actual authority to authorize those crimes, one, it must be a U.S. official. It can't be a Haitian official. It can't be a coconspirator or an informant who represented that they had that authority. It has to be a particular criminal act that has been authorized.

12:02PM In the defense's response filing, their position is that they don't have to acknowledge that that the defendants committed the criminal act in order to assert the affirmative defense, but the Eleventh Circuit case law is explicit that the affirmative defense is the defendant saying that he knowingly committed the crimes but thought he had the authority from the government.

So there are many elements of the public authority defense that the defendants have not raised any prima facie proffer for.

THE COURT: But part of their defense -- let's just take the actual defense off the table for a minute. Part of their defense is that there were other coconspirators involved here who did have contact with the American government; that led them to believe, maybe incorrectly, but that led them to believe that what they were doing was in fact authorized. If they don't get the instruction, the jury is not going to be able to find that that's a basis to excuse their conduct.

But what say you to their argument, which is -- this sort of goes to the reasonable doubt, that there were all these agents in the mix; that there were agents that they were talking to? If I preclude it and just say you can't even mention that, am I going too far?

MS. ELLENRIEDER: So the government distinguishes between the affirmative defenses, which are narrow defenses that say I got specific permission to conduct that specific act, and that law

12:03PM enforcement officer was authorized to give me that. That is different than evidence that goes to their mens rea generally.

12:03PM And so the government is not contesting that they aren't allowed, you know, to present evidence as it relates to their general state of mind.

12:03PM THE COURT: That's the same evidence.

12:04PM MS. ELLENRIEDER: But the difference is they're not -- it is one thing to say I misunderstood or I was deceived by my coconspirators. That is different than the very narrowly tailored affirmative defense that this specific law enforcement officer authorized me to conduct that specific act.

12:04PM THE COURT: But why wouldn't I just say to them, look, you won't in opening statements say, ladies and gentlemen, when it comes to closing arguments, you're going to see that we met our burden because, you know, this was authorized by the American government. I'm going to tell them they can't do that in opening.

12:04PM But it's the same evidence, right? You agree that all of this evidence also goes to mens rea. When I'm done at the jury charge, you're pretty confident -- and from what I've seen, you're probably going to be right on that -- that's probably not going to amount to me instructing this jury on these affirmative defenses.

12:04PM But that's different. That's why I'm saying it is not a case where I can limit that evidence because it does go to their mens rea; so I think they get to bring it in. They may not get a public authority instruction, but why isn't it just a better

12:05PM practice for me to say I'm not limiting your evidence, you will not mention these affirmative defenses in opening, right. We'll get to that, maybe you want to, so we'll get to that in a minute, but let's assume they say, look, we're not going to get to that. We're not going to mention it in opening statement. We want to present this evidence, and we'll see where the evidence falls at the jury conference, the jury charge.

12:05PM MS. ELLENRIEDER: The government agrees that as it relates to opening statement, it would be -- they should not be able to say I had the authority of the U.S. government to commit these offenses.

12:05PM As it relates to evidence that is introduced during the trial, if it is evidence that goes to their mens rea, that seems to be appropriate. But any, I guess, presentation that shows that the government officially did approve this conduct, that is where the government objects, and the government can object as well during trial.

12:06PM THE COURT: Right. Let me hear from Mr. Intriago, and then I will hear from Mr. Solages on this; since you're the two that have put the notice up.

12:06PM MR. FLORES: Your Honor, I think the short answer is that we can present evidence that approaches the public authority defense to demonstrate our good-faith defense, and that's our position. I think it's a wait-and-see proposition at this point.

12:06PM THE COURT: Do you agree that at least for opening

statement, you're not going to make the argument that they had the authority of the United States and that's their affirmative defense?

MR. FLORES: Yes, Your Honor.

THE COURT: Then let me hear from Mr. Solages's counsel.

MR. FRIEDMAN: Yes, Judge.

Judge, with regard to the second question that you asked Mr. Flores, I think it may be appropriate in opening. The Court tells me if I'm improper. But the defense is that Mr. Solages believed that he was operating with the U.S. government behind him. That I think is an appropriate argument to the jury in opening statement, but.

THE COURT: I'm okay with that. That's different than saying --

I think it's different than telling the jury you will find that the law is going to require that he be not guilty because, you know, even though he did this, he was authorized by the United States.

MR. FRIEDMAN: No. I got it. That's fine, Judge.

THE COURT: Okay.

MR. FRIEDMAN: But again I do agree, I think at this juncture to just say public authority does not apply is premature. I think we met the notice provisions. We followed the rule to its T. We listed the name of people we believe were working for the government. We listed a little narrative, so I think the notice

is fine.

I think really at the end of the case when we have the charge conference, we'll really be able to make those arguments if we feel that it does apply; we may not. We may say we're not talking the route of the public authority defense.

THE COURT: So I'm going to deny the motion in limine, without prejudice to the government objecting should the defense in opening or otherwise argue to the jury before the charge conference that the defendants' conduct is excused either from a public authority defense or an entrapment by estoppel defense. So there is that limitation as to what they can and can't argue in opening.

I think you just heard, Mr. Friedman. I think you understand exactly where the line is. I don't have an issue with that argument. The government shouldn't have an issue with that argument. They're going to present the evidence they present. I too am skeptical that you will get the instruction, but I don't know. That's what trials are for.

MR. FRIEDMAN: Judge, one other issue.

THE COURT: Yes.

MR. FRIEDMAN: In our public authority notice we listed Haitian officials, and obviously we have included in one of our filings in a footnote in, I guess, one of the subcommittee reports that that is also something -- public authority I believe should apply to a foreign official, especially if they're in a foreign

country, so we listed the names of those officials.

So I know you're doubtful of the public authority defense here in the United States, but I just want the Court to understand that the foreign nature of public authority I think is alive and still well and something that could be argued at the end of the case here.

THE COURT: Well, we'll see what evidence you have of that in the record, right.

MR. FRIEDMAN: Yes.

THE COURT: It will depend on the evidence. Okay. All right.

Christina, do you mind handing everybody my jury thing. By the way, just for the record then, I will issue the order on 1360 on the deposition. We will issue that today; so that one is still pending.

And then the motion at 2883 with the summary exhibits, obviously that's still pending, the evidentiary hearing. The autopsy photos you're going to bring me at the status.

The self-authenticating records as well, you will all let me know. That's Docket Entry No. 1313 and Docket Entry No. 1314, the defense by no later than the status conference will let me know if they object to the self-authenticating documents.

All right. So let's talk about jury selection. Let me tell you what is going on with jury selection. Both sides submitted proposed voir dire. I'm not using it, but it was still

helpful. Let me tell you what's already happening. So our jury office has already been sending out the notices, okay. Can you grab me one as well.

So when we start picking this jury on March 9th, we're hoping to have about 200 jurors that are available who have already said -- we're not going to need 200, but we think we might get as many as 200 people who have said I'm good with ten weeks, all right; I'm good with ten weeks. That notice that went out to them has three days that we won't sit on the Easter week; so Good Thursday, Good Friday, and Easter Monday. We won't be sitting the Thursday and Friday before Easter or the Monday after Easter. It also happens to be Passover, and so we're going to take those days off. Those are the first week in April, so it will be a nice break after having been together for a month for everybody to take a long breath and a deep breath. I'm not particularly religious, but I typically don't make people work on Good Friday the way I wouldn't make anybody work on Yom Kippur either, so we're going to take that Friday off.

We're going to take the Thursday off as well. Lots of schools are off that week because I think that's the first night of Passover. Then Easter Monday, lots of folks close. People want to go away, that kind of thing; so I am going to give the jury that break.

Other than that, we are going to sit five days, but this is how -- Mr. do Campo, stay with me here. This is what I'm going

to do. Monday, Wednesday, and Friday we're going to sit from 9:00 to 4:30. We're going to break at 4:30, okay. That's usually enough for the jury. The afternoon is rough, people, for jurors, okay. So we take a midmorning break that's 15 minutes. The afternoon break is going to be about 20. We're going to take a little longer for the afternoon, okay, but we're going to break at 4:30.

That is not license for you all to have me here till 6:00 o'clock every night arguing about things that you have had two years to bring to my attention; but it mostly helps the jury get on the train and get a little bit of a head start in traffic; not that it matters in Miami anymore because there's always traffic, but I think juries appreciate a little shortened day, right.

Then Tuesdays and Thursdays we're only sitting from 9:00 to 2:00. And what will happen is from 9:00 to 2:00 we will have a morning break, and we will just take a 30-minute lunch, and we're just going to break at 2:00. So from a time perspective, it gives me a little -- like an hour more a week than if I had taken one day off. The problem with taking the one day off is, people, it's not a day off for me. I will have six sentencings either way. I'm either splitting them up between two days or I'm doing them all in one day.

But my thinking is you get a real break in the middle of trial, you get those afternoons off, two afternoons. And if this

12:14PM really gets out of control and you all can't finish this in eight to ten weeks, it's a lot easier for me to tell the jury, hey, this Thursday you have to be here all day; than to all of a sudden in the middle of trial tell them you have to start coming in on Fridays. It will make them less angry, mostly at me, if I make them stay a few afternoons a little later than 2:00 than if I make them come in a day. So that's how I'm structuring the trial day.

So let's get back to jury selection. Jury selection is going to be in Judge Altonaga's courtroom because I can seat more prospective jurors there. I am hoping to pick a jury in one day. Maybe that's aggressive. Maybe it will take two, but I'm hoping that it won't be more than two days, okay. We're going to use paddles, juror numbers. It will be easier for selection to use numbers than to use names, so we will be using these handy-dandy little paddles.

The defense, I'm giving you five additional strikes; so you will have a total of 15 peremptories. The government gets two more. So the government will get eight; you all will get 15.

You all are going to have to meet and figure out how you want to use those. But giving you 15, right, if you want to each exercise three, then you each have three. If you want to share them, you can share them. You all are going to have to figure out how you're going to do that, but you're going to get 15. When it comes to the peremptories, I am going to be looking -- you all are going to have to nominate a team captain. One of you is going to

exercise that peremptory on behalf of the defense; but you have 15, okay.

I will take a considerable break before we, you know, exercise peremptories. For you all to sit together and figure that out is going to take you a minute, so we'll take a long break. We're not going to take a two-hour break, but we will probably take a 45-minute break or maybe even an hour, right, before you exercise peremptories. So the government gets eight; the defense gets 15.

There is no written jury questionnaire that they're going to get, all right. What's going to happen is, and this is just a proposal, so you all now can go back and complain and think about, you know, ways that you want to challenge me on this, that's why I'm giving this to you now, we will also do this on the status, okay, I bring everybody in, I introduce myself, I introduce, you know, the great wonders of our Constitution, the wonderful thing it is to get a summons for a ten-week trial, you know, I go through all that, I hurl out the flag, I introduce everybody, court personnel, all that kind of stuff, then I introduce the case, okay. And I mean just introduction; Government are you ready? Defense, are you ready? Right. You all introduce yourselves at that time and everyone on your trial teams.

The government gave me, like, a six-page list of witnesses. That's not happening. You're not using all of that. I mean witnesses is one thing; but honestly one of the questions I

ask is: Do any of you know anybody at the FBI," and everybody says no, we don't need to hear the names of 72 case agents. So exercise some discretion on the names that you're going to tell the jury they're going to hear.

And the defense will do the same thing. You'll all introduce yourselves. You can each announce names of people that, you know, may be witnesses or may be names that will be familiar to them. The description of the case is sort of a hodgepodge. I think what the government gave me, it might have some of what the defense gave me. Please look at that. I'm not wedded to that, but I have to give them a description of the case.

And then of course this is where I -- so that actually happens first, and then you introduce yourselves. Then I am going to go through the trial schedule. Remember that all of these people have already said they can serve ten weeks; but I still need to give them a moment for that to sink in, right. So I'm just going to announce the schedule, and I'm going to ask if that presents any particular problem for people. And I'm going to tell them you've already told us that you're available.

I usually tell jurors please don't tell me you have a dentist appointment; please don't tell me you have small children you have to pick up from school. Like, that's already -- we're already done with all that. Presumably everybody here has already said they can serve. All right.

Then when we get to the selection, I ask these general

12:19PM cases of everybody, right. So what I do is I say: This case was primarily investigated by the FBI. Does anybody have an issue with that? And then we'll do paddles: I have an issue. 50 people will have an issue. I'm just going to write down the number. We're not going to go talk to everybody about their issues with the FBI; we're just going to have the number.

12:19PM And this is the series of questions that I ask that are the generic questions that I'm going to ask of everybody and we're going to get a paddle. I only pick six; you all had 50. You're going to look at those six, you're going to go back to your 50, and you're going to tell me: Hey, Judge, you didn't ask this one. You really should ask this one. And you will convince me at the status whether or not there are more general questions like that that I should ask. I'm open to why I was too harsh with these questions. You'll tell me at the status: Judge, you should really still ask this question, okay.

12:19PM And then what happens is there's the general principles of law, right; so then I go to the general principles of law. Does anybody have an issue with the presumption of innocence? We get the paddles up. All right. Listen, there's always those two jurors that have a problem with everything. They have a problem with the government, they have a problem with the defense, they have problem with the Constitution, fine. I am not going to spend 20 minutes trying to convince these people this is the greatest country in the world, okay. I'm not doing that. We're not

12:20PM wasting time. So that's the series of questions I will have there. The government warranted some of these, you all wanted some of these. If I have missed some, you will let me know at the status.

12:20PM And then what I do is the individual questionnaire, all right. So I just put it in this document for you all to have it. The way it works is Juror No. 1 stands up and says: Good morning. My name is Jackie Becerra. I'm 55 years old. I was born in Hialeah. I currently live in the northern part of the district. I went to law school, right. They do this. It's always a little rough for the first few; but by the time you get to Juror 15 they're just rattling it off, okay.

12:21PM I engage with the jury here, too. So if a juror says I'm married but doesn't tell me what the husband does, I'm like: Oh, you didn't mention anything about your husband. What does your 22-year-old do? Oh, you mentioned that you served in three juries, but you didn't tell me if you were the foreperson, right. Like I will engage with some jurors more than others, depending on their answer. I am not engaging with someone who has a problem with everything. We will go quickly with that person and move along because we're not wasting time. We're not rehabilitating the person that says I really just don't think I could be fair to defendants who are accused of these kinds of crimes. Yes, there are people that are just going to say that to get out of it; and then there are people that are going to say that and 50 other

things to get out of it. I'm not poisoning the whole pool with those people. We're going to move it along. I think we will have enough jurors.

So we need by my numbers 39 because we're going to have four alternates. If anybody thinks we should have more, let me know at the status, but I think four is enough. You've got eight challenges; you've got 15. When I get to 39 people for which there are no causes, we're ready to go. So what I'm going to do is in tranches of 40. So we're going to go through this exercise of people telling me their life story, right. We're going to stop at 40 and we're going to take a break. You all are going to tell me: Listen, Judge, of those 40 you missed that Juror No. 22 said their son was arrested. Do you mind voir diring them a little bit more, okay, and I will do that if I think I need to.

But then we will exercise cause challenges in tranches because if to those 40 I've lost 20, right, for cause, then I know I have to at least do 20 more. And we'll just keep doing them in chunks like that till I've got 39 for which no cause challenges could lie. We will take a break, you all will figure out what your peremptories are going to be, and then we will come back and exercise.

In my courtroom the government exercises as to each person first every time. You've got the burden, so I always go first to the government, then the defense. No backstricking. All right. I'm hopeful we can do it in a day because since I can use

Altonaga's courtroom, right, I have a hundred people I can put in the courtroom. Here I can only put in 70. So if I'm wrong and we go through the whole hundred and I still don't have 40, then we have to do the whole thing again to the next group of a hundred.

But I think using her courtroom, like I said, helps me with that extra. And I think -- and you never know what's going to happen. I can't imagine that out of a hundred people I'm going to lose 60 to cause, but I might; and if I do, I have the next hundred. It is what it is. But I think we'll be fine. I think we'll be fine.

And I think I can get it done in a day. It might mean that we're done at 5:00 or we're done at 5:30. We have to take a lunch break because I can't have all these people without lunch, so we will have to take a lunch break. I usually let people use the bathrooms while, you know, if Juror No. 40 needs to use bathroom and, Juror No. 97 needs to use the bathroom, he doesn't need to hear Juror No. 45 drone on about his kids's birthday party, right. So I let people kind of use the bathroom so that we're not constantly taking breaks for that.

During trial the reason these breaks in the afternoon are going to be a little longer, I can't start earlier than 9:00 because 16 people cannot make it to downtown Miami on time; lawyers do, but that's tough for the jury. The jurors, I only have two juror bathrooms, and I will not limit you on the floor. I can't have all of you using the bathrooms on another floor. So

12:25PM I'm keeping the jury here. The jury has my beautiful hallway that lets them look outside, but they only have two bathrooms; so they're somewhat limited there, right. But you all will be allowed to use the floor because there's tons of you. I can't have you getting in the elevator, so you can use the floor here and you can be free to use the floor. The jurors should not be milling about in the public area of this floor. So that's jury selection.

12:25PM Take this home. I didn't file this. Just take this home. Think about it. Obviously, you know, I'm going to hear again from the government if there are questions that you think are appropriate, I'm open ears on more questions. I'm not opposed to it. You all won't be voir diring anybody, so.

12:25PM Yes, sir.

12:25PM MR. DRAY: Good morning, Your Honor. Judge, so they're going to get a written questionnaire with 17 questions, but they're just going to give us the answer. We're not going to get a copy?

12:25PM THE COURT: Correct. Because the written questionnaires, look, they're difficult to manage. They're difficult even to understand people's handwriting. So I voir dire them with those 17 questions, right. So the way it works, and this is how I've been picking juries for two years now, they just basically out loud give you the answer. You know some people miss a question or sometimes you get the random I have no religious issue, well,

that's because there's a question. No morals, that doesn't mean they have no morals; that just means they're answering Question 14, and that's the way we do it.

I engage with the jurors quite a bit. If you see that I'm not engaging somebody who, you know, all they do is watch conspiracy podcasts and they're suspicious of the Constitution and they hate the FBI, I'm not going to rehabilitate that person. Come on. We have a hundred people; I'm not going to do that. And I also don't need that person, like I said, trying to corrupt the whole pool.

That being said, on language, all right, if you have an accent, you can serve on this jury. If it's not your first language, you can serve on this jury. If you get up and you say: It's not my first language. I'm a little uncomfortable, but I've understood everything they've said, they can serve on this jury, right. If they have been in this country for 20 years, have a master's degree from FIU, I could care less what they tell me about their language abilities; they're going to sit on this jury, all right.

Now, if you've been in this country for 20 years, you got here when you were 50, you live in Hialeah, and you're a homemaker, okay, that's different. So on language things, I'm asking about that. I'm absolutely getting into it because that's -- everybody wants to get out because, you know, their English isn't that perfect. Yeah, neither is mine, okay.

So I do explore that a bit, but do not think that I'm automatically getting rid of those jurors. You know every jury pool has a significant amount of Haitian Americans from our community. I'm not getting rid of all the Haitian American jurors, right. But we do have Haitian American jurors that really struggle with the language, the same way we have Hispanic jurors that do; so I will probe that. But the fact that English is your second language, that is not going to be a basis for cause.

And you will see that with some people I explore it more than others because some people legitimately struggle with this, and yes they didn't get out of jury duty, they said they could be here for ten weeks, but now they're here, and when I probe and I say: What did you tell me your son did? And they look at me with a blank stare, maybe they're faking it, I don't know. But if they do that, then of course I am going to strike them. But I expect that out of 16 jurors we have have plenty of naturalized citizens for whom English is not their first language and that should be fine. That should be fine.

So that's just a very big overview of jury selection. Think about it. Talk about it amongst yourselves. And at the status, again, if you want me to add or you think I should be asking other questions or not asking some, I'm all ears. We've got time. But I think we'll have a jury -- I think we'll have it the first day; but if not, we're prepared to go the second day.

The jury office is hopeful that we'll have almost 200.

We don't know yet. We'll know more as the weeks go by as they start getting responses. But yes, they're going to filter out all the people who can't be here for ten weeks, so. All right. I think that's it for today. Mr. do Campo.

THE COURT REPORTER: I need him to speak into a microphone.

MR. Do CAMPO: Your Honor, will you provide the juror's identification information in anticipation of jury selection?

THE COURT: I have to talk to the jury office to see how quickly we will get that. I think if you get it, you're not going to get it a week before. You might get it -- it might be, like, an "attorney's eyes only" the day before or something like that; but I have to talk to the jury office about that because I don't know -- because this is the other thing that happens because I did ask them this. On the actual day, some people don't show; so the numbering, all that kind of stuff, I don't think they do that till day of.

MR. Do CAMPO: I understand. But to the extent that we have identifying information in advance, it will probably expedite the peremptory process.

THE COURT: Let me just state something that should be obvious to all of you; which is if in that process you find information that you believe I need to be put on notice, you have an ethical obligation to notify me of it the minute you have it. That's not something you bring up when Juror No. 7 starts falling

asleep and you say, by the way, we didn't mention to you that Juror 7 had this problem. So if you want to engage in that kind of review and research of the jurors, you're going to disclose it or you're going to live with it; you're not going to bring it up later on.

But I have to talk to the jury office because I'm not sure that I will have it with a lot of time. It's a hundred people. I don't know that I will have it with that. Anything else, Mr. do Campo?

MR. do CAMPO: Nothing from us.

THE COURT: All right. Mr. Flores?

MR. FLORES: No.

MS. DESCALZO: I will speak slowly. The government mentioned two witnesses that the defense knew about and that are going to be shortly agreeing to a plea agreement or an information. I walked over to the government to ask -- to confirm the identity of these two witnesses.

THE COURT: I even know who they are just based on what they said.

MS. DESCALZO: Well, I thought I knew, too. I thought I knew, too; but when I look at the witness list -- the new witness list that was filed on January 28th, it doesn't include one of the people I thought would be one of the two, so that's why I asked.

And the government stated that they cannot tell me; that I'll find out when the plea agreement is approved and it's filed.

So when is that because we're trying to get ready for trial and split up witnesses and do our investigations? We need to know because that could change the analysis.

THE COURT: No. So look, they have their deadline for the witness list. If one of those witnesses next week takes a plea, then the government should advise you of that plea the minute that that plea is available on the public record.

If they don't have that approved yet, I'm not going to tell them they have to give you something that hasn't even been approved by the office.

MR. MCLAUGHLIN: We will provide to you a copy of the information the second it's filed. The information is going to be filed first; the plea will be a couple days later. But the second the information is filed, we will send it to you.

THE COURT: Yes. And then, look, if they're charging this person late or whatever you've got prejudices you, then I will hear it then. But I don't have any reason to think we're there yet, so we will cross that bridge when we come to it.

But I don't want them releasing an information or a plea agreement or anything like that that hasn't been approved. I'm not going to do that.

MS. DESCALZO: Well, I didn't ask for the information; I just wanted the names. That's what I asked for, Your Honor.

THE COURT: Yeah, I don't think they have to give you that. I mean there's all sorts of reasons I can think of just off

the top of my head that they probably don't want to do that yet. They proceed at their peril, right, if that causes you prejudice. They know that.

MS. DESCALZO: And we do have a CJA issue that would take probably two to three minutes if you can attend to us after.

THE COURT: As if there is such a thing for CJA.

MS. DESCALZO: This one might be, Your Honor.

THE COURT: Maybe.

MS. DESCALZO: Maybe?

THE COURT: Maybe I'll let you do that because I have a 1:00 o'clock civil hearing that I should just make you all sit through so you can just see what my life is like. I do this sometimes with the prosecutors. I'm like nobody would ever leave the office if they ever sat through some of these civil hearings. Ms. Bozanic.

MS. BOZANIC: It appears that the government has transported a few of the cooperating defendants' witnesses, and they're all at FDC, which caused our client to end up in the SHU for 15 days, and it seems like he's about to go back with having --

THE COURTROOM DEPUTY: Slow down.

MS. BOZANIC: With having a month or so before trial, we have no access to our client when he is in the the SHU because there is no way we can review any of the discovery. In addition to that, our client was hospitalized. He's diabetic. They found

a mass after they did a colonoscopy. He may need surgery. And for him to be in the SHU for 15 days just because they're trying to separate him -- he didn't do anything wrong; they're trying to accommodate the government's witnesses, I would ask the Court to possibly or the government to find a solution to all these cooperating witnesses, such as Bergmann, Rivera Garcia, and Palacios who were brought back from different facilities to the FDC, perhaps they can be housed in Broward County or somewhere else so that our client doesn't have to go to the SHU every few days for two weeks.

THE COURT: I thought we took care of this.

MS. BOZANIC: No, Judge.

MR. Do CAMPO: Your Honor, Mr. Ortiz also just spent a couple weeks in SHU. It's actually something that I failed to mention, but we have the same issue. And I believe the separation between these five has been lifted.

THE COURT: Oh, that's what got lifted.

MR. Do CAMPO: They could all be on the same floor, and this gives FDC a whole, you know, whatever, however many wings they need to put the cooperating witnesses, but it is a real problem for us. We had to delay a meeting that was very important because we just can't get in to see him.

MR. MCLAUGHLIN: Your Honor, I don't know what's going on at BOP. They took two of our cooperators and threw them in the SHU for four months, and we had to negotiate and engage with them.

12:35PM We know, and we welcome the lifting of the separation as to the five here. Why BOP is doing what they're doing, I have no idea. We have only moved one new cooperator to FDC, and that was Fred Bergmann, and he got there last week. So if I could answer and explain what BOP is doing, I would.

THE COURT: You would be rich.

MR. MCLAUGHLIN: I do not know. And we welcome any help that the Court can provide with BOP, I would welcome it. I just don't know what to say.

THE COURT: Look, I can do this with respect to BOP; not that they listen to me either, you know. But what I can do with BOP is I can set a hearing on this issue and ask that the Bureau of Prisons be present. And they would be present through your office calling the general counsel's office. They usually then bring somebody here who may not be able to do anything, but they can bring me somebody from the BOP, and we can tell that person who these witnesses are; and then at least with respect to purposes of this case, there shouldn't be a SHU issue.

That doesn't mean BOP isn't going to put them in SHU for other reasons. I don't know why these people are being put in SHU. I can set a hearing and ask BOP to show. And usually if you send the warden that, that there is a hearing and I want BOP to show, typically somebody does show. Again, they don't have to listen to me. But if what they're doing is putting people in SHU -- these defendants in SHU because there's cooperators at FDC, we

should try to prevent that from happening because I don't think -- they can put them on other floors, they can do other things. It is a preparation issue, a trial issue. If everybody all of a sudden is in SHU the last month, it does create a problem, so I'll set a hearing and send it to the warden; and they do show up. I mean they don't do anything -- I mean, that doesn't mean they will do anything.

MR. MCLAUGHLIN: Judge, I welcome anything you can do for us on this issue.

THE COURT: You don't want your cooperators in SHU either.

MR. MCLAUGHLIN: No, we did it from the defense attorneys' cooperators, and you guys were having problems on the defense side, and of course the complaints always come to us first, so it's been trying.

THE COURT: I will give you an order. In that order I'll say BOP has to show. They won't know since they're not parties, unless you send that to them. When you send it to them, they usually bring somebody here that's usually very polite, but I'm not sure it works, but something. That's the best I can do. I hear you, but that's the best I can do. I don't have authority over them here.

Anything else, Mr. Friedman? Mr. Dray?

MR. FRIEDMAN: No, nothing further, Judge.

THE COURT: Anything else on behalf of the United States?

MR. MCLAUGHLIN: One matter, Judge, and I think it's best we discuss it while we're all here.

I'll just call it the summary exhibit hearing. What I'm trying to get at is what does the Court expect in terms of the scope of it? How many witnesses should we need to get ready to come in? Do we need to prove the legality of the phone from the moment we took custody through the extraction to now? Do we just need the CART and forensic examiners because it's a lot of bodies. A lot of different people touched different phones.

THE COURT: This is why I'm asking you to give the list to the defense and for the defense to confer before they object. So I'm going to ask you all to get some meeting time with each other next week because you won't know who you have to bring unless you understand the nature of their objection.

MR. MCLAUGHLIN: Understood.

THE COURT: It might be a lot of people that you have to bring, but it's better. I expect we will spend a day on this, if not more. Otherwise, we're going to have to do that at trial. Again, if we still have to do it at trial, I get it; but I think it behooves us all to get to the bottom of any real issues now and not midtrial.

MR. MCLAUGHLIN: Completely agree. Thank you.

THE COURT: Anything else on behalf of the United States?

MR. MCLAUGHLIN: Not from the government.

THE COURT: All right. I'm sure I will see you next

136

12:40PM week. All right.

12:40PM (Proceedings recessed at 12:40 p.m.)

C E R T I F I C A T E

I, VERNITA ALLEN-WILLIAMS, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable JACQUELINE BECERRA, one of the judges of said Court, at Miami, Florida, on January 30, 2026.

/s/Vernita Allen-Williams RMR FCRR
Official Court Reporter to:
The Honorable Jacqueline Becerra
United States District Court
Southern District of Florida
400 North Miami Avenue
Miami, Florida 33128
305.523.5938