UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-cr-20104-JB

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Miami, Florida |
| | ) |
| vs. | ) March 9, 2026 |
| | ) Day 1 - Morning Session |
| ARCANGEL PRETEL ORTIZ, *et al.*, | ) |
| | ) 8:44 AM - 12:11 PM |
| Defendants. | ) |
| | ) Pages 1 to 143 |

# TRANSCRIPT OF JURY TRIAL

HELD BEFORE THE HONORABLE JACQUELINE BECERRA

UNITED STATES DISTRICT JUDGE

LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Federal Certified Realtime Reporter
United States District Court
400 North Miami Avenue
Miami, Florida 33128
305.523.5633

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

APPEARANCES:

FOR THE GOVERNMENT:

SEAN T. MCLAUGHLIN, AUSA
JASON WU, AUSA
ANDREW J. BRIGGS, US DOJ trial attorney
ALTANESE P. PHENELUS, AUSA
United States Attorney's Office

ON BEHALF OF DEFENDANT PRETEL ORTIZ:

ORLANDO DO CAMPO, ESQ.
DANIELA JARAMILLO, ESQ.
Do Campo & Thornton, P.A.

DAVID A. HOWARD, ESQ.
Law Offices of David A. Howard

ON BEHALF OF DEFENDANT INTRIAGO:

EMMANUEL PEREZ, ESQ.
Emmanuel Perez & Associates

HECTOR L. FLORES, ESQ.
Barzee Flores

ON BEHALF OF DEFENDANT VEINTEMILLA:

MARISSEL DESCALZO, ESQ.
Descalzo Law

TAMA BETH KUDMAN, ESQ.
Kudman Trachten Aloe Posner LLP

ON BEHALF OF DEFENDANT SOLAGES:

JONATHAN S. FRIEDMAN, ESQ.
Jonathan S. Friedman, P.A.

S. PATRICK DRAY, ESQ.
S. Patrick Dray, P.A.

T A B L E   O F   C O N T E N T S

PAGE

JURY VOIR DIRE EXAMINATION........................ 38

(Call to the Order of the Court.)

THE COURTROOM DEPUTY: Calling Case 22-cr-20104, the case of the United States of America versus Arcangel Pretel Ortiz, the case of the United States of America versus Antonio Intriago, the case of the United States versus Walter Veintemilla, the case of the United States of America versus James Solages.

Counsel, please announce your appearance for the record, starting with the Government.

MR. LAUGHLIN: Good morning, Your Honor. Sean McLaughlin on behalf of the United States. Also with me at counsel table is AUSA Jason Wu; DOJ trial attorney Andrew Briggs; AUSA Altanese Phenelus; and the case agent, FBI Special Agent Tom Pavletic.

MR. HOWARD: Good morning, Your Honor. David Howard, Daniela Jaramillo, and Orlando do Campo on behalf of Arcangel Pretel Ortiz.

MR. PEREZ: Good morning, Your Honor. Emmanuel Perez and Hector Flores on behalf of Mr. Intriago, who is standing next to us at counsel table.

MS. KUDMAN: Good morning, Your Honor. Tama Kudman and Marissel Descalzo on behalf of Mr. Veintemilla, who is also present at counsel table.

MR. FRIEDMAN: Good morning, Your Honor. Jonathan Friedman and Patrick Dray. We're here on behalf of James

Solages.

THE COURT: All right. Good morning. Everyone be seated --

MR. DO CAMPO: Your Honor, we don't have a translator.

MR. DRAY: They're not here, Judge.

THE COURT: All right. Everyone be seated. Let me know when the translators get here.

(Recess from 8:45 AM to 8:58 AM.)

THE COURT: All right. We're ready to proceed. Good morning.

We have about, I guess, at last count, 80-something jurors or so that have checked in, but that was about 30 minutes ago. One of the CRDs just went down to see what the latest count is. We're getting off to a late start. There was a power outage on the eighth floor, so we had a little trouble getting the interpreters and everybody set up.

Let's talk about some of the issues that I mentioned on Friday I wanted to deal with this morning. Let's start with the depo designations. The only reason I mention this today is because I have two sets of depo designations that I owe you. They're not particularly long. I'll probably get them to you tonight or tomorrow. Again, it doesn't impact opening, as best I could tell from the objections I read.

But, Mr. Wu, the Government submitted another request

for depo designations yesterday. What is the status of that? Why was that the night before trial?

MR. WU: Good morning, Your Honor.

So that was the deposition that you authorized in early February, conducted on February 20th. We received the transcript on Friday. So I immediately gave it to the defense on Saturday, designated it, actually have already delivered the designations to them on Sunday, and that's when I made the filing.

THE COURT: Okay. Let me hear. I don't know who's going to take the lead on the defense for this issue, when the counterdesignations and/or objections will be ready.

MR. PEREZ: Good morning, Your Honor. I guess I will.

As far as our portion of the depo designation, I have my associate working on it today. I anticipate that we should be able to provide that to the Government tomorrow. I believe that the other lawyers are going to deal with their portions of the designation. So hopefully if we can get that done today or tomorrow, we should have it to the Government by tomorrow afternoon at the latest.

THE COURT: I think even if you have it to the Government Wednesday morning it will be fine, because with the slate of witnesses we already have, my best reading of the evidence -- I don't think the Government is looking to

introduce that this week.

So if you get it to the Government let's say Wednesday, Government gets it to me by Friday, right, I'll take the weekend to go ahead and finalize it so it's ready to go on Monday. So I don't think it will be an issue.

Okay. Then I delivered back to the Government the folder of the autopsy photos. This is obviously going to be a sooner-than-later issue, given the lineup of witnesses. I went ahead and just literally threw a Post-it note. There was nothing else I could do because the pictures were not numbered as to ones I did not think were necessary.

I understand that a picture that shows a bullet wound and that shows the bullets, right, because that's the whole issue of the autopsy, to show that there were certain bullets that were taken out of his body. I understand that. And the Government made an argument that one picture of his face was relevant. Okay. I don't see the relevance in anything else other than to create some sort of shock and awe, which I'm not going to allow. So take a look at that.

I want you to pare it down. Feel free to remove even more of those pictures, show them to the defense, and then end of the day today or tomorrow morning -- look, if the defense wants to make an argument that these pictures are necessary or relevant, I'll hear you in the morning. But we've got to take care of that tomorrow morning because that witness is likely

to come up sooner rather than later. So that's where we are with the autopsy photos.

As to the aliases --

MR. HOWARD: Your Honor, one thing briefly with respect to the autopsy photos. To the extent that the Court makes a determination after defense argument that others may be relevant, we are still concerned about the jury not being given a heads-up as to the graphic nature of these. There are people I know who won't look at it regardless, and we're concerned that it may come to a point that we decide that certain ones are relevant, and we haven't inquired of the jurors, and somebody ends up getting picked on the jury and turns away and won't engage in the necessary analysis.

So we're still petitioning the Court to ask them if they're queasy just generally as part of the voir dire that the Court does.

THE COURT: Right, but this is the problem I have. I'm struggling to understand why any of the queasier pictures, if you will, have any relevance to the defense or to the Government's presentation of evidence.

MR. HOWARD: We would be prepared to make a brief argument to the Court ex parte at the appropriate time.

THE COURT: So what instruction or what do you want me to ask the jury now? Because if I ask people, "Who gets queasy looking at autopsy photos?" I'm going to have a

hundred people raise their hands and there's nothing I can do about that.

MR. HOWARD: Right, but so queasy that they can't engage in an analysis, if required to do so, in order to fulfill their duties as jurors.

THE COURT: It would be impossible for anyone to say that without having some understanding of what the pictures were. That's my problem. Because if you ask me that question, I wouldn't know. I guess it depends what you showed me.

MR. HOWARD: Sure.

THE COURT: And so I'm just going to get into some, like, weird spiral with a hundred people about autopsy photos that, as I sit here, I see almost no relevance to about 90 percent of the ones I saw. Now, granted, if people aren't queasy, then they can see whatever they want, but --

MR. HOWARD: Understood.

THE COURT: -- if you structure a question that doesn't get a hundred answers -- because I would raise my hand. You would raise your hand.

MR. HOWARD: Sure.

The ones that the Court selected, have they been provided to defense or just the Government at this point?

THE COURT: I only have one copy of it. So what I did is I just gave the binder back to the Government, and I

flagged ones that I didn't think were necessary.

MR. HOWARD: Okay.

THE COURT: So Mr. Wu can show you the notebook right now. You know, there are multiple pictures of the same thing. I don't think that's necessary.

MR. HOWARD: Understood.

THE COURT: And there are three pictures in particular, one of which the defense had flagged to take out, as well, of the torso that's just completely --

MR. HOWARD: Splayed.

THE COURT: -- splayed open, and I don't understand how that could possibly be relevant. I get the bullet wound ones, sure.

MR. HOWARD: But we'll take a look at what you've identified and then revisit it to the extent we think it's necessary.

THE COURT: Yes, that's fine.

Look, if you can come up with a question that's fair and that doesn't get everybody raising their hands -- because that doesn't help me either. It doesn't help anybody.

MR. HOWARD: Thank you, Judge.

THE COURT: All right. And then let's go now to -- oh, let me jump from there to the aliases, where I was going to. I have the Government's response to the Solages's motion, but the Government, did it not respond to Mr. Intriago's

motion?

MR. WU: No, Your Honor. We are willing to redact that name out of the indictment as to Mr. Intriago.

THE COURT: Okay. So as to Mr. Intriago, the general; right?

MR. WU: Correct, Your Honor.

THE COURT: That was the only request made, so that motion is granted. All right. So, for the record, Docket Entry 1488, the motion is granted.

As to Mr. Solages, the Government has now responded. Let me hear further argument. I'm inclined to deny the Solages's motion based on the Government's representation of what the evidence will be. Let me hear from you, sir.

MR. FRIEDMAN: Yes, Your Honor. The reference to Yakov and Junior, first of all, my client's middle name is Junior. So the indictment should technically read James Junior Solages. We would be fine with that, but removing the "a/k/a Yakov."

It's not really necessary, Judge, because the text messages that the Government will be displaying to the jury and introducing in the trial, they all have a phone number that belongs to Mr. Solages.

Different chats, different people call him different names. So it's going to be in the evidence. We're not asking to redact those things, but we are asking that they come out

of the indictment. That's just prejudicial. It suggests that he somehow has covert names, which he never made up any of these names. The only name he has is Junior. That's his middle name.

So the Government in their presentation of evidence is going to be able to link Mr. Solages to the text messages that have the names Yakov. There's other names. There's Boukman. There's James Haiti. There's several other names as well.

So having the name does not necessarily connect Mr. Solages to the acts charged in the indictment. So for those reasons we're asking the Court to redact that and just have it removed from the front page of the indictment and any other reference in the indictment where it suggests Yakov and Junior.

THE COURT: All right. Let me hear from the Government.

MR. WU: Your Honor, it is necessary. And let me just give a simple example of why. So some of the messages that we quoted in our response are group chats. So in a group chat of five or six participants, someone in the chat will say, "Yakov is doing X." We have to be able to link Yakov to the person who Yakov is, which we will do through witness testimony and through showing those text messages it being James Solages.

So it's not self-evident on the face of these messages that Yakov is James Solages until we do that linkage and until witnesses testify to that. And then, under the case law, that is enough to put the alias in the indictment. As I understand the case law, if we are going to draw that linkage, connect an alias to a defendant, then we are entitled to put that alias in the indictment just as an identifier. It does not say anything bad about that alias. It just says a/k/a, also known as. That's all we're trying to show.

THE COURT: Correct me if I'm wrong; this only goes as to what's said in the indictment, which will only be at issue hopefully six and a half weeks from now when the jury gets a copy of the indictment.

I'm going to deny the motion without prejudice if when the evidence is in, there wasn't evidence of those aliases, then I'll hear you again, and we'll strike them then. But there's enough in the Government's response to suggest that all the aliases are appropriate in the indictment. But again, when they rest and we're getting ready to redact, you're free to make that motion again.

All right. Let's talk about the stipulations. So maybe I need to sort of level set here what my thinking is. I think it is still appropriate to let the jury know -- and I think this is where I offered it, in fact -- that with respect to evidence that was held in Haiti, witnesses that were held

in Haiti -- you haven't been able to go to Haiti; right? And it's possible that jurors don't know that or don't understand that, especially if we're going to pick 16 people who have no interest in anything that's happening in Haiti. Right?

So I'm generally open to something of that nature. I'm not open to telling the jury that the defense has not been given access or that things have been withheld or that the evidence was known to be relevant, that you've been denied reports -- I'm not willing to make these special instructions. I mean, it is well beyond anything that I had even contemplated, nor do I find any support for it in at least my reading of the case law and of the case.

So to go, then, to the second special instruction that was proposed, it seems to me that advising the jury that there was a travel advisory that restricted travel -- civilian travel to Haiti and that that restricted the ability to inspect physical locations or inspect evidence in Haiti or interview witnesses in Haiti, I'm generally still open to that because I think that that's something that the jury -- it's fair for them to know it.

The issue of the defense not conducting independent forensic examinations or independent autopsy, I don't see how that's a jury instruction. I don't see why that's not coming out through a witness. Right? I mean, I would think that the defense could ask any of the FBI CART witnesses that are

coming up -- you know, "Was this device in Haiti available to the defense?" And that witness should say, "No, because if that witness says no -- I suppose they could say, "I don't know," but then I'm going to ask the Government to make sure that somebody says, "No," because I think that's the right way to do it, not a special instruction from me.

So let me first hear -- I'm going to try to parse these out into groups. The Government, if you look at the special instructions or the second special instruction that was submitted by the defense that talks about this idea of travel to Haiti, what says the Government about a limited instruction that just states the fact that, you know, inspections of evidence and interviews or travel to Haiti has been limited, period?

MR. LAUGHLIN: We would object. It's not relevant, Judge.

THE COURT: I can't hear you, sorry.

MR. LAUGHLIN: Oh, I'm sorry.

We would object, Judge. It's not relevant. The Court made the statement that it's only fair. If it's an issue of fairness, of constitutionality, the Court has been dealing with motions from the defense regarding the constitutionality of their access to foreign evidence, their access to foreign witnesses. Those have all been denied.

We are now in front of a jury. What matters in front

of a jury are the facts and the evidence. Whether they can travel somewhere, whether they can talk to someone is not relevant. And all it invites, Judge, is jury nullification. That's the only reason they want it and that's how they're going to use it. They're going to argue to the jury this case isn't fair. "I wasn't able to talk to so and so. I wasn't able to see this and that."

They've had Rule 15. They've used it. They made us move heaven and earth and put people at risk, both Haitian law enforcement and US law enforcement, to get them five Colombian mercenaries. We did so. We did one deposition, and they canceled the other four.

So the idea of where they can't go, what they can't do is not relevant for the jury to decide. If it's an issue of fairness, Judge, you've dealt with that. You've dealt with that in the motions to dismiss repeatedly. We're now in front of a jury. What matters in front of a jury are facts in evidence, not what they can and cannot do. We think it's very dangerous, Judge.

THE COURT: Right. So here's my issue with that. We did deal with it in motions, and I think that's where this came up, that I said that some of this could be addressed that didn't require dismissal of the indictment. Where I find the fairness issue is in areas where the Government was able to do something because it is the United States Government and where

the defense hasn't been able to do it and where in the normal course, if this had been in Miami-Dade County, the defense would have had the ability.

So I agree with you that some of the instructions are sweeping, and I'm not interested in doing that. But what about something more limited? Because it is true that the defense wasn't able to look at the scene. You know, why that's going to matter, I'm not sure. You will argue, I'm sure, in closing that it really doesn't matter because that's not what the case is about. But at least from the Government's perspective, right, that's not what the case is about.

I mean, it is a fact, for example -- let's -- you know, that they weren't able to travel to Haiti. So I hear you on the witnesses, right, because they did get the Rule 15 witnesses, but they weren't able to travel to Haiti, and they did not inspect evidence that was maintained in Haiti. What say you to that?

MR. LAUGHLIN: Again, it's not relevant. What they can and cannot inspect is not relevant, Judge. What matters are facts, testimony, and evidence. And that's what the jury is going to decide. What they can't see, what they cannot touch is not reasonable doubt. That's the Government's perspective.

And I would note, if we're going to talk about a

domestic context, Judge, they haven't had access to our cooperators. Are they going to be asking for an instruction that it's not fair that they can't go see German Rivera and Rodolphe Jaar or --

THE COURT: Because they did have access to them. They could. Those people probably refused to speak to them, but they had access to do that. So let's look at it in US context. Right? There's a homicide and it happens in Miami-Dade County. Right? The defense is able to go to the crime scene. Right? It's able to knock on the door of the neighbors. Right? And whether anything comes of it is neither here nor there. Right? But they're able to do that. They have not been able to do things like this in this case, which the Government has been able to do because it's the United States Government.

And so that's the -- and it's very narrow. I don't think, like I said, it's as sweeping as the defense wants, but I'm struggling as to why the Government objects to something that just goes to what is absolutely true, that they haven't been able to do because it's Haiti and they would have been able to do it here.

MR. LAUGHLIN: Because of how they're going to use it. They're going to argue nullification to the jury.

THE COURT: Well, no, I'm not going to let them argue nullification to the jury.

MR. LAUGHLIN: That's what they're going to do, Judge. That's our concern.

THE COURT: Well, I know, but I'm not going to let them do that. You're going to object and I'm going to sit them down if they do that.

MR. LAUGHLIN: All right.

THE COURT: That, I'm not going to let them do. I mean, they're not going to be able to argue that.

MR. LAUGHLIN: Your Honor, just one point. I think it would be something that would be helpful in voir dire. I mean, the Government would like to know whether a juror would have a problem with the defense not being able to travel to Haiti. We would like to know that now than when the jury's been sworn and suddenly we're dealing with jury questions and issues in deliberations. That's another issue as well.

THE COURT: I know, but this is the problem. If I ask a hundred people, "Do you have a problem with the fact the defense never went to Haiti?" They wouldn't know how to answer that question because how do they know whether that's important or not important?

MR. LAUGHLIN: Because it's -- and that goes back to my relevancy objection. It's not important and it's not relevant.

THE COURT: Right. So no, no, no. So if the United States -- and these aren't the facts. Right? But if the US

had spent six months, right, speaking to all sorts of people in Haiti and presenting this case based on everything they did in Haiti, right -- you had no cooperators. You had none of that. It was an investigation in Haiti. Right? -- and I told jurors, "But the defense was not able to do the same," every juror would raise their hand, right, because they don't know the context of it. They don't know what the rules are.

So again, you all want me to ask these sweeping questions to the jury, and then when I get Juror 7 saying, "Well, tell me more," what do you want me to do? To try your case for you? Which is, by the way, why I'm not letting anybody ask questions to this jury. That's the exactly the problem with these questions.

MR. LAUGHLIN: That's why you shouldn't give the instruction to begin with. It just opens a Pandora's box of questions.

And I would just say this, Judge: If it's not given and the jury's deliberating and suddenly the Court gets a jury question saying, "Was the defense -- were the defense lawyers able to go to Haiti?" I guarantee you, Judge -- or at least I would hope -- that we're not even called in on that question. You quickly write, "That is not for you to consider. You are supposed to pay attention to the facts and the evidence and the indictment."

THE COURT: Right, because -- that example doesn't

help me at all, sir, because, of course, that would have to be my answer, not because it's not relevant or not because they shouldn't have known it but because it wasn't what came into the trial. That's not the question.

The question is, if you had a witness on the stand here -- homicide is in Miami-Dade County, right, and the police never let the defense into the crime scene, the officer who was guarding the crime scene would be cross-examined about why they didn't let the defense in. I'm just comparing it because you were given access that they didn't have. That's the playing field that I think is fair, because they did move to dismiss the indictment. I thought that was too radical a solution.

I think something else is -- I agree with you. These instructions I'm not going to read, but I think -- and by the way, they have a witness that gives them the point. Right? So, for example, when the medical examiner comes up and testifies about the autopsy, if the defense says -- or questions or asks a question, "Were we able to test this?" Are you going to object and say that's not relevant?

MR. LAUGHLIN: Yes.

THE COURT: If this were a homicide in Miami-Dade County and the defense had asked, right, for an independent autopsy and you refused to provide them that access, do you still think they wouldn't be entitled to ask the question?

MR. LAUGHLIN: I've never tried a case in state court, Judge. I don't know. But I do know I would object to it. I would probably get overruled, but I would object.

THE COURT: Right. Those are the things that I'm trying to level set. The defense wants too much. I hear you. You want nothing. There's something in the middle. No one's helping me find that middle. I'll keep working on it.

MR. LAUGHLIN: I have a suggestion, Judge.

Let us, if we could over lunch, find out the dates of the travel advisory, specifically when it started, if it's still going on. We might be able to, based on where the Court's going, add that to our stipulation and might be willing to agree to that. But we would like to know the details, and I've got to confer with the FBI about when the travel advisory went in, is it still in effect --

THE COURT: You do that. This isn't going to interfere with jury selection.

MR. LAUGHLIN: Certainly.

THE COURT: Speaking of which, where are we?

Okay. The jurors are on their way up.

Let's go now to the other bucket or the second swath, which are the jury instructions with respect to the classified information.

MR. HOWARD: Your Honor, just before you get there, the Government was indulged for quite a minute about all this

relevant information being not relevant. If it wasn't relevant that we had an opportunity to go to Haiti, they wouldn't have spent so much time and resources sending people to Haiti. And I know the Court appreciates that.

The jury's more likely to know and appreciate that there was a travel restriction to Haiti than they are to know what CIPA law is, and that's why we're concerned about just these naked stipulations of a fact that is critical.

For example --

THE COURT: Hold on. Are you talking about the CIPA or are you going back --

MR. HOWARD: I'm just making the CIPA record --

THE COURT: I haven't started with the CIPA yet. And we're going to do the CIPA --

MR. HOWARD: I thought that came first.

THE COURT: No, no. The special jury instructions that we've been talking about have to deal with the travel advisory and what limitations that presented to the defense. Okay?

The Government's going to look at the travel advisory. They're going to keep thinking about it, seeing if we can't do something there.

If you want to talk about the CIPA now, this is where I am with the CIPA ones. Right? So the defense wants, as I understand it, and agreed to the stipulations that the

Government proposed. So the question is do those come with anything else. Right?

My issue with what the defense proposes is that it does too much. Right? It gives the jury this impression that there's, like, all this classified information that was Brady material and that it's top secret and secret and confidential, and nobody's allowed to look at it. And then you want me to instruct them that you don't have the information of how it was obtained or any -- well, first of all, some of it is wrong because if there had been any information that was exculpatory, that's why we went through the proceedings and there was a protective order and that's how we ended up with what you have.

But when you talk about, you know, we're not able to know whether this is verified, well, you can't have it both ways. Do you want the information in or do you not want the information in? I'm telling the jury this is a stipulated fact, but then you want me to tell the jury it's not verified.

MR. HOWARD: No, no, that we don't know what the Government did to follow up. So if we have a situation where the Government is heavily reliant upon an investigation that was partially conducted by a foreign government and they're handed information, whether or not through cooperating sources or otherwise, some of which they believe to be reliable at the time, we -- is it not relevant whether or not they followed up

on it or just stuck it in a file?

The thing is -- nothing about what we have asserted there is not a fact and is not true. The question is whether or not we're going to hide the fact that the defense had one or both arms in some instances tied behind their backs. Because if somebody was a US Attorney, anybody sitting here, and a confidential source comes in and says -- gives them an item of information and then they close the file and tell them "have a nice day" and go and indict or decline to indict, they would be fired. Why? Because follow-up is necessary.

So now we're presenting that same information to the jury, and the jury is likely to diminish its significance because they're going to think if this was significant, we would have gotten more. The defense would have followed up. The defense would have given us more of this information, but all we have is that the Government received information on a certain day. End of story.

Well, what was done with that information and what significance does it have? We don't know either because we don't know who gave the information, who received it, who followed up, who did what, and we are left to presume that the Government followed up and that they determined that it's not worth pursuing. Well, if that's the case, then that should have been provided, but the fact is it was not.

And so we now have a situation where we have

information. It's just an item of information with no context, no follow-up, no nothing. And the Court knows, the Government knows, and we know that we know nothing more. The jury should know that.

So telling them absolutely nothing -- here's an item of information that seems pretty critical. One of the primary perpetrators of this crime, the Government received information that he was being hidden at the house of the prime minister. Nothing more. That sounds as though we're being double sabotaged, one, by not being given the information and, two, by asking the jury to accept this information that's significant without providing any further context.

So we believe that something is required -- something more. I did take the liberty of including the Government's own admission in its reply. "We determine this to be significant." Okay. If we take that out, that's fine. But everything else that's included there as to how we were compromised in our ability to present a more fulsome presentation regarding -- this information is all true. There's nothing in it that's either irrelevant or nonfactual.

And so we think -- this notion that, well, the jury shouldn't find out because it's nullification. It's not nullification. It's a fact. The fact that we weren't able to do this or do that are facts. How do they factor into the jury's determination of how much to rely upon what the

Government presents is relevant. It's not nullification. They need to know. We just got -- we just got a -- and I see the frown.

But if we get -- we tell the jury XYZ happened. The Government got information that the major perpetrator was being hidden by the prime minister. Don't we think they want to know more than just that? Who gave the information? Who gave it? Was it followed up on? Was it this? Was it that? We want to know too. We've been deprived of that.

We should at least tell the jury that we have been deprived of that. And telling them nothing undermines the significance of the information we provide.

And also not letting the jury know that the reason we're not giving you this information is because we have a higher national security interest that trumps the defense's ability to know information that's relevant to your determination I think is also relevant. So that's our position on it.

We have not been able -- everybody was trying to prepare, so we haven't been able to confer. Everybody was in their silos as to trying to give you something that's less than what we already provided, but we intend to, and we think obviously something more than what -- than just the naked presentation itself is relevant.

THE COURT: But I'll tell you what I struggle with

too is that this presentation of these stipulated facts are something you want. So that's a little bit my issue. You can't both want the facts and want the stipulation, oh, here's a fact and we didn't get anything of it. Like, you can't have it both ways. Right?

So we cannot have any of these stipulated facts. The Government doesn't want these stipulated facts in. This is an accommodation -- not accommodation, but this is what they propose. So you can't have it both ways --

MR. HOWARD: But for CIPA, we would have it both ways. We could get the facts and we would get that additional information. Now we're just going to give you this little sliver of information. We're not going to tell you anything more. And you can tell the jury that sliver, but we're not going to tell them anything more either. And nobody knows, and there's this big cloud of suspicion as to the merit because nobody knows anything beyond the mere fact.

Yes, if there were no CIPA, we would have exactly what we're asking for. We would have -- in every other 302, this agent took it. They can't give us a 302 with information and not tell us who did the interview and who gave the information. They can't do that.

THE COURT: Right. So let's say you have Agent Smith in the 302 say, "You know, I was having coffee and an unnamed woman came up to me and said X." You have that 302. There's

not anything really you can do with that information. There's not much. The Government doesn't have more than that anyway. So --

MR. HOWARD: Do they not? I don't know.

THE COURT: No, no, my point is in that scenario, right, the Government turns it over. There's nothing more there. They got what they got.

MR. HOWARD: Well, the cross-examination would be this.

"Agent So-and-So, you've accused A. You had a witness come to you and tell you B. Did you follow up? Did you do an investigation? Who is B? What did you do to follow up on B before you started accusing A? Before you settled on A, what did you do about this additional lead? Did you follow it? And how did you follow it? And what was the result of you following it?"

If the answer is "No, I just blew her off and told her to have a nice day," that would be relevant. So this notion that if we know the agent got a lead that he didn't follow up on, I think we would try to wrap it around his neck in cross.

THE COURT: All right. Is the jury here?

THE COURTROOM DEPUTY: They're still lining them up.

THE COURT: All right. Government, any response? We're not going to be able to finish this all because they're

getting ready, but let me hear from the Government.

MR. LAUGHLIN: Your Honor, of course we object to any sort of CIPA instruction. And I think the Court might benefit from an understanding of what even the stipulations are. They're essentially gossip. They're essentially a tip line. That's all it is. The Government received information about person X, person Y, and person Z.

And when Mr. Howard says that they've been prevented from knowing anything about it, that's just not true, Judge. The Government has interviewed hundreds of people in this investigation. We have turned over, I don't know, almost a hundred different devices.

If there was any -- even a hint of relevance between these disclosures or any connection whatsoever, the defense has it, Judge. The reason why there is no follow-up sometimes or is no 302 is because there's nothing to it, because that's all the CIPA stipulation disclosures are. It's a tip line. We receive information about X, Y, and Z. It could be completely false.

THE COURT: So let me ask you a question. Why would the case agent -- if the defense, in the cross-examination of the case agent or one of the agents, said, "This is a stipulated fact in this case. What did you do to follow up?"

The agent says, "We didn't do anything. We didn't think it was relevant to follow that up."

MR. LAUGHLIN: We're stuck with the answer.

THE COURT: No, no, but I think that's their problem, that they're worried that the agent will say, "I can't tell you what I did," or -- right? They're worried about getting stuck with that answer is my understanding, right, that if they cross and the agent says, "You know, I'd tell you but I'd have to kill you," right, what do we do now?

MR. LAUGHLIN: I don't envision that's a world that will ever happen. So if he asks the question about "Did you follow up on whether or not Person X was hiding Person Y at Ariel Henry's house?" The agent would go, "Yeah, we received that information, but all the people we talked to said they couldn't confirm it." I just don't see a world where an agent's going to say that's classified.

THE COURT: Okay. So let's do this -- because this is what we've been talking about, as best I can tell, is the fact that they are not able to pursue this in cross because they don't know what the answer is. And if the answer is "I can't tell you or I'd have to kill you" -- and of course, I'm being flip when I say that. Right?

That's the answer that they don't want because that's the answer that then they're stuck with too, and they didn't have any other ability to review it, and that's why we're here.

And so I'll ask you in your already shortened lunch

break to look at each of these stipulations. And if you're making the representation that these defense lawyers will be able to question agents about it and that the response will be, as you suggest it might be, that that information was either irrelevant or that it came to nothing, then I'll hear the defense on whether that's not sufficient.

Because this whole problem, I thought, was that they were not able because there would be no witness, right, that would be able to say, "We looked at it and there's nothing," or "We didn't bother looking at it." That's how I understand what the crux of the defense problem is.

So sit down with your agents and tell me whether or not that's what an agent will say, because I've got to tell you, if an agent can speak -- I don't know which agents, but if in the whole conglomerate of agents you have testifying the defense is able to push the agent about this information, they're going to get answers that don't say CIPA, then they can cross-examine.

And then you're going to be stuck with the answer that says, "Look at all these facts that the Government did nothing with." I can live with that.

I'm sure -- well, I don't know what they want to live with, but they're going to have to live with that if that's what it is. But I thought we ended up in this problem because of the concern, which I thought was well taken, right, that

they would be stuck with the CIPA answer at trial.

So take a look at them with your agents.

MR. LAUGHLIN: Just one more point, Judge.

They're also going to be able to ask all of our cooperators that were involved in the case, "Do you know so-and-so? Did you conspire with Ariel Henry or Kiki St. Remy? They can ask that as much as they want. So the idea that they're prevented from --

THE COURT: You don't have to respond to that one. Okay.

MR. HOWARD: Just one other thing, Your Honor. We also -- if the answer of some agent is "Everybody I talked to said it was not true." "Yeah, well, who did you talk to, the people that you're offering a 5K to?" Saying that is not sufficient.

THE COURT: Oh, no, no. Saying that would be gold if that's what they said, sir, for the defense. Right? If what the agents are going to say is "We did review it and what we did is review it with a bunch of flips," you're going to have a field day with that. I'll be here for 15 weeks --

MR. HOWARD: Yes.

THE COURT: -- if I let you do that cross-examination --

MR. HOWARD: That's true.

THE COURT: -- to the full extent.

MR. HOWARD: But if, as Mr. McLaughlin suggested, they said, "Oh, no, it's not a good lead because everybody we talked to said it's not a good lead."

"Yeah? How does that help us? Who did you talk to? When did you talk to them? And when" -- because if the Government decided to latch on to a theory of the case and was dismissive or not thorough about other leads, that's relevant.

And so them even coming in and saying, "Our agents will tell you that everybody we talked to said that was foolishness," that isn't going to cut it either.

THE COURT: It does cut it because that's a potential defense. When an agent says, "We didn't bother to do anything else," that you can argue to the jury that the Government so hung its hat on one hook it didn't bother looking at anything else. That's totally fair game.

MR. HOWARD: I agree. But if they say, "No, we talked to some people."

"Who?"

"Can't tell you."

THE COURT: No, no --

MR. HOWARD: "They said it was no good."

THE COURT: That's the point. Once they get to "I can't tell you because it's CIPA," that's why we're in this mess. So they're going to sit down and tell me whether that's going to be the answer, because if an agent surprises me with

that answer, we're going to be really unhappy.

So they've got to sit down and say, "What are these agents going to say?" And you might have an agent that said, "Yeah, I heard that, did nothing with it." You're going to be able to cross-examine. You're going to be able in closing arguments say, "Every time the Government got a piece of information that didn't fit with their theory, they didn't care to review it."

MR. HOWARD: Okay.

THE COURT: The Government has plenty of other evidence. But yeah, they're going to have to sit there and pretend they're taking notes when you argue that. Right? You can argue that then.

MR. HOWARD: Okay. Let's see what they come up with. Thank you, Judge.

THE COURT: Everybody start taking a look at the jury list. We now have it.

Warren, let us know how many people we're able to squeeze into these benches. We're going to try to get to 114 and 115, if we can. We just don't know where 83 is, but 83 checked in; right?

THE COURTROOM DEPUTY: They are looking for them -- actively looking for them as we speak.

THE COURT: Okay. So I do have to wait for 83.

Just to let the Government and the defense -- remind

you -- remember that I'm going to look at you at some point and say, "Introduce yourselves and give us the names of any witnesses that you think are likely to be heard at this trial." I know the Government has a huge list. Hopefully you pared it down a bit for this purpose. But I just wanted to remind you and the defense that to the extent there's names, places, people, things -- right? -- that you think a juror should know, that this happens now.

All right. Mr. Ortiz's counsel is coming back in.

Juror No. 83 decided to go home, so we're just going to skip over 83. We're requiring her to come back. If we have to bring a second tranche of folks, you'll just see 83 randomly brought in. She's not excused, but I'm not waiting for her another 30 minutes to come back.

One last thing. In the proposed questions that I already submitted to all of you, I've added just a few more because I went back this weekend to look at the questions you had all proposed that I had nixed. I brought back in a question about bias for or against law enforcement officers, generally. Right? "Would you believe anything a law enforcement said, or would you not believe anything they said because they were law enforcement?"

I added back the question about whether anybody had worked or had a close member work for a private security firm. I thought that was probably important to know. I'm not sure

that it would be captured sort of in the general questions, so I put it back in. And I also put in the question whether anyone has had a close family member either work for the US Attorney's Office or a prosecutor's office generally and the question if anybody has had anybody close to them work for a defense lawyer or a defense counsel generally, because we've got questions about law enforcement.

I don't think people necessarily view the US Attorney's Office as law enforcement, and I think that that leaves the defense out. So I added those two questions. So if anybody is bothering to follow along what I had initially, I went ahead and added that.

In the description of the indictment, I'm not going to read all of the counts of the indictment. What I'm going to say is that the indictment alleges as to all defendants that they conspired to provide material support and resources to kidnap or kill a person outside the US, that they provided material resources and they conspired to kill or kidnap a person.

Again, it's pretty general. I don't think I need to read the five counts of the indictment. And then I'm going to add that as to Mr. Intriago, he's also charged with conspiring to commit an offense against the United States, smuggling goods from the United States, violating the Export Control Reform Act or submitting false or misleading export

information. Just to let you know, like I said, I'm just summarizing what the allegations in the indictment are.

All right. Let's stand for the jury.

(Venire entered at 9:46 AM.)

THE COURT: Good morning. My name is Jacqueline Becerra, and I'm the district court judge that's presiding over the matter you've been called for today. I know it's Monday after daylight savings. All right. That alarm clock was rough this morning -- at least it was for me. I'm assuming it was for many of you this morning as well.

On behalf of all the judges in our district and our community, I'm so grateful that you're here, and I thank you for being here.

We all know you're here because you got that jury summons. And listen, I know that when you get a jury summons and then you get a form that asks you if you're available for eight weeks, that's not a form that everyone was super excited to get. You probably didn't call work or tell your spouse, "Wow, isn't this exciting?" I understand that. We all understand that.

But for those of us who labor here at the courthouse, we are only here because of you, and we can only be here because of you. Our constitutional system requires that our citizens participate in really one of the most important privileges that you have as citizens, and that is jury duty.

You know, folks tell me, "Hey, we elect the president. We elect senators. We elect members of Congress. Nobody elected you. And that is true; I'm not an elected official. Right? I was appointed by a President, I was confirmed by the Senate, but nobody elected me.

My response to that is the most important thing that happens in my courtroom, those are decisions made by jurors. I don't make that decision, right, because our system is for the people and by the people and of the people. And so again, I thank you for responding, and I thank you for being here to meet the great constitutional honor that it is to be a juror.

I know there are people in this room who have been on other juries. Every jury I pick, there is always a few people who are like "Every two years I get a summons, and when I call, they tell me, 'Oh, the last time you served was county court. This is civil. This is criminal. This is federal.'"

Some of you are pros and you've been to jury service before. For those of you who have been here before, just know that every court works a little differently, every judge works a little differently. I ask that you pay close attention to the instructions I give you as we go along through this election.

For those of you who have never stepped into a federal courthouse, right -- I mean, I'm here every day. I've been a lawyer for more than 30 years. Right? I'm used to

being in a courthouse. This is fun for me. This is home for me. Right?

People walk into the courthouse and they're like wow. Right? I don't want anybody to be nervous, okay. This courthouse is your courthouse. It is for our community. It is yours as much as it is anybody else's, even if you've never been here before.

And through the whole process that we're going to go through selection, we're here to help you. Right? We're here to answer your questions. We're here to make sure that everything runs smoothly.

So this morning you were already introduced to some of our courtroom deputies. I know that Mr. Condon and Ms. Hamm were helping you line up and helping you come in. We'll always have folks from the clerk's office here in court, not only for selection but during the course of the trial, to sort of administer the day-to-day logistics of the court.

Right here to my left is our court reporter. We'll have different court reporters as the process goes along. Please note that these transcripts are prepared in the event that the Court needs them in the future. They're not prepared for you. Right? And so we ask that you pay careful attention. But I also ask that when it comes time for you to answer any of our questions or for you to speak that you speak loudly and not quickly.

Now, I'm the biggest -- I break that rule probably more than anybody else does because I speak very quickly, but I'm going to ask you folks to speak slowly when you're asked to speak.

We also have a number of court security officers with us. Again, they'll be here not only for selection. They're here during the course of the trial. The rule for the court security officers is pretty simple. If I'm on the bench, court security officers are here. That's part of our protocol to make sure that things run smoothly. All right? So that's a little brief introduction.

Like I said, we're all here to make sure that your service goes off without a hitch and that you're comfortable and that you have any of your questions answered.

The case that's set for trial today is the United States versus Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, and James Solages.

Is the United States ready to proceed?

MR. LAUGHLIN: We are, Your Honor.

THE COURT: Is Mr. Ortiz ready to proceed?

MR. HOWARD: We are.

THE COURT: Mr. Intriago?

MR. PEREZ: Yes, we are, Your Honor.

THE COURT: Mr. Veintemilla's counsel, ready to proceed?

MS. KUDMAN: We are, Your Honor.

THE COURT: And Mr. Solages's counsel?

MR. FRIEDMAN: Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, this case arises out of an indictment. An indictment is a formal document that's used by the United States Government to start a criminal case and to bring that case to court.

It advises the defendant of what the charges and the nature of the crime that the Government alleges they committed are. It is, however, not evidence. And the fact that an indictment exists gives no inference whatsoever as to the guilt of any defendant.

The defendants in this case have all pled not guilty to the charges against them. Because they've pled not guilty, the jury selected to try this case must find the relevant facts and determine whether the evidence proves each defendant guilty as to each of the charges.

In a criminal case, it is the Government that has the burden, and only the Government has the burden to prove that a defendant is guilty, and the Government has a duty to prove that beyond any reasonable doubt.

Now, this case concerns the July 7, 2021, assassination of Haitian President Jovenel Moise. The indictment contains as to all the defendants counts that allege that the defendants conspired to provide and provided

material support and resources to kidnap or kill a person outside the United States, to provide that material support and resources to the conspiracy, and that they conspired to kill or kidnap a person outside the United States.

Mr. Intriago also faces charges for conspiring to commit an offense against the United States for smuggling goods from the United States, violating the Export Control Reform Act, and submitting false or misleading expert information.

That's just a general summary of what the charges are. For those of you who are selected on the jury, of course you will have detailed instructions from me on the law that governs the charges.

So, again, I know you don't know anything about the case. Does anybody just hearing this short description of what the case is about -- does anybody have any very strong feelings or opinions already about the matter? And if you do, I'll ask that -- we have those paddles. It's just a little easier -- I know they kind of look like wonky little auctioneer paddles, but I promise you that it's much easier for us to keep track of answers and questions.

Does anybody just -- again, with this short summary, anybody have strong feelings about the case already?

All right. I see no hands.

So I'm going to ask now that each attorney introduce

themselves. And so they're going to stand. They're going to introduce themselves. They're going to introduce everyone who's sitting at their counsel tables. They're going to introduce their clients. And they're also going to introduce or give you names of people that you might hear from if you were selected as a juror.

Look, there might be a very common name. Right? A John Smith, a Maria Rodriguez. Okay. If there's common names like that, that may or may not be that helpful to you. But I'm going to ask two things: that you look closely, take a look at everybody, take a look at the folks sitting around you. I know that you were already processed in the jury room, of course, so you've seen some of your jurors. And I want you to look at people and listen.

Once all the lawyers are done, I'm going to ask if anybody recognizes anybody either in person or by name. I, not too long ago, had my neighbor sitting on a jury panel. I think he was a little shocked to know that I was a judge because otherwise he knows me as the woman who randomly walks her dog at odd hours. Right? But at any rate -- so I just want you to look carefully. I've had coworkers sometimes in the panel -- right? -- people that used to work together.

It's important that you take a minute and that you listen carefully.

We'll hear first from the United States.

MR. LAUGHLIN: Good morning, ladies and gentlemen. Thank you for coming. I'm Assistant United States Attorney Sean McLaughlin. Also with me at counsel table are the people that are going to be helping me try this case on behalf of the United States: Assistant US Attorney Jason Wu; DOJ trial attorney Andrew Briggs; Assistant United States Attorney Altanese Phenelus; and also the case agent, FBI Special Agent Tom Pavletic.

Good morning. Thank you for coming.

THE COURT: Mr. McLaughlin, any names of witnesses that you'd like to present at this time?

MR. LAUGHLIN: Yes, Your Honor.

During the Government's case in chief, the United States will call the following witnesses: Theodore Chavez, with the FBI; Jose Loureiro, FBI; Martin Suarez, FBI; Nicholas Rahmer, FBI; Xavier Castaneda, FBI; Ty Morrison, FBI; Cindy Barrois, FBI; Jorge Nuñez, FBI; Rene Luna, FBI; Jacqueline Valdes, FBI; Chris Pagano, FBI; Ryan Bonura, FBI; Daniel Gonzalez, FBI; Nestor Mascarell, FBI; Kaitlin Dayton, FBI; Leilani Laureano, FBI; Dennis Scheffel, Homeland Security Investigations; John Valentin, Homeland Security Investigations; Richard Maniara, Homeland Security Investigations; Paul Thompson, Homeland Security Investigations; John Labbe, Homeland Security Investigations; Manuel Garcia, US Customs and Border Protection. Those are

some of the agents that are going to testify.

The next tranche of people are forensic examiners. They're both with two agencies, either FBI or Homeland Security, and their names are as follows: Bryan Jordan, FBI; Elizabeth Riddell, FBI; Easton Schlueter, FBI; Dave Mingarelli, FBI; Ricardo Soto, FBI; Robert Herbster, retired FBI; Michael Paul Betancourt, retired FBI; Susy Hwang, formerly with the FBI; Bryan Hixson, Homeland Security Investigations; Christopher Wallace, Homeland Security Investigations.

And the following three people are Homeland Security Investigations folks. They're retired, and their names are Steven Towe, Richard Wilkins, and Tim Stewart.

We're also going to call Dimitri Smith with the US Department of Commerce; former regional security officer with the US Department of State, Scott Reese; and Deputy Director Susan F. Walke with the US Department of State.

We're also going to call the following other witnesses: Mario Antonio Palacios Palacios; German Alejandro Rivera Garcia; Joseph Joel John; Frederick Bergmann; Rodolphe Jaar; Jacob Israel; Keegan Harricharan; Pravin Borkar; Reiniel Gonzalez, who works at IBC Airways; John Roger Noelcius; Martine Moise, the former first lady of Haiti; Jomarlie Moise; and Drs. Jean RC Armel Demorcy, and Dr. Steven Kalandiak. That is all, Your Honor.

THE COURT: Thank you very much.

Anybody recognize either anyone sitting at counsel table or recognize any of those names offhand?

All right. I see no hands.

Mr. Howard.

MR. HOWARD: Thank you, Your Honor.

Good morning, ladies and gentlemen. My name is David Howard. Thank you, good morning. Thank you for coming and participating in this process.

My name is David Howard, and I represent, along with Daniela Jaramillo and Orlando do Campo, we represent Mr. Arcangel Pretel Ortiz.

We only have four names that we want to alert you to at this time, and that is Reynaldo Corvington, Ariel Henry, Robert Jean Marie, and Javier Llanes.

Thank you.

THE COURT: All right. Anybody recognize Mr. Ortiz or any of his counsel or any of those names?

All right. That's No. 58; is that correct? All right. When we get to you, Juror No. 58, we'll talk a little bit about who you know when we get to talk to you, when your number comes up. Thank you very much.

Anybody other than 58?

I think there's a juror with a question. If you're not sure, why don't you just give me your number and then when

we -- okay, Juror No. 25 might have someone they know.

All right. Mr. Perez, let's hear now from you and your team.

MR. PEREZ: Good morning. My name is Manny Perez. Myself and Mr. Hector Flores, who is here, are representing Mr. Antonio Intriago, who is one of the accused in this case.

We have no names to provide to you regarding witnesses.

THE COURT: Anyone recognize Mr. Intriago or his team -- his lawyers?

All right. Thank you very much.

Ms. Kudman? Ms. Descalzo?

MS. KUDMAN: Thank you, Your Honor.

Good morning, ladies and gentlemen. Thank you so much for your service. My name is Tama Kudman. Along with me is Marissel Descalzo. We are both attorneys for Mr. Walter Veintemilla.

DEFENDANT VEINTEMILLA: Good morning.

MS. KUDMAN: We have no names to offer, Your Honor.

THE COURT: Thank you very much.

Anyone recognize Mr. Veintemilla or his counsel?

All right. I see no hands. Thank you very much.

Mr. Friedman? Mr. Dray?

MR. FRIEDMAN: Good morning, everyone. Can everybody hear me now?

My name is Jonathan Friedman. Along with Patrick Dray, we both have the honor of representing James Junior Solages. The following names are as follows: Thomas Pullen, Gus Dimitrius, Pedro Fernandez Ruiz. That's it.

THE COURT: All right. Thank you very much.

Anybody recognize Mr. Solages, his counsel, or any of the names?

All right. I see no hands. Thank you very much.

Does anybody recognize each other? Anybody work together or recognize each other or anybody know me or recognize me? All right. So -- all right. So I see -- let's look first at the jury box. All right. Hold on. Just give me the number and then we'll get to it. So Juror 23 in the jury box. Juror No. 14.

All right. I'm going to look at my left. I have Juror 68, Juror 80, Juror 93, and Juror 99. And over here to my right is Juror 28. Is that 58? Okay. Wonderful. Thank you very much.

All right. Ladies and gentlemen, as you know from the summons that you already received, we expect this to be about an eight-week trial -- eight to ten weeks. I'll do everything I can to keep it at eight or under. And I'll make sure we don't go over that ten-week outlier. All right?

Let me tell you a little bit about how the schedule works, because the schedule is not 9 to 5:00 every day. All

right? We'll be here Mondays, Wednesdays, and Fridays from 9:00 to 4:30. We take a mid-morning break for about 15, 20 minutes, and we take another, mid-afternoon break around 3 o'clock. It depends on when people need their coffee or, more precisely, when I need my Diet Coke, and then you have an hour for lunch.

On Tuesdays and Thursdays we're going to run a shorter day. So on Tuesdays and Thursdays, we'll be here at 9:00. There will be one mid-morning break. Lunch will only be 30 minutes because we'll be gone at 2:00. Right? So Tuesdays and Thursdays it's a 2:00 stop.

We will be in recess Thursday, April 2nd; Friday, April 3rd; and April 6. All right? And so that's around the Passover and Easter break. Right? So the Friday before Easter, the Monday after Easter, the Thursday before Easter, we're going to take three days off during that time period to accommodate what I presume is already some vacations or some plans for those holidays. And that's around the midpoint mark, so everybody gets a little bit of a break there.

Now, I know that you know coming in here that this is going to be a long trial. You've already told our jury office that you're available. I wanted to give you the sense of the time frame, and I think some of that was also in the summons so that you understand what the full scope of the days are.

I want to know now -- okay, now you're here. You see

the case is going to be lengthy. If you, for example, have a doctor's appointment on March, I don't know, 25th and you need to leave by 3 o'clock, look, those are things we're going to accommodate. All right? If your daughter is graduating from kindergarten, even, April 6 and you can't be here in the morning, we're going to accommodate things like that. All right?

The lawyers, myself, we also have things that we need to accommodate. So that kind of stuff we can accommodate. If you have a dentist appointment next week, I'm going to ask you to move that. Those are things that can be accommodated. If you were really hoping to go to Marco Island with some friends two weeks from now, I'm going to ask you to leave Friday night and come back Sunday or do that another week.

If you didn't realize it and you have nonrefundable tickets to celebrate your 20th wedding anniversary and you're leaving April 4, okay, that's a different situation. All right. I understand that there are some things that you can't move. I understand that this is an imposition. We all understand this is a lengthy time period. But as I reminded you all when we started here, this is part of our jury system. This is part of our constitutional system.

So I want to give you an opportunity now, now understanding what the schedule is going to be, does the schedule present a hardship for you that you cannot otherwise

account for or control? So I'm going to ask the folks first in the jury box if there's anyone for whom the time frame presents a hardship.

All right. I see Jurors 11, 16, 18, 24, 26, 20, 9, 10 -- if I've already announced your number, please put your paddle down -- and 22. All right.

Going to my left now, once I say your number, if you can just put the paddle down. So I have Jurors 70, 82, 84, 94, 75, 76, 87, 96, 91, 101, and 104. All right. We'll talk about those hardships.

MR. DRAY: Excuse me, Your Honor, I think 77, but it's not --

THE COURT: 77, all right. 77.

All right. Now to my right. I see Jurors 47, 35, 42, 31 and 32, 40, 60, 61, and 62.

All right. Thank you very much.

Now, ladies and gentlemen, I'm going to be asking you all a series of questions now in order to determine your qualifications to serve in this particular case. These questions are for the sole purpose of determining if your decision in this case would be affected in any way improperly by any opinion or personal experience or special knowledge that you have.

Our goal here today is to pick an impartial jury, right, that will hear the evidence presented in this courtroom

and that will not be influenced by other factors. So I say that to you to make sure that you understand we're not trying to embarrass anybody or make you uncomfortable or to pry into any kind of personal matter. Right? We're trying to obtain a fair and impartial jury.

If during the course of any of the questions I have for you you have something that is responsive that you feel that you need to disclose but you don't want to disclose it to 106 people, let me know, because we can discuss it and you can talk to us with respect to that, right, outside the presence of the entire jury panel.

However, the Government will still be there. All the defense and the counsel will still be here. My courtroom staff will be here. The court reporter will still be here. So I don't want to give anybody the misimpression that you and I are going to have a private meeting about something that other folks don't share. Right? It's still a process, obviously, where all the lawyers and the court staff are available, but I can, like I said for -- if there's something that's truly, truly something that you don't want to share to the whole 106 panel, we can go ahead and do that.

So the first thing I want to do is I'm going to go through again some fundamental questions, some have to do with the case, some have to do just with our system in general. And we're going to go about it the same way we did just now,

whether or not you recognize folks or whether or not you're available.

I just want to determine who you are, and then we're going to -- after this process, we're going to go one by one by one. And so if you're a juror that told me that you knew somebody or you had a problem with your time or you have something to say about any of these issues that I'm going to bring up, we'll talk about it then, all right, when we go one-on-one.

So the same thing will go through with the panels. All right. So my first question for you is, this case was primarily investigated by the Federal Bureau of Investigation -- the FBI -- and the Department of Homeland Security Investigations.

Have you or any close member of your family or any close friend had an experience with the FBI or HSI that have left you with a particularly strong feeling or opinion, either positive or negative, about these law enforcement agencies? So we're talking about a strong opinion based on an experience that you or somebody close to you had with respect to the FBI or the HSI.

Anyone here in the jury box? All right. So I see No. 25. All right. Thank you, ma'am.

The group to my left?

I see no one to my left.

And to my right?

All right. I see no hands.

The next question I have for you, because you will be hearing, as you heard from the prosecutors -- you're going to be hearing testimony from law enforcement agents. I want to know if any of you already have a strong bias for or against a law enforcement agent. And what do I mean by that in particular?

Would you tend to believe a law enforcement agent more just because they're a law enforcement agent? It doesn't matter what they say. You already tend to agree with them just because they're in law enforcement, or you already don't like them. Right? You're already tend not to agree with them before they were a law enforcement agent. I will instruct you because you have to determine credibility. Right? So I will instruct you that when you're measuring someone's credibility, right, you can believe everything they say. You can believe nothing they say. You can believe parts of what they say or not, right, depending on a host of factors.

This is stuff you do in your daily lives. Right? But I want to know just going into it if you feel like, you know, if it's a law enforcement agent testifying, I'm already going to believe them. I'm already going to be more likely to believe them, or I already don't believe them because they're in law enforcement. So let me see any hands here in the jury

box.

All right. So in the jury box I have 18, 20, 9, 22, 25, 26, and 27.

All right. To my left?

All right. I see 73, 78, 84 -- I think that's 98 -- 96, 106.

All right. And to my right, this group here?

All right. I see 47, 54, 63, 61, and 46.

And back to the jury box?

15 and 13.

All right. The next question is whether you or anybody that's close to you or any family member or any close friend has ever worked for a private security firm.

Anybody here in the jury box?

All right. I see Juror No. 18, Juror No. 22, and Juror No. 1.

All right. To my left, private security firm?

All right. I see no one.

And to my right?

Juror No. 43 and Juror No. 66.

All right. The next question is whether you or anybody close to you or any family member or very close friend has ever worked for a prosecutor's office, either the State Attorney's Office or the US Attorney's Office, the Department of Justice, right, any organization that prosecutes.

All right. Here in the jury box, I see Juror No. 4, Juror No. 22, Juror No. 23.

All right. To my left?

I see Juror No. 99.

Anybody to my right?

All right. I see Juror No. 56, 45, 36, 59, and 60.

All right. Thank you very much.

The next question is whether any of you or anyone close to you, family or friends, has ever worked either at a public defender's office or for a criminal defense lawyer, anybody that's sort of in the criminal defense world, right, either in an office that represents criminal defendants or an individual or any kind of law firm that does criminal defense work.

Here in the jury box?

I see no one.

To my left?

All right.

And to my right?

All right. I see no one.

THE COURT: All right. The next question is whether you or any close family member or close friends have any experience with either working in or living in Haiti or whether you have any familiarity with the military, government, or political system of Haiti. You've lived there,

you know about it, you're very familiar with Haiti is the question.

All right. Juror No. 5, Juror No. 7, Juror No. 8, Juror No. 9. I see no one else in the jury box.

To my left, anyone familiar with the political system, the government of Haiti, lived or worked in Haiti, to my left.

I see none.

And to my right?

Juror No. 36.

All right. Now, have any of you or a close member of your family or a close friend had any experience with working or living in Colombia or any familiarity with the military, government, or political system of Colombia?

Anybody here in the jury box?

All right. I see Juror No. 5, Juror No. 26.

All right. To my left?

I see Juror No. 70, 75, 99.

And to my right?

I see Juror No. 37.

All right. Have any of you followed any media coverage with respect to the events surrounding the July 7, 2021, assassination of Haitian President Jovenel Moise in Port-au-Prince? If so, is there anything you've seen, heard, or read about the case or these events that you believe would

interfere with your ability to render a fair verdict in this case?

So has anyone seen anything in the media that would affect their ability to be fair?

All right. In the jury box?

I see Juror No. 5. I see Juror No. 25, Juror No. 9.

Anybody else in the jury box?

All right. How about to my left?

I see Juror 77 -- is that 103 and 106? All right. 103 and 106.

And to my right?

I see Juror 54 and 47.

Anyone else?

All right. Now, there's going to be testimony in this case presented by individuals that were charged with crimes related to the July 7, 2021, assassination. They've pled guilty and they're now cooperating with the Government. Some may have pleaded guilty pursuant to a plea agreement or a cooperation agreement. And in those agreements, the Government agreed to drop other charges against the witness or agreed that they could later recommend, subject to certain conditions to the Court, that that witness receive a lower sentence in return for truthful testimony.

Does anybody believe that it is wrong, unfair, not proper for the Government to do this?

In the jury box?

I see no one.

To my left?

I see no one.

To my right?

Juror No. 56.

All right. Have you, a family member, or a close friend ever run or held an elected office, be it in a city, state, county, federal, any kind of municipality -- any kind of elected office -- you, a family member, or a close friend either in this country or any other country?

Anybody in the jury box?

All right. I see Juror No. 4, No. 15, Juror 23.

All right. To my left?

Juror No. 67. I think that's 105 and 106; is that correct?

A COURT SECURITY OFFICER: Yes.

THE COURT: And to my right?

All right. I see no hands.

All right. Now I'm going to ask you a series of questions about some fundamental principles of law that apply to this case. They apply to all criminal cases pursuant to our Constitution. All right? The first principle is that an accused is presumed innocent. We have the presumption of innocence in this country.

Is there anyone here who cannot fully accept that a defendant is presumed innocent?

In the jury box?

To my left?

And to my right?

I see no hands.

A defendant cannot be found guilty in this country unless his guilt is proved beyond a reasonable doubt.

Is there anybody here who cannot accept the principle that a defendant can only be found guilty if there's proof beyond a reasonable doubt?

In the jury box?

The left?

I see no one.

And on the right?

I think I did see a number. Juror No. 35.

All right. I see no other hands.

A defendant does not need to testify on his own behalf because only the Government, right, has the burden. If a defendant does not testify, you cannot infer any guilt from that fact. Is there anyone here who cannot fully accept the principle that a defendant does not need to testify?

Anybody in the jury box?

All right. I see Juror No. 10. I see nobody else in the jury box -- Juror No. 11.

All right. How about to my left?

I see no one.

And to my right?

I see no one.

All right. A defendant can only be convicted on evidence presented in open court, and nothing else. So nothing that you know or hear about outside the courtroom. Right? You can only consider the evidence that's presented here in the courtroom in the trial. Is there anyone who cannot fully accept that principle in the jury box?

All right. I see no one.

On the left?

I see no one.

On the right?

I see no one.

All right. A juror must accept and apply the law as I instruct. All right? So when I instruct you on the law -- and I will do that at the beginning of the trial. I'll give you just some instructions, and then at the end of the trial I give you all the law that you can consider.

You have to accept the law as I tell you it is, even if you disagree with me, even if you think the law shouldn't be that. Right? You have to accept the law as I instruct you. Is there anyone who cannot do that, who cannot accept the law as I instruct them?

In the jury box?

To my left?

Or to my right?

Okay. As a juror, you have to make decisions based solely on the evidence and the law. You can't look at anything else. You look at the evidence and you look at the law. Is there anyone in the jury box that feels that they would not be able to make a decision based on the evidence and the law? Anybody in the jury box? I don't see anybody.

On the left side? I don't see anyone.

And on the right? Juror No. 35.

As we're sitting here, is there anyone -- you haven't heard any evidence in the case. Right? Is there anybody who already favors the Government -- even though you haven't heard anything, you're already Team Government? Or is there anybody who is already Team Defense? One or the other. Is there anybody who already feels like somebody's got the edge or you already are favoring somebody?

Anybody here in the jury box already favor a side?

All right. So I have Juror No. 20, Juror No. 11.

All right. To my left?

Juror 77, Juror 78, Juror 96, Juror 98, and Juror 106.

Anybody to my right?

All right. That would be Juror 56 and Juror 63.

All right. Those are the general questions I had for you. Now, do you-all have handy your juror questionnaire? Okay. Let me tell you how we're going to work the jury questionnaire. We're now going to go to each of you one by one. All right. You're going to stand and you're going to answer out loud the questions.

For Mr. Yao, it's the hardest push because he is No. 1. When I get to 106, we're going to be flying through this. We're going to ask you to slow down and articulate your answer because the court reporter has to do it. All right?

Let me just go through it with you as if I were a prospective juror. Okay? And the one thing I want to remind you is, again, don't be nervous. We're all here. I have the questions. If you miss something, if you skip over a question, I'll ask you to go back, right, and explain it. So I don't want anybody to be too fixated, right, with the questionnaire.

But if I were, for example, one of the jurors, I would say this. My name is Jacqueline Becerra. I'm 56 years old, and I was born in Hialeah, Florida. I live in the northern part of the district. I have a law degree. I went to elementary school here in Hialeah. I went to high school in Westchester. I went to University of Miami. I went away for law school. I was a lawyer for many years. Now I'm a judge. Of course, I'm a lawyer, so that's my legal training.

I have a niece who's a lawyer. I'm not married. I don't have any adult children. I read the Miami Herald. I read the Washington Post. I read The Wall Street Journal. I read The New York Times. I read all kinds of magazines. I like People magazine. I don't look at a lot of websites.

I watch all kinds of TV. I don't have a lot of hobbies. I do watch, like, Netflix and I do like to buy books. I never have time to read them, but I do like buying them.

I've never served in the military. I don't have any friends or family in the military. I've been called to jury duty before, but I've never been picked. I don't have any close friends in law enforcement. I do have some friends who work for the federal government but nobody I'm really close to. I or no one close to me that -- or no one close to me as a friend or family has ever been arrested or accused of a felony.

I don't have any medical issues that would prevent me from serving as a juror. I don't have any religious or moral beliefs that would prevent me from serving as a juror. And I think I can be fair to both sides.

All right? So that's what we would -- oh, are people missing a page?

A JUROR: Yes.

THE COURT: So they only gave you one page. You knew

something was going to happen. I knew this was just going too smoothly. I'm looking at all the lawyers. They're like, yep, this is going well, and then, here we go.

All right. Yolanda, you don't have one because I didn't send it to you. I only sent it to the jury staff. And the copy that I have has my notes on it. We can put it on the ELMO, but this isn't my courtroom. I'm borrowing the chief's courtroom today so that we can fit more of you in. We don't have the panels down, so they won't see it.

He went to make some copies. Can you grab him and just tell him just ten copies is good, because then we can at least get started and then we'll get most of them.

My apologies. When Mr. Friedman's microphone wasn't working, I thought I was safe that that was all that was going to happen today -- the technical glitch, but no, we've got other glitches. My apologies. If you want to stand and stretch a little bit, go ahead and do that. If anybody needs to run to the restroom quickly... Not everybody at once but...

(Pause in the proceedings.)

THE COURT: All right. So I think we've got enough jurors with that second page. We can go ahead and get started. If the marshals and court security officers, as the jurors who went to the bathroom come back in, just let them know they can be seated right away.

All right. Let's hear from Juror No. 1.

THE PROSPECTIVE JUROR: Hi. My name is Jayson Yao. I'm 60 years old, and I was born in New York City. I live in Miami Shores. I graduated from the University of Miami and I have a master's degree at FAU.

For the last ten years, I own a fire alarm company. We do commercial and -- commercial fire alarm installations. I have a nephew and -- my brother is an attorney. My nephew is an attorney.

My wife works for the Village of Miami Shores. I have three children, all over 18. They all graduated from college.

Newspapers, I read newspapers and sports websites. I like to golf, and watch Netflix with my wife. None of my close friends or family has ever served in the military.

I have not served on jury duty before. No family member has worked for a law enforcement agency or the federal government. No close friend or family members have been convicted of a felony. No medical issues. No religious or moral beliefs that will preclude me. That's it.

THE COURT: So your kids, you said, all graduated from college.

THE PROSPECTIVE JUROR: Yes.

THE COURT: What is it that they do?

THE PROSPECTIVE JUROR: One's a nurse. One is --

currently works for a recruiting company. And my third -- my other son works for me at the alarm company -- fire alarm company.

THE COURT: And then you said you had a brother and a nephew who are lawyers. Tell me what they do.

THE PROSPECTIVE JUROR: Well, my oldest brother is retired, but he was an attorney for Exxon. And then my nephew works for Greenberg.

THE COURT: And did your brother who worked for Exxon, did he ever practice any criminal law?

THE PROSPECTIVE JUROR: No.

THE COURT: Does your nephew?

THE PROSPECTIVE JUROR: No.

THE COURT: And just for full disclosure, your brother is a veterinarian in Miami Shores and -- not my personal veterinarian, of course, but has treated my pets. So I do have -- I don't know you. I've never met you, sir, but just for disclosure for counsel, I do know your brother.

THE PROSPECTIVE JUROR: That is my brother. Thank you.

THE COURT: All right. Thank you very much.

Let's hear from Juror No. 2.

THE PROSPECTIVE JUROR: My name is Edit Szamosi. I'm 38 years old --

THE COURT: Hold on. Your microphone is not

working -- tend to that microphone, please.

A PROSPECTIVE JUROR: My name is Edit -- is it better?

THE COURT: So I can hear you, but our court reporter has an earpiece on. So unless it's coming through the microphone, he wouldn't be able to hear it.

THE PROSPECTIVE JUROR: So my name is Edit Szamosi. I am 38 years old, and I was born in Hungary, in Budapest. I live in Aventura. It's North Miami Beach. I finished my high school in Hungary, and I was studying -- I'm a pharmacy technician, so I did my license here in the United States. And that's what I've been doing in the past five years. Before, I was in sales. I was selling medical devices.

And no, my family member or friend doesn't have any legal training -- none of my friends or family members. And my spouse currently is working in maintenance. I don't have any children. I don't really follow the news. I don't read newspapers or magazines. I just follow, like, major news on Google or on social media, but I don't really follow the news.

And I like to -- I like to do cycling. I do spinning classes almost every day. I don't really watch TV or shows in my spare time. My sister served in the military in Israel. I have never served on a jury before. I don't have any close family member or friend who ever worked for a law enforcement agency.

I don't have any close family member or friend who ever worked for a federal government. I don't have any close family member or close friend who's ever been arrested or accused or convicted of a felony. I don't have any medical issues. And I am not religious. And I don't think I have anything that would affect this case.

THE COURT: You said your spouse works in maintenance?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Where does he work? Like, what kind of work does he do?

THE PROSPECTIVE JUROR: He does maintenance for Airbnb.

THE COURT: All right. Thank you very much, ma'am.

Juror No. 3.

THE PROSPECTIVE JUROR: Good morning. My name is Elizangela De Liz. I was born in Brazil. I live in the US for about 25 years. I have a college degree in business administration. I work as a compliance officer. I used to work for a Brazilian bank for over 23 years until two years ago as a banker.

My husband works for a health company out of San Diego, California. He works from home. I have two children. One is six. The other one is ten. We read magazines, National Geographic. We read a bunch of kids'

books for the kids, and we listen to NPR.

I go to the gym four times a week. My husband does running. I don't have any family member or friend that served in the military. I never served as a juror before. I don't have any friends or family who worked in law enforcement or any agency. I don't have any friends or family that work for the federal government in any capacity.

I don't have any family or friends that have been arrested or accused of or convicted of a felony. I don't have any health issues. I am Catholic, but I don't think that my beliefs would play any kind of judgment on this case, and I don't think there is anything that would affect my ability to be fair for both sides.

THE COURT: You said that your husband works for a health company?

THE PROSPECTIVE JUROR: Yes.

THE COURT: What does he do for the company?

THE PROSPECTIVE JUROR: He's a financial planning manager.

THE COURT: And if I understood you correctly, you had been a banker and then recently became a compliance officer?

THE PROSPECTIVE JUROR: Yes. I became -- I was a banker for 23 years, and I became a compliance officer in March of last year.

THE COURT: All right. Thank you very much.

I'm going to actually ask that you pass the microphone back to Mr. Yao because I forgot to ask him one question.

You had raised your hand that you knew somebody who worked in private security.

THE PROSPECTIVE JUROR: Private security. So prior to the fire alarm company, 50 State Security, which was in existence before we bought the company, they did armed service -- security guard services. So I actually was the CFO for 50 State Security.

THE COURT: Okay. So you worked as the CFO for how many years?

THE PROSPECTIVE JUROR: 18 years.

THE COURT: Okay. And so that company did armed security services. What else did they do?

THE PROSPECTIVE JUROR: Airport security, college security. So everything from unarmed guards to armed guards.

THE COURT: All right. And how long ago was that?

THE PROSPECTIVE JUROR: They sold in 2016.

THE COURT: When you did that, how much information or let's say contact did you have with what the company was doing? I know you're the CFO, so are you just looking at the numbers or was it a small enough company where maybe you also understood the business and had a hand in the business as

well?

THE PROSPECTIVE JUROR: Yeah, it was a small enough company where I advised as to our growth and the actual final sale as well.

THE COURT: All right. Thank you very much, sir.

THE PROSPECTIVE JUROR: You're welcome.

THE COURT: All right. Going now to Juror No. 4, Ms. Moss.

THE PROSPECTIVE JUROR: Hi. My name is Simone Moss. I was born in Miami, Florida. I'm 37 years old. I grew up in Cutler Bay, Florida and still live in Cutler Bay, Florida. I have an associate's degree in college. Graduated high school. Current employment, I currently work at Home Depot, merchandising. Before that, I worked in sales at a retail store. My best friend is a lawyer. She practices family law. I don't have a spouse. I don't have any children. I keep up with the news regularly through social media, websites, television, news.

I like to go to the gym. I like to paint. I do watch TV. I watch sports, mostly tennis and basketball. I have several close friends who are in the military, including my next-door neighbor, who I've known -- who is also my brother's best friend. He's a retired Marine.

I've never served on a jury before, but I've been, like, selected on the last step before the jury, so... I also

know some senators and things. I'm not aware of anybody who worked for the federal government in any capacity. I've never been arrested or a close family member has never been arrested or convicted of a felony.

I don't have any medical issues to keep me from participating. I don't hold any religious or moral beliefs to -- that will keep me from being fair. And I don't believe there's anything that will affect me from being fair.

THE COURT: So you had mentioned before that you knew people who worked at the prosecutor's office or in a prosecutor's office.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Tell me about that.

THE PROSPECTIVE JUROR: Well, my sister used to work for the State Attorney's Office, but now she does -- she works for the Department of Children and Families.

THE COURT: Okay.

THE PROSPECTIVE JUROR: My best friend is a lawyer, but she works in family law.

THE COURT: Right.

So what did your sister do at the State Attorney's Office?

THE PROSPECTIVE JUROR: I'm not sure.

THE COURT: Okay. How long ago was that?

THE PROSPECTIVE JUROR: A long time ago.

THE COURT: Okay. You said -- you raised your hand when we asked about elected officials, and now you mentioned that you knew some senators. Tell me about that.

THE PROSPECTIVE JUROR: Well, I know Senator Dwight Bullard. He was a teacher at the high school I graduated from before he became a senator. And then I have a few friends who were elected -- became elected officials.

THE COURT: State? Local?

THE PROSPECTIVE JUROR: Local.

THE COURT: Are these close friends? Tell me a little bit more about those relationships.

THE PROSPECTIVE JUROR: I knew them from high school, and I helped them campaign once.

THE COURT: And are they, like, municipal or at Tallahassee? Tell me exactly what kind of positions they have.

THE PROSPECTIVE JUROR: A local position, but I don't think she is on it anymore.

THE COURT: What position was it?

THE PROSPECTIVE JUROR: She was a circuit or -- I don't really remember.

THE COURT: Okay. Did you talk to her at all about her work when she was an elected official?

THE PROSPECTIVE JUROR: Not really. Like...

THE COURT: And the state senator that you know, he

was a teacher at your school; is that right?

THE PROSPECTIVE JUROR: Yes, he was.

THE COURT: Is that someone -- do you still talk to him? Are you close to him?

THE PROSPECTIVE JUROR: Not really, no. It's just we occasionally connect on Instagram maybe or Facebook. That's it.

THE COURT: You said you do use social media. It sounds like you use Instagram and Facebook?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Any other social media platforms that you regularly use?

THE PROSPECTIVE JUROR: Those are pretty much the two.

THE COURT: All right. Thank you very much, ma'am.

Juror No. 5, Ms. Herrera?

THE PROSPECTIVE JUROR: Good morning. My name is Irina Herrera. I'm 63 years old. I was born in Santa Marta, Colombia. I live in West Kendall. I have a professional degree in architecture, and I practice architecture. I have been with my current employer for the past ten years, and I do project management, construction administration, site visits, and anything that involves getting permits and dealing with building officials.

Also, I have a partner. He is -- he doesn't have a

college degree, but he is a software developer, and he's a computer programmer, and basically, like, a computer genius. And so he's hired -- he works for a manufacturing plant, writing software that can save them money rather than buying the software. He writes it for them.

Also, I have a child. He's 24 years old. He's a graphic designer, but he works as a welder because it pays a lot more. Also, I do read newspapers online, go to websites. I only watch television in the morning. I watch -- follow the news while I get ready for work, and I do watch shows like investigative work. I like horror movies, action movies, military movies, and some forensic shows.

Also, I have many hobbies. I like languages. I like to travel abroad. Now that my child is older, I can leave the country. I'm learning guitar. I sing with the choir of the church, and I love gardening and cats.

Also, I have a close friend whose child is currently deployed in the military. So I do know somebody who is currently in the military and active. I had never served in a jury before. I have -- I don't have a family member or friend who was working in law enforcement -- nor a family member or friend. I do have a family member who was once arrested, not for failure of anything, but he was arrested. And I have a medical issue but it's not a big deal. I have hypoglycemia. My sugar goes down and I get a little dizzy.

I do hold religious belief. I'm a practicing Catholic -- an active Catholic. I don't think that would interfere, you know, being a juror. And that's it.

THE COURT: Do you think -- the last question asked is whether or not there's any reason why you think you wouldn't be fair in this case. Do you think you could be fair in this case, ma'am?

THE PROSPECTIVE JUROR: I can be fair.

THE COURT: Okay. So I wanted to ask you a couple of other questions because you mentioned when I asked folks if they were familiar with Haiti or had visited Haiti. Tell me about what your connection to Haiti, if any, is.

THE PROSPECTIVE JUROR: Well, I have not visited Haiti, but I do have very, very close friends from church who are nationals from there. And some of them have been persecuted. And one of them recently had something happen really bad, and I am -- I read a little bit about the case.

When you mentioned it, it didn't come to my mind what it was, but as I heard, then I have an idea what it is about and who is involved and where they're coming from.

THE COURT: All right.

THE PROSPECTIVE JUROR: So because of the nationality.

THE COURT: So if you were to serve as a juror in this case, I would be asking you to put that information

aside.

THE PROSPECTIVE JUROR: Yes.

THE COURT: So anything you've read, anything anybody's told you about Haiti, you have to put that aside and not consider it. Do you think you could do that?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. So you don't think you would be influenced? For example, you've had friends, you've said, that are Haitian that have gone through things in Haiti. Would that affect you here?

THE PROSPECTIVE JUROR: No. They're friends from church, and we try to be very neutral when we hear things like that.

THE COURT: Okay. You also mentioned that you visited or were familiar with Colombia. I take it that's because you're from Colombia originally --

THE PROSPECTIVE JUROR: I was born there, yes.

THE COURT: Okay. Do you visit Colombia frequently?

THE PROSPECTIVE JUROR: No.

THE COURT: When was the last time you went to Colombia?

THE PROSPECTIVE JUROR: Well, let me tell you. The first time I went back after I came here was 20 years later, and I have only gone back for funerals only twice.

THE COURT: Okay.

THE PROSPECTIVE JUROR: But I am in touch with my family.

THE COURT: Okay. So you're still in contact with your family, but you don't visit often. Is that fair?

THE PROSPECTIVE JUROR: I don't visit often.

THE COURT: All right. You also mentioned that you had seen some media report --

THE PROSPECTIVE JUROR: Yes.

THE COURT: -- is that correct?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. And again, that is something that you can put aside and just look at the facts as you see them in this courtroom; is that right?

THE PROSPECTIVE JUROR: Yes. Because when you mentioned it, it didn't come to my mind just as I heard. And right now, the details are a little bit fuzzy at the moment.

THE COURT: Okay. All right. Thank you very much, ma'am.

We can go to Juror No. 6.

THE PROSPECTIVE JUROR: Hi. Good morning. My name is Ana Albites. I'm 45, and I was born in Nicaragua. I would say my area is more a little bit West Kendall --

THE COURT: I'm sorry. I'm having a trouble hearing you. A little louder maybe.

THE PROSPECTIVE JUROR: Sure. Sorry. Do I start all

over or --

THE COURT: No, no, that's okay.

THE PROSPECTIVE JUROR: I want to say I'm by, like, the FIU/West Kendall area. My educational background, I completed college, and I work for the University of Miami. I've been in health care all of my life. I work currently in laboratory services. My brother is a personal injury attorney. My partner works for the City of Hallandale in IT. I do have two children under 18. One is 12 and one is 14.

I don't really follow the news, but I do have social media. For hobbies, I play pickleball. I do not have family that served in the military. I've been summonsed for jury but never served. I don't have family that works in law enforcement or the federal government -- well, my partner works for the City of Hallandale.

I do have a first cousin and -- who is -- was convicted, and my best friend's husband was also convicted. I don't have medical issues. I'm Catholic, but I don't see any reason why I can't be fair.

THE COURT: All right. Tell me a little bit more about what you do. You say you're in lab services. What is it that you do?

THE PROSPECTIVE JUROR: So I work in admin -- I do operations for the laboratories --

THE COURT: All right.

THE PROSPECTIVE JUROR: -- for the University of Miami.

THE COURT: How long have you been at the University of Miami?

THE PROSPECTIVE JUROR: Nine years.

THE COURT: Okay. And then you said you had a cousin that had been convicted of a felony?

THE PROSPECTIVE JUROR: That's correct.

THE COURT: How long ago was that?

THE PROSPECTIVE JUROR: Maybe four or -- maybe four years ago, five years ago.

THE COURT: Okay. What was the charge?

THE PROSPECTIVE JUROR: I don't know the charge, but it had to do with -- he was a cheerleading coach, and it had to do with him, I guess, talking to a minor.

THE COURT: Are you close to your cousin?

THE PROSPECTIVE JUROR: I mean, we grew up together, and we did go to his court and supported him.

THE COURT: Okay. Was that here in federal court or was it in state court or -- was it in Florida? Let me start there. Was it here in Florida?

THE PROSPECTIVE JUROR: Yeah, it was here in Florida.

THE COURT: Was it in this courthouse?

THE PROSPECTIVE JUROR: No.

THE COURT: Was it in state court?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: Is there anything about -- so you said that you went to court and that you supported him. Is there anything about that that you think would make it difficult for you to sit in this jury and be fair in this case?

THE PROSPECTIVE JUROR: I don't think so.

THE COURT: Do you think he was treated fairly by the Government in that case?

THE PROSPECTIVE JUROR: Yes.

THE COURT: You said your best friend's husband also had a conviction. What's that conviction for? Do you know?

THE PROSPECTIVE JUROR: I don't know the exact, like, conviction, but that was in this courtroom. I also came there, and it was -- had to do with gold.

THE COURT: With what?

THE PROSPECTIVE JUROR: Gold.

THE COURT: Gold, okay. So you said you did come. Did you come -- was it a trial? A sentencing?

THE PROSPECTIVE JUROR: A sentencing, in support of her.

THE COURT: I'm sorry?

THE PROSPECTIVE JUROR: It was in support of my best friend. I've known her since I'm 11.

THE COURT: Is there anything about having gone through that with your best friend that would impact your

ability to serve here?

THE PROSPECTIVE JUROR: I don't think so.

THE COURT: All right. You said you don't think. I just want to make sure --

THE PROSPECTIVE JUROR: No, I -- my brother is an attorney, and I respect the law, and I think I could be fair.

THE COURT: And you don't think that the experience with your best friend's husband -- that wouldn't impact your ability to treat the Government in this case, as well as the defendants, equally and fairly?

THE PROSPECTIVE JUROR: No, I don't think so.

THE COURT: All right. Thank you very much, ma'am.

Ms. Weller.

THE PROSPECTIVE JUROR: Good morning. My name is Ann-Karen Weller. I'm 69 years old, and I was born in New York. I live in West Kendall, and I have a bachelor of science degree in nursing and a master's degree in business administration with a concentration on health service management.

Currently, I am retired; however, prior to that, I worked for the State of Florida with the Department of Health. And my niece is a lawyer; however, she practices in Jamaica. My husband is currently retired, and he used to be a home inspector. He owned his own business.

I have two adult children. One of them is a

biomechanical engineer. The other is a major in the Army.

I do read newspapers online, magazines, I go to different websites, and I do listen to the news. I like to listen to ABC and CNN. And I do have specific shows that I watch regularly on Netflix, et cetera.

I love to walk. I walk every morning. I love to garden. I do a lot of reading, fiction, nonfiction, self-help books. As I mentioned before, I do like to watch different television shows, especially medical dramas and law dramas as well.

As I mentioned earlier, my son is a member -- he's serving right now as an -- active in the military. Let's see. I have served on a jury. I believe it was a civil case about two years ago, and -- let's see. I do not have any current family members that work in law enforcement. I consider my son to work for the federal government as in the Army. I have not had anyone convicted of -- not anyone convicted of a felony, and my medical issues should not have any problems with me being on the jury, nor -- I'm a Christian, but my religious and moral beliefs should not have any effect on this case, and I do believe I could be fair to both sides.

THE COURT: I have a couple of questions for you. You are retired. What did you do with the Department of Health?

THE PROSPECTIVE JUROR: I oversaw the Office of

Community Health and Planning. So I did a lot of community assessments and helped with different health policies, not necessarily -- well, more in the educational role in that way.

THE COURT: How long did you do that for?

THE PROSPECTIVE JUROR: Oh, gosh. About -- well, I've been a nurse for over 40 years, but actually doing that work for about 24 to 25 years.

THE COURT: I didn't catch if you talked about a spouse or a significant other.

THE PROSPECTIVE JUROR: My husband, yes. He is retired, and he owned his own home inspection business.

THE COURT: And how long did he do that for?

THE PROSPECTIVE JUROR: About 20 years.

THE COURT: You mentioned that you didn't have anybody who currently was working in federal law enforcement.

THE PROSPECTIVE JUROR: Correct, correct.

THE COURT: Do you know anybody who used to work for federal law enforcement?

THE PROSPECTIVE JUROR: Just my son's friends, but not close relatives.

THE COURT: But your son's friends are folks who are in the military with him?

THE PROSPECTIVE JUROR: I'm sorry. Say that --

THE COURT: Are those your son's friends or people in the military or people in law enforcement -- police officers?

THE PROSPECTIVE JUROR: They are law enforcement, but they're not close to me.

THE COURT: Oh, but they're not close to you. Okay.

THE PROSPECTIVE JUROR: They're close to my son.

THE COURT: You mentioned when I asked about Haiti -- you raised your hand. Have you traveled to Haiti?

THE PROSPECTIVE JUROR: Right. My parents are Haitian, and I have traveled to Haiti. The last time was almost 40 years ago, but -- and I still have relatives that live in Haiti.

THE COURT: Okay. I think you said -- were you born in the United States, though?

THE PROSPECTIVE JUROR: Yes. I was born in New York.

THE COURT: Okay. How many times have you gone to Haiti?

THE PROSPECTIVE JUROR: Maybe three or four times.

THE COURT: And how often do you talk to your relatives in Haiti?

THE PROSPECTIVE JUROR: Oh, most of my relatives have migrated. So the ones that are in Haiti I haven't really kept in contact with.

THE COURT: All right. So as you know, this case concerns the assassination of the Haitian president. Is the fact that your parents are from Haiti or you have family members who have immigrated from Haiti, do you think that will

impact your ability to be fair and impartial here?

THE PROSPECTIVE JUROR: I don't think so. I have remembered and read everything at that time, but honestly I've forgotten it all, so I should be okay.

THE COURT: All right. So I just want to separate two things. So one is anything that you've read, right, or anything that you know -- so let's just talk about that first. To the extent that your family members have talked to you about what's happened in Haiti or talked to you about what happened to the president in Haiti, is that something you can put aside and only look at the evidence here?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Then now let's talk about the fact that your parents were from Haiti, right, and that you have family members who are Haitian. That's a different thing. Right? That's not just information. That's life experiences. Right?

Are those experiences that you can put aside and only look at the evidence and the law here as if it were evidence and law dealing with a country you've never been to, a country you have no personal association -- could you as fairly look at this case as you would if the case were about Ecuador?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you very much, ma'am.

All right. Juror No. 8, Ms. Lago.

THE PROSPECTIVE JUROR: Good morning. My name is Emily Lago. I was born here in Miami, Florida. I live in West Kendall, and I went to school -- started in Hialeah, moved over to the Bird area, and I went to school at FIU. I was employed as a contract analyst at Southern Glazer's Wine and Spirits. And I have a bit of legal training, but mine was more so on the business side of things.

I don't have a partner and I don't have any children. I do like to watch TV. I watch a lot of Netflix. I go on social media, Instagram, TikTok. My father served in the Air Force. He was a nurse. I have never served on a jury before, but I have been called to go to jury duty. My cousin -- I'm not very close to him. He works as an officer in West Palm Beach.

And I have had a family member be arrested before for shoplifting. I believe it was under a thousand. I do not have any medical issues that would keep me from participating, neither my religious beliefs. And I would be able to be fair to both sides of the case.

THE COURT: All right. You said that you had legal training but it was more on the business side. Can you tell me a little bit about that?

THE PROSPECTIVE JUROR: So I work as a contract analyst. It's not exactly what I studied. I studied communications in film and television. So I don't have any

legal training background, but I work more so on the business side. So it will be making sure our project managers are, you know, getting the correct contracts, making sure the terms are accurate, that they line up with business expectations, and stuff like that. And then we have a legal team that we send it to after.

THE COURT: I didn't get your age.

THE PROSPECTIVE JUROR: 28.

THE COURT: 28.

When I asked questions about Haiti, I think you were also somebody who raised their hand and said they had either traveled to Haiti or were familiar with Haiti in some way.

THE PROSPECTIVE JUROR: Yeah. My best friend since about seventh grade is Haitian. She was born here, lived in Haiti for a bit, and lives here now.

THE COURT: Have you ever been to Haiti?

THE PROSPECTIVE JUROR: I have not.

THE COURT: Does she talk to you a lot about her experiences in Haiti?

THE PROSPECTIVE JUROR: She does, yes. So I do know a bit about the case and what's going on.

THE COURT: And is it from her or from the media or from other sources?

THE PROSPECTIVE JUROR: From both. I believe her dad has some sort of political side. He still lives over in

Haiti. So I hear a lot from her and I see a lot that's on social media.

THE COURT: You said her dad is on the political side. Can you explain that to me?

THE PROSPECTIVE JUROR: Essentially, I'm really not sure. She doesn't really talk about him that often. But I know he has a bit of a higher status over there. I'm not exactly sure what that is.

THE COURT: So if you were a juror in this case, two things: One is, would you be able to set aside anything you've read or anything she's told you about Haiti? Could you put that aside and decide this case on the facts and the law?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Do you think it would impact you having to make a decision about this case -- would the friendship impact you in any way? In other words, you know, if you were to serve on a jury, would you be worried about what your friend would think about you being on this jury or what your friend would think about whatever the verdict was?

THE PROSPECTIVE JUROR: Yes.

THE COURT: You would worry about that?

THE PROSPECTIVE JUROR: Mm-hmm. It's a very close friendship to me. I understand the legalities of what's needed for court and this need to make a decision, but I also know that I have a close friendship with her, and I would be

scared to cause any rift for that.

THE COURT: Okay. I'm going to ask you to pass the microphone back to Juror No. 7 again.

I'd like to ask Ms. Weller the same question.

THE PROSPECTIVE JUROR: Sorry. Can you repeat the question?

THE COURT: Of course. No problem.

So the question is, again, your family, your parents were from Haiti, and you still have some relatives in Haiti. Would that impact your decision here? And what I mean by that is would you be worried about what your family would think or say if they knew that you were a juror in this case, or would it impact your decision? Would you be worried about your decision being one thing or the other, what your family would think?

THE PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you very much, ma'am.

All right. Let's go to Juror No. 9.

THE PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning. Do we have a different microphone?

THE PROSPECTIVE JUROR: My name is Pierre Larochelle. I'm 52 years old. And I was born in Haiti. And I'm living in the north part of the county. I have a bachelor's in biological science, and I work as an inspector for the past

ten years at the -- I don't have any legal training. My wife work as a TSA officer. And I don't have any children. I like reading newspapers, magazines, and watch television news every day. And I like to travel.

And my wife was in the military, and I have some family members that was -- that were serve in the military. I never serve on a jury before. And I work for the federal government. And I don't have any family member or close friend accused or convicted of a felony. And I have -- I may have a medical issue to participate. And I don't have any religious beliefs that would preclude me from sitting on the jury. And -- and I don't have any other thing that can affect me, on both sides.

THE COURT: Can you tell me a little bit -- you said you have a master's degree in biological sciences. Tell me a little bit about your work.

THE PROSPECTIVE JUROR: Oh, I work for customs.

THE COURT: Oh, you work for customs -- the United States Customs?

THE PROSPECTIVE JUROR: Yes, United States Customs as an inspector by inspecting essentially luggage and commercial cargo for prohibited plant and animal material.

THE COURT: All right. How long have you worked for customs?

THE PROSPECTIVE JUROR: For the past 21 years.

THE COURT: And then your wife is at TSA; is that right?

THE PROSPECTIVE JUROR: Yes.

THE COURT: So you've worked for the federal government for some time now. Would that impact your ability to be fair here? So obviously the federal government is pursuing this case. Do you think there's anything about the fact that you work for customs that would cause you to favor either -- for example, you're going to hear testimony from the FBI, from Homeland Security Investigations. Do you think that would impact your ability to make a decision in this case?

THE PROSPECTIVE JUROR: It may impact me until I hear all the evidence from both sides.

THE COURT: I can't understand -- I'm sorry.

THE PROSPECTIVE JUROR: It won't impact me until I hear all the evidence from both sides.

THE COURT: Put the microphone --

THE PROSPECTIVE JUROR: It will not impact me.

THE COURT: It won't impact you. I'm sorry.

You, like I, we talk with our hands, but then the microphone keeps moving, so I apologize. I can't hear you.

You mentioned that you're originally from Haiti; is that right?

THE PROSPECTIVE JUROR: Yes.

THE COURT: When was the last time you went to Haiti?

THE PROSPECTIVE JUROR: In 2008.
THE COURT: 2008?
THE PROSPECTIVE JUROR: Yes.
THE COURT: And when did you leave Haiti to begin to live in the United States?
THE PROSPECTIVE JUROR: In 1993.
THE COURT: In '93?
THE PROSPECTIVE JUROR: Yes.
THE COURT: Okay. So from 1993 to the present, how many times did you visit Haiti?
THE PROSPECTIVE JUROR: Twice.
THE COURT: Do you still have family in Haiti?
THE PROSPECTIVE JUROR: Yes, some family members live in Haiti that I have contact with.
THE COURT: Okay. So is that something that you can put aside to sit in this case? So as I mentioned to your other fellow panelists, would the fact that you have family in Haiti -- would that weigh on you? In other words, would you be thinking about that and what they might think if you served on this jury?
THE PROSPECTIVE JUROR: No.
THE COURT: All right. And can you put aside any information? I think you mentioned that you knew about Haiti and that you had been following or that you had seen something in the media about this case; is that right?

THE PROSPECTIVE JUROR: Yes. I listen to news and -- I listen to news about the case in Haiti.

THE COURT: Okay. Can you put the news information that you've read about this case aside and just look at the evidence?

THE PROSPECTIVE JUROR: Yes, I can do that.

THE COURT: What about anything anybody has told you about the assassination of the president? Can you put that aside?

THE PROSPECTIVE JUROR: Yes, I can put it aside.

THE COURT: All right. You also mentioned that -- I think you told us that you had an issue with the amount of time that you would serve in this case. I think you mentioned that the length of the trial could be a problem.

THE PROSPECTIVE JUROR: Oh, yeah, because of my medical issue that I want to discuss probably later.

THE COURT: Okay. That's something you want to discuss privately?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: You also mentioned when I was asking the questions of the broader group that if a law enforcement officer testified, you may give that testimony either more credit or less credit. I didn't ask which one. I just asked folks to raise their hand if they think they would credit law enforcement more or less. Tell me a little bit about why you

raised your hand for that.

THE PROSPECTIVE JUROR: The reason that I raised my hand is because I've been working for the federal government for 20 years, so that's the reason I raised my hand.

THE COURT: Okay. But you don't think that that would make you favor the Government in this case?

THE PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you very much, sir.

We go now to Juror No. 10.

THE PROSPECTIVE JUROR: Good morning. My name is Marilyn Fitros. I am 55 years old, and I was born in Miami, Florida. I live in the area of South Miami. I went to school -- to Miami-Dade schools my whole entire life, and I graduated from FIU with a master's in accounting. I currently work as an accounting manager for a company called World Fuel Services. And it's an aviation company, but it's not really an airline.

What we do is we purchase fuel and we hold inventory for our customers really in the US and worldwide. So I do the accounting for them.

We have a close family friend who's a lawyer, but I think he's more into family law from what I gathered with our conversations. I do have my husband. He works as a controller in a company that's also aviation related. His company is called Standard Aero. And what they do is these

airlines come with their engines that are -- you know, that need maintenance. So my husband's company fixes these engines.

I have one son. He's 16. He's a sophomore in high school. I try not to -- well, I have certain shows that I watch on Netflix and stuff like that, but I try to make it light-hearted so it's not that, like, stressful when I'm watching. I like to walk. I like to do some weights at home if possible. And I do go on Instagram, but I'm the kind of person that really doesn't share anything, but I like to follow more things that I like as opposed to people that I like -- certain things.

My dad, a long time ago, was in the military that -- he's in the Army. That's actually how he became a US citizen. And he was serving during the time of -- what is that war that was -- was it Vietnam? Right. And he wasn't called to Vietnam because he has a rare blood type, which he's a universal donor, but he cannot accept -- so that's why he wasn't called to Vietnam.

I've been called to jury duty, but I've never served on a jury. I do have a first cousin who is a Miami-Dade police officer. We grew up together, but honestly, recently we don't keep in touch that much. I don't have anybody that's worked in the federal government. Nobody that I know has been arrested close to me. I don't have any medical issues. No

religious or moral beliefs that would get in my way of being fair. And I do believe that I would be fair for both sides, if I was chosen.

THE COURT: You mentioned before, though, that you might have an issue with the time.

THE PROSPECTIVE JUROR: Yeah, just because spring break is for the high school -- for Miami-Dade. We were going to be out of town on that Monday and Tuesday. And I do have appointments that I can, you know, definitely reschedule, but we were going to be out of town on that Monday and Tuesday. That would be my only problem.

THE COURT: So I know it's spring break, but is that something that maybe your spouse could take your child on?

THE PROSPECTIVE JUROR: If -- if I'm selected, yes, then my husband and my sister can even take them. Yeah, mm-hmm.

THE COURT: You also mentioned when I asked the question of a defendant not testifying. You said that's not something you could accept?

THE PROSPECTIVE JUROR: Well, I know that you explained at the beginning that the burden of proof is on the Government, but for me at least -- and again, I've never been up, you know, in court or anything. But if somebody was accusing me of something that I didn't do, it would be -- I would want to defend myself or explain -- you know, tell my

side of the story. That's why I said that.

THE COURT: So I appreciate that that's how you would feel in that circumstance, but the law is that if a defendant didn't testify in a case, you could not hold that against them. Even if you think that you would testify, that can't be held against them, because the Government has the burden. Right? So it would be improper for you to consider that at all.

If the defendants in this case didn't testify, would you be able to sort of take out that gut feeling of yours that if it were you you would testify -- could you put that aside and be fair in the case?

THE PROSPECTIVE JUROR: I mean, I think so. Once you've explained that the burden of proof is on the Government, I suppose I could, yes.

THE COURT: Okay. So I know you're saying you suppose you could. You think so. I think that sometimes that's just a manner of speaking. I want to make sure because it's my job to make sure that we pick a jury that's fair and impartial. I want to be sure that you could do that. Could you do that?

THE PROSPECTIVE JUROR: Yes, I could.

THE COURT: All right. Thank you very much, ma'am.

THE PROSPECTIVE JUROR: Okay. You're welcome.

THE COURT: All right. We're going to Juror No. 11.

THE PROSPECTIVE JUROR: Hi. Good morning. My name is David Tamayo. I'm 42 years old. I was born in Guayaquil, Ecuador. I live in South Miami. For my educational background, I have an associate's degree in computer science, a bachelor's degree in IT, and a master's in information systems from FIU.

My current employment, I am the director of infrastructure services and cybersecurity for a small managed service provider. We have clients in Latin America, Caribbean, the US. I don't have any legal training. I don't have a partner, a spouse. I have one daughter. She just turned 18, and she goes to school. She's a student. I watch CNN, NBC, Fox. I try to keep up with the news. I do read the Drudge Report online.

Television shows -- let's see here. What I like to do, actually -- yeah, I do bicycling, fitness, watch some documentaries -- a lot of documentaries related to forensics in law enforcement. I have served in the military. I was in the Marines from 2002 to 2006.

I have served on a jury before in a county case, civil, once. And yes, we reached a verdict.

I do have family -- I have friends that are working in law enforcement -- MPD, S.W.A.T. Federal government, I think -- I do have -- because of my military service, I do have a lot of friends in the military. And some of them

have -- they're working in -- for the Coast Guard. So I think that may constitute federal government.

And no one in my family has been arrested or accused of a felony. I don't have any medical issues. I don't have any religious or moral beliefs. But for the last question, I do think that having, you know, a strong relationship with the government, military, and all that, I think maybe that can make me biased towards that.

THE COURT: So you were a Marine --

THE PROSPECTIVE JUROR: Yes.

THE COURT: -- many years ago. Thank you for your service.

You don't think that you could follow my instructions to put that aside and be fair to the defense in this case?

THE PROSPECTIVE JUROR: I think it's going to be difficult because I lean towards the Government and especially, like, you know, this type of case. I think that, you know, may go one way. That's just my belief.

THE COURT: So even though you haven't heard any evidence and even though I would instruct you as a matter of law that you had to be fair, you don't think that you could do that?

THE PROSPECTIVE JUROR: It's going to be difficult. Sorry.

THE COURT: All right. Well, no, I appreciate -- if

you don't think that you could be fair, then I appreciate you saying so.

Let's hear from Juror No. 12.

THE PROSPECTIVE JUROR: Good morning. My name is Mauro Alachouzos. I'm 29 years of age. I was born here in Miami, Florida. I currently live in North Miami with -- my highest education is vocational school. I'm currently employed at JPMorgan with my work history being in retail. I don't have any family member who practices law at the moment.

My spouse, she also works for the financial district -- not JP, but she works for the banks. Her education is for speech therapy. I don't have any children. I do watch TV on the regular -- some forensic shows, some interrogations and stuff like that, anything thought provoking, morally provoking. I do like to go outside and bicycle and gym and stuff like that. I don't have any members in the military or anything like that.

I haven't served on a jury before. I don't have any family members working for law enforcement. And then -- none in a Government capacity as well. I do have a brother who was arrested, and he violated his probation, and then in that sense he also got deported. I don't have any medical issues that will make it difficult for me. No religious practices that will make me biased in this case. And I do believe I will be fair in this case as well.

THE COURT: So what is it that you do at JPMorgan?

THE PROSPECTIVE JUROR: I'm a banker at the moment.

THE COURT: You're a banker?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: You said you have gone to vocational school. What kind of training did you get there?

THE PROSPECTIVE JUROR: I was studying phlebotomy.

THE COURT: Did you finish or --

THE PROSPECTIVE JUROR: Yes, I did.

THE COURT: You said you like to watch forensic shows.

THE PROSPECTIVE JUROR: Um-hum.

THE COURT: I find myself doing that occasionally myself. And I even watch legal shows for whatever reason. I don't know, because you would think I would have enough, but I still watch them.

You know, let me just tell you that everything you see on TV are not exactly how things are in the real world.

THE PROSPECTIVE JUROR: Yes, yes.

THE COURT: Could you put aside those things -- because you said you also like to watch morally provoking things.

THE PROSPECTIVE JUROR: Yes.

THE COURT: In this case, you're going to have the facts that are presented to you, and I'll instruct you on the

law. Can you put aside the things that you've learned in these forensic shows and the stuff that you watch? Can you put that aside?

THE PROSPECTIVE JUROR: Of course, yes.

THE COURT: Okay. And then you said you watched morally provoking shows. What kind of shows are those?

THE PROSPECTIVE JUROR: So, like, I don't know if you guys know this show called Your Honor on Netflix. It was kind of -- that's a good show right there. Yeah, just things -- what would you do if you were in that scenario or just like you're now in this situation, what would you do if the government -- or just anything -- anything of that nature, you know.

THE COURT: Tell me a little bit about -- you said your brother had had a charge. What was your brother convicted of?

THE PROSPECTIVE JUROR: So this was back when I was a teenager. I remember it was a domestic charge. And he was out on probation. He violated the probation. He went back in. And then after that, he just stayed in, served his time, and then he got deported afterwards.

THE COURT: How long ago was that?

THE PROSPECTIVE JUROR: That was, like, ten years ago maybe.

THE COURT: Okay. Are you still close to your

brother?

THE PROSPECTIVE JUROR: Not really, no. You know, like, he -- I haven't spoken to him. He tried calling me the other day. We talk, but I don't reach out to him, if that makes sense. He's the one who tries to, like, "Hey, how are you doing" to my mom, but I don't really speak to him.

THE COURT: Okay. Is there anything about that experience with your brother, that he had either with his conviction or the fact that he was deported, is that something that would impact you here? And by that I mean do you think you would hold it against the Government?

THE PROSPECTIVE JUROR: No, not at all because everything was decision-making, and I didn't see anything if there was a trial or anything in that case. So I have no bias or anything like that towards it.

THE COURT: All right. Thank you very much, sir.

THE PROSPECTIVE JUROR: Thank you.

THE COURT: Juror No. 13, Ms. Edwards?

THE PROSPECTIVE JUROR: Good morning. My name is Aldyn Edwards. I'm 27 years old, and I was born in Miami, Florida. I currently live in Homestead. I have a bachelor's degree in political science from UCF and a master's degree from the University of Texas in political science with a focus in counterterrorism.

I'm currently a legal assistant. And before that, I

was in school. I have a close friend who does contract law, and her spouse, I'm not sure what he -- but he's also an attorney.

My significant other, he works in insurance. I have no kids. I read the Associated Press and New York Times. I watch a lot of local news. I love to travel. I read. I watch just a variety of TV shows. My parents were both in the military. My mother was in the Army, father was in the Marines. I've been summonsed before but never served on a jury.

My father worked for Miami-Dade Police Department. He retired from there, but he's still a reserve officer. And my brother is a current officer in Texas.

My aunt is a -- or was -- she retired from the federal warden. And my mother was -- she retired as a federal agent for the Department of Defense.

Never been or a family member ever convicted of a felony. And I have no medical issues, no religious or moral beliefs, and I think I can be fair to both sides.

THE COURT: You mentioned that you're a legal assistant now, although you had some counter -- your master's is in counterterrorism; is that right?

THE PROSPECTIVE JUROR: Yes.

THE COURT: So where do you work now exactly? Do you work for a law firm or do you work for the government?

THE PROSPECTIVE JUROR: No, it's like a law firm that specializes in real estate.

THE COURT: Okay. Did you ever do anything in -- did you ever work for the government? With this master's degree, I'm just wondering did you ever do any work for the government?

THE PROSPECTIVE JUROR: No. I did case studies and research on counterterrorism programs for the United Nations, but it was just case studies and stuff like that.

THE COURT: All right. And so your dad is currently a Metro-Dade officer?

THE PROSPECTIVE JUROR: He retired but is a reserve officer still.

THE COURT: You mentioned, though, when I asked whether or not -- when I asked the group -- I asked whether or not you would take the testimony of a law enforcement agent sort of differently -- either you would be more prone to accept it or less prone to accept it. You raised your hand, I believe, to that question. Can you explain to me why you raised your hand?

THE PROSPECTIVE JUROR: Well, when I didn't see that there were other questions, so I figured that would be a disclosure. But also, I mean, I've been surrounded by law enforcement my entire life. So a lot of family and friends still currently work for the departments.

And I lived out with my brother in Texas, and he's an active officer right now. So I've been kind of born and raised with law enforcement.

THE COURT: All right. So you're going to hear from law enforcement witnesses. You heard the prosecutor mention a number of FBI and Homeland Security agents. You saw an agent of the FBI testify. Are you already -- do you already think, yeah, I'm going to believe this person because they're an FBI agent. Are you going to be more prone to believe them because they're in law enforcement as opposed to somebody who wasn't law enforcement, or would you treat a law enforcement witness and a non-law enforcement witness equally?

THE PROSPECTIVE JUROR: I would say equally. I mean, I feel like I can be pretty unbiased about things.

THE COURT: You said your mother worked for the Department of Defense?

THE PROSPECTIVE JUROR: Mm-hmm.

THE COURT: What did she do there?

THE PROSPECTIVE JUROR: I don't know. She had a clearance, so there was a lot of stuff she didn't talk about.

THE COURT: How long ago did she retire?

THE PROSPECTIVE JUROR: I'd say she retired probably seven to ten years ago.

THE COURT: All right. And again, I just want to make sure. You said you think that you would be fair. Again,

I have an obligation to make sure that the folks on the jury are folks that can be fair.

Do you think given all the law enforcement people in your family, your brother, your father, your mother with the Department of Defense, do you think that you could be fair in this case, which means you would not credit the Government more, you would be fair to both sides? Could you be fair?

THE PROSPECTIVE JUROR: Yes, mm-hmm.

THE COURT: All right. Thank you very much, ma'am.

Juror No. 14.

THE PROSPECTIVE JUROR: Good morning. My name is Maya Slavin. I was born in Argentina. I currently live in Coral Gables area. I have a college degree in education. I've been working as a preschool teacher for the past 21 years. No family members with legal training. Do not have a partner or children. I do not keep up with the news, by choice. I love meditation and paddle boarding. I read -- Audible, so I don't need the glasses. No friends in the military.

Been summonsed, but never served on a jury before. No close member or friends that work in law enforcement or friends in the federal government, as well, or that have been accused or convicted. No medical issues. My religious beliefs won't be biased to any of the sides, or I think I would be fair to both sides in this case.

THE COURT: You mentioned that you knew somebody, I think, at the beginning.

THE PROSPECTIVE JUROR: I was the teacher of his kids.

THE COURT: Of who?

THE PROSPECTIVE JUROR: Juror No. 23.

THE COURT: Okay. So I just have to make sure. If you were both on the jury together -- so you know what kind of parent he is -- would that impact -- like, would you be swayed by him or less swayed by him if you were both jurors?

THE PROSPECTIVE JUROR: We're both adults, and nothing would be affected.

THE COURT: And how long have you been a preschool teacher, ma'am?

THE PROSPECTIVE JUROR: My entire adult life except the years I've been at college.

THE COURT: You didn't mention your age. How old are you?

THE PROSPECTIVE JUROR: 54.

THE COURT: 54 years old.

All right. Thank you very much, ma'am.

Juror No. 15, Ms. Sotolongo.

THE PROSPECTIVE JUROR: Hi. My name is Elena Sotolongo. I'm 26 years old. I was born in Bulgaria. I live in North Miami. I went to elementary through high school in

Miami, and I went to university, first at Colombia University and then finished at FIU with a degree in computer science.

I currently work in, like, product on-boarding and data management for, like, a luggage retailer. None of my close family or friends have any legal training. I don't have a spouse or a partner or any children.

I regularly try to keep up with the news and current events through social media, like online newspaper articles. I like to work out. I read fiction, non-fiction. And I bake. I watch TV shows and movies on streaming services, and I listen to a lot of podcasts.

My close cousin, who I grew up with, he served in the National Guard. He was deployed overseas for a year. He's back now. I have never served on any jury before. No family or friends in law enforcement. My uncle worked at the VA as a doctor. I'm not sure if that counts as federal government in any capacity. I have an uncle, like a second uncle, who was convicted. I'm not close to him, and it was not in the US.

I have, like, an autoimmune issue, but I don't know if that would make it difficult for me to participate. Probably not. Not religious. And no, I think it would be my intention to try to be fair in both sides of the case.

THE COURT: All right. You mentioned when I was asking the entire group, and I asked if you would favor or disfavor law enforcement simply because they were in law

enforcement. You raised -- I think you raised your hand on that. Tell me why you did that, why you raised your hand.

THE PROSPECTIVE JUROR: I don't think I would favor testimony just necessarily because it came from a law enforcement officer. I know more and more. Now I'm more, like, skeptical, I guess, of things. So I would just take everything -- like, I don't know -- I take things with a grain of salt, and I'm curious and speculative about law enforcement investigations and -- yeah.

THE COURT: So it doesn't sound like -- if somebody's in law enforcement, you know, we ask that you look at all the testimony critically, whether they're in law enforcement or not. What I want to make sure is that you wouldn't be more critical because they were in law enforcement as opposed to someone who wasn't in law enforcement.

So I want to make sure that you would treat law enforcement the same, which means you have to be critical, but you have to be critical of all the witnesses. Right? So would you be more or less critical of law enforcement?

THE PROSPECTIVE JUROR: I -- I don't think I would be less critical of them. I -- and I don't think I would try to be more critical of them. I think -- like you said, you have to be critical of testimonies across the board.

THE COURT: So you would treat them the same?

THE PROSPECTIVE JUROR: Mm-hmm.

THE COURT: You mentioned you had an uncle who had a conviction someplace else. Can you tell me a little bit more about that?

THE PROSPECTIVE JUROR: Yeah. In Bulgaria, I think he was arrested and convicted for pedophilia.

THE COURT: Did you -- it sounds -- were you -- how much did you know about that case while it was happening?

THE PROSPECTIVE JUROR: While it was happening, I didn't know about it. I wasn't close for many years to that side of the family. I hadn't seen them. And I found out after the fact.

THE COURT: You also mentioned that you knew some elected officials.

THE PROSPECTIVE JUROR: Oh, yeah. You said in any country. It didn't have to be here. Just like a local official, I guess, like a mayor type of position in Bulgaria.

THE COURT: And who is that?

THE PROSPECTIVE JUROR: My -- another -- a different uncle.

THE COURT: Okay. Is that someone you're close with? Do you visit Bulgaria? Do you go back and see relatives?

THE PROSPECTIVE JUROR: Yeah. My family and I try to visit at least once a year.

THE COURT: All right. And I don't mean to pry in any kind of medical issue, but you understand that if you're a

juror, right, you would be here five days a week. We have shorter days on Tuesdays and Thursdays.

Is there anything about your medical issue that would make it difficult for you to be here and for you to serve as a juror?

THE PROSPECTIVE JUROR: I don't know. I've never served on a jury before, so I don't know what kind of difficulties might arise from that.

THE COURT: Well, does your autoimmune issue present any difficulties let's say at work? Are you able to go to work Monday through Friday?

THE PROSPECTIVE JUROR: I'm able to go to work, yeah, Monday through Friday. It's just kind of a chronic pain type of thing.

THE COURT: All right. If you were a juror, we let people stand and stretch, and we take breaks and things like that. Would that be enough in terms of any kind of pain issue?

THE PROSPECTIVE JUROR: Yeah, I think that would be helpful. Yeah.

THE COURT: All right. And do you take any kind of medication that would impact your ability to pay attention and to think clearly?

THE PROSPECTIVE JUROR: No, nothing that would affect me like that, no.

THE COURT: I know. It's sort of an odd question. I apologize. But again, I need to make sure that you would be comfortable serving.

All right. Thank you very much, ma'am.

Juror No. 16.

THE PROSPECTIVE JUROR: Hi. I'm James Carvahlo. I'm 57. Born in North Carolina. I live in Downtown Miami. I studied religion at Southeastern Bible College. I've been a stay-at-home dad for our 10-year-old daughters for the past ten years. I do have a concern as they're released from school at 3:00 PM every day --

THE COURT: I need you to really slow down.

THE PROSPECTIVE JUROR: I do have a concern that they're released from school at 3:00 PM every day, and I do have child care obligations that limit my time.

I do not have a family member or a friend with any legal training. My spouse is a director of wealth management at Morgan Stanley. I have -- in addition to my ten-year-old twin daughters, I have a 29-year-old stepson. He's in Washington, DC, and he's in commercial development.

I only follow Bloomberg News. I'm just into fitness and some travel. No one in my family nor I have ever served in the military. I've never served on a jury before. I've never worked for law enforcement nor has anyone in my family, nor the federal government.

My brother was arrested and convicted on a felony case of conspiracy, a drug-related charge, in North Carolina eight years ago. He was convicted.

I have no medical issues. I have no religious beliefs. Other than that, that's all.

THE COURT: All right. Your brother, you said that was in North Carolina?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Did you go to the trial?

THE PROSPECTIVE JUROR: I did not.

THE COURT: Do you know if it was a federal charge or a --

THE PROSPECTIVE JUROR: It was a federal charge.

THE COURT: Are you close to your brother?

THE PROSPECTIVE JUROR: Oh, very close. I was actually happy that he was -- he needed to be charged.

THE COURT: Okay. So is there anything about that experience that you would hold against the Government here?

THE PROSPECTIVE JUROR: No.

THE COURT: You mentioned you might have some child care issues.

THE PROSPECTIVE JUROR: Yeah. I take -- my kids are released from school at eight years old. My husband and I have no family nearby. We do not have a nanny or anyone else. I handle the day-to-day for our kids.

THE COURT: So you wouldn't have any trouble dropping them off at school in the morning?

THE PROSPECTIVE JUROR: No. I did that this morning, but they get released today at 3:00 PM.

THE COURT: All right. So Tuesdays and Thursdays you would have no issue because we would be done at 2:00. On Mondays, Wednesdays, and Fridays, is there a friend that could bring them home or after-school?

THE PROSPECTIVE JUROR: No. No. They have -- they go straight from school to tutoring. It's quite a hectic schedule.

THE COURT: Okay. And then what time are they done with tutoring?

THE PROSPECTIVE JUROR: So on Tuesdays and Thursdays, they go straight from Fisher Island Day School to Mathnasium on Brickell. And from their school to there, that's like a 45- to 50-minute drive. And then I wait for them for an hour and then bring them back. So it's just immediately when they go out of school, we go.

THE COURT: And you don't have anyone --

THE PROSPECTIVE JUROR: No. My husband and I, we have no family.

THE COURT: So if you're sick or you're not feeling well, who takes your kids to school?

THE PROSPECTIVE JUROR: Yeah, no, I do. Yeah.

THE COURT: So you have no one in a pinch, if you have an emergency, if you had --

THE PROSPECTIVE JUROR: No, if it was an emergency, I could call another parent, but not for eight weeks.

THE COURT: And so you have no other help at home?

THE PROSPECTIVE JUROR: No. I mean, we don't have a nanny, or we don't -- I don't have day-to-day help.

THE COURT: And then Mondays, Wednesdays, and Fridays, I'm sure that the Fisher Island Day School has some sort of after-school program --

THE PROSPECTIVE JUROR: Yeah, for $500 a day.

THE COURT: Well, they go to the Fisher Island Day School, so I assume that maybe that's not a particular financial burden for you.

THE PROSPECTIVE JUROR: Yeah, it is.

THE COURT: So you wouldn't be able to make any arrangements for your children?

THE PROSPECTIVE JUROR: No.

THE COURT: All right. Ladies and gentlemen, it's 12:05. So I am going to give everybody an hour for lunch. I'm going to ask that the paddles with your numbers you leave right on your chair or on the bench. That way you know where you're coming back to.

A couple of things before everybody leaves -- two important things. Right? The first thing is you cannot talk

about this case with anybody. So maybe you go to lunch with somebody or maybe you go to lunch by yourself. I don't know. You can't call anybody up and say, "The jury selection I'm on is about this," right, or the judge is a woman named Becerra or the lawyer's name is such and such. Right?

You cannot talk to anybody about the case. You also can't talk about it with each other. Right? So you can't talk about it with anybody else. You can't talk about it with each other. The other thing I will ask you not to do is not to look anything up. I will tell you it is natural. I don't care how old you are. I used to think it was only young people. I'm to blame. My mother now, you know, has an iPhone and looks things up. Right?

It's really natural these days when you don't know something, just look it up. Right? I was at my mother's house yesterday, and my sister randomly mentions some stunt person who had an accident, and my other sister is, "Oh, let me look it up." Right? It's just like part of our nature these days. I know it's hard. You cannot look anything up. All right?

Don't look up anything about the case, about the people, about anything you've heard. Right? It's totally natural. "Oh, let me see this Becerra. That's the judge. Let me look her up." No. So I'm going to ask that you not talk about the case with anybody, including with each other,

and that you don't look anything up.

I'm going to cut your lunch just a little bit short. I want everybody back in that hallway at 1 o'clock, and then the marshals -- by 1:05 you all need to be seated in these chairs. So I'm going to ask that you make a point of being back in this lobby at 1 o'clock.

We do have a cafeteria that actually is quite good. You probably don't all want to rush to the cafeteria. I get that. The train station is behind us. They have lots of different places there. Over on the east side, if you haven't been to Downtown Miami in the last five years, you won't recognize it. Right?

There's lots of places walking distance for you to get a quick bite. All right? Be back in the lobby at 1 o'clock. We can't start without you. So please enjoy your lunch and we'll see you back in an hour.

(Venire exited at 12:07 PM.)

THE COURT: All right. Everyone be seated. All right. Just a couple of things. I don't need to hear from you all yet about further voir dire of any folks. We'll get to that when we have a bigger tranche of people, but my notes reflect Juror No. 8 -- you can all talk about it during the break -- that seems like a cause challenge to me. She's the one -- she's a relatively young woman in the front who says one of her best friends is Haitian, and she thinks it would

bother her to go back and have to tell her friend what she was doing or what she did as a verdict.

Juror No. 9 needs a sidebar. Again, we'll do that much later, when we have more jurors under our belt.

Juror No. 11 is a United States Marine who doesn't think he can be impartial. It is what it is, but I have that down as a potential cause challenge.

And apparently, one can send their child to the Fisher Island Day School but can't afford daycare. I have ideas about that kind of juror. You know, maybe he should be here every Tuesday and Thursday and, you know, watch. I don't know. I haven't yet taken that turn in my judicial service. It's coming, people. I'm telling you it's coming. But we're not there yet.

I don't know what to do with a juror who says he can't be here. And I don't know that anybody wants a juror who says he can't be here, no matter how ridiculous that opinion is.

I'll hear from you folks on cause challenges later. Right? I'm going to try to get maybe, you know, to like an afternoon break, and then at that tranche, let's see where we are on causes, and then you can all tell me questions I missed or things you would really like to know about this group. But I thought I would give you the benefit of my thinking. That's kind of where I am on the numbers and on folks.

I know that some of you have homework during the lunch break, so go ahead and do that and be here by 1 o'clock. All right?

(Lunch recess at 12:11 PM.)

(See Afternoon Session for continuation.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

DATE: 30th of June, 2026

*/s/Lance W. Steinbeisser*
LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Official Court Reporter
United States District Court
Southern District of Florida
Miami, Florida

## $

**$500** [1] - 119:11

## '

**'93** [1] - 95:7
**'Oh** [1] - 39:15

## /

**/s/Lance** [1] - 123:10

## 1

**1** [9] - 1:5, 1:7, 56:16, 64:8, 67:1, 121:3, 121:6, 121:15, 123:2
**10** [3] - 52:5, 61:24, 97:9
**10-year-old** [1] - 116:9
**101** [1] - 52:9
**103** [2] - 59:9, 59:10
**104** [1] - 52:9
**105** [1] - 60:15
**106** [8] - 53:9, 53:21, 56:6, 59:9, 59:10, 60:15, 63:23, 64:8
**11** [6] - 52:4, 61:25, 63:20, 83:23, 100:25, 122:5
**114** [1] - 35:19
**115** [1] - 35:20
**12** [2] - 81:9, 103:3
**123** [1] - 1:7
**12:05** [1] - 119:20
**12:07** [1] - 121:17
**12:11** [2] - 1:6, 123:4
**13** [2] - 56:10, 106:18
**14** [3] - 49:14, 81:9, 110:10
**1488** [1] - 11:9
**15** [7] - 16:8, 17:15, 33:20, 50:2, 56:10, 60:13, 111:22
**16** [4] - 14:3, 52:4, 98:4, 116:5
**18** [7] - 52:4, 56:2, 56:15, 67:11, 72:14, 81:9, 101:12
**1993** [2] - 95:6, 95:9
**1:05** [1] - 121:4

## 2

**2** [1] - 68:22
**20** [7] - 50:3, 52:4, 56:2, 63:20, 79:23, 86:13, 97:4
**2002** [1] - 101:19
**2006** [1] - 101:19
**2008** [2] - 95:1, 95:2
**2016** [1] - 72:20
**2021** [3] - 42:22, 58:23, 59:16
**2026** [2] - 1:5, 123:9
**20th** [2] - 6:5, 51:16
**21** [2] - 93:25, 110:15
**22** [4] - 52:6, 56:2, 56:15, 57:2
**22-cr-20104** [1] - 4:2
**22-cr-20104-JB** [1] - 1:2
**23** [6] - 49:13, 57:2, 60:13, 70:20, 71:24, 111:6
**24** [3] - 52:4, 77:6, 86:7
**25** [6] - 48:1, 54:23, 56:3, 59:6, 70:18, 86:7
**25th** [1] - 51:2
**26** [4] - 52:4, 56:3, 58:16, 111:24
**27** [2] - 56:3, 106:20
**28** [3] - 49:17, 90:8, 90:9
**29** [1] - 103:5
**29-year-old** [1] - 116:19
**2:00** [3] - 50:10, 50:11, 118:6
**2nd** [1] - 50:12

## 3

**3** [3] - 50:4, 51:3, 70:15
**30** [4] - 5:14, 36:14, 39:25, 50:10
**302** [5] - 28:19, 28:20, 28:24, 28:25, 30:16
**305.523.5633** [1] - 1:19
**30th** [1] - 123:9
**31** [1] - 52:15
**32** [1] - 52:15
**33128** [1] - 1:19
**35** [3] - 52:14, 61:16, 63:11
**36** [2] - 57:6, 58:10
**37** [2] - 58:20, 73:10
**38** [3] - 3:3, 68:24, 69:8
**3:00** [3] - 116:11, 116:14, 118:4
**3rd** [1] - 50:13

## 4

**4** [4] - 51:17, 57:1, 60:13, 73:7
**40** [3] - 52:15, 86:6, 87:9
**400** [1] - 1:18
**42** [2] - 52:15, 101:2
**43** [1] - 56:20
**45** [3] - 57:6, 80:21, 118:17
**46** [1] - 56:8
**47** [3] - 52:14, 56:8, 59:12
**4:30** [1] - 50:2

## 5

**5** [4] - 58:3, 58:16, 59:6, 76:16
**50** [2] - 72:8, 72:11
**50-minute** [1] - 118:17
**52** [1] - 92:23
**54** [4] - 56:8, 59:12, 111:19, 111:20
**55** [1] - 97:11
**56** [4] - 57:6, 60:6, 63:25, 64:19
**57** [1] - 116:7
**58** [4] - 47:19, 47:20, 47:23, 49:17
**59** [1] - 57:6
**5:00** [1] - 49:25
**5K** [1] - 33:14

## 6

**6** [3] - 50:13, 51:5, 80:19
**60** [3] - 52:15, 57:6, 67:3
**61** [2] - 52:15, 56:8
**62** [1] - 52:15
**63** [3] - 56:8, 63:25, 76:18
**66** [1] - 56:20
**67** [1] - 60:15
**68** [1] - 49:16
**69** [1] - 84:15

## 7

**7** [6] - 20:9, 42:22, 58:3, 58:22, 59:16, 92:3
**70** [2] - 52:8, 58:18
**73** [1] - 56:5
**75** [2] - 52:9, 58:18
**76** [1] - 52:9
**77** [5] - 52:11, 52:13, 59:9, 63:22
**78** [2] - 56:5, 63:22

## 8

**8** [3] - 58:3, 88:25, 121:22
**80** [1] - 49:16
**80-something** [1] - 5:12
**82** [1] - 52:8
**83** [6] - 35:20, 35:24, 36:10, 36:11, 36:12
**84** [2] - 52:8, 56:5
**87** [1] - 52:9
**8:44** [1] - 1:6
**8:45** [1] - 5:9
**8:58** [1] - 5:9

## 9

**9** [8] - 1:5, 49:25, 52:4, 56:2, 58:4, 59:6, 92:18, 122:3
**90** [1] - 9:15
**91** [1] - 52:9
**93** [1] - 49:16
**94** [1] - 52:9
**96** [3] - 52:9, 56:6, 63:22
**98** [2] - 56:5, 63:22
**99** [3] - 49:16, 57:4, 58:18
**9:00** [2] - 50:2, 50:9
**9:46** [1] - 38:4

## A

**a/k/a** [2] - 11:18, 13:8
**ABC** [1] - 85:4
**ability** [14] - 14:16, 17:3, 26:18, 27:16, 31:23, 59:1, 59:4, 71:12, 84:1, 84:9, 88:1, 94:5, 94:11, 115:22
**able** [46] - 6:17, 12:6, 12:22, 14:1, 16:6, 16:7, 16:24, 17:1, 17:7, 17:14, 17:16, 18:9, 18:10, 18:12, 18:13, 18:14, 18:20, 18:21, 19:8, 19:12, 20:5, 20:20, 21:19, 22:11, 24:14, 26:23, 27:19, 27:20, 29:25, 31:17, 32:3, 32:8, 32:9, 32:16, 33:4, 35:5, 35:18, 63:8, 69:6, 89:18, 91:10, 100:10, 115:10, 115:12, 119:16
**above-entitled** [1] - 123:8
**abroad** [1] - 77:14
**absolutely** [2] - 18:19, 26:5
**accept** [13] - 26:11, 61:1, 61:9, 61:21, 62:10, 62:16, 62:21, 62:23, 62:24, 98:18, 99:19, 108:18
**access** [8] - 14:7, 15:23, 15:24, 18:1, 18:5, 18:7, 21:10, 21:24
**accident** [1] - 120:17
**accommodate** [5] - 50:17, 51:4, 51:6, 51:9
**accommodated** [1] - 51:11
**accommodation** [2] - 28:8
**account** [1] - 52:1
**accounting** [3] - 97:14, 97:15, 97:20
**accurate** [1] - 90:4
**accused** [9] - 29:10, 48:6, 60:24, 65:16, 70:4, 71:9, 93:9, 102:3, 110:23
**accusing** [2] - 29:13, 99:24
**Act** [2] - 37:25, 43:8
**action** [1] - 77:11
**active** [4] - 77:19, 78:2, 85:12, 109:2
**actively** [1] - 35:23
**acts** [1] - 12:11
**actual** [1] - 73:3
**add** [2] - 22:12, 37:22
**added** [4] - 36:16, 36:23, 37:10, 37:12

**addition** [1] - 116:18
**additional** [2] - 28:11, 29:14
**addressed** [1] - 16:22
**admin** [1] - 81:23
**administer** [1] - 40:17
**administration** [3] - 70:19, 76:22, 84:18
**admission** [1] - 26:15
**adult** [3] - 65:2, 84:25, 111:15
**adults** [1] - 111:11
**advised** [1] - 73:3
**advises** [1] - 42:8
**advising** [1] - 14:14
**advisory** [5] - 14:15, 22:10, 22:15, 23:18, 23:21
**Aero** [1] - 97:25
**affect** [7] - 59:4, 70:6, 71:12, 74:8, 79:10, 93:12, 115:24
**affected** [2] - 52:21, 111:12
**afford** [1] - 122:9
**after-school** [2] - 118:8, 119:10
**afternoon** [3] - 6:21, 50:3, 122:21
**Afternoon** [1] - 123:5
**afterwards** [1] - 105:21
**age** [3] - 90:7, 103:5, 111:17
**agencies** [2] - 46:3, 54:18
**agency** [3] - 67:17, 69:25, 71:6
**agent** [26] - 4:13, 28:20, 29:19, 30:21, 30:22, 30:24, 31:3, 31:6, 31:11, 32:13, 32:14, 32:16, 33:12, 34:12, 34:25, 35:3, 45:7, 55:7, 55:9, 55:10, 55:14, 55:22, 107:16, 108:16, 109:6, 109:9
**Agent** [4] - 4:14, 28:23, 29:10, 45:7
**agent's** [1] - 31:14
**agents** [12] - 30:22, 32:3, 32:12, 32:14, 32:15, 33:2, 33:18, 34:8, 35:3, 46:1, 55:5, 109:6
**ago** [18] - 5:14, 44:17, 70:21, 72:19, 74:24, 74:25, 82:9, 82:11, 85:14, 87:9, 98:13, 102:11, 105:22, 105:23, 109:21, 109:23, 117:3
**agree** [6] - 17:4, 21:14, 22:13, 34:16, 55:11, 55:13
**agreed** [3] - 23:25, 59:20, 59:21
**agreement** [2] - 59:18, 59:19
**agreements** [1] - 59:19
**ahead** [7] - 7:4, 7:9, 37:12, 53:21, 66:17, 66:22, 123:2
**aided** [1] - 1:22
**Air** [1] - 89:10
**Airbnb** [1] - 70:13
**airline** [1] - 97:17
**airlines** [1] - 98:1
**airport** [1] - 72:17
**Airways** [1] - 46:22
**al** [1] - 1:6
**Alachouzos** [1] - 103:5
**alarm** [6] - 38:8, 67:6, 67:7, 68:2, 72:8
**Albites** [1] - 80:21
**Aldyn** [1] - 106:20
**Alejandro** [1] - 46:19
**alert** [1] - 47:13
**alias** [4] - 13:4, 13:6, 13:7, 13:8
**aliases** [4] - 8:3, 10:23, 13:16, 13:18
**allegations** [1] - 38:2
**allege** [1] - 42:25
**alleges** [2] - 37:15, 42:9
**allow** [1] - 7:19
**allowed** [1] - 24:7
**almost** [4] - 9:14, 30:11, 69:21, 87:9
**Aloe** [1] - 2:19
**ALTANESE** [1] - 2:5
**Altanese** [2] - 4:13, 45:7
**AM** [4] - 1:6, 5:9, 38:4
**America** [4] - 4:3, 4:4, 4:6, 101:9
**AMERICA** [1] - 1:4
**amount** [1] - 96:12
**Ana** [1] - 80:21
**analysis** [2] - 8:13, 9:4
**analyst** [2] - 89:5, 89:24
**ANDREW** [1] - 2:4
**Andrew** [2] - 4:12, 45:6
**animal** [1] - 93:22
**Ann** [1] - 84:15
**Ann-Karen** [1] - 84:15
**anniversary** [1] - 51:16
**announce** [1] - 4:8
**announced** [1] - 52:5
**answer** [18] - 19:19, 21:2, 29:17, 31:1, 31:5, 31:18, 31:21, 31:22, 32:19, 33:1, 33:12, 34:25, 35:1, 40:10, 40:24, 64:6, 64:10
**answered** [1] - 41:14
**answers** [3] - 9:19, 32:17, 43:21
**anticipate** [1] - 6:16
**Antonio** [4] - 4:4, 41:16, 46:19, 48:6
**anyway** [1] - 29:2
**apologies** [2] - 66:13, 66:16
**apologize** [2] - 94:21, 116:2
**appearance** [1] - 4:8
**APPEARANCES** [1] - 2:1
**apply** [3] - 60:21, 60:22, 62:16
**appointed** [1] - 39:4
**appointment** [2] - 51:2, 51:10
**appointments** [1] - 99:9
**appreciate** [4] - 23:5, 100:2, 102:25, 103:1
**appreciates** [1] - 23:4
**appropriate** [3] - 8:22, 13:18, 13:23
**April** [5] - 50:12, 50:13, 51:5, 51:17
**ARCANGEL** [1] - 1:6
**Arcangel** [4] - 4:3, 4:16, 41:16, 47:12
**architecture** [2] - 76:20
**area** [5] - 80:22, 81:4, 89:4, 97:12, 110:13
**areas** [1] - 16:24
**Argentina** [1] - 110:12
**argue** [8] - 16:5, 17:8, 18:23, 18:24, 19:8, 34:13, 35:12, 35:13
**argument** [5] - 7:16, 7:23, 8:6, 8:22, 11:11
**arguments** [1] - 35:6
**Ariel** [3] - 31:11, 33:6, 47:14
**arise** [1] - 115:8
**arises** [1] - 42:5
**armed** [3] - 72:9, 72:15, 72:18
**Armel** [1] - 46:24
**arms** [1] - 25:5
**Army** [4] - 85:1, 85:16, 98:14, 107:8
**arrangements** [1] - 119:17
**arrested** [13] - 65:16, 70:3, 71:9, 74:3, 77:22, 77:23, 89:15, 98:25, 102:3, 103:21, 114:5, 117:1
**articles** [1] - 112:8
**articulate** [1] - 64:9
**aside** [17] - 79:1, 79:4, 80:12, 88:11, 88:18, 91:10, 91:12, 95:16, 95:22, 96:4, 96:9, 96:10, 100:11, 102:14, 104:20, 105:1, 105:3
**assassination** [5] - 42:23, 58:23, 59:16, 87:23, 96:8
**asserted** [1] - 25:2
**assessments** [1] - 86:2
**Assistant** [2] - 45:2, 45:6
**assistant** [3] - 45:5, 106:25, 107:21
**associate** [1] - 6:16
**associate's** [2] - 73:12, 101:4
**Associated** [1] - 107:5
**Associates** [1] - 2:13
**association** [1] - 88:21
**assume** [1] - 119:13
**assuming** [1] - 38:10
**attention** [4] - 20:23, 39:20, 40:23, 115:22
**attorney** [10] - 2:4, 4:12, 43:25, 45:6, 67:8, 67:9, 68:7, 81:8, 84:6, 107:3
**Attorney** [4] - 25:6, 45:2, 45:5, 45:6
**Attorney's** [7] - 2:5, 37:4, 37:9, 56:24, 74:15, 74:21
**attorneys** [1] - 48:16
**au** [1] - 58:24
**auctioneer** [1] - 43:20
**Audible** [1] - 110:18
**aunt** [1] - 107:14
**AUSA** [5] - 2:3, 2:4, 2:5, 4:12, 4:13
**authorized** [1] - 6:4
**autoimmune** [2] - 112:19, 115:9
**autopsy** [9] - 7:7, 7:14, 8:2, 8:5, 8:25, 9:13, 14:22, 21:18, 21:24
**available** [5] - 15:1, 38:16, 50:22, 53:19, 54:2
**Aventura** [1] - 69:9
**Avenue** [1] - 1:18
**aviation** [2] - 97:16, 97:24
**aware** [1] - 74:1
**awe** [1] - 7:18

## B

**bachelor** [1] - 84:16
**bachelor's** [3] - 92:24, 101:5, 106:21
**background** [3] - 81:4, 90:1, 101:4
**backs** [1] - 25:5
**bad** [2] - 13:8, 78:17
**bake** [1] - 112:9
**bank** [1] - 70:20
**banker** [5] - 70:21, 71:21, 71:24, 104:2, 104:3
**banks** [1] - 103:11
**Barrois** [1] - 45:17
**Barzee** [1] - 2:15
**based** [6] - 11:12, 20:2, 22:11, 54:19, 63:4, 63:8
**basketball** [1] - 73:20
**bathroom** [1] - 66:24
**Bay** [2] - 73:11
**Beach** [2] - 69:9, 89:14
**became** [6] - 71:21,

71:23, 71:24, 75:6, 75:7, 98:14
**Becerra** [4] - 38:6, 64:19, 120:4, 120:23
**BECERRA** [1] - 1:11
**BEFORE** [1] - 1:11
**begin** [2] - 20:15, 95:4
**beginning** [3] - 62:18, 99:21, 111:2
**BEHALF** [4] - 2:7, 2:12, 2:16, 2:21
**behalf** [8] - 4:11, 4:16, 4:19, 4:22, 4:25, 38:11, 45:4, 61:19
**behind** [2] - 25:5, 121:9
**belief** [2] - 78:1, 102:18
**beliefs** [12] - 65:20, 67:20, 71:11, 74:6, 85:20, 89:18, 93:11, 99:1, 102:5, 107:19, 110:24, 117:5
**belongs** [1] - 11:22
**belt** [1] - 122:4
**bench** [2] - 41:8, 119:22
**benches** [1] - 35:19
**benefit** [2] - 30:3, 122:24
**Bergmann** [1] - 46:20
**best** [13] - 5:24, 6:24, 31:16, 73:15, 73:23, 74:18, 81:17, 83:10, 83:22, 83:25, 84:8, 90:13, 121:25
**Betancourt** [1] - 46:7
**BETH** [1] - 2:19
**better** [1] - 69:3
**between** [1] - 30:13
**beyond** [5] - 14:10, 28:17, 42:21, 61:8, 61:11
**bias** [3] - 36:19, 55:6, 106:14
**biased** [3] - 102:8, 103:24, 110:24
**Bible** [1] - 116:8
**bicycle** [1] - 103:16
**bicycling** [1] - 101:16
**big** [2] - 28:16, 77:24
**bigger** [1] - 121:21
**biggest** [1] - 41:1
**binder** [1] - 9:25
**biological** [2] - 92:25, 93:15
**biomechanical** [1] - 85:1
**Bird** [1] - 89:4
**bit** [22] - 28:2, 36:5, 47:21, 49:24, 50:19, 66:17, 75:11, 78:17, 80:16, 80:22, 81:20, 89:6, 89:22, 90:15, 90:21, 91:7, 93:14, 93:16, 96:25, 105:14, 114:2, 121:2
**bite** [1] - 121:14
**blame** [1] - 120:12
**blew** [1] - 29:17
**blood** [1] - 98:17
**Bloomberg** [1] - 116:21
**board** [1] - 113:23
**boarding** [2] - 110:17, 112:3
**body** [1] - 7:15
**Bonura** [1] - 45:18
**books** [3] - 65:8, 71:1, 85:8
**Border** [1] - 45:25
**Borkar** [1] - 46:21
**born** [22] - 64:20, 67:3, 69:8, 70:17, 73:10, 76:18, 79:17, 80:21, 84:15, 87:11, 87:13, 89:2, 90:14, 92:23, 97:11, 101:2, 103:5, 106:20, 109:2, 110:12, 111:24, 116:7
**borrowing** [1] - 66:7
**bother** [4] - 32:10, 34:12, 34:14, 122:1
**bothering** [1] - 37:11
**bought** [1] - 72:9
**Boukman** [1] - 12:8
**box** [26] - 20:15, 49:12, 49:14, 52:2, 54:22, 56:1, 56:2, 56:9, 56:14, 57:1, 57:15, 58:4, 58:15, 59:5, 59:7, 60:1, 60:12, 61:3, 61:12, 61:23, 61:25, 62:10, 63:1, 63:7, 63:9, 63:19
**Brady** [1] - 24:5
**Brazil** [1] - 70:17
**Brazilian** [1] - 70:20
**break** [12] - 32:1, 41:1, 50:2, 50:3, 50:9, 50:14, 50:19, 99:7, 99:12, 121:23, 122:21, 123:2
**breaks** [1] - 115:16
**Brickell** [1] - 118:16
**brief** [2] - 8:21, 41:11
**briefly** [1] - 8:4
**BRIGGS** [1] - 2:4
**Briggs** [2] - 4:13, 45:6
**bring** [5] - 36:12, 42:7, 54:8, 118:8, 118:18
**broader** [1] - 96:21
**brother** [20] - 67:8, 68:4, 68:6, 68:9, 68:15, 68:18, 68:19, 81:7, 84:5, 103:20, 105:15, 106:1, 106:8, 107:13, 109:1, 110:4, 117:1, 117:6, 117:14
**brother's** [1] - 73:23
**brought** [2] - 36:13, 36:18
**Bryan** [2] - 46:4, 46:8
**bucket** [1] - 22:21
**Budapest** [1] - 69:8
**building** [1] - 76:24
**Bulgaria** [4] - 111:24, 114:4, 114:16, 114:21
**Bullard** [1] - 75:5
**bullet** [2] - 7:12, 10:12
**bullets** [2] - 7:13, 7:14
**bunch** [2] - 33:19, 70:25
**burden** [7] - 42:19, 61:19, 99:21, 100:6, 100:14, 119:14
**Bureau** [1] - 54:12
**business** [10] - 70:18, 72:25, 84:17, 84:24, 86:11, 89:7, 89:21, 90:1, 90:4
**but..** [1] - 66:19
**buy** [1] - 65:7
**buying** [2] - 65:8, 77:4

**C**

**cafeteria** [2] - 121:7, 121:8
**California** [1] - 70:23
**campaign** [1] - 75:13
**CAMPO** [2] - 2:8, 5:4
**Campo** [3] - 2:9, 4:16, 47:11
**canceled** [1] - 16:12
**cannot** [17] - 16:18, 17:20, 17:22, 28:6, 51:25, 61:1, 61:7, 61:9, 61:20, 61:21, 62:10, 62:24, 98:18, 119:25, 120:6, 120:19
**capacity** [4] - 71:7, 74:2, 103:20, 112:17
**captured** [1] - 37:1
**care** [6] - 7:25, 35:8, 81:6, 116:15, 117:21, 120:11
**careful** [1] - 40:22
**carefully** [2] - 44:21, 44:24
**cargo** [1] - 93:22
**Caribbean** [1] - 101:10
**Carolina** [3] - 116:7, 117:2, 117:7
**CART** [1] - 14:25
**Carvahlo** [1] - 116:6
**CASE** [1] - 1:2
**Case** [1] - 4:2
**case** [96] - 4:3, 4:4, 4:5, 4:6, 4:13, 13:3, 13:5, 14:12, 16:5, 17:10, 17:11, 18:13, 20:2, 20:11, 22:1, 25:23, 30:21, 30:22, 30:23, 33:5, 34:6, 41:15, 42:5, 42:7, 42:13, 42:15, 42:18, 42:22, 43:15, 43:16, 43:23, 45:4, 45:7, 45:13, 48:6, 51:1, 52:19, 52:21, 53:24, 54:11, 58:25, 59:2, 59:15, 60:22, 63:13, 70:6, 71:11, 78:6, 78:7, 78:17, 78:25, 83:5, 83:8, 84:9, 85:13, 85:21, 87:22, 88:22, 89:19, 90:21, 91:9, 91:12, 91:15, 92:12, 94:7, 94:11, 95:16, 95:25, 96:2, 96:4, 96:13, 97:6, 100:4, 100:9, 100:12, 101:20, 102:14, 102:17, 103:24, 103:25, 104:24, 106:14, 108:7, 108:9, 110:6, 110:25, 112:22, 114:7, 117:2, 120:1, 120:6, 120:21, 120:25
**cases** [1] - 60:22
**Castaneda** [1] - 45:16
**catch** [1] - 86:8
**Catholic** [4] - 71:10, 78:2, 81:18
**cats** [1] - 77:16
**causes** [1] - 122:22
**celebrate** [1] - 51:16
**certain** [6] - 7:14, 8:11, 25:17, 59:21, 98:5, 98:12
**certainly** [1] - 22:18
**CERTIFICATE** [1] - 123:6
**Certified** [1] - 1:17
**certify** [1] - 123:7
**cetera** [1] - 85:5
**CFO** [3] - 72:10, 72:12, 72:23
**chair** [1] - 119:22
**chairs** [1] - 121:5
**challenge** [2] - 121:23, 122:7
**challenges** [1] - 122:19
**charge** [7] - 82:12, 82:13, 105:15, 105:18, 117:2, 117:11, 117:13
**charged** [4] - 12:11, 37:22, 59:15, 117:16
**charges** [7] - 42:8, 42:14, 42:17, 43:5, 43:10, 43:13, 59:20
**chat** [2] - 12:21
**chats** [2] - 11:23, 12:20
**Chavez** [1] - 45:14
**checked** [2] - 5:13, 35:21
**cheerleading** [1] - 82:14
**chief** [1] - 45:13
**chief's** [1] - 66:7

**child** [7] - 77:6, 77:14, 77:17, 99:13, 116:15, 117:20, 122:8
**Children** [1] - 74:16
**children** [13] - 65:2, 67:11, 69:17, 70:24, 73:16, 81:9, 84:25, 89:8, 93:2, 103:12, 110:16, 112:6, 119:17
**choice** [1] - 110:17
**choir** [1] - 77:15
**chosen** [1] - 99:3
**Chris** [1] - 45:18
**Christian** [1] - 85:19
**Christopher** [1] - 46:9
**chronic** [1] - 115:13
**church** [3] - 77:16, 78:14, 79:12
**Cindy** [1] - 45:16
**CIPA** [14] - 23:7, 23:10, 23:12, 23:13, 23:14, 23:23, 23:24, 28:10, 28:18, 30:3, 30:17, 32:17, 33:1, 34:23
**circuit** [1] - 75:20
**circumstance** [1] - 100:3
**citizen** [1] - 98:14
**citizens** [2] - 38:24, 38:25
**City** [3] - 67:3, 81:8, 81:15
**city** [1] - 60:8
**civil** [3] - 39:16, 85:13, 101:21
**civilian** [1] - 14:15
**classes** [1] - 69:21
**classified** [3] - 22:22, 24:5, 31:14
**clearance** [1] - 109:20
**clearly** [1] - 115:23
**clerk's** [1] - 40:15
**client's** [1] - 11:15
**clients** [2] - 44:4, 101:9
**clock** [1] - 38:8
**close** [56] - 25:8, 36:24, 37:3, 37:5, 39:20, 54:15, 54:16, 54:20, 56:12, 56:22, 57:9, 57:22, 58:11, 58:12, 60:7, 60:10, 65:13, 65:14, 65:15, 67:15, 67:18, 69:23, 70:1, 70:2, 70:3, 73:21, 74:3, 75:10, 76:4, 77:17, 78:14, 82:16, 86:20, 87:2, 87:3, 87:4, 89:13, 91:22, 91:25, 93:8, 97:21, 98:25, 105:25, 107:1, 110:21, 112:5, 112:12, 112:18, 114:9, 114:20, 117:14, 117:15
**closely** [1] - 44:10
**closing** [2] - 17:9, 35:5
**cloud** [1] - 28:16
**CNN** [2] - 85:4, 101:13
**coach** [1] - 82:14
**Coast** [1] - 102:1
**coffee** [2] - 28:24, 50:4
**Coke** [1] - 50:5
**College** [1] - 116:8
**college** [9] - 67:12, 67:22, 70:18, 72:17, 73:12, 77:1, 81:5, 110:13, 111:16
**Colombia** [8] - 58:13, 58:14, 76:19, 79:15, 79:16, 79:18, 79:21, 112:1
**Colombian** [1] - 16:10
**comfortable** [2] - 41:13, 116:3
**coming** [13] - 14:23, 15:1, 34:8, 36:9, 45:2, 45:9, 47:8, 50:20, 69:5, 78:20, 119:23, 122:13
**Commerce** [1] - 46:15
**commercial** [4] - 67:7, 93:21, 116:20
**commit** [2] - 37:23, 43:6
**committed** [1] - 42:9
**common** [2] - 44:7, 44:8
**communications** [1] - 89:25
**Community** [1] - 86:1
**community** [3] - 38:12, 40:5, 86:1
**company** [18] - 67:6, 68:1, 68:2, 68:3, 70:22, 71:15, 71:17, 72:8, 72:9, 72:15, 72:22, 72:24, 73:3, 97:15, 97:16, 97:24, 97:25, 98:2
**comparing** [1] - 21:9
**completed** [1] - 81:5
**completely** [2] - 10:9, 30:19
**compliance** [3] - 70:19, 71:21, 71:24
**compromised** [1] - 26:18
**computer** [5] - 1:22, 77:2, 101:4, 112:2
**computer-aided** [1] - 1:22
**concentration** [1] - 84:18
**concern** [4] - 19:2, 32:25, 116:10, 116:13
**concerned** [3] - 8:7, 8:10, 23:7
**concerns** [2] - 42:22, 87:23
**conditions** [1] - 59:22
**Condon** [1] - 40:13
**conducted** [2] - 6:5, 24:22
**conducting** [1] - 14:21
**confer** [2] - 22:14, 27:20
**confidential** [2] - 24:6, 25:7
**confirm** [1] - 31:13
**confirmed** [1] - 39:5
**conglomerate** [1] - 32:15
**Congress** [1] - 39:2
**connect** [3] - 12:10, 13:6, 76:6
**connection** [2] - 30:14, 78:12
**consider** [6] - 20:22, 62:8, 62:20, 79:5, 85:15, 100:7
**conspiracy** [2] - 43:3, 117:2
**conspire** [1] - 33:6
**conspired** [4] - 37:16, 37:18, 42:25, 43:3
**conspiring** [2] - 37:22, 43:5
**constitute** [1] - 102:2
**Constitution** [1] - 60:23
**constitutional** [3] - 38:23, 39:11, 51:22
**constitutionality** [2] - 15:21, 15:23
**construction** [1] - 76:22
**contact** [4] - 72:22, 80:3, 87:21, 95:14
**contains** [1] - 42:24
**contemplated** [1] - 14:11
**context** [5] - 18:1, 18:8, 20:7, 26:2, 26:12
**continuation** [1] - 123:5
**contract** [3] - 89:5, 89:23, 107:1
**contracts** [1] - 90:3
**Control** [2] - 37:24, 43:7
**control** [1] - 52:1
**controller** [1] - 97:24
**conversations** [1] - 97:23
**convicted** [18] - 62:5, 67:19, 70:4, 71:9, 74:4, 81:17, 82:7, 85:17, 93:9, 105:16, 107:17, 110:23, 112:18, 114:5, 117:1, 117:3
**conviction** [5] - 83:11, 83:13, 106:9, 114:2
**cooperating** [2] - 24:23, 59:17
**cooperation** [1] - 59:19
**cooperators** [3] - 18:2, 20:3, 33:5
**copies** [2] - 66:10, 66:11
**copy** [3] - 9:24, 13:13, 66:6
**Coral** [1] - 110:13
**correct** [10] - 11:6, 13:10, 47:19, 60:16, 80:9, 82:8, 86:16, 90:3, 123:7
**correctly** [1] - 71:20
**Corvington** [1] - 47:14
**counsel** [16] - 4:8, 4:12, 4:20, 4:23, 36:9, 37:6, 41:24, 42:2, 44:3, 45:3, 47:2, 47:18, 48:21, 49:6, 53:13, 68:18
**count** [2] - 5:12, 5:15
**counter** [1] - 107:21
**counterdesignations** [1] - 6:12
**counterterrorism** [3] - 106:24, 107:22, 108:8
**country** [8] - 60:11, 60:25, 61:7, 77:15, 88:20, 114:15
**counts** [4] - 37:14, 37:21, 42:24, 112:16
**County** [4] - 17:2, 18:9, 21:6, 21:23
**county** [4] - 39:15, 60:9, 92:24, 101:20
**couple** [4] - 78:9, 85:22, 119:24, 121:19
**course** [13] - 17:2, 21:1, 30:2, 31:19, 40:16, 41:7, 43:11, 44:13, 53:6, 64:25, 68:16, 92:7, 105:4
**court** [25] - 22:2, 38:6, 39:16, 39:19, 40:15, 40:17, 40:18, 40:19, 41:5, 41:7, 41:9, 42:7, 53:14, 53:18, 62:6, 64:10, 66:23, 69:4, 82:18, 82:19, 82:20, 82:25, 83:3, 91:24, 99:23
**COURT** [277] - 1:1, 5:2, 5:7, 5:10, 6:10, 6:22, 8:17, 8:23, 9:6, 9:12, 9:18, 9:24, 10:3, 10:7, 10:11, 10:17, 10:22, 11:4, 11:7, 12:16, 13:10, 15:17, 16:20, 18:5, 18:24, 19:3, 19:7, 19:16, 19:24, 20:25, 21:22, 22:4, 22:16, 22:19, 23:10, 23:13, 23:16, 27:25, 28:23, 29:5, 29:22, 29:24, 30:20, 31:2, 31:15, 33:9, 33:16, 33:22, 33:25, 34:11, 34:20, 34:22, 35:10, 35:16, 35:24, 38:5, 41:20, 41:22, 41:24, 42:2, 42:4, 45:10, 47:1, 47:17,

48:9, 48:20, 49:5, 52:13, 57:21, 60:17, 60:18, 65:25, 66:21, 67:21, 67:24, 68:4, 68:9, 68:12, 68:14, 68:21, 68:25, 69:4, 70:7, 70:10, 70:14, 71:14, 71:17, 71:20, 72:1, 72:12, 72:15, 72:19, 72:21, 73:5, 73:7, 74:9, 74:13, 74:17, 74:20, 74:24, 75:1, 75:8, 75:10, 75:14, 75:19, 75:22, 75:25, 76:3, 76:8, 76:11, 76:15, 78:4, 78:9, 78:21, 78:24, 79:3, 79:7, 79:14, 79:18, 79:20, 79:25, 80:3, 80:6, 80:9, 80:11, 80:17, 80:23, 81:2, 81:20, 81:25, 82:3, 82:6, 82:9, 82:12, 82:16, 82:19, 82:23, 82:25, 83:2, 83:7, 83:10, 83:15, 83:17, 83:21, 83:24, 84:3, 84:7, 84:12, 85:22, 86:4, 86:8, 86:12, 86:14, 86:17, 86:21, 86:24, 87:3, 87:5, 87:11, 87:14, 87:17, 87:22, 88:5, 88:13, 88:24, 89:20, 90:7, 90:9, 90:16, 90:18, 90:22, 91:3, 91:9, 91:14, 91:21, 92:2, 92:7, 92:17, 92:20, 93:14, 93:18, 93:23, 94:1, 94:4, 94:14, 94:17, 94:19, 94:25, 95:2, 95:4, 95:7, 95:9, 95:12, 95:15, 95:22, 96:3, 96:7, 96:11, 96:17, 96:20, 97:5, 97:8, 99:4, 99:12, 99:17, 100:2, 100:16, 100:23, 100:25, 102:9, 102:11, 102:19, 102:25, 104:1, 104:3, 104:5, 104:8, 104:10, 104:13, 104:20, 104:24, 105:5, 105:14, 105:22, 105:25, 106:7, 106:16, 106:18, 107:20, 107:24, 108:3, 108:10, 108:14, 109:4, 109:15, 109:18, 109:21, 109:24, 110:9, 111:1, 111:5, 111:7, 111:13, 111:17, 111:20, 112:23, 113:10, 113:24, 114:1, 114:6, 114:12, 114:17, 114:20, 114:24, 115:9, 115:15, 115:21, 116:1, 116:12, 117:6, 117:9, 117:11, 117:14, 117:17, 117:20, 118:1, 118:5, 118:12, 118:20, 118:23, 119:1, 119:5, 119:8, 119:12, 119:16, 119:19, 121:18

**Court** [18] - 1:18, 4:1, 8:5, 8:14, 8:16, 8:22, 9:22, 12:12, 15:20, 15:21, 20:18, 23:4, 26:2, 30:3, 40:21, 59:22, 123:11, 123:12
**Court's** [1] - 22:12
**courthouse** [7] - 38:21, 39:24, 40:1, 40:3, 40:5, 82:23
**COURTROOM** [3] - 4:2, 29:23, 35:22
**courtroom** [10] - 39:7, 40:13, 52:25, 53:13, 62:7, 62:9, 66:7, 66:8, 80:13, 83:13
**cousin** [6] - 81:16, 82:6, 82:16, 89:12, 98:21, 112:12
**coverage** [1] - 58:22
**covert** [1] - 12:2
**coworkers** [1] - 44:21
**CRDs** [1] - 5:14
**create** [1] - 7:18
**credibility** [2] - 55:15, 55:16
**credit** [4] - 96:23, 96:24, 110:6
**crime** [5] - 18:10, 21:7, 21:8, 26:7, 42:9
**crimes** [1] - 59:16
**criminal** [9] - 39:16, 42:7, 42:18, 57:10, 57:11, 57:12, 57:13, 60:22, 68:10
**critical** [9] - 23:8, 26:6, 113:14, 113:17, 113:18, 113:19, 113:21, 113:22, 113:23
**critically** [1] - 113:12
**cross** [9] - 21:8, 29:8, 29:21, 30:21, 31:6, 31:17, 32:18, 33:23, 35:5
**cross-examination** [3] - 29:8, 30:21, 33:23
**cross-examine** [2] - 32:18, 35:5
**cross-examined** [1] - 21:8
**crux** [1] - 32:11
**curious** [1] - 113:8
**current** [6] - 73:13, 76:21, 85:14, 101:7, 107:13, 112:7
**customers** [1] - 97:19
**customs** [4] - 93:17, 93:18, 93:24, 94:8
**Customs** [3] - 45:25, 93:19, 93:20
**cut** [3] - 34:10, 34:11, 121:2
**Cutler** [2] - 73:11
**cybersecurity** [1] - 101:8
**cycling** [1] - 69:20

## D

**dad** [5] - 90:24, 91:3, 98:13, 108:10, 116:9
**Dade** [9] - 17:2, 18:9, 21:6, 21:22, 97:13, 98:21, 99:7, 107:11, 108:11
**daily** [1] - 55:20
**dangerous** [1] - 16:19
**Daniel** [1] - 45:18
**Daniela** [2] - 4:16, 47:11
**DANIELA** [1] - 2:8
**data** [1] - 112:4
**DATE** [1] - 123:9
**dates** [1] - 22:9
**daughter** [2] - 51:4, 101:11
**daughters** [2] - 116:9, 116:19
**Dave** [1] - 46:5
**DAVID** [1] - 2:10
**David** [5] - 2:10, 4:15, 47:7, 47:10, 101:2
**day-to-day** [3] - 40:17, 117:25, 119:7
**daycare** [1] - 122:9
**daylight** [1] - 38:8
**days** [6] - 50:16, 50:24, 115:1, 115:2, 120:14, 120:19
**Dayton** [1] - 45:19
**DC** [1] - 116:20
**De** [1] - 70:17
**deal** [5] - 5:19, 6:18, 16:21, 23:17, 77:24
**dealing** [4] - 15:22, 19:14, 76:23, 88:20
**dealt** [2] - 16:15
**decide** [4] - 8:10, 16:14, 17:22, 91:12
**decided** [2] - 34:6, 36:10
**decision** [10] - 39:8, 52:21, 63:8, 91:15, 91:24, 92:10, 92:13, 92:14, 94:11, 106:13
**decision-making** [1] - 106:13
**decisions** [2] - 39:7, 63:4
**decline** [1] - 25:9
**defend** [1] - 99:25
**DEFENDANT** [5] - 2:7, 2:12, 2:16, 2:21, 48:18
**defendant** [14] - 13:6, 42:8, 42:12, 42:16, 42:20, 61:2, 61:7, 61:10, 61:18, 61:20, 61:22, 62:5, 99:18, 100:3
**defendants** [7] - 37:15, 42:13, 42:24, 42:25, 57:12, 84:10, 100:9
**Defendants** [1] - 1:7
**defender's** [1] - 57:10
**defense** [53] - 6:6, 6:11, 7:21, 7:22, 8:6, 8:19, 9:23, 10:8, 14:6, 14:21, 14:25, 15:2, 15:10, 15:22, 17:1, 17:2, 17:7, 18:9, 18:17, 19:12, 19:18, 20:5, 20:19, 21:7, 21:9, 21:18, 21:23, 22:5, 23:18, 23:24, 24:3, 25:4, 25:14, 25:15, 30:14, 30:21, 32:2, 32:6, 32:11, 32:16, 33:17, 34:12, 35:25, 36:6, 37:6, 37:10, 53:13, 57:10, 57:11, 57:13, 102:14
**Defense** [4] - 63:16, 107:16, 109:16, 110:5
**defense's** [1] - 27:15
**definitely** [1] - 99:9
**degree** [16] - 64:21, 67:5, 70:18, 73:12, 76:20, 77:1, 84:17, 93:15, 101:4, 101:5, 106:22, 108:4, 110:13, 112:2
**deliberating** [1] - 20:18
**deliberations** [1] - 19:15
**delivered** [2] - 6:7, 7:6
**Demorcy** [1] - 46:24
**denied** [2] - 14:8, 15:24
**Dennis** [1] - 45:20
**dentist** [1] - 51:10
**deny** [2] - 11:11, 13:14
**Department** [12] - 46:15, 46:16, 46:17, 54:13, 56:24, 74:16, 84:21, 85:23, 107:11, 107:16, 109:16, 110:5
**departments** [1] - 108:25
**deployed** [2] - 77:18, 112:13
**depo** [4] - 5:20, 5:21, 6:1, 6:15
**deported** [3] - 103:22, 105:21, 106:9
**deposition** [2] - 6:4,

16:11
**Depot** [1] - 73:13
**deprived** [2] - 27:9, 27:11
**deputies** [1] - 40:13
**DEPUTY** [3] - 4:2, 29:23, 35:22
**Deputy** [1] - 46:16
**DESCALZO** [1] - 2:17
**Descalzo** [4] - 2:18, 4:22, 48:12, 48:16
**description** [2] - 37:13, 43:15
**designated** [1] - 6:7
**designation** [2] - 6:15, 6:19
**designations** [4] - 5:20, 5:21, 6:1, 6:8
**designer** [1] - 77:7
**detailed** [1] - 43:12
**details** [2] - 22:14, 80:16
**determination** [3] - 8:6, 26:25, 27:17
**determine** [5] - 26:15, 42:16, 52:18, 54:3, 55:15
**determined** [1] - 25:22
**determining** [1] - 52:20
**developer** [1] - 77:1
**development** [1] - 116:20
**device** [1] - 15:1
**devices** [2] - 30:12, 69:13
**Diego** [1] - 70:23
**Diet** [1] - 50:5
**different** [13] - 11:23, 30:12, 40:19, 51:17, 85:3, 85:8, 86:2, 88:15, 92:20, 114:18, 121:10
**differently** [3] - 39:19, 39:20, 108:17
**difficult** [6] - 83:4, 102:16, 102:23, 103:23, 112:20, 115:4
**difficulties** [2] - 115:8, 115:10
**diminish** [1] - 25:12
**Dimitri** [1] - 46:14
**Dimitrius** [1] - 49:4
**dire** [3] - 8:15, 19:10, 121:20
**DIRE** [1] - 3:3
**Director** [1] - 46:16
**director** [2] - 101:7, 116:17
**disagree** [1] - 62:22
**disclose** [2] - 53:8
**disclosure** [3] - 68:14, 68:18, 108:23
**disclosures** [2] - 30:14, 30:17
**discuss** [3] - 53:9, 96:16, 96:18
**disfavor** [1] - 112:25
**dismiss** [2] - 16:16, 21:12
**dismissal** [1] - 16:23
**dismissive** [1] - 34:7
**displaying** [1] - 11:20
**distance** [1] - 121:13
**DISTRICT** [3] - 1:1, 1:1, 1:12
**district** [4] - 38:6, 38:11, 64:21, 103:11
**District** [3] - 1:18, 123:12, 123:12
**DIVISION** [1] - 1:2
**dizzy** [1] - 77:25
**DO** [2] - 2:8, 5:4
**Docket** [1] - 11:8
**doctor** [1] - 112:16
**doctor's** [1] - 51:2
**document** [1] - 42:6
**documentaries** [2] - 101:17
**dog** [1] - 44:20
**DOJ** [3] - 2:4, 4:12, 45:5
**domestic** [2] - 18:1, 105:18
**done** [5] - 6:19, 25:18, 44:15, 118:6, 118:12
**donor** [1] - 98:18
**door** [2] - 18:10, 73:22
**double** [1] - 26:10
**doubt** [4] - 17:23, 42:21, 61:8, 61:11
**down** [14] - 5:14, 7:20, 19:5, 32:12, 34:24, 35:2, 36:5, 52:6, 52:8, 64:9, 66:9, 77:25, 116:12, 122:7
**Downtown** [2] - 116:7, 121:11
**Dr** [1] - 46:24
**dramas** [2] - 85:9
**draw** [1] - 13:5
**DRAY** [3] - 2:23, 5:6, 52:11
**Dray** [4] - 2:24, 4:25, 48:23, 49:2
**drive** [1] - 118:17
**drop** [1] - 59:20
**dropping** [1] - 118:1
**Drs** [1] - 46:24
**Drudge** [1] - 101:14
**drug** [1] - 117:2
**drug-related** [1] - 117:2
**during** [8] - 40:16, 41:7, 45:13, 50:16, 53:6, 98:15, 121:22, 123:1
**duties** [1] - 9:5
**duty** [6] - 38:25, 42:20, 65:12, 67:16, 89:12, 98:20
**Dwight** [1] - 75:4

## E

**early** [1] - 6:5
**earpiece** [1] - 69:5
**earth** [1] - 16:9
**easier** [2] - 43:19, 43:20
**east** [1] - 121:10
**Easter** [4] - 50:14, 50:15
**Easton** [1] - 46:5
**Ecuador** [2] - 88:22, 101:3
**edge** [1] - 63:17
**Edit** [3] - 68:23, 69:2, 69:7
**education** [3] - 103:7, 103:12, 110:13
**educational** [3] - 81:4, 86:3, 101:3
**Edwards** [2] - 106:18, 106:20
**effect** [2] - 22:15, 85:20
**eight** [7] - 38:17, 49:21, 49:22, 117:3, 117:23, 119:4
**eight-week** [1] - 49:21
**eighth** [1] - 5:16
**either** [21] - 10:20, 25:19, 26:20, 28:15, 32:5, 34:10, 37:3, 44:16, 46:3, 47:2, 54:17, 56:23, 57:9, 57:12, 57:23, 60:11, 90:11, 94:9, 96:22, 106:8, 108:17
**elect** [3] - 39:1, 39:2
**elected** [10] - 39:3, 39:5, 60:8, 60:10, 75:2, 75:7, 75:23, 114:13
**election** [1] - 39:22
**elementary** [2] - 64:22, 111:25
**Elena** [1] - 111:23
**Elizabeth** [1] - 46:5
**Elizangela** [1] - 70:17
**ELMO** [1] - 66:7
**embarrass** [1] - 53:3
**emergency** [2] - 119:2, 119:3
**Emily** [1] - 89:2
**EMMANUEL** [1] - 2:13
**Emmanuel** [2] - 2:13, 4:18
**employed** [2] - 89:5, 103:8
**employer** [1] - 76:21
**employment** [2] - 73:13, 101:7
**end** [3] - 7:21, 25:17, 62:19
**ended** [2] - 24:12, 32:24
**ends** [1] - 8:12
**enforcement** [54] - 16:10, 36:19, 36:21, 36:22, 37:7, 37:9, 54:18, 55:5, 55:7, 55:9, 55:10, 55:12, 55:14, 55:22, 55:25, 65:13, 67:17, 69:24, 71:5, 77:21, 81:14, 85:15, 86:15, 86:18, 86:25, 87:1, 96:21, 96:25, 101:18, 101:23, 103:19, 108:16, 108:24, 109:3, 109:5, 109:10, 109:11, 109:12, 110:3, 110:21, 112:15, 112:25, 113:1, 113:5, 113:8, 113:11, 113:12, 113:14, 113:15, 113:17, 113:19, 116:24
**engage** [2] - 8:13, 9:4
**engineer** [1] - 85:1
**engines** [2] - 98:1, 98:3
**enjoy** [1] - 121:15
**entered** [1] - 38:4
**entire** [5] - 53:11, 97:13, 108:24, 111:15, 112:24
**entitled** [3] - 13:6, 21:25, 123:8
**Entry** [1] - 11:9
**envision** [1] - 31:8
**equally** [3] - 84:10, 109:12, 109:13
**especially** [3] - 14:3, 85:9, 102:17
**ESQ** [9] - 2:8, 2:8, 2:10, 2:13, 2:14, 2:17, 2:19, 2:22, 2:23
**essentially** [4] - 30:5, 91:5, 93:21
**estate** [1] - 108:2
**et** [2] - 1:6, 85:5
**event** [1] - 40:20
**events** [3] - 58:22, 58:25, 112:8
**evidence** [34] - 6:25, 8:20, 11:13, 11:24, 12:5, 13:15, 13:25, 14:8, 14:17, 15:13, 15:23, 16:1, 16:18, 17:17, 17:21, 20:23, 35:11, 42:10, 42:16, 52:25, 62:6, 62:8, 63:5, 63:6, 63:8, 63:13, 88:11, 88:19, 94:13, 94:16, 96:5, 102:20
**evident** [1] - 13:1
**ex** [1] - 8:22
**exact** [1] - 83:12
**exactly** [7] - 20:12, 28:18, 75:15, 89:24, 91:8, 104:18, 107:24
**examination** [3] - 29:8, 30:21, 33:23
**EXAMINATION**........ ............... [1] - 3:3
**examinations** [1] - 14:22
**examine** [2] - 32:18, 35:5
**examined** [1] - 21:8
**examiner** [1] - 21:17
**examiners** [1] - 46:2
**example** [9] - 12:19, 17:13, 20:25, 21:17, 23:9, 51:1,

64:18, 79:8, 94:9
**except** [1] - 111:15
**excited** [1] - 38:17
**exciting** [1] - 38:19
**exculpatory** [1] - 24:11
**excuse** [1] - 52:11
**excused** [1] - 36:13
**existence** [1] - 72:9
**exists** [1] - 42:11
**exited** [1] - 121:17
**expect** [1] - 49:20
**expectations** [1] - 90:4
**experience** [8] - 52:22, 54:16, 54:19, 57:23, 58:12, 84:7, 106:8, 117:18
**experiences** [3] - 88:17, 88:18, 90:19
**expert** [1] - 43:8
**explain** [4] - 64:15, 91:4, 99:25, 108:19
**explained** [2] - 99:21, 100:14
**Export** [2] - 37:24, 43:7
**export** [1] - 37:25
**extent** [5] - 8:5, 10:15, 33:25, 36:6, 88:8
**Exxon** [2] - 68:7, 68:10

## F

**face** [2] - 7:16, 13:1
**Facebook** [2] - 76:6, 76:9
**faces** [1] - 43:5
**fact** [23] - 13:24, 15:12, 17:13, 19:17, 23:8, 24:18, 25:3, 25:4, 25:24, 26:23, 28:4, 28:17, 30:23, 31:17, 42:10, 61:21, 87:24, 88:14, 94:8, 95:17, 106:9, 114:11
**factor** [1] - 26:24
**factors** [2] - 53:1, 55:19
**facts** [16] - 16:1, 16:17, 17:21, 19:25, 20:23, 26:24, 28:1, 28:3, 28:6, 28:7, 28:11, 32:20, 42:16, 80:12, 91:12, 104:25
**failure** [1] - 77:23
**fair** [41] - 10:18, 14:20, 15:20, 16:6, 18:3, 21:11, 34:15, 53:5, 59:1, 59:4, 65:21, 71:13, 74:7, 74:8, 78:6, 78:8, 80:4, 81:19, 83:5, 84:6, 85:21, 88:1, 89:18, 94:6, 99:2, 100:12, 100:19, 102:14, 102:21, 103:1, 103:25, 107:19, 109:25, 110:2, 110:5, 110:7, 110:25, 112:22
**fairly** [3] - 83:7, 84:10, 88:21
**fairness** [3] - 15:21, 16:15, 16:24
**false** [3] - 30:19, 37:25, 43:8
**familiar** [5] - 58:1, 58:5, 78:11, 79:15, 90:12
**familiarity** [2] - 57:24, 58:13
**Families** [1] - 74:16
**family** [65] - 37:3, 54:15, 56:12, 56:22, 57:9, 57:22, 58:12, 60:7, 60:10, 65:11, 65:16, 67:15, 67:16, 67:18, 69:14, 69:15, 69:24, 70:1, 70:3, 71:3, 71:5, 71:6, 71:8, 73:15, 74:3, 74:19, 77:20, 77:21, 77:22, 80:2, 80:4, 81:11, 81:13, 85:15, 87:24, 88:8, 88:15, 89:15, 92:8, 92:11, 92:14, 93:6, 93:8, 95:12, 95:13, 95:17, 97:21, 97:22, 101:22, 102:3, 103:9, 103:19, 107:17, 108:24, 110:4, 110:15, 112:5, 112:14, 114:10, 114:22, 116:16, 116:22, 116:24, 117:24, 118:22
**far** [1] - 6:15
**father** [4] - 89:10, 107:8, 107:11, 110:4
**FAU** [1] - 67:5
**favor** [5] - 63:19, 94:8, 97:6, 112:24, 113:3
**favoring** [1] - 63:18
**favors** [1] - 63:14
**FBI** [36] - 4:13, 14:25, 22:14, 45:7, 45:15, 45:16, 45:17, 45:18, 45:19, 45:20, 46:3, 46:4, 46:5, 46:6, 46:7, 46:8, 54:13, 54:16, 54:20, 94:10, 109:6, 109:7, 109:8
**FCRR** [2] - 1:17, 123:11
**February** [2] - 6:5
**Federal** [2] - 1:17, 54:12
**federal** [27] - 39:16, 39:24, 60:9, 65:14, 67:17, 70:2, 71:7, 74:2, 81:14, 82:19, 85:16, 86:15, 86:18, 93:7, 94:4, 94:6, 97:3, 98:24, 101:23, 102:2, 107:15, 110:22, 112:16, 116:25, 117:11, 117:13
**feelings** [2] - 43:17, 43:23
**fellow** [1] - 95:17
**felony** [11] - 65:17, 67:19, 70:4, 71:9, 74:4, 82:7, 85:18, 93:9, 102:4, 107:18, 117:1
**Fernandez** [1] - 49:4
**few** [3] - 36:16, 39:13, 75:6
**fiction** [3] - 85:7, 112:9
**field** [2] - 21:11, 33:20
**figured** [1] - 108:22
**file** [2] - 25:1, 25:8
**filing** [1] - 6:9
**film** [1] - 89:25
**final** [1] - 73:3
**finalize** [1] - 7:4
**financial** [3] - 71:18, 103:10, 119:14
**fine** [4] - 6:23, 10:17, 11:17, 26:16
**finish** [2] - 29:25, 104:8
**finished** [2] - 69:9, 112:2
**fire** [4] - 67:6, 67:7, 68:2, 72:8
**fired** [1] - 25:10
**firm** [6] - 36:24, 56:13, 56:17, 57:13, 107:25, 108:1
**first** [17] - 11:15, 15:7, 23:15, 24:9, 44:25, 46:23, 49:12, 52:1, 53:22, 54:11, 60:23, 79:23, 81:16, 88:7, 98:21, 112:1, 119:25
**Fisher** [4] - 118:15, 119:9, 119:12, 122:9
**fit** [2] - 35:7, 66:8
**fitness** [2] - 101:16, 116:21
**Fitros** [1] - 97:11
**FIU** [4] - 89:4, 97:14, 101:6, 112:2
**FIU/West** [1] - 81:4
**five** [7] - 12:21, 16:10, 37:21, 69:12, 82:11, 115:1, 121:11
**fixated** [1] - 64:16
**fixes** [1] - 98:2
**flagged** [2] - 10:1, 10:8
**flip** [1] - 31:20
**flips** [1] - 33:19
**floor** [1] - 5:16
**FLORES** [1] - 2:14
**Flores** [3] - 2:15, 4:19, 48:5
**FLORIDA** [1] - 1:1
**Florida** [16] - 1:4, 1:19, 64:20, 73:10, 73:11, 82:20, 82:21, 82:22, 84:21, 89:2, 97:12, 103:6, 106:21, 123:12, 123:13
**flying** [1] - 64:8
**focus** [1] - 106:23
**folder** [1] - 7:7
**folks** [17] - 36:12, 39:1, 40:15, 41:3, 44:11, 46:12, 52:1, 53:17, 54:1, 78:10, 86:21, 96:24, 110:1, 110:2, 121:20, 122:19, 122:25
**follow** [21] - 24:20, 25:10, 26:2, 29:11, 29:12, 29:14, 29:15, 29:20, 30:15, 30:23, 30:25, 31:10, 37:11, 69:17, 69:18, 69:19, 77:9, 81:10, 98:11, 102:13, 116:21
**follow-up** [3] - 25:10, 26:2, 30:15
**followed** [6] - 24:25, 25:14, 25:21, 25:22, 27:8, 58:21
**following** [6] - 29:16, 45:14, 46:11, 46:18, 49:3, 95:24
**follows** [2] - 46:4, 49:3
**foolishness** [1] - 34:10
**FOR** [1] - 2:2
**Force** [1] - 89:11
**foregoing** [1] - 123:7
**foreign** [3] - 15:23, 15:24, 24:22
**forensic** [6] - 14:22, 46:2, 77:12, 103:13, 104:10, 105:2
**forensics** [1] - 101:17
**forgot** [1] - 72:3
**forgotten** [1] - 88:4
**form** [2] - 38:16, 38:17
**formal** [1] - 42:5
**former** [2] - 46:15, 46:23
**formerly** [1] - 46:8
**four** [6] - 16:12, 47:13, 71:2, 82:10, 87:16
**Fox** [1] - 101:13
**FPR** [2] - 1:17, 123:11
**FPR-C** [2] - 1:17, 123:11
**frame** [2] - 50:23, 52:2
**Frederick** [1] - 46:20
**free** [2] - 7:20, 13:20
**frequently** [1] - 79:18
**Friday** [8] - 5:19, 6:6, 7:3, 50:12, 50:14, 51:13, 115:11, 115:13
**Fridays** [3] - 50:1,

118:7, 119:9
**FRIEDMAN** [5] - 2:22, 4:24, 11:14, 42:3, 48:24
**Friedman** [4] - 2:22, 4:25, 48:23, 49:1
**Friedman's** [1] - 66:13
**friend** [30] - 54:16, 56:13, 56:22, 58:12, 60:8, 60:10, 65:16, 67:18, 69:14, 69:24, 70:1, 70:3, 71:3, 73:15, 73:23, 74:18, 77:17, 77:20, 77:22, 83:23, 83:25, 90:13, 91:18, 91:19, 93:9, 97:21, 107:1, 116:16, 118:7, 122:1
**friend's** [3] - 81:17, 83:10, 84:8
**friends** [29] - 51:12, 57:9, 57:22, 65:11, 65:13, 67:15, 69:15, 71:5, 71:6, 71:8, 73:21, 75:6, 75:10, 78:14, 79:8, 79:11, 86:19, 86:21, 86:24, 101:22, 101:25, 108:24, 110:18, 110:21, 110:22, 112:5, 112:15, 121:25
**friendship** [3] - 91:15, 91:23, 91:25
**front** [6] - 12:13, 15:25, 16:16, 16:17, 121:24
**frown** [1] - 27:3
**Fuel** [1] - 97:15
**fuel** [1] - 97:18
**fulfill** [1] - 9:5
**full** [3] - 33:25, 50:24, 68:14
**fully** [3] - 61:1, 61:21, 62:10
**fulsome** [1] - 26:18
**fun** [1] - 40:1
**fundamental** [2] - 53:23, 60:21
**funerals** [1] - 79:24
**future** [1] - 40:21
**fuzzy** [1] - 80:16

## G

**Gables** [1] - 110:13
**game** [1] - 34:15
**Garcia** [2] - 45:25, 46:20
**garden** [1] - 85:7
**gardening** [1] - 77:16
**gathered** [1] - 97:22
**general** [6] - 11:5, 37:1, 37:20, 43:10, 53:24, 64:1
**generally** [6] - 8:15, 14:5, 14:18, 36:20, 37:4, 37:6
**genius** [1] - 77:2
**gentlemen** [7] - 42:4, 45:1, 47:7, 48:14, 49:19, 52:17, 119:19
**Geographic** [1] - 70:25
**German** [2] - 18:3, 46:19
**given** [8] - 7:8, 8:8, 14:7, 20:17, 21:10, 25:15, 26:10, 110:3
**glasses** [1] - 110:18
**Glazer's** [1] - 89:5
**glitch** [1] - 66:15
**glitches** [1] - 66:16
**goal** [1] - 52:24
**gold** [4] - 33:16, 83:14, 83:16, 83:17
**golf** [1] - 67:14
**Gonzalez** [2] - 45:19, 46:22
**goods** [2] - 37:24, 43:7
**Google** [1] - 69:19
**gosh** [1] - 86:5
**gossip** [1] - 30:5
**Government** [73] - 4:9, 5:25, 6:17, 6:20, 6:23, 6:25, 7:2, 7:3, 7:6, 7:16, 9:23, 9:25, 10:25, 11:10, 11:20, 12:5, 12:17, 15:4, 15:8, 15:11, 16:24, 16:25, 18:14, 18:15, 18:18, 19:11, 22:25, 24:1, 24:20, 24:21, 25:16, 25:22, 26:3, 26:7, 27:1, 27:5, 28:7, 29:2, 29:6, 29:24, 30:1, 30:6, 30:10, 32:20, 34:6, 34:13, 35:6, 35:10, 35:25, 36:4, 42:6, 42:9, 42:18, 42:19, 42:20, 53:12, 59:17, 59:20, 59:25, 61:19, 63:14, 63:15, 83:8, 84:9, 97:6, 99:22, 100:6, 100:15, 102:16, 103:20, 106:11, 110:6, 117:18
**GOVERNMENT** [1] - 2:2
**government** [26] - 24:22, 57:25, 58:6, 58:14, 65:14, 67:18, 70:2, 71:7, 74:2, 81:14, 85:16, 93:8, 94:5, 94:6, 97:3, 98:24, 101:23, 102:2, 102:7, 105:12, 107:25, 108:4, 108:6, 110:22, 112:16, 116:25
**Government's** [9] - 8:20, 10:24, 11:12, 13:17, 17:11, 17:23, 23:20, 26:14, 45:13
**governs** [1] - 43:13
**grab** [1] - 66:10
**grade** [1] - 90:14
**graduated** [6] - 67:4, 67:11, 67:21, 73:12, 75:5, 97:14
**graduating** [1] - 51:4
**grain** [1] - 113:7
**granted** [3] - 9:15, 11:8, 11:9
**graphic** [2] - 8:8, 77:7
**grateful** [1] - 38:12
**great** [1] - 39:11
**Greenberg** [1] - 68:8
**grew** [4] - 73:10, 82:17, 98:22, 112:12
**group** [8] - 12:20, 54:24, 56:7, 96:21, 108:15, 112:24, 122:23
**groups** [1] - 15:8
**growth** [1] - 73:3
**guarantee** [1] - 20:20
**Guard** [2] - 102:1, 112:13
**guard** [1] - 72:10
**guarding** [1] - 21:8
**guards** [2] - 72:18
**Guayaquil** [1] - 101:2
**guess** [6] - 5:12, 6:13, 9:9, 82:15, 113:6, 114:16
**guilt** [3] - 42:12, 61:8, 61:20
**guilty** [8] - 42:13, 42:14, 42:17, 42:20, 59:17, 59:18, 61:7, 61:10
**guitar** [1] - 77:15
**Gus** [1] - 49:4
**gut** [1] - 100:10
**guys** [1] - 105:8
**gym** [3] - 71:2, 73:19, 103:16

## H

**Haiti** [68] - 12:8, 13:25, 14:1, 14:4, 14:16, 14:17, 14:18, 15:1, 15:11, 15:13, 17:14, 17:16, 17:17, 18:20, 19:13, 19:18, 20:2, 20:3, 20:4, 20:20, 23:2, 23:4, 23:6, 46:23, 57:23, 57:25, 58:1, 58:6, 78:11, 78:12, 78:14, 79:4, 79:9, 87:5, 87:6, 87:8, 87:10, 87:15, 87:18, 87:20, 87:24, 87:25, 88:9, 88:10, 88:14, 90:10, 90:12, 90:15, 90:16, 90:19, 91:1, 91:11, 92:9, 92:23, 94:22, 94:25, 95:4, 95:10, 95:12, 95:14, 95:18, 95:23, 96:2
**Haitian** [9] - 16:9, 42:23, 58:23, 79:9, 87:8, 87:23, 88:15, 90:14, 121:25
**half** [1] - 13:12
**Hallandale** [2] - 81:8, 81:15
**hallway** [1] - 121:3
**hamm** [1] - 40:14
**hand** [16] - 9:20, 20:6, 72:5, 72:25, 75:1, 87:6, 90:11, 96:24, 97:1, 97:3, 97:4, 108:18, 108:20, 113:1, 113:2
**handed** [1] - 24:23
**handle** [1] - 117:25
**hands** [12] - 9:1, 10:19, 43:24, 47:4, 48:22, 49:8, 55:2, 55:25, 60:19, 61:6, 61:17, 94:20
**handy** [1] - 64:2
**happy** [1] - 117:16
**hard** [1] - 120:19
**hardest** [1] - 64:7
**hardship** [2] - 51:25, 52:3
**hardships** [1] - 52:10
**Harricharan** [1] - 46:21
**hat** [1] - 34:14
**heads** [1] - 8:8
**heads-up** [1] - 8:8
**Health** [3] - 84:21, 85:24, 86:1
**health** [6] - 70:22, 71:10, 71:15, 81:6, 84:18, 86:2
**hear** [32] - 6:10, 7:24, 11:11, 11:13, 12:16, 13:16, 15:7, 15:17, 17:14, 22:5, 30:1, 32:5, 44:5, 44:25, 48:2, 48:25, 52:25, 62:7, 67:1, 68:22, 69:4, 69:6, 79:12, 91:1, 94:9, 94:12, 94:16, 94:21, 103:3, 109:4, 121:19, 122:19
**heard** [11] - 35:4, 36:3, 55:4, 58:24, 63:13, 63:14, 78:19, 80:15, 102:19, 109:5, 120:22
**hearing** [4] - 43:15, 55:4, 55:5, 80:23
**hearted** [1] - 98:7
**heaven** [1] - 16:9
**heavily** [1] - 24:21
**hectic** [1] - 118:10
**Hector** [2] - 4:19, 48:5
**HECTOR** [1] - 2:14
**HELD** [1] - 1:11
**held** [4] - 13:25, 60:8, 100:6
**help** [8] - 10:20, 21:1, 34:4, 40:9, 85:7, 119:5, 119:7

**helped** [2] - 75:13, 86:2
**helpful** [3] - 19:10, 44:9, 115:20
**helping** [4] - 22:7, 40:14, 45:4
**Henry** [2] - 33:6, 47:14
**Henry's** [1] - 31:11
**Herald** [1] - 65:2
**Herbster** [1] - 46:6
**Herrera** [2] - 76:16, 76:18
**hi** [6] - 67:2, 73:9, 80:20, 101:1, 111:23, 116:6
**Hialeah** [3] - 64:20, 64:22, 89:3
**hidden** [2] - 26:8, 27:6
**hide** [1] - 25:4
**hiding** [1] - 31:10
**high** [8] - 64:22, 69:9, 73:12, 75:5, 75:12, 98:4, 99:7, 111:25
**higher** [2] - 27:15, 91:7
**highest** [1] - 103:7
**hint** [1] - 30:13
**hired** [1] - 77:3
**history** [1] - 103:8
**hitch** [1] - 41:13
**Hixson** [1] - 46:8
**hmm** [5] - 91:22, 99:16, 109:17, 110:8, 113:25
**hobbies** [3] - 65:7, 77:13, 81:11
**hold** [9] - 23:10, 49:12, 68:25, 74:6, 78:1, 97:18, 100:4, 106:11, 117:18
**holidays** [1] - 50:18
**home** [9] - 36:10, 40:1, 70:23, 84:23, 86:11, 98:8, 116:9, 118:8, 119:5
**Home** [1] - 73:13
**Homeland** [12] - 45:20, 45:21, 45:22, 45:23, 45:24, 46:3, 46:8, 46:9, 46:11, 54:13, 94:10, 109:6
**Homestead** [1] - 106:21
**homework** [1] - 123:1
**homicide** [3] - 18:8, 21:6, 21:22
**honestly** [2] - 88:3, 98:22
**Honor** [28] - 4:10, 4:15, 4:18, 4:21, 4:24, 5:4, 6:3, 6:13, 8:4, 11:2, 11:6, 11:14, 12:18, 19:9, 22:24, 30:2, 33:11, 41:19, 41:23, 42:1, 42:3, 45:12, 46:25, 47:6, 48:13, 48:19, 52:11, 105:8
**honor** [2] - 39:11, 49:2
**HONORABLE** [1] - 1:11
**hook** [1] - 34:14
**hope** [1] - 20:21
**hopefully** [3] - 6:19, 13:12, 36:4
**hoping** [1] - 51:12
**horror** [1] - 77:11
**host** [1] - 55:19
**hour** [4] - 50:6, 118:17, 119:20, 121:16
**hours** [1] - 44:20
**house** [3] - 26:8, 31:11, 120:16
**HOWARD** [30] - 2:10, 4:15, 8:4, 8:21, 9:3, 9:11, 9:17, 9:21, 10:2, 10:6, 10:10, 10:14, 10:21, 22:24, 23:12, 23:15, 24:19, 28:10, 29:4, 29:8, 33:11, 33:21, 33:24, 34:1, 34:16, 34:21, 35:9, 35:14, 41:21, 47:6
**Howard** [6] - 2:10, 4:15, 30:8, 47:5, 47:8, 47:10
**HSI** [2] - 54:16, 54:21
**huge** [1] - 36:4
**hum** [1] - 104:12
**hundred** [5] - 9:1, 9:13, 9:19, 19:17, 30:12
**hundreds** [1] - 30:10
**hung** [1] - 34:14
**Hungary** [2] - 69:8, 69:10
**husband** [12] - 70:22, 71:2, 71:14, 81:17, 83:10, 84:8, 84:23, 86:10, 97:23, 99:15, 117:23, 118:21
**husband's** [1] - 98:2
**Hwang** [1] - 46:7
**hypoglycemia** [1] - 77:24

**I**

**IBC** [1] - 46:22
**idea** [4] - 15:10, 16:13, 33:8, 78:19
**ideas** [1] - 122:10
**identified** [1] - 10:15
**identifier** [1] - 13:7
**immediately** [2] - 6:6, 118:18
**immigrated** [1] - 87:25
**impact** [17] - 5:23, 83:25, 84:8, 88:1, 91:14, 91:16, 92:10, 92:13, 94:5, 94:11, 94:12, 94:15, 94:18, 94:19, 106:10, 111:9, 115:22
**impartial** [5] - 52:24, 53:5, 88:1, 100:20, 122:6
**important** [8] - 19:20, 19:22, 36:25, 38:24, 39:6, 44:23, 119:25
**imposition** [1] - 51:19
**impossible** [1] - 9:6
**impression** [1] - 24:4
**improper** [1] - 100:7
**improperly** [1] - 52:21
**inclined** [1] - 11:11
**included** [1] - 26:17
**including** [3] - 26:14, 73:21, 120:25
**independent** [3] - 14:21, 14:22, 21:23
**indict** [2] - 25:9
**indictment** [23] - 11:3, 11:16, 12:1, 12:11, 12:13, 12:14, 13:4, 13:7, 13:11, 13:13, 13:18, 16:23, 20:24, 21:12, 37:13, 37:14, 37:15, 37:21, 38:2, 42:5, 42:11, 42:24
**individual** [1] - 57:13
**individuals** [1] - 59:15
**indulged** [1] - 22:25
**infer** [1] - 61:20
**inference** [1] - 42:11
**influenced** [2] - 53:1, 79:8
**information** [45] - 22:23, 23:1, 24:5, 24:8, 24:10, 24:16, 24:17, 24:23, 25:8, 25:11, 25:15, 25:16, 25:18, 25:20, 26:1, 26:6, 26:8, 26:10, 26:11, 26:19, 27:5, 27:7, 27:12, 27:14, 27:16, 28:12, 28:13, 28:20, 28:22, 29:1, 30:6, 30:18, 31:12, 32:4, 32:16, 35:7, 38:1, 43:9, 72:21, 78:25, 88:16, 95:23, 96:3, 101:5
**infrastructure** [1] - 101:8
**injury** [1] - 81:7
**innocence** [1] - 60:25
**innocent** [2] - 60:24, 61:2
**inquired** [1] - 8:11
**inspect** [4] - 14:17, 17:17, 17:20
**inspecting** [1] - 93:21
**inspection** [1] - 86:11
**inspections** [1] - 15:13
**inspector** [3] - 84:24, 92:25, 93:21
**Instagram** [4] - 76:6, 76:9, 89:10, 98:9
**installations** [1] - 67:7
**instances** [1] - 25:5
**instruct** [9] - 24:8, 55:14, 55:16, 62:17, 62:23, 62:25, 102:20, 104:25
**instruction** [9] - 8:23, 14:13, 14:23, 15:6, 15:9, 15:12, 18:2, 20:15, 30:3
**instructions** [10] - 14:9, 15:9, 17:4, 21:15, 22:22, 23:16, 39:21, 43:12, 62:19, 102:13
**insurance** [1] - 107:4
**intend** [1] - 27:22
**intention** [1] - 112:22
**interest** [2] - 14:4, 27:15
**interested** [1] - 17:5
**interfere** [3] - 22:17, 59:1, 78:3
**interpreters** [1] - 5:17
**interrogations** [1] - 103:14
**interview** [2] - 14:18, 28:21
**interviewed** [1] - 30:10
**interviews** [1] - 15:13
**INTRIAGO** [1] - 2:12
**Intriago** [10] - 4:5, 4:19, 11:3, 11:4, 37:22, 41:16, 41:22, 43:5, 48:6, 48:9
**Intriago's** [1] - 10:25
**introduce** [6] - 7:1, 43:25, 44:2, 44:4
**Introduce** [1] - 36:2
**introduced** [1] - 40:12
**introducing** [1] - 11:21
**introduction** [1] - 41:11
**inventory** [1] - 97:18
**investigated** [1] - 54:12
**investigation** [4] - 20:4, 24:21, 29:12, 30:11
**Investigation** [1] - 54:13
**investigations** [1] - 113:9
**Investigations** [10] - 45:21, 45:22, 45:23, 45:24, 46:9, 46:10, 46:12, 54:14, 94:10
**investigative** [1] - 77:11
**invites** [1] - 16:3
**involved** [2] - 33:5, 78:20
**involves** [1] - 76:23
**iPhone** [1] - 120:12
**Irina** [1] - 76:18
**irrelevant** [2] - 26:20, 32:5
**Island** [5] - 51:12, 118:15, 119:9, 119:12, 122:9

**Israel** [2] - 46:21, 69:22
**issue** [24] - 6:11, 7:5, 7:8, 7:14, 13:12, 14:21, 15:21, 16:14, 16:20, 16:24, 19:15, 24:3, 28:2, 77:24, 93:10, 96:12, 96:16, 99:5, 112:19, 114:25, 115:3, 115:9, 115:18, 118:6
**issues** [18] - 5:18, 19:15, 54:7, 65:18, 67:19, 70:5, 71:10, 74:5, 81:18, 85:18, 89:17, 98:25, 102:4, 103:22, 107:18, 110:23, 117:4, 117:21
**IT** [2] - 81:8, 101:5
**item** [3] - 25:8, 26:1, 26:5
**itself** [1] - 27:24

## J

**Jaar** [2] - 18:4, 46:21
**Jacob** [1] - 46:21
**JACQUELINE** [1] - 1:11
**Jacqueline** [3] - 38:5, 45:17, 64:19
**Jamaica** [1] - 84:22
**James** [9] - 4:7, 4:25, 11:16, 12:8, 12:25, 13:2, 41:17, 49:2, 116:6
**JARAMILLO** [1] - 2:8
**Jaramillo** [2] - 4:16, 47:11
**JASON** [1] - 2:4
**Jason** [2] - 4:12, 45:5
**Javier** [1] - 47:15
**Jayson** [1] - 67:2
**Jean** [2] - 46:24, 47:15
**job** [1] - 100:19
**Joel** [1] - 46:20
**John** [5] - 44:8, 45:21, 45:24, 46:20, 46:22
**Jomarlie** [1] - 46:23
**JONATHAN** [1] - 2:22
**Jonathan** [3] - 2:22, 4:24, 49:1
**Jordan** [1] - 46:4
**Jorge** [1] - 45:17
**Jose** [1] - 45:15
**Joseph** [1] - 46:20
**Journal** [1] - 65:3
**Jovenel** [2] - 42:23, 58:23
**JP** [1] - 103:11
**JPMorgan** [2] - 103:8, 104:1
**Judge** [19] - 5:6, 10:21, 11:19, 15:16, 15:19, 16:3, 16:15, 16:19, 17:20, 18:1, 19:2, 20:17, 20:20, 22:2, 22:8, 30:9, 30:15, 33:3, 35:15
**JUDGE** [1] - 1:12
**judge** [6] - 38:6, 39:19, 44:18, 64:25, 120:4, 120:23
**judges** [1] - 38:11
**judgment** [1] - 71:11
**judicial** [1] - 122:12
**July** [3] - 42:22, 58:22, 59:16
**jump** [1] - 10:23
**June** [1] - 123:9
**Junior** [6] - 11:15, 11:16, 11:17, 12:3, 12:15, 49:2
**juries** [1] - 39:13
**JUROR** [204] - 65:24, 67:2, 67:23, 67:25, 68:6, 68:11, 68:13, 68:19, 68:23, 69:2, 69:7, 70:9, 70:12, 70:16, 71:16, 71:18, 71:23, 72:7, 72:14, 72:17, 72:20, 73:2, 73:6, 73:9, 74:12, 74:14, 74:18, 74:23, 74:25, 75:4, 75:9, 75:12, 75:17, 75:20, 75:24, 76:2, 76:5, 76:10, 76:13, 76:17, 78:8, 78:13, 78:22, 79:2, 79:6, 79:11, 79:17, 79:19, 79:22, 80:1, 80:5, 80:8, 80:10, 80:14, 80:20, 80:25, 81:3, 81:23, 82:1, 82:5, 82:8, 82:10, 82:13, 82:17, 82:22, 82:24, 83:1, 83:6, 83:9, 83:12, 83:16, 83:19, 83:22, 84:2, 84:5, 84:11, 84:14, 85:25, 86:5, 86:10, 86:13, 86:16, 86:19, 86:23, 87:1, 87:4, 87:7, 87:13, 87:16, 87:19, 88:2, 88:12, 88:23, 89:1, 89:23, 90:8, 90:13, 90:17, 90:20, 90:24, 91:5, 91:13, 91:20, 91:22, 92:5, 92:16, 92:19, 92:22, 93:17, 93:20, 93:25, 94:3, 94:12, 94:15, 94:18, 94:24, 95:1, 95:3, 95:6, 95:8, 95:11, 95:13, 95:21, 96:1, 96:6, 96:10, 96:15, 96:19, 97:2, 97:7, 97:10, 99:6, 99:14, 99:20, 100:13, 100:22, 100:24, 101:1, 102:10, 102:15, 102:23, 103:4, 104:2, 104:4, 104:7, 104:9, 104:12, 104:19, 104:23, 105:4, 105:7, 105:17, 105:23, 106:2, 106:12, 106:17, 106:19, 107:23, 108:1, 108:7, 108:12, 108:21, 109:13, 109:17, 109:19, 109:22, 110:8, 110:11, 111:3, 111:6, 111:11, 111:15, 111:19, 111:23, 113:3, 113:20, 113:25, 114:4, 114:8, 114:14, 114:18, 114:22, 115:6, 115:12, 115:19, 115:24, 116:6, 116:13, 117:8, 117:10, 117:13, 117:15, 117:19, 117:22, 118:3, 118:9, 118:14, 118:21, 118:25, 119:3, 119:6, 119:11, 119:15, 119:18
**juror** [25] - 19:11, 20:6, 36:7, 39:11, 44:6, 47:24, 54:5, 62:16, 63:4, 64:2, 64:12, 65:19, 65:20, 71:4, 78:3, 78:24, 91:9, 92:12, 111:22, 115:1, 115:5, 115:15, 122:10, 122:15, 122:16
**Juror** [71] - 20:9, 36:10, 47:20, 48:1, 49:13, 49:14, 49:16, 49:17, 56:15, 56:16, 56:20, 57:1, 57:2, 57:4, 57:6, 58:3, 58:4, 58:10, 58:16, 58:18, 58:20, 59:6, 59:9, 59:12, 60:6, 60:13, 60:15, 61:16, 61:24, 61:25, 63:11, 63:20, 63:22, 63:23, 63:25, 67:1, 68:22, 70:15, 73:7, 76:16, 80:19, 88:25, 92:3, 92:18, 97:9, 100:25, 103:3, 106:18, 110:10, 111:6, 116:5, 121:22, 122:3, 122:5
**jurors** [13] - 5:13, 8:12, 9:5, 14:2, 20:5, 22:20, 39:7, 44:13, 64:18, 66:22, 66:24, 111:10, 122:4
**Jurors** [3] - 52:4, 52:8, 52:14
**jury** [114] - 8:7, 8:12, 8:24, 11:20, 13:12, 13:23, 14:6, 14:14, 14:19, 14:23, 15:25, 16:1, 16:3, 16:5, 16:14, 16:17, 17:21, 18:23, 18:25, 19:14, 20:9, 20:12, 20:18, 22:17, 22:22, 23:16, 24:4, 24:17, 24:18, 25:12, 26:4, 26:11, 26:21, 27:4, 27:10, 27:13, 28:14, 29:22, 34:13, 35:16, 38:3, 38:14, 38:15, 38:25, 39:13, 39:17, 42:15, 43:11, 44:12, 44:17, 49:12, 49:14, 50:21, 51:21, 52:2, 52:24, 53:5, 53:11, 54:22, 55:25, 56:2, 56:9, 56:14, 57:1, 57:15, 58:4, 58:15, 59:5, 59:7, 60:1, 60:12, 61:3, 61:12, 61:23, 61:25, 62:10, 63:1, 63:7, 63:9, 63:19, 64:3, 65:11, 66:5, 67:16, 69:23, 73:24, 73:25, 77:20, 81:12, 83:5, 85:13, 85:19, 89:11, 89:12, 91:17, 91:18, 93:7, 93:12, 95:20, 98:20, 98:21, 100:19, 101:20, 103:18, 107:10, 110:1, 110:20, 111:8, 112:14, 115:7, 116:23, 120:3
**JURY** [2] - 1:10, 3:3
**jury's** [4] - 19:13, 20:18, 23:5, 26:25
**Justice** [1] - 56:25

## K

**Kaitlin** [1] - 45:19
**Kalandiak** [1] - 46:24
**Karen** [1] - 84:15
**Keegan** [1] - 46:21
**keep** [12] - 22:7, 23:21, 43:21, 49:22, 73:16, 74:5, 74:7, 89:17, 98:23, 101:13, 110:16, 112:7
**keeps** [1] - 94:21
**Kendall** [5] - 76:19, 80:22, 81:4, 84:16, 89:3
**kept** [1] - 87:20
**kidnap** [4] - 37:17, 37:18, 43:1, 43:4
**kids** [7] - 67:21, 71:1, 107:5, 111:4, 117:22, 117:25, 118:24
**kids'** [1] - 70:25
**Kiki** [1] - 33:6
**kill** [6] - 31:7, 31:19, 37:17, 37:18, 43:1, 43:4
**kind** [22] - 43:19, 51:9, 53:4, 57:13, 60:9, 70:10, 71:11,

75:15, 98:9, 104:6, 105:6, 105:8, 109:2, 111:8, 114:25, 115:7, 115:13, 115:17, 115:21, 122:10, 122:25
**kindergarten** [1] - 51:5
**kinds** [2] - 65:4, 65:6
**knock** [1] - 18:10
**knowing** [1] - 30:9
**knowledge** [1] - 52:22
**known** [5] - 13:9, 14:8, 21:3, 73:22, 83:23
**knows** [5] - 26:2, 26:3, 28:15, 28:17, 44:19
**KUDMAN** [5] - 2:19, 4:21, 42:1, 48:13, 48:19
**Kudman** [4] - 2:19, 4:21, 48:12, 48:15

## L

**lab** [1] - 81:21
**Labbe** [1] - 45:24
**labor** [1] - 38:21
**laboratories** [1] - 81:24
**laboratory** [1] - 81:7
**ladies** [7] - 42:4, 45:1, 47:7, 48:14, 49:19, 52:17, 119:19
**lady** [1] - 46:23
**Lago** [2] - 88:25, 89:2
**LANCE** [2] - 1:17, 123:11
**languages** [1] - 77:13
**Larochelle** [1] - 92:22
**last** [12] - 5:12, 36:15, 39:15, 67:6, 71:25, 73:25, 78:4, 79:20, 87:8, 94:25, 102:5, 121:11
**latch** [1] - 34:6
**late** [1] - 5:15
**latest** [2] - 5:15, 6:21
**Latin** [1] - 101:9
**LAUGHLIN** [21] - 4:10, 15:15, 15:18, 17:19, 18:22, 19:1, 19:6, 19:9, 19:21, 20:14, 21:21, 22:1, 22:8, 22:18, 30:2, 31:1, 31:8, 33:3, 41:19, 45:1, 45:12
**Laureano** [1] - 45:20
**law** [89] - 13:4, 13:5, 14:12, 16:9, 16:10, 23:7, 36:19, 36:20, 36:22, 37:7, 37:9, 43:12, 54:18, 55:5, 55:7, 55:9, 55:10, 55:12, 55:14, 55:22, 55:25, 57:13, 60:21, 62:16, 62:17, 62:20, 62:21, 62:22, 62:23, 62:25, 63:5, 63:7, 63:9, 64:21, 64:24, 65:13, 67:17, 68:10, 69:24, 71:5, 73:15, 74:19, 77:21, 81:13, 84:6, 85:9, 85:15, 86:15, 86:18, 86:25, 87:1, 88:19, 88:20, 91:12, 96:21, 96:24, 97:22, 100:3, 101:18, 101:23, 102:21, 103:9, 103:19, 105:1, 107:1, 107:25, 108:1, 108:16, 108:23, 109:3, 109:5, 109:10, 109:11, 109:12, 110:3, 110:21, 112:15, 112:25, 113:4, 113:8, 113:11, 113:12, 113:14, 113:15, 113:16, 113:19, 116:24
**Law** [2] - 2:10, 2:18
**lawyer** [10] - 37:6, 39:25, 57:10, 64:24, 64:25, 65:1, 73:15, 74:18, 84:22, 97:21
**lawyer's** [1] - 120:5
**lawyers** [9] - 6:18, 20:19, 32:2, 44:15, 48:10, 51:8, 53:18, 66:2, 68:5
**lead** [5] - 6:11, 29:14, 29:19, 34:2, 34:3
**leads** [1] - 34:7
**lean** [1] - 102:16
**learned** [1] - 105:1
**learning** [1] - 77:15
**least** [8] - 14:11, 17:10, 20:20, 27:10, 38:9, 66:12, 99:22, 114:23
**leave** [5] - 51:3, 51:13, 77:14, 95:4, 119:21
**leaves** [2] - 37:10, 119:24
**leaving** [1] - 51:17
**left** [24] - 25:21, 40:18, 49:15, 52:7, 54:17, 54:24, 54:25, 56:4, 56:17, 57:3, 57:17, 58:5, 58:7, 58:17, 59:8, 60:3, 60:14, 61:4, 61:13, 62:1, 62:12, 63:2, 63:10, 63:21
**legal** [14] - 64:25, 69:15, 89:6, 89:20, 90:1, 90:5, 93:1, 101:10, 104:14, 106:25, 107:20, 110:15, 112:5, 116:17
**legalities** [1] - 91:23
**Leilani** [1] - 45:20
**length** [1] - 96:14
**lengthy** [2] - 51:1, 51:20
**less** [7] - 27:21, 96:23, 96:25, 108:18, 111:10, 113:19, 113:21
**letting** [2] - 20:11, 27:13
**level** [2] - 13:22, 22:5
**liberty** [1] - 26:14
**license** [1] - 69:11
**life** [5] - 81:6, 88:16, 97:13, 108:24, 111:15
**light** [1] - 98:7
**light-hearted** [1] - 98:7
**like..** [1] - 75:24
**likely** [5] - 7:25, 23:5, 25:12, 36:3, 55:23
**limit** [1] - 116:15
**limitations** [1] - 23:18
**limited** [3] - 15:11, 15:14, 17:6
**line** [4] - 30:5, 30:17, 40:14, 90:4
**lineup** [1] - 7:8
**lining** [1] - 29:23
**link** [2] - 12:6, 12:22
**linkage** [2] - 13:2, 13:5
**list** [2] - 35:17, 36:4
**listen** [9] - 38:15, 44:14, 44:24, 71:1, 85:3, 85:4, 96:1, 96:2, 112:11
**literally** [1] - 7:9
**live** [21] - 32:21, 32:22, 32:23, 64:20, 67:3, 69:9, 70:17, 73:11, 76:19, 84:16, 87:10, 89:2, 95:5, 95:13, 97:12, 101:3, 103:6, 106:21, 110:12, 111:24, 116:7
**lived** [4] - 57:25, 58:6, 90:14, 109:1
**lives** [3] - 55:20, 90:15, 90:25
**living** [3] - 57:23, 58:13, 92:23
**Liz** [1] - 70:17
**Llanes** [1] - 47:15
**LLP** [1] - 2:19
**lobby** [2] - 121:6, 121:14
**local** [5] - 75:8, 75:9, 75:17, 107:6, 114:15
**locations** [1] - 14:17
**logistics** [1] - 40:17
**Look** [1] - 32:20
**look** [42] - 7:19, 7:22, 8:9, 10:14, 10:18, 15:8, 17:7, 18:7, 23:20, 24:7, 32:1, 33:2, 35:16, 36:1, 36:17, 43:19, 44:7, 44:10, 44:11, 44:14, 44:21, 49:12, 49:15, 51:3, 63:5, 63:6, 65:5, 80:12, 88:11, 88:19, 88:21, 96:4, 113:11, 120:10, 120:15, 120:18, 120:19, 120:21, 120:24, 121:1
**looked** [1] - 32:9
**looking** [8] - 6:25, 8:25, 32:10, 34:14, 35:22, 35:23, 66:2, 72:23
**looks** [1] - 120:13
**loud** [1] - 64:6
**louder** [1] - 80:24
**loudly** [1] - 40:25
**Loureiro** [1] - 45:15
**love** [5] - 77:16, 85:6, 107:6, 110:17
**lower** [1] - 59:22
**luggage** [2] - 93:21, 112:4
**Luna** [1] - 45:17
**lunch** [10] - 22:9, 31:25, 50:6, 50:9, 119:20, 120:1, 120:2, 121:2, 121:16, 123:2
**Lunch** [1] - 123:4

## M

**ma'am** [13] - 54:23, 70:14, 76:15, 78:7, 80:18, 84:12, 88:24, 92:17, 100:23, 110:9, 111:14, 111:21, 116:4
**magazine** [1] - 65:5
**magazines** [5] - 65:4, 69:18, 70:25, 85:2, 93:3
**maintained** [1] - 17:17
**maintenance** [4] - 69:16, 70:8, 70:12, 98:2
**major** [3] - 27:5, 69:18, 85:1
**managed** [1] - 101:8
**management** [4] - 76:22, 84:19, 112:4, 116:17
**manager** [2] - 71:19, 97:15
**managers** [1] - 90:2
**Maniara** [1] - 45:22
**manner** [1] - 100:18
**Manny** [1] - 48:4
**Manuel** [1] - 45:25
**manufacturing** [1] - 77:3
**March** [3] - 1:5, 51:2, 71:25
**Marco** [1] - 51:12
**Maria** [1] - 44:8
**Marie** [1] - 47:15
**Marilyn** [1] - 97:11
**Marine** [3] - 73:23, 102:9, 122:5
**Marines** [2] - 101:19, 107:9
**Mario** [1] - 46:19
**MARISSEL** [1] - 2:17
**Marissel** [2] - 4:22, 48:16

**mark** [1] - 50:19
**married** [1] - 65:1
**marshals** [2] - 66:23, 121:4
**Marta** [1] - 76:18
**Martin** [1] - 45:15
**Martine** [1] - 46:23
**Mascarell** [1] - 45:19
**master's** [8] - 67:5, 84:17, 93:15, 97:14, 101:5, 106:22, 107:21, 108:4
**material** [6] - 24:6, 37:16, 37:18, 43:1, 43:2, 93:22
**Mathnasium** [1] - 118:15
**matter** [9] - 17:8, 17:9, 38:7, 43:17, 53:4, 55:11, 102:20, 122:17, 123:8
**matters** [3] - 15:25, 16:17, 17:20
**Mauro** [1] - 103:5
**Maya** [1] - 110:12
**mayor** [1] - 114:16
**MCLAUGHLIN** [1] - 2:3
**McLaughlin** [4] - 4:11, 34:1, 45:3, 45:10
**mean** [15] - 14:10, 14:24, 17:13, 19:8, 19:11, 39:24, 55:7, 82:17, 92:10, 100:13, 106:10, 108:23, 109:13, 114:24, 119:6
**means** [2] - 110:6, 113:17
**measuring** [1] - 55:16
**mechanical** [1] - 1:21
**media** [13] - 58:21, 59:3, 69:19, 73:17, 76:8, 76:11, 80:7, 81:11, 89:10, 90:22, 91:2, 95:25, 112:8
**medical** [21] - 21:17, 65:18, 67:19, 69:13, 70:4, 74:5, 77:24, 81:18, 85:9, 85:18, 89:17, 93:10, 96:16, 98:25, 102:4, 103:22, 107:18, 110:23, 114:25, 115:3, 117:4
**medication** [1] - 115:22
**meditation** [1] - 110:17
**meet** [1] - 39:11
**meeting** [1] - 53:16
**member** [26] - 36:24, 37:3, 54:15, 56:12, 56:22, 57:22, 58:11, 60:7, 60:10, 67:17, 69:14, 69:24, 70:1, 70:3, 71:3, 74:3, 77:20, 77:21, 77:22, 85:11, 89:15, 93:8, 103:9, 107:17, 110:21, 116:16
**members** [12] - 39:2, 67:18, 69:15, 85:15, 87:25, 88:8, 88:15, 93:6, 95:13, 103:16, 103:19, 110:15
**mention** [3] - 5:20, 109:5, 111:17
**mentioned** [27] - 5:18, 74:9, 75:2, 78:10, 78:18, 79:14, 80:6, 80:15, 85:8, 85:11, 86:14, 87:5, 94:22, 95:16, 95:23, 96:11, 96:13, 96:20, 99:4, 99:17, 107:20, 108:14, 111:1, 112:23, 114:1, 114:12, 117:20
**mentions** [1] - 120:16
**mercenaries** [1] - 16:11
**merchandising** [1] - 73:14
**mere** [1] - 28:17
**merit** [1] - 28:16
**mess** [1] - 34:24
**messages** [5] - 11:20, 12:6, 12:19, 12:24, 13:2
**met** [1] - 68:17
**Metro** [1] - 108:11
**Metro-Dade** [1] - 108:11
**MIAMI** [1] - 1:2
**Miami** [34] - 1:4, 1:18, 1:19, 17:2, 18:9, 21:6, 21:22, 64:23, 65:2, 67:4, 67:10, 68:15, 69:9, 73:10, 81:5, 82:2, 82:4, 89:2, 97:11, 97:12, 97:13, 98:21, 99:7, 101:3, 103:6, 106:20, 107:11, 111:25, 112:1, 116:7, 121:11, 123:13
**Miami-Dade** [8] - 17:2, 18:9, 21:6, 21:22, 97:13, 98:21, 99:7, 107:11
**Michael** [1] - 46:7
**microphone** [9] - 66:13, 68:25, 69:1, 69:6, 72:3, 92:3, 92:21, 94:17, 94:21
**mid** [3] - 50:2, 50:3, 50:9
**mid-afternoon** [1] - 50:3
**mid-morning** [2] - 50:2, 50:9
**middle** [4] - 11:15, 12:4, 22:6, 22:7
**midpoint** [1] - 50:18
**might** [12] - 22:11, 22:12, 30:3, 32:4, 35:3, 44:5, 44:7, 48:1, 95:19, 99:5, 115:8, 117:20
**migrated** [1] - 87:20
**military** [26] - 57:24, 58:13, 65:10, 65:11, 67:15, 69:22, 71:4, 73:21, 77:12, 77:18, 77:19, 81:12, 85:12, 86:22, 86:25, 93:5, 93:6, 98:13, 101:18, 101:24, 101:25, 102:7, 103:17, 107:8, 110:19, 116:23
**mind** [2] - 78:18, 80:15
**mine** [1] - 89:6
**Mingarelli** [1] - 46:6
**minister** [2] - 26:9, 27:6
**minor** [1] - 82:15
**minute** [2] - 22:25, 44:23
**minutes** [4] - 5:14, 36:14, 50:3, 50:10
**misimpression** [1] - 53:15
**misleading** [2] - 37:25, 43:8
**miss** [1] - 64:14
**missed** [1] - 122:22
**missing** [1] - 65:23
**Moise** [4] - 42:23, 46:23, 58:23
**mom** [1] - 106:6
**moment** [3] - 80:16, 103:9, 104:2
**Monday** [7] - 7:5, 38:8, 50:15, 99:8, 99:10, 115:11, 115:13
**Mondays** [3] - 50:1, 118:7, 119:8
**money** [1] - 77:4
**months** [1] - 20:1
**moral** [7] - 65:19, 67:20, 74:6, 85:20, 99:1, 102:5, 107:18
**morally** [3] - 103:15, 104:21, 105:6
**Morgan** [1] - 116:18
**Morning** [1] - 1:5
**morning** [45] - 4:10, 4:15, 4:18, 4:21, 4:24, 5:2, 5:11, 5:19, 6:3, 6:13, 6:23, 7:22, 7:24, 7:25, 38:5, 38:9, 38:10, 40:12, 45:1, 45:9, 47:7, 47:8, 48:4, 48:14, 48:18, 48:24, 50:2, 50:9, 51:6, 70:16, 76:17, 77:9, 80:20, 84:14, 85:6, 89:1, 92:19, 92:20, 97:10, 101:1, 103:4, 106:19, 110:11, 118:2, 118:3
**Morrison** [1] - 45:16
**Moss** [2] - 73:8, 73:9
**most** [4] - 38:24, 39:6, 66:12, 87:19
**mostly** [1] - 73:20
**mother** [5] - 107:8, 107:15, 109:15, 110:4, 120:12
**mother's** [1] - 120:15
**motion** [7] - 10:24, 11:1, 11:8, 11:9, 11:12, 13:14, 13:20
**motions** [3] - 15:22, 16:16, 16:21
**move** [4] - 16:9, 21:11, 51:11, 51:19
**moved** [1] - 89:4
**movies** [4] - 77:11, 77:12, 112:10
**moving** [1] - 94:21
**MPD** [1] - 101:23
**MR** [65] - 4:10, 4:15, 4:18, 4:24, 5:4, 5:6, 6:3, 6:13, 8:4, 8:21, 9:3, 9:11, 9:17, 9:21, 10:2, 10:6, 10:10, 10:14, 10:21, 11:2, 11:6, 11:14, 12:18, 15:15, 15:18, 17:19, 18:22, 19:1, 19:6, 19:9, 19:21, 20:14, 21:21, 22:1, 22:8, 22:18, 22:24, 23:12, 23:15, 24:19, 28:10, 29:4, 29:8, 30:2, 31:1, 31:8, 33:3, 33:11, 33:21, 33:24, 34:1, 34:16, 34:21, 35:9, 35:14, 41:19, 41:21, 41:23, 42:3, 45:1, 45:12, 47:6, 48:4, 48:24, 52:11
**MS** [4] - 4:21, 42:1, 48:13, 48:19
**multiple** [1] - 10:4
**municipal** [1] - 75:14
**municipality** [1] - 60:9
**must** [2] - 42:15, 62:16

## N

**naked** [2] - 23:8, 27:23
**name** [32] - 11:3, 11:15, 12:3, 12:4, 12:10, 38:5, 44:7, 44:16, 47:7, 47:10, 48:4, 48:15, 49:1, 64:19, 67:2, 68:23, 69:2, 69:7, 70:16, 73:9, 76:17, 80:20, 84:14, 89:1, 92:22, 97:10, 101:1, 103:4, 106:19, 110:11, 111:23, 120:5
**named** [1] - 120:4
**names** [20] - 11:24, 12:2, 12:3, 12:7, 12:8, 36:2, 36:6, 44:5, 44:8, 45:10, 46:4, 46:12, 47:3, 47:13, 47:18, 48:7, 48:19, 49:3, 49:7
**nanny** [2] - 117:24, 119:7

**narrow** [1] - 18:16
**National** [2] - 70:25, 112:13
**national** [1] - 27:15
**nationality** [1] - 78:23
**nationals** [1] - 78:15
**Nations** [1] - 108:8
**natural** [3] - 120:10, 120:14, 120:23
**nature** [5] - 8:8, 14:5, 42:9, 105:12, 120:18
**NBC** [1] - 101:13
**nearby** [1] - 117:24
**necessarily** [4] - 12:10, 37:8, 86:3, 113:4
**necessary** [9] - 7:11, 7:23, 8:13, 10:1, 10:5, 10:16, 11:19, 12:18, 25:10
**neck** [1] - 29:20
**need** [17] - 13:22, 27:2, 37:20, 50:4, 50:5, 51:2, 51:8, 53:8, 61:18, 61:22, 91:24, 98:2, 110:18, 116:2, 116:12, 121:4, 121:19
**needed** [2] - 91:24, 117:16
**needs** [3] - 40:21, 66:17, 122:3
**negative** [1] - 54:18
**neighbor** [2] - 44:17, 73:22
**neighbors** [1] - 18:11
**nephew** [5] - 67:8, 68:5, 68:7, 68:12
**nervous** [2] - 40:4, 64:13
**Nestor** [1] - 45:19
**Netflix** [6] - 65:7, 67:14, 85:5, 89:9, 98:6, 105:8
**neutral** [1] - 79:12
**never** [29] - 12:2, 19:18, 21:7, 22:1, 39:23, 40:6, 65:8, 65:10, 65:12, 68:17, 69:23, 71:4, 73:24, 74:2, 74:3, 77:19, 81:13, 88:20, 89:11, 93:7, 98:20, 99:22, 107:9, 107:17, 110:20, 112:14, 115:6, 116:23, 116:24
**New** [5] - 65:4, 67:3, 84:16, 87:13, 107:5
**news** [16] - 69:17, 69:18, 69:19, 73:17, 73:18, 77:10, 81:10, 85:3, 93:3, 96:1, 96:2, 96:3, 101:13, 107:6, 110:16, 112:7
**News** [1] - 116:21
**newspaper** [1] - 112:8
**newspapers** [6] - 67:13, 69:18, 77:8, 85:2, 93:3
**next** [9] - 4:20, 46:2, 51:10, 55:3, 56:11, 56:21, 57:8, 57:21, 73:22
**next-door** [1] - 73:22
**Nicaragua** [1] - 80:21
**nice** [2] - 25:9, 29:18
**Nicholas** [1] - 45:15
**niece** [2] - 65:1, 84:22
**night** [2] - 6:2, 51:13
**nine** [1] - 82:5
**nixed** [1] - 36:18
**NO** [1] - 1:2
**nobody** [7] - 28:15, 28:17, 39:3, 39:5, 61:24, 65:14, 98:24
**nobody's** [1] - 24:7
**Noelcius** [1] - 46:22
**non** [2] - 109:12, 112:9
**non-fiction** [1] - 112:9
**non-law** [1] - 109:12
**none** [6] - 20:3, 58:8, 67:14, 69:15, 103:19, 112:4
**nonfactual** [1] - 26:20
**nonfiction** [1] - 85:7
**nonrefundable** [1] - 51:15
**normal** [1] - 17:1
**north** [1] - 92:24
**North** [7] - 1:18, 69:9, 103:6, 111:25, 116:7, 117:2, 117:7
**northern** [1] - 64:21
**note** [3] - 7:9, 17:25, 40:20
**notebook** [1] - 10:3
**notes** [4] - 35:12, 66:6, 121:21, 123:8
**nothing** [21] - 7:10, 9:1, 22:6, 25:2, 26:2, 26:3, 26:5, 26:9, 26:20, 27:11, 29:6, 30:16, 32:5, 32:9, 32:21, 35:4, 55:18, 62:6, 62:7, 111:12, 115:24
**notion** [2] - 26:21, 29:19
**NPR** [1] - 71:1
**nullification** [6] - 16:3, 18:23, 18:25, 26:22, 26:23, 27:1
**number** [9] - 11:21, 41:5, 47:22, 47:25, 49:13, 52:5, 52:7, 61:16, 109:6
**numbered** [1] - 7:10
**numbers** [3] - 72:24, 119:21, 122:25
**nurse** [3] - 67:25, 86:6, 89:11
**nursing** [1] - 84:17
**Nuñez** [1] - 45:17

## O

**o'clock** [6] - 50:4, 51:3, 121:3, 121:6, 121:15, 123:2
**object** [7] - 15:15, 15:19, 19:4, 21:20, 22:2, 22:3, 30:2
**objection** [1] - 19:22
**objections** [2] - 5:24, 6:12
**objects** [1] - 18:18
**obligation** [1] - 110:1
**obligations** [1] - 116:15
**obtain** [1] - 53:4
**obtained** [1] - 24:9
**obviously** [4] - 7:7, 27:23, 53:18, 94:6
**occasionally** [2] - 76:6, 104:13
**odd** [2] - 44:20, 116:1
**OF** [8] - 1:1, 1:4, 1:10, 2:7, 2:12, 2:16, 2:21, 123:6
**offense** [2] - 37:23, 43:6
**offer** [1] - 48:19
**offered** [1] - 13:24
**offering** [1] - 33:14
**offhand** [1] - 47:3
**Office** [8] - 2:5, 37:4, 37:9, 56:24, 74:15, 74:22, 85:25
**office** [10] - 37:4, 40:15, 50:21, 56:23, 57:10, 57:12, 60:8, 60:10, 74:10, 74:11
**OFFICER** [1] - 60:17
**officer** [15] - 21:7, 46:15, 70:19, 71:22, 71:24, 89:13, 93:2, 96:22, 98:22, 107:12, 107:13, 108:11, 108:13, 109:2, 113:5
**officers** [6] - 36:19, 41:5, 41:8, 41:9, 66:23, 86:25
**Offices** [1] - 2:10
**Official** [1] - 123:11
**official** [3] - 39:4, 75:23, 114:16
**officials** [4] - 75:2, 75:7, 76:24, 114:13
**often** [4] - 80:4, 80:5, 87:17, 91:6
**old** [18] - 64:20, 67:3, 68:24, 69:8, 73:10, 76:18, 77:6, 84:15, 92:23, 97:11, 101:2, 106:20, 111:17, 111:20, 111:24, 116:18, 117:23, 120:11
**older** [1] - 77:14
**oldest** [1] - 68:6
**ON** [4] - 2:7, 2:12, 2:16, 2:21
**on-boarding** [1] - 112:3
**once** [9] - 34:22, 44:15, 52:7, 66:18, 75:13, 77:22, 100:13, 101:21, 114:23
**one** [68] - 5:14, 7:16, 8:4, 9:24, 10:8, 16:11, 19:9, 25:4, 26:6, 26:10, 30:22, 33:3, 33:9, 33:11, 34:14, 36:15, 38:24, 48:6, 50:9, 54:4, 54:5, 54:9, 54:25, 56:18, 57:16, 57:20, 58:4, 60:2, 60:4, 61:14, 62:2, 62:4, 62:11, 62:13, 62:15, 63:16, 64:4, 64:5, 64:12, 64:18, 65:15, 65:25, 66:4, 67:25, 70:24, 72:3, 78:16, 81:9, 84:25, 88:6, 91:10, 92:14, 96:23, 98:4, 101:11, 102:3, 102:18, 106:5, 116:22, 119:1, 121:24, 121:25, 122:8
**one's** [2] - 22:6, 67:25
**one-on-one** [1] - 54:9
**ones** [8] - 7:11, 8:11, 9:15, 9:22, 10:1, 10:13, 23:24, 87:20
**online** [4] - 77:8, 85:2, 101:14, 112:8
**open** [5] - 10:11, 14:5, 14:6, 14:18, 62:6
**opening** [1] - 5:24
**opens** [1] - 20:15
**operations** [1] - 81:24
**opinion** [4] - 52:22, 54:17, 54:19, 122:18
**opinions** [1] - 43:17
**opportunity** [2] - 23:2, 51:23
**opposed** [3] - 98:11, 109:10, 113:14
**order** [3] - 9:4, 24:12, 52:18
**Order** [1] - 4:1
**organization** [1] - 56:25
**originally** [2] - 79:16, 94:22
**ORLANDO** [1] - 2:8
**Orlando** [2] - 4:16, 47:11
**ORTIZ** [2] - 1:6, 2:7
**Ortiz** [6] - 4:4, 4:17, 41:16, 41:20, 47:12, 47:17
**Ortiz's** [1] - 36:9
**otherwise** [3] - 24:24, 44:19, 51:25
**outage** [1] - 5:16
**outlier** [1] - 49:23
**outside** [6] - 37:17, 43:2, 43:4, 53:10, 62:7, 103:15
**overruled** [1] - 22:3
**oversaw** [1] - 85:25
**overseas** [1] - 112:13
**owe** [1] - 5:22
**own** [5] - 26:15,

61:18, 67:6, 84:24, 86:11
**owned** [2] - 84:24, 86:11

## P

**P.A** [3] - 2:9, 2:22, 2:24
**paddle** [3] - 52:6, 52:8, 110:17
**paddles** [3] - 43:18, 43:20, 119:21
**Pagano** [1] - 45:18
**page** [4] - 12:13, 65:23, 65:25, 66:22
**PAGE** [1] - 3:2
**pages** [1] - 1:7
**pain** [2] - 115:13, 115:17
**paint** [1] - 73:19
**Palacios** [2] - 46:19
**Palm** [1] - 89:13
**Pandora's** [1] - 20:15
**panel** [4] - 44:17, 44:22, 53:11, 53:21
**panelists** [1] - 95:17
**panels** [2] - 54:10, 66:9
**pare** [1] - 7:20
**pared** [1] - 36:5
**parent** [2] - 111:9, 119:4
**parents** [5] - 87:7, 87:24, 88:14, 92:8, 107:7
**parse** [1] - 15:7
**part** [7] - 8:15, 41:9, 51:21, 51:22, 64:21, 92:24, 120:18
**parte** [1] - 8:22
**partially** [1] - 24:22
**participants** [1] - 12:21
**participate** [3] - 38:24, 93:10, 112:20
**participating** [3] - 47:9, 74:6, 89:17
**particular** [4] - 10:8, 52:19, 55:8, 119:13
**particularly** [2] - 5:22, 54:17
**partner** [7] - 76:25, 81:8, 81:14, 89:8, 101:11, 110:16, 112:6
**parts** [1] - 55:18
**pass** [2] - 72:2, 92:2
**Passover** [1] - 50:14
**past** [6] - 69:12, 76:21, 92:25, 93:25, 110:14, 116:9
**PATRICK** [1] - 2:23
**Patrick** [3] - 2:24, 4:25, 49:1
**Paul** [2] - 45:23, 46:7
**Pause** [1] - 66:20
**Pavletic** [2] - 4:14, 45:8
**pay** [4] - 20:23, 39:20, 40:22, 115:22
**pays** [1] - 77:7
**pedophilia** [1] - 114:5
**Pedro** [1] - 49:4
**People** [1] - 65:4
**people** [44] - 8:9, 8:24, 9:1, 9:13, 9:15, 11:23, 14:3, 16:9, 18:6, 19:17, 20:1, 23:3, 30:10, 31:12, 33:14, 34:17, 35:18, 36:7, 37:8, 39:9, 39:12, 39:13, 40:3, 44:5, 44:14, 44:22, 45:3, 46:2, 46:11, 50:4, 53:9, 65:22, 74:10, 86:24, 86:25, 98:11, 110:3, 115:16, 120:12, 120:22, 121:21, 122:13
**percent** [1] - 9:15
**PEREZ** [5] - 2:13, 4:18, 6:13, 41:23, 48:4
**Perez** [4] - 2:13, 4:18, 48:2, 48:4
**period** [3] - 15:14, 50:16, 51:20
**permits** [1] - 76:23
**perpetrator** [1] - 27:5
**perpetrators** [1] - 26:7
**persecuted** [1] - 78:16
**person** [12] - 12:23, 30:7, 37:17, 37:19, 43:1, 43:4, 44:16, 98:10, 109:8, 120:17
**Person** [2] - 31:10
**personal** [5] - 52:22, 53:4, 68:16, 81:7, 88:21
**perspective** [2] - 17:11, 17:24
**petitioning** [1] - 8:14
**pets** [1] - 68:16
**pharmacy** [1] - 69:10
**Phenelus** [2] - 4:13, 45:7
**PHENELUS** [1] - 2:5
**phlebotomy** [1] - 104:7
**phone** [1] - 11:21
**photos** [5] - 7:7, 8:2, 8:5, 8:25, 9:13
**physical** [1] - 14:17
**pick** [4] - 14:3, 39:13, 52:24, 100:19
**picked** [2] - 8:12, 65:12
**pickleball** [1] - 81:11
**picture** [2] - 7:12, 7:16
**pictures** [7] - 7:10, 7:21, 7:23, 8:18, 9:7, 10:4, 10:7
**piece** [1] - 35:6
**Pierre** [1] - 92:22
**pinch** [1] - 119:1
**places** [3] - 36:7, 121:10, 121:13
**Planning** [1] - 86:1
**planning** [1] - 71:18
**plans** [1] - 50:18
**plant** [2] - 77:3, 93:22
**platforms** [1] - 76:12
**play** [2] - 71:11, 81:11
**playing** [1] - 21:11
**plea** [1] - 59:18
**pleaded** [1] - 59:18
**pled** [3] - 42:13, 42:14, 59:17
**plenty** [1] - 35:10
**PM** [6] - 1:6, 116:11, 116:14, 118:4, 121:17, 123:4
**podcasts** [1] - 112:11
**point** [9] - 8:10, 9:23, 19:9, 21:16, 29:5, 33:3, 34:22, 36:1, 121:5
**police** [3] - 21:7, 86:25, 98:22
**Police** [1] - 107:11
**policies** [1] - 86:2
**political** [7] - 57:25, 58:5, 58:14, 90:25, 91:3, 106:22, 106:23
**Port** [1] - 58:24
**Port-au-Prince** [1] - 58:24
**portion** [1] - 6:15
**portions** [1] - 6:18
**position** [4] - 27:18, 75:17, 75:19, 114:16
**positions** [1] - 75:15
**positive** [1] - 54:18
**Posner** [1] - 2:19
**possible** [2] - 14:2, 98:9
**possibly** [1] - 10:12
**Post** [2] - 7:9, 65:3
**Post-it** [1] - 7:9
**potential** [2] - 34:11, 122:7
**power** [1] - 5:16
**practice** [2] - 68:10, 76:20
**practices** [4] - 73:15, 84:22, 103:9, 103:23
**practicing** [1] - 78:1
**Pravin** [1] - 46:21
**precisely** [1] - 50:5
**preclude** [2] - 67:20, 93:11
**prejudice** [1] - 13:14
**prejudicial** [1] - 12:1
**prepare** [1] - 27:20
**prepared** [4] - 8:21, 40:20, 40:21, 123:8
**preschool** [2] - 110:14, 111:13
**presence** [1] - 53:10
**present** [6] - 4:23, 26:18, 45:11, 51:25, 95:9, 115:9
**presentation** [5] - 8:20, 12:5, 26:19, 27:24, 28:1
**presented** [6] - 23:18, 52:25, 59:15, 62:6, 62:8, 104:25
**presenting** [2] - 20:2, 25:11
**presents** [2] - 27:1, 52:3
**president** [4] - 39:2, 87:23, 88:10, 96:8
**President** [3] - 39:4, 42:23, 58:23
**presiding** [1] - 38:6
**Press** [1] - 107:5
**presume** [2] - 25:21, 50:17
**presumed** [2] - 60:24, 61:2
**presumption** [1] - 60:24
**Pretel** [4] - 4:3, 4:17, 41:16, 47:12
**PRETEL** [2] - 1:6, 2:7
**pretend** [1] - 35:12
**pretty** [5] - 26:6, 37:20, 41:8, 76:13, 109:14
**prevent** [2] - 65:18, 65:20
**prevented** [2] - 30:8, 33:8
**primarily** [1] - 54:12
**primary** [1] - 26:6
**prime** [2] - 26:8, 27:6
**Prince** [1] - 58:24
**principle** [4] - 60:23, 61:9, 61:22, 62:10
**principles** [1] - 60:21
**private** [6] - 36:24, 53:16, 56:13, 56:17, 72:6, 72:7
**privately** [1] - 96:18
**privileges** [1] - 38:25
**probation** [3] - 103:21, 105:19
**problem** [14] - 8:17, 9:8, 19:12, 19:16, 19:17, 20:13, 31:2, 32:7, 32:11, 32:24, 54:6, 92:7, 96:14, 99:11
**problems** [1] - 85:18
**proceed** [4] - 5:10, 41:18, 41:20, 41:25
**proceedings** [3] - 24:11, 66:20, 123:8
**Proceedings** [1] - 1:21
**process** [5] - 40:8, 40:19, 47:9, 53:17, 54:4
**processed** [1] - 44:12
**produced** [1] - 1:22
**product** [1] - 112:3
**professional** [1] - 76:19
**program** [1] - 119:10
**programmer** [1] - 77:2
**programs** [1] - 108:8
**prohibited** [1] - 93:22
**project** [2] - 76:22, 90:2
**promise** [1] - 43:20
**prone** [3] - 108:17, 108:18, 109:9
**proof** [3] - 61:10,

99:21, 100:14
**proper** [1] - 59:25
**propose** [1] - 28:9
**proposed** [4] - 14:14, 24:1, 36:15, 36:18
**proposes** [1] - 24:3
**pros** [1] - 39:17
**prosecutes** [1] - 56:25
**prosecutor** [1] - 109:5
**prosecutor's** [4] - 37:4, 56:23, 74:10, 74:11
**prosecutors** [1] - 55:4
**prospective** [1] - 64:12
**PROSPECTIVE** [203] - 67:2, 67:23, 67:25, 68:6, 68:11, 68:13, 68:19, 68:23, 69:2, 69:7, 70:9, 70:12, 70:16, 71:16, 71:18, 71:23, 72:7, 72:14, 72:17, 72:20, 73:2, 73:6, 73:9, 74:12, 74:14, 74:18, 74:23, 74:25, 75:4, 75:9, 75:12, 75:17, 75:20, 75:24, 76:2, 76:5, 76:10, 76:13, 76:17, 78:8, 78:13, 78:22, 79:2, 79:6, 79:11, 79:17, 79:19, 79:22, 80:1, 80:5, 80:8, 80:10, 80:14, 80:20, 80:25, 81:3, 81:23, 82:1, 82:5, 82:8, 82:10, 82:13, 82:17, 82:22, 82:24, 83:1, 83:6, 83:9, 83:12, 83:16, 83:19, 83:22, 84:2, 84:5, 84:11, 84:14, 85:25, 86:5, 86:10, 86:13, 86:16, 86:19, 86:23, 87:1, 87:4, 87:7, 87:13, 87:16, 87:19, 88:2, 88:12, 88:23, 89:1, 89:23, 90:8, 90:13, 90:17, 90:20, 90:24, 91:5, 91:13, 91:20, 91:22, 92:5, 92:16, 92:19, 92:22, 93:17, 93:20, 93:25, 94:3, 94:12, 94:15, 94:18, 94:24, 95:1, 95:3, 95:6, 95:8, 95:11, 95:13, 95:21, 96:1, 96:6, 96:10, 96:15, 96:19, 97:2, 97:7, 97:10, 99:6, 99:14, 99:20, 100:13, 100:22, 100:24, 101:1, 102:10, 102:15, 102:23, 103:4, 104:2, 104:4, 104:7, 104:9, 104:12, 104:19, 104:23, 105:4, 105:7, 105:17, 105:23, 106:2, 106:12, 106:17, 106:19, 107:23, 108:1, 108:7, 108:12, 108:21, 109:13, 109:17, 109:19, 109:22, 110:8, 110:11, 111:3, 111:6, 111:11, 111:15, 111:19, 111:23, 113:3, 113:20, 113:25, 114:4, 114:8, 114:14, 114:18, 114:22, 115:6, 115:12, 115:19, 115:24, 116:6, 116:13, 117:8, 117:10, 117:13, 117:15, 117:19, 117:22, 118:3, 118:9, 118:14, 118:21, 118:25, 119:3, 119:6, 119:11, 119:15, 119:18
**Protection** [1] - 45:25
**protective** [1] - 24:12
**protocol** [1] - 41:9
**prove** [2] - 42:19, 42:20
**proved** [1] - 61:8
**proves** [1] - 42:16
**provide** [7] - 6:17, 21:24, 27:12, 37:16, 42:25, 43:2, 48:7
**provided** [5] - 9:23, 25:24, 27:22, 37:17, 42:25
**provider** [1] - 101:9
**providing** [1] - 26:12
**provoking** [4] - 103:15, 104:21, 105:6
**pry** [2] - 53:3, 114:24
**public** [1] - 57:10
**Pullen** [1] - 49:3
**purchase** [1] - 97:18
**purpose** [2] - 36:5, 52:20
**pursuant** [2] - 59:18, 60:22
**pursue** [1] - 31:17
**pursuing** [2] - 25:23, 94:7
**push** [2] - 32:16, 64:7
**put** [25] - 13:4, 13:6, 16:9, 37:2, 52:5, 52:8, 66:6, 78:25, 79:4, 80:12, 88:11, 88:18, 91:12, 94:17, 95:16, 95:22, 96:3, 96:8, 96:10, 100:11, 102:14, 104:20, 105:1, 105:3

**Q**

**qualifications** [1] - 52:19
**queasier** [1] - 8:18
**queasy** [4] - 8:15, 8:25, 9:3, 9:16
**questionnaire** [3] - 64:2, 64:4, 64:17
**questions** [29] - 19:14, 20:9, 20:12, 20:13, 20:16, 21:19, 36:15, 36:17, 37:1, 37:7, 37:10, 40:10, 40:24, 41:14, 43:21, 52:18, 52:20, 53:6, 53:23, 60:21, 64:1, 64:6, 64:14, 78:10, 85:22, 90:10, 96:21, 108:22, 122:22
**quick** [1] - 121:14
**quickly** [3] - 20:22, 40:25, 41:2
**quickly..** [1] - 66:18
**quite** [3] - 22:25, 118:10, 121:7
**quoted** [1] - 12:20

**R**

**radical** [1] - 21:12
**Rahmer** [1] - 45:16
**raise** [5] - 9:1, 9:19, 9:20, 20:6, 96:24
**raised** [13] - 72:5, 75:1, 87:6, 90:11, 97:1, 97:2, 97:4, 108:18, 108:20, 109:3, 113:1, 113:2
**raising** [1] - 10:19
**randomly** [3] - 36:13, 44:19, 120:16
**rare** [1] - 98:17
**rate** [1] - 44:20
**rather** [2] - 8:1, 77:4
**RC** [1] - 46:24
**reach** [1] - 106:4
**reached** [1] - 101:21
**read** [29] - 5:24, 11:16, 21:15, 37:14, 37:21, 58:25, 65:2, 65:3, 65:4, 65:8, 67:13, 69:17, 70:24, 70:25, 77:8, 78:17, 79:3, 85:2, 88:3, 88:6, 91:11, 96:4, 101:13, 107:5, 107:6, 110:17, 112:9
**reading** [4] - 6:24, 14:12, 85:7, 93:3
**ready** [9] - 5:10, 6:12, 7:4, 13:19, 30:1, 41:18, 41:20, 41:24, 77:10
**real** [2] - 104:18, 108:2
**realize** [1] - 51:15
**really** [26] - 11:19, 17:9, 29:1, 35:1, 38:24, 51:12, 65:14, 69:17, 69:19, 69:21, 75:21, 75:24, 76:5, 78:17, 81:10, 87:20, 91:5, 91:6, 97:16, 97:19, 98:10, 106:2, 106:6, 116:12, 120:14, 122:23
**Realtime** [1] - 1:17
**reason** [9] - 5:20, 16:4, 27:13, 30:15, 78:5, 81:19, 97:2, 97:4, 104:14
**reasonable** [4] - 17:23, 42:21, 61:8, 61:11
**reasons** [1] - 12:12
**receive** [2] - 30:18, 59:22
**received** [7] - 6:5, 25:16, 25:20, 26:7, 30:6, 31:11, 49:20
**recently** [3] - 71:21, 78:16, 98:22
**recess** [2] - 50:12, 123:4
**Recess** [1] - 5:9
**recognize** [11] - 47:2, 47:3, 47:17, 48:9, 48:21, 49:6, 49:9, 49:10, 49:11, 54:1, 121:12
**recognizes** [1] - 44:16
**recommend** [1] - 59:21
**record** [4] - 4:9, 11:8, 23:12, 123:8
**recorded** [1] - 1:21
**recruiting** [1] - 68:1
**redact** [4] - 11:2, 11:25, 12:12, 13:19
**Reese** [1] - 46:16
**reference** [2] - 11:14, 12:14
**reflect** [1] - 121:22
**Reform** [2] - 37:25, 43:8
**refused** [2] - 18:6, 21:24
**regarding** [3] - 15:22, 26:19, 48:7
**regardless** [1] - 8:9
**regional** [1] - 46:15
**regular** [1] - 103:13
**regularly** [4] - 73:17, 76:12, 85:5, 112:7
**Reiniel** [1] - 46:21
**related** [4] - 59:16, 97:24, 101:17, 117:2
**relationship** [1] - 102:6
**relationships** [1] - 75:11
**relatively** [1] - 121:24
**relatives** [6] - 86:20, 87:9, 87:18, 87:19, 92:9, 114:21
**released** [4] - 116:10, 116:14, 117:23, 118:4
**relevance** [4] - 7:17, 8:19, 9:14, 30:13

**relevancy** [1] - 19:22
**relevant** [27] - 7:17, 7:24, 8:7, 8:11, 10:12, 14:8, 15:15, 15:19, 16:3, 16:14, 17:19, 17:20, 19:23, 21:2, 21:20, 23:1, 23:2, 24:25, 27:1, 27:16, 27:17, 27:24, 29:18, 30:25, 34:7, 42:15
**reliable** [1] - 24:24
**reliant** [1] - 24:21
**religion** [1] - 116:8
**religious** [15] - 65:19, 67:19, 70:5, 74:6, 78:1, 85:20, 89:18, 93:11, 99:1, 102:5, 103:23, 107:18, 110:23, 112:21, 117:4
**rely** [1] - 26:25
**remember** [3] - 36:1, 75:21, 105:18
**remembered** [1] - 88:3
**remind** [3] - 35:25, 36:6, 64:12
**reminded** [1] - 51:20
**remove** [1] - 7:20
**removed** [1] - 12:13
**removing** [1] - 11:17
**Remy** [1] - 33:7
**render** [1] - 59:1
**Rene** [1] - 45:17
**repeat** [1] - 92:5
**repeatedly** [1] - 16:16
**reply** [1] - 26:15
**report** [1] - 80:7
**Report** [1] - 101:14
**Reporter** [2] - 1:17, 123:11
**reporter** [4] - 40:18, 53:14, 64:10, 69:4
**REPORTER** [1] - 123:6
**reporters** [1] - 40:19
**reports** [1] - 14:9
**represent** [2] - 47:10, 47:11
**representation** [2] - 11:12, 32:2
**representing** [2] - 48:5, 49:2
**represents** [1] - 57:12
**request** [2] - 5:25, 11:7
**require** [1] - 16:23
**required** [2] - 9:4, 26:13
**requires** [1] - 38:23
**requiring** [1] - 36:11
**reschedule** [1] - 99:9
**research** [1] - 108:8
**reserve** [2] - 107:12, 108:12
**resources** [5] - 23:3, 37:16, 37:18, 43:1, 43:3
**respect** [7] - 8:5, 13:24, 22:22, 53:10, 54:20, 58:22, 84:6
**respond** [2] - 10:25, 33:9
**responded** [1] - 11:10
**responding** [1] - 39:10
**response** [6] - 10:24, 12:20, 13:17, 29:24, 32:3, 39:6
**responsive** [1] - 53:7
**rest** [1] - 13:19
**restricted** [2] - 14:15, 14:16
**restriction** [1] - 23:6
**restroom** [1] - 66:18
**result** [1] - 29:15
**retail** [2] - 73:14, 103:8
**retailer** [1] - 112:4
**retire** [1] - 109:21
**retired** [14] - 46:6, 46:7, 46:12, 68:7, 73:23, 84:20, 84:23, 85:23, 86:11, 107:12, 107:14, 107:15, 108:12, 109:22
**return** [1] - 59:23
**review** [4] - 31:23, 33:18, 33:19, 35:8
**revisit** [1] - 10:15
**Reynaldo** [1] - 47:14
**Ricardo** [1] - 46:6
**Richard** [2] - 45:22, 46:13
**Riddell** [1] - 46:5
**ridiculous** [1] - 122:17
**rift** [1] - 92:1
**risk** [1] - 16:9
**Rivera** [2] - 18:3, 46:20
**Robert** [2] - 46:6, 47:15
**Rodolphe** [2] - 18:4, 46:20
**Rodriguez** [1] - 44:8
**Roger** [1] - 46:22
**role** [1] - 86:3
**room** [2] - 39:12, 44:12
**rough** [1] - 38:9
**RPR** [2] - 1:17, 123:11
**Ruiz** [1] - 49:4
**Rule** [2] - 16:8, 17:15
**rule** [2] - 41:1, 41:7
**rules** [1] - 20:7
**run** [4] - 41:10, 50:7, 60:8, 66:18
**running** [1] - 71:3
**runs** [1] - 40:11
**rush** [1] - 121:8
**Ryan** [1] - 45:18

## S

**S.W.A.T** [1] - 101:23
**sabotaged** [1] - 26:10
**safe** [1] - 66:14
**sale** [1] - 73:4
**sales** [2] - 69:13, 73:14
**salt** [1] - 113:8
**San** [1] - 70:23
**Santa** [1] - 76:18
**Saturday** [1] - 6:7
**save** [1] - 77:4
**savings** [1] - 38:8
**saw** [2] - 9:15, 109:6
**scared** [1] - 92:1
**scenario** [2] - 29:5, 105:10
**scene** [4] - 17:7, 18:10, 21:7, 21:8
**schedule** [5] - 49:24, 49:25, 51:24, 51:25, 118:11
**Scheffel** [1] - 45:20
**Schlueter** [1] - 46:5
**school** [28] - 64:22, 64:24, 69:10, 73:12, 75:5, 75:12, 76:1, 89:3, 89:4, 97:13, 98:5, 99:7, 101:12, 103:7, 104:6, 107:1, 111:25, 116:11, 116:14, 117:23, 118:2, 118:8, 118:10, 118:16, 118:19, 118:24, 119:10
**School** [4] - 118:15, 119:9, 119:13, 122:9
**schools** [1] - 97:13
**science** [6] - 84:17, 92:25, 101:4, 106:22, 106:23, 112:2
**sciences** [1] - 93:15
**scope** [1] - 50:24
**Scott** [1] - 46:16
**Sean** [2] - 4:10, 45:3
**SEAN** [1] - 2:3
**seated** [5] - 5:3, 5:7, 66:25, 121:4, 121:18
**second** [6] - 14:13, 15:9, 22:21, 36:12, 66:22, 112:17
**secret** [2] - 24:6
**SECURITY** [1] - 60:17
**security** [15] - 27:15, 36:24, 41:5, 41:8, 41:9, 46:15, 56:13, 56:17, 66:23, 72:6, 72:7, 72:10, 72:16, 72:17, 72:18
**Security** [14] - 45:20, 45:21, 45:22, 45:23, 45:24, 46:4, 46:8, 46:9, 46:11, 54:14, 72:8, 72:11, 94:10, 109:6
**see** [74] - 5:14, 7:17, 9:14, 9:16, 14:22, 14:23, 16:7, 17:22, 18:3, 27:2, 31:13, 35:14, 36:12, 43:24, 47:4, 48:22, 49:8, 49:11, 50:25, 52:4, 52:14, 54:22, 54:25, 55:2, 55:25, 56:5, 56:8, 56:15, 56:18, 57:1, 57:4, 57:6, 57:16, 57:20, 58:4, 58:8, 58:16, 58:18, 58:20, 59:6, 59:9, 59:12, 60:2, 60:4, 60:13, 60:19, 61:6, 61:14, 61:16, 61:17, 61:24, 62:2, 62:4, 62:11, 62:13, 62:15, 63:9, 63:10, 66:9, 80:12, 81:18, 85:12, 85:14, 91:1, 101:15, 104:18, 106:13, 108:21, 114:21, 120:23, 121:16, 122:21
**See** [1] - 123:5
**seeing** [1] - 23:21
**selected** [6] - 9:22, 42:15, 43:11, 44:6, 73:25, 99:14
**selection** [5] - 22:17, 40:9, 40:16, 41:6, 120:3
**self** [2] - 13:1, 85:7
**self-evident** [1] - 13:1
**self-help** [1] - 85:7
**selling** [1] - 69:13
**Senate** [1] - 39:5
**Senator** [1] - 75:4
**senator** [2] - 75:6, 75:25
**senators** [3] - 39:2, 74:1, 75:3
**send** [3] - 66:5, 90:5, 122:8
**sending** [1] - 23:3
**sense** [3] - 50:22, 103:22, 106:5
**sent** [1] - 66:5
**sentence** [1] - 59:23
**sentencing** [2] - 83:18, 83:19
**separate** [1] - 88:5
**series** [2] - 52:18, 60:20
**serve** [8] - 52:19, 78:24, 84:1, 91:17, 93:6, 93:7, 96:13, 115:4
**served** [28] - 39:15, 65:10, 67:15, 67:16, 69:22, 69:23, 71:3, 71:4, 73:24, 77:19, 81:12, 81:13, 85:13, 89:10, 89:11, 95:19, 98:20, 101:18, 101:20, 103:18, 105:20, 107:9, 110:20, 112:12, 112:14, 115:7, 116:22, 116:23
**service** [9] - 39:17, 41:13, 48:15, 72:10, 84:18, 101:9, 101:24, 102:12, 122:12
**services** [6] - 72:10, 72:16, 81:7, 81:21, 101:8, 112:10
**Services** [1] - 97:16
**serving** [5] - 65:19, 65:20, 85:12, 98:15, 116:3

**Session** [2] - 1:5, 123:5
**set** [5] - 5:17, 13:22, 22:5, 41:15, 91:10
**sets** [1] - 5:21
**settled** [1] - 29:13
**seven** [1] - 109:23
**seventh** [1] - 90:14
**several** [2] - 12:8, 73:21
**share** [3] - 53:17, 53:20, 98:10
**shock** [1] - 7:18
**shocked** [1] - 44:18
**shoplifting** [1] - 89:16
**Shores** [3] - 67:4, 67:10, 68:15
**short** [3] - 43:15, 43:22, 121:2
**shortened** [1] - 31:25
**shorter** [2] - 50:8, 115:2
**show** [6] - 7:14, 7:21, 10:3, 13:9, 105:8, 105:9
**showed** [1] - 9:9
**showing** [1] - 12:24
**shows** [17] - 7:12, 7:13, 69:21, 77:10, 77:12, 85:4, 85:9, 98:5, 101:15, 103:13, 104:11, 104:14, 105:2, 105:6, 107:7, 112:10
**sick** [1] - 118:23
**side** [10] - 63:10, 63:19, 89:7, 89:21, 90:2, 90:25, 91:4, 100:1, 114:10, 121:10
**sidebar** [1] - 122:3
**sides** [13] - 65:21, 71:13, 85:21, 89:19, 93:13, 94:13, 94:16, 99:2, 107:13, 107:19, 110:7, 110:24, 110:25, 112:22
**significance** [3] - 25:12, 25:19, 27:12
**significant** [5] - 25:13, 26:12, 26:16, 86:9, 107:4
**silos** [1] - 27:21
**Simone** [1] - 73:9
**simple** [2] - 12:19, 41:8
**simply** [1] - 112:25
**sing** [1] - 77:15
**sister** [6] - 69:22, 74:14, 74:21, 99:15, 120:16, 120:17
**sit** [8] - 9:14, 19:4, 32:12, 34:24, 35:2, 35:11, 83:5, 95:16
**site** [1] - 76:22
**sitting** [7] - 25:6, 44:3, 44:11, 44:17, 47:2, 63:12, 93:11
**situation** [4] - 24:20, 25:25, 51:17, 105:11
**six** [4] - 12:21, 13:12, 20:1, 70:24
**skeptical** [1] - 113:6
**skip** [2] - 36:11, 64:14
**slate** [1] - 6:24
**Slavin** [1] - 110:12
**sliver** [2] - 28:13, 28:14
**slow** [2] - 64:9, 116:12
**slowly** [1] - 41:3
**small** [3] - 72:24, 73:2, 101:8
**Smith** [3] - 28:23, 44:8, 46:14
**smoothly** [3] - 40:11, 41:10, 66:2
**smuggling** [2] - 37:23, 43:6
**so-and-so** [1] - 33:6
**So-and-So** [1] - 29:10
**so..** [1] - 73:25
**social** [8] - 69:19, 73:17, 76:8, 76:11, 81:10, 89:10, 91:2, 112:8
**software** [3] - 77:1, 77:4, 77:5
**SOLAGES** [1] - 2:21
**Solages** [12] - 4:7, 5:1, 11:10, 11:17, 11:22, 12:6, 12:11, 12:25, 13:2, 41:17, 49:3, 49:6
**Solages's** [3] - 10:24, 11:12, 42:2
**sold** [1] - 72:20
**sole** [1] - 52:20
**solely** [1] - 63:5
**solution** [1] - 21:13
**someone** [6] - 12:21, 16:2, 48:1, 76:3, 113:15, 114:20
**someplace** [1] - 114:2
**sometimes** [3] - 30:15, 44:21, 100:17
**somewhere** [1] - 16:2
**son** [5] - 68:2, 85:11, 85:16, 87:4, 98:4
**son's** [3] - 86:19, 86:21, 86:24
**sooner** [2] - 7:8, 8:1
**sooner-than-later** [1] - 7:8
**sophomore** [1] - 98:4
**sorry** [10] - 15:17, 15:18, 80:23, 80:25, 83:21, 86:23, 92:5, 94:14, 94:19, 102:24
**sort** [11] - 7:18, 13:22, 30:3, 37:1, 40:17, 57:11, 90:25, 100:10, 108:17, 116:1, 119:10
**sorts** [1] - 20:1
**Soto** [1] - 46:6
**Sotolongo** [2] - 111:22, 111:24
**sound** [1] - 113:10
**sounds** [3] - 26:9, 76:9, 114:6
**source** [1] - 25:7
**sources** [2] - 24:23, 90:23
**South** [2] - 97:12, 101:3
**Southeastern** [1] - 116:8
**Southern** [2] - 89:5, 123:12
**SOUTHERN** [1] - 1:1
**spare** [1] - 69:22
**speaking** [3] - 20:1, 22:19, 100:18
**special** [7] - 14:9, 14:13, 15:6, 15:9, 23:16, 52:22
**Special** [2] - 4:14, 45:7
**specializes** [1] - 108:2
**specific** [1] - 85:4
**specifically** [1] - 22:10
**speculative** [1] - 113:8
**speech** [1] - 103:12
**spent** [2] - 20:1, 23:3
**spinning** [1] - 69:20
**spiral** [1] - 9:13
**Spirits** [1] - 89:6
**splayed** [2] - 10:10, 10:11
**spoken** [1] - 106:3
**sports** [2] - 67:13, 73:20
**spouse** [11] - 38:18, 69:16, 70:7, 73:16, 86:9, 99:13, 101:11, 103:10, 107:2, 112:6, 116:17
**spring** [2] - 99:6, 99:12
**squeeze** [1] - 35:19
**St** [1] - 33:7
**staff** [3] - 53:14, 53:18, 66:5
**stand** [6] - 21:5, 38:3, 44:1, 64:5, 66:16, 115:16
**Standard** [1] - 97:25
**standing** [1] - 4:19
**Stanley** [1] - 116:18
**start** [7] - 5:15, 5:19, 35:16, 42:6, 80:25, 82:20, 121:15
**started** [7] - 22:10, 23:13, 29:13, 51:21, 66:12, 66:23, 89:3
**starting** [1] - 4:9
**State** [8] - 46:16, 46:17, 56:23, 72:8, 72:11, 74:15, 74:21, 84:21
**state** [6] - 22:1, 60:9, 75:8, 75:25, 82:20, 82:25
**statement** [1] - 15:20
**STATES** [3] - 1:1, 1:4, 1:12
**states** [1] - 15:12
**States** [31] - 1:18, 2:5, 4:3, 4:4, 4:5, 4:6, 4:11, 16:25, 18:15, 19:25, 37:23, 37:24, 41:16, 41:18, 42:6, 43:2, 43:4, 43:6, 43:7, 44:25, 45:2, 45:5, 45:6, 45:14, 69:11, 87:12, 93:19, 93:20, 95:5, 122:5, 123:12
**station** [1] - 121:9
**status** [2] - 6:1, 91:7
**stay** [1] - 116:9
**stay-at-home** [1] - 116:9
**stayed** [1] - 105:20
**Steinbeisser** [1] - 123:10
**STEINBEISSER** [2] - 1:17, 123:11
**stenography** [1] - 1:21
**stenotype** [1] - 123:8
**step** [1] - 73:25
**stepped** [1] - 39:23
**stepson** [1] - 116:19
**Steven** [2] - 46:13, 46:24
**Stewart** [1] - 46:13
**still** [24] - 8:7, 8:14, 13:23, 14:18, 21:25, 22:11, 22:15, 29:23, 53:12, 53:13, 53:14, 53:17, 73:11, 76:3, 80:3, 87:9, 90:25, 92:9, 95:12, 104:16, 105:25, 107:12, 108:13, 108:25
**stipulated** [5] - 24:17, 28:1, 28:6, 28:7, 30:23
**stipulation** [3] - 22:12, 28:3, 30:17
**stipulations** [5] - 13:21, 23:8, 23:25, 30:4, 32:1
**stop** [1] - 50:11
**store** [1] - 73:15
**story** [2] - 25:17, 100:1
**straight** [2] - 118:10, 118:15
**streaming** [1] - 112:10
**Street** [1] - 65:3
**stressful** [1] - 98:7
**stretch** [2] - 66:17, 115:16
**strike** [1] - 13:16
**strong** [6] - 43:16, 43:23, 54:17, 54:19, 55:6, 102:6
**structure** [1] - 9:18
**struggle** [1] - 27:25
**struggling** [2] - 8:18, 18:18
**stuck** [6] - 25:1, 31:1, 31:5, 31:22, 32:19, 33:1
**student** [1] - 101:12
**studied** [3] - 89:24, 116:8

**studies** [2] - 108:7, 108:9
**studying** [2] - 69:10, 104:7
**stuff** [9] - 51:9, 55:20, 90:5, 98:6, 103:14, 103:16, 105:2, 108:9, 109:20
**stunt** [1] - 120:16
**Suarez** [1] - 45:15
**subject** [1] - 59:21
**submitted** [3] - 5:25, 15:10, 36:16
**submitting** [2] - 37:25, 43:8
**suddenly** [2] - 19:14, 20:18
**sufficient** [2] - 32:6, 33:15
**sugar** [1] - 77:25
**suggest** [2] - 13:17, 32:4
**suggested** [1] - 34:1
**suggestion** [1] - 22:8
**suggests** [2] - 12:1, 12:14
**summarizing** [1] - 38:2
**summary** [2] - 43:10, 43:22
**summons** [5] - 38:15, 39:14, 49:20, 50:23
**summonsed** [3] - 81:12, 107:9, 110:20
**Sunday** [2] - 6:8, 51:14
**super** [1] - 38:17
**support** [6] - 14:11, 37:16, 43:1, 43:2, 83:19, 83:22
**supported** [2] - 82:18, 83:3
**suppose** [3] - 15:3, 100:15, 100:17
**supposed** [1] - 20:23
**surprises** [1] - 34:25
**surrounded** [1] - 108:23
**surrounding** [1] - 58:22
**Susan** [1] - 46:17
**suspicion** [1] - 28:16
**Susy** [1] - 46:7
**swath** [1] - 22:21
**swayed** [2] - 111:9, 111:10
**sweeping** [3] - 17:5, 18:17, 20:8
**sworn** [1] - 19:14
**system** [8] - 38:23, 39:8, 51:21, 51:22, 53:24, 57:25, 58:6, 58:14
**systems** [1] - 101:6
**Szamosi** [2] - 68:23, 69:7

## T

**table** [5] - 4:12, 4:20, 4:23, 45:3, 47:3
**tables** [1] - 44:3
**talks** [1] - 15:10
**Tallahassee** [1] - 75:15
**Tama** [2] - 4:21, 48:15
**TAMA** [1] - 2:19
**Tamayo** [1] - 101:2
**teacher** [5] - 75:5, 76:1, 110:14, 111:3, 111:14
**Team** [2] - 63:15, 63:16
**team** [3] - 48:3, 48:10, 90:5
**technical** [1] - 66:15
**technically** [1] - 11:16
**technician** [1] - 69:11
**teenager** [1] - 105:18
**television** [6] - 73:18, 77:9, 85:9, 89:25, 93:3, 101:15
**ten** [11] - 49:21, 49:23, 66:11, 67:6, 70:24, 76:21, 93:1, 105:23, 109:23, 116:10, 116:18
**ten-week** [1] - 49:23
**ten-year-old** [1] - 116:18
**tend** [4] - 55:9, 55:11, 55:13, 69:1
**tennis** [1] - 73:20
**terms** [2] - 90:3, 115:17
**test** [1] - 21:19
**testified** [1] - 96:22
**testifies** [1] - 21:18
**testify** [10] - 13:3, 46:1, 61:18, 61:20, 61:22, 100:4, 100:5, 100:9, 100:11, 109:7
**testifying** [3] - 32:15, 55:22, 99:18
**testimonies** [1] - 113:23
**testimony** [10] - 12:24, 17:21, 55:5, 59:14, 59:23, 94:9, 96:22, 108:16, 113:4, 113:12
**Texas** [3] - 106:23, 107:13, 109:1
**text** [3] - 11:19, 12:6, 12:24
**THE** [482] - 1:11, 2:2, 4:2, 5:2, 5:7, 5:10, 6:10, 6:22, 8:17, 8:23, 9:6, 9:12, 9:18, 9:24, 10:3, 10:7, 10:11, 10:17, 10:22, 11:4, 11:7, 12:16, 13:10, 15:17, 16:20, 18:5, 18:24, 19:3, 19:7, 19:16, 19:24, 20:25, 21:22, 22:4, 22:16, 22:19, 23:10, 23:13, 23:16, 27:25, 28:23, 29:5, 29:22, 29:23, 29:24, 30:20, 31:2, 31:15, 33:9, 33:16, 33:22, 33:25, 34:11, 34:20, 34:22, 35:10, 35:16, 35:22, 35:24, 38:5, 41:20, 41:22, 41:24, 42:2, 42:4, 45:10, 47:1, 47:17, 48:9, 48:20, 49:5, 52:13, 57:21, 60:18, 65:25, 66:21, 67:2, 67:21, 67:23, 67:24, 67:25, 68:4, 68:6, 68:9, 68:11, 68:12, 68:13, 68:14, 68:19, 68:21, 68:23, 68:25, 69:4, 69:7, 70:7, 70:9, 70:10, 70:12, 70:14, 70:16, 71:14, 71:16, 71:17, 71:18, 71:20, 71:23, 72:1, 72:7, 72:12, 72:14, 72:15, 72:17, 72:19, 72:20, 72:21, 73:2, 73:5, 73:6, 73:7, 73:9, 74:9, 74:12, 74:13, 74:14, 74:17, 74:18, 74:20, 74:23, 74:24, 74:25, 75:1, 75:4, 75:8, 75:9, 75:10, 75:12, 75:14, 75:17, 75:19, 75:20, 75:22, 75:24, 75:25, 76:2, 76:3, 76:5, 76:8, 76:10, 76:11, 76:13, 76:15, 76:17, 78:4, 78:8, 78:9, 78:13, 78:21, 78:22, 78:24, 79:2, 79:3, 79:6, 79:7, 79:11, 79:14, 79:17, 79:18, 79:19, 79:20, 79:22, 79:25, 80:1, 80:3, 80:5, 80:6, 80:8, 80:9, 80:10, 80:11, 80:14, 80:17, 80:20, 80:23, 80:25, 81:2, 81:3, 81:20, 81:23, 81:25, 82:1, 82:3, 82:5, 82:6, 82:8, 82:9, 82:10, 82:12, 82:13, 82:16, 82:17, 82:19, 82:22, 82:23, 82:24, 82:25, 83:1, 83:2, 83:6, 83:7, 83:9, 83:10, 83:12, 83:15, 83:16, 83:17, 83:19, 83:21, 83:22, 83:24, 84:2, 84:3, 84:5, 84:7, 84:11, 84:12, 84:14, 85:22, 85:25, 86:4, 86:5, 86:8, 86:10, 86:12, 86:13, 86:14, 86:16, 86:17, 86:19, 86:21, 86:23, 86:24, 87:1, 87:3, 87:4, 87:5, 87:7, 87:11, 87:13, 87:14, 87:16, 87:17, 87:19, 87:22, 88:2, 88:5, 88:12, 88:13, 88:23, 88:24, 89:1, 89:20, 89:23, 90:7, 90:8, 90:9, 90:13, 90:16, 90:17, 90:18, 90:20, 90:22, 90:24, 91:3, 91:5, 91:9, 91:13, 91:14, 91:20, 91:21, 91:22, 92:2, 92:5, 92:7, 92:16, 92:17, 92:19, 92:20, 92:22, 93:14, 93:17, 93:18, 93:20, 93:23, 93:25, 94:1, 94:3, 94:4, 94:12, 94:14, 94:15, 94:17, 94:18, 94:19, 94:24, 94:25, 95:1, 95:2, 95:3, 95:4, 95:6, 95:7, 95:8, 95:9, 95:11, 95:12, 95:13, 95:15, 95:21, 95:22, 96:1, 96:3, 96:6, 96:7, 96:10, 96:11, 96:15, 96:17, 96:19, 96:20, 97:2, 97:5, 97:7, 97:8, 97:10, 99:4, 99:6, 99:12, 99:14, 99:17, 99:20, 100:2, 100:13, 100:16, 100:22, 100:23, 100:24, 100:25, 101:1, 102:9, 102:10, 102:11, 102:15, 102:19, 102:23, 102:25, 103:4, 104:1, 104:2, 104:3, 104:4, 104:5, 104:7, 104:8, 104:9, 104:10, 104:12, 104:13, 104:19, 104:20, 104:23, 104:24, 105:4, 105:5, 105:7, 105:14, 105:17, 105:22, 105:23, 105:25, 106:2, 106:7, 106:12, 106:16, 106:17, 106:18, 106:19, 107:20, 107:23, 107:24, 108:1, 108:3, 108:7, 108:10, 108:12, 108:14, 108:21, 109:4, 109:13, 109:15, 109:17, 109:18, 109:19, 109:21, 109:22, 109:24, 110:8, 110:9, 110:11, 111:1, 111:3, 111:5, 111:6,

111:7, 111:11, 111:13, 111:15, 111:17, 111:19, 111:20, 111:23, 112:23, 113:3, 113:10, 113:20, 113:24, 113:25, 114:1, 114:4, 114:6, 114:8, 114:12, 114:14, 114:17, 114:18, 114:20, 114:22, 114:24, 115:6, 115:9, 115:12, 115:15, 115:19, 115:21, 115:24, 116:1, 116:6, 116:12, 116:13, 117:6, 117:8, 117:9, 117:10, 117:11, 117:13, 117:14, 117:15, 117:17, 117:19, 117:20, 117:22, 118:1, 118:3, 118:5, 118:9, 118:12, 118:14, 118:20, 118:21, 118:23, 118:25, 119:1, 119:3, 119:5, 119:6, 119:8, 119:11, 119:12, 119:15, 119:16, 119:18, 119:19, 121:18
**themselves** [2] - 44:1, 44:2
**Theodore** [1] - 45:14
**theory** [2] - 34:6, 35:7
**therapy** [1] - 103:12
**they've** [6] - 16:8, 30:8, 35:2, 42:14, 59:16
**thinking** [4] - 13:22, 23:21, 95:19, 122:24
**thinks** [1] - 121:25
**third** [1] - 68:1
**Thomas** [1] - 49:3
**Thompson** [1] - 45:23
**Thornton** [1] - 2:9
**thorough** [1] - 34:7
**thousand** [1] - 89:16
**three** [5] - 10:7, 46:11, 50:16, 67:11, 87:16
**threw** [1] - 7:9
**Thursday** [3] - 50:12, 50:15, 122:11
**Thursdays** [6] - 50:7, 50:8, 50:11, 115:2, 118:5, 118:14
**tickets** [1] - 51:16
**tied** [1] - 25:5
**TikTok** [1] - 89:10
**Tim** [1] - 46:13
**tip** [2] - 30:5, 30:17
**today** [10] - 5:21, 6:16, 6:20, 7:22, 38:7, 41:15, 52:24, 66:8, 66:15, 118:4
**together** [5] - 44:22, 49:10, 82:17, 98:22, 111:8
**Tom** [2] - 4:14, 45:8
**tomorrow** [6] - 5:23, 6:17, 6:20, 6:21, 7:22, 7:25
**tonight** [1] - 5:23
**took** [1] - 28:20
**top** [1] - 24:6
**torso** [1] - 10:9
**totally** [2] - 34:15, 120:22
**touch** [3] - 17:23, 80:1, 98:23
**towards** [3] - 102:8, 102:16, 106:15
**Towe** [1] - 46:13
**town** [2] - 99:8, 99:10
**Trachten** [1] - 2:19
**track** [1] - 43:21
**train** [1] - 121:9
**training** [11] - 64:25, 69:15, 89:6, 89:21, 90:1, 93:1, 101:10, 104:6, 110:15, 112:5, 116:17
**tranche** [4] - 36:12, 46:2, 121:21, 122:21
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 1:21, 6:6
**transcription** [2] - 1:22, 123:8
**transcripts** [1] - 40:20
**translator** [1] - 5:5
**translators** [1] - 5:8
**travel** [18] - 14:15, 14:16, 15:11, 15:13, 16:2, 17:14, 17:16, 19:12, 22:10, 22:15, 23:6, 23:17, 23:20, 77:14, 93:4, 107:6, 116:22
**traveled** [3] - 87:6, 87:8, 90:12
**treat** [4] - 84:9, 109:11, 113:16, 113:24
**treated** [2] - 68:16, 83:7
**TRIAL** [1] - 1:10
**trial** [20] - 2:4, 4:12, 6:2, 11:21, 21:4, 33:1, 36:4, 40:16, 41:7, 41:15, 45:5, 49:21, 50:21, 62:9, 62:18, 62:19, 83:18, 96:14, 106:14, 117:9
**tried** [2] - 22:1, 106:3
**tries** [1] - 106:5
**trouble** [3] - 5:17, 80:23, 118:1
**true** [8] - 17:6, 18:19, 25:3, 26:19, 30:9, 33:13, 33:24, 39:3
**truly** [2] - 53:20
**trumps** [1] - 27:15
**truthful** [1] - 59:23
**try** [15] - 15:7, 20:10, 29:20, 35:19, 42:15, 45:4, 79:12, 98:5, 98:6, 101:13, 112:7, 112:22, 113:21, 114:22, 122:20
**trying** [6] - 13:9, 22:5, 27:19, 27:21, 53:2, 53:4
**TSA** [2] - 93:2, 94:1
**Tuesday** [3] - 99:8, 99:10, 122:11
**Tuesdays** [6] - 50:7, 50:8, 50:11, 115:2, 118:5, 118:14
**turn** [1] - 122:12
**turned** [2] - 30:11, 101:12
**turns** [2] - 8:13, 29:6
**tutoring** [2] - 118:10, 118:13
**TV** [8] - 65:6, 69:21, 73:20, 89:9, 103:13, 104:18, 107:7, 112:10
**twice** [2] - 79:24, 95:11
**twin** [1] - 116:19
**two** [16] - 5:21, 26:11, 37:10, 39:14, 44:10, 46:3, 51:13, 70:20, 70:23, 76:14, 81:9, 84:25, 85:14, 88:6, 91:9, 119:24
**Ty** [1] - 45:16
**type** [4] - 98:17, 102:17, 114:16, 115:13

## U

**UCF** [1] - 106:22
**um-hum** [1] - 104:12
**unarmed** [1] - 72:18
**unbiased** [1] - 109:14
**uncle** [5] - 112:15, 112:17, 114:1, 114:19
**uncomfortable** [1] - 53:3
**under** [5] - 13:3, 49:22, 81:9, 89:16, 122:4
**undermines** [1] - 27:11
**understood** [4] - 9:17, 10:6, 71:20, 72:25
**unfair** [1] - 59:24
**unhappy** [1] - 35:1
**UNITED** [3] - 1:1, 1:4, 1:12
**United** [32] - 1:18, 2:5, 4:3, 4:4, 4:5, 4:6, 4:11, 16:25, 18:15, 19:24, 37:23, 37:24, 41:15, 41:18, 42:6, 43:2, 43:4, 43:6, 43:7, 44:25, 45:2, 45:5, 45:6, 45:13, 69:11, 87:12, 93:18, 93:20, 95:5, 108:8, 122:5, 123:12
**universal** [1] - 98:18
**university** [1] - 112:1
**University** [7] - 64:23, 67:4, 81:5, 82:1, 82:3, 106:23, 112:1
**unless** [2] - 61:8, 69:5
**unnamed** [1] - 28:24
**up** [52] - 5:17, 8:1, 8:8, 8:12, 10:18, 12:2, 15:1, 16:22, 21:17, 22:20, 24:12, 24:20, 24:25, 25:10, 25:14, 25:21, 25:22, 26:2, 27:8, 28:25, 29:11, 29:13, 29:20, 29:23, 30:15, 30:23, 30:25, 31:10, 32:24, 35:14, 40:14, 47:22, 54:8, 73:10, 73:16, 82:17, 90:4, 98:22, 99:23, 101:13, 110:16, 112:7, 112:12, 120:3, 120:10, 120:13, 120:15, 120:18, 120:19, 120:21, 120:24, 121:1
**US** [19] - 2:4, 16:10, 18:7, 19:25, 25:6, 37:3, 37:8, 37:17, 45:5, 45:25, 46:14, 46:16, 46:17, 56:24, 70:17, 97:19, 98:14, 101:10, 112:18

## V

**VA** [1] - 112:15
**vacations** [1] - 50:17
**Valdes** [1] - 45:18
**Valentin** [1] - 45:21
**variety** [1] - 107:7
**Veintemilla** [5] - 4:6, 4:22, 41:17, 48:17, 48:21
**VEINTEMILLA** [2] - 2:16, 48:18
**Veintemilla's** [1] - 41:24
**venire** [2] - 38:4, 121:17
**verdict** [4] - 59:1, 91:19, 101:21, 122:2
**verified** [2] - 24:15, 24:18
**versus** [5] - 4:3, 4:4, 4:5, 4:6, 41:16
**veterinarian** [2] - 68:15, 68:16
**Vietnam** [3] - 98:16, 98:17, 98:19
**view** [1] - 37:8
**Village** [1] - 67:10
**violated** [2] - 103:21, 105:19
**violating** [2] - 37:24, 43:7

**visit** [6] - 79:18, 80:4, 80:5, 95:10, 114:21, 114:23
**visited** [3] - 78:11, 78:13, 79:15
**visits** [1] - 76:22
**vocational** [2] - 103:7, 104:5
**voir** [3] - 8:15, 19:10, 121:20
**VOIR** [1] - 3:3
**vs** [1] - 1:5

## W

**wait** [2] - 35:24, 118:17
**waiting** [1] - 36:13
**walk** [4] - 40:3, 85:6, 98:8
**Walke** [1] - 46:17
**walking** [1] - 121:13
**walks** [1] - 44:19
**Wall** [1] - 65:3
**Wallace** [1] - 46:9
**Walter** [3] - 4:5, 41:16, 48:16
**wants** [5] - 7:23, 18:17, 22:5, 23:24, 122:16
**war** [1] - 98:15
**warden** [1] - 107:15
**Warren** [1] - 35:18
**Washington** [2] - 65:3, 116:20
**watch** [27] - 65:6, 65:7, 67:14, 69:21, 73:20, 77:9, 77:10, 85:5, 85:8, 89:9, 93:3, 98:6, 101:12, 101:16, 103:13, 104:10, 104:14, 104:16, 104:21, 105:2, 107:6, 107:7, 112:10, 122:11
**watched** [1] - 105:5
**watching** [1] - 98:8
**ways** [4] - 24:16, 28:5, 28:9, 28:11
**wealth** [1] - 116:17
**websites** [5] - 65:5, 67:13, 73:17, 77:8, 85:3
**wedding** [1] - 51:16
**Wednesday** [2] - 6:23, 7:3
**Wednesdays** [3] - 50:1, 118:7, 119:8
**week** [7] - 7:1, 49:21, 49:23, 51:10, 51:14, 71:2, 115:1
**weekend** [2] - 7:4, 36:17
**weeks** [6] - 13:12, 33:20, 38:17, 49:21, 51:13, 119:4
**weigh** [1] - 95:18
**weights** [1] - 98:8
**weird** [1] - 9:13
**welcome** [2] - 73:6, 100:24
**welder** [1] - 77:7
**Weller** [3] - 84:13, 84:15, 92:4
**West** [5] - 76:19, 80:22, 84:16, 89:3, 89:13
**Westchester** [1] - 64:23
**whatsoever** [2] - 30:14, 42:11
**whole** [6] - 7:13, 32:7, 32:15, 40:8, 53:21, 97:13
**wife** [5] - 67:10, 67:14, 93:1, 93:5, 94:1
**Wilkins** [1] - 46:13
**willing** [3] - 11:2, 14:9, 22:13
**Wine** [1] - 89:5
**withheld** [1] - 14:7
**witness** [13] - 7:25, 12:23, 14:24, 15:2, 15:3, 21:5, 21:16, 29:11, 32:8, 59:20, 59:22, 109:11, 109:12
**witnesses** [16] - 6:24, 7:8, 13:3, 13:25, 14:18, 14:25, 15:24, 17:15, 17:16, 36:3, 45:10, 45:14, 46:19, 48:8, 109:5, 113:18
**woman** [4] - 28:25, 44:19, 120:4, 121:24
**wonderful** [1] - 49:17
**wondering** [1] - 108:5
**wonky** [1] - 43:19
**words** [2] - 91:16, 95:18
**works** [24] - 39:19, 46:22, 49:25, 67:10, 68:1, 68:2, 68:8, 70:7, 70:22, 70:23, 71:14, 74:15, 74:19, 77:3, 77:7, 81:8, 81:13, 81:15, 89:13, 97:23, 103:10, 103:11, 107:4
**world** [4] - 31:8, 31:13, 57:11, 104:18
**World** [1] - 97:15
**worldwide** [1] - 97:19
**worried** [5] - 31:3, 31:4, 91:17, 92:11, 92:13
**worry** [1] - 91:21
**worth** [1] - 25:23
**wound** [2] - 7:12, 10:12
**wow** [1] - 40:3
**Wow** [1] - 38:19
**wrap** [1] - 29:20
**write** [1] - 20:22
**writes** [1] - 77:5
**writing** [1] - 77:4
**Wu** [4] - 4:12, 5:25, 10:3, 45:5
**WU** [5] - 2:4, 6:3, 11:2, 11:6, 12:18

## X

**Xavier** [1] - 45:16
**XYZ** [1] - 27:4

## Y

**Yakov** [8] - 11:15, 11:18, 12:7, 12:14, 12:22, 12:23, 13:2
**Yao** [3] - 64:7, 67:2, 72:3
**year** [4] - 71:25, 112:13, 114:23, 116:18
**years** [49] - 39:14, 39:25, 64:19, 64:24, 67:3, 67:6, 68:24, 69:8, 69:12, 70:18, 70:20, 71:24, 72:13, 72:14, 73:10, 76:18, 76:21, 77:6, 79:23, 82:5, 82:11, 84:15, 85:14, 86:6, 86:7, 86:13, 87:9, 92:23, 93:1, 93:25, 97:4, 97:11, 101:2, 102:11, 103:5, 105:23, 106:20, 109:23, 110:15, 111:16, 111:20, 111:24, 114:9, 116:10, 117:3, 117:23, 121:11
**yesterday** [2] - 6:1, 120:16
**Yolanda** [1] - 66:4
**York** [5] - 65:4, 67:3, 84:16, 87:13, 107:5
**you-all** [1] - 64:2
**young** [2] - 120:11, 121:24
**yourself** [1] - 120:2
**yourselves** [1] - 36:2