UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-cr-20104-JB

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Miami, Florida |
| | ) |
| vs. | ) March 11, 2026 |
| | ) Day 3 - Morning Session |
| ARCANGEL PRETEL ORTIZ, *et al.*, | ) |
| | ) 8:56 AM - 12:04 PM |
| Defendants. | ) |
| | ) Pages 1 to 95 |

# TRANSCRIPT OF JURY TRIAL

HELD BEFORE THE HONORABLE JACQUELINE BECERRA

UNITED STATES DISTRICT JUDGE

LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Federal Certified Realtime Reporter
United States District Court
400 North Miami Avenue
Miami, Florida 33128
305.523.5633

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

APPEARANCES:

FOR THE GOVERNMENT:

SEAN T. MCLAUGHLIN, AUSA
JASON WU, AUSA
ANDREW J. BRIGGS, US DOJ trial attorney
ALTANESE P. PHENELUS, AUSA
United States Attorney's Office

ON BEHALF OF DEFENDANT PRETEL ORTIZ:

ORLANDO DO CAMPO, ESQ.
DANIELA JARAMILLO, ESQ.
Do Campo & Thornton, P.A.

DAVID A. HOWARD, ESQ.
Law Offices of David A. Howard

ON BEHALF OF DEFENDANT INTRIAGO:

EMMANUEL PEREZ, ESQ.
Emmanuel Perez & Associates

HECTOR L. FLORES, ESQ.
Barzee Flores

ON BEHALF OF DEFENDANT VEINTEMILLA:

MARISSEL DESCALZO, ESQ.
Descalzo Law

TAMA BETH KUDMAN, ESQ.
Kudman Trachten Aloe Posner LLP

ON BEHALF OF DEFENDANT SOLAGES:

JONATHAN S. FRIEDMAN, ESQ.
Jonathan S. Friedman, P.A.

S. PATRICK DRAY, ESQ.
S. Patrick Dray, P.A.

# T A B L E  O F  C O N T E N T S


| | PAGE |
|---|---|
| MARTINE MOISE | |
| Continued Direct Examination by Ms. Phenelus...... | 7 |
| Cross-Examination by Mr. Howard.................. | 37 |
| Certificate of Reporter.......................... | 83 |

GOVERNMENT EXHIBITS

| | MARKED | ADMITTED |
|---|---|---|
| 102B | | 12 |
| 160A, 160B, 160C | | 21 |
| 93A | | 31 |

(Call to the Order of the Court.)

THE COURTROOM DEPUTY: Calling the case of the United States versus Arcangel Pretel Ortiz, United States of America versus Antonio Intriago, United States of America versus Walter Veintemilla, United States of America versus James Solages, Case 22-CR-20104-Becerra.

Counsel, please announce your appearance for the record, starting with the Government.

MR. MCLAUGHLIN: Good morning, Your Honor. Sean McLaughlin on behalf of the United States. Also with me at counsel table is AUSA Jason Wu, DOJ trial attorney Andrew Briggs, AUSA Altanese Phenelus, and the case agent, FBI Special Agent Tom Pavletic.

THE COURT: Good morning.

MS. JARAMILLO: Good morning, Your Honor. Daniela Jaramillo, David Howard, and Orlando do Campo on behalf of Arcangel Pretel Ortiz, who is present before the Court and utilizing the services of the court interpreter.

MR. PEREZ: Good morning, Your Honor. Emmanuel Perez and Hector Flores on behalf of Mr. Intriago, who is seated next to me at counsel table.

MS. KUDMAN: Good morning, Your Honor. Tama Kudman and Marissel Descalzo on behalf of Mr. Veintemilla, who is also here at counsel table.

MR. FRIEDMAN: Good morning, Your Honor. Jonathan

Friedman. We're here with Patrick Dray on behalf of James Solages.

THE COURT: All right. Good morning. You may all be seated. Ms. Hamm provided you two notes that we have to attend to this morning from the jury.

The first is a handwritten note that had three questions for me. I think you've been handed what my proposed answers are to those questions. I don't know if you have any objections to them or any additions or any changes. Let me hear from the United States.

MR. MCLAUGHLIN: No objection, Judge.

THE COURT: Let me hear from the defense, from Mr. Ortiz's counsel.

MR. HOWARD: No objection, Your Honor.

THE COURT: Intriago.

MR. PEREZ: No objection, Your Honor.

THE COURT: Mr. Veintemilla's counsel.

MS. KUDMAN: No objection, Your Honor.

THE COURT: And on behalf of Mr. Solages.

MR. DO CAMPO: No objection.

THE COURT: So I'll give Ms. Hamm my response so she can give that to the juror.

And then the second question/issue was a letter received from the employer of one juror asking that she be excused due to the fact she had signed up to participate in a

collaborative initiative -- it's some sort of fellowship. I'm prepared to write a lovely letter back describing the importance of jury service, letting them know that both the questionnaire that came out from the jury office months ago as well as my voir dire made it amply clear what the commitment was. Having had opportunities to raise issues like these with the Court, none were raised.

I don't intend to excuse her. Like I said, I'm happy to write a letter. I'll share that letter with you all after I finish drafting it, but I do not find this good cause to excuse a juror.

Let me hear from the Government.

MR. MCLAUGHLIN: We agree, Your Honor.

MR. HOWARD: Your Honor, just so long as the juror is aware that it's the Court's call and not --

THE COURT: No, no, absolutely.

So I'll let Yolanda, because she handed it to Yolanda, know that she won't be excused for this reason but that I will be writing a letter explaining this to her employer. I'll call, and I'll write the letter. And I'll share the letter with you all like I said, but it will absolutely be from me. It won't mention anything about the parties or anything like that. All right.

Mr. Perez, anything further on the second note?

MR. PEREZ: Nothing else, Your Honor.

THE COURT: All right.

MS. KUDMAN: No, we're good.

THE COURT: And for Mr. Solages?

MR. FRIEDMAN: No objection.

THE COURT: Is the jury here? Are we ready?

Okay. We're still missing four jurors. At ease. I'm going to stay on the bench because the exhibits are now on this laptop, so I have to look at those autopsy pictures again and take advantage of the time to do that now. We'll let you know when the jury is here.

We're in recess.

(Recess from 9:00 AM to 9:04 AM)

THE COURT: We're ready. You can bring them in.

(Jury entered at 9:06 AM)

THE COURT: Good morning, ladies and gentlemen. We're ready to resume.

Counsel.

(Government witness, MARTINE MOISE, was previously sworn.)

CONTINUED DIRECT EXAMINATION

BY MS. PHENELUS:

Q. Mrs. Moise, yesterday you were asked -- and just so you know, I'm going to go back for a moment. Okay?

You were asked and you answered that you are aware of how arrest warrants are executed in Haiti.

MR. PEREZ: Objection, Your Honor.

THE COURT: Sustained.

MS. PHENELUS: Your Honor --

THE COURT: I'm sorry. We don't allow speaking objections. That objection will be sustained. You can raise it before court starts or you can raise it at the next break, but you need to move on. I sustained those objections yesterday.

BY MS. PHENELUS:

Q. Mrs. Moise, I want to discuss more about July 6. You talked about going downstairs and then checking on your children yesterday.

A. Yes. And I also would like to go back to yesterday as well because yesterday was a very emotional day for me. I believe that today I'll have more strength in order to be able to continue with the day. I also wanted to say that I spent 48 years at home before having to run because they tried to kill me.

MR. PEREZ: Objection, Your Honor.

MR. HOWARD: Move to strike, Your Honor.

THE COURT: So the objection is overruled.

Ma'am, the prosecutor really hasn't even asked you a question yet. So the prosecutor's going to ask a question. I respect that you have a lot to say, but in the procedure that we're having here, this is not an opportunity for you to

speak. It's an opportunity only for you to answer questions. That's how our system works.

So please listen to the question and only answer the question.

You may continue, Counsel.

MS. PHENELUS: Thank you, Your Honor.

BY MS. PHENELUS:

Q. Mrs. Moise, yesterday, when you said that you fled the country after 42 years, what was the amount of time that you actually wanted to say?

A. The amount of years I wanted to say yesterday was 48 years. Yesterday I said 42 years, and so before we started today, I wanted to make that correction.

Q. Okay. So let's talk about July 6, 2021. After checking on your children and going back up the stairs, you talked about the gunfire you hear. Could you tell us whether it's inside or outside the home?

A. They were outside. Had they been inside, they would have gotten us because the way the house is structured, there's no place to hide, and from the upstairs, you can see -- dominate the whole bottom of the house.

Q. And I'm going to stay on that for a moment. When you say the way the house is structured, what do you mean by that?

A. Once you go through the entrance door, you can see the dining room, and from the dining room, you can see the

upstairs with the bedroom.

Q. So as you go up these stairs and you're hearing the gunfire, at this point in time do you know how far the gunfire is?

A. I could not determine the distance, but I knew that they were very, very close. Every time you heard a gun fire, there was a piece of brick that fell off. What I mean is cement when I said brick.

Q. And in addition to brick, is there anything else breaking in the home?

A. I did not look to see what was breaking. I could only hear them. My focus was to get out from where I was and then go where I was supposed to be.

Q. So what could you hear breaking, if anything, beyond the bricks?

A. That's all I could hear, pieces of cement breaking.

Q. And at this point in time, you're going back up the stairs. You say you hear them close. When you initially awoke out of your sleep, were they farther?

A. It's the same position because the yard is not a very big, big yard. When the gunfire goes off, it's -- you hear it with the same intensity because it's the same space -- area.

Q. And when you say intensity, what do you mean by that?

A. In other words, the gunfire you're hearing does not go up in volume and does not decrease in volume. You hear the same

exact noise, but it never stopped.
Q. So as this gunfire is continuing and you're going up the stairs, besides your children, do you see any of those 30 to 50 men in uniform, those law enforcement inside the home? What do you see?
A. I was by myself inside the house with the children, with the president.
Q. So where are the security forces normally?
A. They were supposed to be outside, as I showed yesterday. Their post is outside the house. They're not posted inside the house.
Q. Is there a reason why they're not inside the house?
A. We never allowed any police officer to come into the house because, you know, that's where you reside and sometimes you're not dressed, and they're posted outside of the house.
Q. Mrs. Moise, you go upstairs, and you talked to the members of the jury yesterday about where you saw your husband. Where was he when you got inside the room?
A. I saw him -- when you go inside the room, I saw him on the other side of the bed.
Q. And when you say other side, what side is that? Left or right?
A. I don't know if you could put up the picture you showed yesterday. It would be easier then to show so that I can see where the door was so I can explain where I was situated and

where he was situated.

Q. That's okay.

So, Mrs. Moise, I'm going to show you now what's been marked for identification only as page 72 of Government's Exhibit 102B.

What is on page 72 of Government's Exhibit 102B?

A. My bedroom, where Joe and I used to sleep.

Q. And does this fairly and accurately depict your bedroom?

A. Yes.

MS. PHENELUS: The Government moves to admit page 72 of Government's Exhibit 102B.

THE COURT: Any objection to page 72?

MR. PEREZ: No objection.

THE COURT: So admitted.

(Government Exhibit 102B was received in evidence.)

MS. PHENELUS: May we publish, Your Honor?

THE COURT: You may.

BY MS. PHENELUS:

Q. Mrs. Moise, on this exhibit what view of the room is this?

A. There is -- from this view there is a filing cabinet. The person taking this picture would probably be standing by the filing cabinet in order to take that picture. And it's not far away from the door either.

May I please show where the door is?

Q. So, Mrs. Moise, I'll direct you to that.

So from this angle, you mentioned that there is a door. When you walk into the room, what would this angle be? Would this be the angle that you're referring to that someone sees when you walk in?
A. The person who stood to take that picture, the door would be to that person's left side.
Q. So, Mrs. Moise, when you walk into the room, what side of the bed is your husband on? And could you please mark that for the members of the jury?
A. He's on this other side.
Q. And for the record, that is the right side of the bed?
A. Yes. If you stand in front of the bed, it will be on your right-hand side.
Q. And then where did you -- where did you go?
A. When I went in, I went to him where he was, and I asked him, Who did you call? And he named the people he had called, and then he told me, Go on the other side.
Q. For the record, that other side is the left side of the bed?
A. Yes, on the left side of the bed.
Q. Mrs. Moise, when you walk into the room, as you all are in the room, are the lights on or off?
A. They were on.
Q. Now I'm going to show you what's already been admitted into evidence as Government's Exhibit 101A. Could you please

mark for the members of the jury from this aerial view where your bedroom would be at this point in time when you're upstairs?

Let the record reflect the witness has marked the left side of the house with the dark-colored roof.

Mrs. Moise, when we left off yesterday, we talked about you being on your stomach; is that right?

A. Yes.

Q. And then you described the door opening. Could you please tell us what happened when the door opened?

A. Once I heard a big noise as the door was opening, and my body was shaking up and down. And then that's when I felt that I had been hit with a bullet because I heard the noise, "brrrrr."

Q. And when you say a bullet, was it one bullet or multiple? You made this sound.

A. There were several. That's what I heard. And then my body was shaking up and down.

Q. Do you know how many times you were shot?

A. Not really. You only hear the noise, "brrrrr." Even after all this time, I cannot count how many. There was a big wound on this side.

Q. What is this side that you're referring to? Could you describe with words what side that is?

A. When I went under the bed, this side was outside of the

bed, and that's where I got shot.
Q. When you say you were underneath, yesterday you described how you were positioned. Were you completely underneath or not?
A. No.
Q. Okay. So what areas of your body do you know has bullet holes or damage?
A. The bullets came from here all the way to my thigh.
Q. Anywhere else on your body you were shot?
A. Yes. Also in my elbow.
Q. Mrs. Moise, you've made this sound a few times, "brrrrr." What gun -- if you know, what is that? What type of gun is that?
A. I don't know because I didn't see it.
Q. Now, after you're shot several times, do you know how much time has passed from when you first awoke around 1:00 AM to when they enter and you're shot?
A. Not really, but it could be maybe 45 minutes.
Q. Now, even though you were shot multiple times, were you still conscious?
A. Yes, I was conscious.
Q. As you're laying on your stomach, what, if anything, could you see?
A. As I was laying on the floor, I could see Joe on the other side. As they shot at me, I saw his face disfigured. As

someone who was telling himself, Okay, it's over.

I lifted my head from underneath the bed. I lifted my right finger so he could see that I was still alive.

Q. And, Mrs. Moise --

A. Automatically, once I did that, I saw him gaining a little bit of strength. He stopped looking at me, and he looked at the person that was at the bottom of his feet, straight in the eye.

Q. And, Mrs. Moise, as you're looking at your husband from underneath the bed, do you know the positioning that he is laying?

A. He was laying on his back.

Q. What happens after you are shot multiple times?

A. After I finish kind of letting him know that I was still alive and that I had not died, I don't know if they were looking for something in the bedroom and they finally found it. I heard someone giving his description who answered to him. And automatically, right there and then, the person that was standing at his feet shot him. It's the very same sound I heard while I was being shot.

The way I felt my body shaking up and down is the same way I saw his body. And he made a sound like an "oh," like someone who was going to say something. Right there and then, I closed my eyes because I had no more hope that anyone would come to my rescue.

Q. Mrs. Moise, I want to go back for a moment.

You mentioned that the people in the room -- in your bedroom -- that you think that they were looking for something. Why is that your thought?

A. It's in relationship to where I felt they were standing, and that position is where the president used to put his documents.

Q. What, if anything, could you hear them saying as they are looking for things is what you're mentioning that they're looking?

A. "No, that's not it. No, that's not it. No, that's not it. Yes, this is it."

Q. Now, what language are these people speaking?

A. They were speaking in Spanish.

Q. Do you understand Spanish?

A. Yes, I understand Spanish because I spent two years studying Spanish.

Q. And these voices, were they male or female voices?

A. Only male.

Q. Now, you mentioned that you could sense where -- their positioning. Where is it that you could sense their positioning?

A. I felt that they were at the bottom of the bed.

Q. Now, you mentioned that you were on your stomach?

A. Foot of the bed. I'm sorry. Correction. Foot of the

bed.

Q. You mentioned that you were on your stomach, Mrs. Moise. How is it that you could sense that they were at the foot of the bed?

A. Because even though you're under the bed -- lying down under the bed, you can feel the position of the people given their voices in the position they are at.

Q. Now, showing you what's already been admitted into evidence as page 83 of Government's Exhibit 102B. Mrs. Moise, could you please circle for the members of the jury where it is that you could sense the male voices or these males in your room?

Let the record reflect the witness has circled the foot of the bed where there is blood marks across.

Mrs. Moise, you then mention that there was a description that was being discussed. Could you talk more about that?

A. What I understood in the discussion that was going on about the description is that they were talking about someone who was slim, someone who was Black, and tall.

Q. And then after this description, what happens?

A. After the description, they just went ahead and shot the president.

Q. Now, Mrs. Moise, and you then said, and you heard the same sound as your husband is being shot. What is that sound?

A. The same noise I heard for myself that I heard for him as well, "brrrrr."
Q. What happens after your husband is shot multiple times? And first, let me just go back for a moment. As he's shot, you said you could see him shaking up and down.
A. Yes, the body was shaking as he was being shot.
Q. What happens after that?
A. After that, I closed my eyes. I didn't open them again, but I could hear the people that were inside the house walking all over the house. The only thing I understood about what they were saying is, What's behind this door?
And someone answered, This is the backyard. Then they asked again, What's behind that door? And someone answered, It's the pool. And I did not understand the rest of the conversation.
Q. Now, as they are speaking, are they still speaking Spanish?
A. Yes.
Q. And then, Mrs. Moise, you said that they are walking throughout. What, if anything, could you hear them doing?
A. It's like they were rummaging through the house. You hear things falling on the floor. Things were falling here and there.
Q. So you're mentioning rummaging through the house. We're looking at page 83 of Government's Exhibit 102B. When you

went to sleep at 10:00 PM, were the items all throughout your house in this same manner?
A. No.
Q. So they rummage, and then they're looking and describing the areas around. What else do you hear?
A. I heard them speaking. I could no longer understood what they were saying, but I caught two names: Jefe and Pibe.
Q. Mrs. Moise, had you ever heard the name Pibe before?
A. No, this is the only time I heard it. I never heard it before, and I never heard it after.
Q. And you said you understand Spanish. What does "jefe" mean?
A. "Jefe" in Spanish means "boss."
Q. Now, you were just talking about them rummaging through your bedroom. At some point later, had you discovered that you had valuable items missing?
A. No, no. At the time, no. I was not looking. I was not searching, trying to determine whether or not I had lost some items. The minute the possibility came about for me -- for us to leave the house, you leave the house.
Q. Mrs. Moise, I'm not referring to on July 6. I understand. But at some point did US law enforcement make contact with you about items missing?
A. Yes.
Q. I'm now showing you what's been marked for identification

as Government's Exhibits 160A, 160B, and 160C.

MS. PHENELUS: Your Honor, may I approach the witness?

THE COURT: You may.

THE WITNESS: Yes.

BY MS. PHENELUS:

Q. Mrs. Moise, I am now showing you -- excuse me -- I've already showed you what's been marked as Government's Exhibits 160A, 160B, and 160C. What are they?

A. One, it's the first one, is a necklace. It's mine. There's also a watch that's mine. And there's also another watch. It was a gift from an ambassador to Joe.

Q. And are they in the same or substantially same condition as they were in as you remember them in 2021?

A. Yes, I see they are in the same conditions.

MS. PHENELUS: Your Honor, the Government moves to admit Government's Exhibits 160A, 160B, and 160C into evidence.

THE COURT: Any objection?

MR. HOWARD: None, Your Honor.

THE COURT: So admitted.

(Government Exhibits 160A, 160B, 160C were received in evidence.)

MS. PHENELUS: May we publish, Your Honor?

THE COURT: You may.

BY MS. PHENELUS:
Q. Mrs. Moise, I'm now showing you what's been already admitted into evidence as Government's Exhibit 160A. What is this?
A. It is my necklace.
Q. And where was this on July 6, 2021?
A. In a drawer where I kept all of my jewelry at home.
Q. And where is that in your home?
A. If you're standing in the same position where the person who took the picture, it's on your right-hand side.
Q. I'm now showing you what's already been admitted into evidence as Government's Exhibit 160B. Mrs. Moise, what is Government's Exhibit 160B?
A. This is a watch. It was a gift to Joe from an ambassador before he left his mission in Haiti.
Q. And where was this on July 6, 2021?
A. This watch is always on the dresser, next to him.
Q. And I'm showing you what's already been admitted into evidence as Government's Exhibit 160C. What is this?
A. This is my watch.
Q. And where was this on July 6 and July 7, 2021?
A. I can't -- I don't know. I'm not able to tell you because this is an everyday watch for me. It was either on the nightstand next to me or on the table where I keep all my jewelry. This is an everyday watch for me.

Q. And, Mrs. Moise, when I mentioned 160A and 160B, I said on July 6. Also, on July 7, 2021, where were these pieces of items?
A. They were in the room.
Q. I want to go back to the early morning hours of July 7th, 2021.
After they're rummaging through your home and mentioning these names, Pibe and Jefe, what happens next?
A. They rummaged through the room, and then they left.
Q. What, if anything, was done to you before that?
A. Before they left, I felt someone grabbing my leg. That person pulled me and flipped me on my back, and I felt a flashlight in my eyes.
Q. And what did you do?
A. I didn't do anything. I could not do anything. I was bleeding from the mouth and from my nose.
Q. So, Mrs. Moise, these people then leave. What happens after that?
A. Once they left, I heard nothing, no noise, nothing at all in the neighborhood. I tried to get up so I could say to Joe, "I'm alive. Let's go to the hospital." I attempted to get up, and I realized that I was sliding, I was falling off, and I realized that I was soaked in blood.
I tried to slide on my back -- on my butt to go near Joe, and I felt that my hand was stuck to the floor. So I

used my left hand to lift my right hand. Then I continued to slide to go near him and tell him, "Let's go to the hospital."

Then I look at him, and I saw that his eyes was out. And I asked myself, and I cried to God. I said, "God, why is it in one night -- why am I still alive?" I lost my husband. I lost both of my children. I lost everyone who was keeping an eye on the house. Why was I still alive?

What I'm saying then -- I was sitting at the foot of the bed, and I saw Vilson, the gentleman who takes care of the house. And I saw him coming, and I said, "Vilson, please, why don't you grab a tie from the president closet so you could tie up my arm." And I asked God for forgiveness because I wasn't supposed to ask him any questions.

Then Vilson tied up my arm. Then I saw my children showing up.

Q. Mrs. Moise, I want to go back for a moment.

A. Okay.

Q. You mentioned that you slid yourself across the floor to get to your husband. Where did you slide?

A. I slid from the side where I was laying down on the floor, and then I went to his side, sliding.

Q. And so I'm going to show you what's already been admitted into evidence as page 83 of Government's Exhibit 102B.

MS. PHENELUS: May I have the HDMI, please. Thank you.

BY MS. PHENELUS:

Q. Mrs. Moise, could you please mark for the members of the jury the direction in which you slid across the floor to see and check on your husband.

Let the record reflect the witness has marked from the left side of the bed to the foot of the bed, and then going to the right side.

Mrs. Moise, as we look at page 83 of Government's Exhibit --

A. I need a break, please. I'm sorry. And I need some water. If you could please give me some water.

THE COURT: Officer, could you give her some water. Is there water there?

THE WITNESS: If it's okay -- if you don't have any water, it's okay. It's fine. Just give me some time.

THE COURT: We have water, ma'am. Just give us a minute.

THE WITNESS: Just let me compose myself, please.

Yes, we can move forward. Once you bring the water, I'll take a sip of water. Yes, let's continue. I believe I can.

MS. PHENELUS: Okay.

THE COURT: Somebody went to get the water; no?

Give us one moment, ma'am.

MS. PHENELUS: Your Honor, would you like me to

continue or wait?

THE COURT: She said she just needed a sip of water. I'm hearing the door, so we're going to have the water here in a minute.

You can resume, Counsel.

MS. PHENELUS: Thank you, Your Honor.

BY MS. PHENELUS:

Q. Mrs. Moise, you just marked for the members of the jury the path in which you slid to see your husband on the other side of the bed.

Whose blood is that across the foot of the bed?

A. It is my blood.

Q. And you mentioned that you could see your husband once you got to him. Could you describe what you saw?

A. He was laying down, and one of his eyes -- his left eye was gone completely. It's almost like it came out of the orbit. That's when I realized that he was dead and we would not have a chance to go to the hospital.

Q. Then you mentioned that someone came upstairs. Who was that?

A. Vilson, the person who takes care of the house.

Q. And what happened after that?

A. I asked him to go get a tie for me, and he did so, so I could tie up my arm. While he was doing so, he was tying up my arm. My children came up, and shortly after my children,

the people, the team who was supposed to help us out and save us, they showed up.
Q. What was the purpose of you asking him to help you tie your arm?
A. Because I felt weak, and I felt that I lost a lot of blood. If I didn't tie it up, I don't think I would have had the chance to make it to the hospital because the blood flow never stopped.
Q. Then you mentioned that your kids came upstairs too and there was a team that came. Who was a part of that team?
A. It was the Paraison team. His full name is Vladimir Paraison.
Q. Anyone else?
A. Then Ben was also with Paraison. He's always with me whenever I have to go out.
Q. And this Ben who is always with you normally, who is that, and why would he always be with you even before July 7th?
A. He was my -- my -- part of my security detail attached to me. Whenever I'm going out, even though I have a team who is there for my security, Ben is always with me.
Q. So Ben and Paraison, your kids, and the house manager, what do you all do next?
A. After I tied up my arm, I got up from the floor, and they took me downstairs because we needed to take a car and make it to the nearest hospital. When I was going down the stairs,

I -- you know, my heart was tightening up because I thought I was going to walk over a corpse among bodies, among bodies. As I was crossing the yard to get inside the car, I didn't see anyone.
Q. Mrs. Moise, you mentioned that you would have -- you imagined or you thought you would have seen bodies. Why?
A. Because I thought that the people who were in charge of our security posted in the yard, there is no way that they would have allowed anyone to come in without fighting -- defending us. I thought that if they had a chance to arrive to us, it was because they were all dead.
Q. And when you say "they" had a chance to arrive to you, who are you referring to would have a chance to enter your home and arrive?
A. I am speaking of the people who entered the room, killed the president, and also shot me.
Q. And you mention that -- you thought that there would be the security -- is this the 30 to 50 that you were mentioning yesterday, those three levels of security?
A. Yes.
Q. Mrs. Moise, you're going down the stairs, and you're thinking you would see bodies. Did you actually see any dead bodies?
A. No, I didn't see anyone.
Q. Now, you said that Vilson --

A. Vilson, yes.
Q. Your house manager and others were helping you. I want to go back for a moment.
Do you know where Vilson was the entire time before he came to help you?
A. No. I didn't know.
Q. Do you know where he normally sleeps?
A. Yes. His quarters is attached to the house. He slept inside the house but in the -- at the bottom, downstairs.
Q. And is that normally where he sleeps?
A. Yes, that's where he sleeps.
Q. And when he assisted you in tying your arm and then going down the stairs with others, do you know a sense of time of when that happened after the shooting?
A. No, not really.
Q. Mrs. Moise, as you're going down the stairs, you don't see any dead bodies. What are you hearing?
A. I didn't hear a thing. It was as though you were in a cemetery.
Q. What happened next?
A. The team took me and took me to a hospital.
Q. A hospital where?
A. A hospital in Pétion-Ville. At least, it's a place that's further down from Pétion-Ville, and the name is Canapé Vert.
Q. And if you know, what happened while you were there at the

hospital in Pétion-Ville?
A. I did not know much about what was going on because I was at the hospital and disconnected from the outside. I know that there was a lot of shooting. That I know because while I was in the room that I was, they brought over a police officer who had been shot as well. And because of security, they had covered my face so I could not see the police officer that was brought in.
Q. Mrs. Moise, where were you taken after this hospital in Pétion-Ville?
A. They got on a plane with me, and I was brought here to Jackson.
Q. What plane? Who brought you? First, let me ask what plane?
A. A hospital plane, but I don't have much information concerning that.
Q. And then you said you were brought to Jackson. Where is that?
A. Here, Florida.
Q. I'm now showing you what's been marked for identification as Government's Exhibit 93A.
Mrs. Moise, what is Government's Exhibit 93A?
A. That's the Caribbean map.
Q. Anything else?
A. Well, up at the top, you can see Florida. You can see

Cuba, Jamaica, and Haiti.

Q. Does this fairly and accurately depict the map of Haiti and Florida and other islands?

A. Yes.

MS. PHENELUS: The Government moves to admit into evidence Government's Exhibit 93A.

THE COURT: Any objection?

MR. FLORES: No objection.

MR. HOWARD: No objection.

THE COURT: So admitted.

(Government Exhibit 93A was received in evidence.)

MS. PHENELUS: Permission to publish?

BY MS. PHENELUS:

Q. Mrs. Moise, could you please mark for the members of the jury where you were flown from Haiti and to Jackson?

Let the record reflect the witness has marked a line from Haiti to Miami on Government's Exhibit 93A.

What happened when you arrived to a hospital in Florida or Miami?

A. Once I got to the hospital, there was a gentleman talking to me, and then after that I know nothing.

Q. How were your injuries cared for?

A. I underwent several surgeries. And after each surgery, there would be a group or a team of doctors that would come by to see how I was doing.

Q. What were the results of those multiple surgeries?
A. The result was that I had some wounds on this side, and they healed them -- gunshot wounds. I also had all over my butt -- and please forgive me for having to say "my butt." Also, on my thigh, on my arm.

The doctors were insisting, they said that the way the arm was, they would probably need to reconstruct it, that they would try to do the maximum best they could, and that they would do the best that they would -- they could for the rest of the arm to see if they could reconstruct it back. They said I would be very limited in lots of activities but that they would try to do their best.

So I've had to learn to do a lot of things with my left hand because I was right-handed; I was never left-handed. Given the fact that I cannot bend my right arm, there are lots of things I cannot do because I can't even eat with my right arm. I cannot style my hair, comb my hair because I can't reach. And the pain there has never gone away.

MS. PHENELUS: Thank you. No further questions.

THE COURT: Cross-examination.

MR. FRIEDMAN: Your Honor, before we go into cross, can we have a sidebar?

THE COURT: Sure.

(The following proceedings were held sidebar:)

THE COURT: Yes, sir.

MR. FRIEDMAN: The Government filed a 1302 prohibiting us from admitting the Haitian charging document, and we had a hearing on it. The Court granted the motion but without prejudice, and the Court set up some parameters for us if it involved motive and bias and things like that.

And during the cross-examination, if we go -- I just don't want us to create an issue here by bringing up the fact that she was charged in Haiti initially under indictment with the death of her husband and to ask her questions about that and the pending investigation that's going on, and I think that's fair game.

THE COURT: Hold on. I think I made clear that they're allowed to ask. What you can't do is bring the charging document. That's not allowed. You can ask her as you would be able to ask any witness. You can probe into her bias. You can ask if she's been charged.

I think the state of things is that she's not charged because the first indictment was dismissed and there's nothing pending, so you proceed at your peril when you ask her those questions.

MR. HOWARD: Can we ask if she was charged? "Have you been charged?"

THE COURT: You can ask her if she was charged. If you ask her if she was charged, she's going to tell you then those charges were dismissed.

MR. FRIEDMAN: We can ask if she's aware of the pending investigation that's taking place right now where they're investigating with the assistance of the Government and --

MS. PHENELUS: It's --

THE COURT: You have to let him finish, and then I'll let you respond.

MR. FRIEDMAN: We should be able to ask about the pending investigation, if she's aware. That's -- in every case when somebody's got a pending investigation, we can question them --

THE COURT: I think that's what I said when I ruled. I think I was pretty clear that you couldn't put the documents in but that you would be allowed to ask her questions.

But let me hear what the Government's response is.

MS. PHENELUS: Your Honor, I recall very differently. I know that you did say you could not put the document in. But you also said, Your Honor, that the charging document -- because it's not currently active and unless they charge her again, then they can go into the details of that.

But I recall, Your Honor, that you said that they cannot -- they can only ask sort of up to a limit. And it did not include "were you charged" because that would be irrelevant, and that was part of your ruling. The document and the indictment is out, and so they should not be questions

that they're able to ask.

THE COURT: I know I didn't say that because it's absolutely perfectly appropriate. It goes to her bias, right?

Look, I don't know that the jury is going to -- it will be up to the jury to believe whether or not -- whether she is making this up to somehow save herself. That will be up to you all to try to make that -- link that. That's the argument.

But they're allowed to question her. What they're not allowed to do is to show her the documents because that document is never going to be in evidence. It's clearly hearsay. They can ask her because what they are probing is what her motivation might be to testify falsely, so...

MS. PHENELUS: My only concern, Your Honor, is if there's any mention that it's at the assistance of the US Government, that is completely false, and so to phrase a question that the Haitian Government -- the US Government is assisting the Haitians as they investigate further, that is not -- they're two different sovereigns and two independent investigations. That's what he just said.

THE COURT: You're not going to be asking her questions about the US involvement in it because that, I do recall that the Government flat-out said they had nothing to do with that. So you can't be asking her questions that -- you know better -- you have no foundation to ask her that --

MR. FRIEDMAN: The Government represented that they have nothing to do with what's being investigated at Haiti. They didn't ask for the support of the US Government and the Canadian Government. They've represented -- I mean, this is just an open-source media.

But is the Government stating on the record that the United States Government is taking no part in assisting Haiti with their investigation right now?

MS. PHENELUS: No. We are not working hand-in-hand with the Haitian Government.

THE COURT: That wasn't the question. The question is whether or not --

First of all, can you ask this woman questions for the next 15 minutes without getting into this? Because my patience --

Hold on. Hold on. We have a record here. My patience for the sidebars is already at zero, right, because they're unworkable with the court reporter, is the problem, right.

So this is stuff that we knew this morning. I get here at 8:15. We have a break coming up in 20 minutes. The jury gets antsy with me, so let's just keep it rolling until 10:30. Okay?

MS. PHENELUS: Thank you, Your Honor.

(The following proceedings were held in open court:)

THE INTERPRETER: Your Honor, from the interpreter. Mrs. Moise would like to use the restroom, please.

THE COURT: We have a break coming up in 15 minutes, ma'am. Can you wait 15 minutes? All right. We will take our break at 10:30. Thank you, ma'am. I appreciate that.

CROSS-EXAMINATION

BY MR. HOWARD:

Q. Good morning, ma'am.

A. Good morning.

Q. My name is David Howard. I represent one of the defendants.

I'd like to begin by offering you my sincere condolences for the horrific experience that you had and the loss to you and your family; however, I have some questions that I need to ask you, if you'll indulge me.

You have been interviewed by law enforcement agents in the United States; is that correct?

A. Yes.

Q. On more than one occasion?

A. Yes.

Q. And you gave statements, and reports were written?

A. Yes, I think so. I've given statements, but I've never seen the reports.

Q. Okay. So in preparation for your testimony, you were not shown the contents of any of the reports that were generated

as a result of the interviews that you were subjected to?
A. No. While I was at the hospital, I spoke to the FBI, but I've never seen those reports.
Q. Okay. You spoke to the FBI at the hospital on at least two occasions; correct?
A. I think so. I don't recall exactly how many times I spoke to them. I spoke to them at the hospital, and I also went to their place where I was invited to come and talk to them.
Q. Okay. I want to take you to, unfortunately, the time of this incident. And you went to bed between 10:00 and 11:00?
A. I went to bed around 10:00.
Q. Okay. And did you get back up at any time and use your phone after 11 o'clock?
A. I don't recall. Once I go to bed, I don't wake up to call anyone.
Q. Okay.
A. I go to sleep, I go to sleep.
Q. Okay. So if there are any phone records indicating calls from your phone after 11:00 PM that night, it would have been somebody else that was using your phone?
A. If the call was placed after I fell asleep, it could have very well been Joe who placed the call because the phone, once I go in, it's always in the bedroom with me.
Q. Okay. Is it customary for -- or was it customary for your husband, the former president, to use your phone to make phone

calls, or does he have a phone of his own?
A. He has his own phone, but if need be, sometimes he uses mine to place calls. And it's not a matter of him being a president. It was customary. And the phone that I had is not -- I didn't get it when I became first lady or he became president. I've always had that phone.
Q. Okay. All right. So at about 1 o'clock in the morning, you hear gunshots?
A. Yes.
Q. And it awakens you and your husband?
A. Yes.
Q. And I imagine, as you say, it must have been terrifying?
A. Yes.
Q. And were these shots that you were hearing in the distance, or were these shots that you were hearing hitting the walls of your house?
A. At first, when I was hearing the gunfire, it was kind of far. And then as they drew closer, every time you heard a gun fire, it's as though it was part of the house that was falling apart. But, again, when I said far, I don't mean very far. I mean in the backyard.
Q. Okay. Tell me. You said you understand Spanish; right?
A. More or less.
Q. More or less?
A. Less. Because I learned it but never got a chance to

practice it.
Q. Okay. Did you live in Spain for a spell?
A. Not really, no.
Q. Okay. And you speak English as well?
A. I speak more English than Spanish.
Q. Yeah, you're more proficient in English than you are in Spanish?
A. Yes.
Q. And --
A. Because I had the opportunity -- my children attended a school in Port-de-Paix, which was an English school.
Q. And you've done interviews like with the news and what have you in English?
A. I've done some interviews in English, yes.
Q. So before my question is translated to you, you understand what I'm saying?
A. I do understand.
Q. Is there a reason that you can't communicate with me in English, then?
A. Yes.
Q. That would be?
A. I don't want to have terms being used that I do not understand. Getting justice for Joe is very important to me. I don't want to miss anything or not understand something.
Q. Okay. Fair enough.

So at 1 o'clock when you hear these gunshots, you awaken, and after having brief conversation with your husband, you head downstairs to your children?
A. Yes.
Q. And your children weren't minors. They're adults, but you're a mother, and a mother is a mother; right? So your first instinct was to go to see about your children?
A. Yes, you are correct.
However, I went down -- I went downstairs because I knew that if I didn't go downstairs, they would be coming up. And I didn't want them to come up, as they were shooting, for them to be hit by a bullet. So I went downstairs to tell them, "You better stay in your room."
Q. Were there bullets coming through the window of your bedroom at that time, before you went downstairs?
A. I don't know where the bullets were going. I only could hear them. My focus was to run down the stairs and run back up to go to Joe.
Q. I understand.
But my question is, there is a window in your bedroom; correct?
A. Yes, it does have a window.
Q. And before you went downstairs to see about your children, had any bullets come through the window of your bedroom, as best as you can recall?

A. I don't know because the windows are covered with draperies, with curtains. I could only hear.
Q. Okay. You understand -- my question is whether bullets came through the window. I guess they would have come through the curtain as well. Did you hear the window of your bedroom shatter as bullets were coming in?
A. I could only hear the noise of the bullets -- of the gunfire. I didn't verify the curtains.
Q. How many dogs did you have at the time, in the house?
A. Three that belong to us and another stray one that we got from the streets. The one that we took in came to give birth in front of the gate, but the only dog that was always inside the house was Lilah -- Delilah. The other ones would never come into the house.
Q. Okay. So was Delilah barking, making noise?
A. No, because the children were holding her mouth -- muzzle. She was shaking a lot.
Q. Okay. You told us that you went downstairs and you told the kids to get in the bathroom and muzzle the dog so that the dog wouldn't alert --
A. I told the children to go into the bathroom because there was no window so that they wouldn't be hit by a stray bullet. They're the ones that covered the dog's mouth so that the dog wouldn't bark.
Q. Okay. And they had thought to do that before you had

arrived downstairs to tell them to go in the bathroom?
A. Yes.
Q. Okay. You told us you went downstairs on all fours?
A. Yes.
Q. You have a two-story house; right? That house.
A. Yes, it has a first floor and then the upstairs, the bedrooms.
Q. So the entrance to the house, in order to enter your house, would be on the first floor, not the second floor?
A. Yes. Yes. The entrance doors are on the first floor.
Q. And so anybody who breached your house and went through the door, they would be going downstairs before they got upstairs; correct?
A. Yes, that's what I said a little while ago, that from downstairs, the first floor, you can dominate and see the upstairs.
Q. But your thinking was that you wanted to make sure that your kids stayed downstairs where the attackers would first come in and make sure they didn't come upstairs. Explain your thinking on that.
A. I thought that the bathroom of Jovenel's bedroom, since it had no window, was one of the safest places in the house. And that's the reason why I had them stay there.
Q. Okay. So it wasn't so much that you didn't want them to go upstairs. It's just that you knew that the safest place in

the house was Jovenel, Jr.'s, bathroom because it had no windows; right?

A. And if I didn't go downstairs, they would have come upstairs. And if they had been upstairs, they would have been dead.

Q. Okay.

THE COURT: All right. Counsel, it's 10:30. Are you going to another line of questioning? Is this a good time for a break?

MR. HOWARD: It's a great time. Thank you.

THE COURT: Ladies and gentlemen of the jury, we're going to take our 15-minute break.

Ma'am, if you need more than 15 minutes, let me know. I know that you've wanted a break for a bit, so we'll give you the time you need. We'll resume, like I said, in about 15 minutes or so.

Remember, don't look anything up, don't talk to each other about the case.

(Jury exited at 10:32 AM)

THE COURT: All right. Let's take ten minutes so I can get my notes from the motion in limine and then come back in ten minutes so we can discuss the issue that was raised at sidebar before the witness testifies.

MR. HOWARD: And we should excuse the witness while this is going on.

THE COURT: Correct. I thought that's why it was easier so the witness could -- she needs to use the restroom. She can be excused, and we'll bring her back in when we're done.

MR. DO CAMPO: What time are we breaking for lunch?

THE COURT: We're trying to break at noon. From noon to 1:00 is going to --

MR. DO CAMPO: That's going to be the plan going forward?

THE COURT: I'm going to try to stick to close to noon. The jury's been good so far about being here when I tell them, so let's -- I think we're going to stick to noon.

(Recess from 10:33 AM to 10:46 AM)

THE COURT: Counsel, I appreciate dealing with things during the break limits, our break time, but we really do have to be, as best we can, careful with the sidebars. Generally it annoys the jury, and two, as much money as we spent on that microphone that you saw on the side, it's very difficult for the court reporter.

Now, I've looked at my notes, and I've looked at the motions in limine that were filed about this. This is where I thought I was then, and I think it's where I'm still now, but you'll correct me if I'm wrong.

A line of questioning that suggests that the previous Haitian charges were dismissed because of a cooperation with

the United States is improper. Any line of questioning that suggests that her testimony here, if it's favorable to the United States, is favorable to her because the United States is going to help her in any future charges is also improper because the Government in writing has said that there are no promises of leniency or help that the United States has offered her or would be prepared to offer her should she be charged again.

I think all of that is foreclosed because you don't have a good faith-based reason to ask the question. I'm pretty sure I said this at the hearing, although my notes are not as good as they should be. I suppose it's hard to talk and write. To the extent that the defense wants to cross-examine her in a line of questions that would suggest that to the extent her testimony is going to convict other people of this crime, that she has that bias because she doesn't want to be associated with the crime.

That's a different line of questioning that isn't implicating the more traditional cross-examination on this point, right. You're testifying this way because the Government wants you to testify and if the Government is happy with this testimony, then you're going to get a pass for this or that. There's no basis for that.

But if they're questioning her on the -- if these men are guilty, if other people committed this other than the

people that you're associated with, that's good for you because you're implicated in this. You're under investigation. You've been implicated in this crime.

Why is that -- I get it. We're carving things pretty thinly, but that road, I think, is available to the defense. My initial ruling, of course, had been without prejudice because we didn't know, right, if there would be, by the time the trial started, whether there'd be any actual change in the charges, if you will, that would make this line of questioning more difficult or less narrow.

But let me hear from the Government. That's just traditional bias, cross-examination. Why can't they do that?

MR. WU: Your Honor, I think we are on the same page, but I do want us to be very, very precise. And I appreciate, like you said, we're slicing the salami pretty thin, but I think you were doing it at exactly the right point, which is they can question about her bias based on their -- if they have some good faith basis to believe that she was involved in these events herself, meaning she might have some culpability.

The words that we do not think can come out of their mouths in cross-examination are: indictment, charging document, whatever equivalent exists in Haiti. The mere reference to that charging document that once existed that, by the way, has been annulled, is a nullity, does not exist anymore.

That is absolutely improper under the precedence that we cited in our motion, so I'm not going to reiterate those. But I think as long as that's the line that we're holding to, we understand they can ask, for instance -- they can just straight-up ask, "Were you involved in your husband's murder? Did you orchestrate it? Did you assist in it?" et cetera, assuming they have a good faith basis for that, which I'm personally skeptical of, but they can attend to their own ethical obligations there.

But that's all about the facts of what she did, not the fact that, you know, in 2022 or 2023 a Haitian court or judge once recommended charging her and then that got annulled by a Haitian Court of Appeals. All the Haitian legal proceedings, that, in our minds, is completely out-of-bounds, again, for the reasons we laid out and the precedence that we cited in our papers.

THE COURT: But why can't they ask her if she's under investigation or had been under investigation? I get that the word "indictment," especially since it's been annulled and it's not anything that could ever be introduced here, is a different issue. But why can't they ask her, "Isn't it true that you're currently under investigation in Haiti for this?"

They have some basis for that, whether you think that that basis is sufficient, whether you think the people who are investigating her are right, wrong, corrupt, not. I think

that's enough for them to say she's under investigation. She might tell them no. I don't know what they're going to do if that's what she says.

But why can't they ask that question? I think they can ask that.

MR. WU: Your Honor, well, here is how I see the hierarchy. Conviction, you can always ask about. That's really bad -- bad if your witness got convicted.

Below that is pending charges. They often cannot even ask about pending charges unless they can show a promise of leniency from us, this government. Annulled charges, lower than that, cannot ask about that.

Investigation is lower than pending charges or annulled charges, so it gives all the same prejudicial inferences to the jury that this person is somehow -- because they're merely being investigated, that somehow implies that they've done something wrong. It's all the prejudicial problems that led to the case law that bars questions about pending charges --

THE COURT: I know, and the case law that you cite is on a different point. The case law that you cite is to suggest that their testimony would somehow -- because these are all cases where folks are testifying on behalf of the Government -- that the bias is because the Government is going to somehow give them leniency. That's a different issue.

Here, it's for a different purpose, right, which is to show that she has bias to shed criminal light on other people and not herself. That's a different line of cross-examination. Look, they're going to have to be very careful with it or I'm going to either stop them and/or I'll give them a limiting instruction so the jury understands what's going on.

But as long as their questions are "You're someone who is currently being looked at, so you have an incentive to lie about these folks so that the government of Haiti and whoever's investigating you doesn't investigate you anymore because they've got -- you know, if there's a conviction here if our client is involved, then that will be enough for Haiti."

Again, they're going to have to be careful with it, but I don't see what the issue is there. I understand the hierarchy, but that's for the other purpose --

MR. WU: Let me raise really quickly one more problem, which we also mentioned in our motion papers, which is the Haitian investigation was precipitated and based, just on the language of that original Haitian charging recommendation, in large part on Mrs. Moise's refusal to speak to investigators. In other words, predicated on her silence, something that we absolutely would not allow in this country.

And so I think that's a very important factor to take

into account as well. This is an investigation in a foreign country, not in the US. So it's something that proceeds under different rules, and we're kind of getting into all kinds of dangerous territory when we're allowing them to ask about a person who's being investigated essentially because they maintain the right -- something that they would have a right to, silence or non-self-incrimination, here in the United States.

THE COURT: If this were all something that had happened in the United States and she were testifying and the defense had reason to believe that the witness was involved and that the conviction of the defendant would lessen her culpability, irrespective of a charging decision, that would be proper cross-examination.

They're going to have to be careful with it because if I start hearing "Haitian indictment" and things like that, you know, we're going to be done. But this issue of her bias because she wants to shed light away from her, I don't see how that's improper.

Let me hear from the defense as to whether -- why shaving it that way is too thin or improper.

MR. FRIEDMAN: Judge, first of all, one of the bases for indicting her originally in Haiti had to do with her testimony and statements given to investigators in Haiti that she was hiding under the bed. And when they went to

investigate and saw that you cannot physically get under the bed or hide under the bed, they found that to be a little deceptive. So it's not just the fact --

THE COURT: So what's your question? Do you think you're going to be able to testify -- you testify, essentially, as to what the Haitian government was doing? Because I'm not let --

MR. FRIEDMAN: No, no, no, Judge, I'm just --

THE COURT: Okay. You can't talk over me because then you have no record because of the court reporter. So, please, one at a time.

MR. FRIEDMAN: No, I'm just bringing that fact out because the Government said that's the basis of the indictment because she refused to give a statement, but she did give a statement.

But, Judge, if you are allowing us to ask her about the pending investigation -- which I think is appropriate -- I think that's, you know, what we should be able to ask -- I think we are also permitted to ask about whether or not she had previously been charged or accused in Haiti, although dismissed.

THE COURT: For what purpose would you ask her that?

MR. FRIEDMAN: Well, for the purpose of the current investigation.

THE COURT: No. So this is my trouble with it.

Again, let's just imagine this were in the US. If somebody had been acquitted of something, right, you wouldn't be allowed to ask about it.

So I understand that she -- based on representations you've made, that there's currently, right, she's still currently being looked at. You can explore with her -- and I think it's in limited fashion -- "Isn't it true that you're currently under investigation for your possible involvement?" If she says yes, then I guess you get to ask her a few more questions. If she says no, you're going to be stuck because I'm not letting you show the jury or show her an indictment that's already been annulled or show her articles or anything like that. I'm not going to allow that.

MR. FRIEDMAN: What about if she says no to that question, can we ask, "Have you previously been investigated?"

THE COURT: No.

All right. Anything further?

MR. HOWARD: Yes, Your Honor. Just one. And I thought the Court had said at sidebar that we can ask about the indictment, we just can't show it, but I was incorrect there.

THE COURT: Yeah, because I went back to my notes. That's why I said, "Let's do this later." I went back to my notes. I pretty much -- and I think that's why it was without prejudice because it was this -- the issue was whether there

would be a new indictment by today, and there wasn't.

MR. HOWARD: The degree of her bias or concern as to what may come of an investigation that's currently pending would be heightened by the fact that it had already gotten to the point of her being charged previously. So we think it would be relevant for that.

THE COURT: Okay.

MR. HOWARD: So might we?

THE COURT: No, I disagree.

MR. HOWARD: Let's go on, then.

MR. DO CAMPO: Your Honor, before the jury comes out, Mr. Howard may want to display some exhibits. I'm connected to my unit here. Is there anything else that needs to be done so that I can show whatever he wants to show?

THE COURT: If you're asking me, that's a tough one. I know your cable was broken. Let's see if it works --

MR. DO CAMPO: No, the cable is fixed. It's plugged in.

THE COURT: Do you want to just try it out now?

MR. DO CAMPO: Yeah, that would be great.

MR. MCLAUGHLIN: Your Honor, if I may.

What exhibits is the defense showing?

THE COURT: Hold on. You can't take this one out.

MR. DO CAMPO: I think only things that have already been admitted.

MR. MCLAUGHLIN: Okay.

MR. DO CAMPO: He may want another picture from a house that you haven't admitted. Is that a problem? But only that. It's going to be in that same series, the house. That's it.

MR. DRAY: Also, 102, the diagram. I don't know if you guys admitted that.

MR. MCLAUGHLIN: As long as it's our marked exhibits and we know what they are, that's totally fine.

MR. DO CAMPO: Going forward, we don't have to square that with you if it's one of your exhibits?

MR. MCLAUGHLIN: Yes.

THE COURT: All right. Did it work?

MR. DO CAMPO: I don't know. It doesn't look like it.

Let's do this, Judge. If it works here, we'll see if the problem is my laptop or...

That's my desktop. So it's a problem there.

THE COURT: Let's bring the jury in. Let's bring the witness in.

(Jury entered at 11:01 AM)

THE COURT: Mr. Howard, you may resume.

MR. HOWARD: Thank you, Your Honor.

BY MR. HOWARD:

Q. Ma'am, when we left off -- I think this is where we

were -- you were saying that you have no recollection of whether or not bullets were coming through the window of your bedroom as you were going -- before you went downstairs to look about your children; correct?
A. I don't know if there was a bullet that went through window or not. I could only hear the gunfire and then every so often I could hear like a piece of cement falling off.
Q. You agree with me like if a bullet came through a window here, we might notice?
A. Under these circumstances, yes. But on the other hand, when you're hearing gunfire, you're not focusing on where the bullets are coming from. You just are thinking about surviving and trying to reach your children to save their lives.
Q. Okay. And even though you can't recall whether bullets had come through the window at that time, you thought it best for your safety to get on all fours to go downstairs; right?
A. Yes, go downstairs in order for the children not to come upstairs.
Q. All right. It makes sense.
When you got out of the room and you were going down the stairs, I take it you got up on two feet and ran down the stairs at that point; right? Or did you crawl downstairs on all fours?
A. The way the gunfire was going, there was no way you could

stand up and walk.
Q. Okay.
A. Because the noise never stopped.
Q. Okay. So do you recall when you were crawling on all fours downstairs whether you turned around and went backwards or you were crawling down? Do you recall?
A. No matter how I was going, I was going forward. When I was going down the stairs as well as going up the stairs.
Q. I understand. But it does matter.
Do you recall yourself going downstairs on all fours by turning around and backing down the stairs, or were you going forward, or do you not recall?
MS. PHENELUS: Objection. Asked and answered.
THE COURT: Overruled.
THE WITNESS: When I went down the stairs, I went down on all four. I passed the bedroom of Jormalie on all four. I passed Jovenel, Jr.'s, bedroom on all four, and the rooms are one next to each other.
BY MR. HOWARD:
Q. Okay. So you won't answer that question. Let me move on.
A. I am answering your question. It's the question you asked me that I am answering. I don't know.
Q. Okay. Let me clarify, then.
I take it that Jovenel, Jr., and Jormalie's rooms aren't along the stairs. I'm asking, as you traverse the

stairs going down, do you recall if you went forward or you backed down? That's the only question I'm asking.
A. I answered. I went forward on all four.
Q. Okay. So you did go forward. All right.
A. Forward. I never turned around nor when I was going downstairs or coming back upstairs.
Q. Okay. Thank you. I misunderstood you.
And you went downstairs and -- are there any -- strike that.
Are there any rooms upstairs that don't have any windows?
A. No, there are no such rooms without windows. All rooms have windows.
Q. Except Jovenel, Jr.'s, bathroom?
A. Only.
Q. Okay. And I want to get some clarity on the security detail that you say is typically at the house.
You said there are usually 30 to 50 men that are inside and outside; correct?
A. I mean inside. Inside the backyard and outside.
Q. Okay. I just need some clarification.
None of them actually stay inside the house where you reside? None?
A. No.
Q. Okay. And I think you mentioned the word "basement" at

some point. Is there a basement in the house in which you reside?
A. Yes.
Q. And there are windows in the rooms in the basement? All of them?
A. That's where the guards stay. I don't know if they have windows or not because I've never gone in.
Q. Okay. And did it occur to you that getting your children downstairs in a basement where the guards are might be your best bet? Did that occur to you at all?
A. From the house you have no access to the basement.
Q. Okay.
A. In order to go to the basement, you must exit the house, go through the yard, turn around the pool, and that's where the basement is.
Q. Okay. So the basement is actually not inside the structure that you're in. It's in the guardhouse that we saw yesterday?
A. It is part of the structure; however, there's no access from the house.
Q. Okay. So after you told your children to go in the bathroom, inside the shower, and pull the curtain, the shower curtain, and then lock the door?
A. I didn't have time to give them all these kind of instructions. I just told them to stay in the bathroom

because there are no windows and that they would be safer there. And at that time I told them I could not stay with them because I couldn't leave their father alone, and I went right back to their father.
Q. Okay. Do you recall -- well, strike that.
So you go back upstairs. Did it occur to you that maybe you and your husband should also get in the room with no windows, or no?
A. No, I didn't -- I didn't think about that.
Q. Okay. So you had some notion when you heard all this gunfire that the target of whatever assault had ensued was your husband and no one else in the house? Was that your impression?
A. For me, it was everybody that was in the house because, in my mind, if they were firing this kind of gunfire, then they were going to be shooting everybody.
Q. Okay.
A. For me, before I even saw the children, in my mind, the children were already dead.
Q. When you went back upstairs -- we saw Government's Exhibit 102B. While we wait on this photograph to be displayed, you got back in the house and you saw your husband on the right side of the bed?
A. Yes.
Q. And the right side of the bed is right by the window;

right?

A. I don't see the bed there.

Q. No, no, that's not it. 72.

I want you to focus your attention on the photograph -- this photograph, and this is Government Exhibit 102B, Photograph No. 72.

So you got back upstairs; right?

A. Yes.

Q. And you saw your husband on the right side of the bed that we see in this photograph?

A. Yes.

Q. And we see some drapes there, right, on the right?

A. Yes.

Q. And where was your husband exactly? Was he standing? Sitting? Lying? What was he doing?

A. He was lying.

Q. Okay. And he was lying on the same side where the window is?

A. That was on that side that he was lying down.

Q. And he directed you to the other side of the bed; correct?

A. Yes.

Q. And you were telling us that he had instructed you to go under the bed; right?

A. Yes, so that the mattress could protect me so that I would not get hit by a stray bullet.

Q. Okay. And the idea wasn't to hide under the bed. It was to seek the protection of the mattress?
A. There's no place to hide under the bed. Even he couldn't go under the bed.
Q. And that's because it's too low?
A. It's very low.
Q. Okay. And so he was under the bed on the side with the window?
A. Yes, he was on the right side of the bed.
Q. And so the mattress wouldn't have protected him. He was being chivalrous and made sure that it protected you?
A. I don't know because he told me to go on the other side, and I just did.
Q. Okay. And so now I wasn't able to see you. I was sitting in a place that I didn't have a vantage point.
You described yesterday how much of your body you were able to maneuver under the bed, but I didn't see. Could you describe, show us how much of your body was actually under the bed?
A. I said that I couldn't remember which part of my body I was able to get under the bed, but one thing I did say is that my head was under the bed.
Q. Okay. So the only thing we know for sure is that -- strike that.
Did you see your husband also under the bed to the

extent that he could get there?
A. No, he did not go -- he did not go under the bed. He was lying down right next to the bed.
Q. Okay. So you were the only one that was underneath?
A. Yes. My head was under the bed.
Q. Okay. So it took -- was it five or six minutes of the shots outside before people came inside?
A. I don't know how long it was, but it was a long time. It had to be at least 45 minutes.
Q. Okay. And during this entire time, you were hearing no fire -- counterfire? No one was in the house firing back?
A. The way the noise of the gunfire was going, you cannot tell whether they were returning fire or not. All you can hear is gunfire. That is why, before I left the house, I thought to myself that everybody that was in the house was dead.
Q. You said you recall giving a statement to law enforcement in the hospital -- the FBI?
A. Yes.
Q. And would you agree with me that in all likelihood, your recollection of events was best closer to the time of the events, or did your recollection get better as the days passed?
A. I believe that there are certain things that happen to you in life that no matter how much time goes by, you will never

be able to forget because, even though the time goes by, it's like a movie that never stops playing.
Q. Okay. I understand.
So on the 9th of July, 2021 -- that would have been within 48 hours of this incident -- you were interviewed at Jackson Memorial Hospital by two FBI agents. Do you recall that?
A. I do remember.
Q. And at that time, you told the agents that it took five to six minutes after the gunshots started for them to breach your house -- breach the door of your house?
A. No, it's more than five minutes.
Q. Okay. So you did not say that to the agent, then?
A. 45 minutes. It could not have been five minutes.
Q. I'm not asking whether it could or not. I wasn't there. I'm asking you whether you recall telling two FBI agents within 48 hours of the incident that it took five to six minutes before they got in the house.
A. I did not say that.
Q. Okay. So he must have been --
A. I did not say that it took five to six minutes.
Q. So he must have been mistaken, then?
A. I don't know. I never saw the report, so I can't tell you.
Q. Okay. So it was more like 30 to 45 minutes?

A. 45 minutes, I'd say.
Q. Okay. And you recall also telling the agents that you could not hear anybody firing back out with counterfire? All you could hear was people firing in?
A. That's the thing. I could not tell whether these gunfires that I was hearing were fire being returned back because all you hear are gunfire, and you don't know where it's coming from.
Q. Okay. So you didn't say that you couldn't hear anybody inside firing back out?
A. No one could have returned fire from the house where I was with the president because there were no armed agents -- armed agents. All the agents were in the yard -- in the back -- in the yard, and I heard the gunfire from the yard.
Q. Well, you wouldn't know this because it's not five, six minutes. It's 30 to 45 minutes. You're upstairs, and there're 30 to 50 people right next door as far as you know. You don't know whether anybody came inside.
How would you know that? Would that not have been their assignment?
A. I don't know whose duty -- who had what duty that evening or that night. All I can tell you is that no one could have entered the house because, the minute I was going down on four, I would have bumped into that person if there was someone inside the house.

Q. How long did it take before you went downstairs to the kids?
A. I don't know.
Q. Five minutes? 10 minutes? 15 minutes?
A. I don't know.
Q. So you can't approximate how long within the 45 minutes that you heard gunfire before they breached the house that you went down to the kids? It occurred to you maybe in the 30th minute is what you're trying to tell us?
A. The reason why I gave you 45 minutes is because when I heard the first gunshot, I looked at my clock. It was 1 o'clock. So I can tell you that from that point of time until the president was killed, yes, 45 minutes went by.
So going downstairs to see the children, it's within the 45 minutes. I cannot tell you how long it took me to go downstairs and come back up after I checked on the children.
Q. Okay. I'm asking you to try and recall some kind of approximation because when you recount the events, I think you told us yesterday the first thing is your husband says to you, "Honey, we're dead," and then you went down to the kids.
Are you saying that there might have been a 30-minute gap there that you have no account for other than that one statement?
MS. PHENELUS: Your Honor, objection. Asked and answered.

THE COURT: Overruled.

THE INTERPRETER: Would you rephrase your question, please, Mr. Howard?

BY MR. HOWARD:

Q. You gave us an account yesterday of the series of events beginning at 1:00 AM, and as one would imagine, the first thing you said is you were awakened and so was your husband. You were both terrified.

A. Yes.

Q. He looked at you, and he said, "Honey, we're dead"?

A. Yes.

Q. And then you say you went down to look about your children?

A. Yes.

Q. My question to you is this. Between the time that you were awakened by gunfire and your husband's exclamation, you're telling me that it could be as much as 30 minutes before you went downstairs to look about the kids and you can't recall anything else happening within that time?

A. Right after he exclaimed, "Honey, we are dead," I went downstairs to see about the children.

Q. Okay. So it would have had to have been on the front end of that 45 minutes; correct?

A. Front end of what? Can you be more specific?

Q. Yes.

There's a 45-minute period between the time you wake up and the time they come into the house is your best approximation?
A. Yes, approximately.
Q. At 1 o'clock, after you hear the fire and your husband says, "Honey, we're dead," you then go downstairs?
A. Yes. Right after he said, "Honey, we are dead," I said, "No problem. I'm going downstairs to check on the children."
Q. Okay. That makes sense.
And how long were you downstairs with the children?
A. That's what I'm telling you. I don't know. I don't know how long I spent with the children. But it wasn't long. I went downstairs, and I instructed them to go to the bathroom because it was the safest place. Then I went back upstairs to be with their father.
Q. Okay. That couldn't have taken more than five minutes, 10 at max, would you agree?
A. Yes.
Q. Okay. So now we have another 30 minutes. You told us that you don't know the assignment of the president's security detail. I'm taking a wild guess that it is to secure his safety?
A. Yes, that is what it was supposed to be.
Q. So if gunfire is going off for 45 minutes, I imagine if they had any way possible to make their way to the president,

that would have been their first priority. Would you agree with that?
A. Yes, that's what it is. Yes, if I can add something for you, you know, what took place that night. I found out that all the agents were paid, and they were not there.
Q. Oh, you found that out that night, or you found that out subsequently?
A. Way after.
Q. Okay. So let's keep our focus on that night. You're now back upstairs, after having secured the children.
A. Mm-hmm.
Q. There's another 45 minutes of gunfire -- sorry -- 30 minutes, approximately?
A. About, yes.
Q. This entire time, I assume your head is under the bed?
A. Yes, when I got to the room and the president instructed me to go to that side, that's where I went.
Q. And the president was lying on the opposite side of the bed by the window, mind you; correct?
A. Yes, that's where I found him.
Q. For approximately 30 minutes, before they breached the door?
A. I cannot tell you the duration how long they took, but I know once they breached the door, I was the first one shot.
Q. Okay. Did you hear when they busted in downstairs on the

front door?
A. No. They were shooting. The gunfire never stopped.
Q. So that's a no, you did not hear them actually enter downstairs?
A. No.
Q. Okay. Doesn't your husband have two automatic rifles in his bedroom that he keeps there?
A. Maybe, but I don't know.
Q. Maybe?
A. Maybe.
Q. Okay --
A. What I remember, I knew that he had a revolver, but that was way before he became president.
Q. But no, I'm talking about automatic rifles. I'm talking about the big, long ones that you said go "brrrrr"?
A. No. I don't know.
Q. You don't know that he had them in the room?
A. No, I didn't know.
Q. Okay. Because it would make sense for him to arm himself as opposed to sticking his head under the bed. Do you agree?
A. Well, if he had them in his hands, I would have seen it.
Q. Oh, so you're saying there weren't any such things in the bedroom. I want to get clear. Are you saying you don't know or that they weren't?
A. I stated that I did not know.

Q. Okay. So I take it after 30 minutes of lying with your head under the bed and the rest of your body exposed, facedown; right?
A. Yes, I'm laying on my stomach.
Q. You realized that if they breached your house, that's about the most vulnerable position you could have been in?
A. Well, the way the house is structured, there is no way really for you to put yourself in a certain position to protect yourself because the house is full of windows. And we stayed there because we were waiting for the person that the president had reached out to to come and save us.
Q. I understand.
But you realize if you're lying down under the bed that has very little room to maneuver such that you can't get much beyond your head under the bed, you're facedown, your body is exposed, I understand the entire house has no safe zone, but you can't run from that position; right?
A. No.
Q. You can't hide? It's kind of like an ostrich with its head in the sand; right?
A. Yes. You're still following up and expecting three people to come and pick you up. You are trying to find a way to survive and to stay away from stray bullet because the president had reached out to some people and they were on their way.

Q. Okay. And you can't maneuver at all. You're just under the bed with your -- your head under the bed, lying facedown?
A. Yes. The bed was too low. You could not maneuver underneath it.
Q. Okay. So eventually they breach -- they come inside the bedroom?
A. Yes.
Q. And your side of the bed is closest to the door?
A. Yes.
Q. And they approach you first?
A. I cannot tell you if they approached me first. I heard the noise both in the door and then the shot at me.

MR. HOWARD: I didn't get that. I think -- I didn't hear what you said, Madam Interpreter.

THE WITNESS: All I can tell you, I heard the noise both in the door and when they shot me.

BY MR. HOWARD:
Q. And you're saying before they shot you, they pulled you out from under the bed to some degree?
A. No, they shot me way before then. They pulled me from under the bed before they left. The president was already dead.
Q. I want you to back up to when you got shot.

Before you were shot, were you pulled from under the bed?

A. No. They busted through the door, and I was shot.
Q. Okay. Do you recall telling agents from the FBI repeatedly that before you were shot, you were partially pulled from under the bed? Do you not recall that, ma'am?
A. No. I stated that they pulled me from under the bed before they left so they could verify that I was indeed dead, because they flash a light in my eyes. Then after that, they were gone.
Q. Okay. All right. So on July the 9th, 2021, within 48 hours of the incident, you do not recall telling FBI special agents that before you were shot, you were pulled halfway out from under the bed by one of the men who then fired multiple shots? You don't recall telling the agents that within 48 hours?
A. No, that's not what I told them. If they had pulled me the way you mentioned, they would have shot me in my face, and I would have been dead if they had done so the way you explain it.
I received gunshots on that side where I was lying down. Inside the room, they didn't come to speak to anyone. They came to kill.
Q. I agree.
So I'm saying if they pulled you out from under the bed the way that you said, not me, to the agents on the 9th of July, 2021, you said that they pulled you out from under the

bed partially before they shot you. Are you taking that back, or are you just telling us the agents got it wrong again?

MS. PHENELUS: Your Honor, objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I cannot say that the agent made a mistake. It is not my role. The agent study for whatever it is that the agent does.

I am only telling you what took place that night. What the agent wrote, I can't tell you. But I'm telling you what happened that night.

BY MR. HOWARD:

Q. Okay. And you were shot at point-blank range?

A. The minute that they breached the door, they got inside the bedroom, they shot at me.

Q. You can't tell if they were standing over you or not at the time?

A. I can't tell you -- I didn't see the person who shot me. I can tell you whether the person was sitting down or standing up. I heard the noise both right when they busted through the door and my body was going up and down under the bed.

Q. And you said that it was -- you have described -- you had made this sound several times that you were shot with an automatic weapon?

A. Yes, that's the noise I heard.

Q. And the noise was -- could you just give it to us one more time?
A. "Brrrrr."
Q. Okay. It wasn't "bang, bang, bang"?
A. No, it was not "bang, bang, bang."
Q. So any bullet that would have been retrieved from you would have had to have come from an automatic weapon, based upon what you recall in terms of the sound of the fire?
A. Yes, that would be the case. That should be the case, but I never read the report about the bullets, never read any ballistic report or any bullets that were taken away from my body. What I remember that night was the noise.
Q. And you remember "brrrrr"; right?
A. I remember "brrrrr."
Q. And notwithstanding the fact that there was this "brrrrr" fire, you were fortunate enough to only get hit in the elbow and where else now?
A. When they came in and they first shot me, it was on that side that I was shot. The other side were the bullets that were -- they shot the president with, and they also reached me because under the bed, while the president thought I was dead and then blood was flowing, I lift up my head slightly and I wave my right hand. I wanted him to know that I was still alive.
Q. Okay. So how far is the distance from -- and I want you

to reference this photograph again -- from the door to your bedroom to the side of the bed, how far would you say that is? Is that further or -- from you are to me now or closer?
A. You see this pink bag right there, this is in front of the door.
Q. Okay. And would you say that's further than I am from you now or closer?
A. No, closer.
Q. Okay. And this automatic weapon, you're saying, hit you along your left side?
A. Yes.
Q. Your right side would be what's exposed to the door, though; right?
A. No.
Q. Look at that photo.
A. I'm looking at it.
Q. You're on your stomach?
A. Yes.
Q. Head's under the bed?
A. Yes.
Q. Which side of you is facing the door?
A. The right side -- part of the right side is under the bed. The left side is exposed and it's closer to the door because I'm lying on my stomach, and this side was under the bed.
Q. Could you tell us the angle that you were lying?

A. I cannot give you an angle. I know I'm lying down. I'm under the bed. I cannot tell you which part of what's in and which part was out, but I was lying down right there, yes, on that side. Do you see where you have -- I just marked it on the screen? That's where I was.
Q. I see that. That makes it more clear.
But if you're lying at that angle, your head's not under the bed, is it?
A. Yes, I stuck my head under the bed.
Q. Oh, okay.
So none of you was necessarily under the bed, then. You were lying parallel to the bed, and you just had your head under it?
A. The bed was too low. You cannot get underneath the bed.
Q. Okay. But you were lying parallel to the bed, and you just stuck your head under? Is that what happened?
A. My -- my head and also part of my shoulder went under the bed. I can't tell you which part. I cannot give you details because I was not able to see.
Q. Okay. But you would agree with me that somebody who was closer to you than I am now who fired directly at your fully exposed body with an automatic weapon, that for you to have not been shot anywhere in your body mass or along your back would have had to have been a miraculous blessing and you're a very blessed woman?

MS. PHENELUS: Objection. Speculation.

THE COURT: Overruled. It's cross-examination, Counsel.

THE WITNESS: That's what one of the doctors told me.

BY MR. HOWARD:

Q. That it was a miracle?

A. He informed me that one of the bullets went through my lung -- grazed my lung.

Q. Grazed your lung?

A. Grazed, yes. It was very close. And I explained to him that I could not breathe. I was having trouble breathing, and he explained to me that was why. And he advised me 1 millimeter closer, it would have been irreversible. Then I would have died in my blood.

Q. Well, I'm certainly glad that did not happen.

But I want to talk about another miracle. After they shot your husband, they came back to you, and they wanted to make sure that you were deceased. I think that was your testimony?

A. Yes.

Q. And instead of just putting a couple of extra rounds in the body that's lying there, they were like, "Anybody got a flashlight?" Is that what happened?

A. No, no. The person who did so did not ask anything. He picked up -- the person picked up my leg and flipped me over

and then took the flashlight and did what he needed to do.
Q. Okay. You agree with me that's a lot more effort than just putting a couple of extra rounds in you; right?
A. Yes, I think so.
Q. And you said that when they took the flashlight to your eyes, you prevented your pupils from reacting. You do know that's not a thing?
A. Are you talking, when you say "pupil," inside my eyes? Because my eyes were closed. I didn't see the person.
Q. Okay.
A. When your eyes are closed and they run a flashlight across them, you can feel it, you can see it, but I did not open my eyes to see anything. Once the president was killed, I closed my eyes. I did not open them.
Q. Okay. So when he was shining the flashlight into your eyes, your eyes were closed?
A. After Joe was killed, I never opened up my eyes.
Q. When he shined the flashlight into your eyes, your eyes were closed? That's a yes-or-no thing.
A. Yes, my eyes were closed.
Q. Okay. So he was maybe shining the light to see if you were breathing, and you held your breath. Is that what that was?
A. I was not holding my breath. Once he flipped me, blood came out of my mouth.

Q. Well, you told agents you tried to push blood out of your mouth. That's what you said.
A. Blood was flowing even when I was under the bed. It was already there. So there is no need for me to push anything.
Q. I understand. I'm just talking about what you said to the agents.
You said you made a deliberate attempt, in order to appear deceased, to push blood out of your mouth. You said that, not me.
A. If the report said it, yes, I had blood coming out of my mouth, and I felt it.
Q. You know you're not answering my question; right?
A. I believe I answered -- I believe I answered your question, and I apologize if my answer does not satisfy what you are looking for.
But I'm telling you, the moment the person flipped me over, I'm lying down on my stomach. The person grabbed my leg, flipped me, and so now I'm on my back. The flashlight ran across my eyes, and then blood came out of my mouth.
Q. Okay. All right. You are under investigation for your husband's murder. You do know that; right?
A. I know the people who killed him. They are now in power in Haiti. They also control the judicial power. As a victim, they want to pass -- they want to look at me, make it seem like I'm the one who killed him.

But they need to remember there was a coup -- it was a failed coup on February 7. They need to look into the people who were the authors of the coup in February. If the February 7 was not a failed coup, I don't think they would have had a July 7.

Q. So you can explain further when we get back from lunch. It's 12 o'clock. But the answer is yes, you do know you're under investigation in Haiti, right now as we speak, for your husband's murder; right?

A. Yes, I know that they want to blame me for his death, but they have taken over power, and they are now holding the judicial power in hand, and they can do it.

Q. Okay. Can --

A. However, their plan is to murder me or assassinate me, and that's the reason why I haven't gone down to answer any of their questions. They tried four times already. They have not been successful. My attorney has requested that I be heard through videoconference. Of course, they're not in agreement because they're the judges handling the case.

I'm looking for justice. I am ready to answer all questions in any judicial system from any country, but I need to know that I'm physically safe.

MR. HOWARD: Of course.

Your Honor, should we hold to the time?

THE COURT: Yes. It's 12 o'clock.

How much longer for your cross-examination, Counsel?

MR. HOWARD: I'm thinking -- it's taking longer than I anticipated, but maybe another 45 minutes, Your Honor.

THE COURT: Ladies and gentlemen of the jury, we're going to take our one-hour lunch break. Please be back at 1 o'clock.

(Jury exited at 12:03 PM.)

THE COURT: All right. Anything on behalf of the United States before we take our break?

MR. MCLAUGHLIN: Not at this time, Judge.

MR. HOWARD: We'd just like to remind the witness that she can't speak to anybody during lunch.

THE COURT: Ma'am, so just like for the evening, you can, of course, take a break. You can have lunch. You cannot speak to anyone about your testimony. We'll see you back -- if you can come just a little bit before 1 o'clock. Thank you very much.

We're in recess.

(Lunch recess at 12:04 PM.)

(See Afternoon Session for continuation.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

DATE: 30th of March, 2026

/s/*Lance W. Steinbeisser*
LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Official Court Reporter
United States District Court
Southern District of Florida
Miami, Florida

## /

**/s/Lance** [1] - 83:5

## 1

**1** [8] - 1:7, 39:7, 41:1, 66:12, 68:5, 78:13, 82:6, 82:16
**10** [2] - 66:4, 68:16
**101A** [1] - 13:25
**102** [1] - 55:6
**102B** [10] - 3:9, 12:5, 12:6, 12:11, 12:15, 18:9, 19:25, 24:23, 60:21, 61:6
**10:00** [3] - 20:1, 38:10, 38:11
**10:30** [3] - 36:23, 37:5, 44:7
**10:32** [1] - 44:19
**10:33** [1] - 45:13
**10:46** [1] - 45:13
**11** [2] - 1:5, 38:13
**11:00** [2] - 38:10, 38:19
**11:01** [1] - 55:21
**12** [3] - 3:9, 81:7, 81:25
**12:03** [1] - 82:7
**12:04** [2] - 1:6, 82:19
**1302** [1] - 33:1
**15** [6] - 36:14, 37:3, 37:4, 44:13, 44:16, 66:4
**15-minute** [1] - 44:12
**160A** [7] - 3:9, 21:1, 21:9, 21:17, 21:22, 22:3, 23:1
**160B** [8] - 3:9, 21:1, 21:9, 21:17, 21:22, 22:12, 22:13, 23:1
**160C** [6] - 3:9, 21:1, 21:9, 21:17, 21:22, 22:19
**1:00** [3] - 15:16, 45:7, 67:6

## 2

**20** [1] - 36:21
**2021** [10] - 9:14, 21:14, 22:6, 22:16, 22:21, 23:2, 23:6, 64:4, 73:9, 73:25
**2022** [1] - 48:11
**2023** [1] - 48:11
**2026** [2] - 1:5, 83:4
**21** [1] - 3:9
**22-CR-20104-Becerra** [1] - 4:6
**22-cr-20104-JB** [1] - 1:2

## 3

**3** [1] - 1:5
**30** [11] - 11:3, 28:18, 58:18, 64:25, 65:16, 65:17, 67:17, 68:19, 69:13, 69:21, 71:1
**30-minute** [1] - 66:21
**305.523.5633** [1] - 1:19
**30th** [2] - 66:8, 83:4
**31** [1] - 3:10
**33128** [1] - 1:19
**37** [1] - 3:4

## 4

**400** [1] - 1:18
**42** [2] - 9:9, 9:12
**45** [14] - 15:18, 63:9, 64:14, 64:25, 65:1, 65:16, 66:6, 66:10, 66:13, 66:15, 67:23, 68:24, 69:12, 82:3
**45-minute** [1] - 68:1
**48** [6] - 8:17, 9:12, 64:5, 64:17, 73:10, 73:14

## 5

**50** [4] - 11:4, 28:18, 58:18, 65:17

## 6

**6** [7] - 8:10, 9:14, 20:21, 22:6, 22:16, 22:21, 23:2

## 7

**7** [6] - 3:3, 22:21, 23:2, 81:2, 81:4, 81:5
**72** [6] - 12:4, 12:6, 12:10, 12:12, 61:3, 61:6
**7th** [2] - 23:5, 27:17

## 8

**83** [6] - 1:7, 3:5, 18:9, 19:25, 24:23, 25:8
**8:15** [1] - 36:21
**8:56** [1] - 1:6

## 9

**93A** [6] - 3:10, 30:21, 30:22, 31:6, 31:11, 31:17
**9:00** [1] - 7:12
**9:04** [1] - 7:12
**9:06** [1] - 7:14
**9th** [3] - 64:4, 73:9, 73:24

## A

**able** [12] - 8:15, 22:22, 33:15, 34:8, 35:1, 52:5, 52:18, 62:14, 62:17, 62:21, 64:1, 77:19
**above-entitled** [1] - 83:3
**absolutely** [5] - 6:16, 6:22, 35:3, 48:1, 50:24
**access** [2] - 59:11, 59:19
**account** [3] - 51:1, 66:22, 67:5
**accurately** [2] - 12:8, 31:2
**accused** [1] - 52:20
**acquitted** [1] - 53:2
**active** [1] - 34:19
**activities** [1] - 32:11
**actual** [1] - 47:8
**add** [1] - 69:3
**addition** [1] - 10:9
**additions** [1] - 5:9
**admit** [3] - 12:10, 21:17, 31:5
**ADMITTED** [1] - 3:8
**admitted** [12] - 12:14, 13:24, 18:8, 21:21, 22:3, 22:11, 22:18, 24:22, 31:10, 54:25, 55:3, 55:7
**admitting** [1] - 33:2
**adults** [1] - 41:5
**advantage** [1] - 7:9
**advised** [1] - 78:12
**aerial** [1] - 14:1
**Afternoon** [1] - 82:20
**agent** [6] - 4:12, 64:13, 74:6, 74:7, 74:8, 74:10
**Agent** [1] - 4:13
**agents** [16] - 37:16, 64:6, 64:9, 64:16, 65:2, 65:12, 65:13, 69:5, 73:2, 73:11, 73:13, 73:24, 74:2, 80:1, 80:6
**ago** [2] - 6:4, 43:14
**agree** [9] - 6:13, 56:8, 63:20, 68:17, 69:1, 70:20, 73:22, 77:20, 79:2
**agreement** [1] - 81:19
**ahead** [1] - 18:22
**aided** [1] - 1:22
**al** [1] - 1:6
**alert** [1] - 42:20
**alive** [6] - 16:3, 16:15, 23:21, 24:5, 24:7, 75:24
**allow** [3] - 8:4, 50:24, 53:13
**allowed** [8] - 11:13, 28:9, 33:13, 33:14, 34:14, 35:9, 35:10, 53:3
**allowing** [2] - 51:4, 52:16
**almost** [1] - 26:16
**Aloe** [1] - 2:19
**alone** [1] - 60:3
**ALTANESE** [1] - 2:4
**Altanese** [1] - 4:12
**AM** [10] - 1:6, 7:12, 7:14, 15:16, 44:19, 45:13, 55:21, 67:6
**ambassador** [2] - 21:12, 22:14
**America** [3] - 4:3, 4:4, 4:5
**AMERICA** [1] - 1:4
**amount** [2] - 9:9, 9:11
**amply** [1] - 6:5
**ANDREW** [1] - 2:4
**Andrew** [1] - 4:11
**angle** [6] - 13:1, 13:2, 13:3, 76:25, 77:1, 77:7
**announce** [1] - 4:7
**annoys** [1] - 45:17
**annulled** [6] - 47:24, 48:12, 48:19, 49:11, 49:14, 53:12
**answer** [7] - 9:1, 9:3, 57:20, 80:14, 81:7, 81:15, 81:20
**answered** [10] - 7:24, 16:17, 19:12, 19:14, 57:13, 58:3, 66:25, 74:4, 80:13
**answering** [3] - 57:21, 57:22, 80:12
**answers** [1] - 5:8
**anticipated** [1] - 82:3
**Antonio** [1] - 4:4
**antsy** [1] - 36:22
**apart** [1] - 39:20
**apologize** [1] - 80:14
**Appeals** [1] - 48:13
**appear** [1] - 80:8
**appearance** [1] - 4:7
**APPEARANCES** [1] - 2:1
**appreciate** [3] - 37:5, 45:14, 47:14
**approach** [2] - 21:2, 72:10
**approached** [1] - 72:11
**appropriate** [2] - 35:3, 52:17
**approximate** [1] - 66:6
**approximation** [2] - 66:18, 68:3
**ARCANGEL** [1] - 1:6
**Arcangel** [2] - 4:3, 4:17
**area** [1] - 10:22
**areas** [2] - 15:6, 20:5
**argument** [1] - 35:8
**arm** [13] - 24:12, 24:14, 26:24, 26:25, 27:4, 27:23, 29:12, 32:5, 32:7, 32:10, 32:15, 32:17, 70:19
**armed** [2] - 65:12
**arrest** [1] - 7:25
**arrive** [3] - 28:10, 28:12, 28:14
**arrived** [2] - 31:18, 43:1
**articles** [1] - 53:12
**asleep** [1] - 38:21
**assassinate** [1] - 81:14
**assault** [1] - 60:11
**assignment** [2] - 65:20, 68:20
**assist** [1] - 48:6
**assistance** [2] - 34:3, 35:15
**assisted** [1] - 29:12
**assisting** [2] - 35:18,

36:7
**associated** [2] - 46:17, 47:1
**Associates** [1] - 2:13
**assume** [1] - 69:15
**assuming** [1] - 48:7
**attached** [2] - 27:18, 29:8
**attackers** [1] - 43:18
**attempt** [1] - 80:7
**attempted** [1] - 23:21
**attend** [2] - 5:5, 48:8
**attended** [1] - 40:10
**attention** [1] - 61:4
**attorney** [3] - 2:4, 4:11, 81:17
**Attorney's** [1] - 2:5
**AUSA** [5] - 2:3, 2:3, 2:4, 4:11, 4:12
**authors** [1] - 81:3
**automatic** [6] - 70:6, 70:14, 74:24, 75:7, 76:9, 77:22
**automatically** [2] - 16:5, 16:18
**autopsy** [1] - 7:8
**available** [1] - 47:5
**Avenue** [1] - 1:18
**awaken** [1] - 41:2
**awakened** [2] - 67:7, 67:16
**awakens** [1] - 39:10
**aware** [4] - 6:15, 7:24, 34:1, 34:9
**awoke** [2] - 10:19, 15:16

## B

**backed** [1] - 58:2
**backing** [1] - 57:11
**backwards** [1] - 57:5
**backyard** [3] - 19:12, 39:21, 58:20
**bad** [2] - 49:8
**bag** [1] - 76:4
**ballistic** [1] - 75:11
**bang** [6] - 75:4, 75:5
**bark** [1] - 42:24
**barking** [1] - 42:15
**bars** [1] - 49:18
**Barzee** [1] - 2:14
**based** [5] - 46:10, 47:17, 50:20, 53:4, 75:7
**basement** [8] - 58:25, 59:1, 59:4, 59:9, 59:11, 59:13, 59:15, 59:16
**bases** [1] - 51:22
**basis** [6] - 46:23, 47:18, 48:7, 48:23, 48:24, 52:13
**bathroom** [9] - 42:19, 42:21, 43:1, 43:21, 44:1, 58:14, 59:22, 59:25, 68:13
**became** [3] - 39:5, 70:13
**BECERRA** [1] - 1:11
**bed** [81] - 11:20, 13:8, 13:11, 13:12, 13:19, 13:20, 14:25, 15:1, 16:2, 16:10, 17:23, 17:25, 18:1, 18:4, 18:5, 18:6, 18:14, 24:9, 25:6, 26:10, 26:11, 38:10, 38:11, 38:14, 51:25, 52:2, 60:23, 60:25, 61:2, 61:9, 61:20, 61:23, 62:1, 62:3, 62:4, 62:7, 62:9, 62:17, 62:19, 62:21, 62:22, 62:25, 63:2, 63:3, 63:5, 69:15, 69:19, 70:20, 71:2, 71:13, 71:15, 72:2, 72:3, 72:8, 72:19, 72:21, 72:25, 73:4, 73:5, 73:12, 73:24, 74:1, 74:21, 75:21, 76:2, 76:19, 76:22, 76:24, 77:2, 77:8, 77:9, 77:11, 77:12, 77:14, 77:15, 77:18, 80:3
**bedroom** [21] - 10:1, 12:7, 12:8, 14:2, 16:16, 17:3, 20:15, 38:23, 41:15, 41:21, 41:24, 42:5, 43:21, 56:3, 57:16, 57:17, 70:7, 70:23, 72:6, 74:15, 76:2
**bedrooms** [1] - 43:7
**BEFORE** [1] - 1:11
**begin** [1] - 37:12
**beginning** [1] - 67:6
**behalf** [8] - 4:10, 4:16, 4:20, 4:23, 5:1, 5:19, 49:23, 82:8
**BEHALF** [4] - 2:6, 2:11, 2:16, 2:20
**behind** [2] - 19:11, 19:13
**belong** [1] - 42:10
**below** [1] - 49:9
**Ben** [4] - 27:14, 27:16, 27:20, 27:21
**bench** [1] - 7:7
**bend** [1] - 32:15
**best** [9] - 32:8, 32:9, 32:12, 41:25, 45:16, 56:16, 59:10, 63:21, 68:2
**bet** [1] - 59:10
**BETH** [1] - 2:18
**better** [3] - 35:25, 41:13, 63:22
**between** [3] - 38:10, 67:15, 68:1
**beyond** [2] - 10:14, 71:15
**bias** [10] - 33:5, 33:16, 35:3, 46:16, 47:12, 47:17, 49:24, 50:2, 51:17, 54:2
**big** [5] - 10:20, 10:21, 14:11, 14:21, 70:15
**birth** [1] - 42:11
**bit** [3] - 16:6, 44:14, 82:16
**Black** [1] - 18:20
**blame** [1] - 81:10
**blank** [1] - 74:13
**bleeding** [1] - 23:16
**blessed** [1] - 77:25
**blessing** [1] - 77:24
**blood** [14] - 18:14, 23:23, 26:11, 26:12, 27:6, 27:7, 75:22, 78:14, 79:24, 80:1, 80:3, 80:8, 80:10, 80:19
**bodies** [6] - 28:2, 28:6, 28:22, 28:23, 29:17
**body** [17] - 14:12, 14:18, 15:6, 15:9, 16:21, 16:22, 19:6, 62:16, 62:18, 62:20, 71:2, 71:16, 74:21, 75:12, 77:22, 77:23, 78:22
**boss** [1] - 20:13
**bottom** [4] - 9:21, 16:7, 17:23, 29:9
**bounds** [1] - 48:14
**breach** [3] - 64:10, 64:11, 72:5
**breached** [6] - 43:11, 66:7, 69:21, 69:24, 71:5, 74:14
**break** [14] - 8:6, 25:10, 36:21, 37:3, 37:5, 44:9, 44:12, 44:14, 45:6, 45:15, 82:5, 82:9, 82:14
**breaking** [5] - 10:9, 10:11, 10:14, 10:16, 45:5
**breath** [2] - 79:22, 79:24
**breathe** [1] - 78:11
**breathing** [2] - 78:11, 79:22
**brick** [3] - 10:7, 10:8, 10:9
**bricks** [1] - 10:15
**brief** [1] - 41:2
**BRIGGS** [1] - 2:4
**Briggs** [1] - 4:12
**bring** [6] - 7:13, 25:19, 33:13, 45:3, 55:19
**bringing** [2] - 33:7, 52:12
**broken** [1] - 54:16
**brought** [5] - 30:5, 30:8, 30:11, 30:13, 30:17
**brrrrr** [9] - 14:14, 14:20, 15:11, 19:2, 70:15, 75:3, 75:13, 75:14, 75:15
**bullet** [11] - 14:13, 14:15, 15:6, 41:12, 42:22, 56:5, 56:8, 61:25, 71:23, 75:6
**bullets** [14] - 15:8, 41:14, 41:16, 41:24, 42:3, 42:6, 42:7, 56:2, 56:12, 56:15, 75:10, 75:11, 75:19, 78:7
**bumped** [1] - 65:24
**busted** [3] - 69:25, 73:1, 74:20
**butt** [3] - 23:24, 32:4
**BY** [16] - 7:21, 8:9, 9:7, 12:18, 21:6, 22:1, 25:1, 26:7, 31:13, 37:7, 55:24, 57:19, 67:4, 72:17, 74:12, 78:5

## C

**cabinet** [2] - 12:20, 12:22
**cable** [2] - 54:16, 54:17
**CAMPO** [11] - 2:7, 5:20, 45:5, 45:8, 54:11, 54:17, 54:20, 54:24, 55:2, 55:10, 55:14
**Campo** [2] - 2:8, 4:16
**Canadian** [1] - 36:4
**Canapé** [1] - 29:24
**cannot** [18] - 14:21, 32:15, 32:16, 32:17, 34:22, 49:9, 49:12, 52:1, 63:12, 66:15, 69:23, 72:11, 74:6, 77:1, 77:2, 77:14, 77:18, 82:14
**car** [2] - 27:24, 28:3
**care** [2] - 24:9, 26:21
**cared** [1] - 31:22
**careful** [4] - 45:16, 50:5, 50:15, 51:15
**Caribbean** [1] - 30:23
**carving** [1] - 47:4
**case** [10] - 4:2, 4:12, 34:10, 44:18, 49:18, 49:20, 49:21, 75:9, 81:19
**CASE** [1] - 1:2
**Case** [1] - 4:6
**cases** [1] - 49:23
**caught** [1] - 20:7
**cement** [3] - 10:7, 10:16, 56:7
**cemetery** [1] - 29:19
**certain** [2] - 63:24, 71:8
**certainly** [1] - 78:15
**Certificate** [1] - 3:5
**CERTIFICATE** [1] - 83:1
**Certified** [1] - 1:17
**certify** [1] - 83:2
**cetera** [1] - 48:6
**chance** [6] - 26:18, 27:7, 28:10, 28:12, 28:13, 39:25
**change** [1] - 47:8
**changes** [1] - 5:9
**charge** [2] - 28:7, 34:19
**charged** [11] - 33:8, 33:16, 33:17, 33:21, 33:22, 33:23, 33:24, 34:23, 46:8, 52:20, 54:5
**charges** [10] - 33:25, 45:25, 46:4, 47:9, 49:9, 49:10, 49:11, 49:13, 49:14, 49:19
**charging** [8] - 33:2,

33:14, 34:18, 47:21, 47:23, 48:12, 50:21, 51:13
**check** [2] - 25:4, 68:8
**checked** [1] - 66:16
**checking** [2] - 8:11, 9:14
**children** [30] - 8:12, 9:15, 11:3, 11:6, 24:6, 24:14, 26:25, 40:10, 41:3, 41:5, 41:7, 41:23, 42:16, 42:21, 56:4, 56:13, 56:18, 59:8, 59:21, 60:18, 60:19, 66:14, 66:16, 67:13, 67:21, 68:8, 68:10, 68:12, 69:10
**chivalrous** [1] - 62:11
**circle** [1] - 18:10
**circled** [1] - 18:13
**circumstances** [1] - 56:10
**cite** [2] - 49:20, 49:21
**cited** [2] - 48:2, 48:16
**clarification** [1] - 58:21
**clarify** [1] - 57:23
**clarity** [1] - 58:16
**clear** [5] - 6:5, 33:12, 34:13, 70:23, 77:6
**clearly** [1] - 35:11
**client** [1] - 50:13
**clock** [1] - 66:11
**close** [4] - 10:6, 10:18, 45:10, 78:10
**closed** [8] - 16:24, 19:8, 79:9, 79:11, 79:13, 79:16, 79:19, 79:20
**closer** [8] - 39:18, 63:21, 76:3, 76:7, 76:8, 76:23, 77:21, 78:13
**closest** [1] - 72:8
**closet** [1] - 24:11
**collaborative** [1] - 6:1
**colored** [1] - 14:5
**comb** [1] - 32:17
**coming** [11] - 24:10, 36:21, 37:3, 41:10, 41:14, 42:6, 56:2, 56:12, 58:6, 65:7, 80:10
**commitment** [1] - 6:5
**committed** [1] - 46:25
**communicate** [1] - 40:18
**completely** [4] - 15:3, 26:16, 35:16, 48:14
**compose** [1] - 25:18
**computer** [1] - 1:22
**computer-aided** [1] - 1:22
**concern** [2] - 35:14, 54:2
**concerning** [1] - 30:16
**condition** [1] - 21:13
**conditions** [1] - 21:15
**condolences** [1] - 37:13
**connected** [1] - 54:12
**conscious** [2] - 15:20, 15:21
**contact** [1] - 20:22
**contents** [1] - 37:25
**continuation** [1] - 82:20
**continue** [4] - 8:16, 9:5, 25:20, 26:1
**continued** [1] - 24:1
**Continued** [1] - 3:3
**CONTINUED** [1] - 7:20
**continuing** [1] - 11:2
**control** [1] - 80:23
**conversation** [2] - 19:15, 41:2
**convict** [1] - 46:15
**convicted** [1] - 49:8
**conviction** [3] - 49:7, 50:12, 51:12
**cooperation** [1] - 45:25
**corpse** [1] - 28:2
**correct** [13] - 37:17, 38:5, 41:8, 41:21, 43:13, 45:1, 45:23, 56:4, 58:19, 61:20, 67:23, 69:19, 83:2
**correction** [2] - 9:13, 17:25
**corrupt** [1] - 48:25
**counsel** [8] - 4:7, 4:11, 4:21, 4:24, 5:13, 5:17, 7:17, 45:14
**Counsel** [5] - 9:5, 26:5, 44:7, 78:3, 82:1
**count** [1] - 14:21
**counterfire** [2] - 63:11, 65:3
**country** [4] - 9:9, 50:24, 51:2, 81:21
**coup** [4] - 81:1, 81:2, 81:3, 81:4
**couple** [2] - 78:21, 79:3
**course** [4] - 47:6, 81:18, 81:23, 82:14
**COURT** [73] - 1:1, 4:14, 5:3, 5:12, 5:15, 5:17, 5:19, 5:21, 6:16, 7:1, 7:3, 7:5, 7:13, 7:15, 8:2, 8:4, 8:21, 12:12, 12:14, 12:17, 21:4, 21:19, 21:21, 21:25, 25:12, 25:16, 25:23, 26:2, 31:7, 31:10, 32:20, 32:23, 32:25, 33:12, 33:23, 34:6, 34:12, 35:2, 35:21, 36:11, 37:3, 44:7, 44:11, 44:20, 45:1, 45:6, 45:10, 45:14, 48:17, 49:20, 51:9, 52:4, 52:9, 52:22, 52:25, 53:16, 53:22, 54:7, 54:9, 54:15, 54:19, 54:23, 55:13, 55:19, 55:22, 57:14, 67:1, 74:5, 78:2, 81:25, 82:4, 82:8, 82:13
**court** [7] - 4:18, 8:6, 36:18, 36:25, 45:19, 48:11, 52:10
**Court** [10] - 1:18, 4:1, 4:17, 6:7, 33:3, 33:4, 48:13, 53:19, 83:6, 83:6
**Court's** [1] - 6:15
**COURTROOM** [1] - 4:2
**covered** [3] - 30:7, 42:1, 42:23
**crawl** [1] - 56:23
**crawling** [2] - 57:4, 57:6
**create** [1] - 33:7
**cried** [1] - 24:4
**crime** [3] - 46:16, 46:17, 47:3
**criminal** [1] - 50:2
**CROSS** [1] - 37:6
**Cross** [1] - 3:4
**cross** [11] - 32:20, 32:21, 33:6, 46:14, 46:19, 47:12, 47:21, 50:4, 51:14, 78:2, 82:1
**CROSS-EXAMINATION** [1] - 37:6
**cross-examination** [9] - 32:20, 33:6, 46:19, 47:12, 47:21, 50:4, 51:14, 78:2, 82:1
**Cross-Examination** [1] - 3:4
**cross-examine** [1] - 46:14
**crossing** [1] - 28:3
**Cuba** [1] - 31:1
**culpability** [2] - 47:19, 51:13
**current** [1] - 52:23
**curtain** [3] - 42:5, 59:22, 59:23
**curtains** [2] - 42:2, 42:8
**customary** [3] - 38:24, 39:4

## D

**damage** [1] - 15:7
**dangerous** [1] - 51:4
**Daniela** [1] - 4:15
**DANIELA** [1] - 2:8
**dark** [1] - 14:5
**dark-colored** [1] - 14:5
**DATE** [1] - 83:4
**DAVID** [1] - 2:9
**David** [3] - 2:10, 4:16, 37:10
**days** [1] - 63:22
**de** [1] - 40:11
**dead** [16] - 26:17, 28:11, 28:22, 29:17, 44:5, 60:19, 63:16, 66:20, 67:10, 67:20, 68:6, 68:7, 72:22, 73:6, 73:17, 75:21
**dealing** [1] - 45:14
**death** [2] - 33:9, 81:10
**deceased** [2] - 78:18, 80:8
**deceptive** [1] - 52:3
**decision** [1] - 51:13
**decrease** [1] - 10:25
**DEFENDANT** [4] - 2:6, 2:11, 2:16, 2:20
**defendant** [1] - 51:12
**defendants** [1] - 37:11
**Defendants** [1] - 1:7
**defending** [1] - 28:10
**defense** [6] - 5:12, 46:13, 47:5, 51:11, 51:20, 54:22
**degree** [2] - 54:2, 72:19
**deliberate** [1] - 80:7
**Delilah** [2] - 42:13, 42:15
**depict** [2] - 12:8, 31:2
**DEPUTY** [1] - 4:2
**DESCALZO** [1] - 2:17
**Descalzo** [2] - 2:17, 4:23
**describe** [3] - 14:24, 26:14, 62:18
**described** [4] - 14:9, 15:2, 62:16, 74:22
**describing** [2] - 6:2, 20:4
**description** [5] - 16:17, 18:16, 18:19, 18:21, 18:22
**desktop** [1] - 55:18
**detail** [3] - 27:18, 58:17, 68:21
**details** [2] - 34:20, 77:18
**determine** [2] - 10:5, 20:18
**diagram** [1] - 55:6
**died** [2] - 16:15, 78:14
**different** [8] - 35:19, 46:18, 48:21, 49:21, 49:25, 50:1, 50:3, 51:3
**differently** [1] - 34:16
**difficult** [2] - 45:18, 47:10
**dining** [2] - 9:25
**dire** [1] - 6:5
**DIRECT** [1] - 7:20
**direct** [1] - 12:25
**Direct** [1] - 3:3
**directed** [1] - 61:20
**direction** [1] - 25:3
**directly** [1] - 77:21
**disagree** [1] - 54:9
**disconnected** [1] - 30:3
**discovered** [1] - 20:15
**discuss** [2] - 8:10, 44:22
**discussed** [1] - 18:16
**discussion** [1] -

18:18
**disfigured** [1] - 15:25
**dismissed** [4] - 33:18, 33:25, 45:25, 52:21
**display** [1] - 54:12
**displayed** [1] - 60:22
**distance** [3] - 10:5, 39:15, 75:25
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [3] - 1:18, 83:6, 83:7
**DIVISION** [1] - 1:2
**DO** [11] - 2:7, 5:20, 45:5, 45:8, 54:11, 54:17, 54:20, 54:24, 55:2, 55:10, 55:14
**doctors** [3] - 31:24, 32:6, 78:4
**document** [8] - 33:2, 33:14, 34:17, 34:18, 34:24, 35:11, 47:22, 47:23
**documents** [3] - 17:7, 34:13, 35:10
**dog** [4] - 42:12, 42:19, 42:20, 42:23
**dog's** [1] - 42:23
**dogs** [1] - 42:9
**DOJ** [2] - 2:4, 4:11
**dominate** [2] - 9:20, 43:15
**done** [8] - 23:10, 40:12, 40:14, 45:4, 49:17, 51:17, 54:13, 73:17
**door** [30] - 9:24, 11:25, 12:23, 12:24, 13:2, 13:5, 14:9, 14:10, 14:11, 19:11, 19:13, 26:3, 43:12, 59:23, 64:11, 65:17, 69:22, 69:24, 70:1, 72:8, 72:12, 72:16, 73:1, 74:14, 74:21, 76:1, 76:5, 76:12, 76:21, 76:23
**doors** [1] - 43:10
**down** [37] - 14:12, 14:18, 16:21, 18:5, 19:5, 24:20, 26:15, 27:25, 28:21, 29:13, 29:16, 29:24, 41:9, 41:17, 56:21, 56:22, 57:6, 57:8, 57:11, 57:15, 57:16, 58:1, 58:2, 61:19, 63:3, 65:23, 66:8, 66:20, 67:12, 71:13, 73:20, 74:19, 74:21, 77:1, 77:3, 80:17, 81:15
**downstairs** [36] - 8:11, 27:24, 29:9, 41:3, 41:9, 41:10, 41:12, 41:15, 41:23, 42:18, 43:1, 43:3, 43:12, 43:15, 43:18, 44:3, 56:3, 56:17, 56:18, 56:23, 57:5, 57:10, 58:6, 58:8, 59:9, 66:1, 66:14, 66:16, 67:18, 67:21, 68:6, 68:8, 68:10, 68:13, 69:25, 70:4
**drafting** [1] - 6:10
**draperies** [1] - 42:2
**drapes** [1] - 61:12
**drawer** [1] - 22:7
**DRAY** [2] - 2:23, 55:6
**Dray** [2] - 2:23, 5:1
**dressed** [1] - 11:15
**dresser** [1] - 22:17
**drew** [1] - 39:18
**due** [1] - 5:25
**duration** [1] - 69:23
**during** [4] - 33:6, 45:15, 63:10, 82:12
**duty** [2] - 65:21

## E

**early** [1] - 23:5
**ease** [1] - 7:6
**easier** [2] - 11:24, 45:2
**eat** [1] - 32:16
**effort** [1] - 79:2
**either** [3] - 12:23, 22:23, 50:5
**elbow** [2] - 15:10, 75:16
**EMMANUEL** [1] - 2:12
**Emmanuel** [2] - 2:13, 4:19
**emotional** [1] - 8:14
**employer** [2] - 5:24, 6:20
**end** [2] - 67:22, 67:24
**enforcement** [4] - 11:4, 20:22, 37:16, 63:17
**English** [7] - 40:4, 40:5, 40:6, 40:11, 40:13, 40:14, 40:19
**ensued** [1] - 60:11
**enter** [4] - 15:17, 28:13, 43:8, 70:3
**entered** [4] - 7:14, 28:15, 55:21, 65:23
**entire** [4] - 29:4, 63:10, 69:15, 71:16
**entitled** [1] - 83:3
**entrance** [3] - 9:24, 43:8, 43:10
**equivalent** [1] - 47:22
**especially** [1] - 48:19
**ESQ** [9] - 2:7, 2:8, 2:9, 2:12, 2:14, 2:17, 2:18, 2:21, 2:23
**essentially** [2] - 51:5, 52:6
**et** [2] - 1:6, 48:6
**ethical** [1] - 48:9
**evening** [2] - 65:21, 82:13
**events** [5] - 47:19, 63:21, 63:22, 66:18, 67:5
**eventually** [1] - 72:5
**everyday** [2] - 22:23, 22:25
**evidence** [12] - 12:15, 13:25, 18:9, 21:18, 21:23, 22:3, 22:12, 22:19, 24:23, 31:6, 31:11, 35:11
**exact** [1] - 11:1
**exactly** [3] - 38:6, 47:16, 61:14
**examination** [9] - 32:20, 33:6, 46:19, 47:12, 47:21, 50:4, 51:14, 78:2, 82:1
**EXAMINATION** [2] - 7:20, 37:6
**Examination** [2] - 3:3, 3:4
**examine** [1] - 46:14
**except** [1] - 58:14
**exclaimed** [1] - 67:20
**exclamation** [1] - 67:16
**excuse** [4] - 6:8, 6:11, 21:7, 44:24
**excused** [3] - 5:25, 6:18, 45:3
**executed** [1] - 7:25
**Exhibit** [20] - 12:5, 12:6, 12:11, 12:15, 13:25, 18:9, 19:25, 22:3, 22:12, 22:13, 22:19, 24:23, 25:9, 30:21, 30:22, 31:6, 31:11, 31:17, 60:21, 61:6
**exhibit** [1] - 12:19
**Exhibits** [4] - 21:1, 21:9, 21:17, 21:22
**exhibits** [5] - 7:7, 54:12, 54:22, 55:9, 55:11
**EXHIBITS** [1] - 3:7
**exist** [1] - 47:24
**existed** [1] - 47:23
**exists** [1] - 47:22
**exit** [1] - 59:13
**exited** [2] - 44:19, 82:7
**expecting** [1] - 71:21
**experience** [1] - 37:13
**explain** [4] - 11:25, 43:19, 73:17, 81:6
**explained** [2] - 78:10, 78:12
**explaining** [1] - 6:19
**explore** [1] - 53:6
**exposed** [5] - 71:2, 71:16, 76:12, 76:23, 77:22
**extent** [3] - 46:13, 46:15, 63:1
**extra** [2] - 78:21, 79:3
**eye** [3] - 16:8, 24:7, 26:15
**eyes** [19] - 16:24, 19:8, 23:13, 24:3, 26:15, 73:7, 79:6, 79:8, 79:9, 79:11, 79:13, 79:14, 79:16, 79:17, 79:18, 79:20, 80:19

## F

**face** [3] - 15:25, 30:7, 73:16
**facedown** [3] - 71:3, 71:15, 72:2
**facing** [1] - 76:21
**fact** [8] - 5:25, 32:15, 33:7, 48:11, 52:3, 52:12, 54:4, 75:15
**factor** [1] - 50:25
**facts** [1] - 48:10
**failed** [2] - 81:2, 81:4
**fair** [2] - 33:11, 40:25
**fairly** [2] - 12:8, 31:2
**faith** [3] - 46:10, 47:18, 48:7
**faith-based** [1] - 46:10
**falling** [5] - 19:22, 23:22, 39:19, 56:7
**false** [1] - 35:16
**falsely** [1] - 35:13
**family** [1] - 37:14
**far** [9] - 10:3, 12:23, 39:18, 39:20, 45:11, 65:17, 75:25, 76:2
**fashion** [1] - 53:7
**father** [3] - 60:3, 60:4, 68:15
**favorable** [2] - 46:2, 46:3
**FBI** [8] - 4:12, 38:2, 38:4, 63:18, 64:6, 64:16, 73:2, 73:10
**FCRR** [2] - 1:17, 83:5
**February** [3] - 81:2, 81:3, 81:4
**Federal** [1] - 1:17
**feet** [3] - 16:7, 16:19, 56:22
**fell** [2] - 10:7, 38:21
**fellowship** [1] - 6:1
**felt** [10] - 14:12, 16:21, 17:5, 17:23, 23:11, 23:12, 23:25, 27:5, 80:11
**female** [1] - 17:18
**few** [2] - 15:11, 53:9
**fighting** [1] - 28:9
**filed** [2] - 33:1, 45:21
**filing** [2] - 12:20, 12:22
**finally** [1] - 16:16
**fine** [2] - 25:15, 55:9
**finger** [1] - 16:3
**finish** [3] - 6:10, 16:14, 34:6
**fire** [9] - 10:6, 39:19, 63:11, 63:13, 65:6, 65:11, 68:5, 75:8, 75:16
**fired** [2] - 73:13, 77:21
**firing** [5] - 60:15, 63:11, 65:3, 65:4, 65:10
**first** [24] - 5:6, 15:16, 19:4, 21:10, 30:13, 33:18, 36:13, 39:5, 39:17, 41:7, 43:6, 43:9, 43:10, 43:15, 43:18, 51:22, 66:11, 66:19, 67:6, 69:1, 69:24, 72:10, 72:11, 75:18
**five** [9] - 63:6, 64:9,

64:12, 64:14, 64:17, 64:21, 65:15, 66:4, 68:16
**fixed** [1] - 54:17
**flash** [1] - 73:7
**flashlight** [8] - 23:13, 78:23, 79:1, 79:5, 79:11, 79:15, 79:18, 80:18
**flat** [1] - 35:23
**flat-out** [1] - 35:23
**fled** [1] - 9:8
**flipped** [5] - 23:12, 78:25, 79:24, 80:16, 80:18
**floor** [12] - 15:24, 19:22, 23:25, 24:18, 24:20, 25:3, 27:23, 43:6, 43:9, 43:10, 43:15
**FLORES** [2] - 2:14, 31:8
**Flores** [2] - 2:14, 4:20
**FLORIDA** [1] - 1:1
**Florida** [8] - 1:4, 1:19, 30:19, 30:25, 31:3, 31:19, 83:7, 83:7
**flow** [1] - 27:7
**flowing** [2] - 75:22, 80:3
**flown** [1] - 31:15
**focus** [4] - 10:12, 41:17, 61:4, 69:9
**focusing** [1] - 56:11
**folks** [2] - 49:23, 50:10
**following** [3] - 32:24, 36:25, 71:21
**foot** [7] - 17:25, 18:3, 18:14, 24:8, 25:6, 26:11
**FOR** [1] - 2:2
**forces** [1] - 11:8
**foreclosed** [1] - 46:9
**foregoing** [1] - 83:2
**foreign** [1] - 51:1
**forget** [1] - 64:1
**forgive** [1] - 32:4
**forgiveness** [1] - 24:12
**former** [1] - 38:25
**fortunate** [1] - 75:16
**forward** [9] - 25:19, 45:9, 55:10, 57:7, 57:12, 58:1, 58:3, 58:4, 58:5
**foundation** [1] - 35:25
**four** [7] - 7:6, 57:16, 57:17, 58:3, 65:24, 81:16
**fours** [5] - 43:3, 56:17, 56:24, 57:5, 57:10
**FPR** [2] - 1:17, 83:5
**FPR-C** [2] - 1:17, 83:5
**FRIEDMAN** [13] - 2:21, 4:25, 7:4, 32:21, 33:1, 34:1, 34:8, 36:1, 51:22, 52:8, 52:12, 52:23, 53:14
**Friedman** [2] - 2:22, 5:1
**front** [6] - 13:12, 42:12, 67:22, 67:24, 70:1, 76:4
**full** [2] - 27:11, 71:9
**fully** [1] - 77:21
**future** [1] - 46:4

## G

**gaining** [1] - 16:5
**game** [1] - 33:11
**gap** [1] - 66:22
**gate** [1] - 42:12
**generally** [1] - 45:16
**generated** [1] - 37:25
**gentleman** [2] - 24:9, 31:20
**gentlemen** [3] - 7:15, 44:11, 82:4
**gift** [2] - 21:12, 22:14
**given** [4] - 18:6, 32:15, 37:22, 51:24
**glad** [1] - 78:15
**God** [3] - 24:4, 24:12
**government** [3] - 49:11, 50:10, 52:6
**GOVERNMENT** [2] - 2:2, 3:7
**Government** [29] - 4:8, 6:12, 7:18, 12:10, 12:15, 21:16, 21:22, 31:5, 31:11, 33:1, 34:3, 35:16, 35:17, 35:23, 36:1, 36:3, 36:4, 36:6, 36:7, 36:10, 46:5, 46:21, 47:11, 49:24, 52:13, 61:5
**Government's** [21] - 12:4, 12:6, 12:11, 13:25, 18:9, 19:25, 21:1, 21:8, 21:17, 22:3, 22:12, 22:13, 22:19, 24:23, 25:8, 30:21, 30:22, 31:6, 31:17, 34:15, 60:20
**grab** [1] - 24:11
**grabbed** [1] - 80:17
**grabbing** [1] - 23:11
**granted** [1] - 33:3
**grazed** [3] - 78:8, 78:9, 78:10
**great** [2] - 44:10, 54:20
**group** [1] - 31:24
**guardhouse** [1] - 59:17
**guards** [2] - 59:6, 59:9
**guess** [3] - 42:4, 53:9, 68:21
**guilty** [1] - 46:25
**gun** [4] - 10:6, 15:12, 39:18
**gunfire** [22] - 9:16, 10:3, 10:21, 10:24, 11:2, 39:17, 42:8, 56:6, 56:11, 56:25, 60:11, 60:15, 63:12, 63:14, 65:7, 65:14, 66:7, 67:16, 68:24, 69:12, 70:2
**gunfires** [1] - 65:5
**gunshot** [2] - 32:3, 66:11
**gunshots** [4] - 39:8, 41:1, 64:10, 73:19
**guys** [1] - 55:7

## H

**hair** [2] - 32:17
**Haiti** [18] - 7:25, 22:15, 31:1, 31:2, 31:15, 31:17, 33:8, 36:2, 36:7, 47:22, 48:22, 50:10, 50:14, 51:23, 51:24, 52:20, 80:23, 81:8
**Haitian** [11] - 33:2, 35:17, 36:10, 45:25, 48:11, 48:13, 50:20, 50:21, 51:16, 52:6
**Haitians** [1] - 35:18
**halfway** [1] - 73:12
**hamm** [2] - 5:4, 5:21
**hand** [11] - 13:13, 22:10, 23:25, 24:1, 32:14, 36:9, 56:10, 75:23, 81:12
**hand-in-hand** [1] - 36:9
**handed** [4] - 5:7, 6:17, 32:14
**handling** [1] - 81:19
**hands** [1] - 70:21
**handwritten** [1] - 5:6
**happy** [2] - 6:8, 46:21
**hard** [1] - 46:12
**HDMI** [1] - 24:24
**head** [15] - 16:2, 41:3, 62:22, 63:5, 69:15, 70:20, 71:2, 71:15, 71:20, 72:2, 75:22, 77:9, 77:12, 77:16, 77:17
**head's** [2] - 76:19, 77:7
**healed** [1] - 32:3
**hear** [37] - 5:10, 5:12, 6:12, 9:16, 10:12, 10:14, 10:16, 10:18, 10:21, 10:25, 14:20, 17:8, 19:9, 19:20, 19:21, 20:5, 29:18, 34:15, 39:8, 41:1, 41:17, 42:2, 42:5, 42:7, 47:11, 51:20, 56:6, 56:7, 63:14, 65:3, 65:4, 65:7, 65:9, 68:5, 69:25, 70:3, 72:14
**heard** [25] - 10:6, 14:11, 14:13, 14:17, 16:17, 16:20, 18:24, 19:1, 20:6, 20:8, 20:9, 20:10, 23:19, 39:18, 60:10, 65:14, 66:7, 66:11, 72:11, 72:15, 74:20, 74:25, 81:18
**hearing** [13] - 10:2, 10:24, 26:3, 29:17, 33:3, 39:14, 39:15, 39:17, 46:11, 51:16, 56:11, 63:10, 65:6
**hearsay** [1] - 35:12
**heart** [1] - 28:1
**HECTOR** [1] - 2:14
**Hector** [1] - 4:20
**heightened** [1] - 54:4
**HELD** [1] - 1:11
**held** [3] - 32:24, 36:25, 79:22
**help** [5] - 27:1, 27:3, 29:5, 46:4, 46:6
**helping** [1] - 29:2
**herself** [3] - 35:6, 47:19, 50:3
**hide** [5] - 9:20, 52:2, 62:1, 62:3, 71:19
**hiding** [1] - 51:25
**hierarchy** [2] - 49:7, 50:17
**himself** [2] - 16:1, 70:19
**hit** [6] - 14:13, 41:12, 42:22, 61:25, 75:16, 76:9
**hitting** [1] - 39:15
**hmm** [1] - 69:11
**Hold** [1] - 54:23
**hold** [4] - 33:12, 36:16, 81:24
**holding** [4] - 42:16, 48:3, 79:24, 81:11
**holes** [1] - 15:7
**home** [8] - 8:17, 9:17, 10:10, 11:4, 22:7, 22:8, 23:7, 28:13
**Honey** [5] - 66:20, 67:10, 67:20, 68:6, 68:7
**Honor** [40] - 4:9, 4:15, 4:19, 4:22, 4:25, 5:14, 5:16, 5:18, 6:13, 6:14, 6:25, 8:1, 8:3, 8:19, 8:20, 9:6, 12:16, 21:2, 21:16, 21:20, 21:24, 25:25, 26:6, 32:21, 34:16, 34:18, 34:21, 35:14, 36:24, 37:1, 47:13, 49:6, 53:18, 54:11, 54:21, 55:23, 66:24, 74:3, 81:24, 82:3
**HONORABLE** [1] - 1:11
**hope** [1] - 16:24
**horrific** [1] - 37:13
**hospital** [18] - 23:21, 24:2, 26:18, 27:7, 27:25, 29:21, 29:22, 29:23, 30:1, 30:3, 30:9, 30:15, 31:18, 31:20, 38:2, 38:4, 38:7, 63:18
**Hospital** [1] - 64:6
**hour** [1] - 82:5
**hours** [5] - 23:5, 64:5, 64:17, 73:10, 73:14
**house** [62] - 9:19, 9:21, 9:23, 11:6,

11:10, 11:11, 11:12, 11:13, 11:15, 14:5, 19:9, 19:10, 19:21, 19:24, 20:2, 20:20, 24:7, 24:10, 26:21, 27:21, 29:2, 29:8, 29:9, 39:16, 39:19, 42:9, 42:13, 42:14, 43:5, 43:8, 43:9, 43:11, 43:22, 44:1, 55:3, 55:4, 58:17, 58:22, 59:1, 59:11, 59:13, 59:20, 60:12, 60:14, 60:22, 63:11, 63:14, 63:15, 64:11, 64:18, 65:11, 65:23, 65:25, 66:7, 68:2, 71:5, 71:7, 71:9, 71:16
**HOWARD** [25] - 2:9, 5:14, 6:14, 8:20, 21:20, 31:9, 33:21, 37:7, 44:10, 44:24, 53:18, 54:2, 54:8, 54:10, 55:23, 55:24, 57:19, 67:4, 72:13, 72:17, 74:12, 78:5, 81:23, 82:2, 82:11
**Howard** [6] - 2:10, 4:16, 37:10, 54:12, 55:22, 67:3
**Howard..................** [1] - 3:4
**husband** [25] - 11:17, 13:8, 16:9, 18:25, 19:3, 24:5, 24:19, 25:4, 26:9, 26:13, 33:9, 38:25, 39:10, 41:2, 60:7, 60:12, 60:22, 61:9, 61:14, 62:25, 66:19, 67:7, 68:5, 70:6, 78:17
**husband's** [4] - 48:5, 67:16, 80:21, 81:9

## I

**idea** [1] - 62:1
**identification** [3] - 12:4, 20:25, 30:20
**imagine** [4] - 39:12, 53:1, 67:6, 68:24
**imagined** [1] - 28:6
**implicated** [2] - 47:2, 47:3
**implicating** [1] - 46:19
**implies** [1] - 49:16
**importance** [1] - 6:3
**important** [2] - 40:23, 50:25
**impression** [1] - 60:13
**improper** [5] - 46:1, 46:4, 48:1, 51:19, 51:21
**incentive** [1] - 50:9
**incident** [4] - 38:10, 64:5, 64:17, 73:10
**include** [1] - 34:23
**incorrect** [1] - 53:20
**incrimination** [1] - 51:7
**indeed** [1] - 73:6
**independent** [1] - 35:19
**indicating** [1] - 38:18
**indicting** [1] - 51:23
**indictment** [10] - 33:8, 33:18, 34:25, 47:21, 48:19, 51:16, 52:13, 53:11, 53:20, 54:1
**indulge** [1] - 37:15
**inferences** [1] - 49:15
**information** [1] - 30:15
**informed** [1] - 78:7
**initial** [1] - 47:6
**initiative** [1] - 6:1
**injuries** [1] - 31:22
**inside** [26] - 9:17, 9:18, 11:4, 11:6, 11:10, 11:12, 11:18, 11:19, 19:9, 28:3, 29:9, 42:12, 58:19, 58:20, 58:22, 59:16, 59:22, 63:7, 65:10, 65:18, 65:25, 72:5, 73:20, 74:14, 79:8
**insisting** [1] - 32:6
**instance** [1] - 48:4
**instead** [1] - 78:21
**instinct** [1] - 41:7
**instructed** [3] - 61:22, 68:13, 69:16
**instruction** [1] - 50:6
**instructions** [1] - 59:25
**intend** [1] - 6:8
**intensity** [2] - 10:22, 10:23
**INTERPRETER** [2] - 37:1, 67:2
**Interpreter** [1] - 72:14
**interpreter** [2] - 4:18, 37:1
**interviewed** [2] - 37:16, 64:5
**interviews** [3] - 38:1, 40:12, 40:14
**Intriago** [3] - 4:4, 4:20, 5:15
**INTRIAGO** [1] - 2:11
**introduced** [1] - 48:20
**investigate** [3] - 35:18, 50:11, 52:1
**investigated** [4] - 36:2, 49:16, 51:5, 53:15
**investigating** [3] - 34:3, 48:25, 50:11
**investigation** [19] - 33:10, 34:2, 34:9, 34:10, 36:8, 47:3, 48:18, 48:22, 49:1, 49:13, 50:20, 51:1, 52:17, 52:24, 53:8, 54:3, 80:20, 81:8
**investigations** [1] - 35:20
**investigators** [2] - 50:23, 51:24
**invited** [1] - 38:8
**involved** [5] - 33:5, 47:18, 48:5, 50:13, 51:11
**involvement** [2] - 35:22, 53:8
**irrelevant** [1] - 34:24
**irrespective** [1] - 51:13
**irreversible** [1] - 78:13
**islands** [1] - 31:3
**issue** [7] - 33:7, 44:22, 48:21, 49:25, 50:16, 51:17, 53:25
**issues** [1] - 6:6
**items** [5] - 20:1, 20:16, 20:19, 20:23, 23:3

## J

**Jackson** [4] - 30:12, 30:17, 31:15, 64:6
**JACQUELINE** [1] - 1:11
**Jamaica** [1] - 31:1
**James** [2] - 4:5, 5:1
**JARAMILLO** [2] - 2:8, 4:15
**Jaramillo** [1] - 4:16
**JASON** [1] - 2:3
**Jason** [1] - 4:11
**Jefe** [1] - 23:8
**jefe** [3] - 20:7, 20:11, 20:13
**jewelry** [2] - 22:7, 22:25
**Joe** [10] - 12:7, 15:24, 21:12, 22:14, 23:20, 23:25, 38:22, 40:23, 41:18, 79:17
**JONATHAN** [1] - 2:21
**Jonathan** [2] - 2:22, 4:25
**Jormalie** [1] - 57:16
**Jormalie's** [1] - 57:24
**Jovenel** [4] - 44:1, 57:17, 57:24, 58:14
**Jovenel's** [1] - 43:21
**Jr** [1] - 57:24
**Jr.'s** [3] - 44:1, 57:17, 58:14
**judge** [2] - 48:12, 51:22
**Judge** [5] - 5:11, 52:8, 52:16, 55:16, 82:10
**JUDGE** [1] - 1:12
**judges** [1] - 81:19
**judicial** [3] - 80:23, 81:12, 81:21
**July** [15] - 8:10, 9:14, 20:21, 22:6, 22:16, 22:21, 23:2, 23:5, 27:17, 64:4, 73:9, 73:25, 81:5
**juror** [4] - 5:22, 5:24, 6:11, 6:14
**jurors** [1] - 7:6
**jury** [23] - 5:5, 6:3, 6:4, 7:5, 7:10, 11:17, 13:9, 14:1, 18:10, 25:3, 26:8, 31:15, 35:4, 35:5, 36:22, 44:11, 45:17, 49:15, 50:6, 53:11, 54:11, 55:19, 82:4
**JURY** [1] - 1:10
**Jury** [4] - 7:14, 44:19, 55:21, 82:7
**jury's** [1] - 45:11
**justice** [2] - 40:23, 81:20

## K

**keep** [3] - 22:24, 36:22, 69:9
**keeping** [1] - 24:6
**keeps** [1] - 70:7
**kept** [1] - 22:7
**kids** [8] - 27:9, 27:21, 42:19, 43:18, 66:2, 66:8, 66:20, 67:18
**kill** [2] - 8:18, 73:21
**killed** [6] - 28:15, 66:13, 79:13, 79:17, 80:22, 80:25
**kind** [7] - 16:14, 39:17, 51:3, 59:24, 60:15, 66:17, 71:19
**kinds** [1] - 51:3
**KUDMAN** [4] - 2:18, 4:22, 5:18, 7:2
**Kudman** [2] - 2:19, 4:22

## L

**ladies** [3] - 7:15, 44:11, 82:4
**lady** [1] - 39:5
**laid** [1] - 48:15
**LANCE** [2] - 1:17, 83:5
**language** [2] - 17:13, 50:21
**laptop** [2] - 7:8, 55:17
**large** [1] - 50:22
**Law** [2] - 2:10, 2:17
**law** [7] - 11:4, 20:22, 37:16, 49:18, 49:20, 49:21, 63:17
**laying** [7] - 15:22, 15:24, 16:11, 16:12, 24:20, 26:15, 71:4
**learn** [1] - 32:13
**learned** [1] - 39:25
**least** [3] - 29:23, 38:4, 63:9
**leave** [4] - 20:20, 23:17, 60:3
**led** [1] - 49:18
**left** [21] - 11:21, 13:6, 13:18, 13:20, 14:5, 14:6, 22:15, 23:9, 23:11, 23:19, 24:1, 25:6, 26:15, 32:14, 55:25, 63:14, 72:21, 73:6, 76:10, 76:23

**left-handed** [1] - 32:14
**leg** [3] - 23:11, 78:25, 80:18
**legal** [1] - 48:13
**leniency** [3] - 46:6, 49:11, 49:25
**less** [4] - 39:23, 39:24, 39:25, 47:10
**lessen** [1] - 51:12
**letter** [7] - 5:23, 6:2, 6:9, 6:19, 6:20, 6:21
**letting** [3] - 6:3, 16:14, 53:11
**levels** [1] - 28:19
**lie** [1] - 50:10
**life** [1] - 63:25
**lift** [2] - 24:1, 75:22
**lifted** [2] - 16:2
**light** [4] - 50:2, 51:18, 73:7, 79:21
**lights** [1] - 13:22
**likelihood** [1] - 63:20
**Lilah** [1] - 42:13
**limine** [2] - 44:21, 45:21
**limit** [1] - 34:22
**limited** [2] - 32:11, 53:7
**limiting** [1] - 50:6
**limits** [1] - 45:15
**line** [9] - 31:16, 44:8, 45:24, 46:1, 46:14, 46:18, 47:9, 48:3, 50:3
**link** [1] - 35:7
**listen** [1] - 9:3
**live** [1] - 40:2
**lives** [1] - 56:14
**LLP** [1] - 2:19
**lock** [1] - 59:23
**look** [14] - 7:8, 10:11, 24:3, 25:8, 35:4, 44:17, 50:4, 55:14, 56:4, 67:12, 67:18, 76:15, 80:24, 81:2
**looked** [7] - 16:6, 45:20, 50:9, 53:6, 66:11, 67:10
**looking** [12] - 16:6, 16:9, 16:16, 17:3, 17:9, 17:10, 19:25, 20:4, 20:17, 76:16, 80:15, 81:20
**loss** [1] - 37:14
**lost** [5] - 20:18, 24:5, 24:6, 27:5
**lovely** [1] - 6:2
**low** [4] - 62:5, 62:6, 72:3, 77:14
**lower** [2] - 49:11, 49:13
**Lunch** [1] - 82:19
**lunch** [5] - 45:5, 81:6, 82:5, 82:12, 82:14
**lung** [3] - 78:8, 78:9
**lying** [20] - 18:5, 61:15, 61:16, 61:17, 61:19, 63:3, 69:18, 71:1, 71:13, 72:2, 73:19, 76:24, 76:25, 77:1, 77:3, 77:7, 77:12, 77:15, 78:22, 80:17

## M

**ma'am** [10] - 8:22, 25:16, 25:24, 37:4, 37:5, 37:8, 44:13, 55:25, 73:4, 82:13
**Madam** [1] - 72:14
**maintain** [1] - 51:6
**male** [3] - 17:18, 17:19, 18:11
**males** [1] - 18:11
**manager** [2] - 27:21, 29:2
**maneuver** [4] - 62:17, 71:14, 72:1, 72:3
**manner** [1] - 20:2
**map** [2] - 30:23, 31:2
**March** [2] - 1:5, 83:4
**Marissel** [1] - 4:23
**MARISSEL** [1] - 2:17
**mark** [4] - 13:8, 14:1, 25:2, 31:14
**MARKED** [1] - 3:8
**marked** [10] - 12:4, 14:4, 20:25, 21:8, 25:5, 26:8, 30:20, 31:16, 55:8, 77:4
**marks** [1] - 18:14
**MARTINE** [2] - 3:3, 7:18
**mass** [1] - 77:23
**matter** [5] - 39:3, 57:7, 57:9, 63:25, 83:3
**mattress** [3] - 61:24, 62:2, 62:10
**max** [1] - 68:17
**maximum** [1] - 32:8
**McLaughlin** [1] - 4:10
**MCLAUGHLIN** [9] - 2:3, 4:9, 5:11, 6:13, 54:21, 55:1, 55:8, 55:12, 82:10
**mean** [8] - 9:23, 10:7, 10:23, 20:12, 36:4, 39:20, 39:21, 58:20
**meaning** [1] - 47:19
**means** [1] - 20:13
**mechanical** [1] - 1:21
**media** [1] - 36:5
**members** [7] - 11:16, 13:9, 14:1, 18:10, 25:2, 26:8, 31:14
**Memorial** [1] - 64:6
**men** [4] - 11:4, 46:24, 58:18, 73:12
**mention** [4] - 6:22, 18:15, 28:17, 35:15
**mentioned** [14] - 13:1, 17:2, 17:20, 17:24, 18:2, 23:1, 24:18, 26:13, 26:19, 27:9, 28:5, 50:19, 58:25, 73:16
**mentioning** [4] - 17:9, 19:24, 23:8, 28:18
**mere** [1] - 47:22
**merely** [1] - 49:16
**MIAMI** [1] - 1:2
**Miami** [6] - 1:4, 1:18, 1:19, 31:17, 31:19, 83:7
**microphone** [1] - 45:18
**might** [7] - 35:13, 47:19, 49:2, 54:8, 56:9, 59:9, 66:21
**millimeter** [1] - 78:13
**mind** [3] - 60:15, 60:18, 69:19
**minds** [1] - 48:14
**mine** [3] - 21:10, 21:11, 39:3
**minors** [1] - 41:5
**minute** [6] - 20:19, 25:17, 26:4, 65:23, 66:9, 74:14
**minutes** [38] - 15:18, 36:14, 36:21, 37:3, 37:4, 44:13, 44:16, 44:20, 44:22, 63:6, 63:9, 64:10, 64:12, 64:14, 64:18, 64:21, 64:25, 65:1, 65:16, 66:4, 66:6, 66:10, 66:13, 66:15, 67:17, 67:23, 68:16, 68:19, 68:24, 69:12, 69:13, 69:21, 71:1, 82:3
**miracle** [2] - 78:6, 78:16
**miraculous** [1] - 77:24
**miss** [1] - 40:24
**missing** [3] - 7:6, 20:16, 20:23
**mission** [1] - 22:15
**mistake** [1] - 74:7
**mistaken** [1] - 64:22
**misunderstood** [1] - 58:7
**Moise** [37] - 7:22, 8:10, 9:8, 11:16, 12:3, 12:19, 12:25, 13:7, 13:21, 14:6, 15:11, 16:4, 16:9, 17:1, 18:2, 18:9, 18:15, 18:24, 19:19, 20:8, 20:21, 21:7, 22:2, 22:12, 23:1, 23:17, 24:16, 25:2, 25:8, 26:8, 28:5, 28:21, 29:16, 30:9, 30:22, 31:14, 37:2
**MOISE** [2] - 3:3, 7:18
**Moise's** [1] - 50:22
**moment** [8] - 7:23, 9:22, 17:1, 19:4, 24:16, 25:24, 29:3, 80:16
**money** [1] - 45:17
**months** [1] - 6:4
**Morning** [1] - 1:5
**morning** [14] - 4:9, 4:14, 4:15, 4:19, 4:22, 4:25, 5:3, 5:5, 7:15, 23:5, 36:20, 37:8, 37:9, 39:7
**most** [1] - 71:6
**mother** [3] - 41:6
**motion** [4] - 33:3, 44:21, 48:2, 50:19
**motions** [1] - 45:21
**motivation** [1] - 35:13
**motive** [1] - 33:5
**mouth** [8] - 23:16, 42:16, 42:23, 79:25, 80:2, 80:8, 80:11, 80:19
**mouths** [1] - 47:21
**move** [4] - 8:7, 8:20, 25:19, 57:20
**moves** [3] - 12:10, 21:16, 31:5
**movie** [1] - 64:2
**MR** [65] - 4:9, 4:19, 4:25, 5:11, 5:14, 5:16, 5:20, 6:13, 6:14, 6:25, 7:4, 8:1, 8:19, 8:20, 12:13, 21:20, 31:8, 31:9, 32:21, 33:1, 33:21, 34:1, 34:8, 36:1, 37:7, 44:10, 44:24, 45:5, 45:8, 47:13, 49:6, 50:18, 51:22, 52:8, 52:12, 52:23, 53:14, 53:18, 54:2, 54:8, 54:10, 54:11, 54:17, 54:20, 54:21, 54:24, 55:1, 55:2, 55:6, 55:8, 55:10, 55:12, 55:14, 55:23, 55:24, 57:19, 67:4, 72:13, 72:17, 74:12, 78:5, 81:23, 82:2, 82:10, 82:11
**MS** [36] - 4:15, 4:22, 5:18, 7:2, 7:21, 8:3, 8:9, 9:6, 9:7, 12:10, 12:16, 12:18, 21:2, 21:6, 21:16, 21:24, 22:1, 24:24, 25:1, 25:22, 25:25, 26:6, 26:7, 31:5, 31:12, 31:13, 32:19, 34:5, 34:16, 35:14, 36:9, 36:24, 57:13, 66:24, 74:3, 78:1
**multiple** [6] - 14:15, 15:19, 16:13, 19:3, 32:1, 73:13
**murder** [4] - 48:5, 80:21, 81:9, 81:14
**must** [4] - 39:12, 59:13, 64:20, 64:22
**muzzle** [2] - 42:16, 42:19

## N

**name** [4] - 20:8, 27:11, 29:24, 37:10
**named** [1] - 13:16
**names** [2] - 20:7, 23:8
**narrow** [1] - 47:10
**near** [2] - 23:24, 24:2
**nearest** [1] - 27:25
**necessarily** [1] - 77:11
**necklace** [2] - 21:10, 22:5
**need** [13] - 8:7, 25:10, 32:7, 37:15, 39:2, 44:13, 44:15,

58:21, 80:4, 81:1, 81:2, 81:21
**needed** [3] - 26:2, 27:24, 79:1
**needs** [2] - 45:2, 54:13
**neighborhood** [1] - 23:20
**never** [22] - 11:1, 11:13, 20:9, 20:10, 27:8, 32:14, 32:18, 35:11, 37:22, 38:3, 39:25, 42:13, 57:3, 58:5, 59:7, 63:25, 64:2, 64:23, 70:2, 75:10, 79:17
**new** [1] - 54:1
**news** [1] - 40:12
**next** [11] - 4:21, 8:6, 22:17, 22:24, 23:8, 27:22, 29:20, 36:14, 57:18, 63:3, 65:17
**night** [9] - 24:5, 38:19, 65:22, 69:4, 69:6, 69:9, 74:9, 74:11, 75:12
**nightstand** [1] - 22:24
**NO** [1] - 1:2
**noise** [16] - 11:1, 14:11, 14:13, 14:20, 19:1, 23:19, 42:7, 42:15, 57:3, 63:12, 72:12, 72:15, 74:20, 74:25, 75:1, 75:12
**non** [1] - 51:7
**non-self-incrimination** [1] - 51:7
**none** [5] - 6:7, 21:20, 58:22, 58:23, 77:11
**noon** [4] - 45:6, 45:11, 45:12
**normally** [4] - 11:8, 27:16, 29:7, 29:10
**North** [1] - 1:18
**nose** [1] - 23:16
**note** [2] - 5:6, 6:24
**notes** [7] - 5:4, 44:21, 45:20, 46:11, 53:22, 53:24, 83:3
**nothing** [7] - 6:25, 23:19, 31:21, 33:18, 35:23, 36:2
**notice** [1] - 56:9
**notion** [1] - 60:10
**notwithstanding** [1] - 75:15
**nullity** [1] - 47:24

## O

**o'clock** [9] - 38:13, 39:7, 41:1, 66:12, 68:5, 81:7, 81:25, 82:6, 82:16
**objection** [20] - 5:11, 5:14, 5:16, 5:18, 5:20, 7:4, 8:1, 8:5, 8:19, 8:21, 12:12, 12:13, 21:19, 31:7, 31:8, 31:9, 57:13, 66:24, 74:3, 78:1
**objections** [3] - 5:9, 8:5, 8:7
**obligations** [1] - 48:9
**occasion** [1] - 37:19
**occasions** [1] - 38:5
**occur** [3] - 59:8, 59:10, 60:6
**occurred** [1] - 66:8
**OF** [8] - 1:1, 1:4, 1:10, 2:6, 2:11, 2:16, 2:20, 83:1
**offer** [1] - 46:7
**offered** [1] - 46:7
**offering** [1] - 37:12
**Office** [1] - 2:5
**office** [1] - 6:4
**officer** [4] - 11:13, 25:12, 30:5, 30:7
**Offices** [1] - 2:10
**Official** [1] - 83:6
**often** [2] - 49:9, 56:7
**ON** [4] - 2:6, 2:11, 2:16, 2:20
**once** [14] - 9:24, 14:11, 16:5, 23:19, 25:19, 26:13, 31:20, 38:14, 38:22, 47:23, 48:12, 69:24, 79:13, 79:24
**one** [35] - 5:24, 14:15, 21:10, 24:5, 25:24, 26:15, 37:10, 37:19, 42:10, 42:11, 43:22, 50:18, 51:22, 52:11, 53:18, 54:15, 54:23, 55:11, 57:18, 60:12, 62:21, 63:4, 63:11, 65:11, 65:22, 66:22, 67:6, 69:24, 73:12, 75:1, 78:4, 78:7, 80:25, 82:5
**one-hour** [1] - 82:5
**ones** [3] - 42:13, 42:23, 70:15
**open** [5] - 19:8, 36:5, 36:25, 79:12, 79:14
**open-source** [1] - 36:5
**opened** [2] - 14:10, 79:17
**opening** [2] - 14:9, 14:11
**opportunities** [1] - 6:6
**opportunity** [3] - 8:25, 9:1, 40:10
**opposed** [1] - 70:20
**opposite** [1] - 69:18
**or..** [1] - 55:17
**orbit** [1] - 26:17
**orchestrate** [1] - 48:6
**Order** [1] - 4:1
**order** [6] - 8:15, 12:22, 43:8, 56:18, 59:13, 80:7
**original** [1] - 50:21
**originally** [1] - 51:23
**Orlando** [1] - 4:16
**ORLANDO** [1] - 2:7
**ORTIZ** [2] - 1:6, 2:6
**Ortiz** [2] - 4:3, 4:17
**Ortiz's** [1] - 5:13
**ostrich** [1] - 71:19
**out-of-bounds** [1] - 48:14
**outside** [10] - 9:17, 9:18, 11:9, 11:10, 11:15, 14:25, 30:3, 58:19, 58:20, 63:7
**overruled** [5] - 8:21, 57:14, 67:1, 74:5, 78:2
**own** [3] - 39:1, 39:2, 48:8

## P

**P.A** [3] - 2:8, 2:22, 2:23
**PAGE** [1] - 3:2
**page** [9] - 12:4, 12:6, 12:10, 12:12, 18:9, 19:25, 24:23, 25:8, 47:13
**pages** [1] - 1:7
**paid** [1] - 69:5
**pain** [1] - 32:18
**Paix** [1] - 40:11
**papers** [2] - 48:16, 50:19
**Paraison** [4] - 27:11, 27:12, 27:14, 27:21
**parallel** [2] - 77:12, 77:15
**parameters** [1] - 33:4
**part** [13] - 27:10, 27:18, 34:24, 36:7, 39:19, 50:22, 59:19, 62:20, 76:22, 77:2, 77:3, 77:17, 77:18
**partially** [2] - 73:3, 74:1
**participate** [1] - 5:25
**parties** [1] - 6:23
**pass** [2] - 46:22, 80:24
**passed** [4] - 15:16, 57:16, 57:17, 63:23
**path** [1] - 26:9
**patience** [2] - 36:15, 36:17
**PATRICK** [1] - 2:23
**Patrick** [2] - 2:23, 5:1
**Pavletic** [1] - 4:13
**pending** [11] - 33:10, 33:19, 34:2, 34:9, 34:10, 49:9, 49:10, 49:13, 49:19, 52:17, 54:3
**people** [21] - 13:16, 17:2, 17:13, 18:6, 19:9, 23:17, 27:1, 28:7, 28:15, 46:16, 46:25, 47:1, 48:24, 50:3, 63:7, 65:4, 65:17, 71:21, 71:24, 80:22, 81:3
**PEREZ** [7] - 2:12, 4:19, 5:16, 6:25, 8:1, 8:19, 12:13
**Perez** [3] - 2:13, 4:19, 6:24
**perfectly** [1] - 35:3
**peril** [1] - 33:19
**period** [1] - 68:1
**permission** [1] - 31:12
**permitted** [1] - 52:19
**person** [18] - 12:21, 13:5, 16:7, 16:18, 22:9, 23:12, 26:21, 49:15, 51:5, 65:24, 71:10, 74:18, 74:19, 78:24, 78:25, 79:9, 80:16, 80:17
**person's** [1] - 13:6
**personally** [1] - 48:8
**Phenelus** [1] - 4:12
**PHENELUS** [33] - 2:4, 7:21, 8:3, 8:9, 9:6, 9:7, 12:10, 12:16, 12:18, 21:2, 21:6, 21:16, 21:24, 22:1, 24:24, 25:1, 25:22, 25:25, 26:6, 26:7, 31:5, 31:12, 31:13, 32:19, 34:5, 34:16, 35:14, 36:9, 36:24, 57:13, 66:24, 74:3, 78:1
**Phenelus.....** [1] - 3:3
**phone** [11] - 38:13, 38:18, 38:19, 38:20, 38:22, 38:25, 39:1, 39:2, 39:4, 39:6
**photo** [1] - 76:15
**photograph** [5] - 60:21, 61:5, 61:10, 76:1
**Photograph** [1] - 61:6
**phrase** [1] - 35:16
**physically** [2] - 52:1, 81:22
**Pibe** [3] - 20:7, 20:8, 23:8
**pick** [1] - 71:22
**picked** [2] - 78:25
**picture** [6] - 11:23, 12:21, 12:22, 13:5, 22:10, 55:2
**pictures** [1] - 7:8
**piece** [2] - 10:7, 56:7
**pieces** [2] - 10:16, 23:2
**pink** [1] - 76:4
**place** [11] - 9:20, 29:23, 34:2, 38:8, 39:3, 43:25, 62:3, 62:15, 68:14, 69:4, 74:9
**placed** [2] - 38:21, 38:22
**places** [1] - 43:22
**plan** [2] - 45:8, 81:14
**plane** [4] - 30:11, 30:13, 30:14, 30:15
**playing** [1] - 64:2
**plugged** [1] - 54:17
**PM** [5] - 1:6, 20:1, 38:19, 82:7, 82:19
**point** [14] - 10:3, 10:17, 14:2, 20:15, 20:22, 46:20, 47:16, 49:21, 54:5, 56:23, 59:1, 62:15,

66:12, 74:13
**point-blank** [1] - 74:13
**police** [3] - 11:13, 30:5, 30:7
**pool** [2] - 19:14, 59:14
**Port** [1] - 40:11
**Port-de-Paix** [1] - 40:11
**position** [8] - 10:20, 17:6, 18:6, 18:7, 22:9, 71:6, 71:8, 71:17
**positioned** [1] - 15:3
**positioning** [3] - 16:10, 17:21, 17:22
**Posner** [1] - 2:19
**possibility** [1] - 20:19
**possible** [2] - 53:8, 68:25
**post** [1] - 11:10
**posted** [3] - 11:10, 11:15, 28:8
**power** [4] - 80:22, 80:23, 81:11, 81:12
**practice** [1] - 40:1
**precedence** [2] - 48:1, 48:15
**precipitated** [1] - 50:20
**precise** [1] - 47:14
**predicated** [1] - 50:23
**prejudice** [3] - 33:4, 47:6, 53:25
**prejudicial** [2] - 49:14, 49:17
**preparation** [1] - 37:24
**prepared** [3] - 6:2, 46:7, 83:3
**present** [1] - 4:17
**president** [20] - 11:7, 17:6, 18:23, 24:11, 28:16, 38:25, 39:4, 39:6, 65:12, 66:13, 68:25, 69:16, 69:18, 70:13, 71:11, 71:24, 72:21, 75:20, 75:21, 79:13
**president's** [1] - 68:20
**PRETEL** [2] - 1:6, 2:6
**Pretel** [2] - 4:3, 4:17
**pretty** [5] - 34:13, 46:11, 47:4, 47:15, 53:24
**prevented** [1] - 79:6
**previous** [1] - 45:24
**previously** [4] - 7:18, 52:20, 53:15, 54:5
**priority** [1] - 69:1
**probe** [1] - 33:15
**probing** [1] - 35:12
**problem** [6] - 36:18, 50:19, 55:3, 55:17, 55:18, 68:8
**problems** [1] - 49:18
**procedure** [1] - 8:24
**proceed** [1] - 33:19
**Proceedings** [1] - 1:21
**proceedings** [4] - 32:24, 36:25, 48:14, 83:2
**proceeds** [1] - 51:2
**produced** [1] - 1:22
**proficient** [1] - 40:6
**prohibiting** [1] - 33:2
**promise** [1] - 49:10
**promises** [1] - 46:6
**proper** [1] - 51:14
**proposed** [1] - 5:7
**prosecutor** [1] - 8:22
**prosecutor's** [1] - 8:23
**protect** [2] - 61:24, 71:9
**protected** [2] - 62:10, 62:11
**protection** [1] - 62:2
**provided** [1] - 5:4
**publish** [3] - 12:16, 21:24, 31:12
**pull** [1] - 59:22
**pulled** [10] - 23:12, 72:18, 72:20, 72:24, 73:4, 73:5, 73:11, 73:15, 73:23, 73:25
**pupil** [1] - 79:8
**pupils** [1] - 79:6
**purpose** [5] - 27:3, 50:1, 50:17, 52:22, 52:23
**push** [3] - 80:1, 80:4, 80:8
**put** [5] - 11:23, 17:6, 34:13, 34:17, 71:8
**putting** [2] - 78:21, 79:3
**Pétion** [4] - 29:23, 29:24, 30:1, 30:10
**Pétion-Ville** [4] - 29:23, 29:24, 30:1, 30:10

## Q

**quarters** [1] - 29:8
**question/issue** [1] - 5:23
**questioning** [6] - 44:8, 45:24, 46:1, 46:18, 46:24, 47:9
**questionnaire** [1] - 6:4
**questions** [19] - 5:7, 5:8, 9:1, 24:13, 32:19, 33:9, 33:20, 34:14, 34:25, 35:22, 35:24, 36:13, 37:14, 46:14, 49:18, 50:8, 53:10, 81:16, 81:21
**quickly** [1] - 50:18

## R

**raise** [4] - 6:6, 8:5, 8:6, 50:18
**raised** [2] - 6:7, 44:22
**ran** [2] - 56:22, 80:19
**range** [1] - 74:13
**reach** [2] - 32:18, 56:13
**reached** [3] - 71:11, 71:24, 75:20
**reacting** [1] - 79:6
**read** [2] - 75:10
**ready** [4] - 7:5, 7:13, 7:16, 81:20
**realize** [1] - 71:13
**realized** [4] - 23:22, 23:23, 26:17, 71:5
**really** [9] - 8:22, 14:20, 15:18, 29:15, 40:3, 45:15, 49:8, 50:18, 71:8
**Realtime** [1] - 1:17
**reason** [8] - 6:18, 11:12, 40:18, 43:23, 46:10, 51:11, 66:10, 81:15
**reasons** [1] - 48:15
**received** [5] - 5:24, 12:15, 21:22, 31:11, 73:19
**recess** [3] - 7:11, 82:18, 82:19
**Recess** [2] - 7:12, 45:13
**recollection** [3] - 56:1, 63:21, 63:22
**recommendation** [1] - 50:22
**recommended** [1] - 48:12
**reconstruct** [2] - 32:7, 32:10
**record** [11] - 4:8, 13:11, 13:18, 14:4, 18:13, 25:5, 31:16, 36:6, 36:16, 52:10, 83:2
**recorded** [1] - 1:21
**records** [1] - 38:18
**recount** [1] - 66:18
**reference** [2] - 47:23, 76:1
**referring** [4] - 13:3, 14:23, 20:21, 28:13
**reflect** [4] - 14:4, 18:13, 25:5, 31:16
**refusal** [1] - 50:22
**refused** [1] - 52:14
**reiterate** [1] - 48:2
**relationship** [1] - 17:5
**relevant** [1] - 54:6
**remember** [9] - 21:14, 44:17, 62:20, 64:8, 70:12, 75:12, 75:13, 75:14, 81:1
**remind** [1] - 82:11
**repeatedly** [1] - 73:3
**rephrase** [1] - 67:2
**report** [4] - 64:23, 75:10, 75:11, 80:10
**reporter** [3] - 36:18, 45:19, 52:10
**Reporter** [2] - 1:17, 83:6
**REPORTER** [1] - 83:1
**Reporter.........................** [1] - 3:5
**reports** [4] - 37:21, 37:23, 37:25, 38:3
**represent** [1] - 37:10
**representations** [1] - 53:4
**represented** [2] - 36:1, 36:4
**requested** [1] - 81:17
**rescue** [1] - 16:25
**reside** [3] - 11:14, 58:23, 59:2
**respect** [1] - 8:24
**respond** [1] - 34:7
**response** [2] - 5:21, 34:15
**rest** [3] - 19:14, 32:10, 71:2
**restroom** [2] - 37:2, 45:2
**result** [2] - 32:2, 38:1
**results** [1] - 32:1
**resume** [4] - 7:16, 26:5, 44:15, 55:22
**retrieved** [1] - 75:6
**returned** [2] - 65:6, 65:11
**returning** [1] - 63:13
**revolver** [1] - 70:12
**rifles** [2] - 70:6, 70:14
**right-hand** [2] - 13:13, 22:10
**right-handed** [1] - 32:14
**road** [1] - 47:5
**role** [1] - 74:7
**rolling** [1] - 36:22
**roof** [1] - 14:5
**room** [22] - 9:25, 11:18, 11:19, 12:19, 13:2, 13:7, 13:21, 13:22, 17:2, 18:12, 23:4, 23:9, 28:15, 30:5, 41:13, 56:21, 60:7, 69:16, 70:17, 71:14, 73:20
**rooms** [6] - 57:18, 57:24, 58:10, 58:12, 59:4
**rounds** [2] - 78:21, 79:3
**RPR** [2] - 1:17, 83:5
**ruled** [1] - 34:12
**rules** [1] - 51:3
**ruling** [2] - 34:24, 47:6
**rummage** [1] - 20:4
**rummaged** [1] - 23:9
**rummaging** [4] - 19:21, 19:24, 20:14, 23:7
**run** [5] - 8:17, 41:17, 71:17, 79:11

## S

**safe** [2] - 71:16, 81:22
**safer** [1] - 60:1
**safest** [3] - 43:22, 43:25, 68:14
**safety** [2] - 56:17, 68:22
**salami** [1] - 47:15
**sand** [1] - 71:20
**satisfy** [1] - 80:14
**save** [4] - 27:1, 35:6,

56:13, 71:11
**saw** [19] - 11:17, 11:19, 15:25, 16:5, 16:22, 24:3, 24:9, 24:10, 24:14, 26:14, 45:18, 52:1, 59:17, 60:18, 60:20, 60:22, 61:9, 64:23
**school** [2] - 40:11
**screen** [1] - 77:5
**SEAN** [1] - 2:3
**Sean** [1] - 4:9
**searching** [1] - 20:18
**seated** [2] - 4:20, 5:4
**second** [3] - 5:23, 6:24, 43:9
**secure** [1] - 68:21
**secured** [1] - 69:10
**security** [9] - 11:8, 27:18, 27:20, 28:8, 28:18, 28:19, 30:6, 58:16, 68:20
**See** [1] - 82:20
**see** [52] - 9:20, 9:24, 9:25, 10:11, 11:3, 11:5, 11:24, 15:14, 15:23, 15:24, 16:3, 19:5, 21:15, 25:3, 26:9, 26:13, 28:3, 28:22, 28:24, 29:16, 30:7, 30:25, 31:25, 32:10, 41:7, 41:23, 43:15, 49:6, 50:16, 51:18, 54:16, 55:16, 61:2, 61:10, 61:12, 62:14, 62:17, 62:25, 66:14, 67:21, 74:18, 76:4, 77:4, 77:6, 77:19, 79:9, 79:12, 79:13, 79:21, 82:15
**seek** [1] - 62:2
**seem** [1] - 80:24
**sees** [1] - 13:4
**self** [1] - 51:7
**sense** [8] - 17:20, 17:21, 18:3, 18:11, 29:13, 56:20, 68:9, 70:19
**series** [2] - 55:4, 67:5
**service** [1] - 6:3
**services** [1] - 4:18
**Session** [2] - 1:5, 82:20
**set** [1] - 33:4
**several** [4] - 14:17, 15:15, 31:23, 74:23
**shaking** [6] - 14:12, 14:18, 16:21, 19:5, 19:6, 42:17
**share** [2] - 6:9, 6:21
**shatter** [1] - 42:6
**shaving** [1] - 51:21
**shed** [2] - 50:2, 51:18
**shined** [1] - 79:18
**shining** [2] - 79:15, 79:21
**shooting** [5] - 29:14, 30:4, 41:11, 60:16, 70:2
**shortly** [1] - 26:25
**shot** [38] - 14:19, 15:1, 15:9, 15:15, 15:17, 15:19, 15:25, 16:13, 16:19, 16:20, 18:22, 18:25, 19:3, 19:4, 19:6, 28:16, 30:6, 69:24, 72:12, 72:16, 72:18, 72:20, 72:23, 72:24, 73:1, 73:3, 73:11, 73:16, 74:1, 74:13, 74:15, 74:18, 74:23, 75:18, 75:19, 75:20, 77:23, 78:17
**shots** [4] - 39:14, 39:15, 63:7, 73:13
**shoulder** [1] - 77:17
**show** [15] - 11:24, 12:3, 12:24, 13:24, 24:22, 35:10, 49:10, 50:2, 53:11, 53:12, 53:20, 54:14, 62:18
**showed** [4] - 11:9, 11:23, 21:8, 27:2
**shower** [2] - 59:22
**showing** [9] - 18:8, 20:25, 21:7, 22:2, 22:11, 22:18, 24:15, 30:20, 54:22
**shown** [1] - 37:25
**side** [50] - 11:20, 11:21, 13:6, 13:7, 13:10, 13:11, 13:13, 13:17, 13:18, 13:20, 14:5, 14:22, 14:23, 14:24, 14:25, 15:25, 22:10, 24:20, 24:21, 25:6, 25:7, 26:10, 32:2, 45:18, 60:23, 60:25, 61:9, 61:17, 61:19, 61:20, 62:7, 62:9, 62:12, 69:17, 69:18, 72:8, 73:19, 75:19, 76:2, 76:10, 76:12, 76:21, 76:22, 76:23, 76:24, 77:4
**sidebar** [4] - 32:22, 32:24, 44:23, 53:19
**sidebars** [2] - 36:17, 45:16
**signed** [1] - 5:25
**silence** [2] - 50:23, 51:7
**sincere** [1] - 37:12
**sip** [2] - 25:20, 26:2
**sitting** [4] - 24:8, 61:15, 62:14, 74:19
**situated** [2] - 11:25, 12:1
**six** [5] - 63:6, 64:10, 64:17, 64:21, 65:15
**skeptical** [1] - 48:8
**sleep** [5] - 10:19, 12:7, 20:1, 38:17
**sleeps** [3] - 29:7, 29:10, 29:11
**slept** [1] - 29:8
**slicing** [1] - 47:15
**slid** [4] - 24:18, 24:20, 25:3, 26:9
**slide** [3] - 23:24, 24:2, 24:19
**sliding** [2] - 23:22, 24:21
**slightly** [1] - 75:22
**slim** [1] - 18:20
**so..** [1] - 35:13
**soaked** [1] - 23:23
**SOLAGES** [1] - 2:20
**Solages** [4] - 4:6, 5:2, 5:19, 7:3
**someone** [12] - 13:3, 16:1, 16:17, 16:23, 18:19, 18:20, 19:12, 19:13, 23:11, 26:19, 50:8, 65:25
**sometimes** [2] - 11:14, 39:2
**sorry** [4] - 8:4, 17:25, 25:10, 69:12
**sort** [2] - 6:1, 34:22
**sound** [8] - 14:16, 15:11, 16:19, 16:22, 18:25, 74:23, 75:8
**source** [1] - 36:5
**Southern** [1] - 83:7
**SOUTHERN** [1] - 1:1
**sovereigns** [1] - 35:19
**space** [1] - 10:22
**Spain** [1] - 40:2
**Spanish** [10] - 17:14, 17:15, 17:16, 17:17, 19:17, 20:11, 20:13, 39:22, 40:5, 40:7
**speaking** [7] - 8:4, 17:13, 17:14, 19:16, 20:6, 28:15
**Special** [1] - 4:13
**special** [1] - 73:11
**specific** [1] - 67:24
**speculation** [1] - 78:1
**spell** [1] - 40:2
**spent** [4] - 8:16, 17:16, 45:17, 68:12
**square** [1] - 55:10
**stairs** [17] - 9:15, 10:2, 10:18, 11:3, 27:25, 28:21, 29:13, 29:16, 41:17, 56:22, 56:23, 57:8, 57:11, 57:15, 57:25, 58:1
**stand** [2] - 13:12, 57:1
**standing** [7] - 12:21, 16:19, 17:5, 22:9, 61:14, 74:16, 74:19
**start** [1] - 51:16
**started** [3] - 9:12, 47:8, 64:10
**starting** [1] - 4:8
**starts** [1] - 8:6
**state** [1] - 33:17
**statement** [4] - 52:14, 52:15, 63:17, 66:23
**statements** [3] - 37:21, 37:22, 51:24
**STATES** [3] - 1:1, 1:4, 1:12
**States** [18] - 1:18, 2:5, 4:3, 4:4, 4:5, 4:10, 5:10, 36:7, 37:17, 46:1, 46:3, 46:6, 51:8, 51:10, 82:9, 83:6
**stating** [1] - 36:6
**stay** [9] - 7:7, 9:22, 41:13, 43:23, 58:22, 59:6, 59:25, 60:2, 71:23
**stayed** [2] - 43:18, 71:10
**STEINBEISSER** [2] - 1:17, 83:5
**Steinbeisser** [1] - 83:5
**stenography** [1] - 1:21
**stenotype** [1] - 83:3
**stick** [2] - 45:10, 45:12
**sticking** [1] - 70:20
**still** [11] - 7:6, 15:20, 16:3, 16:14, 19:16, 24:5, 24:7, 45:22, 53:5, 71:21, 75:23
**stomach** [8] - 14:7, 15:22, 17:24, 18:2, 71:4, 76:17, 76:24, 80:17
**stood** [1] - 13:5
**stop** [1] - 50:5
**stopped** [5] - 11:1, 16:6, 27:8, 57:3, 70:2
**stops** [1] - 64:2
**story** [1] - 43:5
**straight** [2] - 16:7, 48:5
**straight-up** [1] - 48:5
**stray** [4] - 42:10, 42:22, 61:25, 71:23
**streets** [1] - 42:11
**strength** [2] - 8:15, 16:6
**strike** [4] - 8:20, 58:9, 60:5, 62:24
**structure** [2] - 59:17, 59:19
**structured** [3] - 9:19, 9:23, 71:7
**stuck** [4] - 23:25, 53:10, 77:9, 77:16
**study** [1] - 74:7
**studying** [1] - 17:17
**stuff** [1] - 36:20
**style** [1] - 32:17
**subjected** [1] - 38:1
**subsequently** [1] - 69:7
**substantially** [1] - 21:13
**successful** [1] - 81:17
**sufficient** [1] - 48:24
**suggest** [2] - 46:14, 49:22
**suggests** [2] - 45:24, 46:2
**support** [1] - 36:3
**suppose** [1] - 46:12
**supposed** [5] - 10:13, 11:9, 24:13, 27:1, 68:23
**surgeries** [2] - 31:23,

32:1
**surgery** [1] - 31:23
**survive** [1] - 71:23
**surviving** [1] - 56:13
**Sustained** [1] - 8:2
**sustained** [2] - 8:5, 8:7
**sworn** [1] - 7:19
**system** [2] - 9:2, 81:21

**T**

**table** [4] - 4:11, 4:21, 4:24, 22:24
**tall** [1] - 18:20
**TAMA** [1] - 2:18
**Tama** [1] - 4:22
**target** [1] - 60:11
**team** [7] - 27:1, 27:10, 27:11, 27:19, 29:21, 31:24
**ten** [2] - 44:20, 44:22
**terms** [2] - 40:22, 75:8
**terrified** [1] - 67:8
**terrifying** [1] - 39:12
**territory** [1] - 51:4
**testifies** [1] - 44:23
**testify** [4] - 35:13, 46:21, 52:5
**testifying** [3] - 46:20, 49:23, 51:10
**testimony** [8] - 37:24, 46:2, 46:15, 46:22, 49:22, 51:24, 78:19, 82:15
**THE** [84] - 1:11, 2:2, 4:2, 4:14, 5:3, 5:12, 5:15, 5:17, 5:19, 5:21, 6:16, 7:1, 7:3, 7:5, 7:13, 7:15, 8:2, 8:4, 8:21, 12:12, 12:14, 12:17, 21:4, 21:5, 21:19, 21:21, 21:25, 25:12, 25:14, 25:16, 25:18, 25:23, 26:2, 31:7, 31:10, 32:20, 32:23, 32:25, 33:12, 33:23, 34:6, 34:12, 35:2, 35:21, 36:11, 37:1, 37:3, 44:7, 44:11, 44:20, 45:1, 45:6, 45:10, 45:14, 48:17, 49:20, 51:9, 52:4, 52:9, 52:22, 52:25, 53:16, 53:22, 54:7, 54:9, 54:15, 54:19, 54:23, 55:13, 55:19, 55:22, 57:14, 57:15, 67:1, 67:2, 72:15, 74:5, 74:6, 78:2, 78:4, 81:25, 82:4, 82:8, 82:13
**there'd** [1] - 47:8
**there're** [1] - 65:17
**they've** [3] - 36:4, 49:17, 50:12
**thigh** [2] - 15:8, 32:5
**thin** [2] - 47:15, 51:21
**thinking** [5] - 28:22, 43:17, 43:20, 56:12, 82:2
**thinly** [1] - 47:5
**Thornton** [1] - 2:8
**three** [4] - 5:6, 28:19, 42:10, 71:21
**throughout** [2] - 19:20, 20:1
**tie** [6] - 24:11, 24:12, 26:23, 26:24, 27:3, 27:6
**tied** [2] - 24:14, 27:23
**tightening** [1] - 28:1
**today** [3] - 8:15, 9:13, 54:1
**Tom** [1] - 4:13
**took** [15] - 22:10, 27:24, 29:21, 42:11, 63:6, 64:9, 64:17, 64:21, 66:15, 69:4, 69:23, 74:9, 79:1, 79:5
**top** [1] - 30:25
**totally** [1] - 55:9
**tough** [1] - 54:15
**Trachten** [1] - 2:19
**traditional** [2] - 46:19, 47:12
**TRANSCRIPT** [1] - 1:10
**transcript** [1] - 1:21
**transcription** [2] - 1:22, 83:2
**translated** [1] - 40:15
**traverse** [1] - 57:25
**TRIAL** [1] - 1:10
**trial** [3] - 2:4, 4:11, 47:8
**tried** [5] - 8:17, 23:20, 23:24, 80:1, 81:16
**trouble** [2] - 52:25, 78:11
**true** [2] - 48:21, 53:7
**try** [6] - 32:8, 32:12, 35:7, 45:10, 54:19, 66:17
**trying** [5] - 20:18, 45:6, 56:13, 66:9, 71:22
**turn** [1] - 59:14
**turned** [2] - 57:5, 58:5
**turning** [1] - 57:11
**two** [12] - 5:4, 17:16, 20:7, 35:19, 38:5, 43:5, 45:17, 56:22, 64:6, 64:16, 70:6
**two-story** [1] - 43:5
**tying** [2] - 26:24, 29:12
**type** [1] - 15:12
**typically** [1] - 58:17

**U**

**under** [58] - 14:25, 18:5, 18:6, 33:8, 47:2, 48:1, 48:17, 48:18, 48:22, 49:1, 51:2, 51:25, 52:1, 52:2, 53:8, 56:10, 61:23, 62:1, 62:3, 62:4, 62:7, 62:17, 62:18, 62:21, 62:22, 62:25, 63:2, 63:5, 69:15, 70:20, 71:2, 71:13, 71:15, 72:1, 72:2, 72:19, 72:21, 72:24, 73:4, 73:5, 73:12, 73:23, 73:25, 74:21, 75:21, 76:19, 76:22, 76:24, 77:2, 77:8, 77:9, 77:11, 77:13, 77:16, 77:17, 80:3, 80:20, 81:8
**underneath** [7] - 15:2, 15:3, 16:2, 16:10, 63:4, 72:4, 77:14
**understood** [3] - 18:18, 19:10, 20:6
**underwent** [1] - 31:23
**unfortunately** [1] - 38:9
**uniform** [1] - 11:4
**unit** [1] - 54:13
**UNITED** [3] - 1:1, 1:4, 1:12
**United** [18] - 1:18, 2:5, 4:2, 4:3, 4:4, 4:5, 4:10, 5:10, 36:7, 37:17, 46:1, 46:3, 46:6, 51:7, 51:10, 82:9, 83:6
**unless** [2] - 34:19, 49:10
**unworkable** [1] - 36:18
**up** [54] - 5:25, 9:15, 10:2, 10:17, 10:24, 11:2, 11:23, 14:12, 14:18, 16:21, 19:5, 23:20, 23:22, 24:12, 24:14, 24:15, 26:24, 26:25, 27:2, 27:6, 27:23, 28:1, 30:25, 33:4, 33:7, 34:22, 35:5, 35:6, 35:7, 36:21, 37:3, 38:12, 38:14, 41:10, 41:11, 41:18, 44:17, 48:5, 56:22, 57:1, 57:8, 66:16, 68:2, 71:21, 71:22, 72:23, 74:20, 74:21, 75:22, 78:25, 79:17
**upstairs** [22] - 9:20, 10:1, 11:16, 14:3, 26:19, 27:9, 43:6, 43:13, 43:16, 43:19, 43:25, 44:4, 56:19, 58:6, 58:10, 60:6, 60:20, 61:7, 65:16, 68:14, 69:10
**US** [8] - 2:4, 20:22, 35:16, 35:17, 35:22, 36:3, 51:2, 53:1
**uses** [1] - 39:2
**utilizing** [1] - 4:18

**V**

**valuable** [1] - 20:16
**vantage** [1] - 62:15
**VEINTEMILLA** [1] - 2:16
**Veintemilla** [2] - 4:5, 4:23
**Veintemilla's** [1] - 5:17
**verify** [2] - 42:8, 73:6
**versus** [4] - 4:3, 4:4, 4:5
**Vert** [1] - 29:24
**victim** [1] - 80:23
**videoconference** [1] - 81:18
**view** [3] - 12:19, 12:20, 14:1
**Ville** [4] - 29:23, 29:24, 30:1, 30:10
**Vilson** [7] - 24:9, 24:10, 24:14, 26:21, 28:25, 29:1, 29:4
**Vladimir** [1] - 27:11
**voices** [4] - 17:18, 18:7, 18:11
**voir** [1] - 6:5
**volume** [2] - 10:25
**vs** [1] - 1:5
**vulnerable** [1] - 71:6

**W**

**wait** [3] - 26:1, 37:4, 60:21
**waiting** [1] - 71:10
**wake** [2] - 38:14, 68:1
**walk** [6] - 13:2, 13:4, 13:7, 13:21, 28:2, 57:1
**walking** [2] - 19:9, 19:19
**walls** [1] - 39:16
**Walter** [1] - 4:5
**wants** [4] - 46:13, 46:21, 51:18, 54:14
**warrants** [1] - 7:25
**watch** [7] - 21:11, 21:12, 22:14, 22:17, 22:20, 22:23, 22:25
**water** [11] - 25:11, 25:12, 25:13, 25:15, 25:16, 25:19, 25:20, 25:23, 26:2, 26:3
**wave** [1] - 75:23
**weak** [1] - 27:5
**weapon** [4] - 74:24, 75:7, 76:9, 77:22
**whoever's** [1] - 50:11
**whole** [1] - 9:21
**wild** [1] - 68:21
**window** [16] - 41:14, 41:20, 41:22, 41:24, 42:4, 42:5, 42:22, 43:22, 56:2, 56:6, 56:8, 56:16, 60:25, 61:17, 62:8, 69:19
**windows** [10] - 42:1, 44:2, 58:11, 58:12, 58:13, 59:4, 59:7, 60:1, 60:8, 71:9

**witness** [14] - 7:18, 14:4, 18:13, 21:3, 25:5, 31:16, 33:15, 44:23, 44:24, 45:2, 49:8, 51:11, 55:20, 82:11
**WITNESS** [7] - 21:5, 25:14, 25:18, 57:15, 72:15, 74:6, 78:4
**woman** [2] - 36:13, 77:25
**word** [2] - 48:19, 58:25
**words** [4] - 10:24, 14:24, 47:20, 50:23
**works** [3] - 9:2, 54:16, 55:16
**wound** [1] - 14:22
**wounds** [2] - 32:2, 32:3
**write** [4] - 6:2, 6:9, 6:20, 46:13
**writing** [2] - 6:19, 46:5
**written** [1] - 37:21
**wrote** [1] - 74:10
**WU** [4] - 2:3, 47:13, 49:6, 50:18
**Wu** [1] - 4:11

Y

**yard** [8] - 10:20, 10:21, 28:3, 28:8, 59:14, 65:13, 65:14
**years** [6] - 8:17, 9:9, 9:11, 9:12, 17:16
**yes-or-no** [1] - 79:19
**yesterday** [18] - 7:22, 8:8, 8:12, 8:13, 8:14, 9:8, 9:11, 9:12, 11:9, 11:17, 11:24, 14:6, 15:2, 28:19, 59:18, 62:16, 66:19, 67:5
**Yolanda** [2] - 6:17, 6:18
**yourself** [4] - 24:18, 57:10, 71:8, 71:9

Z

**zero** [1] - 36:17
**zone** [1] - 71:17